FILED BY FAX
PURSUANT TO LOCAL RULES

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
CASEY E. SADLER (#274241)
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JORGE SALHUANA, Individually and On
Behalf of All Others Similarly Situated,

    Plaintiff,

        v.

DIAMOND FOODS, INC., MICHAEL J.
MENDES, and STEVEN M. NEIL,

    Defendants.

Case No. _____ **CV 11 5386**

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

WHA

E-filing

FILED
2011 NOV -7 P 5:



1    Plaintiff Jorge Salhuana ("Plaintiff"), by and through his attorneys, alleges the

2   following upon information and belief, except as to those allegations concerning Plaintiff,

3   which are alleged upon personal knowledge. Plaintiff's information and belief is based upon,

4   among other things, his counsel's investigation, which includes without limitation: (a) review

5   and analysis of regulatory filings made by Diamond Foods, Inc. ("Diamond Foods" or the

6

7   "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review

8   and analysis of press releases and media reports issued by and disseminated by Diamond

9   Foods; and (c) review of other publicly available information concerning Diamond Foods.

10

## NATURE OF THE ACTION AND OVERVIEW

11

12    1.    This is a class action on behalf of purchasers of Diamond Foods' securities

13   between April 5, 2011, and November 1, 2011, inclusive (the "Class Period"), seeking to

14   pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

15    2.    Diamond Foods, Inc. was incorporated in Delaware in 2005 as the successor to

16   Diamond Walnut Growers, Inc., a member-owned California agricultural cooperative

17

18   association. In July 2005, Diamond Walnut Growers, Inc. merged with and into Diamond

19   Foods, Inc., converted from a cooperative association to a Delaware corporation and completed

20   an initial public offering of Diamond Foods' common stock. Diamond Foods engages in

21   processing, marketing and distributing snack products.

22

23    3.    Diamond Foods enters into exclusive purchase agreements with walnut growers

24   for their crops. According to the Company, under these agreements, the walnut growers

25   deliver their entire walnut crop to the Company during the fall harvest season and the

26   Company then determines the minimum price for the crops by March 31, or later, of the

27   following calendar year. The Company represents that it determines the purchase price in

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 1 -

1  good faith, taking into account market conditions, crop size, quality, and nut varieties, among

2  other relevant factors. Since the ultimate price to be paid by the Company to the walnut

3  growers is determined subsequent to receiving the walnut crop, the Company estimates the cost

4  of the walnuts for its interim financial statements.

5

6  4.     On April 5, 2011, the Company announced that it was going to acquire the

7  Pringles snack business (the "Acquisition") from The Procter & Gamble Company ("P&G").

8  The Company represented to investors that the Acquisition would be completed by December

9  2011.

10

11  5.     According to media reports, on or around September 25, 2011, an equity

12  research firm for hedge funds named Off Wall Street Consulting Group issued a report

13  questioning Diamond Foods' accounting practices with respect to walnut purchases.

14  Thereafter, on September 27, 2011, *The Wall Street Journal* published an article noting that as

15  walnut prices surged for the 2010 crop, Diamond Foods actually paid growers much less than

16  most buyers. Further, the article disclosed that on September 2, 2011, after the close of the

17  Company's 2011 fiscal year (July 31, 2011), the Company made an unusual extra

18  "momentum" payment to growers that growers had not received in past years. According to

19  the article, that payment would significantly impact the Company's 2011 fiscal year financial

20  results had it been made by July 31, 2011. The article estimates that the "momentum"

21  payments could total as much as $50 million, which if made prior to July 31, 2011, would have

22  substantially reduced the Company's $93 million in operating income that it had previously

23  reported for the entire 2011 fiscal year.

24

25

26  6.     On this news, shares of Diamond Foods declined $5.11 per share, or about

27  5.65%, to close on September 26, 2011, at $85.26 per share, on unusually heavy trading

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 2 -

volume, and shares of Diamond Foods further declined $3.20 per share, or 3.75%, to close on September 27, 2011, at $82.06 per share, also on unusually heavy trading volume.

7. On November 1, 2011, the Company disclosed that the Acquisition would be delayed until the first half of 2012. The Company revealed that the delay was the result of an internal investigation regarding payments to walnut growers. According to the Company, the investigation was prompted by the Chairman of the Audit Committee of the Company's Board of Directors receiving an external communication regarding Diamond's accounting for certain crop payments to walnut growers.

8. On this news, the Company's shares declined $11.33 per share, or 17.67%, to close on November 2, 2011, at $52.79 per share, on unusually heavy trading volume.

9. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was underestimating the ultimate price to be paid to walnut growers; (2) that the Company was improperly accounting for its cost of sales; (3) that, as a result, the Company's financial results were overstated; (4) that the Company lacked adequate internal and financial controls; (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times; and (6) that, as a result of the foregoing, the Company's positive statements about Diamond Foods' business, operations, and prospects, as well as those regarding the timetable for the Acquisition, lacked a reasonable basis.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3 -

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to §28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Additionally, the Company's principal executive offices are located in this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff Jorge Salhuana, as set forth in the accompanying certification, incorporated by reference herein, purchased Diamond Foods securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Diamond Foods is a Delaware corporation with its principle executive offices located at 600 Montgomery Street, 13th Floor, San Francisco, California 94111.

17.     Defendant Michael J. Mendes ("Mendes") was, at all relevant times, the Chairman of the Board, President and Chief Executive Officer ("CEO") of Diamond Foods.

18.     Defendant Steven M. Neil ("Neil") was, at all relevant times, Chief Financial Officer ("CFO") of Diamond Foods.

19.     Defendants Mendes and Neil are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Diamond Foods' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Diamond Foods, Inc. was incorporated in Delaware in 2005 as the successor to Diamond Walnut Growers, Inc., a member-owned California agricultural cooperative association. In July 2005, Diamond Walnut Growers, Inc. merged with and into Diamond Foods, Inc., converted from a cooperative association to a Delaware corporation and completed an initial public offering of Diamond Foods' common stock. Diamond Foods engages in processing, marketing and distributing snack products.

21.     Diamond Foods enters into exclusive purchase agreements with walnut growers for their crops. According to the Company, under these agreements, the walnut growers deliver their entire walnut crop to the Company during the fall harvest season and the Company then determines the minimum price for the crops by March 31, or later, of the following calendar year. The Company represents that it determines the purchase price in good faith, taking into account market conditions, crop size, quality, and nut varieties, among other relevant factors. Since the ultimate price to be paid by the Company to the walnut growers is determined subsequent to receiving the walnut crop, the Company estimates the cost of the walnuts for its interim financial statements.

### Materially False and Misleading
### Statements Issued During the Class Period

22.     The Class Period begins on April 5, 2011. On this day, Diamond Foods issued a press release entitled, "Diamond Foods to Merge P&G's Pringles Business into the Company." Therein, the Company, in relevant part, stated:

> SAN FRANCISCO and CINCINNATI, April 5, 2011 /PRNewswire-FirstCall/ --
> Diamond Foods, Inc. (NASDAQ:DMND - News) and The Procter & Gamble
> Company (NYSE:PG - News) today announced the signing of a definitive

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 6 -

1

agreement to merge the Pringles business ("Pringles") into Diamond Foods in a transaction valued at $2.35 billion.

