UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

JORGE SALHUANA,                          )
                                         )
            Plaintiff,                   )
                                         )
   VS.                                   ) NO. C 11-5386 WHA
                                         )
DIAMOND FOODS, INC., et al,              )
                                         )San Francisco, California
            Defendants.                  )  Thursday
                                         )  March 1, 2012
_____ )  2:00 p.m.

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Movant**              Robbins, Geller, Rudman and Dowd, LLP
**New England:**            655 West Broadway
                            Suite 1900
                            San Diego, California 92101
                   BY:  **DARREN ROBBINS, ESQ.**

                            Robbins, Geller, Rudman and Dowd, LLP
                            Post Montgomery Center
                            One Montgomery Street
                            Suite 1800
                            San Francisco, California 94104
                   BY:  **SHAWN WILLIAMS, ESQ.**


**For Movant**              Grant and Eisenhofer, P.A.
**Mississippi PERS:**       485 Lexington Avenue
                            New York, New York 10017
                   BY:  **JAMES SABELLA, ESQ.**

         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

**APPEARANCES:   (CONTINUED)**

| | |
|---|---|
| **For Movant** | Lieff, Cabraser, Heimann |
| **Mississippi PERS:** | & Bernstein |
| | 275 Battery Street, 30th Fl. |
| | San Francisco, California  94111 |
| | BY:  **RICHARD HEIMANN, ESQ.** |

| | |
|---|---|
| | Chitwood & Harley |
| | 1350 Broadway |
| | Suite 908 |
| | New York, New York 10018 |
| | BY:  **JOHN HARNES, ESQ.** |

| | |
|---|---|
| | Office of the Attorney General |
| | State of Mississippi |
| | 550 High Street |
| | Jackson, Mississippi 39205 |
| | BY:  **GEORGE NEVILLE, ESQ.** |
| | **S. MARTIN MILLETTE, ESQ.** |

| | |
|---|---|
| **For Defendant** | Fenwick & West |
| **Diamond Foods:** | 555 California Street |
| | 12th Floor |
| | San Francisco, California 94104 |
| | BY:  **JENNIFER BRETAN, ESQ.** |
| | **CATHERINE KEVANE, ESQ.** |

| | |
|---|---|
| **For Defendant** | Sidley & Austin |
| **Mendez:** | 555 California Street |
| | San Francisco, California 94104 |
| | BY:  **ROBERT MARTIN, ESQ.** |
| | **NAOMI IGRA, ESQ.** |

| | |
|---|---|
| **For Defendant** | Hogan Lovells, LLP |
| **Neil:** | 525 University Avenue |
| | 4th Floor |
| | Palo Alto, California 94301 |
| | BY:  **NORMAN BLEARS, ESQ.** |

<u>**P R O C E E D I N G S**</u>

1

2    **MARCH 1, 2012**                                    2:09 p.m.

3

4            **THE COURT:**  Now we go to Diamond Foods,

5    Inc. Securities Litigation.

6            **THE CLERK:**  Civil Matter 11-5386.

7            Counsel, please state your appearance for the

8    record.

9            **MS. BRETAN:**  Good afternoon.  Jennifer Bretan of

10   Fenwick & West on behalf of Diamond Foods, Inc.  With me is my

11   colleague Catherine Kevane.

12           **MR. MARTIN:**  Good afternoon, your Honor.  Robert

13   Martin for defendant Michael Mendez.

14           **MS. IGRA:**  Good afternoon, your Honor.  Naomi Igra

15   for defendant Michael Mendez.

16           **MR. ROBBINS:**  Darren Robbins, your Honor, and Shawn

17   Williams on behalf of the New England Carpenters Pension and

18   Annuity Fund, lead plaintiff movants.

19           **THE COURT:**  Thank you.  And?

20           **MR. BLEARS:**  Good afternoon, your Honor.  Norm Blears

21   from Hogan Lovells on behalf of defendant Steven Neil.

22           **THE COURT:**  All right.  And?

23           **MR. HEIMANN:**  Richard Heimann, your Honor, for

24   Mississippi.

25           **MR. SABELLA:**  Jim Sabella also for Mississippi

```
1   Retirement.

2              THE COURT:  What's your name?

3              MR. SABELLA:  Jim Sabella.

4              MR. HARNES:  John Harnes also for Mississippi.

5              THE COURT:  What's your name?

6              MR. HARNES:  Harnes, H-A-R-N-E-S.

7              THE COURT:  All right, welcome.  And?

8              MR. NEVILLE:  I'm George Neville with the Mississippi

9   Attorney General's Office, your Honor.

10             And Martin Millette with the Mississippi Attorney

11  General's Office.

12             THE COURT:  And?

13             MR. WILLIAMS:  Your Honor, Sean Williams, Robbins,

14  Geller, Rudman and Dowd, on behalf of the Carpenters Fund.

15             THE COURT:  Which fund?

16             MR. WILLIAMS:  The Carpenters Fund.  New England

17  Carpenters Fund.

18             THE COURT:  I got it.  Thank you.

19             Let's see.  We're here for appointment of lead

20  plaintiff.

21             So how many applicants do we have today?

22             MR. ROBBINS:  Just two, your Honor.

23             THE COURT:  All right.  And those are Mississippi

24  Public Employees Retirement System, that's one, right?

25             MR. ROBBINS:  Yes, your Honor.
```

         1              THE COURT:  And who is the other one?

         2              MR. ROBBINS:  The New England Carpenters Pension and

         3    Annuity Funds.

         4              THE COURT:  Okay.  All right.  So let's hear first

         5    from New England.

