DEAN S. KRISTY (CSB NO. 157646)
dkristy@fenwick.com
SUSAN S. MUCK (CSB NO. 126930)
smuck@fenwick.com
JENNIFER BRETAN (CSB NO. 233475)
jbretan@fenwick.com
JAMES J. VARELLAS III (CSB NO. 253633)
jvarellas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, California 94104
Telephone:    (415) 875-2300
Facsimile:    (415) 281-1350

Attorneys for Defendant
Diamond Foods, Inc.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE DIAMOND FOODS, INC. SECURITIES LITIGATION | Case No. CV-11-05386-WHA |
| | **DEFENDANT DIAMOND FOODS, INC.'S MOTION TO DISMISS CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION** |
| This Document Relates to:<br><br>    All Actions. | Date:    November 15, 2012<br>Time:    8:00 a.m.<br>Place:    Courtroom 8, 19th Floor<br>Judge:    The Honorable William H. Alsup |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................1

ISSUES TO BE DECIDED ...............................................................................................1

POINTS AND AUTHORITIES ..........................................................................................1

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................3

    A.    The Parties................................................................................................3

    B.    Diamond And Its Business........................................................................4

    C.    Diamond Discloses The Audit Committee Investigation And Conclusions...........6

    D.    Procedural History And Claims .................................................................6

III.   LEGAL STANDARDS...........................................................................................7

IV.   PLAINTIFF FAILS TO PLEAD FACTS SUFFICIENT TO ESTABLISH A STRONG INFERENCE OF SCIENTER ..................................................................8

    A.    In Assessing Whether Plaintiff Has Adequately Alleged Scienter, The PSLRA Requires A Holistic Review Of All Relevant Facts ...................................8

    B.    The Relevant Facts, When Considered In Their Totality, Are Inconsistent With Plaintiff's Theory Of Fraud And Instead Support An Inference Of Nonfraudulent Intent .................................................................................9

        1.    Contrary To Plaintiff's Conjecture Regarding Defendants' Supposed Motive To Enrich Themselves, Mr. Mendes' and Mr. Neil's Stock Holdings Negate An Inference Of Fraud ......................................9

        2.    Plaintiff's Allegations Regarding Deloitte Are Inconsistent With An Intent to Defraud .....................................................................11

        3.    Allegations Regarding P&G Likewise Undercut Any Theory Of Fraud .......................................................................................13

        4.    The Prominent Nature Of The Continuity And Momentum Payments Is Another Fact Negating An Inference Of Scienter ................15

    C.    Plaintiff's Accounting Allegations Are Inadequate To Plead Scienter And Do Not Overcome The Absence Of A Plausible Theory Of Fraud ..............15

        1.    Neither A Restatement Nor An Alleged GAAP Violation Establishes Scienter Under The PSLRA ....................................16

        2.    The Confidential Witness Allegations Do Nothing To Establish That Defendants Made Accounting Determinations Knowing They Were False...................................................................................16

a.     The Grower CWs Had No Contact With Defendants And Offer Nothing To Suggest Intentional Misconduct By Defendants ................................................................. 16

b.     The Employee Confidential Witnesses Fail to Meet The Two-Part Test Under *Zucco* ........................................ 19

    i.     The Employee CWs Lack Personal Knowledge Of Facts Relevant to Defendants' Scienter ............................ 19

    ii.     The Employee Confidential Witnesses Offer No Facts To Show That Defendants Deliberately Misstated Diamond's Financial Results ............................ 20

3.     Allegations Regarding Sarbanes-Oxley Certifications And Internal Control Deficiencies Do Not Substitute For Particularized Facts Establishing Accounting Fraud ................................................. 22

D.     Allegations That Defendants Made The Decisions To Make The Continuity And Momentum Payments Or Other Similar 'Core Operations' Averments Do Not Support Claims That Those Payments Were Knowingly Improper .......... 23

V.     THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION ....................................... 24

VI.     CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................23

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ...........................................................19

*Cement Masons & Plasterers Jt. Pension Trust v. Equinix, Inc.*,
2012 WL 685344 (N.D. Cal. Mar. 2, 2012) ......................................................10

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008) ..............................................................24

*Curry v. Hansen Medical, Inc.*,
2011 WL 3741238 (N.D. Cal. Aug. 25, 2011) ..................................................18

*DSAM Global Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002) .......................................................................8, 16

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...................................................................................24, 25

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ........................................................................22

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ..........................................................2, 13, 14, 23

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002) .............................................................................8

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) .........................................................16, 18

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) .........................................................3, 17

*In re Business Objects S.A. Sec. Litig.*,
2005 WL 1787860 (N.D. Cal. July 27, 2005) ...................................................21

*In re Cadence Design Sys., Inc. Sec. Litig.*,
654 F. Supp. 2d 1037 (N.D. Cal. 2009) ............................................................21

*In re Century Alum. Co. Sec. Litig.*,
749 F. Supp. 2d 964 (N.D. Cal. 2010) ..............................................................22

*In re CIENA Corp. Sec. Litig.*,
99 F. Supp. 2d 650 (D. Md. 1999) ....................................................................14

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996) .................................................................11, 12

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................................15

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .............................................................................24, 25

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .............................................10, 17, 19

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..............................................................11, 23

*In re Hypercom Corp. Sec. Litig.*,
    2006 WL 1836181 (D. Ariz. July 5, 2006) ..........................................................20, 23

*In re Immersion Corp. Sec. Litig.*,
    2011 WL 6303389 (N.D. Cal. Dec. 16, 2011) ..........................................................24

*In re Immersion Corp. Sec. Litig.*,
    2011 WL 871650 (N.D. Cal. Mar. 11, 2011) .......................................................16, 21

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
    639 F. Supp. 2d 1038 (N.D. Cal. 2009) ...................................................................24

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ..........................................................17, 18

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ..........................................................17

*In re Rigel Pharms., Inc. Sec. Litig.*,
    --- F.3d ---, 2012 WL 3858112 (9th Cir. Sept. 6, 2012) ....................................8, 9, 10

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999).................................................................................8, 16

*In re Taleo Corp. Sec. Litig.*,
    2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ......................................................12, 13, 23

*In re Tibco Software, Inc. Sec. Litig.*,
    2006 WL 1469654 (N.D. Cal. May 25, 2006) ......................................................10, 18

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ..............................................................21, 23

*In re Verifone Holdings, Inc. Sec. Litig.*,
    2011 WL 1045120 (N.D. Cal. Mar. 22, 2011) ..........................................................23

*In re WatchGuard Sec. Litig.*,
    2006 WL 2038656 (W.D. Wash. Apr. 21, 2006)....................................................12, 15

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) .....................................................................12

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*In re Winstar Commc'ns Sec. Litig.*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ............................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) ..................................................................................................9

*McCasland v. FormFactor, Inc.*,
  2008 WL 2951275 (N.D. Cal. July 25, 2008) ................................................16, 21

*Medis Inv. Group v. Medis Techs., Ltd.*,
  586 F. Supp. 2d 136 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 754
  (2d Cir. 2009) ................................................................................................................15

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008).............................................................................*passim*

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001)........................................................................................7

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996).....................................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  2012 WL 1868874 (N.D. Cal. May 22, 2012) .................................................16, 18

*Reiger v. PricewaterhouseCoopers LLP*,
  117 F. Supp. 2d 1003 (S.D. Cal. 2000), *aff'd*, 288 F.3d 385 (9th Cir. 2002) ..........12

*Richard v. Northwest Pipe Co.*,
  2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ..................................................25

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001).......................................................................................8

*Rudolph v. UT Starcom*,
  560 F. Supp. 2d 880 (N.D. Cal. 2008) ...................................................................15

*Schuster v. Symmetricon, Inc.*,
  2000 WL 33115909 (N.D. Cal. Aug. 1, 2000)........................................................11

*Shurkin v. Golden State Vintners Inc.*,
  471 F. Supp. 2d 998 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008) ..........19

*South Ferry LP, # 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008).................................................................................16, 23

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*,
  633 F. Supp. 2d 763 (D. Ariz. 2009), *vacated in part on other grounds*,
  690 F. Supp. 2d 959 (D. Ariz. 2010)......................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................*passim*

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007)......................................................................24

*Zack v. Allied Waste Indus., Inc.*,
  2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722
  (9th Cir. 2008).................................................................................................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009).................................................................................*passim*

## STATUTES

Sarbanes-Oxley Act of 2002
  Section 302...........................................................................................................................22

Securities Exchange Act of 1934
  Section 10(b), 15 U.S.C. § 78j(b) .....................................................................*passim*
  Section 21(D)(b), 15 U.S.C. § 78j(b).....................................................................8

## RULES

Federal Rules of Civil Procedure
  Rule 9(b)..........................................................................................................................1, 8
  Rule 12(b)(6) ...................................................................................................................1
Securities and Exchange Commission
  Rule 16b-3(e) ...............................................................................................................10

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 15, 2012, at 8:00 a.m. or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable William H. Alsup, located at the United States District Court, 450 Golden Gate Avenue, San Francisco, California, defendant Diamond Foods, Inc. ("Diamond" or the "Company") will and hereby does move the Court for an order dismissing the Consolidated Complaint ("Complaint").

