1
2
3
4                    IN THE UNITED STATES DISTRICT COURT
5
6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    IN RE:
                                                     No. C 11-05386 WHA
9    DIAMOND FOODS, INC.,
     SECURITIES LITIGATION.
10   _____/                       **ORDER ON DEFENDANTS'**
                                                     **MOTIONS TO DISMISS**
11   This Document Relates to:
12        All Actions.
     _____/
13
14                              **INTRODUCTION**
15          In this putative securities class action arising from allegations of false and misleading
16   statements in violation of federal securities laws, defendants move to dismiss the consolidated
17   complaint for failure to plead scienter under the PSLRA and loss causation. The company and
18   individual defendants' motions to dismiss are **DENIED**. The outside auditor's motion to dismiss
19   is **GRANTED**.
20                               **STATEMENT**
21          This is a putative securities class action that arises from allegations of false and
22   misleading statements in violation of federal securities laws. After the actions were consolidated
23   into the above-captioned action, lead plaintiff Mississippi Public Employees Retirement System
24   was appointed and counsel were approved.
25          Plaintiffs are investors who purchased securities of Diamond Foods, Inc., between
26   October 5, 2010, and February 8, 2012. The consolidated complaint brings claims against
27   defendants Diamond Foods, Inc.; individuals Michael J. Mendes, Chairman of the Board and
28   President and Chief Executive Officer of Diamond Foods, Inc., and Steven M. Neil, Chief
     Financial Officer of Diamond Foods, Inc; and Deloitte & Touche LLP, Diamond's outside

**United States District Court**
For the Northern District of California

1   auditor.  The consolidated complaint alleges that defendants deliberately understated commodity

2   costs, specifically the cost of walnuts, and improperly accounted for payments made to walnut

3   growers in order to increase apparent profits and maintain high share prices.  Plaintiff alleges

4   that defendants were motivated in part to inflate share prices during a period in which Diamond

5   was seeking to use its stock to acquire Pringles, a snack chip brand owned by Proctor & Gamble

6   Co.

7                        **ANALYSIS**

8        To state a claim under Section 10(b) of the Securities Exchange Act of 1934, plaintiffs

9   must plead the following:  (i) a material misrepresentation or omission; (ii) scienter (a wrongful

10   state of mind); (iii) connection with the purchase or sale of a security; (iv) reliance; (v) economic

11   loss; and (vi) loss causation (a causal connection between the material misrepresentation and the

12   loss).  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  On a motion to

13   dismiss, all well-pled allegations must be taken as true.  The key question is whether those

14   allegations add up to the inference required by the PSLRA.  Diamond also argues that the

15   complaint fails to plead loss causation.

16        Prior to incorporation in 2005, Diamond was a member-owned agricultural cooperative

17   association that specialized in processing, marketing, and distributing nuts.  In 2005, Diamond

18   converted to a Delaware corporation and completed a public offering of shares (Compl. ¶ 26).

19   Diamond's principal executive offices are located in San Francisco.   Diamond subsequently

20   acquired several snack food brands, including Pop Secret, a brand of microwave popcorn

21   products, and Kettle Foods, a premium potato chip company.  Diamond also processed,

22   marketed, and distributed other nut and snack products.

23        In the spring of 2009, Diamond began discussions with P&G regarding an acquisition

24   from P&G of the Pringles brand of snack chips, held by a wholly-owned subsidiary of P&G.

25   The board of P&G authorized its management to explore a potential divestiture of Pringles in

26   February 2010.  Beginning in May 2010, Diamond submitted four purchase offers to P&G, all of

27   which were rejected by P&G.  Negotiations resumed again in February 2011.  On April 5, 2011,

28   an agreement was reached and Diamond's acquisition of Pringles was announced.  Diamond

**United States District Court**
For the Northern District of California

agreed to exchange shares of Diamond stock and pay $850 million in cash.  The transaction had a "cash collar," such that if the price of Diamond stock dropped, Diamond would increase the cash component up to $1.05 billion, and could reduce the cash component to only $700 million if the stock price rose (*id*. at ¶ 49).

Eventually, after the machinations alleged herein, the deal cratered.  The termination of the deal was announced in February 2012.  "[T]he principal consideration of every offer made by Diamond to P&G to acquire Pringles was Diamond common stock" (*id*. at ¶ 42).  In order to inflate the price of Diamond shares to effectuate the Pringles acquisition, defendants manipulated Diamond's financial statements, in particular its cost of walnuts; that is, instead of matching its cost of walnuts with the revenue earned from selling them, Diamond recognized the revenue part but found a way to postpone accounting for the cost part (*id*. at ¶ 232–38).  Below is a timeline of the Pringles negotiations.



Timeline of Pringles Acquisition

At center stage are how payments for walnuts were accounted for during this period.  Plaintiff alleges that, according to GAAP, the costs associated with purchasing the fall 2009 crop should have been recorded in fiscal year 2010, which ran from August 1, 2009, to July 31, 2010, the same fiscal year as when the revenue therefrom was recognized.  Similarly, costs associated with purchasing the fall 2010 crop should have been booked in fiscal year 2011.  Moreover, because Diamond took delivery of the walnut crop before determining the final price, Diamond recorded estimates of nut costs it expected to incur over the course of the fiscal year, which were reported in its interim financial statements (*id.* at ¶ 38).  Below is a timeline diagram showing the basics of when the crops were delivered in the fiscal (and calendar) year.



Crop Deliveries vs. Calendar Years vs. Fiscal Years

United States District Court

For the Northern District of California

Plaintiff alleges that defendants deliberately understated the payments due to walnut growers at the end of fiscal years 2010 and 2011. Diamond then provided "make-up" payments to walnut growers that it attempted to disguise as payments for *later* crops. Diamond allegedly did so in order to postpone the cost part of the accounting equation, while the revenue part was either immediately recognized or had already been recognized, in order to report higher profits and inflate its stock value. As a result of this manipulation, Diamond reported much higher earnings for fiscal years 2010 and 2011, as well as in the quarterly periods reported in Diamond's Form 10-Q statements for fiscal years 2010 and 2011. The financial press began to question this accounting. Then, an internal investigation by Diamond's audit committee reversed this accounting and announced that the financial statements for these fiscal years would have to be restated, causing the stock price to plunge. The audit committee announced that "payments to growers in September 2011 in the amount of approximately $60 million and payments to growers in August 2010 of approximately $20 million" were not accounted for in the correct periods (*id*. at ¶ 212). After the announcement, Diamond shares fell 36.9 percent (*id*. at ¶ 438).

