# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| IN RE DIAMOND FOODS, INC., SECURITIES LITIGATION | : : : : : | Case No.: 11-cv-05386-WHA  CLASS ACTION |

# DECLARATION OF DR. JAY HARTZELL

# IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**April 18, 2013**

## Declaration of Dr. Jay Hartzell

**I.    Introduction**

1. I have been retained by counsel for the class plaintiffs in the Diamond Foods, Inc. Securities Litigation to provide an opinion on the efficiency of the market for Diamond Foods, Inc. common stock during the class period starting 10/5/2010 and ending 2/8/2012 (inclusive). My expert report dated March 28, 2013 contains my analysis of eight market efficiency factors proposed by the courts in *Cammer* and *Krogman*, and my opinion that Diamond common stock traded in an efficient market during the class period. All of the factors I analyzed in my first report support the conclusion that Diamond stock traded in an efficient market during the class period. In short, during the class period Diamond common stock was actively traded on the NASDAQ Exchange, the stock was followed and reported on by numerous equity analysts and news organizations, and the stock price reacted quickly and significantly to corporate news announcements regarding earnings, Diamond's attempted purchase of Pringles, and Diamond's eventual cancellation of the Pringles' acquisition and admission that it would have to restate its previously reported financial results.

2. Dr. Allan Kleidon, expert for defendant Diamond, submitted a declaration in this matter in opposition to class certification in which he claims that plaintiff has not established that the market for Diamond's stock was efficient throughout the class period for three reasons: (1) plaintiff's investment philosophy and trading behavior are at odds with a belief that the market for Diamond's stock was efficient; (2) plaintiff's allegations are inconsistent with an assertion that the market for Diamond's stock was efficient

p. 2

**Declaration of Dr. Jay Hartzell**

throughout the class period; (3) my expert report of March 28 does not establish that the market for Diamond's stock was efficient.[1]

3. This declaration in support of motion for class certification contains my rebuttal of Dr. Kleidon's claims regarding market efficiency as presented in his declaration in opposition to class certification.

## II. Qualifications

4. I am a Professor and the Chair of the Finance Department of the McCombs School of Business at The University of Texas at Austin. My research and teaching are in the areas of corporate finance and real estate finance. I regularly teach valuation at both the undergraduate and graduate levels. In addition, I regularly teach a PhD class on empirical corporate finance, which includes event study methodology among its topics. I have published in the top finance and real estate journals, held multiple editorial positions for those journals, and hold a Ph.D. in finance from The University of Texas at Austin.

## III. Rebuttal of Kleidon's criticisms regarding market efficiency

*i) Kleidon Opinion VI. A. – Plaintiff's Investment Philosophy and Trading Behavior Are at Odds with a Belief That the Market for Diamond Was Efficient*

---

[1] Declaration of Dr. Allan W. Kleidon In Opposition To Motion For Class Certification Dated April 11, 2013, paragraph 27.

## Declaration of Dr. Jay Hartzell

5. Dr. Kleidon argues that because plaintiff's investment manager, Artisan, traded in a way that was not consistent with a belief in efficient markets, this fact rebuts plaintiff's claim of reliance on an efficient market.

6. Kleidon mischaracterizes the link between Artisan's investment philosophy and market efficiency. As quoted in Kleidon's report, Artisan states,

    *We look for valuations that we can understand and that reflect reasonable assumptions about the prospects of the business. Through our fundamental research, we estimate the amount a private market buyer would pay to buy the entire company, which we call its "private market value". We will consider for investment those companies that are selling at a discount to our estimate of private market value.*

7. Semi-strong form market efficiency does not require that the market price of Diamond Foods' stock equals this estimate of private value. Note that Artisan is calculating a private (not public) value that a buyer would pay to buy the entire company (not a single or small number of shares). In contrast, shares traded in the public market represent minority interests in the firm. The fact that a controlling interest (which would be satisfied by buying the entire company) is likely to be worth more than a minority interest is well-known, and a principle of standard valuation practice. One reason for such a gap between the public market (minority interest) value and the private market (controlling interest) value is that a private market buyer may be willing to pay more than the prevailing market price because of the ability to realize synergies with his or her current operations or holdings.