2

3

4

5

6

7

"Pringles is an iconic, billion dollar snack brand with significant global manufacturing and supply chain infrastructure," said Michael J. Mendes, Chairman, President and CEO of Diamond Foods. "Our plan is to build upon the brand equity Pringles has established in over 140 countries. This strategic combination will create an independent, global leader in the snack industry with a focus on quality and innovative products. Not only is this combination immediately accretive, it also creates a platform that we believe will allow us to build shareholder value for years to come."

8

9

10

"We are confident Diamond Foods will be an excellent new home for our Snacks employees," said Bob McDonald, Chairman of the Board, President and Chief Executive Officer of P&G. "This is also a terrific deal for our shareholders – maximizing value and minimizing earnings per share dilution."

11

12

13

14

15

Pringles® is the world's largest potato crisp brand with sales in over 140 countries and manufacturing operations in the U.S., Europe and Asia. The global, iconic brand has been built over 45 years with a combination of proprietary products, unique package design and significant advertising investment. Pringles will join Diamond's dynamic portfolio of brands, which includes Diamond of California® and Emerald® nuts, Pop Secret® microwave popcorn and Kettle Brand® potato chips, creating a premium snack-focused company with total revenues of approximately $2.4 billion.

16

17

The combination will more than triple the size of Diamond's snack business and:

18

• Increase scale in U.S. grocery, mass merchandise, drug and convenience channels to gain greater merchandising and distribution influence;

19

20

21

• Leverage Diamond's sales and distribution infrastructure through a more than doubling of snack sales in the U.S. and U.K., which are Pringles' two largest markets;

22

23

• Gain a broader global manufacturing and supply chain platform, with access into key growth markets around the world, including Asia, Latin America and Central Europe;

24

25

26

• Increase Diamond's geographic diversity, with international sales accounting for approximately 49 percent of total revenues on a pro forma basis.

27

28

Diamond Foods has a history of building, acquiring and energizing brands through product and package innovation, efficient distribution and brand

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 7 -

1   investment. The Company's total revenues have doubled and earnings per share (EPS) have grown more than four-fold in the past five years.

2

3   Diamond of California brand has grown from a single product offering to a full line of culinary nuts over the past decade. Today, Diamond is the category leader with a market share ten times larger than the nearest branded competitor. Emerald, which was launched in 2004, is the fastest growing and second largest brand in the snack nut category. In 2008, the Company acquired and successfully integrated Pop Secret microwave popcorn, and by revitalizing the brand, Diamond has gained over 350 basis points of market share to 26 percent today. In 2010, the Company acquired Kettle Brand potato chips and has fueled double-digit organic growth in its first year of ownership while investing in new products and operational infrastructure.

4

5

6

7

8

9   Financial Benefit for Diamond Foods Shareholders

10  Assuming Pringles had been owned for all of fiscal year 2011, the combined company would be expected to deliver the following estimated financial results on a pro forma basis for fiscal year 2011:

11

12

13  • Net sales of approximately \$2.4 billion;

14  • Double-digit accretion to earnings per share (EPS), excluding merger and integration costs;

15

16  • Estimated earnings before interest, taxes, depreciation and amortization (EBITDA), including \$25 million in synergies, of approximately \$398 million to \$410 million.

17

18  For fiscal year 2012, Diamond anticipates strong growth in its core business with EPS of \$2.85 to \$2.98 per share on a standalone basis, an increase of 15 percent to 20 percent from the midpoint of its fiscal 2011 guidance range, which represents a 30 percent increase over 2010 EPS.

19

20

21  Combined results for Diamond plus the Pringles business for fiscal year 2012 will depend on the actual closing date of the transaction. Assuming the transaction closes by the end of calendar 2011, seven months of Pringles performance would be included in the following expected results:

22

23

24  • Fiscal 2012 total net sales are estimated to be approximately \$1.8 billion;

25

26  • Fiscal 2012 EPS, before costs associated with the transaction and integration, are estimated to range from \$3.00 to \$3.10 per share, which reflects EPS accretion of 12 to 15 cents per share

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 8 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The transaction is expected to significantly increase cash flow and accelerate the de-levering of Diamond's balance sheet. Pro forma leverage at closing is projected to be below four times EBITDA, and projected to drop below three times at the end of fiscal 2013. Cash flow after brand investments and capital expenditures is expected to approach $200 million in the first full fiscal year after closing the merger.

Financial Value for P&G Shareholders

The tax–efficient deal structure maximizes value for P&G shareholders and minimizes annual earnings dilution. The transaction will result in a one-time earnings increase for P&G of approximately $1.5 billion after tax or approximately $0.50 per share. P&G expects only modest EPS dilution of $0.02 to $0.04 on an annualized basis. The stock exchange with Diamond will reduce outstanding P&G shares, partially offsetting the Pringles earnings impact. Updated financial impacts will be provided when the transaction is completed.

Transaction Details

P&G expects the separation to occur through a "split-off" transaction in which P&G shareholders can elect to participate in an exchange offer to exchange P&G shares for shares of Diamond. Under the terms of a split-merge agreement, P&G will establish a separate entity to hold the Pringles business, which will be distributed to electing P&G shareholders in a tax-efficient transaction with a simultaneous merger with Diamond. This "Reverse Morris Trust" transaction has been approved by the boards of both companies. We expect to finalize the details of this transaction in the coming months.

The value of the transaction is $2.35 billion, comprising $1.5 billion in Diamond common stock, consisting of 29.1 million shares for approximately 57 percent of the outstanding shares of the combined company, and the assumption of $850 million of Pringles debt. Diamond's existing shareholders would continue to own approximately 43 percent of the combined company.

The parties have also agreed to a collar mechanism that would adjust the amount of debt assumed by Diamond based upon Diamond's stock price during a trading period prior to the commencement of the Exchange Offer. The amount of debt to be assumed by Diamond could increase by up to $200 million or decrease by up to $150 million based on this adjustment mechanism.

Diamond expects to incur one-time costs of approximately $100 million related to the transaction over the next two years. P&G also will provide Diamond transition services for up to 12 months after closing.

Leadership, Approvals and Timing

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 9 -

1    The combined business will be managed by Diamond's executive team and board
     of directors, led by Michael J. Mendes, Chairman, President and CEO. The
2    company's headquarters will remain in San Francisco, California.

3    The transaction is subject to approval by Diamond shareholders and the
     satisfaction of customary closing conditions and regulatory approvals. The
4    transaction is expected to be completed by the end of calendar 2011.

5
     23.    On June 2, 2011, the Company issued a press release entitled, "Diamond Foods
6
7    Raises Guidance After Strong Third Quarter." Therein, the Company, in relevant part, stated:

8    SAN FRANCISCO, June 2, 2011 (GLOBE NEWSWIRE) -- Diamond Foods, Inc.
     (Nasdaq:DMND) today reported strong financial results for its third quarter of
9    fiscal 2011 and raised guidance for fiscal year 2011.

10   For the three months ended April 30, 2011 non-GAAP diluted earnings per share
11   (EPS) was $0.52 and non-GAAP net income was $11.8 million, 91 percent above
     the prior year's comparable net income. On a GAAP basis, EPS was $0.34
12   compared to $(0.22) for the prior year's comparable period. This year's GAAP
     EPS included costs associated with the announced merger with Pringles and
13   integration costs associated with the Kettle acquisition, while last year's GAAP
14   EPS included costs associated with the Kettle acquisition.