         6              THE COURT REPORTER:  Counsel, your name one more

         7    time, please?

         8              MR. ROBBINS:  Darren Robbins.  And together with my

         9    partner, your Honor, Sean Williams, we appear on behalf of New

        10    England Carpenters.

        11              First and foremost, my client Harry Dow, the

        12    executive director of the firm, is here with us in the

        13    courtroom.  He traveled from Boston to attend this hearing.

        14              THE COURT:  Thank you for coming today.

        15              MR. ROBBINS:  Your Honor, his --

        16              THE COURT:  What is his name?

        17              MR. ROBBINS:  Harry Dow.

        18              THE COURT:  D-O-W?

        19              MR. ROBBINS:  D-O-W.

        20              THE COURT:  Okay.

        21              MR. ROBBINS:  This case presents a very

        22    straightforward case of statutory interpretation.  It deals

        23    with two specific provisions in the lead plaintiff --

        24    provisions of the PSLRA.  And your Honor is well aware of them

        25    having opined on this almost a half dozen times over the last

1  event or 15 years, including one of the first decisions in this

2  district on the interpretation of the overly litigious lead

3  plaintiff provision.

4          It's being juxtaposed here, your Honor, with another

5  provision, which is the most adequate plaintiff provision, both

6  of which appear in 15 U.S.C. 78u-4(a)(3) and I'll go on and on,

7  but basically there is subpart (6), your Honor, which is the

8  overly litigious plaintiff provision, and there is subpart (3),

9  which is the most adequate plaintiff provision.  And the Court

10 is being asked to interpret the interaction between these

11 provisions.

12         Now, in November, 1999 Judge White, actually, about a

13 week or 10 days before your Honor issued an opinion in a case

14 called *McKesson*, and in that case, your Honor, there was a

15 movant, an institutional movant, much like Mississippi PERS

16 here.  In that case it was the Florida State Board of

17 Administration, which had been -- which had triggered the

18 provision that we're talking about here, the overly litigious

19 plaintiff provision which bars lead plaintiff applicants from

20 being appointed more than five times in any three-year period.

21         However, it also provides the ability for Courts to

22 lift that bar -- and these are the key words, your Honor --

23 consistent with purposes of this section.

24         And in that situation the Florida Board had a loss of

25 $180 million.  That was $130 million more than any other lead

1 plaintiff movant.  And in that case Judge White was presented

2 with the notion that, wait a second.  We have what appears to

3 be the most adequate plaintiff because its loss is dramatic,

4 180 million.  Yet, Judge White found that because that entity

5 was in six cases -- here we know that Mississippi PERS

6 currently is involved in at least 12 and counting, overseeing

7 12 complex class actions at a minimum and having filed at least

8 one of those during the pendency of this motion.

9        In that case Judge White found there were no special

10 circumstances that would warrant lifting the presumptive bar

11 that was triggered by Florida having been in six cases in the

12 prior three years.

13        About 10 days later your Honor dealt with the same

14 issue in the case called *Network Associates*.  And in that case

15 your Honor concluded that the City of Philadelphia Pension Fund

16 could, in fact, serve, notwithstanding the fact that it had

17 been in more than five cases in three years.  And in concluding

18 that, your Honor, without a lot of analysis, your Honor pointed

19 to the conference committee report and said that the next best

20 thing to the statutory language is the -- is the -- is a

21 conference committee report showing Congressional intent.  And

22 your Honor cited *Silicon Graphics*, which as you may recall was

23 the seminal decision in this area, which said exactly the same

24 thing.

25        Now, here is my point, your Honor.  There are two

intervening decisions which dramatically alter the landscape
with respect to the lead plaintiff provisions. In two separate
situations since 1999 the Ninth Circuit has expressly opined in
the context of a mandamus on these lead plaintiff provisions.
Judge Kozinski in the seminal opinion of *Cavanaugh versus*
*Copper Mountain* 306 F.3d 726 at 732 admonished District Courts
to follow, and I quote Judge Kozinski, the straightforward
application of the statutory scheme, end quote.

  Went on to say in that opinion, the Ninth Circuit
said, and I quote again: Courts may not depart from the
statutory text because they believe some other arrangement
would better serve the legislative goals; period, end quote.

  Now, in the interim, about two years ago, another
lead plaintiff decision was taken up to the Ninth Circuit,
again on mandamus, dealing with one of these other six subparts
of the PSLRA lead plaintiff provisions. That case is *Cohen*
586 F.3d 703, and at 709 and 710 the Ninth Circuit repeatedly
said the statutory text controls, saying things like, quote,
ordinary reading of this clause, end quote.

  The plain text of the statute, or going on to say
things like:

  "When a statute speaks with clarity to an
   issue, Courts must apply the clear meaning of
   the statute."

  The emphasis here, your Honor, is that the statutory

1   text should control, yet Mississippi PERS asked this Court to

2   basically leapfrog the conference committee report over the

3   statutory text.  And this is not an ambiguity.  This statute is

4   clear.  In fact, the Ninth Circuit referred to these provisions

5   as mandates.  These six subparts are mandates.  They are not

6   some touchy-feely provision which judges are to think about and

7   maybe throw in the mix.  The statute is clear, express and

8   unambiguous.

9          Now, what MPERS cites at Page 5 of its reply brief

10  says as follows:

11          "The presumptive bar should not operate

12      at cross purposes with the most adequate

13      plaintiff provision."

14          That's the conference committee report.  What the

15  statute says is that:

16          "It should be interpreted consistent with

17      the purposes of this section."