Diamond asks the Court to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), on the grounds that the Complaint does not contain facts sufficient to state a claim for violation of Sections 10(b) of the Securities Exchange Act of 1934 ("1934 Act"). Diamond's motion is based on: this Notice of Motion and Motion; the following Points and Authorities; the Request for Judicial Notice ("RJN") and accompanying exhibits thereto, and Declaration of Jennifer Bretan ("Bretan Decl."), filed and served herewith; the pleadings and records on file in this action; and on such further argument and materials as may be submitted to the Court.

## ISSUES TO BE DECIDED

1. Whether the claim under Section 10(b) of the 1934 Act should be dismissed in light of plaintiff's failure to plead facts establishing a strong inference that defendants acted with scienter.

2. Whether plaintiff's failure to plead facts establishing the element of loss causation provides an independent basis for dismissing the Section 10(b) claim.

## POINTS AND AUTHORITIES

### I. INTRODUCTION

This action arises out of Diamond's accounting for two payments made to walnut growers: one payment in August 2010 and another in September 2011. There is no dispute that, in February 2012, Diamond's Audit Committee determined that the Company's original accounting treatment of those payments was incorrect and that certain financial results would need to be restated. But this is an action for securities fraud, and errors and mistakes – even with respect to Generally Accepted Accounting Principles (GAAP) – are *not* the same thing as fraud. Under the PSLRA, plaintiff must plead particularized facts sufficient to create a "strong inference" of scienter – *i.e.,*

that defendants intentionally or deliberately falsified the Company's financial results.  In assessing whether plaintiff has satisfied that burden, the Court examines all relevant facts "holistically," considers all reasonable inferences (including those unfavorable to plaintiff), and determines whether the inference of fraud is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Here, plaintiff's allegations do not give rise to a cogent and compelling inference of fraud.  Putting aside that plaintiff relies heavily on ineffectual "motive and opportunity" theories, the Complaint actually negates any inference of scienter.  Among other things, plaintiff suggests that Diamond's CEO and CFO were motivated to engage in accounting fraud to enrich themselves, but *ignores* that neither sold any Diamond stock during the class period (despite collectively holding more than 880,000 shares and vested options).  In fact, both individual defendants actually purchased Diamond stock in the open market during the class period at high prices, and received options at virtually the peak stock price – refuting plaintiff's central theory that they believed the Company's stock price was artificially inflated.

Equally fruitless is conjecture that defendants were motivated to engage in accounting fraud so they could dump "inflated" stock on Procter & Gamble, Inc. as part of an acquisition.  It defies logic to suggest (as the Complaint does) that defendants would deliberately engage in "obvious" and conspicuous accounting impropriety and then invite a sophisticated corporation and its investment bankers, accountants and lawyers to conduct due diligence.  Indeed, in another PSLRA case, the Ninth Circuit found that strikingly similar allegations negated scienter and warranted dismissal. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747-48 (9th Cir. 2008).

Further negating scienter are plaintiff's allegations regarding Deloitte & Touche LLP ("Deloitte"), Diamond's independent auditor.  There is no allegation that Diamond hid anything from Deloitte or disregarded its advice.  To the contrary, the Complaint alleges that Diamond provided Deloitte with "broad and unfettered access" to accounting records, Deloitte was aware of the first payment and how it was accounted for, and Deloitte provided the Company with an unqualified audit opinion – allegations that simply cannot be reconciled with the theory that management deliberately engaged in accounting fraud.

As a result, the "holistic" analysis required by *Tellabs* reveals that plaintiff's theory of fraud is implausible, and that the far more "cogent and compelling" inference is that Diamond personnel simply made a mistake in accounting for the payments to growers. The Complaint's references to various "confidential witnesses" do nothing to alter that conclusion. Not only does plaintiff fail to plead the requisite facts showing that those witnesses are reliable or have personal knowledge of relevant facts, nothing they say is indicative of accounting fraud. Those witnesses do not claim the CEO, CFO or anyone else made a deliberate decision to account improperly for the payments at issue. Nor, tellingly, do those sources (not even those who worked in Diamond's finance department) contend they were ever told to hide information from Deloitte or P&G.

Apart from the issue of scienter, the Complaint also fails to plead loss causation. Although plaintiff seeks recovery for "[t]he decline in Diamond's stock price from September 23, 2011 until the end of the Class Period," it is unable to allege that decline was caused by revelation of the alleged accounting fraud. Rather, plaintiff relies on what it calls "partial disclosures" (including announcement of the Audit Committee investigation) that do not suffice to show loss causation.

Plaintiff is unable to plead two of the essential elements of a claim for securities fraud under Section 10(b). The Complaint should be dismissed.

## II.    STATEMENT OF FACTS

### A.    The Parties

San Francisco-based Diamond, founded in 1912, began as a member-owned agricultural cooperative. ¶¶ 11, 27.[1] It became a Delaware corporation and completed a public offering in 2005. ¶ 27; RJN Ex. A (Form S-1, filed Mar. 25, 2005), at 1.[2] Michael J. Mendes joined the Company in 1991, and became its president and CEO in 1997. ¶ 12. Steven M. Neil became Diamond's CFO in 2008. ¶ 13. Deloitte is the Company's independent outside auditor. ¶ 15.

Plaintiff Mississippi PERS brings suit on behalf of an alleged class of persons and entities who purchased Diamond common stock between October 5, 2010 and February 8, 2012 (the

---

[1] Unless otherwise specified, citations to "¶ __" refer to numbered paragraphs of the Complaint.
[2] Documents filed with the SEC are subject to judicial notice and may be considered on a motion to dismiss. *See, e.g., In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010). Documents may also be considered if they are referenced in the Complaint. *Id.*

"class period").  ¶¶ 1, 9.  It was appointed lead plaintiff on March 20, 2012.  ¶ 10.

## B. Diamond And Its Business

By the time of its public offering in 2005, Diamond was the leading purveyor of culinary and in-shell nuts in the United States (under its Diamond of California brand), and a leading marketer of culinary and snack nuts (under its Emerald of California brand) – represented in over 60,000 retail locations and over 100 countries.  RJN Ex. A at 1.  Diamond not only expanded its legacy walnut business but diversified its operations by introducing new, higher-margin products to its snack and culinary businesses.  ¶¶ 29, 30.  In 2006, Diamond acquired the assets of Harmony Foods Corporation (including a processing facility allowing for expansion into complementary snacks, such as trail mix and dried fruits).  ¶ 29.  It acquired the PopSecret microwave popcorn business from General Mills in 2008 and, two years later, acquired Kettle Foods (the premium potato chip maker).  Id.  By 2010, Diamond's annual revenues had grown to $680 million.  ¶ 31.

In late 2009 and early 2010, representatives of Procter & Gamble (P&G) and Diamond had preliminary discussions about the possibility of Diamond acquiring P&G's Pringles snack chip business.  ¶¶ 42-44.  Diamond made several offers, which P&G rejected.  By September 2010, the discussions were terminated.  ¶¶ 46, 47; RJN Ex. B (Form S-4, filed June 20, 2011) at 127-29.