### 1.    WALNUT PAYMENTS AND LONG-TERM GROWER CONTRACTS.

Diamond purchased walnuts from growers pursuant to exclusive long-term contracts. Under these contracts, Diamond was required to purchase the entirety of each grower's crop. Diamond had the right to unilaterally set the purchase price for walnuts, though it had to do so "in good faith, taking into account market conditions, crop size, quality, and nut varieties, among other relevant factors" (*id*. at ¶ 236). Diamond historically paid "slightly below the going rate

for walnuts, but the trade-off was the security and predictability of Diamond's commitment" (*id.* at ¶ 36). For the 2008 crop year, Diamond paid a price per pound that was competitive with or higher than the market price (*id.* at ¶¶ 58, 179).

### A.    Fall 2009 Crop.

Diamond's practice was to send out "grower guidelines" in August of each year, prior to the expected delivery of that year's crop. The grower guidelines set forth the anticipated payment schedule for the upcoming crop. The guidelines did not publish prices in advance. The grower guidelines for the 2009 crop stated that payments would be made in three installments, with the first payment to be made in late September 2009, the second payment by February 15, 2010, and a "Final Payment" by August 15, 2010 (Compl. Exh. 3 at 3). There was nothing unusual about this. The first two payments were made as stated. The total payment was lower than expected. These two payments were properly accounted for as costs of goods sold for the 2009 crop.

Next, however, came something unusual — a so-called "continuity payment." In August 2010, Diamond sent a single check to each of its growers. Diamond also sent a letter to growers, signed by CEO Mendes. The letter stated that the August 2010 check was meant to "represent[ ] *both* the final payment on the fall 2009 crop *and* a continuity payment reflecting the value of the multi-year supply arrangement with our Diamond walnut growers" (Compl. Ex. 1 at 3) (emphasis added). The term "continuity payment" was invented by Diamond. It had never been used before by Diamond, and had not been mentioned to growers in the guidelines or earlier. GAAP does not recognize such a term. In truth, the "continuity payment" was a disguised make-up payment to appease walnut growers for the shortfall in payouts to date for the 2009 crop. Indeed, according to one walnut grower, even with the continuity payment, Diamond paid less per pound for walnuts than the market price for the 2009 crop (Compl. ¶ 58).

Incongruously, however, Diamond accounted for $20 million of the payment made in August 2010 as costs associated with the next fiscal year 2011 (*id.* at ¶ 106). In accordance with GAAP, all payments for the fall 2009 crop should have been associated with the cost of sales for fiscal year 2010 so as to match costs with revenues (*id.* at ¶¶ 237, 241). The continuity payment

United States District Court

For the Northern District of California

was, however, "treated as a pre-harvest payment for the upcoming fall crop (i.e., paid and accounted for in fiscal [year] 2011)" (Br. 5).  Diamond did not record the cost in its Form 10-K for fiscal year 2010, filed with the Securities and Exchange Commission on October 5, 2010.

### B.   Fall 2010 Crop.

The same pattern repeated for the next year but the phrase "momentum payment" was substituted for the phrase "continuity payment."  For the 2010 crop, Diamond's 2010 grower guidelines stated that the first payment was planned for early October, with a second payment by February 15, 2011 and a "Final Payment" in August 2011 (Compl. Exh. 4 at 2).  The 2011 grower guidelines put out the following year, however, modified the payment schedule.  The 2011 guidelines stated that the final payment for the 2010 crop would be made on August 31, 2011, with a further "momentum payment" to be paid on September 2.  According to the 2011 grower guidelines, "the momentum payment [was] designed to reflect the projected market environment prior to the delivery of the 2011 crop" (Sauro Decl. Exh. G).

Diamond sent out two checks to each grower in August and September 2011.  In the accompanying letter, Diamond stated that the momentum payment:

> is designed to reflect the projected market environment prior to your delivery of the 2011 crop. . . . This payment conveys the anticipated value added by our branded walnut retail business during the transitional period prior to delivery and new crop availability.  The momentum payment is independent of and incremental to your upcoming delivery payment.

(Compl. Exh. 2 at 2).  This statement was deliberately ambiguous regarding what the momentum payment was meant to cover.  If, for example, the earlier August 2011 check really constituted the final payment for the fall 2010 crop, then the total payment to growers would have been "so far below market prices that it could not have been made in good faith" (Compl. ¶ 71).  Instead, in addition to the August 2011 "final payment," Diamond then made a further payment — called a "momentum payment" — to appease growers.  This momentum payment was, like the continuity payment, a disguised make-up payment for the fall 2010 crop, *not* a future payment for the fall 2011 crop.  Diamond did not record the cost in its Form 10-K for fiscal year 2011, filed with the Commission on September 15, 2011.

### 2.   DIAMOND'S PUBLIC STATEMENTS.

Beginning in late September 2011, concerns were raised by analysts and the media regarding the momentum payment.  For example, an article published in *Reuters Breakingviews* on September 26 discussed the prices Diamond paid to walnut growers and noted the "follow-up payment by Diamond to walnut growers just two days after its Aug[ust] 31 outlay" was strange (*id*. at ¶ 165).  The article reported that "Diamond's IR chief says the period to which the September payment applies is '*somewhat of a blur*' because the company sees it in the context of its three, five and 10-year contracts with growers" (*ibid.*) (emphasis added).  The article also opined that "how the company packages its 'momentum payment' in financial reports surely matters to P&G shareholders as they consider switching into Diamond stock."

Another article, published in the *Wall Street Journal* on September 27, 2011, reported that Diamond stated in an email that:  "in an effort to optimize cash flow for growers, particularly in light of the delayed harvest, we issued a momentum payment to growers that provides additional cash flow in the fall consistent with the current market environment as we enter the 2011 harvest" (*id*. at ¶ 166).

On October 3, Diamond issued a press release stating that it had made a "pre-harvest momentum payment to walnut growers in early September, prior to the delivery of the fall walnut crop to reflect the fiscal 2012 projected market environment."  Diamond also stated that the payment was accounted for in the fiscal year 2012 cost of goods sold (*id*. at ¶ 168).