8. Furthermore, Kleidon appears to confuse the direction of causality between active portfolio management and market efficiency. Dr. Kleidon asserts that the fact that Artisan is actively selecting stocks is inconsistent with market efficiency. What is

**Declaration of Dr. Jay Hartzell**

missing from this assertion is the fact that active money management (i.e., trying to "beat the market") is a necessary condition to arrive at an efficient market. Investors and traders acquire and analyze information as they attempt to beat the market, but it is through this process that information in impounded into prices and the market becomes efficient. Put another way, having active money managers such as Artisan speculating on a stock is a necessary condition for, rather than evidence against, market efficiency. Their speculation does not imply that the resulting prices in the market allow for profitable trading opportunities using public information.

9. Market efficiency does not require that every trader agrees with the current market price. If it did, then all investors would invest only passively (e.g., buying index funds), holding every stock in proportion to its market value, and the only observed trading would be for liquidity reasons. Artisan could very well believe that it possesses private information (e.g., by virtue of its information acquisition process or by having unusual skill) in identifying firms that will be worth more when sold as a whole firm to a private buyer than suggested by all available public information in a semi-strong form efficient market.

*ii) Kleidon Opinion VI. B. – Plaintiff's Allegations are Inconsistent with an Assertion that the Market for Diamond Stock Was Efficient Throughout the Putative Class Period.*

10. Kleidon states "The Complaint alleges that information disclosed in the *Wall Street Journal* article and the BB&T Capital Markets report on November 3, 2011, caused Diamond's stock price to decline 12.1% over November 3, 2011, and November 4, 2011" […] "Accepting Plaintiff's allegations at face value, the only possible conclusion

**Declaration of Dr. Jay Hartzell**

is that the market was inefficient with respect to information contained in the November 3, 2011, *Wall Street Journal* article and BB&T Capital Markets report."[2] In my report, I did not specifically analyze the price movements surrounding this *Wall Street Journal* article, but instead relied upon corporate disclosure events, as suggested by *Cammer*. Thus, my conclusion that the market for Diamond Foods stock was semi-strong form efficient during the class period did not rely on these particular days' returns. Unlike Dr. Kleidon, I do not consider the plaintiff's choice of rhetoric in the legal complaint as economic proof of inefficiency in the market for Diamond Foods stock. I address the general issue of delayed price responses to the news events that I considered later in this declaration.

11. Still, it is worth noting that a negative price reaction to the November 3, 2011 *Wall Street Journal* article is not inconsistent with market efficiency. In paragraphs 54-56, Kleidon claims that any price reaction following news concerning payments to walnut growers after the September 25, 2011, Off Wall Street report, "means that the market for Diamond's stock cannot be efficient." This statement implies that the public information set available to the market regarding all aspects of the walnut payments was constant between September 25, 2011 and November 3, 2011, which it was not. The November 3, 2011 *Wall Street Journal* article is based on information obtained from confidential sources "familiar with the matter," information from walnut growers, and contains commentary from an institutional investor and an ex-SEC official. Even if the dollar estimates produced from this investigation were in line with previous commentary, the sources and in-depth analysis of the *Wall Street Journal* coverage

---

[2] Kleidon Declaration, Paragraphs 52, 53.

p. 6

**Declaration of Dr. Jay Hartzell**

changed the information set available to the market regarding the confidence of those estimates.  Likewise, the November 3, 2011 BB&T report provides incremental commentary regarding the walnut payments and BB&T's assessment of rumors surrounding the payments, including a resulting reduction in BB&T's estimate of FY2012 EPS.  A negative market reaction on November 3, 2011 following these additional reports is not inconsistent with an efficient market.  Nevertheless, the smaller, and less statistically significant, abnormal return on November 3 (-3.2%) is consistent with these events containing less information content than the September 25, 2011 report (-6.7%) or the November 1, 2011 8K (-18.5%).