15   "Our business performed well during the quarter, including double digit organic
16   growth in our snack portfolio," said Michael J. Mendes, Chairman, President and
     CEO. "Based on our strong overall performance and effective integration of
17   Kettle, we have increased our financial guidance for the year. We're off to a
     strong start in planning for the integration of Pringles, and are encouraged by the
18   prospects for the new combined entity."

19
     24.    On June 2, 2011, the Company filed its Quarterly Report on Form 10-Q with the
20
21   SEC for the 2011 fiscal third quarter. The Company's Form 10-Q was signed by Defendant

22   Neil and reaffirmed the Company's financial results previously announced that same day. The

23   Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by

24   Defendants Mendes and Neil, who certified:

25
     1.     I have reviewed this quarterly report on Form 10-Q for the quarter ended
26          April 30, 2011 of Diamond Foods, Inc.;

27
     2.     Based on my knowledge, this report does not contain any untrue
28          statement of a material fact or omit to state a material fact necessary to

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 10 -

1
2
make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3
4
5
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

6
7
8
9
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

10
11
12
13
(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

14
15
16
17
(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

18
19
20
21
(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

22
23
24
25
(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

26
27
28
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 11 -

1

2

3

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

4

5

6

    (b)    Any fraud, whether or not material, that involves management    or other employees who have a significant role in the registrant's internal control over financial reporting.

7

    25.    Additionally, the Company's Form 10-Q filed on June 2, 2011, in relevant part,

8

stated:

9

10

11

12

On April 5, 2011, Diamond entered into a definitive agreement with The Procter & Gamble Company ("P&G") to merge P&G's Pringles business into the company. The value of the proposed transaction is approximately $2.35 billion, consisting of $1.5 billion in Diamond common stock and the assumption of $850 million of Pringles debt. The equity portion of the purchase price is represented by approximately 29.1 million shares.

13

14

15

16

17

18

The transaction, which is expected to be completed by the end of calendar 2011, is subject to approval by Diamond's and P&G's stockholders and satisfaction of customary closing conditions and regulatory approvals. Diamond expects to incur one-time costs of approximately $100 million related to the transaction over the next two years. P&G will also provide Diamond with transition services for up to 12 months after closing. The merger will be accounted for as a purchase business combination and for accounting purposes, Diamond will be treated as the acquiring entity.

19

\*    \*    \*

20

21

22

23

24

25

26

27

28

We have entered into long-term Walnut Purchase Agreements with growers, under which they deliver their entire walnut crop to us during the Fall harvest season and we determine the purchase price for this inventory by March 31, or later, of the following year. This purchase price will be a price determined by us in good faith, taking into account market conditions, crop size, quality, and nut varieties, among other relevant factors. Since the ultimate price to be paid will be determined subsequent to receiving the walnut crop, we must make an estimate of price for interim financial statements. Those estimates may subsequently change and the effect of the change could be significant. *In the three months ended April 30, 2011, the Company revised its estimate for expected commodity costs which resulted in a pre-tax decrease in cost of sales of approximately $1.5 million for sales recognized in the first six months of fiscal year 2011. In the three months ended April 30, 2010, the Company revised its estimate for expected commodity costs which resulted in a pre-tax*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 12 -

1

*decrease in cost of sales of approximately $1.1 million for sales recognized in the first six months of fiscal year 2010.*

2

(Emphasis added).

3

4      26.    On June 21, 2011, Diamond Foods issued a press release entitled, "Diamond

5   Foods Announces Expiration of Hart-Scott-Rodino Act Waiting Period for Acquisition of

6   Pringles." Therein, the Company, in relevant part, stated:

7

8

9

10

11

SAN FRANCISCO, Jun 21, 2011 (GlobeNewswire via COMTEX) -- Diamond Foods, Inc. (Nasdaq:DMND) today announced that the waiting period for U.S. antitrust review under the Hart-Scott Rodino Antitrust Improvements Act of 1976 for Diamond Foods' pending acquisition of the Pringles business from The Procter & Gamble Company expired on June 20, 2011. The pending acquisition remains subject to regulatory approval by competition authorities in various jurisdictions outside the United States.

12

13

14

15

On April 5, 2011, Diamond Foods announced the signing of a definitive agreement to acquire the Pringles business from The Procter & Gamble Company in a Reverse Morris Trust transaction valued at $2.35 billion. The transaction, expected to close by the end of this calendar year, is also subject to satisfaction of other conditions including approval by Diamond's stockholders.

16      27.    On July 27, 2011, Diamond Foods issued a press release entitled, "Diamond

17   Foods Receives Clearance on Pringles Acquisition From U.K. Office of Fair Trading."

18   Therein, the Company, in relevant part, stated:

19

20

21

Diamond Foods, Inc. (Nasdaq:DMND) today announced that it has received clearance from the United Kingdom's Office of Fair Trading (OFT) on its pending acquisition of the Pringles business from The Procter & Gamble Company.

22

23

24

The clearance by the OFT follows Diamond's June announcement that the waiting period for U.S. antitrust review under the Hart-Scott Rodino Antitrust Improvements Act of 1976 for Diamond Foods' pending acquisition of the Pringles business from The Procter & Gamble Company expired on June 20, 2011.

25

26

27

28

On April 5, 2011, Diamond Foods announced the signing of a definitive agreement to acquire the Pringles business from The Procter & Gamble Company in a Reverse Morris Trust transaction valued at $2.35 billion. The transaction, expected to close by the end of this calendar year, is also subject to satisfaction of other conditions, including approval by Diamond's stockholders.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 13 -

28.     On August 3, 2011, Diamond Foods issued a press release entitled, "Diamond Foods Receives Final Anti-Trust Clearance on Pringles Acquisition." Therein, the Company, in relevant part, stated:

> Diamond Foods, Inc. (Nasdaq:DMND) today announced that The Antimonopoly Committee of Ukraine has granted its approval to Diamond Foods, Inc. for its pending acquisition of the Pringles business from The Procter & Gamble Company. Earlier this summer Diamond received clearances from U.S., U.K. and German authorities. With today's announcement, Diamond has received all antitrust clearances required for the transaction.
>
> On April 5, 2011, Diamond Foods announced the signing of a definitive agreement to acquire the Pringles business from The Procter & Gamble Company in a Reverse Morris Trust transaction valued at $2.35 billion. The transaction, expected to close by the end of this calendar year, remains subject to the satisfaction of other closing conditions, including approval of Diamond's stockholders.

29.     On September 15, 2011, Diamond Foods issued a press release entitled, "Diamond Reports Record 2011 Results and Raises Guidance for Fiscal 2012." Therein, the Company, in relevant part, stated:

> SAN FRANCISCO, Sept. 15, 2011 (GLOBE NEWSWIRE) -- Diamond Foods, Inc. (Nasdaq:DMND) today reported record financial results for its fiscal 2011 fourth quarter and full year.
>
> For the three months ended July 31, 2011, the first full comparable quarter since the acquisition of Kettle Foods, non-GAAP net income grew 58 percent to $11.9 million and non-GAAP fully diluted earnings per share (EPS) grew 53 percent over the prior year's quarter to $0.52. During the quarter, the Company incurred $9.4 million in acquisition and integration costs related to the purchase of Kettle Foods in 2010 and the pending acquisition of Pringles. Including these charges, GAAP net income grew 27 percent to $8.5 million and GAAP fully diluted EPS was $0.37, up 23 percent.
>
> For the twelve months ended July 31, 2011, non-GAAP net income grew 61 percent over the prior year period to $59.0 million and non-GAAP EPS grew 37 percent to $2.61. Including $16.8 million in acquisition and integration costs related to the purchase of Kettle Foods in 2010 and the pending acquisition of Pringles, GAAP earnings grew 92 percent to $50.2 million, and GAAP EPS grew 63 percent to $2.22.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 14 -

1

2

3

4

"Our base Diamond business delivered record financial results this quarter, with our snack portfolio up a solid 16 percent on an organic basis," said Michael J. Mendes, Chairman, President and CEO. "We're particularly pleased that we could achieve such strong performance while effectively managing the Pringles integration."