18          Those are meaningful distinctions.  And MPERS relies

19  heavily, repeatedly going back citing District Court decisions

20  of which there have been a dozen or so that don't really go

21  into the analysis of the interplay between the statutory text

22  and the conference committee report.

23          So what are the purposes of this section?  Because

24  that's the statutory text.  And your Honor dealt with this.

25  And no other Court has really delved into this.  Five different

times in your Honor's opinion in 1999 you referred to the
appointment of institutional investors as being one of the most
important functions of the lead plaintiff provisions of the
PSLRA, five different times in that decision.

You also went on to say that, and you used the
following words, "manage, control and monitor."  In other
words, the whole -- the whole purpose behind this statute was
to create a litigation scheme whereby the plaintiff would act
like a traditional litigant and not be captured by lawyers so
that lawyers were making decisions as opposed to the plaintiff
themselves.

And here, as your Honor probably notes, not a single
place in that questionnaire that was submitted to your Honor is
there any testimony, there is not one bit of evidence in the
record from the fiduciaries at the Mississippi fund.  In fact,
if you look through there, everything comes from lawyers.

Now, some of it is from the lawyers to the Fund --
that is, the Attorney General's Office, but none from the
fiduciaries.  It's a big point.  Plaintiff versus counsel.

One of the other important purposes of the section
manifested in the statutory text was subpart (6), which says
the statute is designed to avoid repeat litigants, right in the
statute.  So what MPERS characterizes as aspirational or
considerations are, in fact, mandates; that is, the mandate of
the statute as interpreted by the Ninth Circuit is that a

1  litigant who has been appointed five times in three years is

2  presumptively barred and only where that litigant has made an

3  evidentiary record of what Judge White called special

4  circumstances can the bar be lifted.

5          Now, it is true that MPERS would like the statute to

6  read that the presumptive bar doesn't apply if you have really

7  large losses, but that's not what Congress said, and the mere

8  fact that that would be convenient for MPERS doesn't make it

9  so.  So the issue becomes:  Have they made an evidentiary

10 showing of the special circumstances warranting lifting of the

11 presumptive bar?  And I think the answer here is a resounding

12 no.  Actually, quite the opposite.

13         Your Honor has seen in the questionnaire that they

14 are again involved in at least a dozen cases.  Some of those

15 cases, your Honor, are years old.  They have gone to the

16 Supreme Court, fifth amended complaint, discovery cut-off.

17 Cases like *Merck* involving $6 billion in damage, dozens of

18 defendants.  These are complex cases and they certainly are not

19 someone where maybe they had been appointed five times in three

20 years, but have no litigation load.  In fact, they have a

21 massive litigation load.

22         **THE COURT:**  Be more precise on what is Mississippi

23 PERS' current caseload as a lead plaintiff?

24         **MR. ROBBINS:**  Its current caseload, your Honor --

25         **THE COURT:**  As a lead plaintiff.

1    **MR. ROBBINS:**  As a lead plaintiff, I believe, is 11

2  cases and one more as a class representative.  But as a lead

3  plaintiff, the direct answer to your question is 11.

4         Those cases involve a massive litigation that went to

5  the Supreme Court in *Merck*.  They involve a case involving

6  JPMorgan arising out of about $20 billion worth of MBS

7  securities.  A *Sharing Plough* case in New Jersey, the District

8  Court in New Jersey.  A 230 page, 588 paragraph complaint with,

9  like, 300 docket entries.  I mean, these are not -- as your

10 Honor knows, having overseen these, these are not simple

11 litigations.

12         **THE COURT:**  Is the five in three years, does that

13 mean five that have commenced in the last three years or

14 regardless of when the case commenced five representations as

15 lead plaintiff in the last three years?

16         **MR. ROBBINS:**  What it means, your Honor, is that the

17 presumptive bar is triggered if they have been appointed within

18 five in the last three years.  However, there are scenarios, of

19 course, where somebody had been appointed five in the last

20 three years, but none of them are ongoing.  So that might be

21 the type of circumstance that would militate in favor of

22 lifting the bar.

23         **THE COURT:**  How many of these 11 were in the last

24 three years?

25         **MR. ROBBINS:**  I believe it is eight or nine.

1      **THE COURT:**  So, all right.  So you're saying that

2  eight or nine times in the last three years Mississippi PERS

3  has been appointed as lead counsel in some securities case?

4      **MR. ROBBINS:**  Correct.  Thereby triggering the

5  provisions of subpart (6).  So now they are in a position to

6  provide the Court with evidence that would warrant lifting the

7  bar.

8          And what Judge White said in the *McKesson* decision

9  was:  What are the circumstances that would warrant lifting the

10  bar if somebody has triggered this?  In that case Florida had

11  been appointed in only six cases.  Here it's significantly

12  more.  And Judge White said, Here is a scenario in which it

13  would warrant lifting the bar.  What about if they had been

14  involved in eight actions in the last three years, but there is

15  no other movant?  Should the class suffer because that?

16  Absolutely not.  That would be one of the special

17  circumstances.

18          Or how about, your Honor, given the importance, as

19  you articulated in your *Network Associates* decision, that all

20  the other movants were individuals.  Judge White said that

21  might warrant lifting the presumptive bar.  That might

22  constitute special circumstances.

23          Or how about if you had someone, your Honor, who had

24  been appointed seven times in the last three years, but another

25  movant had been appointed 20 times.  That might warrant it.

1  But those are the special circumstances that warrant lifting

2  the bar.  They have shown none.