In February 2011, Diamond and P&G began discussions anew.  ¶ 48.  Negotiations proceeded and, on April 5, 2011, Diamond announced an agreement to merge the Pringles business into Diamond.  ¶ 49; RJN Ex. B at 131.  In essence, Diamond agreed to pay $2.35 billion for Pringles, of which $1.5 billion would consist of Diamond common stock (subject to the possibility of certain adjustments based on changes in Diamond's stock price).  ¶ 49.

While Diamond diversified its operations, its walnut business continued.  Given the nature of that business, the Company entered into long-term Walnut Purchase Agreements ("WPAs") with its growers, both to secure its supply and to protect against fluctuations in commodity prices.  ¶ 236.  Under the WPAs, Diamond was obligated to buy the entire walnut crop from its growers each year, but had discretion in setting the purchase price, and could unilaterally set the price in "good faith, taking into account market conditions, crop size, quality, and nut varieties, among other relevant factors."  Id.  Historically, Diamond paid walnut growers for a given year's crop in

three installments: delivery payments in connection with the fall harvest; a "progress" payment around February; and a final payment by August. ¶¶ 37-38; Complaint, Exs. 3-4. Because Diamond determined the ultimate price it would pay for walnuts only after taking delivery of the crop each year, it relied on price estimates for purposes of its interim financial statements. ¶¶ 38, 94. Final walnut costs were to be reflected in Diamond's year-end financial statements. *Id.*[3]

The WPAs offered stability to Diamond and its growers alike. ¶¶ 36, 179. For example, during the 2008 global economic downturn, when demand for walnuts was weak, Diamond still took its growers' entire crops and paid its growers more than other walnut handlers were paying. ¶¶ 58, 179. For the 2009 crop year, the California walnut industry (including Diamond growers) delivered the largest supply in its history, 987.5 million pounds. Complaint, Ex. 1. That record crop was exceeded the following year, reaching 1.088 billion pounds in 2010. *Id.*, Ex 2. Despite the record supply, however, the market for walnuts was unexpectedly "booming" (due largely to demand in China and Turkey, markets in which Diamond did not participate) and the prices paid by non-Diamond handlers increased. ¶¶ 165, 166, 179, 287.

Although Diamond was not set to (and did not) match the prices paid by other handlers, it made an additional $20 million payment in August 2010, which it treated as a pre-harvest payment of the upcoming fall crop (*i.e.*, paid and accounted for in fiscal 2011). ¶ 57. That "continuity" payment was an effort by Diamond to distinguish itself in the competitive market environment by demonstrating the value of the "multi-year supply arrangement" with its growers. Complaint, Ex. 1. Plaintiff alleges that the continuity payment, and Diamond's accounting for it, were vetted and approved by Deloitte, which issued an unqualified audit opinion for fiscal 2010. ¶¶ 59, 288, 305.

The following year, with prices paid by non-Diamond handlers remaining high (¶ 62), Diamond made a similar "momentum payment" of about $60 million to walnut growers. ¶ 399. While the nomenclature evolved, the concept was the same: the September 2011 payment was designed to "convey[] the anticipated value added by [Diamond's] branded walnut retail business" going in to the next crop year. ¶ 69; Complaint, Ex. 3. As with the continuity payment, the costs associated with the momentum payment were recognized in the fiscal year it was made. ¶ 81.

[3] Diamond's fiscal year ends July 31 (*i.e.*, fiscal 2010 ended July 31, 2010). ¶ 38.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### C. Diamond Discloses The Audit Committee Investigation And Conclusions

On November 1, 2011, Diamond announced that its Audit Committee had determined to conduct an investigation into the accounting for certain crop payments to walnut growers. ¶ 171; RJN, Ex. C (Form 8-K, filed Nov. 1, 2011). In light of the investigation, the Company further disclosed that the close of the Pringles acquisition would be delayed. *Id*.

On February 8, 2012, Diamond announced that the Audit Committee had substantially completed its investigation and concluded that the $20 million continuity payment in August 2010, and the $60 million momentum payment in September 2011, had not been accounted for in the correct periods. ¶ 212; RJN, Ex. D (Form 8-K, filed Feb. 8, 2012). Diamond further disclosed that its previously issued financial statements for fiscal 2010 and fiscal 2011 (as well as the interim quarterly periods in fiscal 2011 and the fourth quarter of fiscal 2010) should no longer be relied upon, and correction of the errors would require restatement of the Company's financial results for the affected periods. *Id*. At the same time, the Company announced that Mr. Mendes and Mr. Neil had been placed on administrative leave. *Id*. On February 15, 2012, Diamond announced the termination of the Pringles acquisition, by mutual agreement of the parties. ¶ 219.

### D. Procedural History And Claims

The first of five securities class actions was filed on November 7, 2011, just a few days after the Audit Committee investigation was announced. After consolidation and appointment of lead plaintiff and lead counsel, the Consolidated Complaint was filed on July 30, 2012.

Plaintiff assails a series of public statements during the class period – primarily SEC filings and press releases, as well as comments made during analyst conference calls – concerning, *inter alia*, Diamond's financial results, internal controls, grower payments, and the Pringles acquisition. ¶¶ 82-222. Despite that broad sweep, the Complaint alleges that all of the statements were false for the same reason: they did not disclose that Diamond failed to account properly for the continuity and momentum payments. *See, e.g.,* ¶¶ 97, 106, 120, 131, 143, 153, 164.

Relying on Diamond's ability to set walnut costs (¶ 52), plaintiff posits an expansive scheme whereby defendants deliberately understated those expected costs to boost earnings and then, when payments came up short at year's end: (i) devised the continuity and momentum

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

payments to placate growers; and (ii) caused Diamond to defer improperly the charges associated with those payments. ¶¶ 55, 56, 60, 68-69. In other words, plaintiff suggests the accounting decision to treat the continuity payment as an expense in fiscal 2011 (when payment was actually made), and the concomitant decision to book the momentum payment as an expense in fiscal 2012, were not merely mistakes but rather part of a grand plan hatched in the fall of 2009. ¶ 52.

Plaintiff hypothesizes two primary motives for this alleged scheme. First, the Complaint avers that Mr. Mendes and Mr. Neil (whose compensation was dependent in part on Diamond's earnings) were motivated to manipulate financial results in order to enrich themselves. ¶ 27. Second, plaintiff speculates that Mr. Mendes and Mr. Neil wanted to inflate Diamond's stock price as a means of enhancing the Company's ability to acquire Pringles from P&G. ¶¶ 40-81, 297. Because consideration for Pringles would involve a stock component, plaintiff theorizes, it was "essential for Mendes and Neil to maintain the market price of Diamond's common stock." ¶ 42.

Based on these allegations, the Complaint asserts claims against Diamond, Mr. Mendes, Mr. Neil and Deloitte for violations of Section 10(b), and sues Mr. Mendes and Mr. Neil as control persons under Section 20(a). ¶¶ 442-469. Plaintiff alleges class members were damaged by "[t]he decline in Diamond's stock price from September 23, 2011 until the end of the [c]lass [p]eriod." ¶ 440. Plaintiff further alleges that decline was caused by a series of "partial disclosures," starting with press reports about the grower payments, continuing through announcement of the Audit Committee and governmental investigations, and culminating in Diamond's February 8, 2012 statement that it would restate certain of its financial results for fiscal 2010 and 2011 as a result of the continuity and momentum payments. ¶¶ 423-440.