Diamond's public statements regarding the purpose of the momentum payment were contradictory and inconsistent.  Statements made prior to October 3 — including the grower guidelines, the August 2011 letter to growers, and Diamond's email and statements to the press — were deliberately ambiguous.  Diamond's October 3 statement then finally disclosed that the momentum payment was accounted for in fiscal year 2012.  According to GAAP, this would mean the momentum payment could not be a payment for the fall 2010 crop.  Diamond implied that the "pre-harvest momentum payment" was an advance payment on the fall 2011 crop.  As discussed below, however, this was inconsistent with what Diamond told walnut growers, and what it eventually admitted after the audit committee investigation.

United States District Court

For the Northern District of California

### 3.   DIAMOND'S STATEMENTS TO GROWERS.

At the same time that Diamond was waffling before the media about the purpose of the momentum payment, Diamond was telling growers something different.  Plaintiff relies on the statements of several confidential witnesses, identified as walnut growers who sold to Diamond during the relevant period, to establish that Diamond itself did not believe that the continuity and momentum payments were meant to be advances on future crops.

*First*, a grower identified as Confidential Witness No. 1 reported that he contacted Eric Heidman, senior director of field operations, on three separate occasions in August, September, and October 2011.  "Each time, Heidman confirmed [the momentum payment] was for the Fall 2010 crop" (*id*. at ¶ 77).  The complaint only provides details regarding a single phone call between the witness and Heidman, occurring around October 2011.  In response to questions regarding whether the momentum payment was for the fall 2010 crop, Heidman told the witness "it was just a numbers game, don't worry about it."  He further told the witness that "the money was just 'budgeted' or 'forecast' into 2011, even though it was applied to the 2010 crop."  Heidman "was adamant that [the momentum payment] was for the 2010 crop" (*ibid*).  *Second*, Confidential Witness No. 1 and a grower identified as Confidential Witness No. 7 recounted that Diamond did not attempt to recover the momentum payments from growers who decided not to sell their fall 2011 crop to Diamond.  Confidential Witness No. 1 "refused to sell his whole Fall 2011 crop to Diamond" (*id.* at ¶ 78).  Diamond informed the witness that his refusal to sell his entire crop was a violation of his contract, but did not attempt to retrieve the momentum payment.  Confidential Witness No. 7 stated that she "knew at least two growers who had already cancelled their contracts to sell walnuts to Diamond in Fall 2011, but still received the momentum payment."  According to the witness, Diamond employee Dan Newman, an employee in the Grower Services department, told the two growers that the momentum payments were for 2010 and that they could keep them, even without selling their 2011 crop to Diamond (*id*. at ¶ 79).

Our court of appeals has established a two-part test for confidential witnesses in the context of securities fraud pleadings.  *First*, where additional factual information, such as

United States District Court

For the Northern District of California

documentary evidence, is absent, "the complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). *Second*, the statements "must themselves be indicative of scienter." *Ibid*. Confidential Witness No. 1's statements are based on his direct personal knowledge and interactions with Diamond representatives as a walnut grower. His statements on these topics are sufficiently reliable, and establish that what Diamond told growers was inconsistent with what it told the media. Moreover, Diamond did not appear to treat the momentum payment as a true advance on the fall 2011 crop, as it did not seek to recover the payment when the witness breached his contract by not selling his entire fall 2011 crop to Diamond. The statements of Confidential Witness No. 7, however, are hearsay-within-hearsay. The witness has not established that she has adequate, reliable bases for her personal knowledge regarding what Newman told the two growers. *See, e.g., id.* at 996.

### 4. DISCLOSURES OF AUDIT COMMITTEE INVESTIGATION AND RESULTS.

On November 1, 2011, Diamond disclosed that the previously announced Pringle's acquisition from P&G was delayed and that an internal investigation would be conducted. The press release stated:

> Diamond and P&G have revised the expected closing date of the acquisition following the receipt by the Chairman of the Audit Committee of Diamond's Board of Directors of an external communication regarding Diamond's accounting for certain crop payments to walnut growers. In response to the communication, Diamond's Audit Committee decided to perform an investigation of this matter.

(Compl. ¶ 171).

On December 12, Diamond disclosed that, due to the investigation, it would miss the deadline for filing its Form 10-Q with the Commission. Two days later, Diamond announced that it had received a formal order of investigation from the Commission. Diamond disclosed that the Commission "has informed Diamond that its investigation should not be construed as an indication by the [Commission] that any violations of law have occurred" (*id.* at ¶ 194). On February 8, 2012, Diamond announced that its internal audit committee had concluded that $20 million of "continuity payments" in August 2010 and $60 million of "momentum payments" in

United States District Court

For the Northern District of California

1   September 2011 were not properly accounted for in the correct fiscal years. The audit committee

2   also identified a "material weakness in the Company's internal control over financial reporting."

3   Diamond reported that it would have to restate its financial statements for fiscal years 2010 and

4   2011. Diamond further stated that the audit committee's investigation was ongoing, and that

5   more information could be discovered. Defendants Mendes and Neil were placed on

6   administrative leave. Several days later, on February 15, Diamond announced that the Pringles

7   acquisition was terminated.

8       As of the filing of the consolidated complaint, Diamond had not issued corrected

9   financial statements. The complaint includes rough calculations of what the estimated results

10   would have been had the continuity and momentum payments been recorded in the correct fiscal

11   years. Plaintiff contends that the obviousness and magnitude of the GAAP violations support an

12   inference that defendants acted with the requisite scienter. *The complaint alleges that, if the $20*

13   *million continuity payment had been correctly recorded as cost of sales in fiscal year 2010,*

14   *rather than 2011, net income for fiscal year 2010 would drop from $26.2 million to $6.2 million.*

15   Cost of sales for fiscal year 2010, reported to be $519.2 million, would have increased by 3.9

16   percent, to $539.2 million (*id*. at ¶ 247). Similarly, plaintiff provides simple calculations to

17   estimate what the results would have been if the $60 million momentum payments in September

18   2011 were recorded as cost of sales for fiscal year 2011. *According to the complaint, if the*

19   *September 2010 momentum payment was applied to the fiscal year 2011 financial results, net*

20   *income would decrease from $50.2 million to approximately negative $9.8 million, a decrease of*

21   *119.5 percent.* Cost of sales would increase from $714.8 million to $774.8 million, a change of

22   8.4 percent (*id*. at ¶ 254). Plaintiff's calculations for fiscal year 2011 do not, however, take into

23   account the fact that the figures for that period were both overstated by $20 million and

24   understated by $60 million.