*iii) Kleidon Opinion VI. C. – Plaintiff's Expert Does Not Establish That the Market for Diamond Stock was Efficient Throughout the Putative Class Period*

12. My first report presented evidence from my analysis of eight different market efficiency factors suggested by *Cammer* and *Krogman*, and Kleidon presents criticisms of only one of those eight factors, namely the event study analysis.  Kleidon presents no rebuttal of the other evidence I presented that supported a presumption of market efficiency, namely: (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the company's market capitalization; (6) the bid-ask spread for stock sales; and (7) float, the stock's trading volume without counting insider-owned stock.  These factors still support my conclusion that trading in Diamond Foods common stock was semi-strong form efficient during the class period in this matter.

p. 7

**Declaration of Dr. Jay Hartzell**

*Kleidon Opinion VI.C.2.a. – Hartzell's identification of events, and the associated expected price impact, is potentially influenced by the very stock price reactions he purports to test*

13. Kleidon states that I did not follow the appropriate procedure for testing for market efficiency, as he claims that my selection of events may have been tainted by the stock price reactions that I later test. As discussed in my original report, I began with a set of 8-Ks. Then, I used the *existence* of analyst reports around those corporate disclosures to help decide which 8-Ks were likely to represent material changes in the market's beliefs about the valuation of Diamond Foods' stock. I did not use the *content* of the reports (or any discussion of stock prices) to select the events, in contrast to Kleidon's characterization. An alternative approach of using my judgment to ascertain which 8-Ks were and were not likely to lead to significant stock-price reactions would very likely have led to the same set of events. As shown in Panel B of Table 1 in my original report, the excluded 8-Ks were less important and conveyed information that was consistent with expectations (and, thus, unlikely to generate analyst coverage, news stories, or stock-price changes). For example, of the 12 excluded 8-Ks, three disclosed the details or results of shareholder elections, two announced the appointment of directors, and two released presentations that had been given at industry events. My procedure of event selection and testing and interpretation is consistent with Dr. Kleidon's definition of an appropriate event study methodology.[3]

14. I used the *content* of analysts' reports to help classify each earnings announcement as a positive or negative surprise, or one that was unlikely to generate a statistically

---

[3] Kleidon Declaration, paragraph 62.

**Declaration of Dr. Jay Hartzell**

significant stock-price reaction. This step is necessary with any analysis of earnings announcements because the way in which a firm does or does not beat expectations is important, and analysts and market participants are worried about more than just one single, unadjusted earnings per share number relative to a consensus forecast. In addition, even though Kleidon implies that I should primarily use additional information contained in price targets, earnings guidance or investment recommendations, there are well-known problems with doing so, as documented extensively in the academic literature. Two such problems are the fact that analysts are slow to update their forecasts in light of news,[4] and the fact that analysts tend to be positively biased (even though the dispersion in their recommendations across firms still conveys information).[5] Furthermore, I did not rely on any analyst's characterization of the realized post-announcement stock-price reactions (many reports are issued overnight or very near the opening bell the day after an announcement) in determining the predicted direction for the stock price change – only their discussion of the news.

15. For the non-earnings announcements, the direction of the news contained in the 8-K was clear. To the extent that Kleidon does not believe these predictions, which I made based on reading the evidence, though, there is support for efficiency in the two-tail p-values that I report. Statistical tests of price reaction to information explicitly allow for a two-sided alternative hypothesis (i.e., the relevant news could have been good or bad). The results under a two-tailed hypothesis are also consistent with and support my conclusion

---

[4] For example, see "The effect of experience on security analyst underreaction," Michael B. Mikhail, Beverly R. Walther, and Richard H. Willis, 2003, Journal of Accounting and Economics 35, 101-116.

[5] For example, see "Rationality and analysts' forecast bias," Terrence Lim, 2001, Journal of Finance 56, 369-385.

**Declaration of Dr. Jay Hartzell**

that trading in Diamond Foods common stock was semi-strong form efficient during the class period in this matter.

16. In addition to my qualitative evaluation of the events presented in my March 28, 2013, report, I also examined three purely quantitative measures of the news contained in the earnings events – the surprise in sales revenues (as a percentage), the surprise in EPS (as a percentage), and the surprise in quality-adjusted EPS (also as a percentage). Of these three measures, Kleidon only criticizes the third, stating my rationale for examining quality-adjusted surprise is "unfounded." Notably, he does not raise concerns with my examination of the surprise on sales revenue, an analysis with results consistent with the results of the quality-adjusted surprise.