5

\*     \*     \*

6

7

8

-- On August 3, 2011, the Company received the last of its antitrust clearances required for its pending merger of the Pringles business into Diamond in a Reverse Morris Trust transaction. The transaction is expected to close in December of this year.

9

10

11

12

13

14

15

30.     On September 15, 2011, the Company filed its Annual Report on Form 10-K with the SEC for the 2011 fiscal year. The Company's Form 10-K was signed by Defendants Mendes and Neil, and reaffirmed the Company's financial results previously announced that same day. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Mendes and Neil, substantially similar to the certifications contained in ¶24, *supra.*

16

17

18

31.     Additionally, the Company's Form 10-K filed on September 15, 2011, in relevant part, stated:

19

Pending Pringles Merger

20

21

22

23

24

25

26

27

28

On April 5, 2011, we entered into a definitive agreement with The Procter & Gamble Company ("P&G") to merge P&G's Pringles business into our Company. The value of the proposed transaction at April 5, 2011 was approximately \$2.35 billion, consisting of \$1.5 billion of our common stock and the assumption of \$850 million of Pringles debt. The number of shares of our common stock to be issued in the transaction was based on \$1.5 billion divided by the average of 60 days of daily volume weighted average prices, or 60-day VWAP, of our common stock for the period ended March 28, 2011 of \$51.47, which amounted to approximately 29.1 million shares of our common stock to be issued to Pringles stockholders in connection with the transaction. As of September 14, 2011, the value of the approximately 29.1 million shares of our common stock to be issued in the transaction was \$2.2 billion. The parties have also agreed to a collar mechanism that would adjust the amount of debt assumed by us based upon our price during a trading period prior to the commencement

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 15 -

1

2

3

of the Exchange Offer. The amount of debt to be assumed by us could increase by up to \$200 million or decrease by up to \$150 million based on this adjustment mechanism. The equity portion of the purchase price is represented by approximately 29.1 million shares.

4

5

6

7

8

The transaction, which is expected to be completed by the end of calendar 2011, is subject to approval by our stockholders and satisfaction of customary closing conditions and regulatory approvals. We expect to incur one-time costs of approximately \$150 million, net of income taxes, related to the transaction over the next two years. P&G will also provide us with transition services for up to 12 months after closing. The merger will be accounted for as a purchase business combination and for accounting purposes, we will be treated as the acquiring entity.

9

10

11

12

13

14

15

16

17

18

19

32. The statements contained in ¶¶22-31 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was underestimating the ultimate price to be paid to walnut growers; (2) that the Company was improperly accounting for its cost of sales; (3) that, as a result, the Company's financial results were overstated; (4) that the Company lacked adequate internal and financial controls; (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times; and (6) that, as a result of the foregoing, the Company's positive statements about Diamond Foods' business, operations, and prospects, as well as those regarding the timetable for the Acquisition, lacked a reasonable basis.

20

21

22

23

33. According to media reports, on or around September 25, 2011, an equity research firm for hedge funds called Off Wall Street Consulting Group issued a report questioning Diamond Foods' accounting practices for walnut purchases.

24

25

34. Thereafter, on September 27, 2011, *The Wall Street Journal* published an article entitled, "Hidden Flaw in P&G's Diamond Deal." Therein, the article, in relevant part, stated:

26

27

Procter & Gamble's plan to combine its Pringles unit with Diamond Foods should come with a warning label: Old business problems won't disappear.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 16 -

P&G has agreed to unload the potato-chip unit in a deal where its investors can choose to swap some of their shares for a stake in Diamond, the snack and nut company that is buying Pringles. The transaction, which was announced in April but hasn't closed, needs enough P&G shareholders to take that option, so that they end up owning 57% of Diamond foods. The deal would let P&G exit the food business to concentrate on household products. In turn, Diamond would become the second-largest snack company after PepsiCo, owner of Frito-Lay.

But before opting for shares in the merged company, which keeps the Diamond name, investors should take a closer look at its historical business: walnuts. Diamond uses multi-year contracts that allow it to set walnut prices unilaterally—a practice that is causing uproar among growers.

*As walnut prices surged for the 2010 crop, Diamond paid growers much less than most buyers, according to several growers interviewed by The Wall Street Journal. And yet on September 2, Diamond made an extra "momentum" payment to growers they hadn't received in past years. The payment sizes varied, but averaged 25 cents a pound or more, growers say. By email, Diamond says: "In an effort to optimize cash flow for growers, particularly in light of the delayed harvest, we issued a momentum payment to growers that provides additional cash flow in the fall consistent with the current market environment as we enter the 2011 harvest."*

A deal with Diamond Foods would allow P&G to exit the food business.

*That payment is critical to investors because it would have made a big dent in Diamond's earnings had it been made by July 31, when the company's fiscal year ended. The company declined to specify the size of the payment, but it's possible to make a decent estimate. According to the Department of Agriculture, one billion pounds of California walnuts were sold in the 2010 crop. Diamond disclosed that in 2005 it bought 283 million pounds of walnuts, or about 40% of California's production. So conservatively assuming it bought 20% of 2010's output, the momentum payments would total $50 million. That compares with $93 million in operating income for the entire fiscal year.*

*Even with the September payment, growers still look underpaid for the 2010 crop. Independent grower Ryan Palm, for example, says he received about 70 cents a pound before the momentum payment and less than $1 a pound if it's included. The Department of Agriculture says the average price per pound was $1.06 for all California walnuts in the 2010 crop. Some varieties sold for far more.*

Pressure from growers could quickly become an issue for Diamond. After all, growers can go elsewhere when contracts expire and exports to places like China and Turkey have been surging.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 17 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

That makes the Pringles deal all the more important for Diamond as a way to diversify away from walnuts, which account for nearly 30% of sales, estimates Ed Aaron of RBC Capital Markets. Apart from Walnuts, Diamond owns snack brands like Kettle chips and Pop Secret. It says the combined company's sales would have been \$2.4 billion last fiscal year including Pringles, rather than its actual \$966 million.

Diamond's shares have surged 51% since the deal announcement, trading at 27.3 times earnings for the year ending next July. That valuation helps P&G get a big price for Pringles, whose shareholders will get a fixed number of Diamond shares. But with the walnut business looking strained, Diamond stock could soon begin to crack.

(Emphasis added).

35.     On this news, shares of Diamond Foods declined \$5.11 per share, or about 5.65%, to close on September 26, 2011, at \$85.26 per share, on unusually heavy trading volume, and shares of Diamond Foods further declined \$3.20 per share, or 3.75%, to close on September 27, 2011, at \$82.06 per share, also on unusually heavy trading volume.