3         In fact, your Honor, if you look at question nine of

4  the questionnaire that was submitted, it took no less than

5  nine, nine lawyers to respond to a simple questionnaire.  Look

6  at all the lawyers in the room.  You know, for my partner,

7  Shawn Williams, it was a $10 cab ride to get here.  For me to

8  get here it was a $200 airfare from San Diego.  All these

9  lawyers have flown for one simple hearing.  I think it

10 highlights that, in fact, lawyers are driving this as to

11 Mississippi PERS.

12         Some of them state employees, no doubt, but they are

13 not fiduciaries at the fund.  There is no executive director.

14 There is no trustee from the fund who has testified here to

15 provide evidence necessary to warrant lifting the bar.

16         **THE COURT:**  What's the story on New England?  Does

17 New England have -- has your side been appointed to be lead

18 plaintiff in the last three years?

19         **MR. ROBBINS:**  Yes, your Honor.

20         **THE COURT:**  How many times is that?

21         **MR. ROBBINS:**  Twice.

22         **THE COURT:**  Okay.  So you're not up to five yet.

23 This would be number three, is that what you are saying?

24         **MR. ROBBINS:**  Correct, your Honor.  That would not

25 trigger the bar.

1    **THE COURT:** Do you have other applications pending?

2    **MR. ROBBINS:** No, your Honor.

3    **THE COURT:** All right. Go ahead.

4    **MR. ROBBINS:** So one of the things that also

5 militates -- and, again, there has been no affirmative showing

6 which is required by MPERS, but one thing that illustrates how

7 spread out they are is, in fact, in submitting their

8 certification, they missed a case. Now, they say in their

9 brief -- their reply, it wasn't really missed. We kind of

10 mischaracterized it and they were consolidated, but nonetheless

11 it wasn't in there.

12    And then we see in the questionnaire they submitted

13 that they put a certification in which missed some of their

14 trades. So they have some trades in their certification that

15 are different than their trades in the questionnaire. And I

16 think it's just illustrative that when you take on a dozen

17 major class action litigations involving tens or maybe even

18 more than $100 billion worth of losses, that sometimes you get

19 spread a little too thin, and that's the case here.

20    So it's not as if my client has to show that they are

21 spread too thin. They have the burden and they made no showing

22 at all.

23    And it's interesting. One of the things that they

24 say, your Honor, the arguments they give is that they cite a

25 judge here in this Court, Judge Chesney. And they say, Judge

1  Chesney dealt with this issue.  This is -- this is silly.  You

2  you shouldn't not lift the bar for them.  And Judge Chesney

3  said that:

4       "The PSLRA as set forth in the conference

5       report indicates that the provision should be

6       narrowly applied with respect to

7       institutional investors."

8           And they said basically whenever you have a large

9  loss and you're an institution, the bar should be lifted.

10 Essentially the exception swallows the rule.  But you know what

11 Judge Chesney cited in opining in the *Sirf* case -- that's

12 S-I-R-F -- and I read as follows, which I find quite

13 interesting:

14       "As a result, the conference committee

15       grants Courts discretion to avoid the

16       unintended consequence of disqualifying

17       institutional investors."

18            Read that again.

19       "The conference committee grants courts

20       discretion."

21           Conference committees, obviously, don't grant

22 anything.  Statutes grant authority, and that was the basis

23 upon which Judge Chesney concluded that the presumptive bar

24 should be lifted simply because somebody had larger losses than

25 another.

```
1              And I think that really kind of summarizes our
2     arguments, your Honor.  I would be glad to address any
3     questions or respond to the other side if you would like me to.
4          THE COURT:  I do have a question that looks ahead a
5     bit.  Maybe this has already been answered, but whoever gets
6     this job has to go out and interview and try to get the best
7     deal on the lawyers.
8              Now, has your New England already got an inside deal
9     with your firm?  Is New England willing to do a fair appraisal
10    of other candidate law firms?
11         MR. ROBBINS:  Your Honor, my client is well aware of
12    your prior orders and your concern about lead plaintiff
13    involvement.  Not only did he just come today, but, in fact,
14    asked for and received the names of lawyers in this litigation
15    presumably with some background and experience in this case.
16    So has asked for that already.  That's in his possession before
17    even being appointed.
18             So he does understand and has indicated that, in
19    fact, he intends to speak with other --
20         THE COURT:  I have found in many of these class
21    actions -- almost every one of them, in fact -- that the lead
22    plaintiff will negotiate a good deal that will be far less than
23    the standard rates going.  In Network Associates the
24    plaintiff's law firm agreed to an eight percent fee.  That was
25    Mr. Heimann's firm.  They got one of the best results, in my
```

1   judgment, in securities law's history.  And the class got the

2   benefit of that because the lawyers only got eight percent.

3           And I think this -- this is what the lead plaintiff

4   owes to the class.  This business of the lawyers being in bed

5   with the lead plaintiff and scratching each other's back, I

6   don't like that.  I want the class to get the benefit.

7           **MR. ROBBINS:**  First and foremost is maximizing the

8   net recovery to the class.

9           **THE COURT:**  Correct, including attorney's fees.

10          **MR. ROBBINS:**  That is the biggest expense to the

11  class.

12          **THE COURT:**  On the other hand, you don't want to go

13  out and hire a cheap lawyer who is not going to do a good job.

14  I see both sides of that.  But there's -- I'm telling you, they

15  have done a great job in getting good deals with lawyers who

16  have done an excellent job and at the same time the lawyers

17  have taken a hair cut and still made out like bandits, too, I'm

18  sure.  You know what I mean.

19          All right.  Well, I understand.  So you're saying

20  that your New England is all okay with that.

21          **MR. ROBBINS:**  Yes, your Honor.