## III. LEGAL STANDARDS

A motion to dismiss "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The factual allegations of a complaint must be examined, together with materials referenced in the pleading and those subject to judicial notice, to "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). *See also Tellabs*, 551 U.S. at 322; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

In asserting claims for securities fraud under Section 10(b), plaintiffs must allege the essential elements in accordance with the heightened standards of the PSLRA and Fed. R. Civ. P. 9(b). *In re Rigel Pharms., Inc. Sec. Litig.*, --- F.3d ---, 2012 WL 3858112, at *6 (9th Cir. Sept. 6, 2012); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Accordingly, failure to plead particularized facts showing that defendants made false statements with scienter, or that those statements caused the loss for which plaintiff seeks recovery, mandates dismissal of a securities fraud claim. *Rigel*, 2012 WL 3858112, at *6; *Metzler*, 540 F.3d at 1064-65. The PLSRA thus changes the way in which pleadings are analyzed and represents a "deviation from the usually lenient requirements of federal rules pleading." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001). "In few other areas are motions to dismiss … so powerful." *Id.*

## IV. PLAINTIFF FAILS TO PLEAD FACTS SUFFICIENT TO ESTABLISH A STRONG INFERENCE OF SCIENTER

### A. In Assessing Whether Plaintiff Has Adequately Alleged Scienter, The PSLRA Requires A Holistic Review Of All Relevant Facts

Scienter is "the nefarious mental state necessary to constitute securities fraud." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002). It encompasses either intent to defraud or deliberate recklessness so egregious as to be tantamount to actual intent. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976-77 (9th Cir. 1999). The PSLRA requires plaintiff to plead specific facts establishing a "strong inference" of scienter as to each defendant. 15 U.S.C. § 78u-4(b)(1)-(2); *Tellabs*, 551 U.S. at 321-22.

In *Tellabs*, the Supreme Court held that the "strong inference" standard requires careful examination of all relevant facts – not just those alleged in the complaint, but also materials referenced in the pleading and facts subject to judicial notice – to determine whether they can rationally support a theory of fraud. The Court must undertake a "comparative analysis" to:

> consider, not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs*, 551 U.S. at 314. *See also Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) ("the

court must consider all reasonable inferences…, including inferences unfavorable to the plaintiffs"). In determining whether plaintiff has met its pleading burden, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. *See also Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324-25 (2011).

**B.     The Relevant Facts, When Considered In Their Totality, Are Inconsistent With Plaintiff's Theory Of Fraud And Instead Support An Inference Of Nonfraudulent Intent**

Plaintiff offers a number of theories designed to plead scienter, relying heavily on "motive and opportunity" allegations – *i.e.*, that Mr. Mendes and Mr. Neil were motivated to engage in accounting fraud in order to increase their personal wealth and entice P&G to enter into an agreement to sell Pringles to Diamond. Plaintiff also argues that the purported misconduct was so obvious and "lacking complexity" that fraudulent intent may be inferred – not only as to Mr. Mendes, Mr. Neil and Diamond, but also as to Deloitte. However, as discussed below, a holistic review of these allegations leads to the ***opposite*** conclusion: plaintiff's theory of fraud is illogical, and the inference of nonfraudulent intent (*i.e.*, an honest mistake with respect to Diamond's accounting issues) is far more cogent and compelling.

**1.     Contrary To Plaintiff's Conjecture Regarding Defendants' Supposed Motive To Enrich Themselves, Mr. Mendes' and Mr. Neil's Stock Holdings Negate An Inference Of Fraud**

Plaintiff posits that Messrs. Mendes and Neil "were motivated to misrepresent Diamond's financial results" to enrich themselves with "large cash bonuses and stock option grants … closely tied to the Company's financial performance." ¶ 407. *See also* ¶ 27. The Ninth Circuit recently held that similar allegations were insufficient to establish a strong inference of scienter:

> …it is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals. Thus, especially given the holistic approach to assessing scienter adopted in *Tellabs* and the requirement that we take into account plausible opposing inferences, we will not conclude that there is fraudulent intent merely because a defendant's compensation was based in part on such successes.

*Rigel*, 2012 WL 3858112, at *12.

Moreover, as in *Rigel*, "the individual defendants' conduct concerning their [Diamond] stock is inconsistent with Plaintiff's theory that financial motive establishes scienter here." 2012 WL 3858112, at *13. As of December 2011, Mr. Mendes and Mr. Neil held the following:

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | Diamond Shares | Vested Options | Unvested Options |
|---|---|---|---|
| Mr. Mendes | 149,228 | 609,699 | 250,138 |
| Mr. Neil | 39,528 | 83,318 | 50,409 |

RJN, Exs. E and F (SEC Form 4 filings).  Contrary to the allegation that Mr. Mendes and Mr. Neil

engineered a scheme to "inflate artificially the price of the Company's common stock" (¶ 2), they

**sold none of these holdings during the class period** (RJN, Exs. E and F)[4] – even though the **price**

**rose to more than $96 per share** (¶ 175), and they held vested options with exercise prices as low

as $17.00.  RJN, Ex. E at 1-2; Ex. F at 1-2.  These are powerful facts undermining any inference of

scienter, and "support[ing] the opposite inference" that defendants had no intent to defraud.  *See,*

*e.g., Rigel*, 2012 WL 3858112, at *13.  *See also In re Downey Sec. Litig.*, 2009 WL 2767670, at

*13 (C.D. Cal. Aug. 21, 2009) ("a strong inference of scienter is negated when there is an absence

of stock sales or where such sales are minimal"); *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL

1469654, at *20 (N.D. Cal. May 25, 2006) (where one defendant did not sell "his stock during the

class period," that fact "actually negate[d] a finding that the Defendants were engaged in fraud").

Underscoring the lack of scienter is Mr. Mendes' sale of 150,000 shares in 2009, **before**

**the class period**.  RJN, Ex. E at 55-56.  "In other words, [Mr. Mendes] held on to [Diamond] stock

when its price was allegedly inflated and sold when it was not." *Cement Masons & Plasterers Jt.*

*Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012).  That fact further

undermines the Complaint's central theory of fraud, and makes clear plaintiff cannot satisfy its

pleading burden under the Reform Act and *Tellabs*.  *Id.*

Even more significantly, Mr. Mendes and Mr. Neil **increased their holdings** in the class

period.  They bought more than 9,400 Diamond shares in the open market (RJN, Ex. E at 59-60,

63-68, 73-74; Ex. F at 25-26, 35-36), including Mr. Mendes' purchase in September 2011 at

$80.60 per share and Mr. Neil's purchase in October 2011 at $71.37 per share.  *Id.*  Put simply,

rather than cashing out when the stock price was high, these executives **added more shares** to their

holdings – and then **saw the value of their collective holdings decline more than $60 million**

---

[4] As noted in the Form 4s, defendants' only "dispositions" during the class period consisted of the relinquishing of certain shares, pursuant to SEC Rule 16b-3(e), to pay tax withholding obligations resulting from the vesting of restricted stock.  RJN Ex. E at 69-70; Ex. F at 29-32.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

from the stock's apex to the end of the class period. Such facts are utterly inconsistent with a belief that Diamond's stock price was artificially inflated, and "instead give[] rise to an inference of good faith" *Zack v. Allied Waste Indus., Inc.*, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).

Mr. Mendes and Mr. Neil also **received option grants** (100,368 and 30,110 shares, respectively) in September 2011, at an exercise price of $91.13 per share. RJN, Ex. E at 71-72; Ex. F at 33-34. As Judge Whyte has noted, acquisition of these "new stock options, which were keyed to prices that plaintiff alleges were artificially inflated," is another fact that "negates any reasonable inference of scienter." *Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000).

### 2. Plaintiff's Allegations Regarding Deloitte Are Inconsistent With An Intent to Defraud

In cases involving alleged accounting fraud, scienter may be negated where defendants consulted with outside auditors, especially in the absence of facts showing defendants misled the auditors or disregarded their advice. *Metzler*, 540 F.3d at 1069; *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1465 (N.D. Cal. 1996); *In re Winstar Commc'ns Sec. Litig.*, 2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006). Here, plaintiff's allegations regarding Deloitte's knowledge of the transactions at issue and its "unfettered" access to Diamond's records and financial information refute an inference of scienter.

According to plaintiff, Deloitte was aware of the continuity payment at or about the time it was made in August 2010 – and, critically, before Diamond finalized its financial results for fiscal 2010. ¶ 288 ("Deloitte became aware of the $20 million payment while performing its audit procedures related to Diamond's financial statements for Fiscal Year 2010"). *See also* ¶¶ 291-293. Yet plaintiff does not allege the "external auditors counseled against" Diamond's accounting treatment of that payment. *Metzler*, 540 F.3d at 1069. To the contrary, plaintiff alleges Deloitte "submitted an unqualified audit opinion" for 2010. ¶ 305. *See also* ¶¶ 361-367. When conducting the "comparative analysis" mandated by *Tellabs*, these allegations are "highly probative of an absence of scienter." *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1157-58 (C.D.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Cal. 2007) (dismissing complaint where, among other things, auditors issued an "unqualified audit opinion that [the] financial statements present fairly, in all material respects, the financial position of the Company"). *See also In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1166 (C.D. Cal. 2007) (Deloitte's "clean audit opinion" was a fact that "weighs against scienter").