25       **5.**    **DIAMOND'S ARGUMENTS AGAINST SCIENTER.**

26       Diamond admits that "there is no dispute that, in February 2012, Diamond's Audit

27   Committee determined that the Company's original accounting treatment of those payments was

28   incorrect and that certain financial results would need to be restated" (Br. 1). Diamond argues,

United States District Court

For the Northern District of California

however, that allegations of GAAP violations are not sufficient to create a "strong inference" that defendants intentionally, or with deliberate recklessness, falsified financial statements. Diamond contends that plaintiff's allegations are not sufficient to give rise to a strong inference of intentional fraud, and is instead consistent with an inference that defendants made an "honest mistake."

### A.      Lack of stock sales.

Diamond argues that the fact that individual defendants Neil and Mendes did not sell stock during the class period, and in fact increased their holdings, negates a finding that they were involved in fraud. Rather than cashing out when shares were allegedly artificially inflated, they purchased more shares, and "then saw the value of their collective holdings decline more than $60 million from the stock's apex to the end of the class period" (*id*. at 10–11). Defendants rely on *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654 at *20 (N.D. Cal. May 25, 2006) (Armstrong, J.), for the proposition that lack of stock sales by a defendant during the class period negates a finding that the defendant was engaged in fraud. Here, however, plaintiff alleges that Diamond and the individual defendants were motivated to inflate share prices in order to complete the acquisition of Pringles, which would have presumably resulted in even higher prices after the transaction was successfully completed. Moreover, our court of appeals has noted that a lack of stock sales by a defendant company's management "is not dispositive as to scienter." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). This order finds that defendants' lack of stock sales neither negates scienter, nor supports plaintiff's other scienter allegations.

### B.      Reliance on Deloitte's audit opinion.

Diamond further contends that the fact that its outside auditor, Deloitte, provided unqualified audit opinions undermines a finding of scienter. A clean audit opinion may possibly support the conclusion that defendants did not act with scienter, but it is not dispositive. In order to know how much reasonable reliance should be accorded the audit opinion, we will eventually have to evaluate what communications passed between the company and the auditor as well as what, if anything, was hidden from the auditor.

1   Senior management at Diamond had an independent duty to ensure compliance with

2   GAAP and maintain effective internal controls.  This duty cannot be delegated to Deloitte.

3   Additionally, as discussed below, plaintiff has alleged that Diamond engaged in pre-audit

4   reviews where the financial statements were "scrubbed" prior to providing them to Deloitte.  On

5   these facts, this order finds that Deloitte's unqualified audit opinion does not negate an inference

6   of scienter.

7               **C.    P&G due diligence.**

8   Diamond contends that the upcoming acquisition of Pringles weighs against an inference

9   of scienter, because it was aware that P&G would be scrutinizing Diamond's books in the course

10   of conducting due diligence.  P&G employed professional advisors including Morgan Stanley,

11   The Blackstone Group, and Deloitte to assist in the acquisition discussions (Compl. ¶¶ 42, 179,

12   360).  Plaintiff contends that the Pringles acquisition was the driving motivation for the fraud

13   because, without keeping share prices high, the deal would have fallen apart.  Defendants took

14   steps to hide the fraudulent accounting of the $60 million momentum payment.  On September

15   16, 2011, soon after the momentum payment had been made, Diamond announced an increase of

16   $50 million in the estimated transaction and integration costs of the Pringles acquisition, raising

17   the figure from $100 million to $150 million (*id.* at ¶¶ 252, 316).  The facts alleged do not

18   indicate what diligence, if any, P&G conducted of Diamond's financial statements and

19   accounting practices prior to the November 1 announcement of the internal investigation.  That

20   P&G would or did conduct due diligence in connection with the Pringles acquisition does not per

21   se negate an inference of scienter.  An equally plausible inference is that defendants were

22   motivated to push through the deal, and planned to hide the fraud in the costs of acquiring and

23   integrating Pringles into Diamond's business.

24               **6.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER.**

25   This order finds that, viewing the complaint in its entirety, including "plausible opposing

26   inferences," the allegations give rise to a strong inference of scienter on the part of Diamond.

27   *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 323 (2007).  The magnitude of

28   the wrongful accounting, the fact that the GAAP violations were basic and fundamental, and

Diamond's inconsistent and deliberately ambiguous statements regarding the nature and purpose of the payments all contribute to a strong inference of intentional misconduct. Diamond knew that the "continuity payment" and "momentum payment" were unprecedented, and departed from the company's prior practice and stated policy. Diamond attempted to disguise the payments as something other than "make-up" payments to growers in order to allow it to defer recording the costs. This allowed Diamond to meet analyst expectations and maintain inflated stock prices. Plaintiff has sufficiently pled scienter under the heightened pleading standards set forth by the PSLRA.

### 7.   INDIVIDUAL DEFENDANTS NEIL AND MENDES.

Defendant Steven M. Neil was Executive Vice President and Chief Financial and Administrative Officer of Diamond from March 2008 to February 8, 2012, when he was placed on administrative leave. Neil served on the Board of Directors from 2005 until his resignation in March 2012. Defendant Michael J. Mendes was President and Chief Executive Officer of Diamond from 1997 until February 8, when he was placed on administrative leave. Mendes first joined Diamond in 1991 as Vice President of International Sales and Marketing. Like Neil, Mendes had been on Diamond's Board of Directors since 2005, and resigned in March 2012.

"Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). Specific and particular allegations that defendants were actually aware of the data that was the subject of the allegedly false statements can be sufficient to establish scienter under the PSLRA. *See In re Daou Systems, Inc*., 411 F.3d 1006, 1022–23 (9th Cir. 2005). Allegations that "go beyond a mere inference of management knowledge of all 'core operations'" and include details about defendants' access to information within the company can be sufficient to create a strong inference of scienter. *S. Ferry*, 542 F.3d at 785. Our court of appeals has noted that "[w]here a complaint relies on allegations that management had an important role in the company but does not contain additional detailed

13

allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *id.* at 784.

### A. Scienter allegations against Neil.

Plaintiff relies on the statements of several former Diamond employees to establish that Neil had actual knowledge of and access to walnut pricing and payment information, and that he was aware of the nature and purpose of the continuity and momentum payments. Neil was involved in making accounting decisions and directed and oversaw the manipulation of accounting for commodity costs such as walnuts.