17. Nevertheless, I disagree with Dr. Kleidon's rejection of the consideration of quality-adjusted surprise. A penny of earnings from higher sales is not equal to a penny of earnings from lower investment in advertising, and failing to adjust for advertising expense obscures information about future earnings revealed in an earnings announcement. This is consistent with the way in which analysts and other market participants discuss earnings announcements and the news that they reveal.

18. In Paragraph 70, Kleidon proposes an alternate methodology for evaluating the directional content of earnings announcements, suggesting one should "examine whether and how analysts change their price targets, earnings guidance, or investment recommendations before and after the event," for that purpose. Notably, he does not systematically perform this analysis, but merely cites three cherry-picked analysts (Janney, Keybanc, and Craig-Hallum) that increased their estimate of FY 2011 EPS after the October 5, 2010 FY2010 earnings event as evidence of positive actions in response

**Declaration of Dr. Jay Hartzell**

that announcement. Dr. Kleidon's description of the actions taken by these analysts is incomplete, as he does not acknowledge that these three analysts went into the announcement with FY 2011 EPS estimates below consensus, and while they did revise their FY 2011 EPS estimates to be more in line with other analysts, they simultaneously decreased their estimates of FY 2011 sales revenue. In fact, five of the six analysts I reviewed decreased their estimates of FY 2011 sales revenue following the FY2010 earnings announcement.[6] Additionally, all four analysts that had previously held estimates of 1Q 2011 EPS decreased those estimates dramatically (by an average of 34 cents), shifting those earnings farther out in time.

19. A basic implication of the time-value of money is that the current value of future earnings is reduced when those earnings are moved farther into the future. Moving forecasted earnings farther into the future is a negative analyst action. Likewise, downward revisions of revenue estimates are negative analyst actions reflecting a perceived change in growth potential for the stock. In its report on this announcement, BB&T noted sales revenue was "an important metric for a growth stock such as DMND."

20. A systematic review of the analyst forecast changes made in response to the October 5, 2010 earnings announcement shows those changes are consistent with analysts interpreting the information content in that announcement in a negative light, and also

---

[6] The six analyst reports discussed here are: "4Q10 Results: A Few Unpopped Kernels but Story Remains Intact," SunTrust, October 6, 2010; "1Q11 Nut Good; Balance of FY11 Better," Janney Capital Markets, October 6, 2010; "DMND: 4Q10 Review; Updating FY11 Estimates," KeyBanc, October 6, 2010; "Diamond Adding New Capacity And Distribution; Maintaining Accumulate Rating And $45 Price Target," Craig-Hallum, October 6, 2010; "DMND: Strong EPS Growth & Guidance Raise, But Sales Light," BB&T Capital Markets, October 6, 2010; "Quality Concerns Temper 'Beat & Raise' Quarter," RBC Capital Markets, October 6, 2010.

**Declaration of Dr. Jay Hartzell**

consistent with, and support, the findings of the earnings-adjusted surprise analysis I conducted and presented in my first report.

*Kleidon Opinion VI.C.2.b. – Hartzell's analysis does not test whether the market price fully impounds the information he analyzes within one trading day*

21. Kleidon states "Hartzell's analysis does not test whether the market price fully impounds the information he analyzes within one trading day," and then pulls anecdotal "examples" of multi-day changes following the news events I examined in my March 28, 2013 report. Kleidon cherry-picks three such examples, one of which, the November 2, 2013 event, is discussed elsewhere in this report. The other two examples are the only two, of the ten events evaluated, following-day changes that are statistically significant at the 5% level using a two-tailed test.

22. Kleidon never performs a systematic evaluation of following-day returns after news events to examine systematic evidence of a delayed reaction of Diamond stock to news events. For each of the ten news events examined in my March 28 report, I compared the abnormal returns of Diamond stock (i.e. the returns not explained by market-wide movements) on the first day the news was available to the market (t=1) to the abnormal returns of Diamond stock on the second day news was available to the market (t=2). A statistical analysis of these returns fails to reject the hypothesis that they are not correlated.[7] This failure to reject is inconsistent with Kleidon's assertion and supports the hypothesis that the information content available to the market on day one is fully

---

[7] The test of significance of the correlation between the abnormal returns at t and t+1 has a two-tailed p-value of .22, which is not significant at the 1%, 5%, or 10% level.