36.     On October 3, 2011, the Company issued a press release entitled, "Media Statement -- Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance." Therein, the Company, in relevant part, stated:

Diamond Foods, Inc. (Nasdaq:DMND) *made a pre-harvest momentum payment to walnut growers in early September, prior to the delivery of the fall walnut crop to reflect the fiscal 2012 projected market environment.* The payment is accounted for in fiscal 2012 cost of goods sold and is reflected in the guidance provided by the company on September 15, 2011.

Diamond reaffirms the guidance provided in its press release dated September 15, 2011, which reflects not only higher commodity costs expected in fiscal 2012, but also recent retail price increases taken for its products. Diamond believes it has an ample walnut supply for both the retail and value-added, non-retail business.

### Financial Outlook

For the first half of fiscal 2012, for Diamond on a standalone basis, we expect total net sales of between \$540 million to \$560 million, an increase in

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 18 -

1    advertising investment of 20-25% over the first half of 2011 and non-GAAP
     EPS ranging from $1.65 to $1.75. We expect the distribution of earnings
2    between Q1 and Q2 to be similar to last year's first half.

3    For the full year of fiscal 2012, we expect non-GAAP EPS to range from $3.05
4    to $3.15, assuming the Pringles transaction closes in the first half of December
     and reflects:

5
6         •    Net sales of between $1.85 billion and $1.95 billion;

7         •    An estimated operating margin of between 11.5 percent and 12.0
               percent;
8
9         •    Interest expense of between $40 million to $45 million;

10        •    An effective tax rate of 27 percent to 30 percent;

11        •    Outstanding share count of 42 million to 43 million;

12
          •    Capital expenditures of $75 million to $85 million;
13
14        •    EBITDA of $300 million to $310 million;

15        •    Transaction and integration costs of $150 million associated with the
               Pringles transaction over the next two years.
16

17   (Emphasis added).

18        37.    The statements contained in ¶36 were materially false and/or misleading when

19   made because defendants failed to disclose or indicate the following: (1) that the Company was

20   underestimating the ultimate price to be paid to walnut growers; (2) that the Company was

21
     improperly accounting for its cost of sales; (3) that, as a result, the Company's financial results
22
23   were overstated; (4) that the Company lacked adequate internal and financial controls; (5) that,

24   as a result of the foregoing, the Company's financial statements were materially false and

25   misleading at all relevant times; and (6) that, as a result of the foregoing, the Company's

26   positive statements about Diamond Foods' business, operations, and prospects, as well as those
27
28   regarding the timetable for the Acquisition, lacked a reasonable basis.

**Disclosures at the End of the Class Period**

38.     On November 1, 2011, the Company issued a press release entitled, "Diamond Foods Provides Update on Pringles Transaction." Therein, the Company, in relevant part, stated:

> Diamond Foods, Inc. (Nasdaq:DMND) today announced that its previously announced acquisition of the Pringles snack business from The Procter & Gamble Company ("P&G") is now expected to close in the first half of calendar 2012. Diamond and P&G had previously expected the closing to occur in December of 2011.

> Diamond and P&G have revised the expected closing date of the acquisition following the receipt by the Chairman of the Audit Committee of Diamond's Board of Directors of an external communication regarding Diamond's accounting for certain crop payments to walnut growers. In response to the communication, Diamond's Audit Committee decided to perform an investigation of this matter. Management is fully committed to supporting the Audit Committee in this process.

> Closing of the Pringles transaction remains subject to customary closing conditions and completion of an exchange offer by P&G. Antitrust approvals required for the transaction have already been obtained.

39.     On this news, the Company's shares declined $11.33 per share, or 17.67%, to close on November 2, 2011, at $52.79 per share, on unusually heavy trading volume.

40.     On November 3, 2011, *The Wall Street Journal* published an article entitled, "Investors Punish Diamond for Delay: *Stock Drops 18% as Questions About Company's Accounting Force Postponement of Pringles Purchase*." Therein, the article, in relevant part, stated:

> Investors reacted harshly Wednesday to questions about accounting at Diamond Foods Inc. that forced the snack maker to delay its $2.35 billion acquisition of Pringles into next year.

> The company's stock fell 18% to $52.79 a share, a level that, if sustained, would make the deal $150 million more expensive than it would have been before Diamond announced the delay.

> A worker views harvested walnuts. The questions at Diamond involve the company's accounting for crop payments to walnut growers.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 20 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Late Tuesday, Diamond said it would investigate allegations sent to the chairman of the board's audit committee, Edward A. Blechschmidt, regarding Diamond's accounting for certain crop payments to walnut growers.

The company didn't detail the allegations or say who sent them, but a person familiar with the matter said they didn't come from the Securities and Exchange Commission or another enforcement agency. Mr. Blechschmidt didn't return calls seeking comment.

The investigation centers around the timing of a recent payment to walnut growers for their 2011 crop, which currently is being harvested, another person familiar with the matter said.

Under the long-term contracts Diamond uses to buy walnuts, the company takes delivery in the fall and then decides the following year what to pay growers—potentially not until the July 31 end of its fiscal year, according to the company's securities filings.

In between, the company reports estimated prices in its financial statements. The company warns that those estimates can change significantly.

*On Sept. 2, Diamond made what it called a "momentum" payment to growers, who said it arrived just after they received their final payment for their 2010 crop as usual in August.*

*The company told growers in a terse letter in late August that the momentum payment was an advance on the 2011 crop yet to be delivered. But growers said they didn't recall receiving that sort of payment in past years. Some analysts and growers speculated that the timing of the payment—more than 30 days after the close of the 2011 fiscal year—was meant to make that year's costs appear lower than they actually were.*

*"We believe the basis of the investigation is whether the momentum payment was properly accounted for," RBC Capital analyst Ed Aaron said in a report.*

The company has said the payment is accounted for in its fiscal 2012 cost of goods sold and reflected in its earnings forecast for the year.

*In prior years, analysts say, Diamond has sent growers one lump sum in August covering the final payment for the previous year and a momentum payment for the coming year. The company wouldn't say if that was the case or why it decided to separate the payments this year.*

*After the market closed on Sept. 15, Diamond reported that its fourth-quarter earnings rose a better than expected 27% to $8.5 million, with help from*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 21 -

*stronger sales and a tax benefit. The company's shares climbed nearly 12% the following day and closed at $87.30.*

*Diamond is using its stock to buy Pringles. Under the deal, Procter & Gamble shareholders will end up owning 57% of Diamond. In addition to turning over the shares, Diamond has agreed to assume $850 million in Pringles debt.*

*If the company's share price is averaging more than $56.62 when the deal closes, Diamond will have to take on only $700 million in debt, according to Diamond's securities filings. But if the price falls below $44.61, it will have to take on $1.05 billion in debt.*

An official with one institutional investor with just over 70,000 Diamond Foods shares and eight million P&G shares said the unexpected setback in completing the Pringles purchase troubles some investors. "Diamond Foods needs to get to the bottom of this," the official said. "Is this an isolated incident? Or is it a pattern of behavior?"

*If Diamond does find that it materially misrepresented its accounting for grower payments, the company could have to restate its financial reports, said Lynn Turner, a former chief accountant for the Securities and Exchange Commission.*

A big enough breach could give P&G room to cancel or renegotiate the sale, though analysts don't think that outcome is likely. P&G is still committed to closing the sale, a spokesman said.

(Emphasis added).