22          **THE COURT:**  All right.  Let's hear from Mississippi

23  PERS.

24          **MR. ROBBINS:**  Thank you, your Honor.

25          **THE COURT REPORTER:**  Counsel, your name again,

```
 1  please?

 2          MR. SABELLA:  Yes.  Jim Sabella from Mississippi.

 3          During Mr. Robbins' argument it seems to me he kind

 4  of reversed the overall scheme of the PSLRA.  The professional

 5  plaintiff bar that he talked about is there, but the overriding

 6  presumption of the PSLRA is that the entity, the lead

 7  plaintiff, movant with the largest losses presumptively is the

 8  most active plaintiff.

 9          In this case Mississippi's losses are seven times

10  greater than New England Carpenter.

11          THE COURT:  So what do you say to the fact that

12  you've got more than five times in three years?

13          MR. SABELLA:  Right.  And, of course, that provision

14  in the statute says that the Court may rule -- may accept as

15  the Court permits otherwise.  So there is no question the Court

16  has discretion to do --

17          THE COURT:  Well, how about these two decisions in

18  the Ninth Circuit, *Copper Mountain* and the other one?

19          MR. SABELLA:  The statute itself says that the Court

20  may order otherwise.

21          THE COURT:  I understand that.  But what do you say

22  to the Ninth Circuit decisions?

23          MR. SABELLA:  The Ninth Circuit decision simply says

24  you have to follow the statutory language, and the statutory

25  language has the professional plaintiff bar, but the Court may
```

order otherwise. And Courts traditionally in the case of

institutional investors do order otherwise.

Now, he cites one or two cases -- one case in this

district, where they invoke the professional plaintiff bar

against an institutional investor.

But I would submit to your Honor this is not that

kind of case, and let me explain why. I think Mr. Robbins

misstated the role of the Mississippi Attorney General in

supervising and handling litigation for the Pension Retirement

System.

And Mr. Neville is here. He can address it. But by

statute, the Mississippi Attorney General manages and monitors

and supervises all litigation on behalf of the retirement

system. And so what you have are the resources of the Attorney

General. They have got over 100 lawyers. Mr. Neville's spends

a substantial portion of his time. And also Mr. Millette,

who's here, is a member of that team.

So there is an enormous network of lawyers at the

Attorney General's Office to whom outside counsel have to

report. Mr. Neville is a hands-on monitor and supervisor of

litigation. He meets with us regularly. He attends

mediations. He reads drafts of the briefs, as do the members

of his staff.

So this is a situation where not only is there

sufficient manpower for the Attorney General to manage and

1  monitor outside litigation.  This is perhaps the paradigm

2  situation where the outside counsel have a strict leash because

3  the Attorney General's Office has so much manpower.

4        **THE COURT:**  Perhaps, but you didn't even list the

5  name of the real fidicuary at Mississippi PERS.  Who is that?

6  There must be somebody in charge of Mississippi PERS?

7        **MR. SABELLA:**  Well, and Mr. Neville can address how

8  he relates to the client.  We have to report to the Attorney

9  General.

10        **THE COURT:**  You don't even know who the client is.

11  You don't even know the name of the person at Mississippi PERS.

12        **MR. SABELLA:**  We report to the Attorney General --

13        **THE COURT:**  Yeah.

14        **MR. SABELLA:**  (Continuing) -- who is essentially the

15  in-house lawyers for Mississippi PERS.  I mean, that's the way

16  our reporting responsibility works.

17        **THE COURT:**  That's good.  It's all good that they

18  have those lawyers working for them, but at the end of the day

19  the lawyers are not supposed to make the decision.

20        Whenever the Mississippi Attorney General settles a

21  case, they can't just do it on their own.  They have got to go

22  and talk to the head of the agency and say -- or the governor

23  or whoever and say, "We recommend you settle the case.  Do you

24  agree?"  And the governor or the head of the agency just says

25  "yes" or "no."  It's an executive decision.  It's not a

1  lawyer's decision.

2          MR. SABELLA:  By statute -- can I have Mr. Neville

3  address that?

4          MR. NEVILLE:  That's not actually the case in the

5  State of Mississippi.  The Attorney General is vested through

6  the constitutional powers that actually initiate --

7          THE COURT:  Why then doesn't the Attorney General run

8  the -- do you make the investment decisions?

9          MR. NEVILLE:  Oh, no, sir.  And those are actually

10  not made by the retirement system themself either.  They have

11  staff that they hire --

12          THE COURT:  Is PERS just some kind of shell and the

13  lawyers do that and the outside consultants do the rest?  What

14  do they -- there must be a head of PERS.

15          MR. NEVILLE:  Certainly.

16          THE COURT:  What is that person's name?

17          MR. NEVILLE:  Her name is Pat -- I'm terrible with

18  names.

19          THE COURT:  See, there you are.  You can't even

20  remember.

21          MR. NEVILLE:  I'm terrible with names, your Honor.

22  I deal mostly with Laura Tingle, who is the investment advisor.

23  And the relationship between any state agency and the Attorney

24  General's Office of the State of Mississippi is that we

25  represent them on behalf of the state.  They are an arm of the

1    state.  But ultimately when it comes to litigation, whether to

2    initiate litigation or to settle litigation or take it to

3    trial, is ultimately decided by the Attorney General.  Perhaps

4    that's unique --

5              **THE COURT:**  What does ultimately?  Is there a

6    statute -- I mean, you're telling me -- I want you to use the

7    right words here.  You're saying there is a statute in the

8    State of Mississippi that says the Attorney General has the

9    authority to settle lawsuits brought on behalf of Mississippi

10   PERS?

11             **MR. NEVILLE:**  It's true for all state cases, not

12   just --

13             **THE COURT:**  Where can I find that provision of the

14   Mississippi Code?

15             **MR. NEVILLE:**  I don't know the cite right offhand,

16   your Honor.