Notably, plaintiff does not allege that Mr. Mendes, Mr. Neil or anyone else at Diamond tried to hide the continuity payment (or any facts relating to the payment and its accounting treatment) from Deloitte. Indeed, plaintiff alleges that Deloitte had "***broad and unfettered access to Diamond's accounting records and information***." ¶ 359 (emphasis added). This is yet another powerful fact rebutting an inference of scienter and supporting an inference of nonfraudulent intent. *Cirrus Logic*, 946 F. Supp. at 1463 (fact that defendants made "extensive disclosure to, and voluntarily consulted with, [outside auditors] on all material accounting reserve decisions" is conduct that "tends to negate an inference of scienter"). Likewise, plaintiff avers that the relevant facts were supposedly obvious from Diamond's financial statements and records (¶¶ 293, 316, 317) – in other words, according to the Complaint, the Company and its officers apparently did not disguise or hide the nature and purpose of the continuity payment from the auditors. *See In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *13 (N.D. Cal. Feb. 17, 2010) (dismissing complaint for failure to plead a strong inference of scienter and noting, *inter alia*, the absence of facts showing that "[d]efendants attempted to deceive [the company's] auditors"); *In re WatchGuard Sec. Litig.*, 2006 WL 2038656, at *5-6 (W.D. Wash. Apr. 21, 2006) (where "a blatant [accounting] error" was made "in open and notorious fashion for years, it is reasonable to infer that a Defendant who perpetuated the error did not do so deliberately").

Unable to allege that Diamond or its officers concealed the continuity payment from the auditors, plaintiff instead hypothesizes that Deloitte chose to participate in a "fraudulent scheme." *See, e.g.,* ¶¶ 305, 379-380. Not only is that speculation unsupported by any factual allegations (as discussed in Deloitte's motion to dismiss), it is irrational to suggest that a major accounting firm would risk its reputation or subject itself to liability by deliberately engaging in such misconduct. *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000) ("The accountant's success depends on maintaining a reputation for honesty and integrity, requiring a

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client"), *aff'd*, 288 F.3d 385 (9th Cir. 2002). Underscoring that irrationality is plaintiff's allegation that P&G – which would have received about $1.5 billion of "artificially inflated" Diamond stock in the Pringles deal, and hence would have been directly injured by a deliberate scheme to falsify Diamond's financial results (¶ 49) – was itself one of Deloitte's biggest clients. ¶¶ 359, 378. Plaintiff pleads no facts to show that Deloitte – which allegedly earned nearly $34 million a year from P&G, about 2300% more than it earned from Diamond (¶ 380) – would knowingly destroy its relationship with P&G.

Plaintiff's allegations concerning Deloitte also negate any inference that defendants knew Diamond improperly accounted for the September 2011 momentum payment. Given that the relevant allegations and facts overwhelmingly support the inference that defendants believed (even if mistakenly) the August 2010 continuity payment should be recognized in the fiscal year in which it was actually paid, it is equally reasonable to infer defendants believed the momentum payment should be treated the same way and recognized in fiscal 2012. The Complaint supports that conclusion by: (i) admitting the similarity of the two payments (¶¶ 69, 70, 308); and (ii) failing to allege that Mr. Mendes, Mr. Neil or anyone else at Diamond concealed information regarding the momentum payment from Deloitte, or disregarded advice as to the proper accounting treatment of that payment. *See Metzler*, 540 F.3d at 1069; *Taleo*, 2010 WL 597987, at *13.

### 3. Allegations Regarding P&G Likewise Undercut Any Theory Of Fraud

The Complaint repeatedly suggests that the desire to acquire Pringles from P&G created a motive to engage in accounting fraud, in order to artificially inflate Diamond's stock price (because Diamond stock would comprise a substantial portion of the consideration in a Pringles deal). *See, e.g.*, ¶¶ 2, 42, 52, 297. Not only are such motive allegations inadequate to plead scienter under the PSLRA (*see Glazer*, 549 F.3d at 748), but plaintiff's averments concerning P&G and the Pringles transaction end up *refuting* an inference of fraudulent intent.

As the Complaint makes clear, P&G retained a bevy of sophisticated advisors to assist in its dealings with Diamond, including Morgan Stanley, The Blackstone Group and Deloitte. ¶¶ 42, 179, 360. It is irrational to suggest that Mr. Mendes and Mr. Neil would implement an "obvious"

fraudulent scheme to misstate Diamond's financial results for 2010 and 2011, and then knowingly invite scrutiny from one of the world's largest and most sophisticated companies – not to mention the investment bankers, accountants and lawyers conducting comprehensive due diligence on P&G's behalf. *See Glazer*, 549 F.3d at 748; *see also In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 664 (D. Md. 1999). That is particularly true given the obvious importance of Diamond's financial statements to P&G and its shareholders. *See, e.g.,* ¶ 165 (quoting news article noting that "how the company packages its 'momentum payment' in financial reports surely matters to P&G shareholders as they consider switching into Diamond stock").

The Ninth Circuit's decision in *Glazer* is especially instructive. In that case, a company (InVision) disclosed FCPA violations after it had agreed to be acquired by General Electric (GE). *Glazer*, 549 F.3d at 740. Plaintiff alleged that InVision's CEO knew of the violations at the time of the GE deal, and that his statements regarding the company's FCPA compliance were therefore actionable. *Id.* at 747-48. In finding that plaintiff failed to plead scienter, the court noted that the CEO had made compliance representations directly to GE, and that fact:

> **undercuts any inference** that [the CEO] knew about the FCPA violations when he signed the merger agreement, **because such knowledge would have required him to make false representations knowingly**, not only to the investing public, but also **to the very company that would shortly be conducting a due diligence inquiry**.

*Id.* at 748 (emphasis added). *See also CIENA*, 99 F. Supp. 2d at 663-64 (allegation that CEO knowingly made false statements was not plausible given proposed merger and awareness of impending due diligence). As in *Glazer*, the presence of a highly sophisticated acquirer and its advisors, and the knowledge that they would engage in extensive due diligence, negate an inference that defendants knowingly misstated Diamond's financial results.

Other allegations underscore that conclusion. Plaintiff claims Diamond's accounting improprieties were obvious, "materially large" and not complex. ¶ 418. If true, that would also support an inference that defendants had no intent to defraud, because they could not expect such "obvious" issues to escape detection during due diligence. *CIENA*, 99 F. Supp. 2d at 664 (no scienter where, *inter alia*, defendants would have known acquirer's due diligence was likely to address matters allegedly misrepresented). Allegations regarding Deloitte's relationship with

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

P&G (¶¶ 378-380), and that "Deloitte had two separate teams reviewing and analyzing Diamond's accounting records" (¶ 360), further eviscerate any inference that defendants believed there was an "obvious" accounting error that would be ignored in the due diligence process.

**4.      The Prominent Nature Of The Continuity And Momentum Payments Is Another Fact Negating An Inference Of Scienter**

Plaintiff does not claim the acts underlying the alleged accounting fraud (the continuity and momentum payments) were surreptitious or even inconspicuous.  Rather, the Complaint avers the $20 million and $60 million payments were "obvious," "extraordinary" and prominent (*see, e.g.,* ¶¶ 3, 288, 291, 293, 308, 309, 316, 317, 414, 418) – allegations inconsistent with an inference of fraudulent intent.  *See WatchGuard*, 2006 WL 2038656, at *5-6.  Of particular note, the payments were expressly called out in letters to walnut growers (¶¶ 56, 69), a group highly motivated to scrutinize matters pertaining directly to their livelihood.  In fact, plaintiff acknowledges the growers were understandably focused on walnut prices and payments they received from Diamond (¶¶ 58, 61, 71-75), and were not reticent about taking their concerns to the Company or the press. ¶¶ 76, 165, 166.  Those facts highlight the implausibility of plaintiff's theory of fraud.  *See Medis Inv. Group v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 147 (S.D.N.Y. 2008) (dismissing complaint and noting it "def[ies] common sense" to suggest "that Defendants consciously disseminated false information to that segment of the investing public with the most to gain by ferreting out any inaccuracies in their statements"), *aff'd*, 328 F. App'x 754 (2d Cir. 2009).