*First,* Confidential Witness No. 5 was employed at Diamond as a financial accountant from April 2008 to May 2011. The witness reported that he, along with others in the accounting department, was asked by Diamond management to change commodity costs "without any business justification for doing so" (Compl. ¶ 53). The witness recounted that Senior Director Debra Donaghy and Senior Vice President and Controller Jim Tropp would request that the witness prepare financial reports to determine earnings "if we dropped commodity prices half a penny or one penny." If the executives approved, the change would be accepted and recorded in a journal entry. According to the witness, it "seemed like every quarter they dropped commodity costs" (*id.* at ¶ 54). In the view of the witness, changing the "commodity costs were how they were able to beat their numbers" (*id.* at ¶ 55). The witness also described Diamond's practice of performing quarter-end reviews and pre-audit reviews of the financial results. He stated that he was directed by Neil, Donaghy, and Tropp to change financials by shuffling costs and expenses on the financial statements. The witness recounted that typically he would run profitability numbers. If Diamond was losing money or was "not where we want to be at," Donaghy, Tropp, and Neil would review the financial information "to see any big ticket items they could shuffle into next quarter" (*ibid.*). "Or if we were making too much money they would push more costs in. Whenever we couldn't hit our numbers, [or] if they needed extra money, it was always commodity costs that got changed" (*ibid.*). "The process was to look at all possible expenses and 'scrub'" through the numbers. The witness further stated that Neil was "intimately involved in the quarter end review of Diamond's financial results" and was involved in pre-audit reviews.

"Neil definitely knew what was going on. He was involved in pre-audit reviews. He was in charge of treasury, too" (*id.* at ¶ 389). The complaint provides sufficient detail to establish that Confidential Witness No. 5 has personal knowledge of the events he reported, as his statements are based on his first-hand accounts from his work as a financial accountant. The witness described specific incidents involving management, including Neil, in which the witness was directed to change accounting information in relation to meeting earnings goals.

*Second*, Confidential Witness No. 3 was an assistant treasurer from 1999 through May 2011. He similarly stated that he was involved in meetings with Neil and other executives "where accounting decisions were discussed in the context of the impact the decision would have on the share price." The witness recounted that, in these meetings, Neil and other executives decided "on numerous occasions" to accelerate payments or delay recognizing an expense in order to make their earnings look better. The witness also recounted an incident regarding two payments that were made to growers in February and March 2011. Due to a lack of cash, Diamond could not make the expected February 2011 payment to growers. Confidential Witness No. 3 raised this issue with management. After discussions with Diamond officers, including Neil, it was decided that the payment would be divided into two payments, with one payment sent in February and the remainder sent in March 2011. The officers told the witness that this solution would avoid the problem of tapping into Diamond's line of credit and potentially attracting attention from investors. Neil told the witness that Mendes' approval was needed in order to send out the two payments. After Mendes provided approval, the payments were sent out. The witness's statements are based on first-hand accounts of his work, including meetings and discussions with Neil. Standing alone, these statements are not sufficient to establish that Neil was aware of or directed accounting fraud for the continuity and momentum payments to walnut growers. For example, the witness provided no specific details regarding the meetings he described, or the types of expenses and costs discussed therein. The statements do, however, establish that Neil was involved in and aware of how accounting decisions would affect earnings numbers. Neil was also involved in and aware of how and when walnut payments were made.

*Third*, Neil made statements to analysts in earnings conference calls that evidence Neil's involvement in and awareness of how Diamond accounted for walnut payments. In an earnings

15

conference call held on March 8, 2011, Neil responded in detail to questions regarding accounting for walnut costs in relation to Diamond's Q-2 fiscal year 2011 results.  For example, in response to an analyst's question regarding a disclosure that there was "about a $1.2 million catch-up accrual on walnut costs," Neil explained the adjustment in detail, stating:

> [T]hat $1 million represents the impact in the second quarter of a very small increase in estimated costs that we estimated for the walnuts.  So that's a little bit of a — and the reason we highlight it, it's a little bit of out-of-period for the pure second quarter results; but a small amount.

(*id.* at ¶ 114).  Neil responded to another analyst's question regarding Diamond's estimates for walnuts and whether there was a "risk of further catch-ups in the back half of the year."  Neil explained: "[w]hat we need to do from an accounting perspective is each quarter provide our best estimate of the cost associated with the sellthrough of the entire crop. . . . So that's how we approach it — that's how GAAP says to approach it" (*id.* at ¶ 115).  Similarly, during a conference call with analysts regarding financial statements for the third quarter of fiscal year 2011, Neil was asked directly about walnut cost accrual.  Neil spoke in detail about a "small adjustment" of around $300,000 of estimated walnut cost accrual in the second and third quarters of that year (*id.* at ¶ 139).

*Fourth,* plaintiff contends that scienter can be inferred based on Neil's position in the company and his hands-on approach to management.  In an interview published by *Executive Briefing* on May 25, 2010, Neil said he was a "hands-on" type of CFO, who was "also responsible for operations, logistics, IT, treasury, grower relations, and purchasing" (*id.* at ¶ 386).  Neil characterized himself as "the type of finance guy that looks at a financial report and sees it as just numbers on a piece of paper unless I'm out in the plant and can see how the product flows, how we can reduce our unit costs, and how we can improve our logistics."  Neil stated that he visited walnut growers in the field at least twice a year, "usually once during harvest and once during some stage of the bloom, either at the beginning or during the middle of the summer" (*ibid.*).

Taken as a whole, the allegations establish that Neil was directly involved in making accounting decisions and was intimately aware of accounting as related to Diamond's walnut business.  This likewise reinforces the inference of scienter of the company.

### B.     Scienter allegations against Mendes.

CEO Mendes signed the August 2010 letter that informed growers that they would receive a single check that constituted both the final payment for the fall 2009 crop and a continuity payment.  Plaintiff alleges that Mendes would also have known about the August 2011 letter describing the momentum payment, even if he did not sign the letter himself.  CEO Mendes does not dispute that he knew of the fact of the payments.  He argues, however, that plaintiff has failed to establish that Mendes knew of the incorrect *accounting* for the continuity and momentum payments.  That is, CEO Mendes contends that he was ignorant of the nature and purpose of the payments, which were allegedly intended as "make-up" payments to growers.  As discussed below, however, this argument is unpersuasive given Mendes' role in the walnut business at Diamond and his own statements.