**Declaration of Dr. Jay Hartzell**

incorporated in the stock price on day one and consistent with an (semi-strong) efficient market for Diamond stock.

*Kleidon Opinion VIII. A. – Plaintiff provides No Evidence Concerning Damages*

23. Kleidon states "Plaintiff has made no showing of how it would propose to establish recoverable damages on a common, classwide basis." (Paragraph 93). He then proposes such methodology, stating in paragraph 94 (footnote omitted):

> "Recoverable damages in a securities case such as this are a function of the timing of purchases and sales of stock. Per-share recoverable damages for a plaintiff purchasing on a given day and selling on another day (or retaining throughout the class period) are the lesser of:
> a) Out-of-pocket damages, that is, share price inflation on the date of purchase less share price inflation on the date of sale (where share price inflation is defined as the difference between the actual share price and the "true value" that would have prevailed absent the alleged material misrepresentations);
> b) Actual losses caused to the shareholder by the alleged misrepresentations as opposed to the share price declines resulting from non-fraud related factors such as new information unrelated to the fraud;
> c) and PSLRA "bounce-back" calculation (if applicable)."

Kleidon also notes, in paragraph 98, "There is a standard framework in financial economics that is appropriate for determining the but-for price." Kleidon's proposed methodology and but-for price framework provide a reasonable method of establishing recoverable damages on a common, class-wide, basis.

24. Kleidon claims that the lead plaintiff "does not propose a methodology for determining what portion of the declines (if any) following each of these alleged corrective disclosures results from revelation of the purported truth and is thus relevant for the calculation of recoverable damages, as opposed to other factors." Damages in this matter will be calculated using an event study analysis similar to the event study analysis

p. 13

**Declaration of Dr. Jay Hartzell**

presented in my first report on market efficiency. The event study analysis I have already performed shows that damages are calculable to the class using standard event study methodology.

*Conclusion*

25. During the class period, Diamond Foods stock was actively traded on the NASDAQ, a national stock exchange, and was followed and reported on by numerous analysts and national press. My event study analysis clearly shows that the stock price reacted to corporate news events in a statistically significant and logical way. Dr. Kleidon's criticisms of only the event study part of my overall efficiency analysis are primarily limited to complaints about the sample selection methodology of my event study dates – although he does not propose an alternative set of dates to study – and complaints about stock price movements on a few days in the class period. Dr. Kleidon does not prove or conclude in his report that Diamond Foods stock traded in an inefficient market, and Dr. Kleidon does not present evidence to support a claim of inefficiency. In my professional opinion, the evidence taken in total, as presented in both my first report and in this declaration, supports the (semi-strong) efficiency of the market for Diamond Foods, Inc. stock during the class period in this matter. Additionally, recoverable, class-wide, damages in this matter are calculable using methodology commonly applied in matters of this type.

p. 14

**Declaration of Dr. Jay Hartzell**

## VI. Documents considered

26. In addition to the documents considered for my March 28, 2013 report, I have also considered the April 11, 2013, Declaration of Dr. Allan W. Kleidon In Opposition To Motion For Class Certification in this matter, the April 11, 2013, Opposition To Motion For Class Certification in this matter, the April 4, 2013, Transcript of Andrew Stephens in this matter, and Opinion and Order, *GAMCO Global Series Funds, Inc. v. Vivendi, S.A.*, 1:03-cv-05911-SAS (S.D.N.Y. Feb. 28, 2013).

## VII. Potential Additional Analyses to Perform

27. My opinions are based on the information received and available as of the date of my report. I will consider any additional documents or information that becomes available after the date of this report. I will consider issues raised at any deposition. Any of this additional information may cause me to change my opinions, and I may supplement this report accordingly.

## VIII. Compensation

28. I am being compensated at a rate of $500 per hour. Those assisting me in my work on this matter, Kevin Jewell and Dr. Greg Hallman, are being compensated at rates of $300 and $500 per hour, respectively.

**Declaration of Dr. Jay Hartzell**

I declare under penalty of perjury, 28 U.S.C. sec. 1746, that the foregoing is true and correct this 18th day of April, 2013, in Austin, Texas.

_____
Jay Hartzell