41.    On November 3, 2011, *The Wall Street Journal* published an article entitled, "Procter & Gamble's Diamond Loses Its Sparkle." Therein, the article, in relevant part, stated:

Once you pop, you can't stop—that has been true of Diamond Foods in recent years as it gorged on snack-food acquisitions. But with the deal to acquire Pringles from Procter & Gamble in question, it may be tough to get the party started again.

Diamond shares plunged 18% Wednesday following an announcement the night before that the audit committee was investigating how the company accounted for crop payments to walnut growers. P&G said it wants to see the matter resolved before proceeding with the deal and delayed the expected close to next year, rather than December.

If the Pringles deal crumbles, so too could Diamond's hopes of transforming into a high-margin snacks conglomerate.

1

*At issue is an extra payment Diamond made to walnut farmers in September,
which may have related to walnuts purchased in the previous fiscal year. The
payment, estimated at $50 million based on Wall Street Journal interviews
with walnut farmers, would have reduced the company's operating income by
more than 50% had it been included in results for the year ended July.*

If the Pringles deal crumbles, so too could Diamond's hopes of transforming
from a nuts company to a high-margin snacks conglomerate. Back in 2005,
nearly 70% of the company's sales were walnuts. But the company has since
spent more than $800 million to acquire Pop Secret and Kettle Chips, bringing
its net debt to $529 million. That compares with earnings before interest, taxes,
depreciation and amortization of about $140 million last fiscal year, a figure that
would have been lower including the September walnut payment.

It isn't just cash that could get tight. The company wants to use its shares as a
currency to buy Pringles, but the stock would likely fall hard without a deal.
Even after Wednesday's plunge, the stock trades at about 20 times earnings for
the year through July. Without deals to boost the top line, such a multiple looks
rich.

It is true Diamond shares could justify a level even higher if the Pringles deal
closes. But if it cracks, it's a long way to the bottom.

(Emphasis added).

42.     On November 5, 2011, *Barron's* published an article entitled, "Getting to the

Nut of the Problem." Therein, the article, in relevant part, stated:

After nearly a century as a walnut growers' cooperative, Diamond Foods broke
out of its shell with a 2005 initial public offering. The San Francisco company,
which also sells pine nuts, almonds and pecans, proceeded to gobble up snack
brands that included Pop Secret popcorn and Kettle chips—and promoting them
with cheeky television ads, among them, an annual 30-second spot on the Super
Bowl.

In April, Diamond (ticker: DMND) took an even bigger bite, announcing plans
to acquire the Pringles chips business from Procter & Gamble (PG) in exchange
for Diamond stock. Those shares had themselves become a premium brand.
Endorsements from mutual-fund manager Ron Baron and CNBC's Jim Cramer
helped the snack company's stock climb over the past three years from about 20
bucks to an all time high of 92 in mid-September.

Then, The Wall Street Journal talked to some walnut growers and found serious
issues with Diamond's accounting—issues that had escaped the eagle-eyed

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 23 -

1

2

3

advisors on the Pringles deal: Bank of America Merrill Lynch, Morgan Stanley and the Blackstone Group. On Tuesday, Diamond delayed the Pringles closing while the audit committee of its board of directors investigates how Diamond accounted for its walnut-crop payments. Diamond's shares closed late Friday at $46.40, below their level when the Pringles plan was announced.

4

5

After Diamond's walnut accounting gets scrutiny, the stock could get crushed again.

6

7

Suspect accounting for walnut purchases could crack snack-food producer Diamond Foods' deal to buy Pringles from Procter & Gamble.

8

9

10

11

12

13

Diamond's problems come from its legacy business as a walnut processor, which Chief Executive Michael Mendes has been hustling to push backstage via his purchases of snack brands. At the same time, walnut growers say that the company has underpaid them in recent years. Rio Oso, Calif., grower Pat Mecklenburg remembers when she realized that Diamond was turning its back on walnuts: She poured out one of the company's Emerald brand pouches of trail mix, and there was one walnut in the whole package. "Ever since Diamond came public," says Mecklenburg, "they've become less and less competitive with other handlers, until the point that it just got ridiculous."

14

15

16

17

18

19

Even after the selloff, Diamond shares look pricey. The acquisitive outfit has no tangible book value. It reported earnings for the fiscal year ended July 2011 of $2.61 a share (ignoring pesky noncash charges, like option expenses), so Diamond's multiple on those trailing earnings is a generous 18 times. And 2011 earnings were likely overstated, says Mark Roberts, whose Off Wall Street Consulting Group rang the first alarm about Diamond's nutty accounting on Sept. 25, when most of Wall Street was still cheering the company on. Had Diamond properly booked costs for fiscal 2011, Roberts estimates, it would've earned as little as $1.14 a share.

20

21

22

23

Diamond declined to talk about the walnut investigation, but a spokesman said that both Diamond and P&G remain committed to completing a Pringles deal next year, which would double the company's sales. Yet if questions arise about Diamond's "representations and warranties" as it offered its shares to P&G shareholders in exchange for the Pringles business, the deal could fall apart—or at least become much more expensive for Diamond.

24

25

26

27

Diamond's co-op members got more than half the company's stock in the IPO and signed contracts to sell their entire crop to Diamond for a term of three, five or 10 years. Happily for the farmer shareholders and all others, the stock rose steadily from its IPO price of 17. At the same time, however, many growers became unhappy with their multiyear contracts with Diamond.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 24 -

1

2

3

Over its history, Diamond had paid growers around a third of the fall crop's estimated value within two weeks of receiving delivery, typically in November. It made another small payment in February of the following year, and the final 65% in August. Diamond ought to have booked these payments, or estimates thereof, as costs against the matching revenues from the prior fall's crop.

4

5

6

7

In good years, Diamond paid a little less than other handlers, says Jonathan Field, the general manager of the Walnut Bargaining Association, because Diamond committed to take a grower's entire crop, and because in years of weak demand, it paid a little more than the market price. In 2008, prices tanked to about 60 cents a pound, recalls Field, but Diamond paid more than 70 cents.

8

9

With recent demand booming for walnuts as a protein-packed snack with healthy, omega-3 fatty acids, Diamond's payments for the fall 2010 crop came short of market prices. "Woefully short," says Field.

10

11

12

13

14

Then, in early September, Diamond sent growers something it called "a momentum payment" of 30 to 40 cents a pound. The company said the payment was for the coming 2011 crop, but farmers believe it was really a way to bring Diamond's price for their 2010 crop closer to market rates. Transaction records examined by Off Wall Street's Roberts showed that, until 2009, Diamond had called its August check the "final payment" for the prior year's crop.
The Bottom Line

15

16

17

Diamond Foods' shares have fallen by half since analyst Mark Roberts raised accounting questions. There could be more downside if Diamond's deal to buy Pringles gets scotched.

18

19

20

21

22

This year, Diamond didn't use the word "final" on its August payment to a grower Roberts spoke with, telling the grower to expect a September "momentum payment." Believing himself underpaid, the farmer asked Diamond's head of field operations if the September payment was for the 2010 crop. According to Roberts, the Diamond executive said yes. Most puzzling, the September payments went to farmers who've ended their sales contracts with Diamond and won't be supplying it with their 2011 year crop. Barron's spoke with one of those growers.

23

24

25

Had the September payments been counted as part of Diamond's July 2011 fiscal year, Roberts thinks that the gross margin reported by the company would have shrunk to less than 20%, from about 25%—making the exchange of its shares for Pringles less appetizing for P&G shareholders.