17             **THE COURT:**  You can submit it to me right after the

18   hearing.

19             **MR. NEVILLE:**  Yes, your Honor.

20             **THE COURT:**  I would like to read that language and

21   see, because that could be.  It could be that that's the way it

22   works there.

23             But ordinarily the way it would work is that the

24   executive decision to settle a case still resides in the

25   executive with, of course, the advice and counsel of the

1  lawyer.  But that the executive makes that decision.

2         But it's conceivable that you can set it up so that

3  the lawyers always make those decisions.  Fine, but I would

4  like to see that.

5         And I want you to know.  This is one of the issues

6  that I came into this hearing worried about, is that it looks

7  lawyer-driven as opposed to an executive somewhere in the

8  background saying, "What's the best for our fund?"  So it would

9  be useful to see that statutory authority.

10        All right.  So try to get that to me by tomorrow?

11  Can you do that?

12        **MR. NEVILLE:**  Yes, your Honor.

13        **THE COURT:**  Very well.  Thank you.

14        Continue with your argument.

15        **MR. SABELLA:**  If I could continue.  *Bach* against

16  *Amedisys* and *Ironworkers* --

17        **THE COURT:**  Now you have gotten more -- now you've

18  got eight or nine.  Back then you only had six or eight -- six

19  or seven.  It keeps going up and up and up.  At some point that

20  argument has got to stop.

21        **MR. SABELLA:**  Actually, your Honor, what's

22  interesting about this is -- first of all, the actual number,

23  I believe, is six in the last three years, but -- which is

24  still more than five, but it's not eight or nine.

25        **THE COURT:**  No, no, but that would make a difference

1   to me.  I would like to know the precise number.

2          **MR. SABELLA:**  In the certification that we filed we

3   identified six cases in the last three years.

4          **THE COURT:**  Was it accurate?

5          **MR. SABELLA:**  I believe it was.  There's a dispute

6   over a seventh case, which was consolidated with an earlier

7   filed case and the appointment was in the earlier filed case.

8   So whether or not that's considered within the period or not,

9   you know, is open to, I guess, interpretation.

10         But in both of the two cases that I cited, Judge

11  Rykoff in the New York case and Judge Jackson in the Louisiana

12  case, the Courts specifically found there was no merit to the

13  "spread too thin" argument and that the accumulated experience

14  of Mississippi in multiple cases seems a benefit more than a

15  detriment.

16         And I would underscore that here because as we

17  mentioned in our brief, all during this period Mississippi has

18  had multiple cases, yet, they have achieved settlements of

19  100 million, 200 million, $300 million in cases during this

20  period.

21         By contrast, I would suggest to your Honor, New

22  England Carpenters list in their certification or their answer

23  to the questionnaire two cases.  They settled one for 9 million

24  and one for 12 million.  They've virtually no experience in the

25  magnitude of the case that we're involved with here.

1    Mississippi routinely through the Attorney General's

2 Office can manage and monitor cases, multiple cases like this

3 and obtain hundred million dollar results for the class.  And

4 after all at the end of the day what we're trying to do is get

5 the best recovery for the class.  And I would submit to your

6 Honor the track record of Mississippi, notwithstanding that at

7 any point in time they may have six, seven, eight, nine cases

8 is extraordinary, maybe the best in the country and

9 certainly --

10    **THE COURT:**  You have to judge that against the amount

11 of money that was requested.  Though $100 million sounds like a

12 lot, but if $100 billion was being requested, that's not so

13 great.

14    **MR. SABELLA:**  The point is, your Honor, they were big

15 cases that required a lot of supervision and a lot of

16 depositions and mediations and experts and all the things that

17 go into big cases and Mississippi knows how to handle a case

18 like that.

19    I would also suggest to your Honor, if your Honor is

20 worried about lawyer-driven litigation, which I understand to

21 mean outside counsel-driven litigation, New England Carpenters

22 is a one-man shop.  They have Mr. Dow and he's the only person

23 they mention in their certification.  So he has to run the --

24 the pension system.  In addition, he has to supervise counsel,

25 and he also spends part of his time running a bank.

1          I would suggest to your Honor that if you're worried

2    about lawyer-driven litigation, New England Carpenters, which

3    doesn't have experience in big cases, is not in a position to

4    monitor Mr. Robbins' firm or whoever else would be appointed,

5    whereas the numerous lawyers at the Attorney General's office

6    routinely can monitor outside counsel.  It's what they do.

7    They litigate for a living.

8          **THE COURT:**  Do you -- that's a fair point.  In any of

9    those other cases does the Mississippi Attorney General's

10   Office ask for attorney's fees?

11         **MR. SABELLA:**  For themselves?

12         **THE COURT:**  Yes.

13         **MR. SABELLA:**  Not that I know of.

14         **THE COURT:**  So when the settlement comes and -- is

15   there any part of that money that goes to the Mississippi

16   A.G.'s office?

17         **MR. SABELLA:**  Not that I know of.

18         **THE COURT:**  Does it go to the treasury or does it

19   just go back to PERS?  Let's see what counsel says.

20         **MR. NEVILLE:**  I hate to keep interrupting, but I feel

21   like these questions are something that...

22         The PSLRA allows for the person who actually is doing

23   the hands-on work as lead plaintiff to ask for reimbursement of

24   their time, and we have been awarded that in most of the cases

25   we have.  We're talking about, you know, $5,000, $20,000.