**C.      Plaintiff's Accounting Allegations Are Inadequate To Plead Scienter And Do Not Overcome The Absence Of A Plausible Theory Of Fraud**

To plead accounting fraud, plaintiff must allege particularized facts to show "defendants knew specific facts … that rendered their accounting determinations fraudulent."  *Rudolph v. UT Starcom*, 560 F. Supp. 2d 880, 889 (N.D. Cal. 2008); *see also In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) ("allegations of GAAP violations must be augmented by facts that shed light on the mental state of defendants, rather than conclusory allegations that defendants must have known of the accounting failures due to the degree of departure from established accounting principles").  Inasmuch as plaintiff's own

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    allegations negate an inference of scienter (as discussed above), it is not surprising that the

2    Complaint fails to plead facts showing that Mr. Mendes, Mr. Neil or anyone else at Diamond

3    made a deliberate decision to account improperly for the continuity and momentum payments.

### 1. Neither A Restatement Nor An Alleged GAAP Violation Establishes Scienter Under The PSLRA

6    Contrary to the assumption that seemingly suffuses the Complaint, the fact that Diamond

7    eventually decided to restate historical financial results does not establish scienter. *Zucco*, 552

8    F.3d at 1000 ("the mere publication of a restatement is not enough to create a strong inference of

9    scienter"); *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *4 (N.D. Cal. Mar. 11, 2011)

10   (same). Likewise, GAAP violations, without more, are inadequate to plead scienter. *DSAM*, 288

11   F.3d at 390; *McCasland v. FormFactor, Inc.*, 2008 WL 2951275, at *9 (N.D. Cal. July 25, 2008).

### 2. The Confidential Witness Allegations Do Nothing To Establish That Defendants Made Accounting Determinations Knowing They Were False

14   Plaintiff's effort to plead accounting fraud hinges largely on confidential witnesses. Such

15   sources do not suffice to plead scienter unless they: (i) are described with sufficient particularity to

16   establish their reliability and personal knowledge of the matters alleged; and (ii) offer statements

17   that are themselves "indicative of scienter." *Zucco*, 552 F.3d at 995. Thus, a confidential witness

18   account is ineffectual absent reliable information directly suggesting the "intentional or conscious

19   misconduct" of defendants. *South Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)

20   (quoting *In re Silicon Graphics*, 183 F.3d at 977). Here, plaintiff relies on two types of

21   confidential witnesses: walnut growers ("Grower CWs") and a few former employees ("Employee

22   CWs"). None of them has the requisite knowledge or sets forth facts indicative of fraud.

### a. The Grower CWs Had No Contact With Defendants And Offer Nothing To Suggest Intentional Misconduct By Defendants

25   None of the Grower CWs claims to have had any personal interaction with the defendants,

26   let alone knowledge of improper accounting. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical,*

27   *Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) (rejecting as unreliable accounts of

28   witnesses who had no direct communication with defendants); *In re Accuray, Inc. Sec. Litig.*, 757

F. Supp. 2d 936, 949 (N.D. Cal. 2010) (absent interaction with defendants, it was "difficult to surmise how the opinions and observations of the CWs could support a reasonable inference about what these individual [d]efendants knew or did not know at the time [of] each of the challenged statements").[5]  Instead, the Grower CWs offer anecdotal accounts of how their payments measured up to what they heard *non-Diamond* walnut handlers may have paid *non-Diamond* growers for nuts of unspecified variety and quality. *See, e.g.*, ¶¶ 61, 71-74.  While such allegations may be grist for the rumor mill, they do not substitute for personal knowledge of deliberate misconduct by defendants with respect to walnut pricing or accounting. *See In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("[t]he Court must be able to tell whether a confidential witness is speaking from personal knowledge or 'merely regurgitating gossip and innuendo'"); *Zucco*, 552 F.3d at 997 (CWs' allegations based on hearsay insufficient to meet reliability standard); *Downey*, 2009 WL 2767670, at *9 ("statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation").[6]

Even a cursory review of the Grower CW allegations demonstrates these deficiencies. Only two of these sources (CW6 and CW7) mention the 2009 crop year or August 2010 continuity payment.  ¶¶ 58, 59.  To the extent those topics are addressed, these CWs merely allege Diamond paid slightly less than "other handlers" that year and one thought the continuity payment was "a nice gesture" intended to address the difference.  *Id.*  Such averments do not address accounting for the continuity payment, let alone show defendants deliberately accounted for it improperly. *Zucco*, 552 F.3d at 995 (statements offered "must themselves be indicative of scienter").

---

[5] *See also In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *9 (N.D. Cal. Aug. 27, 2010) (rejecting CW allegations where complaint did not indicate witnesses had any interaction with defendants); *Bare Escentuals*, 745 F. Supp. 2d at 1078-79 (allegations not indicative of scienter as to certain defendants where CWs did not allege any information concerning those defendants).

[6] Indeed, under the WPAs, Diamond had discretion to set the price it paid its growers each year, and rumored prices paid for walnuts by others does nothing to undermine the propriety of that determination.  ¶¶ 36, 94.  Moreover, variety alone accounts for great disparity in pricing. *See* Complaint, Ex. 5 (USDA Walnut/Raisin/Prune Report 2010 Crop Year) ("USDA Report") (weighted *average* price by walnut variety for the 2010 crop year ranged from $0.77 to $1.11 per pound).  Typifying the problem inherent in such secondhand accounts is CW1's claim that "Diamond was $0.70 to $0.80 under market" for the 2010 crop year, at around "$0.60 [per pound]" (¶ 61).  Following CW1's math, walnuts would have finalized at $1.30 to $1.40 per pound. However, the Complaint elsewhere concedes that the final average price for walnuts for the 2010 crop year was just under $1.02.  *See* Complaint, Ex. 5 (USDA Report).

Fenwick & West LLP
Attorneys at Law
San Francisco

For the same reasons, Grower CW accounts of discontent over Diamond's 2010 crop year payments or the September 2011 momentum payment do not support claims of fraud. Dashed hopes aside, that CW9 "anticipated" his August 2011 "final payment" would be significant (given prices he heard non-Diamond handlers were paying), but was disappointed when "he only received a small payment" (¶ 73), does ***not*** suggest ***intentional accounting fraud.*** Likewise, claims that CW7 and CW10 were dissatisfied with their final 2010 crop payments but received substantial momentum payments (¶¶ 72, 74, 76), or CW8's unexplained opinion that the momentum payment seemed like "accounting hocus pocus" and did not break out "what price he was getting for which varieties and grades" of walnuts (¶ 71), remain untethered to facts suggesting knowing misconduct by defendants.[7] *See Zucco*, 552 F.3d at 998 (rejecting conclusory assertions by CWs); *Metawave*, 298 F. Supp. 2d at 1070 (absent specific allegations showing the requisite particularity and personal knowledge, a "shared opinion" of CWs does not suffice to establish scienter).