Plaintiff alleges that CEO Mendes was deeply involved in the day-to-day operations of Diamond, including its finances, and that he was particularly involved in and aware of walnut payments.  Confidential Witness No. 3 stated that information regarding walnut payments and prices was carefully guarded and "maintained within a very small circle of people" including Tropp, Neil, Mendes, and Heidman (*id.* at ¶ 39).  As described above, according to Confidential Witness No. 3, Mendes' approval was required to split up a payment to walnut growers in February and March 2011.  The witness also stated that both Neil and Mendes "received the daily forecasts, which detailed all the money going out and coming in that particular day as well as how much cash and borrowing capacity the Company had available under its revolving line of credit" (*id.* at ¶ 387).  The complaint does not provide any specific detail regarding whether these reports would contain information related to revenue, liabilities, or cost of sales in general, or of walnuts in particular.

Another former employee, identified as a financial accountant from 2005 through November 2010, stated that he attended frequent meetings with Mendes.  The witness opined that Mendes' knowledge of what was happening at Diamond was "the best of anyone in the Company" (*id.* at ¶ 32).  "[Mendes] gave you the impression he was involved in everything and he made that known."  The witness further recounted that "about grower payments, in my opinion, [Mendes] knew every detail" (*ibid.*).

Plaintiff also points to statements Mendes made to analysts at an earnings call on October 5, 2010, during which Mendes discussed the potential impact the late harvest of the walnut crop might have on Diamond's financial position in great detail. CEO Mendes stated "[t]here's a later walnut crop this year, probably about two weeks later than normal. Last year was a little bit late but this year is quite a bit later. That's one factor. The second thing is we're evaluating the optimal market mix for that non-retail walnut business." Mendes went on to discuss potential plans to shift from international bulk in-shell business to a higher proportion of shelled walnut business, noting that "when you go more domestic versus international the product changes position at our Ford warehouse so that would be a Q2 sale versus Q1 sale. And then just the fundamental fact that the crop's later and you can only process so much product per day, is just going to shift about 10 days worth of production to the next quarter" (*id.* at ¶ 90). These statements indicate that Mendes had actual knowledge of Diamond's walnut business, and was aware of how that business would impact the company's financial statements.

### C.     "Core operations" theory.

Defendants Neil and Mendes argue that general allegations that executives are closely involved in the day-to-day operations of a company are insufficient to establish scienter. Here, however, the allegations establish that Neil and Mendes were heavily involved in walnut pricing and payments, and were acutely aware of how the walnut business affected the company's financial statements. CFO Neil oversaw and directed accounting, and repeatedly demonstrated intimate knowledge of walnut accounting in particular. CEO Mendes approved how and when walnut payments were made. Given his long history at the company and close involvement in the walnut business, it can readily be inferred that Mendes was aware that the "continuity" and "momentum" payments were an unprecedented departure from Diamond's prior practices and the stated policy set forth in the grower guidelines, all the more so given the dominant role of walnuts and their pricing in Diamond's business. Mendes himself signed the August 2010 letter to growers accompanying the continuity payment  The complaint contains detailed and specific allegations about defendants' awareness and involvement in all aspects of Diamond's walnut business. Combined with defendants' role in the company, and the magnitude and obviousness of the accounting violations at issue, this order finds that the allegations give rise to a strong

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

inference of scienter.  *See S. Ferry,* 542 F.3d at 785.  Unlike the defendant in *Zucco,* CFO Neil and CEO Mendes were exposed to and aware of the underlying facts — namely, walnut pricing and payment practices and the two unusual walnut payments at issue.  Both defendants were acutely aware of the walnut business's affect on Diamond's financial statements, as indicated both by the confidential witness statements as well as by defendants' own statements to analysts and investors.  Moreover, the accounting violations at issue here are basic and fundamental principles of accounting, not detailed and "largely definitional," as in *Zucco*.  *See, Zucco*, 552 F.3d at 1001.

### D.      Section 20(a) Claim.

Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of Section 10(b) and its underlying regulations.  "In order to prove a prima facie case under Section 20(a), a plaintiff must prove:  (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator."  *No. 84 Employer-Teamster*, 320 F.3d at 945 (internal quotations omitted).  "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. 230.405.  As discussed above, the complaint adequately alleges that defendants were control persons within the meaning of the statute, as they were actively involved in the day-to-day operations of Diamond, were senior executives, and sat on Diamond's Board of Directors.  *See Paracor Fin. Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996).  At the pleading stage, this is sufficient, although it will, like other claims, be subject to later proof.

### 8.      DELOITTE.

Deloitte was the independent auditor for both Diamond and P&G.  Deloitte provided an unqualified audit opinion along with Diamond's 10-K for the fiscal year ended July 31, 2010 (fiscal year 2010).  The 10-K was filed with the Commission on October 5, 2010, and the audit opinion was signed by Deloitte on the same date.  Deloitte also provided an unqualified audit opinion for Diamond's 10-K for the fiscal year ended July 31, 2011 (fiscal year 2011).  That audit opinion was signed by Deloitte on September 15, 2011, for the 10-K filed with the

Commission on the same date.  Deloitte's opinions stated that Diamond had complied with GAAP principles and maintained effective internal control over financial reporting for the time periods reviewed (Sauro Decl. Exh. E at 5).

With regard to pleading scienter of an outside auditor, our court of appeals has stated that:

> [S]cienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002).  The allegations against Deloitte consist largely of recitations of generally accepted auditing standards and allegations that, because the accounting manipulations were so pervasive and obvious, Deloitte must have known about them.  Deloitte ignored red flags and failed to investigate further.  Had it done so, Deloitte would have uncovered the accounting violations.  Plaintiff alleges that Deloitte had actual knowledge of the continuity payment; as to the momentum payment, however, the complaint alleges only that Deloitte likely knew or should have known about the payment and accounting therefor.

Deloitte was allegedly involved in a fraudulent scheme with Diamond, whereby Deloitte deliberately ignored red flags that should have alerted it to accounting irregularities.  Deloitte was motivated to disregard Diamond's GAAP violations in order to gain fees from both Deloitte and P&G.  Moreover, because P&G was "eager to divest itself of Pringles," Deloitte was motivated to help push through the Pringles acquisition in order to benefit both its clients.  Plaintiff contends that P&G would not be injured by any inflation in Diamond shares because "stock in the combined Pringles/Diamond entity was to be spun off directly to that company's shareholders" (Opp. 3).  Plaintiff's argument that P&G would be willing to accept artificially inflated Diamond stock makes little sense and is contradicted by the facts.  Indeed, the deal was terminated soon after the audit committee results were announced.  Several days later, P&G announced the sale of Pringles to Kellogg for $2.7 billion in cash.  Additionally, as Deloitte argues, it is somewhat unlikely that Deloitte would have knowingly participated in fraud on behalf of Diamond in order to swindle its much larger client, P&G.