26

## CLASS ACTION ALLEGATIONS

27

28

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased Diamond Foods securities between April 5, 2011, and November 1, 2011, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Diamond Foods securities were actively traded on the NASDAQ Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Diamond Foods shares were traded publicly during the Class Period on the NASDAQ and as of August 31, 2011, the Company had 22,011,196 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Diamond Foods or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 26 -

1    47.    Common questions of law and fact exist as to all members of the Class and

2  predominate over any questions solely affecting individual members of the Class. Among the

3  questions of law and fact common to the Class are:

4          (a)    Whether the federal securities laws were violated by Defendants' acts as

5  alleged herein;

6

7          (b)    Whether statements made by Defendants to the investing public during

8  the Class Period omitted and/or misrepresented material facts about the operations, financial

9  performance and prospects of Diamond Foods; and

10          (c)    To what extent the members of the Class have sustained damages and the

11  proper measure of damages.

12

13    48.    A class action is superior to all other available methods for the fair and efficient

14  adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

15  the damages suffered by individual Class members may be relatively small, the expense and

16  burden of individual litigation makes it impossible for members of the Class to individually

17  redress the wrongs done to them. There will be no difficulty in the management of this action as

18  a class action.

19

20                          **UNDISCLOSED ADVERSE FACTS**

21    49.    The market for Diamond Foods securities was open, well-developed and efficient

22  at all relevant times. As a result of these materially false and/or misleading statements, and/or

23  failures to disclose, Diamond Foods securities traded at artificially inflated prices during the

24  Class Period. Plaintiff and other members of the Class purchased or otherwise acquired

25  Diamond Foods securities relying upon the integrity of the market price of the Company's

26  securities and market information relating to Diamond Foods, and have been damaged thereby.

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 27 -

1   50. During the Class Period, Defendants materially misled the investing public,

2   thereby inflating the price of Diamond Foods securities, by publicly issuing false and/or

3   misleading statements and/or omitting to disclose material facts necessary to make Defendants'

4   statements, as set forth herein, not false and/or misleading. Said statements and omissions were

5   materially false and/or misleading in that they failed to disclose material adverse information

6   and/or misrepresented the truth about Diamond Foods' business, operations, and prospects as

7   alleged herein.

8

9   51. At all relevant times, the material misrepresentations and omissions particularized

10  in this Complaint directly or proximately caused or were a substantial contributing cause of the

11  damages sustained by Plaintiff and other members of the Class. As described herein, during the

12  Class Period, Defendants made or caused to be made a series of materially false and/or

13  misleading statements about Diamond Foods' financial performance and prospects. These

14  material misstatements and/or omissions had the cause and effect of creating in the market an

15  unrealistically positive assessment of the Company and its financial well-being and prospects,

16  thus causing the Company's securities to be overvalued and artificially inflated at all relevant

17  times. Defendants' materially false and/or misleading statements during the Class Period

18  resulted in Plaintiff and other members of the Class purchasing the Company's securities at

19  artificially inflated prices, thus causing the damages complained of herein.

20

21

22                                    **LOSS CAUSATION**

23  52. Defendants' wrongful conduct, as alleged herein, directly and proximately caused

24  the economic loss suffered by Plaintiff and the Class.

25

26  53. During the Class Period, Plaintiff and the Class purchased Diamond Foods

27  securities at artificially inflated prices and were damaged thereby. The price of the Company's

28  securities significantly declined when the misrepresentations made to the market, and/or the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 28 -

1  information alleged herein to have been concealed from the market, and/or the effects thereof,
2  were revealed, causing investors' losses

3  ### SCIENTER ALLEGATIONS

4  54.     As alleged herein, Defendants acted with scienter in that Defendants knew that
5  the public documents and statements issued or disseminated in the name of the Company were
6
7  materially false and/or misleading; knew that such statements or documents would be issued or
8  disseminated to the investing public; and knowingly and substantially participated or acquiesced
9  in the issuance or dissemination of such statements or documents as primary violations of the
10  federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their
11  receipt of information reflecting the true facts regarding Diamond Foods, his/her control over,
12
13  and/or receipt and/or modification of Diamond Foods' allegedly materially misleading
14  misstatements and/or their associations with the Company which made them privy to
15  confidential proprietary information concerning Diamond Foods, participated in the fraudulent
16  scheme alleged herein.

17  ### APPLICABILITY OF PRESUMPTION OF RELIANCE
18  ### (FRAUD-ON-THE-MARKET DOCTRINE)

19  55.     The market for Diamond Foods securities was open, well-developed and efficient
20  at all relevant times.  As a result of the materially false and/or misleading statements and/or
21
22  failures to disclose, Diamond Foods securities traded at artificially inflated prices during the
23  Class Period.  On September 20, 2011, the Company's stock closed at a Class Period high of
24  $92.47 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the
25  Company's securities relying upon the integrity of the market price of Diamond Foods securities
26  and market information relating to Diamond Foods, and have been damaged thereby.
27
28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 29 -

1    56.    During the Class Period, the artificial inflation of Diamond Foods stock was
2  caused by the material misrepresentations and/or omissions particularized in this Complaint
3  causing the damages sustained by Plaintiff and other members of the Class. As described herein,
4  during the Class Period, Defendants made or caused to be made a series of materially false
5  and/or misleading statements about Diamond Foods' financial performance and prospects.
6
   These material misstatements and/or omissions created an unrealistically positive assessment of
7
8  Diamond Foods and its business, operations, and financial performance, thus causing the price of
9  the Company's securities to be artificially inflated at all relevant times, and when disclosed,
10  negatively affected the value of the Company stock. Defendants' materially false and/or
11
   misleading statements during the Class Period resulted in Plaintiff and other members of the
12
13  Class purchasing the Company's securities at such artificially inflated prices, and each of them
14  has been damaged as a result.

15    57.    At all relevant times, the market for Diamond Foods securities was an efficient
16  market for the following reasons, among others:
17
18    (a)    Diamond Foods stock met the requirements for listing, and was listed
19  and actively traded on the NASDAQ, a highly efficient and automated market;

20    (b)    As a regulated issuer, Diamond Foods filed periodic public reports with
21  the SEC and the NASDAQ;
22
23    (c)    Diamond Foods regularly communicated with public investors via
24  established market communication mechanisms, including through regular dissemination of
25  press releases on the national circuits of major newswire services and through other wide-
26  ranging public disclosures, such as communications with the financial press and other similar
27  reporting services; and
28

1    (d)    Diamond Foods was followed by securities analysts employed by major
2    brokerage firms who wrote reports about the Company, and these reports were distributed to
3    the sales force and certain customers of their respective brokerage firms. Each of these reports
4    was publicly available and entered the public marketplace.