1          THE COURT:  How much?

2          MR. NEVILLE:  $5,000 or $20,000 total for the time

3    that we spent.

4          THE COURT:  Out of $100 million settlement?

5          MR. NEVILLE:  Yes.  Yes, your Honor.

6          MR. SABELLA:  Those are, I think, the incentive fees

7    that the lead plaintiff can ask for.

8          THE COURT:  That's a whole different subject, which

9    we won't get into right now.

10          MR. SABELLA:  Good.

11          Another point I'd like to make.  Mr. Robbins argues

12    that, well, one of the special circumstances that he thinks is

13    necessary in order to override the professional plaintiff bar

14    is that maybe the next in line is an individual.  So you would

15    let the institution do it.

16          But we cite in our brief numerous cases, including at

17    least two cases in this district, where the next in line was

18    another institutional investor.  But nevertheless the Court

19    refused -- refused to invoke the professional plaintiff bar and

20    allowed the plaintiff, the institution that had more than five

21    appointments, to continue.

22          And those cases were Judge Chesney's case in *Sirf*

23    and, also, Judge Walker's case called *Casden*.  In both of those

24    you had a lead plaintiff institutional movant with more than

25    five.  You had other institutional investors waiting in the

1  wings to take over, but they didn't invoke the professional

2  plaintiff bar because they found the institutional investor was

3  certainly capable of handling the job and there was no reason

4  to override the overall presumption that the person with the

5  greatest losses should come next -- should come first.

6          Your Honor, if there is any concern whatsoever about

7  the resources of the Attorney General's office to monitor

8  outside litigation, I think they are put to rest by

9  Mr. Millette's declaration that he submitted in this case.  He

10 goes through the staffing of the Attorney General's Office and

11 the participation that they have in cases, detail the

12 participation.

13         It's noteworthy if you look at the questionnaire

14 response from New England, they don't talk about what their man

15 does in cases.  Mr. Neville attends mediations.  He attends

16 trials.  He attends depositions.  He reads drafts of briefs.

17 The New England's questionnaire is silent about all that.

18 Their man isn't a lawyer.  Their man is literally spread too

19 thin because he seems to be from their questionnaire a one-man

20 operation.

21         So if there is any concern here about adequate

22 supervision of outside counsel to make sure they don't get off

23 the reservation, I can assure your Honor from my past

24 experiences and from the written decisions other judges have

25 issued that Mississippi is the plaintiff that stays most

1  closely on top of outside counsel, and your Honor can't really

2  have any confidence at all that New England could do the same

3  thing.

4        THE COURT:  What do you think about my views that if

5  Mississippi PERS is selected, that Mississippi PERS ought to

6  interview various law firms, take into account their track

7  records and get the overall best deal for the class rather than

8  just go with whoever happens to be representing them now?

9        MR. SABELLA:  I suspect that's what Mississippi would

10  do.  We don't have any fee arrangement in place with respect to

11  Mississippi.  Mississippi has a list of, I believe, 13 law

12  firms that they deal with and they routinely will talk to a

13  large number of those firms about any particular case.

14        And I would like to point out the following --

15        THE COURT:  Why limit it to 13?  Why wouldn't you

16  want to -- someone who is very good may come forward with an

17  excellent fee arrangement, or that they may have done a case

18  exactly like this one in the past and they may give more value

19  to the class than somebody on your list of 13.

20        MR. SABELLA:  How Mississippi has created that list

21  of 13 is basically the 13 top securities law firms in the

22  country, people they have worked with successfully in other

23  cases, who they know them personally, they know their

24  reputations.

25        I'm not saying they wouldn't go outside that list,

1  but this is a list of people that they know can handle the job

2  because they vetted them previously.

3  　　　　What I wanted to mention to your Honor, when your

4  Honor expressed his concern about fee percentages.  My

5  understanding from looking at the reported cases is that in the

6  cases where New England has been the lead plaintiff the kind of

7  fee arrangements they have negotiated have been 24 and

8  25 percent.

9  　　　　Now, maybe Mr. Robbins can tell me I'm wrong, but I

10  believe that's been the case, which suggest to me that New

11  England doesn't bargain very hard with their outside counsel.

12  　　　　**THE COURT:**  How about Mississippi PERS?

13  　　　　**MR. SABELLA:**  Traditionally it's in the teens.

14  Traditionally it's in the teens.  So a big difference.

15  　　　　Mississippi, I can tell you from personal experience,

16  is pretty tough on negotiating fees.  It does not appear to me,

17  at least from what's available in the public record, that New

18  England is equally, shall we say, aggressive in terms of

19  negotiating with their outside counsel, but maybe Mr. Robbins

20  can address that.

21  　　　　**THE COURT:**  All right.  I need to bring it to a close

22  and let the other side have a brief reply.

23  　　　　**MR. SABELLA:**  Thank you, your Honor.

24  　　　　**MR. ROBBINS:**  Your Honor, may I show you just one

25  chart before we close?

1          THE COURT:  Of course.

2          MR. ROBBINS:  If I can address from the documentation

3     that was given to the Court in the questionnaire, Mr. Millette

4     put in a declaration before the Court and I'll address this

5     issue in a second, but this is directly responsive to the

6     Court's question about the ultimate decision making authority.

7          THE COURT:  Your colleague is making so much noise

8     over there I can't hear you.  Let him go ahead and open up the

9     surprise package.

10          MR. ROBBINS:  Nothing like a surprise at the end of a

11    long day in court.

12          (Brief pause.)

13          MR. ROBBINS:  It's just that when, when Mr. Sabella

14    was talking --

15          THE COURT:  Is this the way it would work at trial if

16    we were to appoint you as the lawyer?  We would have this?