Significantly, not a single Grower CW attests to *any* personal interaction with either of the individual defendants. *See Intuitive Surgical*, 2012 WL 1868874 at *2; *Accuray*, 757 F. Supp 2d at 949. The most the Grower CWs allege is that some Diamond personnel may have been unclear or mistaken when discussing the momentum payment. For example, CW1 was reportedly told the payment was for the 2010 crop, but was "budgeted" or "forecast" into 2011 (¶ 77), while CW7 claims growers who cancelled their contracts for Fall 2011 were told by a field representative that they could keep the payment because it was for 2010 (¶ 79). Even crediting CW1's recollection or CW7's hearsay account, absent from those allegations is any indication of deliberate misconduct involving either of the individual defendants. *See Curry v. Hansen Medical, Inc.*, 2011 WL 3741238, at *5 (N.D. Cal. Aug. 25, 2011) (discounting confidential witness accounts that failed to "demonstrate that the [i]ndividual [d]efendants had knowledge of the alleged of purportedly fraudulent activity"). *See also Tibco*, 2006 WL 1469654, at *18 (rejecting confidential witness

---

[7] If anything, allegations that the momentum payment did not include a breakdown by variety and quality are entirely consistent with it being an advance for a crop not yet delivered (as to which grading and quality data would not yet be available). *See* ¶ 168 (Oct. 3, 2011 Diamond press release that it "made a pre-harvest momentum payment to walnut growers in early September, prior to the delivery of the fall walnut crop"); Complaint, Ex. 2 (Aug. 31, 2011 letter to growers noting that, "on September 2nd, [the Company] will mail a momentum payment designed to reflect the projected market environment ***prior to your delivery of the 2011 crop***") (emphasis added).

allegations where plaintiffs "fail[ed] to provide information that would suggest that Defendants either knew that the false statements being made were false *when made* or that they were acting in a deliberately reckless manner"). Claims that payments were too low, or that growers were confused, unaccompanied by a single allegation suggesting intentional misconduct by defendants, do not add up to securities fraud. *See Downey*, 2009 WL 2767670, at *11 ("The second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud").

> **b.** **The Employee Confidential Witnesses Fail to Meet The Two-Part Test Under *Zucco***

> **i.** **The Employee CWs Lack Personal Knowledge Of Facts Relevant to Defendants' Scienter**

Plaintiff fares no better as to the four Employee CWs. The Complaint fails to establish that those sources can speak knowledgably about defendants' intent with respect to walnut payments or the challenged accounting decisions. *See Zucco*, 552 F.3d at 995-96 (plaintiff must offer "sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge").

Indeed, only one of the employees (¶ 35) is alleged to have been at Diamond throughout the relevant period. CW2 left by November 2010 (about a month into the class period), and CW3 exited by May 2011 (before the final 2010 crop year and momentum payments). ¶ 32. Thus, neither can even arguably support allegations of fraud for the bulk of the class period. *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1015 (N.D. Cal. 2006) (witness whose tenure ended prior to class period lacked personal knowledge of activities during that period), *aff'd*, 303 F. App'x 431 (9th Cir. 2008). Similarly, CW4 was at Diamond for just six months of the class period, and is offered for the lone proposition that Mr. Mendes decided everything from "what soda to stock in the vending machine to whom to hire." ¶ 33. Even if CW4 could shed light on the CEO's beverage preferences in late 2011, plaintiff provides no basis for concluding that CW4 (a "human resources" employee) was in position to know, at any time, Mr. Mendes' awareness of the accounting for payments to growers. *See Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201-02 (N.D. Cal. 2008) (CW allegations do not "carry any weight" absent "first-hand knowledge of Defendants' accounting decisions").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The allegations suffer from other defects. For example, apart from CW2's short tenure (working at Diamond for just one month during the class period), plaintiff cannot decide whether CW2 was a "financial accountant" with a need to know about grower payments (¶¶ 32, 39), or instead a "Senior Director of Customer Marketing" focused on "the color of labels for packaging" (¶¶ 390, 393). More significantly, even if he were a "financial accountant," CW2 actually *disclaims* any insight into decisions on walnut pricing or accounting for grower payments. Thus, while CW2's "opinion" might be that Mr. Mendes "knew every detail [about grower payments]" (¶ 32), the basis for that conclusory statement is entirely undermined by CW2's later claim that information regarding "[g]rower payments [was] held very close to the vest" and *was not shared with him*. ¶ 39. *See In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at *5 (D. Ariz. July 5, 2006) ("confidential witnesses' unreliable or conclusory allegations will not be considered").

CW3's informational deficit is equally stark. By his own admission, "information about grower payments and accounting for those payments" was maintained within a very small circle at Diamond, and *CW3 was not among those in the know.* ¶ 39. *See also* ¶ 385 (alleging decisions on walnut pricing were "a closely guarded secret" among senior executives, as to which others were not informed). Thus, plaintiff fails to establish that these Employee CWs were "positioned to know the information alleged." *Zucco*, 552 F.3d at 996.

### ii. The Employee Confidential Witnesses Offer No Facts To Show That Defendants Deliberately Misstated Diamond's Financial Results

Not only does plaintiff fail to establish that the Employee CWs are knowledgeable or reliable, their allegations are not "indicative of scienter." *Zucco*, 552 F.3d at 995. Not one of the witnesses alleges that defendants made a deliberate decision to account improperly for payments to growers, or knew Diamond's financials were misstated. Rather, the bulk of the Employee CWs' allegations describe routine job activities. CW3, for example, alleges that he conferred with his superiors in finance when, in early 2011, it was determined that the Company's cash position would require it to break its spring payment to walnut growers into two parts, rather than "tap its line of credit." ¶¶ 64-65. These assertions do little more than show that CW3, an "assistant treasurer," and the managers he consulted (including Mr. Neil) were doing their jobs. *See In re*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1048 (N.D. Cal. 2009) (confidential witness reports not indicative of scienter when transactions at issue involved numerous personnel and a chain of review). And while CW3 claims to have heard that Mr. Mendes approved the decision to make a two-part payment (¶ 393), CW3 never alleges there was anything improper about that decision. *See Immersion*, 2011 WL 871650, at *6 (rejecting as unavailing confidential witness allegations that did not demonstrate notice of accounting improprieties).[8]

Nor are the allegations of CW5, a financial accountant (¶ 35), indicative of fraud. Vague claims that, during quarterly "pre-audit" reviews, Mr. Neil urged unspecified "employees" to "be aggressive" (*id.*) raise far more questions than they answer. CW5 provides no detail regarding these purported comments, and hence it is impossible to know: (i) as to what matters employees were urged to be "aggressive"; (ii) what being "aggressive" meant in the context of the alleged discussion (*e.g.*, whether Mr. Neil was actually urging his staff to be more vigilant and rigorous in ensuring that accounting decisions complied with all applicable requirements); and (iii) what accounting decisions, if any, resulted from that purported directive. As a result, the allegations do not plead scienter. *See McCasland*, 2008 WL 2951275, at *3 (no inference of scienter where confidential witness did not supply adequate corroborating details); *In re Business Objects S.A. Sec. Litig.*, 2005 WL 1787860, at *6 (N.D. Cal. July 27, 2005) (rejecting confidential witness statements that were "long on speculation but short on relevant detail").

The gist of CW5's averments is that he did not see the business justifications for walnut commodity cost adjustments he was asked to make, and assumed Mr. Neil was focused on Diamond's profitability. ¶¶ 53-55. Although management's business rationale for setting the crop price may have been opaque to a junior accountant, what remains clear is that ***CW5 never states defendants set the crop price improperly or knowingly caused Diamond to account for those payments in error***. *See In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (no scienter allegations in accounting fraud claim where "confidential witnesses [did

---

[8] Recognizing its inability to plead facts indicative of fraud, plaintiff tries to draw unwarranted inferences from the neutral descriptions of the Employee CWs – for example, the bald assertion that a decision to make two payments was "in violation of the contractually stipulated payment schedule." ¶ 66. Such assertions, devoid of supporting facts, are no substitute for particularized allegations from knowledgeable witnesses. *See Zucco*, 552 F.3d at 995.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

not] have any first-hand knowledge of [defendant's] accounting decisions").  So too, even if Mr. Neil and others in finance may have been concerned with how walnut costs might impact financial results and profitability (¶¶ 53-55), these "facts" do not raise any inference of scienter, but are entirely consistent with reasonable concerns and ordinary responsibilities of corporate officers. *In re Century Alum. Co. Sec. Litig.*, 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010) ("bare allegations that … officers had access to financial statements and analyzed those statements does not support the inference that defendants knew about the accounting error") (citing *Glazer,* 549 F.3d at 746).