20

**A.    Deloitte was aware of the continuity payment.**

Deloitte had "broad and unfettered access to Diamond's accounting records and information" (Compl. ¶ 359).  Deloitte conducted quarterly reviews, during which time it should have been aware of the accounting irregularities.  According to plaintiff, the fact that the inventory and payable to growers for walnuts for Q-1 through Q-3 of fiscal year 2010 were lower than estimates recorded for the same quarters in prior years should have alerted Deloitte to investigate further (*id.* at ¶¶ 273, 287).  For example, Diamond's recorded payable to growers for Q-1 of fiscal year 2010 was $114.6 million as compared to $135.7 million for the same quarter of the prior fiscal year.  The amount was approximately $21.1 million, or 16 percent, lower.  Deloitte also should have known that the inventory and payable to growers were below the market price, which should have caused it to investigate further.[1]  Moreover, "given the clear language in the grower contracts that the first payment to growers would not be made until after the crop was delivered to Diamond," Deloitte knew or should have known that any payment that deviated from this schedule was suspicious (*id.* at ¶ 273).

If the foregoing "red flags" had not yet alerted Deloitte of the accounting irregularities, Deloitte became aware of the $20 million continuity payment "while performing its audit procedures related to Diamond's financial statements for Fiscal Year 2010" (*id.* at ¶ 288).  According to the statement of audit committee and board committee member Dennis Mussell, reported in a *Reuters* article dated March 19, 2012, Deloitte inquired about the continuity payment.  Plaintiff alleges, however, that "[t]o resolve the $20 million payment in the audit workpapers, Deloitte necessarily had to rely on management's representation that the payments related to the Fall 2010 crop and were properly recorded in Diamond's Fiscal Year 2011 financial results" (*id.* at ¶ 300).  Deloitte contends that the complaint itself alleges that Deloitte did more than rely on the representations of management.  According to the complaint, Deloitte approached Diamond's independent audit committee to discuss the payment.  The committee "included no members of management and was responsible for independent oversight of

---

[1] Plaintiff contends that Deloitte should have known that California walnut prices were higher for the fall 2009 crop than in 2008.  The sole evidence cited for this alleged fact is a United States Department of Agriculture report published on October 7, 2011, after the date the quarterly financial statements were created and reviewed.

United States District Court

For the Northern District of California

management with respect to Diamond's financial statements" (Reply Br. 1). No further details are provided regarding the content of any discussions Deloitte may have had with the audit committee. At most, the complaint alleges that Board Member Mussell recalled the continuity payment issue was "resolved" (Sauro Decl. Exh. H at 2; Compl. ¶ 222).

**B.** **Deloitte may have been aware of the momentum payment.**

The complaint does not allege that Deloitte was actually aware of the momentum payment Diamond made in early September 2011. Plaintiff contends that a number of "red flags" should have alerted Deloitte to inquire further, such that it necessarily would have become aware of the momentum payment. Among the "red flags" that should have put Deloitte on notice were that (1) the "payable to growers" figure on the balance sheet for July 31, 2011, was lower than that recorded on the same date for 2008, (2) Deloitte was aware that Diamond's "pre-determined payment schedule mandated the final payment associated with the Fall 2010 crop be made in August 2011," (3) Diamond filed its fiscal year 2011 financial results ten days before it had ever filed in its short history as a public company (*id.* at ¶ 308), and (4) the momentum payment was large.

The complaint alleges that Deloitte either disregarded its accounting procedures or improperly relied on representations from management without requiring further assurances. Deloitte's "typical audit approach for accounts payable is to test the outstanding balance as of the end of the year via subsequent disbursements" (*id.* at ¶ 289). With respect to the momentum payment, "[i]t appears that Deloitte did not employ . . . any adequate subsequent disbursement testing." If Deloitte had properly performed the testing, it would allegedly have uncovered the fraud. Furthermore, "*if* Deloitte knew of the $60 million payment," it improperly relied upon an unsubstantiated management representation when it issued an unqualified audit opinion (*id.* at ¶ 309) (emphasis added).

**C.** **No strong inference of scienter as to Deloitte.**

The allegations against Deloitte are based on assumptions of what might have or could have occurred. Very few facts are alleged regarding what Deloitte actually did, the procedures it used in its audits of Diamond, or what documents or information were considered or reviewed. The allegations in the current complaint are insufficient to establish even that Deloitte

United States District Court
For the Northern District of California

1   disregarded its own auditing procedures, much less that it performed no audit procedures at all.

2   Plaintiff essentially argues that the accounting errors were so obvious and of such magnitude that

3   no reasonable accountant would have made the same decisions.  In support of this contention,

4   plaintiff points to news articles and statements by analysts raising questions about the walnut

5   payments.  A number of articles , however, reported that other analysts opined that Diamond's

6   accounting of the momentum payment was proper (*id*. at ¶¶ 174, 191).

7           While the facts currently alleged may establish that Deloitte was negligent in providing

8   unqualified audit opinions for fiscal years 2010 and 2011, the complaint does not give rise to a

9   strong inference that Deloitte was deliberately reckless or intentionally fraudulent under the

10  PSLRA's heightened pleading standard.  Plaintiff does not allege that Deloitte was actually

11  aware of the momentum payment, or was aware that the payment was improperly accounted for

12  in fiscal year 2012.  Moreover, the complaint alleges that Diamond's practice was to conduct

13  pre-audit quarterly reviews of the financial statements, at which Diamond's management

14  instructed accountants to "scrub" the statements to disguise or shift costs.  Plaintiff does not

15  allege that Deloitte was aware of these pre-audit reviews.  Viewing the complaint as a whole, the

16  allegations against Deloitte are insufficient to raise a strong inference of scienter.