5
6    58.    As a result of the foregoing, the market for Diamond Foods securities promptly
7    digested current information regarding Diamond Foods from all publicly available sources and
8    reflected such information in Diamond Foods' stock price. Under these circumstances, all
9    purchasers of Diamond Foods securities during the Class Period suffered similar injury through
10   their purchase of Diamond Foods securities at artificially inflated prices and a presumption of
11   reliance applies.
12

13                                   **NO SAFE HARBOR**

14   59.    The statutory safe harbor provided for forward-looking statements under certain
15   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.
16   The statements alleged to be false and misleading herein all relate to then-existing facts and
17   conditions. In addition, to the extent certain of the statements alleged to be false may be
18   characterized as forward looking, they were not identified as "forward-looking statements" when
19   made and there were no meaningful cautionary statements identifying important factors that
20   could cause actual results to differ materially from those in the purportedly forward-looking
21   statements. In the alternative, to the extent that the statutory safe harbor is determined to apply
22   to any forward-looking statements pleaded herein, Defendants are liable for those false forward-
23   looking statements because at the time each of those forward-looking statements was made, the
24   speaker had actual knowledge that the forward-looking statement was materially false or
25   misleading, and/or the forward-looking statement was authorized or approved by an executive
26
27
28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 31 -

officer of Diamond Foods who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

60. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Diamond Foods' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

62. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Diamond Foods' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

63. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Diamond Foods' financial well-being and prospects, as specified herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 32 -

64.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Diamond Foods' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Diamond Foods and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

65.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 33 -

1    66.    The Defendants had actual knowledge of the misrepresentations and/or omissions
2    of material facts set forth herein, or acted with reckless disregard for the truth in that they failed
3    to ascertain and to disclose such facts, even though such facts were available to them. Such
4    Defendants' material misrepresentations and/or omissions were done knowingly or recklessly
5    and for the purpose and effect of concealing Diamond Foods' financial well-being and prospects
6    from the investing public and supporting the artificially inflated price of its securities. As
7    demonstrated by Defendants' overstatements and/or misstatements of the Company's business,
8
9    operations, financial well-being, and prospects throughout the Class Period, Defendants, if they
10   did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless
11   in failing to obtain such knowledge by deliberately refraining from taking those steps necessary
12   to discover whether those statements were false or misleading.
13

14   67.    As a result of the dissemination of the materially false and/or misleading
15   information and/or failure to disclose material facts, as set forth above, the market price of
16   Diamond Foods securities was artificially inflated during the Class Period. In ignorance of the
17   fact that market prices of the Company's securities were artificially inflated, and relying directly
18   or indirectly on the false and misleading statements made by Defendants, or upon the integrity of
19   the market in which the securities trades, and/or in the absence of material adverse information
20   that was known to or recklessly disregarded by Defendants, but not disclosed in public
21   statements by Defendants during the Class Period, Plaintiff and the other members of the Class
22   acquired Diamond Foods securities during the Class Period at artificially high prices and were
23   damaged thereby.
24
25

26   68.    At the time of said misrepresentations and/or omissions, Plaintiff and other
27   members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff
28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 34 -

1   and the other members of the Class and the marketplace known the truth regarding the

2   Company's improper accounting practices, which were not disclosed by Defendants, Plaintiff

3   and other members of the Class would not have purchased or otherwise acquired their Diamond

4   Foods securities, or, if they had acquired such securities during the Class Period, they would not

5   have done so at the artificially inflated prices which they paid.

6

7   69.    By virtue of the foregoing, Defendants have violated Section 10(b) of the

8   Exchange Act and Rule 10b-5 promulgated thereunder.

9   70.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

10  the other members of the Class suffered damages in connection with their respective purchases

11  and sales of the Company's securities during the Class Period.

12

13                          **SECOND CLAIM**
                  **Violation of Section 20(a) of The Exchange Act**
14                  **Against the Individual Defendants**

15  71.    Plaintiff repeats and realleges each and every allegation contained above as if

16  fully set forth herein.

17

18  72.    The Individual Defendants acted as controlling persons of Diamond Foods within

19  the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

20  positions, and their ownership and contractual rights, participation in and/or awareness of the

21  Company's operations and/or intimate knowledge of the false financial statements filed by the

22  Company with the SEC and disseminated to the investing public, the Individual Defendants had

23  the power to influence and control and did influence and control, directly or indirectly, the

24  decision-making of the Company, including the content and dissemination of the various

25  statements which Plaintiff contends are false and misleading. The Individual Defendants were

26  provided with or had unlimited access to copies of the Company's reports, press releases, public

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 35 -

1   filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

2   these statements were issued and had the ability to prevent the issuance of the statements or

3   cause the statements to be corrected.

4       73.    In particular, each of these Defendants had direct and supervisory involvement in

5   the day-to-day operations of the Company and, therefore, is presumed to have had the power to

6

7   control or influence the particular transactions giving rise to the securities violations as alleged

8   herein, and exercised the same.

9       74.    As set forth above, Diamond Foods and the Individual Defendants each violated

10  either Section 10(b) or Rule 10b-5, by their acts and/or omissions as alleged in this Complaint.

11  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant

12
    to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful
13
    conduct, Plaintiff and other members of the Class suffered damages in connection with their

14

15  purchases of the Company's securities during the Class Period.

16
                                **PRAYER FOR RELIEF**
17

18          WHEREFORE, Plaintiff prays for relief and judgment, as follows:

19      (a)    Determining that this action is a proper class action under Rule 23 of the Federal

20  Rules of Civil Procedure;

21      (b)    Awarding compensatory damages in favor of Plaintiff and the other Class

22
    members against all Defendants, jointly and severally, for all damages sustained as a result of
23

24  Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

25      (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

26  this action, including counsel fees and expert fees; and

27      (d)    Such other and further relief as the Court may deem just and proper.

28

        COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
                                - 36 -

1

## JURY TRIAL DEMANDED

2       Plaintiff hereby demands a trial by jury.

3
        DATED: November 7, 2011                    GLANCY BINKOW & GOLDBERG LLP
4
5                                                  By:
                                                   Michael Goldberg
6                                                  Lionel Z. Glancy
                                                   Robert V. Prongay
7                                                  Casey E. Sadler
                                                   1801 Avenue of the Stars, Suite 311
8                                                  Los Angeles, California 90067
9                                                  Telephone:    (310) 201-9150
                                                   Facsimile:    (310) 201-9160
10
                                                   LAW OFFICES OF HOWARD G. SMITH
11                                                 Howard G. Smith
12                                                 3070 Bristol Pike, Suite 112
                                                   Bensalem, PA 19020
13                                                 Telephone:    (215) 638-4847
                                                   Facsimile:    (215) 638-4867
14
15                                                 *Attorneys for Plaintiff Jorge Salhuana*

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 37 -

## SWORN CERTIFICATION OF PLAINTIFF

Diamond Foods, Inc., SECURITIES LITIGATION

I, Jorge Salhuana, certify that:

1.   I have reviewed the complaint and authorized its filing.

2.   I did not purchase Diamond Foods, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in Diamond Foods, Inc.. during the class period set forth in the Complaint are as follows:

I bought _500_ shares on _9_ / _19_ / _11_ at $_86.56_ per share.
I bought _1000_ shares on _9_ / _19_ / _11_ at $_86.89_ per share.
I bought _400_ shares on _10_ / _28_ / _11_ at $_67.33_ per share.
I bought _350_ shares on _10_ / _28_ / _11_ at $_67.32_ per share.
I bought _1000_ shares on _10_ / _03_ / _11_ at $_72.11_ per share.

I sold _____ shares on ___ / ___ / ___ at $ ____ per share.
I sold _____ shares on ___ / ___ / ___ at $ ____ per share.
I sold _____ shares on ___ / ___ / ___ at $ ____ per share.
I sold _____ shares on ___ / ___ / ___ at $ ____ per share.
I sold _____ shares on ___ / ___ / ___ at $ ____ per share.

(List Additional Transactions on a Separate Page if Necessary)

5.   I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

____ ☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _11/4/11_

_____
(Please Sign Your Name Above)