17          MR. WILLIAMS:  It's my job today, your Honor.

18          THE COURT:  Okay.

19          (Chart displayed)

20          MR. ROBBINS:  I just think this highlights, you heard

21    during the argument that there is a, quote, enormous network of

22    lawyers, end quote, appearing on behalf of MPERS, and you see

23    them in the courtroom.  And this is the decision making

24    structure, with the Court and the -- and MPERS itself at the

25    two extremes and in the middle are no less than 14 different

1  lawyers.

2          Mr. Millette's declaration, I cite to Paragraph 11,

3  says as follows.  Now, the Court has asked in the

4  questionnaire -- sorry has stated:

5          "No settlement will be approved by the

6      Court without the lead plaintiff's careful

7      recommendation in favor of it."

8          Emphasizing again the importance of the class member

9  as opposed to the lawyer.

10          Mr. Millette's declaration at Paragraph 11 says the

11  following, which is the Court's concern, I think, highlighting

12  the Court's concern:

13          "The ultimate decision regarding whether

14      to settle the litigation or proceed to trial

15      will be made by the Attorney General's

16      Office."

17          Now, I take grave exception to the disparagement of

18  my client, your Honor, Mr. Dow.  It is true that he is an

19  executive director and he oversees the funds, but I can assure

20  you of this.  Before this litigation was brought, it wasn't

21  some lawyer who decided it would be brought.  That board of

22  trustees voted on this.  So he is not there by himself.  The

23  actual fiduciaries have considered this and have decided that

24  they would participate in this litigation.

25          And this notion, your Honor, that the New England

Carpenters have no experience, in fact, there have been only
three decisions since the enactment of the PSLRA at the
appellate level in favor of plaintiffs.  One of those was
obtained after class certification was denied and the New
England Carpenters fought that case up to the Fifth Circuit,
which is not known as a bastion of liberalism, and were able to
prevail with Justice O'Connor sitting by special designation in
reversing that decision.  And so the fact is in that case after
doing that, they were able to obtain a recovery 10 times larger
than what was being offered before, $55 million.

The New England carpenters also participated as class
representatives in a case involving Flemming, which recovered
$93 million.  And your Honor actually hit the nail on the head.
I was waiting for this.  You're being told 100 million,
200 million said, "Yeah, that's great."  If you've got the
numerator, what's the denominator?  Well, in fact, what you
weren't told is in the biggest recovery obtained by MPERS,
that's $350 million.  That sounds like a lot of money.  Do you
know what the damages were?  Their own lawyers told what the
damages were.  7.7 billion.

So I would say, your Honor, it's not something you
want to write home to mom about getting a four percent
recovery.  That's not something that my client will stand for,
and it's not something to be very proud about either, I don't
think.

1          So with that, your Honor, I think I've addressed, you

2    know, the fact is that in the case of New England Carpenters,

3    there are real fiduciaries making real decisions overseeing

4    lawyers and there has been no showing in this case that would

5    warrant lifting the presumptive bar.  None of the special

6    circumstances that have been recognized by Courts.

7          And simply relying on Judge Chesney's decision, which

8    cited the conference committee report, over the statute, a

9    conference committee report which says, "The conference

10   committee grants the authority to judges," is not -- is not

11   appropriate and is not compelling.

12          **THE COURT:**  Thank you.

13          All right.  Thank you.

14      **MR. SABELLA:**  Your Honor, could I have one minute?

15   Thirty seconds?

16          **THE COURT:**  Thirty seconds.

17      **MR. SABELLA:**  Thirty seconds.  In all the cases that

18   Mr. Robbins just mentioned where he says there was a

19   $90 million recovery or case went to the Fifth Circuit, his

20   client was a -- one of the named class representatives.  They

21   weren't the lead.  So they weren't in charge of those cases.

22          **THE COURT:**  Thank you.

23          All right.  Two things to follow up with.  It could

24   matter to me whether it's six or eight or nine appointments

25   within the last three years.  So I want to -- by Monday at noon

1  I want you to each submit a new declaration under oath that is

2  very precise on that point and identifies -- so that we're not

3  guessing at it.  All right?

4          So each side can -- the point that I'm interested in

5  is how many times has MPERS been appointed as lead counsel in

6  the last three years?  All right?  And then -- and then beyond

7  that, how many other cases do they have on their plate?  But

8  those are two different points.

9          Second thing is, this is just for Mississippi -- or

10  both sides can present, and that is:  I would like to see the

11  Mississippi Code Section whereby the law gives the Attorney

12  General the responsibility and authority to bring and decide

13  and settle cases on behalf of Mississippi PERS.  Of course, I

14  have no doubt that they are authorized to litigate on their

15  behalf.  That's not what I'm interested in.

16          What was represented to me was that they have the

17  executive authority to settle a case without even consulting

18  Mississippi PERS.

19          So that strikes me as a remarkable proposition, but

20  it could be true and I on would like to see that.  Both sides

21  can submit something -- all of this is due by Monday at noon.

22  Unless you tell me you can't do it.  I will give you more time

23  if you need it.  Do you want more time or not?

24          **MR. SABELLA:**  No, your Honor.  I'll do it.

25          **MR. ROBBINS:**  No.

1          THE COURT:  Okay.  It will be under submission.

2     (Whereupon, further proceedings in the

3      above matter were adjourned.)

4

5                    --oo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 11-5386 WHA, JORGE SALHUANA vs DIAMOND FOODS, INC. were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____ /s/ Debra L. Pas _____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, March 6, 2012