Indeed, CW5 (and the other former employees) are ***most noteworthy for what they fail to allege*** – especially in light of plaintiff's other allegations.  As noted above, plaintiff avers that the purported accounting improprieties were "obvious" and not complex (*see, e.g.,* ¶¶ 293, 316, 317, 418), yet none of the former employees claims to have been aware of such erroneous accounting – much less is able to attest to defendants' awareness of it.  ***Nor do the Employee CWs*** (even those, like CW5, who apparently had accounting responsibilities) ***claim they were ever told to conceal any facts from Deloitte***.  That is especially telling given plaintiff's assertion that Deloitte had "broad and unfettered access to Diamond's accounting records and information."  ¶ 359. Similarly, ***the Employee CWs do not suggest that any facts were ever hidden from P&G*** or the advisors conducting due diligence on its behalf.  In conducting the "holistic" analysis mandated by *Tellabs*, the absence of such allegations has enormous significance, and ultimately confirms plaintiff's inability to plead facts raising a strong inference of accounting fraud.

### 3. Allegations Regarding Sarbanes-Oxley Certifications And Internal Control Deficiencies Do Not Substitute For Particularized Facts Establishing Accounting Fraud

Plaintiff cannot salvage its Section 10(b) claim by pointing to the fact that Mr. Mendes and Mr. Neil made internal control certifications under Section 302 of the Sarbanes-Oxley Act.  ¶¶ 199-202.  Such certifications "are not enough to create a strong inference of scienter and do not make [plaintiff's] otherwise insufficient allegations more compelling."  *Zucco*, 552 F.3d at 1004. A contrary rule would "eviscerat[e] the pleading requirements for scienter set forth in the PSLRA."  *Id.*, quoting *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir. 2006).

Likewise, alleged internal control deficiencies (¶¶ 203-211) add nothing to the scienter

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

analysis where, as here, plaintiff does not allege facts showing knowledge of such deficiencies. *See In re Verifone Holdings, Inc. Sec. Litig.*, 2011 WL 1045120, at *12 (N.D. Cal. Mar. 22, 2011). Any other result would permit a plaintiff to allege scienter whenever there is a restatement, contrary to the PSLRA's strict standards. *See Hansen Natural*, 527 F. Supp. 2d at 1158; *see also Hypercom*, 2006 WL 1836181, at *9 ("[p]resumably every company that issues a financial restatement because of GAAP errors will cite as the reason a lack of effective internal controls").

### D. Allegations That Defendants Made The Decisions To Make The Continuity And Momentum Payments Or Other Similar 'Core Operations' Averments Do Not Support Claims That Those Payments Were Knowingly Improper

Plaintiff devotes considerable effort to outlining the individual defendants' access to information, and their roles in the continuity and momentum payments, attention to detail, and hands-on management style. *See, e.g.*, ¶¶ 32, 34, 385-398. This apparent attempt to invoke the "core operations" theory fails to plead scienter. The "core operations" theory applies only in "rare circumstances" where plaintiff pleads facts showing the existence of adverse information so "prominent … that it would be 'absurd to suggest' that top management was unaware" their statements were false. *Zucco*, 552 F.3d at 1001 (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008)). By contrast, where (as here) the "complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *South Ferry*, 542 F.3d at 784. *See also Glazer*, 549 F.3d at 746 ("general allegations of defendants' 'hands-on' management style … are insufficient to create strong inference of scienter"); *U.S. Aggregates*, 235 F. Supp. 2d at 1074 ("plaintiffs must do more than allege that … key officers had the requisite knowledge by virtue of their 'hands on' positions").

Even if one were to assume the "core operations" inference applies as to all things walnuts, and Mr. Mendes and Mr. Neil knew exactly when and how the growers were paid, that would not answer the critical question: whether they knew the ***accounting treatment*** for payments to walnut growers was wrong. Because the Complaint does not set forth such facts, the "core operations" theory does nothing to plead a claim for accounting fraud. *See Taleo*, 2010 WL 597987, at *8-9 (even where defendants allegedly had general knowledge of accounting procedures, no scienter

absent facts showing knowledge of key information alerting them to the misapplication of accounting rules at issue); *City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 473-74 (S.D.N.Y. 2008) (no scienter absent facts showing that defendants "were furnished with information that would have allowed them to discern that the financial data was wrong").

## V.  THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION

As the Supreme Court has recognized, stock price declines can be caused by a myriad of factors unrelated to fraud. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). To avoid dismissal, plaintiff must plead facts to show that the losses for which it seeks recovery were brought about by disclosure of the alleged fraud, rather than some other cause. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005). Put another way, "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1063.

Here, plaintiff seeks recovery for "[t]he decline in Diamond's stock price from September 23, 2011 until the end of the Class Period," which was purportedly "a direct result" of "fraud being at least partially revealed to investors and the market." ¶ 440. Plaintiff's principal effort to plead loss causation is to point to the disclosure of Audit Committee and governmental investigations (¶¶ 429, 435, 436), along with press reports questioning Diamond's accounting (¶¶ 425-428, 431, 432), and note that the stock price declined during the period of those disclosures (*i.e.*, September 2011 through January 2012). However, those allegations do not suffice to plead loss causation.

"[N]either *Daou* nor *Dura* support the notion that loss causation is pled where a defendant's disclosure reveals a 'risk' or 'potential' for widespread fraudulent conduct." *Metzler*, 540 F.3d at 1064. Therefore, announcement of an Audit Committee or regulatory investigation, without a finding of wrongdoing, is not sufficient for loss causation. *See, e.g., In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (disclosure of an "SEC investigation, subpoenas from the United States Attorney's office, and the formation of [a] Special Committee to investigate options granting practices do not reveal the alleged fraud"); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 946 (D. Ariz. 2007) (announcement of special committee investigation not a corrective disclosure); *In re Immersion Corp. Sec. Litig.*, 2011 WL

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6303389, at *10-11 (N.D. Cal. Dec. 16, 2011) (same).[9]  Similarly, press reports speculating on the possible nature or impact of Diamond's accounting are not corrective disclosures; at most, they would reflect a "'risk' or 'potential'" for fraud.  *See Metzler*, 540 F.3d at 1064.

Nor does Diamond's February 8, 2012 announcement regarding the expected restatement of financial results due to the continuity and momentum payments (¶ 437) satisfy the requirements for loss causation.  Once again, plaintiff does not plead that the announcement disclosed any fraudulent conduct.  Moreover, plaintiff can hardly argue that the losses for which it seeks recovery – "[t]he decline in Diamond's stock price from September 23, 2011 until the end of the Class Period" (¶ 440) – were caused by something that was purportedly revealed on the very last day of that class period.  Indeed, the Complaint acknowledges that approximately 80% of the relevant stock price decline occurred ***prior*** to the February 8, 2012 announcement.  ¶¶ 423, 424, 440.  *See Metzler*, 540 F.3d at 1062-63 (under *Dura* and *Daou*, there can be no loss causation where the drop in stock price occurs before the alleged corrective disclosure).[10]

## VI.  CONCLUSION

For the foregoing reasons, plaintiff has failed to state a claim for securities fraud in accordance with the PSLRA, and the Complaint should be dismissed.

Dated:  September 28, 2012

FENWICK & WEST LLP

By: _____/s/ Susan S. Muck_____
                   Susan S. Muck
Attorneys for Defendant Diamond Foods, Inc.

---

[9] *See also Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 821 (D. Ariz. 2009), *vacated in part on other grounds*, 690 F. Supp. 2d 959 (D. Ariz. 2010) ("the court agrees with those courts finding that standing alone the announcement of an internal investigation does not give rise to a viable loss causation allegation").  While other courts have reached a contrary conclusion – *see, e.g., Richard v. Northwest Pipe Co.*, 2011 WL 3813073, at *3 (W.D. Wash. Aug. 26, 2011) (discussing cases) – Diamond submits such decisions cannot be reconciled with *Metzler*'s holding that disclosure of the ***possibility*** of fraud is insufficient to establish loss causation.

[10] Count III of the Complaint, an alleged control person claim under Section 20(a), is not asserted against Diamond.  ¶¶ 466-469.  Nonetheless, Diamond notes that plaintiff's failure to plead an underlying Section 10(b) claim mandates dismissal of the control person claim.  *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).