17          **9.      LOSS CAUSATION.**

18          In order to state a securities fraud claim, a plaintiff must also allege "loss causation,"

19  which is "a causal connection between the material [omission] and the loss."  *Dura*

20  *Pharmaceuticals,* 544 U.S. at 342; 15 U.S.C. 78u–4(b)(4).  "A plaintiff is not required to show

21  'that a misrepresentation was the sole reason for the investment's decline in value' in order to

22  establish loss causation. '[A]s long as the misrepresentation is one substantial cause of the

23  investment's decline in value, other contributing forces will not bar recovery under the loss

24  causation requirement' but will play a role 'in determining recoverable damages.'" *In re Daou*,

25  411 F.3d at 1025 (internal citations omitted).

26          Plaintiff has sufficiently alleged that fraud occurred, in the form of improper accounting

27  for walnut payments in violation of GAAP, which resulted in an inflated stock price.  When the

28  truth came out, the stock price plummeted.  On February 8, 2012, Diamond disclosed the

    findings of the audit committee's investigation.  Diamond stated that:

> The investigation focused primarily on whether payments to growers in September 2011 in the amount of approximately $60 million and payments to growers in August 2010 of approximately $20 million were accounted for in the correct periods. On February 7, 2012, the Audit Committee concluded that such crop payments were not accounted for in the correct periods and that Diamond's previously issued consolidated financial statements for the fiscal years ended July 31, 2011 and July 31, 2010, the accompanying reports of Diamond's independent registered public accounting firm, and the previously issued unaudited condensed financial statements for the interim quarterly periods for the fiscal year ended July 31, 2011 and the quarter ended July 31, 2010, should no longer be relied upon.

(Diamond RJN Exh. D). Diamond further stated that the audit committee's investigation was ongoing, and that more information could be discovered. Following the announcement, the stock dropped $13.53, a decrease of 36.9 percent (Compl. ¶ 438). Plaintiff has alleged loss causation with sufficient detail to give defendants ample notice of its loss causation theory, and give some assurance that the theory has a basis in fact. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053–54 (9th Cir. 2011).

It was not until February 8, 2012, that the truth was sufficiently disclosed to the market, or so a jury could reasonably find. To be sure, a question may arise concerning how the class period should be defined, including whether there should be a subclass after November 1, 2011, or subclasses, and whether lead plaintiff is a proper representative for the subclass, or subclasses. This order need not address those issues at this juncture.

**10.    REQUESTS FOR JUDICIAL NOTICE.**

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Commission filings are appropriate for judicial notice, even where filed outside the class period. *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1149 n.2 (C.D. Cal. 2007) (Walter, J.). Under the incorporation by reference doctrine, a court may also consider documents submitted by defendants "that were referenced in the complaint and whose authenticity has not been questioned." *No. 84 Employer-Teamster,* 320 F.3d at 925 n. 2.

Defendants' request for judicial notice of filings with the Commission is granted (Diamond's RJN; Sauro Decl. Exhs. B, C, D, E, F, I, K, L, and N). Deloitte further requests judicial notice be taken of the following documents: print-outs of Diamond's website (Exh. A),

United States District Court

For the Northern District of California

a print-out from the Commission's website (Exh. O), a "timeline" of relevant dates allegedly compiled from the allegations in the complaint (Exh. P), publicly available news articles referenced and cited in the complaint (Exhs. H and J), excerpts from Public Company Accounting Board ("PCAOB") Interim Standards (Exh. M), and a document entitled "Diamond's Harvest 2011 Grower Guidelines for Delivery, Grading & Payment" (Exh. G). Judicial notice will be taken of the accounting standards and 2011 Grower Guidelines document referenced in the complaint (Sauro Decl. Exhs. G and M). The request for judicial notice is also granted as to the news articles referenced in the complaint, but not for the truth of their contents (*id.* Exhs. H and J). The request for judicial notice is denied as moot as to the website print-outs and and the "timeline," as they are unnecessary to this order (*id.* Exhs. A, O, and P). Diamond's supplemental request for judicial notice is denied as moot, as the exhibit appears identical to Exhibit G of the Sauro Declaration. Deloitte's supplemental request for judicial notice is denied as unnecessary to this order.

Plaintiff's requests for judicial notice of Diamond's Form 10-Q, filed with the Commission on June 3, 2008 and PCAOB accounting standards are granted. Plaintiff also filed two supplemental requests for judicial notice of two documents Diamond filed with the Commission on October 25, 2012, and November 14, 2012, well after the filing of the complaint. While "facts raised for the first time in plaintiff's opposition papers should be considered by the court in determining whether to grant leave to amend or to dismiss the complaint with or without prejudice," on a motion to dismiss, "a court may not look beyond the complaint to a plaintiff's moving papers." *Broam v. Bogan*, 320 F.3d 1023, 1026 n2 (9th Cir. 2003). Plaintiff's request for judicial notice of the October 25 and November 14 documents are therefore denied.

## CONCLUSION

For the reasons stated above, this order finds that the consolidated complaint has sufficiently pled scienter and loss causation under the PSLRA as to Diamond and individual defendants Mendes and Neil. Those defendants must file an answer **WITHIN 21 CALENDAR DAYS** of the date of this order. The discovery stay is now lifted as to them, effective immediately. All initial disclosures under Rule 26 must be made within **FOURTEEN CALENDAR DAYS** of this order. Please do not ask for extensions.

As to Deloitte, however, the claims shall be **DISMISSED**.  The case management order (Dkt. No. 139) shall be modified as follows:  leave to add any new parties or pleading amendments must be sought by **APRIL 30, 2013**, or within 28 days after any interlocutory appellate review is ended as to any aspect of this order, whichever is later.  Any motions for leave to file an amended complaint must be noticed on the normal 35-day track.  A proposed amended complaint must be appended to the motion and plaintiff must plead its best case.  Any such motion should clearly explain how the amendments to the complaint cure the deficiencies identified herein.  The opposition shall respond on the merits of plaintiff's motion so that, if the amendment is allowed, no more motions to dismiss may be filed.  All other deadlines set by the case management order shall remain in place.

For now, no discovery may be taken from Deloitte save and except for discovery that is proper as to the three defendants held to answer.  Put differently, even if Deloitte had never been a target in this proceeding, given its role as a key percipient witness, Deloitte would have still had to stand for depositions and to respond to subpoenas for documents as a third party witness, at least as to reasonable requests proper in aid of the claims and defenses as to the three now held to answer.  This same degree of discovery will be appropriate, effective immediately.

**IT IS SO ORDERED.**

Dated:  November 30, 2012.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

26