# Exhibit 1

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**1**

```
            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION

IN RE DIAMOND FOODS, INC., )
SECURITIES LITIGATION      )
                           )
                           )CASE NO. 11-cv-05386-WHA
                           )
_____   )
                           )
This Document Relates to:  )
                           )
    All Actions.           )
_____   )


              30(b)(6) DEPOSITION OF
                 GEORGE W. NEVILLE

                  April 3, 2013
                    9:04 a.m.


      Lieff, Cabraser, Heimann & Bernstein, LLP
            275 Battery Street, 29th Floor
            San Francisco, California 94111




      Catherine A. Ryan, RMR, CRR, CSR No. 8239
```

---

**3**

1   APPEARANCES (Continued)
2
3   For the Defendant Steven Neil:
4       HOGAN LOVELLS US LLP
        BY:  AVI DANIEL ROSENBLIT, ESQ.
5       3 Embarcadero Center, Suite 1500
        San Francisco, California 94111
6       415.374.2314
        415.374.2499 Fax
7       avi.rosenblit@hoganlovells.com
8       (Mr. Rosenblit was not present at the commencement
9       of the deposition proceedings.)
10
11
        Also Present:
12
        Videographer:
13
          NANCY KARP, ESQUIRE DEPOSITION SOLUTIONS
14
15
16
17
18
19
20
21
22
23
24
25

---

**2**

1
2
3   For the Lead Plaintiff:
4       CHITWOOD HARLEY HARNES
        BY:  JOHN F. HARNES., ESQ.
5       1350 Broadway, Suite 908
        New York, New York 10018
6       917.595.4600
        jfharnes@chitwoodlaw.com
7
        BY:  ZE'EVA KUSHNER BANKS, ESQ.
8       2300 Promenade II
        1230 Peachtree Street
9       Atlanta, Georgia 30309
        404.873.3900
10      404.876.4476 Fax
        zbanks@chitwoodlaw.com
11
12  For the Defendant Diamond Foods:
13      FENWICK & WEST, LLP
        BY:  JENNIFER C. BRETAN, ESQ.
14        MARIE BAFUS, ESQ.
        555 California Street, 12th Floor
15      San Francisco, California 94104
        415.875.2412 (Ms. Bretan)
16      415.875.2371 (Ms. Bafus)
        415.281.1350 Fax
17      jbretan@fenwick.com
        mbafus@fenwick.com
18
19  For the Defendant Michael Mendes:
20      SIDLEY AUSTIN, LLP
        BY:  ROBERT B. MARTIN, III, ESQ.
21      555 California Street, 12th Floor
        San Francisco, California 94104
22      415.772.7443
        415.772.4000 Fax
23      rbmartin@sidley.com
24
25      //

At the very top of page 2: "APPEARANCES OF COUNSEL"

---

**4**

1               INDEX OF EXAMINATION
2
3   WITNESS:  GEORGE W. NEVILLE
4   EXAMINATION                     PAGE
5       By Ms. Bretan               10
6       By Mr. Martin               200
7       By Ms. Bretan               203
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

GEORGE W. NEVILLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.

April 3, 2013

---

**5**

1                    INDEX TO EXHIBITS
2    Exhibit      Description           Page
3    Exhibit 1  "Defendant Diamond Foods, Inc.'s     11
         Amended Notice of Deposition of Lead
4        Plaintiff Mississippi Public
         Employees' Retirement System Pursuant
         to Federal Rules of Civil Procedure 26
5        and 30(b)(6)" and attachments; 5 pages
6
     Exhibit 2  "Letter on the letterhead of Chitwood   31
7        & Harley LLP dated December 3, 2004";
         Bates MSPERS 020244 - MSPERS 020255
8
     Exhibit 3  "Notice of Motion and Motion of the    40
9        Mississippi Public Employees'
         Retirement System for Consolidation
10       and Appointment of Lead Plaintiff;
         Memorandum of Points and Authorities
11       in Support Thereof; 34 pages
12   Exhibit 4  "Declaration of James M. Wilson, Jr.    49
         in Support of Motion of the
13       Mississippi Public Employees'
         Retirement System for Consolidation
14       and Appointment of Lead Plaintiff" and
         attachments; 14 page
15
     Exhibit 5  "Court Questionnaire to Lead-Plaintiff  65
16       Candidates"; 16 pages
17   Exhibit 6  "Memorandum in Further Support of the   78
         Motion of Mississippi Public
18       Employees' Retirement System for
         Appointment as Lead Plaintiff and in
19       Opposition to the Competing Motions";
         16 pages
20
     Exhibit 7  Letter on the letterhead of the State   82
21       of Mississippi, Jim Hood, Attorney
         General, dated March 5, 2012, "Re: In
22       re Diamond Foods, Inc. Securities
         Litigation, No. 11-CV-05386 (WHA)" and
23       attachments; 13 pages
24   Exhibit 8  "Order Appointing Lead Plaintiff; 13    96
         pages
25   //

---

**6**

1    INDEX (Continued)
2                    INDEX TO EXHIBITS
3    Exhibit      Description           Page
4    Exhibit 9  "Notice of Motion and Motion of Lead    97
         Plaintiff Mississippi Public
5        Employees' Retirement System for
         Appointment and Approval of Lead and
6        Local Counsel; Memorandum of Points
         and Authorities in Support Thereof";
7        10 pages
8    Exhibit 10  "Retention Agreement"; Bates MSPERS    98
         007130 - MSPERS 007137
9
     Exhibit 11  "Order Appointing Class Counsel"; 2   107
10       pages
11   Exhibit 12  "Mississippi Legislature, House Bill  111
         No. 211 (As Sent to Governor)"; 36
12       pages
13   Exhibit 13  "Mississippi Legislature 2012 Regular 121
         Session House Bill 211"; 3 pages
14
     Exhibit 14  Email series dated November 08, 2011, 127
15       "Subject: Fw: Victories in Kentucky
         and Mississippi!"; Bates MSPERS 009902
16       - MSPERS 009903
17   Exhibit 15  "OpenSecrets.org, Democratic Attorneys 129
         General Assn: Top Contributors, 2004
18       Cycle"; 5 pages
19   Exhibit 16  "OpenSecrets.org Democratic Attorneys 135
         General Assn: Donor Search"; 16 pages
20
     Exhibit 17  "OpenSecrets.org, Democratic Attorneys 141
21       General Assn: Expenditures, 2004
         Cycle"; 3 pages
22
     Exhibit 18  "Candidate Report of 2007, Receipts   144
23       and Disbursements; 3 pages
24   Exhibit 19  "2011 Election Cycle, Candidate Report 146
         of Receipts and Disbursements, 2001
25       Elections"; 54 pages

---

**7**

1    INDEX (Continued)
2                    INDEX TO EXHIBITS
3    Exhibit      Description           Page
4    Exhibit 20  "Lead Plaintiff's Initial            155
         Disclosures"; 31 pages
5
     Exhibit 21  "Lead Plaintiff's Amended Initial     157
6        Disclosures"; 4 pages
7    Exhibit 22  "Lead Plaintiff Mississippi Public    160
         Employees' Retirement System's
8        Responses and Objections to Defendant
         Diamond Foods, Inc.'s First Request
9        for Production of Documents" and
         "Exhibit A"; 25 pages
10
     Exhibit 23  "Lead Plaintiff Mississippi Public    167
11       Employees' Retirement System's
         Responses and Objections to Defendant
12       Diamond Foods, Inc.'s First Set of
         Interrogatories" and "Verification";
13       12 pages
14   Exhibit 24  "Lead Plaintiff Mississippi Public    172
         Employees' Retirement System's
15       Supplemental Responses and Objections
         to Defendant Diamond Foods, Inc.'s
16       First Set of Interrogatories"; 6 pages
17   Exhibit 25  "Diamond Foods Provides Update on     178
         Pringles Transaction"; Bates MSPERS
18       001505 - MSPERS 001506
19   Exhibit 26  "Diamond Foods Announces Audit        180
         Committee Investigation Findings";
20       Bates MSPERS 001511 - MSPERS 001512
21   Exhibit 27  "Notice of Motion and Motion for Class 183
         Certification; Memorandum of Points
22       and Authorities in Support Thereof";
         30 pages
23
24   Exhibit 28  "Declaration of John F. Harnes in     184
         Support of Lead Plaintiff's Motion for
25       Class Certification" and attachments;
         7 pages

---

**8**

1    INDEX (Continued)
2                    INDEX TO EXHIBITS
3    Exhibit      Description           Page
4    Exhibit 29  "PERS of Mississippi (U.S. Mid-Cap    193
         Growth Account) - Fiduciary Review
5        Parts 1 & 2"; Bates MPERS 011839 -
         MPERS 011840
6
     Exhibit 30  "2010 Election Cycle, Candidate Report 203
7        of Receipts and Disbursements, 2010
         Non-Judicial Election"; 32 pages
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

GEORGE W. NEVILLE  30(b)(6)                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**9**

1    DEPOSITION OF GEORGE W. NEVILLE
2             April 3, 2013
3
4         THE VIDEOGRAPHER:  Good morning.  We are
5    on the record.  This is tape number one to the
6    videotaped deposition of 30(b)(6) witness George
7    Neville, in RE Diamond Foods, Inc., Securities
8    Litigation, being heard before the United States
9    District Court, Northern District of California, San
10   Francisco Division.  The case number is
11   CV-11-05386-WHA.  This deposition is being held at
12   the law offices of Lieff Cabraser, 275 Battery
13   Street in San Francisco, California on April 3,
14   2013.  The time on the record is 9:04 a.m.  My name
15   is Nancy Karp, and I'm the videographer with
16   Esquire.  The court reporter is Catherine Ryan.
17        Counsel, will you please introduce
18   yourselves and affiliations and the witness will be
19   sworn.
20        MS. BRETAN:  I'm Jennifer Bretan, Fenwick
21   & West, on behalf of Defendant Diamond Foods.
22        MS. BAFUS:  Marie Bafus from Fenwick &
23   West on behalf of Defendant Diamond Foods.
24        MR. MARTIN:  Robert Martin with Sidley
25   Austin on behalf of Defendant Michael Mendes.

---

**10**

1         MS. BANKS:  Ze'eva Kushner Banks, Chitwood
2    Harley Harnes, on behalf of Lead Plaintiff.
3         MR. HARNES:  John Harnes, Chitwood Harley,
4    on behalf of Lead Plaintiff.
5         THE VIDEOGRAPHER:  Will you please swear
6    in the witness.
7              GEORGE W. NEVILLE,
8    having been administered an oath, was examined and
9    testified as follows:
10        THE VIDEOGRAPHER:  Please proceed.
11             EXAMINATION
12   BY MS. BRETAN:
13        Q   Good morning, Mr. Neville.
14        A   Good morning.
15        Q   Can you state your full name and address
16   for the record?
17        A   It's George W. Neville, 403 Garden Park
18   Cove, Brandon, Mississippi 39047.
19        MR. HARNES:  Jennifer, can I just
20   interrupt you for a second.  I just wanted to put on
21   the record -- and I don't know that it's necessary,
22   but in connection with your 30(b)(6) notice of
23   deposition, that Mr. Neville is here to testify
24   about topics four to the -- to the extent that they
25   involve the Attorney General's office, five, six,

---

**11**

1    seven and then eight to the extent that it involves
2    the Attorney General's office.
3         MS. BRETAN:  Thank you.
4         Q   I'm Jennifer Bretan.  I represent Diamond
5    Foods in this matter.
6         Have you been deposed before, Mr. Neville?
7         A   Yes.
8         Q   And how many times have you been deposed
9    before?
10        A   In non-domestic relations cases?
11        A   In non-domestic relations cases.
12        A   I think eight times.
13        Q   And were those securities --
14        A   Yes, they were.
15        Q   -- litigations?
16        And what I'm going to do is have the court
17   reporter mark as Exhibit 1 the "Amended Notice of
18   Deposition of Lead -- 30(b)(6) Deposition of Lead
19   Plaintiff" in this matter.
20        (Exhibit 1 was marked for
21        identification by the court reporter.)
22   BY MS. BRETAN:
23        Q   So for the record, Exhibit 1 is the
24   "Amended Notice of Deposition of Lead Plaintiff
25   Mississippi Public Employees' Retirement System

---

**12**

1    Pursuant to Federal Rules of Civil Procedure 26 and
2    30(b)(6)."  Do you understand, Mr. Neville, that
3    you're testifying in connection with a securities
4    class action lawsuit filed against Diamond Foods?
5         A   Yes, I do.
6         Q   And you understand you're testifying as
7    person most knowledgeable on certain topics?
8         A   That's correct.
9         Q   Okay.  And your counsel has identified
10   those topics as -- in this notice as four as it
11   relates to Diamond Foods, five, six, seven and eight
12   with respect to documents of the AG's office, the
13   Attorney General's office; is that correct?
14        A   Well, four you said as it relates to
15   Diamond, but, I mean, obviously it relates to
16   Diamond because that's why we're here, but that the
17   AG's office would -- involvement with Diamond, yes,
18   I do.
19        Q   And I just -- I know you're old hat at
20   this, but I'd just for the record like to go through
21   some rules for the deposition.  Do you understand
22   you're under oath and anything you say today is as
23   if you were testifying in court?
24        A   I do.
25        Q   Okay.  And you understand you should be

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**13**

1   testifying truthfully?
2       A   Yes.
3       Q   Okay.  And the reporter is going to
4   transcribe everything you say today.  If you don't
5   understand one of my questions, Mr. Neville, I just
6   need you to say so.
7       A   Okay.
8       Q   I'll assume otherwise that you understood
9   my question if you don't tell me.
10          (Mr. Rosenblit joined the deposition
11          proceedings.)
12          THE WITNESS:  Oh.
13  BY MS. BRETAN:
14      Q   Do you understand that?
15      A   Okay.
16      Q   I'll need you to answer audibly, and so
17  that means no shaking heads.
18      A   Okay.
19      Q   Okay.  Not to talk over me, and that will
20  just help the court reporter transcribe.
21          I'm entitled today to your best
22  recollection.  I'm not asking you to guess, but to
23  your best recollection.  If I ask you a question and
24  later on you remember information that's additional,
25  just let me know --

---

**14**

1       A   Okay.
2       Q   -- or want to clarify something, please
3   just let me know.
4       A   Okay.
5       Q   If you think there are documents that
6   would be helpful in your testimony today, please let
7   me know that as well.
8       A   Okay.
9       Q   We can take breaks today.  I know time is
10  scarce, but -- but just not while a question is
11  pending, okay?
12      A   All right.
13      Q   Are you represented here today --
14      A   Yes --
15      Q   -- Mr. Neville?
16      A   -- I am.
17      Q   And who is your counsel?
18      A   Chitwood Harley.
19      Q   So if counsel objects today, you still
20  need to answer my question.  They're objecting to
21  preserve that objection for the record.  It doesn't
22  mean you don't answer the question.  Do you
23  understand that?
24      A   Unless he instructs me not to answer.
25      Q   Unless he's instructing you not to answer.

---

**15**

1       A   I understand.
2       Q   And, most importantly, you need to answer
3   the question.  You may have feelings about some of
4   the issues we're going to discuss or points you want
5   to make, and at the appropriate time, if called as a
6   witness by your counsel, you will have the
7   opportunity to make those points in response to your
8   counsel's questions.  The purpose today is to allow
9   me a chance to ask you some questions, and so it's
10  going to be important that we limit your answers to
11  the questions I'm asking.
12      A   I'm not sure that I will, but ...
13          MR. HARNES:  I'm going to object -- I'm
14  going to object to that instruction.  He can answer
15  a question any way he feels --
16          THE WITNESS:  Yeah, I --
17          MR. HARNES:  -- is the best way to answer.
18          THE WITNESS:  You know, I'm an attorney.
19  This is not just -- the fact -- the first time I've
20  ever been deposed.  I'm an attorney practicing 27
21  years.  So I'm not sure that all this is terribly
22  necessary, but if that's what you want to do.
23  BY MS. BRETAN:
24      Q   I understand.  Is there any reason you're
25  not able to testify truthfully today?

---

**16**

1       A   No.
2       Q   Are you on any medications?
3       A   No.
4       Q   Okay.  Any other reason why your testimony
5   would be impaired?
6       A   No.
7       Q   Okay.  Did you do anything to prepare for
8   this deposition?
9       A   I met with my counsel.
10      Q   When was that?
11      A   Last week.
12      Q   Uh-huh.  And for how long?
13      A   An hour or two.
14      Q   Did you speak with anyone other than your
15  counsel regarding this deposition?
16      A   No.
17      Q   Did you review any documents in
18  preparation for this deposition?
19      A   The notice, a brief, class cert and the
20  complaint.
21      Q   Okay.  Did you -- is there any other
22  correspondence that you might have about this
23  deposition with anyone other than your counsel?
24      A   I let people in the office know where I
25  was going.

---

GEORGE W. NEVILLE  30(b)(6)                           April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**17**

1    Q   Okay.  And have you been told to keep all
2  your documents related to this case?
3    A   Yes.
4    Q   Okay.  And I want to just very briefly go
5  through your educational background.  You attended
6  college?
7    A   Yeah, I went to Meridian Junior College
8  for a year, graduated from University of South
9  Alabama in 1980, graduated from the University of
10  Mississippi School of Law in 1986 -- excuse me --
11  '85, admitted to the bar May 1 of 1986 in
12  Mississippi.  That's the only bar that I'm a member
13  of.
14    Q   Okay.  And thank you.
15       For whom do you work, Mr. Neville?
16    A   Mississippi Attorney General's office.
17    Q   Okay.  And what's your title?
18    A   Special Assistant Attorney General.
19    Q   And is that an elected position?
20    A   I'm not.  His is.
21    Q   The Attorney General?
22    A   Correct.
23    Q   So you're -- are you appointed, then?
24    A   I suppose.  We're hired.  There are 125 of
25  us; so it's not like I'm unique.

---

**18**

1    Q   Okay.  And who is the Attorney General?
2    A   Jim Hood.
3    Q   And when did he -- is he an elected --
4  he's elected?
5    A   That is correct.
6    Q   And --
7    A   He was first elected in 2003, sworn into
8  office in January of 2004, been reelected twice.
9    Q   And when was the most recent election?
10    A   '11.
11    Q   2011?
12    A   Uh-huh.
13    Q   And do you report to the Attorney General?
14    A   Well, my first line is the chief of staff.
15    Q   And who is that?
16    A   Geoffrey Morgan.  That's G-e-o-f-f-r-e-y.
17  Geoffrey Morgan is the chief of staff, and I report
18  to Geoffrey, and then he reports to the Attorney
19  General.
20    Q   Okay.  What does the chief of staff do?
21    A   He oversees the office and makes sure that
22  staff and functions of the office are being carried
23  out and the policies of the AG and works with me
24  overseeing any outside litigation.
25    Q   Okay.  And is -- that's -- is that an

---

**19**

1  elected position or --
2    A   No, we're all appointed, hired or
3  whatever.
4    Q   And is the chief of staff involved in the
5  campaign of Mr. Hood?
6    A   No.
7    Q   Okay.  What are your responsibilities as
8  Special Assistant Attorney General?
9    A   My primary responsibility is to oversee
10  outside litigation.  The State of Mississippi is
11  either involved with the brains on -- with the
12  outside counsel that's -- most of -- we have
13  hundreds or thousands of cases that outside counsel
14  may be involved with on behalf of the State of
15  Mississippi, like defending workers' comp claims or
16  tort claims and those kinds of things, but I don't
17  typically do that.  It's mostly the larger cases,
18  consumer anti-trust or securities cases.
19    Q   Okay.  And are you the person most
20  knowledgeable about securities litigation undertaken
21  by the AG's office?
22    A   Yes.
23    Q   And are you the most -- the person most
24  knowledgeable for the AG's office in this particular
25  litigation?

---

**20**

1    A   Yes.
2    Q   Okay.  So I'd like to have you just walk
3  me a little bit through the process of how outside
4  litigation -- securities litigation gets started.
5  What happens?
6    A   The typical process is that we're notified
7  by -- there -- there are about 13 law firms that
8  monitor the portfolio of PERS, which is about a
9  $21 billion fund, to determine if there have been
10  allegations of fraud that -- in securities that we
11  own.  We either get a phone call or text or
12  typically an email from one of the lawyers in those
13  firms notifying us that a case is -- should either
14  be brought or has been brought.
15       I'd say 95 percent of the cases that
16  people contact us about have already been brought
17  under the Securities Act.  As you know, there's a
18  60-day window that larger holders of the security --
19  in our case an institutional investor -- has to
20  decide whether they would like to get involved in
21  the case.  We are contacted by various law firms
22  about the merits of the case.  They -- they may --
23  sometimes we get -- the first day may just be a
24  paragraph.  The next day or three days later or so
25  it may be the complaint that's already been filed, a

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**21**

1   synopsis, those kinds of things.  And so we analyze
2   them to determine whether we feel like it's a case
3   that we have some interest in getting involved with.
4      Q    And PERS is the pension fund for
5   Mississippi; is that right?
6      A    Right.  It's all state employees as well
7   as county and city employees.
8      Q    Okay.  And the AG's office represents PERS
9   in a fiduciary capacity with respect to litigation;
10  is that right?  I'm just trying to understand the
11  relationship between it -- how -- how it is that the
12  AG is here representing -- you, on behalf of the AG,
13  is representing PERS.
14     A    Because the Attorney General's office is
15  responsible for all litigation on behalf of any
16  state agency or arm of the State.
17     Q    Okay.
18     A    And so we do the analysis and -- and make
19  the decision about whether this is a case that's
20  appropriate or not, and that was what was done in
21  Diamond.
22     Q    Okay.  You mentioned monitoring firms --
23  some 13 law firms are monitored?
24     A    That's correct.
25     Q    And are those monitoring agreements -- are

---

**22**

1   there agreements reflecting those relationships?
2      A    Well, there's an agreement with the AG's
3   office that they have a right to monitor.
4      Q    Okay.
5      A    And then there's -- those documents are
6   public.  I mean, they're -- we don't have them
7   posted somewhere, but, I mean, they're public
8   record.
9      Q    What do they provide -- what's the purpose
10  of the agreement?
11     A    Well, as I appreciate it, they're -- I'm
12  not a technological person --
13     Q    Okay.
14     A    -- but they have the ability to look at
15  the holdings of PERS, when things were purchased,
16  when they were sold, to determine whether -- even if
17  the security was owned.  I mean, in this case we
18  happen to have owned Diamond Foods.  We very well
19  may not have owned it.  A lot of major funds may not
20  have owned Diamond Foods stock.
21        So if a case is filed and they would like
22  to ask us to look at being involved, then the law
23  firm needs to tell us whether we own the stock or
24  not because I don't have access to that.  I mean, I
25  can get it, but I don't want to have to do the

---

**23**

1   analysis of when we bought, when we sold and whether
2   it was in a class -- purported class period or not
3   and, you know, is it a FIFO, a LIFO, a loss, and all
4   of that stuff is done by the outside counsel.  And
5   so they need access to be able to do that.
6      Q    Okay.  How do you choose the firms?  How
7   does the AG choose the firms that are -- with whom
8   the office has monitoring agreements?
9      A    Is over time the -- we were approached in
10  2004 by Bernstein Litowitz and Wolf Popper about
11  doing it.  It kind of grew from there, I suspect.  I
12  don't know this.  As word spread around that -- some
13  of the other firms that do securities work, like
14  Chitwood Harley and others, that we were going to
15  enter monitoring agreements with people, and so they
16  asked if they could do that.  At some point we got
17  enough and we kind of just stopped.  I mean, there
18  was no magic or science to it.
19     Q    Okay.  Who actually makes the decision to
20  enter into the monitoring agreement with the law
21  firm?
22     A    Well, the Attorney General ultimately
23  makes all the decisions, but Geoffrey and the chief
24  of staff and I make recommendations to it.
25     Q    Okay.  You mentioned Bernstein Litowitz.

---

**24**

1      A    Litowitz, Berger & Grossmann.  I think
2   they were the first one.  It may have been Wolf
3   Popper, but those two were, I think, our first ones.
4      Q    And what are -- if you know, what are the
5   other firms that --
6      A    Well, Lieff Cabraser is one.
7      Q    Lieff Cabraser?
8      A    Uh-huh.
9      Q    And Lieff Cabraser is counsel in this
10  action?
11     A    Yeah, but they're also one of our
12  monitoring firms.  Kaplan Fox, Nix Patterson,
13  Barrack, Rodos & Bacine, Bernstein Liebhard.  I
14  mentioned Wolf Popper.  Baron & Budd.  There's one
15  out of Little Rock, and then there's -- Darren
16  Check's firm out of Philadelphia.  I can't remember
17  the -- it's changed hands -- I mean, names a few
18  times; so I'm not sure what the name is.
19     Q    It's not a memory test.  I appreciate it.
20  So pursuant to those agreements, then, if I'm
21  understanding correctly, monitoring firms receive
22  access to trading records of PERS?
23     A    My understanding is they have electronic
24  access to the trading history.
25     Q    Okay.  And what do they do with that

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

25

1    information?
2        A    Well --
3            MR. HARNES:  Before we go any further, I
4    just want to caution the witness to be cognizant of
5    the attorney-client privilege in discussing too
6    specifically.  I have no problem if you discuss
7    generally the services that were provided, but with
8    respect to any specific -- specifics, I just want to
9    caution him in advance.
10           THE WITNESS:  The -- again, as I
11   appreciate how this works, they have electronic
12   access to be able to look at the stocks and buy,
13   sell, and they -- I've had to learn over time,
14   obviously, what LIFO and FIFO mean and, you know,
15   whether we have net gain or a net loss.  And so they
16   look at those transactions, make a determination of
17   whether there is sufficient basis for us to get
18   involved in a case.
19   BY MS. BRETAN:
20       Q    Okay.  And they use that information, the
21   monitoring firms, to bring potential cases to your
22   -- to the Attorney General's office's attention; is
23   that right?
24       A    That's right, because we don't -- I
25   presume there's some sort of newsletters and blogs

26

1    on what cases that are filed.  We don't follow
2    those.
3        Q    Okay.
4        A    So the law firms would know what may have
5    been filed; so they can advise us whether a case has
6    merit or not.
7        Q    And once a case is brought to your
8    attention, what do you do?  Do you consult other
9    firms at that point or what -- what happens next?
10       A    It depends.  A case like Diamond -- I
11   don't remember the number.  Six or eight of our
12   monitoring firms came to us because they realized
13   that -- how -- fraudulent activity that had taken
14   place.  It was pretty blatant, and they felt like
15   this was a case that should be brought or we should
16   be involved with.  There are some that -- we may
17   only hear from one firm and -- but it varies from
18   case to case, but often I go to the firms I haven't
19   heard from and ask them to do an analysis or give
20   their recommendation.
21       Q    Okay.  And who decides whether to go
22   forward with securities litigation?
23       A    The General, but, again, Geoffrey and I
24   make a recommendation.
25       Q    And that's Attorney General Hood?

27

1        A    Uh-huh.
2        Q    Okay.  He makes the ultimate decision
3    whether to pursue a litigation or not?
4        A    That's right.
5        Q    Is there an amount of losses -- is there a
6    threshold amount of losses related to that decision
7    to go forward or not?
8        A    There's not --
9            MR. HARNES:  Can --
10           THE WITNESS:  I'm sorry.
11           MR. HARNES:  Can I think about that
12   question for a second?
13           THE WITNESS:  I've testified a lot about
14   this.  So I --
15           MR. HARNES:  I'm sorry.  I just --
16           THE WITNESS:  That's okay.
17           MR. HARNES:  Again, it's only a privilege
18   issue.  Go ahead.  If you've testified, then
19   it's ...
20           THE WITNESS:  I've been on panels before
21   and spoken.  Typically it's about $2 million, but
22   there's no locked figure.  I mean, some pension
23   funds, as I appreciate it, do have a minimum
24   threshold, especially those like CalPERS or Ohio
25   where they're so large, much, much larger than ours,

28

1    that they will set some minimum -- I don't know what
2    it is -- you know, of 10 million or $50 million, but
3    ours is around 2, but, you know, like in this case
4    it doesn't mean that we won't do a case that we feel
5    like is a good one.
6    BY MS. BRETAN:
7        Q    And here -- do you know what the claimed
8    losses are here?
9        A    My memory is it was about 1.8 million.
10       Q    So it didn't meet the 2 million threshold?
11       A    I think 1.8 is less than 2, yeah.
12       Q    Who chooses -- once the decision is made
13   to go forward, who is it that chooses what outside
14   counsel will be retained?
15       A    Well, our Attorney General always makes
16   the ultimate decision in all this, but Geoffrey and
17   I recommend a law firm or firms.
18       Q    And what do you -- is it the firm that
19   first contacted you typically?
20       A    Typically, that is the first thing that we
21   look at because in -- it doesn't necessarily apply
22   so much in the securities realm, but a lot of the --
23   most of the time when we hear from attorneys -- in
24   essence it's like a Quitam Case.  They're
25   whistle-blowers.  We may not know about it; so we

GEORGE W. NEVILLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.

April 3, 2013

---

**29**

1  don't want to take their idea and go pass it off on
2  someone else. In the securities realm, obviously
3  the -- if we've contacted eight firms, there are
4  eight often that have some interest in it, but we do
5  give a preference to the first person that contacts
6  us.
7      Q    Has PERS ever proposed or selected a firm
8  that is not a monitoring firm as lead counsel in a
9  securities litigation?
10     A    I don't think so.
11     Q    Would it be possible for outside counsel
12  to analyze whether PERS should participate in a
13  securities case without access to that bank
14  information -- the trading information we were
15  talking about?
16     A    I don't know that they could.  A stock
17  like Exxon Mobile is probably held by PERS in
18  multiple different funds because I would suspect --
19  again, I don't analyze their holdings, but the --
20  there were several index funds, and so a company as
21  large as Exxon Mobile is probably in some of the
22  index funds, if not all of them.
23         And then there may be some that they're
24  target acquisitions based on an analyst at one of
25  the investment advisor's recommendation to buy, but

---

**30**

1  as I appreciate, a lot of the issues that come up as
2  far as at the stage where the court is going to make
3  a decision who is going to be lead counsel and
4  ultimately class rep, it's going to be based on the
5  holdings and the trading activity during the class
6  period.
7         And so there are lots of reasons why even
8  though you may not have access to the data and you
9  think, "Well, if Exxon is the case, then certainly
10  there's going to be holdings and it will be
11  sufficient and I'll get in touch with Mississippi."
12  If they can't tell me whether we fit into the class
13  period or not, it's not very helpful to me.
14     Q    So the monitoring firms or -- or even
15  firms that were not monitoring firms, they would
16  need access to that -- the trading records of PERS
17  in order to do the analysis needed to bring a case
18  to you?
19     A    Well, it's not -- I mean, the -- yes, they
20  -- they could ultimately get it through public
21  records request, but it doesn't mean that they could
22  do the analysis quickly enough to be able to meet
23  the 60-day window, if that's what we're in.
24     MS. BRETAN: I'm going to have the
25  reporter mark as Exhibit 2 a monitoring and

---

**31**

1  confidentiality agreement.
2         THE WITNESS:  And, by the way -- excuse
3  me -- you asked me -- we did hire local counsel on a
4  case or cases, as it turned out, dealing with our
5  mortgage-backed securities, Pond, Gadow & Tyler,
6  but, you know, I'll let them know they -- I gave
7  them the list of monitoring firms and said, "You all
8  need to work with somebody here on this list or
9  several of these folks on this list because the
10  judges probably aren't going to approve you all as
11  class counsel.  So that's what happened.  But
12  they -- they came to us with the information, but
13  they had to get somebody to work the case.
14  BY MS. BRETAN:
15     Q    Was that a securities class action?
16     A    Well, there are several of them, yes.  And
17  Merrill Lynch we've settled.  Goldman Sachs we've
18  settled.  We were involved with Morgan Stanley, JP
19  Morgan, Wells -- several.
20     Q    That's fine.  So this is an agreement.
21  It's Bates-labeled at the bottom 202 -- MSPERS
22  020244.
23         (Exhibit 2 was marked for
24         identification by the court reporter.)
25  //

---

**32**

1  BY MS. BRETAN:
2     Q    Do you recognize this document?
3     A    A lot of blank pages, but, yeah, it looks
4  like the monitoring agreement that the different law
5  firms would sign, and then at the end it's got a
6  confidentiality agreement, which is Chitwood
7  Harley's ability to access electronically the
8  portfolio.
9     Q    Okay.  And is this the kind of monitoring
10  agreement we were just discussing?
11     A    Yes, it is.
12     Q    And it's between the Chitwood firm and the
13  Attorney General's office?
14     A    Well, the monitoring agreement is, not the
15  confidentiality -- the confidentiality agreement is
16  between the retirement system and Chitwood Harley.
17     Q    Okay.
18     A    Frank Ready was the executive director of
19  PERS at the time.
20     Q    Okay.
21     MR. HARNES:  Jennifer, if I may interrupt
22  for just a second, if it's not self-evident, there
23  should be a notation that there's information
24  redacted from this on the basis of attorney-client
25  privilege.

---

GEORGE W. NEVILLE  30(b)(6)                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**33**

1      MS. BRETAN: The --
2      MR. HARNES: It's not --
3      MS. BRETAN: The internal -- all these
4  blanks pages are not actually blank.
5      MR. HARNES: I'm sorry?
6      MS. BRETAN: These are not blank pages.
7      MR. HARNES: Well, the things have been --
8      MS. BRETAN: Redacted.
9      MR. HARNES: -- have been redacted from
10  them.
11      MS. BRETAN: Okay.
12      MR. HARNES: And I apologize. It doesn't
13  reflect that things have been redacted.
14  BY MS. BRETAN:
15      Q    Okay. And this agreement -- the first
16  part of the agreement, that's signed by Attorney
17  General Hood; is that right?
18      A    That's right.
19      Q    Okay. And the purpose of this agreement
20  with the Chitwood firm is to do what we were
21  discussing, to monitor the PERS investment
22  portfolio; is that correct?
23      A    The monitoring --
24      MR. HARNES: I object. The document
25  speaks for itself, but go ahead.

---

**34**

1      THE WITNESS: The monitoring agreement for
2  them to monitor.
3  BY MS. BRETAN:
4      Q    Okay. And they're looking for potential
5  cases or providing the Attorney General with an
6  analysis with respect to potential claims; is that
7  right?
8      MR. HARNES: Object to the form of the
9  question.
10      THE WITNESS: They -- for them to be able
11  to evaluate the holdings, to be able to advise us on
12  any issue that may be of concern at the Attorney
13  General's office on behalf of the State of
14  Mississippi.
15  BY MS. BRETAN:
16      Q    Okay. In the, let's see, one, two --
17  third paragraph down in the agreement it notes that
18  you'll consider retaining Chitwood & Harley to
19  represent it as counsels -- as counsel with respect
20  to such actions; is that correct?
21      A    It says that.
22      Q    And is that accurate that when they --
23  when they brings to the Attorney General's
24  attention potential claims, you then consider the
25  monitoring firm that has -- Chitwood in this

---

**35**

1  instance -- as potential counsel for those claims?
2      A    We consider each case independently. We
3  consider who brought it -- who came to us and said
4  something -- "Here. Here it is." I mean, we
5  consider it.
6      Q    Okay. And at the bottom paragraph on page
7  20244 the agreement notes that "The Attorney General
8  will ask PERS to arrange for its custodial bank to
9  provide the law firm Chitwood with access to trading
10  information of PERS"; is that correct? Do you see
11  that?
12      A    Yeah, just what I've testified earlier, is
13  that they have a right to electronically monitor.
14  We said we would work with PERS to do that, and
15  that's what that monitoring -- I mean electronic
16  access confidentiality agreement is on pages 1, 2
17  and 3 near the back. You'll see it's Bates-stamped
18  020253, 54 and 55.
19      Q    And that's a confidentiality agreement
20  with PERS; is that correct?
21      A    Uh-huh.
22      Q    So that's at the back of this agreement.
23  And in the second "Whereas" clause, turning to the
24  confidentiality agreement on 20253 --
25      A    Which paragraph?

---

**36**

1      Q    The second "Whereas" clause.
2      A    All right.
3      Q    I guess it's the first "Whereas" clause.
4  It says that -- that "PERS, the system," which is
5  PERS, correct, "owes fiduciary obligations to its
6  members to protect and invest the system's asset";
7  do you see that?
8      A    Yes.
9      Q    What does that mean --
10      A    Well --
11      Q    -- to you, reading it?
12      A    The retirement system has an obligation to
13  look out for the best interest of its -- the people
14  that are either paying in currently or those that
15  have already paid in or those people who are drawing
16  a retirement check.
17      Q    And in the fifth -- the fourth "Whereas"
18  clause, the first before "The Terms," it says, "The
19  system contends -- considers the information
20  provided to be confidential"; is that correct?
21      A    That's right.
22      Q    So the trading -- is that -- that's the
23  trading information, correct?
24      A    That's right, because they have realtime
25  access.

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**37**

1    Q   Okay.  And that information is
2  confidential?
3    A   It is, but you -- you know, the public can
4  make a public records request and say, you know, "Do
5  we own stock in BP?"  Obviously that was a big issue
6  for Mississippians at the time of the oil spill.
7  They probably -- I don't know.
8       They probably did get open records
9  requests, but, as I mentioned, BP is like Exxon
10  Mobile.  It's so large I know we own it.  I just
11  don't have any doubt about it.  I haven't looked,
12  but I'm sure we do.
13       And so if somebody filed a open records
14  request and said -- which is in the federal side --
15  you know, it's Freedom of Information Act, but we
16  call it the open records act and -- you know, I'd
17  like to see what holdings we have, and they've got
18  to go pull all that stuff together, and it's not
19  easy and kind of a pain, but they will, and they
20  have, I think, ten days to take -- to get all that
21  together, ten working days.
22    Q   Okay.  Is the monitoring agreement that
23  we've been looking at with the Chitwood firm -- is
24  that still in effect?
25    A   As far as I know, yes.  The custodial bank

---

**38**

1  is different and there's a different executive
2  director --
3    Q   But they have -- they --
4    A   -- as far as I know.
5    Q   -- still have access --
6    A   As far as I know, yes.
7    Q   -- to the custodial bank records?
8    A   That's my understanding.
9    Q   I want to talk a little bit about this
10  specific litigation now.  How did -- how did -- in
11  this case how did the outside litigation start?
12  Were you contacted by a monitoring firm?
13    A   Well, the original litigation was filed by
14  someone else.
15    Q   Okay.
16    A   So that's how it started.  I don't know
17  what law firm or what plaintiffs.  I just don't
18  remember.  I saw the original complaint.
19    Q   And with respect to PERS, though, and
20  PERS' involvement, how did the litigation start?
21    A   Well, we were notified or contacted by
22  several, as I mentioned -- I think six or maybe more
23  -- six to eight of the monitoring firms about this
24  particular matter and asked us to look at the
25  feasibility of whether we would like to get involved

---

**39**

1  in this case.
2       We -- we looked at it, you know, as
3  mentioned, as you know -- under the law of the
4  60-day window to file for leads.  It gives you some
5  time to be able to analyze the case, and typically
6  what we asked for and what we receive is analysis
7  from the various firms.
8       And so each one of those firms provided us
9  some sort of analysis and a copy of how -- probably
10  at some point in time -- I don't remember -- that I
11  would have said, "Don't send me the original
12  complaint.  I've already got it."  But I would have
13  gotten an original complaint, any kind of analysis
14  and certainly news articles, things of that nature
15  that may have been -- come out, anything that's
16  newsworthy or relevant that would help us make a
17  determination of whether Geoffrey and I want to
18  recommend to the AG's office to do the case or not.
19    Q   Okay.  Do you recall which firm contacted
20  you first?
21    A   My memory is that Chitwood did.
22    Q   Okay.  Was Grant & Eisenhofer one of the
23  firms that contacted you?
24    A   Yes, my memory is that it was second.  I
25  don't know that, but I think so, yes, which is --

---

**40**

1  they're also -- my memorization test, they're one of
2  our monitoring firms.
3    Q   Okay.  And did Lieff Cabraser contact you?
4    A   Yes, I think they did.
5    Q   Were they third?
6    A   No, I -- I don't think so.  I don't
7  remember who was third, but I don't think they were.
8    Q   Okay.  And who made the decision -- the
9  ultimate decision to get involved in the case?
10    A   The Attorney General.
11    Q   And that was the decision to move for a
12  lead plaintiff status --
13    A   That's right.
14    Q   -- is that correct?
15    A   Uh-huh.
16       MS. BRETAN:  Okay.  I'm going to have the
17  court reporter mark as Exhibit 3 the "Motion by
18  Mississippi PERS For Appointment As Lead Plaintiff."
19       (Exhibit 3 was marked for
20        identification by the court reporter.)
21  BY MS. BRETAN:
22    Q   So, Mr. Neville, Exhibit 3 is the motion
23  by Mississippi PERS to be appointed lead plaintiff.
24    A   Okay.
25    Q   Do you recognize this document?

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**41**

1    A   Uh-huh.
2    Q   Turning to the first page --
3    A   First substantive page or the index?
4    Q   First substantive page.
5    A   All right.
6    Q   I'm going to turn your attention to
7  footnote two there.  Could you read footnote two,
8  Mr. Neville?
9    A   "Pursuant to this --" out loud or ...?
10   Q   Yes, please.
11   A   "Pursuant to this court's January 5th,
12  2012, order, see docket number 22, Mississippi PERS
13  is deferring its application to appoint its counsel,
14  Chitwood Harley Harnes, LLP and Grant & Eisenhofer,
15  PA, as co-lead counsel for the class of all of those
16  who purchased or otherwise acquired Diamond Foods,
17  Inc. securities during the class period.  At the
18  appropriate time, as directed by the court,
19  Mississippi PERS will move for an order approving
20  Mississippi PERS' selection of Chitwood Harley
21  Harnes, LLP and Grant & Eisenhofer, PA as co-lead
22  counsel and Lieff Cabraser Heimann & Bernstein, LLP
23  as local counsel."
24   Q   So this motion was filed on January 6th,
25  2012; is that correct?  It's at the top of the page.

---

**42**

1    A   Oh, okay.  Yes.
2    Q   On January 6th, 2012, had the Attorney
3  General's office already determined that Chitwood --
4  the Chitwood firm -- I'm going to call Chitwood
5  Harley Harnes the Chitwood firm --
6    A   That's okay.
7    Q   -- if that's okay -- and Grant &
8  Eisenhofer and Lieff Cabraser would be appointed
9  co-lead and local counsel?
10   A   We had determined that we would like to
11  work with Chitwood and Harley and G&E as our
12  counsel, co-lead counsel and that Lieff Cabraser
13  would be our local counsel.
14   Q   Okay.  And had -- so that determination
15  had been made by January 1st, 2012 -- I mean
16  January 6th, 2012?
17   A   It's what we wanted to propose.
18   Q   Okay.
19   A   I mean, obviously the court had to make
20  the final decision about who was going to be lead
21  counsel.
22   Q   What is the role of lead plaintiff in a
23  securities class action?
24   A   To oversee the litigation, to make sure
25  that the class interests are being looked out after.

---

**43**

1         Certainly on the front end, to select and
2  make recommendation to the court about who is going
3  to be counsel.  It varies about how many, you know,
4  attend motion practice sometimes, to approve and --
5  hiring of experts, to approve the filing of
6  complaints or amended complaints, decisions about
7  whether to appeal it or not.  I've been involved in
8  numerous mediations.  So attend mediations and
9  actively engage in the chance of settlement of the
10  case and what -- how much and what are the
11  conditions, corporate governance issues.
12   Q   Okay.  Do you know what the class period
13  is in this case?
14   A   I don't remember offhand.  It's in the
15  complaint.
16   Q   Okay.  If you turn to page 2, right at the
17  bottom in the statement of issues it notes a class
18  period defined December 9th, 2000 -- page 2, lines
19  19 and a half through 20 and a half, "Class period
20  from December 9th, 2010, through November 4th, 2011,
21  inclusive"; do you see that?
22   A   Right, that's the original class period
23  that was in the original complaints.
24   Q   And at the time of this motion did you
25  feel that that was the correct period?

---

**44**

1    A   Based on the analysis and whatever that I
2  may have had with counsel, I was comfortable with
3  that, but, as I know, in progress through litigation
4  you often learn things that may make you change your
5  mind.
6    Q   Okay.  And on the same line, same sentence
7  where they're defined -- where the class is defined
8  it says, "The classes on behalf of all purchasers of
9  Diamond securities during that period"; do you see
10  that?  Line 19 and a half.
11   A   Uh-huh.
12   Q   What are "all purchasers"?  What does that
13  mean?
14   A   People that purchased Diamond securities
15  on the stock market.
16   Q   And are short sellers purchasers in -- in
17  the class?
18   A   I don't know.  I'd have to consult my
19  attorney and -- I don't know.
20   Q   Okay.
21   A   Typically, it's not the people that were
22  engaged in the lit-- I mean in the fraud
23  themselves.
24   Q   Are short sellers engaged in the fraud?
25   A   No, I'm talking about the

---

GEORGE W. NEVILLE  30(b)(6)                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**45**

1    corporate-governance people --
2      Q   Oh.
3      A   -- the corporate leaders.
4      Q   Okay.  And on page 4, line 2 it says that
5    "Mississippi PERS believed that it is the most
6    adequate plaintiff, as defined by the PSLRA and
7    should be appointed to represent all persons who
8    purchased or otherwise acquired the securities of
9    Diamond during the class period"; is that correct?
10     A   You -- you read it correctly.
11     Q   Okay.  So at the time this motion was
12   submitted, did you view people who would have
13   purchased after November 4th differently than the
14   people in the class period defined at that time?
15     A   It -- when we filed under the PSLRA 60-day
16   window, I don't think I remember ever having a case
17   that we were engaged in where we didn't file an
18   amended complaint.  So very rarely -- I don't know
19   that most anyone stands on the original complaint.
20   For maybe -- there are a lot of reasons why, but
21   certainly counsel that we engage makes a
22   determination or evaluation whether they think that
23   the complaint -- excuse me -- yeah, the complaint
24   ought to reflect a different class period, and they
25   have to -- and they file the amended complaint, and

**46**

1    the court is going to take up the decision of
2    whether they think -- what the class period ought to
3    be.
4          So you do the analysis based on the
5    complaint that's filed.  You make a determination of
6    whether you feel like this is an action that you
7    feel like you could do a better job than who is
8    purported to be the lead plaintiff, the first to
9    file the lawsuit, and step in and see if it's -- you
10   can do a better job.
11         One of the things is evaluating whether
12   the first complaint, the original complaint,
13   adequately meets the -- the laws and whether it
14   meets the interest of the folks who bought the
15   stock.  You have to look at it from the standpoint
16   of -- the court is not going to -- as I appreciate
17   the PLSRA, the court is not going to give
18   Mississippi PERS lead plaintiff status if they
19   didn't buy and sell or -- excuse me -- they didn't
20   have losses sustained during the class period that's
21   on file originally.  You'd have to file a different
22   lawsuit.  So you go with what you've got, and then
23   you evaluate to see whether it needs to be expanded
24   or contracted.
25     Q   Okay.  And on January 6th, 2012, when this

**47**

1    motion was filed, which is approximately two months
2    after the original complaint was filed, you still
3    thought that that class period defined was the
4    appropriate class period?
5          MR. HARNES:  Object to the question -- to
6    the form of the question.  That just completely
7    mischaracterizes what he just said.  The question
8    has been asked and answered.  And go ahead and
9    answer it.
10         MS. BRETAN:  Counsel, I appreciate that
11   you are aware of Judge Alsup's supplemental order.
12         MR. HARNES:  And I'm objecting to the form
13   of the question --
14         MS. BRETAN:  Okay.
15         MR. HARNES:  -- and -- and one form -- one
16   essence of form is improper foundation, and that was
17   an improper foundation.
18   BY MS. BRETAN:
19     Q   You can answer.
20         MR. HARNES:  Yes, you may.
21         THE WITNESS:  I think what you're -- I
22   don't know where you're trying to go with this.
23   BY MS. BRETAN:
24     Q   That's okay.
25     A   But my guess is you're trying to -- some

**48**

1    sort of trick back here.  It's not going to work,
2    okay?
3          Here's the deal.  You know the PLSRA just
4    like -- much better than I do, I'm sure.  You take
5    the complaint that's on record.  If you believe that
6    they're -- because there may be class periods for
7    different lawsuits that are filed -- in that case,
8    there may be a motion to consolidate the cases
9    because they involve some of the same issues, but
10   they're different periods of time.
11         So every case that I've been involved
12   with, the amended complaint that -- or the lead
13   plaintiff and their counsel are allowed to file
14   incorporates information that they learn or they
15   believe is best for the class, and they file the
16   amended complaint.  That's when you, as defense
17   counsel, come in and ask the court to either limit
18   the class period.  You ask them to dismiss certain
19   claims or the entire claim, of course.  They always
20   do that no matter what the evidence is, and then
21   they ask the court to try to eliminate certain
22   defendants, certain basis of causes of action.  So I
23   don't -- I'm not -- I've answered the question.  I
24   don't know what it -- if you want an answer that you
25   want, it may not be the truth, and it may be what I

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**49**

1    think may be some sort of trick.  You're not going
2    to get it.
3       Q    My question was straightforward, I
4    thought.  What I was asking was:  At the time this
5    lead plaintiff motion was filed, which had a class
6    period defined December 9th through November 4th,
7    did you think that was the appropriate class period?
8       A    It's the class period that's on file.  You
9    don't get to go make stuff up.  You don't get to
10   make stuff up.
11      Q    Okay.
12      A    You are stuck with the complaint that's on
13   record.  You file for lead plaintiff status of the
14   complaint that's on file.  If you feel like you need
15   to do something different, you file the first
16   amended complaint.
17      MS. BRETAN:  Okay.  Let's mark as
18   Exhibit 4 a declaration that was submitted in
19   connection with the lead plaintiff motion.
20      (Exhibit 4 was marked for
21      identification by the court reporter.)
22   BY MS. BRETAN:
23      Q    So Exhibit 4, Mr. Neville, is a
24   declaration of James Wilson, Jr. in support of
25   Mississippi PERS' motion for appointment as lead

---

**50**

1    plaintiff; is that right?
2       A    That's what it says, uh-huh.
3       Q    And turning to Exhibit A, it appears to be
4    a certification by you; is that correct?
5       A    That's right.
6       Q    Did you prepare this certification?
7       A    No.
8       Q    Who prepared that?
9       A    Counsel.
10      Q    Okay.  What is the certification?
11      A    That we own the stock and we own -- had
12   transactional history within the stock.
13      Q    Okay.  And in paragraph two of your
14   certification you note that "Mississippi PERS'
15   transactions in Diamond Foods are listed in the
16   chart attached as schedule A"; is that correct?
17      A    That's correct.
18      Q    And did you prepare the attached schedule?
19      A    No, I did not.
20      Q    And who prepared the schedule?
21      A    Counsel.
22      Q    Okay.  Paragraph three, the first sentence
23   there, you state that "Mississippi PERS has reviewed
24   the facts and allegations of a complaint filed in
25   this action and adopts its allegations"; is that

---

**51**

1    correct?
2       A    Yes.
3       Q    Is that statement accurate?
4       A    It is what we put in every certification.
5       Q    So that's just standard language?
6       A    Yes.
7       Q    Okay.  Who at PERS reviewed the facts and
8    allegations of a complaint filed --
9       A    It's me on behalf of PERS.
10      Q    Let me just finish the question --
11      A    Oh.
12      Q    -- okay?  So you are the person referred
13   to -- when it says, "Mississippi PERS reviewed the
14   facts and allegations of the complaint," that would
15   be you?
16      A    That's correct.
17      Q    And you are standing in -- for purposes of
18   that sentence, you are standing -- the Attorney
19   General's office is effectively standing in the
20   shoes of Mississippi PERS?
21      A    Mississippi PERS is an arm or an agent of
22   the state of Mississippi, an agency.  The Attorney
23   General's office represents the State in its
24   entirety as well as its agencies and its arms, and,
25   yes, that's why I'm here.  That's what I've been

---

**52**

1    designated as a 30(b)(6) for.
2       Q    I understand.  So you're essentially
3    acting on behalf of Mississippi PERS with respect to
4    the certification?
5       A    I'm acting on behalf of the State of
6    Mississippi, and PERS is the holder of the
7    transaction or the securities.
8       Q    I'm just -- if you look at the top it says
9    he's -- that you're certifying on behalf of
10   Mississippi PERS; is that correct?
11      A    Uh-huh.
12      Q    Okay.
13      A    It says that, yes.
14      Q    Okay.  So this is filed in connection with
15   the January 6th, 2012, motion for lead plaintiff.
16   In January of 2012 what complaint is it where you
17   reviewed the facts and allegations?
18      A    Jorge Salhuana, an individual on behalf of
19   all others similarly situated, versus Diamond Foods,
20   Inc., Michael Mendes and Steven Neil.
21      Q    And that's the original complaint filed in
22   this action?
23      A    That's my understanding or memory.  I
24   certainly don't have any specific memory of studying
25   the title.

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

53

1    Q   But you reviewed the facts and
2  allegations --
3    A   Yes --
4    Q   -- of that complaint?
5    A   -- I did.
6    Q   And when you say you "adopt its
7  allegations," what does that mean?
8    A   It means until we file a first amended
9  complaint, it's what we're going with.
10   Q   So you agreed with the allegations in that
11  complaint?
12   A   For purposes of the PLSRA, yes.
13   Q   Okay.  Still in paragraph three of your
14  certification, you go on to say that "PERS intends
15  to actively monitor the conduct of this action for
16  the benefit of the class"; do you see that?
17   A   I do.
18   Q   Is that statement accurate?
19   A   Yes.
20   Q   What do you do to actively monitor this
21  action?
22   A   I talk with counsel on a regular basis.  I
23  approve filings of complaints, amended complaints,
24  discuss discovery issues, hire -- there's a younger
25  lawyer named Martin Millett who helps Geoffrey and

---

54

1  me in this.  There's Jane Mapp, who is an attorney
2  over at PERS that's an AG lawyer.  She works full
3  time at the agency.  That's where her office is.
4  And we all work on issues about discovery.  We talk
5  about strategy and make decisions about where things
6  ought to go and what we ought to do.
7    Q   Okay.  Continuing on in paragraph three,
8  it says, "Mississippi PERS has retained the law firm
9  of Grant & Eisenhofer, PA and the law firm of
10  Chitwood Harley Harnes, LLP to represent Mississippi
11  PERS."  Is that correct?
12   A   You read it correctly.
13   Q   And was that statement accurate?
14   A   Uh-huh.  We had agreed that we would make
15  a motion for lead plaintiff status and ask the court
16  to appoint the two of them as co-lead counsel.
17   Q   So the statement says that "Mississippi
18  PERS had retained the law firm of Grant & Eisenhofer
19  and the law firms of Chitwood Harley & Harnes."  Had
20  you retained them at that point?
21   A   I don't remember.  We typically don't sign
22  a retention agreement until after the court has
23  approved an attorney -- us to be lead plaintiff
24  because if we're not -- if the court doesn't
25  designate or choose Mississippi PERS as the lead or

---

55

1  co-lead plaintiff, we're not in the litigation
2  except as a passive class member; so there's no
3  reason for having a law firm retained at that point,
4  but I -- for some reason I think we had, but I just
5  don't remember the specifics, but often we don't do
6  it until after the court has made a decision.
7    Q   And there's an approval process for lead
8  counsel as well, correct?
9    A   Are you talking about for us or are you
10  talking about the court?
11   Q   With respect to the court.
12   A   Yeah, every case.  The court is the
13  ultimate decider who is going to be class counsel.
14   Q   Okay.
15   A   Typically they defer to the lead plaintiff
16  that they've chosen, but they ultimately make the
17  decision.
18   Q   And is the retention agreement you're
19  talking about -- is that signed before or after that
20  determination is made?
21   A   I just testified that we often wait until
22  after the court has made the determination of who is
23  going to be class lead.  If we're not chosen as
24  class lead or co-class lead, we often -- there's no
25  reason at that point to have a retention agreement.

---

56

1    Q   But prior to the determination of class
2  counsel?
3    A   Typically we don't sign -- we have an
4  agreement.  We have a verbal agreement.  It's
5  binding.  We don't have a signed retention agreement
6  typically until after the court has made the
7  determination of whether we're going to be class
8  lead or not.
9    Q   And I'm asking specifically:  Is that
10  retention agreement before the court has approved
11  class counsel?
12   MR. HARNES:  I think you just asked --
13  objection to form.  You just -- you just asked that
14  question and he just answered it.
15   THE WITNESS:  In my experience the court
16  makes a determination who is class counsel at the
17  same time he makes a decision as to who is going to
18  be class lead.
19  BY MS. BRETAN:
20   Q   Okay.  Is there a retention agreement with
21  Grant & Eisenhofer?
22   A   I don't think so.  I think it's with
23  Chitwood Harley.
24   Q   In paragraph four you state that
25  "Mississippi PERS believes it has suffered damages

---

GEORGE W. NEVILLE  30(b)(6)                                   April 3, 2013
IN RE: DIAMOND FOODS, INC.

<table>
<tr><td>

**57**

1  as a result of Defendants' fraudulent conduct"; do
2  you see that?
3      A   Uh-huh.
4      Q   What damages are you referring to there?
5      A   The loss in stock values.
6      Q   Are damages the same as the loss in stock
7  value?
8      A   No, but typically you can't determine
9  damages until after the court has made decisions as
10  it relates to what the class period is going to be,
11  whether he's going to allow certain disclosures to
12  be accepted or not as causing damages, and then an
13  expert has to make some evaluation based on the
14  trading history.
15      Q   Do you know what the damages are to
16  Mississippi PERS in this action?
17      A   I do not.
18      Q   Okay.  At the time of this filing had
19  there been analysis done with respect to Mississippi
20  PERS' damages?
21      A   No.  Losses.
22      Q   Okay.  In paragraph four the final
23  sentence says that "Mississippi PERS believes its
24  claims against Defendants are typical as those of
25  other class members"; do you see that?

</td><td>

**59**

1  calls for a legal conclusion.  You can go ahead and
2  answer.
3      THE WITNESS:  The court makes
4  determinations of who is going to be in the class
5  not based on the law, and that's a battle between
6  you all and my counsel.  It's not my responsibility
7  to battle that out and to know the intricacies of
8  all the securities cases around the country or
9  certainly in the Ninth Circuit to determine whether
10  you are able as class lead to cover cases -- the
11  case as a co-lead -- I mean as lead.  Sometimes
12  they'll appoint a class rep after class cert -- if
13  they certify the class, then they'll want class reps
14  to -- to cover some claims that they feel like are
15  not covered adequately by the person who is now the
16  class rep.  So you'll have -- they might not have a
17  role in the litigation as far as picking counsel and
18  making decisions about strategy, but they -- I call
19  it covering the gaps.  I -- but, again, how all of
20  that works and the legal issues involved, it's not
21  my call.
22  BY MS. BRETAN:
23      Q   And the gaps involve areas -- to your
24  understanding, gaps would involve areas where the
25  class -- the lead plaintiff, as class rep, doesn't

</td></tr>
<tr><td>

**58**

1      A   Uh-huh.
2      Q   And what were you -- what were you basing
3  that on?
4      A   The requirement of the PLSRA that those
5  that want to be lead plaintiff have -- meet the
6  threshold of typicality, that they have typical
7  trading histories that would encompass most of the
8  -- those purported members of the class as it
9  relates to losses that they may have sustained.
10      Q   Mr. Neville, are you aware that
11  Mississippi PERS had sold all of its holdings by
12  November 16th, 2011?
13      A   I believe that's what this ...
14      Q   It's in the back of that same document.
15      A   The one I've got in my hand?
16      Q   The one you have your hand on --
17      A   Okay.
18      Q   -- Schedule A.
19      A   I haven't done the math, but if you say
20  that all those -- if you add up on the right to the
21  same as the purchases, then okay.
22      Q   Would Mississippi PERS be typical of
23  purchasers after November 16th?
24      MR. HARNES:  I'm going to object to the
25  question.  Object to the form of the question.  It

</td><td>

**60**

1  necessarily cover the interests of the entire class?
2      MR. HARNES:  Could I have that question
3  read back, please.
4      (Record read by the reporter.)
5      MR. HARNES:  I'm objecting to the -- to
6  the form of the question to the extent -- I'm
7  objecting to the form of the question.  It -- it
8  lacks foundation, but go ahead.
9      THE WITNESS:  The -- there is -- as I
10  understand the PLSRA, the lead plaintiff and then
11  the class rep is given some latitude to be able to
12  cover the basis, so to speak, of more people than
13  those that fit its exact selling history and
14  purchasing history.
15      We've had a real long tortuous history in
16  the mortgage-backed securities realm because of the
17  rulings that various courts have made, and now most
18  of them have been overturned by the Second Circuit
19  as it related to whether -- if you owned a
20  pass-through certificate or not, whether you could
21  cover those people in traunches other than the
22  traunch you purchased in, and all of this is -- I
23  don't keep up with on a day-to-day legal basis.  I'm
24  not an expert in it.
25      And so we believe we have been in the past

</td></tr>
</table>

GEORGE W. NEVILLE  30(b)(6)                                      April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**61**

1  and continue to be a very good fiduciary on behalf
2  of people who have suffered losses, damages in
3  securities cases.  We do that just like CalPERS does
4  it, New York State Plan, Arkansas Teachers and on
5  and on.  That's what our role is.  We feel like we
6  do a better job and we have a fiduciary duty to the
7  class, and we look out for that, and that's what we
8  do.
9  BY MS. BRETAN:
10     Q   So when you say here that Mississippi PERS
11  believes its -- in paragraph four, "Mississippi PERS
12  believes its claims against Defendants are typical
13  of those of other members of the class," you think
14  Mississippi PERS having sold -- let me rephrase --
15  let me check the question, leave it there.
16         Let's go to paragraph seven.
17     A   Okay.
18     Q   Paragraph seven lists other cases where
19  Mississippi PERS was appointed lead plaintiff in
20  securities cases in the three prior years; is that
21  correct?
22     A   Yes.
23     Q   And just running through those cases, the
24  first one is Sat-- -- "In Re Satyam Computer
25  Services."

---

**62**

1     A   Right.
2     Q   Who was counsel in that case?
3     A   G&E and Bernstein Litowitz, I believe.  We
4  were co-lead counsel -- I mean co-lead plaintiff.
5     Q   And Grant & Eisenhofer and Bernstein
6  Litowitz are monitoring firms --
7     A   That's right.
8     Q   -- is that correct?
9     A   Uh-huh.
10     Q   What's the status of that case?
11     A   It's effectively over.  We settled with
12  Satyam.  We are in a tax dispute with the country of
13  India, who claimed that they were able to assess a
14  15 or 20 percent tax on the settlement.  We settled
15  with the accounting firm.  We still have outstanding
16  claims against the individual defendants, only some
17  of them.  Unfortunately, they are in jail, and we
18  don't expect they'll be able to pay.  The court
19  dismissed the individual defendants that aren't in
20  jail.  So there's defendants outstanding, but the
21  collectibility is an issue.
22     Q   Okay.  The next one is World Bank of
23  Scotland.
24     A   Uh-huh.
25     Q   Is that a securities -- that's a

---

**63**

1  securities litigation.  Who is your counsel in that
2  case?
3     A   Labaton.
4     Q   Is that Labaton Sucharow --
5     A   I never have learned how to pronounce the
6  second name.
7     Q   Uh-huh.  And are they a monitoring firm?
8     A   Yes.
9     Q   Okay.  And the next case is the
10  Goldman-Sachs case?
11     A   That's right.  That was a pass-through
12  case, a mortgage-backed securities pass-through
13  case.
14     Q   And who was your counsel in that case?
15     A   Well, that was the one where -- the Pond
16  Gadow & Tyler firm, but they associated Bernstein
17  Litowitz or got Bernstein Litowitz to be class
18  counsel on that.  The case has settled.
19     Q   And I think you said Bernstein Litowitz is
20  a monitoring firm for --
21     A   They are.
22     Q   Okay.  Hill versus State Street?
23     A   It's ongoing and we're in discovery.
24  That --
25     Q   Who is counsel?

---

**64**

1     A   Bernstein Litowitz.
2     Q   Bernstein Litowitz and -- Structured Asset
3  Mortgage case, the next one --
4     A   Unfortunately --
5     Q   -- who is counsel?
6     A   Well, Pond Gadow.  It's a pass-through
7  case, but I don't remember which of the underwriters
8  this is.  It's a pass-through case.  Pond Gadow &
9  Tyler, they've associated -- Bernstein Litowitz
10  owned several.  Wolf Popper owned two and Lieff
11  Cabraser owned one, and I, unfortunately -- because
12  I don't know which one of the underwriters this is,
13  I can't tell you, but it's one of the three.
14     Q   And all three of those firms are
15  monitoring firms?
16     A   That's correct.
17     Q   Okay.  Bach versus Amedisys?
18     A   Amedisys.
19     Q   Amedisys.
20     A   The judge dismissed the case.  We filed a
21  motion for reconsideration.  We're co-lead with
22  Puerto Rico Teachers Fund.  Our counsel is Bernstein
23  Litowitz and Puerto Rico's is Wolf Popper.
24     Q   Okay.  And turning to schedule A, which is
25  attached, you signed -- if you turn to page 3, this

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

65

1   -- you signed this on January 5th, 2012; is that
2   correct?
3       A   That's right.
4       Q   Okay.  The certification.  In turning to
5   schedule A, so we've talked about -- at the time of
6   this motion, the class period was defined to end
7   November 4th, 2011, correct?
8       A   I don't have the original complaint in
9   front of me, but I --
10      Q   That was in Exhibit 3.
11      MS. BAFUS:  Exhibit 4.  No, Exhibit 3.
12  BY MS. BRETAN:
13      Q   I can represent to you that it said
14  November 4th, 2011.
15      A   Okay.  Well, that's the trading data from
16  that period of time because that's what we would
17  have had to file under the PLSRA.
18      Q   Okay.  And based on this schedule, it
19  looks like PERS had sold its shares by
20  November 16th, 2011; is that correct?
21      A   That's what this says, yes.
22      MS. BRETAN:  Okay.  Let's go to Exhibit 5.
23  I'm going to ask the court reporter to mark
24  Exhibit 5.
25      (Exhibit 5 was marked for

---

66

1       identification by the court reporter.)
2       THE WITNESS:  This would be a good time
3   for me to hit the restroom, if that's okay.
4       MS. BRETAN:  Okay.
5       THE VIDEOGRAPHER:  Okay.  I'll get us off
6   the record, and if everyone can leave their
7   microphones on the table.  Going off the record, and
8   the time is 10:10 a.m.
9       (Recess.)
10      THE VIDEOGRAPHER:  Back on the record.
11  The time is 10:21 a.m.  Please continue.
12  BY MS. BRETAN:
13      Q   Actually, I would like to turn back to
14  Exhibit 4, if you don't mind, for a minute.  Do you
15  recall Exhibit 4 has attached to it -- is a
16  declaration in support of the lead plaintiff motion?
17  It has your certification attached to it, and
18  attached to your certification is schedule A, which
19  has transactions in Diamond Foods.
20      A   Okay.
21      Q   Do you see that?  If you look on the
22  left-hand side of the page on schedule A,
23  Mr. Neville, there are trades running from -- which
24  appear to be purchased in Diamond Foods; is that
25  correct?

---

67

1       A   That's correct.
2       Q   Okay.  And those are purchases by PERS in
3   Diamond Foods?
4       A   That's right.
5       Q   And so there are trades running from about
6   June 3rd, 2011, to August 19th, 2011.  I'm going to
7   be asking you about those first, those trades first
8   up through August 19th --
9       A   Okay.  All right.
10      Q   -- 2011.  Do you know what the base --
11  what PERS was relying on when it made those trades
12  in -- what information PERS was relying on when it
13  made those trades in Diamond Foods?
14      MR. HARNES:  I'm going to object to that
15  question.  This is not what this witness is about --
16  this witness is here to testify.  I'm happy to let
17  him answer.
18      THE WITNESS:  PERS doesn't do investing
19  decisions itself.  It has, I think, somewhere in the
20  range of investment advisors are hired by --
21  there's investment -- as I appreciate it --
22  Ms. Tingle can give you all of this information.
23  BY MS. BRETAN:
24      Q   Who is Ms. Tingle?
25      A   She's investment director -- I'm not sure

---

68

1   of her exact title, but, I mean, she's in charge of
2   all the investment issues as relates to PERS.  And
3   there's a board of trustees for PERS, and they have
4   a committee, and they interview and make decisions
5   of what advisors to hire or not -- or dismiss, and
6   those investment advisors are given, as I appreciate
7   it, unfettered ability to buy and sell based on
8   guidance, either state law or the PERS guidance that
9   they have, and they're -- some of them are indexed
10  funds that might buy any kind of security worldwide.
11  Some may be a security in only U.S. companies, but
12  they have those that invest in small cap stocks and
13  large value.  I mean, it's full -- as I appreciate
14  it, it runs the full gamut.
15  BY MS. BRETAN:
16      Q   Okay.
17      A   Those people make the decisions to buy and
18  sell.  PERS has -- I nor Ms. Tingle are going to
19  know why we bought or sold shares in any stock, much
20  less this particular one.
21      Q   Okay.  Thank you.  And similarly for the
22  sales of Diamond?
23      A   That's right.  We don't -- there's a
24  hands-off policy.  I'm sure there's a formal word
25  for it, but that's what I would call it, a hands-off

---

GEORGE W. NEVILLE 30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

### 69

1  policy, and they don't make any decisions. So if
2  the governor calls up and says, "Man, I want you all
3  to buy some Coca-Cola," they're not going to do it.
4      Q   Okay. So your understanding is that the
5  investment managers to PERS make all the decisions
6  with respect to buying and selling?
7      A   That's right, and if --
8          MR. HARNES: Object to the form of the
9  question.
10         THE WITNESS: And if it's an index fund,
11 what stocks or securities are in the index is made
12 by the investment advisor. And that's -- so if they
13 -- nobody is going to buy or sell a security based
14 on a phone call from Lorrie or me or the governor or
15 anyone else.
16 BY MS. BRETAN:
17     Q   Okay.
18         MR. HARNES: I'm going to ask -- this is
19 twice now. I'm going to ask you to let him finish
20 his answer before you try and cut him off.
21         THE WITNESS: We through with it? I'm
22 through. Are you through with this?
23 BY MS. BRETAN:
24     Q   Yes. So before the break we marked
25 Exhibit 5.

### 70

1      A   Okay.
2      Q   Exhibit 5 is the "Court Questionnaire to
3  Lead-Plaintiff Candidates." Do you recognize this
4  document?
5      A   Yes.
6      Q   What is it?
7      A   The -- and this was unique to my
8  experience, that this court sent out a questionnaire
9  and had those of us to answer all these questions.
10 That's just not something that I've experienced
11 before, but this particular judge wanted all these
12 answers.
13     Q   And this questionnaire is signed -- let me
14 see -- turning to page 8, by Martin Millett; am I
15 reading that correctly?
16     A   That's right.
17     Q   Who is Mr. Millett?
18     A   He's -- as I mentioned a while back, he
19 worked with -- he's a younger attorney that works
20 with me and Geoffrey on securities matters at the
21 AG's office.
22     Q   Do you have people who report to you
23 directly?
24     A   Not even -- not even my secretary. I
25 mean, obviously Martin is not going to make a

### 71

1  recommendation to Geoffrey about a securities matter
2  unless we talk about it first, but he doesn't report
3  to me; he reports to Geoffrey.
4      Q   Turning back a page on page 7, the
5  questionnaire asks who prepared or reviewed the
6  answers given and whether lawyers assisted in any
7  way and that they be identified.
8      A   Which number are we talking about?
9      Q   It's paragraph nine, question nine. The
10 questionnaire notes that you assisted --
11     A   That's right.
12     Q   -- in preparing or reviewing the answers
13 to the questionnaires. Is that correct?
14     A   That's right.
15     Q   And attached to the questionnaire as
16 Exhibit C is a list of Mississippi PERS transactions
17 in Diamond Foods, Inc.; do you see that?
18     A   Yes.
19     Q   Did you prepare this exhibit?
20     A   No.
21     Q   Do you know who prepared this exhibit?
22     A   My presumption would be outside counsel.
23 They have access to the electronic information.
24     Q   Okay. I noticed on Exhibit B, if you go
25 down to the purchases on October 6th, 2011; do you

### 72

1  see that?
2      A   Yes, uh-huh.
3      Q   It shows two purchases of 2900 shares on
4  October 6th at two different prices; do you see
5  that?
6      A   Uh-huh.
7      Q   Do you believe it's accurate that
8  Mississippi PERS purchased 2900 shares at differing
9  prices on that day?
10     A   I did not go back and -- because I don't
11 have electronic access, so -- so I didn't go back to
12 verify whether this information is accurate. It
13 could be a typographical error. It could be
14 correct. You certainly could. The prices fluctuate
15 throughout the day; so it could easily be at a
16 different price.
17     Q   And the next two entries on October 18th,
18 2011, show 3600 shares being purchased twice at two
19 different prices; do you see that?
20     A   Same answer.
21     Q   And on October 21st, 2011, it shows 2200
22 shares being purchased twice; do you see that?
23     A   Same answer.
24     Q   Okay. You're not sure whether those are
25 accurate?

---

GEORGE W. NEVILLE  30(b)(6)                              April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

73

1      A   I don't have any personal knowledge.  I
2  have not looked at the electronic data.
3      Q   Did you -- in helping to prepare this
4  court questionnaire, did you do anything to confirm
5  that the Exhibit B was accurate?
6      A   I relied on representations of counsel.
7      Q   Turning to page two of the court
8  questionnaire, I think this is a preamble of sorts
9  from the court, but if you look at line 23, it notes
10 that -- I'll read it.  "No decision by lead
11 plaintiff is more important than the selection of
12 class counsel"; do you see that?
13     A   I do.
14     Q   Do you agree with that?
15     A   Actually, I think the most -- I think
16 it's --
17         MR. HARNES:  I'm not coaching the witness.
18         THE WITNESS:  I think it's a good answer
19 -- I mean, you know it's a good statement, but
20 whether it is the most important, I'm not sure.  I
21 hadn't thought about it.  I mean, according to Judge
22 Alsup, it means that; so, you know, I know the
23 correct thing for me to say at this point would be,
24 "Yeah, that's right, Judge.  You're right," but, I
25 mean, I'm not sure.  I think it's extremely

---

74

1  important, but I don't know if it it's the most
2  important.
3  BY MS. BRETAN:
4      Q   What do you think is the most important?
5      A   I haven't thought about it at all.
6      Q   Okay.  On page -- turn to page 4 of the
7  certification -- I mean the questionnaire.  That's
8  question two.  It asks about qualifications to be
9  lead plaintiff.
10     A   Uh-huh.
11     Q   On line 13 there it notes that
12 "Mississippi PERS engages in an extensive, thorough
13 process of vetting outside law firms with the
14 experience and manpower and resources to handle
15 large, complex litigation such as this case"; is
16 that correct?
17     A   That's right.
18     Q   And then it goes on to say that "After
19 selecting the firm that has done a comprehensive
20 analysis of a particular case, Mississippi PERS
21 negotiates and executes an agreement setting the
22 potential attorneys' fees we're covering"; is that
23 correct?
24     A   Uh-huh.
25     Q   And with respect to the vetting process, I

---

75

1  think earlier we were talking about who -- which of
2  the monitoring firms is normally recommended --
3  typically recommended to be lead counsel in these
4  securities litigation cases; do you recall that?
5         MR. HARNES:  I object to the form of the
6  question.  I think the factual predicate is
7  inaccurate.
8         THE WITNESS:  You and I discussed who was
9  on our monitoring list and how they got on the
10 monitoring list, and we discussed how we might
11 select which of the monitoring firms we would want
12 to work with on a particular case.  We did discuss
13 that.
14 BY MS. BRETAN:
15     Q   Uh-huh.  And I think -- I think you said
16 that typically the first firm that contacts the AG's
17 office with respect to potential claims in typical
18 cases, that's the firm that's recommended; is that
19 correct?
20     A   Well, it's one of.  We may recommend more
21 than one firm, but that's true not just in the
22 securities realm, but also secure -- would be the
23 case in non-securities cases.
24     Q   And the AG's office handles non-security
25 cases as well as security cases?

---

76

1      A   Right.  You asked me that -- that was one
2  of the first things you asked me about, what I did,
3  and I oversee anti-trust, consumer and health care
4  fraud matters.
5      Q   And turning to page 6 of the
6  questionnaire, page 6 and question six, the court
7  asks whether there are any circumstances that might
8  give rise to possible issues asserted against you
9  that would not generally apply to the rest of the
10 class do you see that?
11     A   Uh-huh.
12     Q   And Mr. -- the response is that
13 "Mississippi PERS is unaware of any circumstances
14 that might give rise to possible issues being
15 asserted against it that would not apply to the rest
16 of the class"; do you see that --
17     A   Well --
18     Q   -- the answer, line 18?
19     A   -- we are -- the answer is in relation to
20 the question asked.  Yes, I see that.
21     Q   And is it accurate that Mississippi PERS
22 was unaware of any circumstances that might give
23 rise to possible issues being asserted against it
24 that would not apply to the rest of the class?
25     A   It was in context of the an- -- I mean,

---

GEORGE W. NEVILLE  30(b)(6)                                      April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**77**

1  the question asked -- I mean, an individual would
2  not necessarily have -- is not a governmental
3  entity.  So if an individual is asking to be lead,
4  they may be subject to being sued for driving
5  negligently in a car; we wouldn't.
6       And the converse is if the state
7  transportation department in the state of
8  Mississippi issued a no-bid contract for the building
9  of a bridge, an emergency circumstance -- an
10  individual wouldn't be issuing a no-bid contract for
11  a bridge to be built after a disaster.
12       So there are going to be circumstances,
13  but that's not what the court, as I appreciate the
14  question, was about.  The question was about fraud.
15  The example is about fraud.  "Ever convicted of a
16  crime?"  No.  Well, the county of Lauderdale or the
17  state of Mississippi is not going to be convicted of
18  a crime, but an individual might be.
19       Q   Okay.  So your understanding of question
20  six was that it was just about fraud?
21       A   My understanding of question six is the
22  context of the question that was asked.
23       Q   What's your understanding of question six?
24       MR. HARNES:  Asked and answered.
25       THE WITNESS:  I can read it.  "Are there

**78**

1  any circumstances that might give rise to possible
2  issues asserted against you that would not generally
3  apply against the rest of the class?"  Very
4  open-ended, very broad question.  It could be open
5  to many interpretations.  So I'll look to the rest
6  of the paragraph.
7       "Have you ever been convicted of a crime?
8  If so, state the circumstances.  Have you ever been
9  sued in a fraud suit?  If so, state the
10  circumstances."  So the second and third part of
11  that paragraph would lead the normal person to
12  understand that the very broad first sentence is
13  talking about matters that have to do with
14  fraudulent or criminal behavior.
15  BY MS. BRETAN:
16       Q   Okay.  Are there circumstances that might
17  give rise to possible issues asserted against
18  Mississippi PERS that would not generally apply to
19  the rest of the class?
20       A   I've already answered that question.  I
21  gave you an example.
22       MS. BRETAN:  Okay.  Let's turn to
23  Exhibit 6.  I'm asking the court reporter to mark
24  Exhibit 6.
25       (Exhibit 6 was marked for

**79**

1  identification by the court reporter.)
2  BY MS. BRETAN:
3       Q   Exhibit 6 is a memorandum in further
4  support of Mississippi PERS' motion for appointment
5  as lead plaintiff --
6       A   Okay.
7       Q   -- filed February 9th, 2012.  Do you
8  recognize this document?
9       A   Yes, uh-huh.
10       Q   So turning to page 6, substantive page 6,
11  now paragraph two there or section two, it says,
12  "Mississippi PERS will adequately work to represent
13  the interests of the class"; do you see that?
14       A   I do.
15       Q   And it goes on to say that -- and this is
16  line 27 -- that "The requirement is met if there are
17  no conflicts between the representative and class
18  interests and the representatives' attorneys are
19  qualified, experienced and generally able to conduct
20  litigation"; do you see that?
21       A   Yes, you read that correctly.
22       Q   And do you agree with that statement?
23       A   It sounds logical to me.
24       MR. HARNES:  I'm going to object to the
25  form of the question to the extent it asks for him

**80**

1  to draw a legal conclusion, but he can go ahead and
2  answer.
3       THE WITNESS:  It sounds fine.
4  BY MS. BRETAN:
5       Q   So adequacy relates to whether there are
6  conflicts between the interests of the
7  representative on the one hand, Mississippi PERS,
8  and the class interests generally; is that -- is
9  that correct?
10       A   Adequacy -- adequacy is determined by the
11  court.  There's case law.  It's right there in front
12  of you.  You know, it's not my role here.  You know,
13  I'm an attorney, but I'm not designated for purposes
14  of interpreting the law for you.  So I'm not going
15  to tell you anything other than we adopt whatever
16  the case law is.
17       Q   Okay.  But this is Mississippi PERS'
18  submission in support of its appointment motion to
19  be appointed lead plaintiff, correct?
20       A   It's called a legal memorandum.
21       Q   Okay.
22       A   So it's prepared by the attorneys based on
23  the law in this case, probably more Ninth Circuit
24  oriented, but certainly the U.S. Supreme Court and
25  what the congress has enacted and set out certain

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**81**

1   criteria to determine who should be class lead.
2   Q   Can you turn to page 7 for just a moment?
3   A   Okay.  All right.
4   Q   At line 17 do you see the sentence
5   beginning with "Furthermore"?
6       MR. HARNES:  I'm sorry.  What page are we
7   on?
8       MS. BRETAN:  Page 7, line 17.
9       MR. HARNES:  Sorry.
10      THE WITNESS:  Okay.  I read it.
11  BY MS. BRETAN:
12  Q   Could you read that sentence aloud?
13  A   The one that ends on 17 or starts on 17?
14  Q   The one that starts on 17, "Furthermore."
15  A   "Furthermore, there are no facts
16  suggesting that any actual or potential conflict of
17  interest or other antagonism exists between the
18  interests of Mississippi PERS and other class
19  members."
20  Q   Is that statement accurate?
21      MR. HARNES:  Same objection that I did
22  before.
23      THE WITNESS:  At the time there was
24  nothing that would indicate that there were any
25  facts that would lead anyone to know about any

---

**82**

1   antagonism.  I -- there's no secret.  I have
2   somewhat of an antagonism with the counsel who was
3   attempting to be representing the class, but I don't
4   have any beef with those other class members.
5   BY MS. BRETAN:
6   Q   And who is that counsel?
7   A   I'd rather not say.  They're not involved
8   in the litigation.
9   Q   Was it personal antagonism with their --
10  A   I don't care much for them, and one of
11  them particularly didn't care for me.
12  Q   Is that the Robbins Geller firm?
13  A   Yes.
14  Q   And were they among the retained firm for
15  the --
16  A   Oh, no.
17      MS. BRETAN:  Let's mark Exhibit 7.
18      (Exhibit 7 was marked for
19      identification by the court reporter.)
20  BY MS. BRETAN:
21  Q   Exhibit 7 is a March 5th, 2012, letter
22  from -- it appears to be from Attorney General Jim
23  Hood to Judge Alsup.
24  A   It's on the letterhead.
25  Q   It's on letterhead.

---

**83**

1   A   It's on letterhead, but I signed it.
2   Q   Did you write this letter?
3   A   I mean, I helped edit it.  It was a joint
4   effort.
5   Q   A joint effort by ...?
6   A   Martin, Geoffrey, the outside counsel and
7   myself.
8   Q   Why did you send -- why did you send this
9   letter to Judge Alsup?
10  A   His response to some question that he had.
11  Q   Do you remember what the question was?
12  A   My memory is he wanted to know why the
13  Mississippi PERS Attorney General's office and --
14  was the one who was in charge or whatever, who --
15  basically the driving force behind litigation and
16  not PERS itself, for instance, Pat Robertson, the
17  executive director or the board of trustees or
18  whatever, and we laid out the law and why.  And he
19  was -- that was the -- what he wanted to hear, I
20  suppose, because that was the last we heard of it.
21  Q   So Judge Alsup had asked for information
22  about why the Attorney General's office was
23  representing PERS instead of someone directly at
24  PERS; is that correct?
25  A   That was the gist of my understanding.  I

---

**84**

1   mean, he wasn't familiar with us, I guess.  We never
2   had this issue come up before, but he wanted it
3   addressed and we addressed it.
4   Q   Was it your sense that the -- that Judge
5   Alsup hadn't had prior cases where the Attorney
6   General was representing the pension fund before; is
7   that --
8       MR. HARNES:  I'm going to object to the
9   form of the question as --
10      THE WITNESS:  I don't --
11      MR. HARNES:  -- calls for speculation.
12      THE WITNESS:  Excuse me.  I have no idea
13  what the basis was.  I just know he was puzzled and
14  curious.  It wasn't the normal process for him, I
15  suppose, and so we went through this exercise to lay
16  it out for him.  And we did.  And here we are.
17  BY MS. BRETAN:
18  Q   All right.  Turning to page 5 of the
19  letter, at the very last line on page 5 of the
20  letter it says that "The office of the Attorney
21  General, on behalf of PERS, has accepted the
22  profound responsibility to be the fiduciary for the
23  class impacted by the underlying allegations"; do
24  you see that?
25  A   This one, yes, I do.

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

85

1      Q   What is the job of the -- what is the
2   purpose of being the fiduciary for the class?
3      A   It --
4         MR. HARNES:  Object.  That question has
5   been asked and answered, but you can go ahead and
6   answer it again if you can.
7         THE WITNESS:  It is to oversee the
8   litigation, to make sure that the interests of the
9   class are being represented.  One of the reasons
10  that we have law firms that -- on our monitoring
11  list and not every law firm that might want to be on
12  it is that we want to make sure that we have law
13  firms that we think are going to follow the guidance
14  of our office and also look out for the best
15  interests of the class and not their own interests.
16  Not to say that there are some firms that are out
17  there that wouldn't be good ones.  It's just that at
18  some point in time we ran -- 12 to 13 seemed to be
19  as many as we needed to work with.
20        You monitor litigation.  You engage in,
21  you know, strategy issues and know what's going on
22  to be able to say, "I'm not comfortable with that"
23  or "We need to do something differently."
24        But it's a global issue.  There are people
25  that I don't know personally, obviously -- I don't

---

86

1   know how many people you all know, but tens of
2   thousands, hundreds of thousands of people who own
3   securities in Diamond Foods.  And it's our job if
4   they're in the class to look out for their
5   interests.  It may not necessarily be our particular
6   interest, but you have to be global about it.  It's
7   much like, to me, being mayor.  You can't worry
8   about the neighborhood you grew up in or the
9   elementary school you went to.  You have to look out
10  for the entire city.  So I don't see much difference
11  in that.
12  BY MS. BRETAN:
13     Q   Is part of the fiduciary responsibility
14  making sure that the choice of class counsel and the
15  agreement related to the fees for class counsel is
16  in the best interest of the class?
17     A   Yes, but, you know, it would be nice to
18  have a no-fee -- the lawyers do it for free, but it
19  doesn't work that way.  I presume you get paid based
20  on the hour, and the more you work on this case, the
21  more you get paid.  And so our interest is to try to
22  find somebody that for a reasonable fee will do the
23  case, and historically institutional investors like
24  MPERS has been able to negotiate rates that are
25  better than what small investors or individual

---

87

1   investors in small pension funds have been able to
2   do.  So I think in that respect we've accomplished
3   our goal.
4      Q   Attachment A to this letter appears to be
5   a securities litigation policy of PERS; do you see
6   that?
7      A   I do.  I think this is off their -- the
8   website for them.
9      Q   Is that off their website?  Are you
10  familiar with the policy?
11     A   I've seen it.  I didn't help write it, but
12  I've seen it.  I'm not intimately familiar with it,
13  but I'm familiar -- I have seen it before.
14     Q   And you are the person who is at the AG's
15  office who is in charge of securities litigation at
16  PERS?
17     A   That's right, but I think Margo Bowers,
18  who is now retired -- she was our attorney at PERS.
19  I think she helped write this for PERS.
20     Q   On page 1, I think, about in the second
21  big paragraph, the final sentence there it says tha
22  "The lead plaintiff might also be in a position to
23  reduce fees paid to the attorneys from any
24  settlement, thereby resulting in more compensation
25  for the investors"; do you see that?

---

88

1      A   I do.
2      Q   Is that what we were talking about
3   earlier, the ability of lead plaintiff to negotiate
4   fees that are in the best interest of the class?
5         MR. HARNES:  I'm going to object to the
6   form of the question.
7         THE WITNESS:  No fee is in the best
8   interest of the class, but that's not what's going
9   to happen.  You're not going to represent Diamond
10  Foods for free, and law firms aren't going to
11  represent the class members in this case for free.
12  So you try to find some reasonable amount.
13        We came up with a schedule.  We're
14  comfortable with it.  The court apparently is
15  comfortable with it because it was provided to,
16  and -- and so we feel like -- that we do a decent
17  job with it that way.  I mean, there -- some pension
18  -- and mainly my experience is with institutional
19  investors because we talk -- we work together.  Some
20  of them bid out each case to look at separately and
21  they take bids on legal fees on a percentage or
22  contingent fee.  We don't.  Not to say that their
23  system is better than ours or ours is better than
24  theirs.  It's a policy decision that we make.  Some
25  have a higher -- they allow higher fees or they

---

89

1    don't have a structure at all and they just look at
2    each case differently, look at how many hours are
3    put in it, trying to determine on a lodestar basis
4    whether -- you know, is 16 percent or 27 percent
5    better on that particular case based on the work
6    involved, how far you got into the litigation, the
7    case settled a month prior to trial or did it settle
8    fairly early on in the litigation.  And so they
9    don't have an agreement until it's time to file for
10   approval.  We happen to have one.
11   BY MS. BRETAN:
12       Q    In looking at this sentence we were just
13   talking about, about lead plaintiff may also be in a
14   position to reduce fees paid to attorneys from any
15   settlement, is that part of the fiduciary
16   responsibility to the class that the AG would
17   undertake on behalf of PERS in this action?
18       A    That's right.  If we were able to either
19   obtain a settlement or obtain a judgment and go to
20   the court and ask for a fee approval, we will sit
21   down with the counsel and take the fee structure and
22   figure out what it is we will propose to the court.
23   Judge Alsup may not approve it.  He may cut it.  He
24   may give more.  I doubt more, but, I mean, that's
25   just his prerogative as a federal judge.  I mean,

90

1    it's basically unfettered control over how, you
2    know, the class counsel is compensated.  He is much
3    more of a hands-on reviewer of those issues than
4    some other judges that we've dealt with, but that's
5    his prerogative.  He got the appointment for life
6    and it's his job, not mine.
7        Q    Turning to page 2 -- oh, no.  Sorry.  Let
8    me stay here.  Let me just ask one more question
9    here.  In the next paragraph down it says that "In
10   some cases where a large continuing investment
11   position exists, the State may, due to potential
12   conflict between vigorous pursuit of the company and
13   the values of PERS' retained holdings, take a
14   passive role or withdraw its support from the
15   class"; do you see that?
16       A    Uh-huh.
17       Q    So I'm just trying to understand that.
18   What does that sentence mean?
19       A    Well, it's not a legal concept like we
20   would have studied in law school.  It's just the
21   National Chamber of Commerce's position always is
22   that nobody ever ought to sue anybody ever, no
23   matter what, and nobody ought to go to jail.
24       I don't happen to subscribe to that theory
25   and neither does my boss.  What I'm guessing what

91

1    PERS is trying to say here is that there's a theory
2    out there that I don't agree with, Jim Hood doesn't
3    agree with, that if you own a stock and -- let's say
4    you own 10 million shares of Coca Cola and you own
5    it in three different investment accounts, one in
6    index two that are -- analysts make decisions to buy
7    and sell based on their various issues that they --
8    analysis they do, whether that's a good stock to
9    own, when to buy, when to sell.  And if you were to
10   file a lawsuit against Coca-Cola, then because you
11   still own the shares, that -- that whatever either
12   judgment or settlement you may obtain from it is a
13   current -- is going to come from the current
14   resources of the company, and you pay back to the
15   folks who own the stock, which would include PERS in
16   that particular example, for a window, two-year
17   window, let's say, and so there -- it might not be
18   in the interest of the current stockholders to give
19   money to the former stockholders.  Literally, it --
20   I guess you could say it's true, but if you don't do
21   it, if you don't hold the company accountable, then
22   they do whatever they want because they can always
23   say that there are former stockholders and there are
24   current stockholders, and if you take it from the
25   current ones and give it to the former ones, you're

92

1    punishing the current owners.
2        And, again, the National Chamber of
3    Commerce position would be, "Great," because then
4    nobody would ever be accountable for oil spills,
5    stealing, back-dating stock options, misrepresenting
6    accounting, over- -- misrepresenting --
7    misrepresenting how much stock options they may take
8    or the rewards, all kinds of fraudulent activity,
9    bribes to foreign officials.
10       So if you just don't do anything because
11   it's going to take money from the current
12   stockholders, then perhaps some people would believe
13   that that's somehow breaching a fiduciary duty.
14       Q    So in this case Mississippi PERS had sold
15   all of its stock by November 16th, 2011, correct?
16       A    That's the date that sounds familiar,
17   November of '11.
18       Q    And would the -- so you're a former
19   stockholder at that point?
20       A    That's right.
21       Q    And so are their interests there as a
22   former stockholder different than people who still
23   held shares after that point or were purchasing
24   shares after that point?
25       A    Mr. Ready, who was the executive director

GEORGE W. NEVILLE  30(b)(6)                              April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

93

1   at the time this -- my understanding is this is --
2   Q   Of PERS?
3   A   Of PERS at the time this was developed,
4   his philosophy would be that this is not a problem
5   for PERS because they don't own the stock anymore.
6   Q   What is not a problem for PERS?
7   A   Being involved in a case like Diamond.
8   Q   Let me just go back to my question.
9   A   Well --
10      MS. BRETAN:  Could you read back my
11  question, please?
12      (Record read by the reporter.)
13      THE WITNESS:  Well, that's not what -- I
14  mean, this policy is talking about a problem that
15  PERS might have in that it may be a current
16  stockholder and that their concern would be we're
17  suing ourselves, in essence.  It's not the case here
18  because I've told you, I guess, at least twice, if
19  not more times already, the fiduciary responsibility
20  of being a class rep is a higher calling, so to
21  speak, than just to a policy that PERS may have
22  developed.
23      Regardless of what this policy says is --
24  when the court is appointed -- in PERS -- and I am
25  on behalf of the Attorney General.  The focal

---

94

1   point -- our job is to be the fiduciary for the
2   class, whatever the court allows the class to be or
3   restricts it to be, and, therefore, regardless of
4   this policy or anything else, my job is to look out
5   for the interests of the class first and foremost.
6   That's what I have to do.
7   BY MS. BRETAN:
8   Q   Turning to pag 2, there's a provision at
9   the bottom there, "Retention of Outside Counsel."
10  A   Okay.
11  Q   Can you just read that sentence for me,
12  please?
13  A   The -- the one that starts "If a
14  recommendation"?
15  Q   Correct.
16  A   "If a recommendation to pursue an active
17  role in seeking recovery of financial damages is
18  received, the Attorney General, Mississippi, will
19  determine what action, if any, that should be taken.
20  Should the decision --" keep going?
21  Q   Yes, please.
22  A   "Should the decision be made to pursue
23  litigation, the Attorney General will retain or
24  provide legal counsel on PERS' behalf."
25  Q   So the Attorney General -- to put a fine

---

95

1   point on it, the Attorney General decides which
2   actions to pursue on behalf of PERS, correct?
3   A   That's right.  That's what the
4   constitution says he's supposed to be.
5   Q   The Mississippi constitution?
6   A   Right.
7   Q   And also the Attorney General decides what
8   counsel -- legal counsel to retain on PERS'
9   behalf --
10  A   That's right.
11  Q   -- for this litigation?
12  A   That's right.  If PERS needs a law firm to
13  give them guidance on an issue that's complex, then
14  that's -- the AG's office finds counsel for them.
15  We -- recently PERS was sued as someone who had sold
16  a security -- I don't remember the details of it --
17  along with others to disgorge the monies that they
18  received from an acquisition, and so we're a
19  defendant in that case.  So we found them counsel.
20  That's just -- and it's not just with PERS.  It's
21  with other agencies.
22  Q   Okay.  And Judge Alsup ultimately granted
23  PERS' motion to be appointed lead plaintiff; is that
24  correct?
25  A   I wouldn't be here if he hadn't.

---

96

1   Q   That's right.
2       Okay.  Exhibit 8.
3       (Exhibit 8 was marked for
4       identification by the court reporter.)
5   BY MS. BRETAN:
6   Q   Are you familiar with Exhibit 8,
7   Mr. Neville?
8   A   Yes, I've seen it.
9   Q   And that's the order appointing lead
10  plaintiff in this case?
11  A   That's right.
12  Q   It's March 20th, 2012?
13  A   Yes.
14  Q   Okay.  And turning to the conclusion, page
15  12, line -- Judge Alsup talks about lead plaintiff
16  moving for class counsel, selecting class counsel.
17  And at line 15 he says the order says, "The motion
18  should be accompanied by declarations from lead
19  plaintiff explaining the due diligence undertaken
20  with respect to the selection of class counsel"; do
21  you see that?
22  A   Yes.
23  Q   And that "Those declarations should
24  explain why counsel was selected in favor of other
25  potential candidates"; do you see that?

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**97**

1    A   Right, Uh-huh.
2    Q   And then PERS goes ahead and PERS files
3  its motion for appointment of lead and local
4  counsel, correct?
5    A   Yes.
6        MS. BRETAN:  This is Exhibit 9.
7        (Exhibit 9 was marked for
8        identification by the court reporter.)
9  BY MS. BRETAN:
10   Q   Exhibit 9, Mr. Neville, is the motion by
11 Mississippi PERS for approval of lead and local
12 counsel; is that correct?
13   A   It's a notice and a motion.
14   Q   And turning to page 2, which is the
15 notice --
16   A   Okay.
17   Q   -- at line eight it says that "Mississippi
18 PERS is moving for an order approving and appointing
19 Chitwood Harley Harnes and Grant & Eisenhofer as
20 co-lead counsel and Lieff Cabraser as local counsel;
21 is that correct?
22   A   That's right.
23   Q   And when was this motion filed?
24   A   This says April 24th of 2012.
25   Q   And you submitted a declaration under seal

---

**98**

1  -- turn to page 3.  It said -- footnote one says
2  you've submitted a declaration under seal in support
3  of that motion; is that correct?
4    A   That's right.
5    Q   Okay.  So at the time of the motion it was
6  still contemplated by MPERS that the Chitwood firm
7  and Grant & Eisenhofer would be co-lead counsel and
8  Lieff Cabraser as local counsel?
9    A   That was our -- our thought process, yes.
10       (Exhibit 10 was marked for
11       identification by the court reporter.)
12       THE VIDEOGRAPHER:  Excuse me, Counsel.
13 This marks -- this marks the end of tape number one
14 in the deposition of George Neville.  We're going
15 off the record, and the time is 11:03 a.m.
16       (Recess.)
17       THE VIDEOGRAPHER:  We're back on the
18 record, and this marks the beginning of tape number
19 two in the deposition of George Neville.  The time
20 is 11:09.  Go ahead, please.
21 BY MS. BRETAN:
22   Q   So before the break we were talking about
23 Exhibit 9, which is the motion for appointment of
24 lead and local counsel.
25   A   Okay.

---

**99**

1    Q   And that was filed on April 24th, 2012; is
2  that correct?
3    A   It looks like it, yeah.
4    Q   And in that motion Mississippi PERS sought
5  to have the Chitwood firm and Grant & Eisenhofer
6  appointed as lead counsel and Lieff Cabraser as
7  local counsel, correct?
8    A   That's right.
9    Q   We've marked Exhibit 10.  You can keep
10 that next to you.  What is -- are you familiar with
11 Exhibit 10?
12   A   Uh-huh.  It's our retention agreement.
13   Q   And that's a retention agreement entered
14 into with the Chitwood firm?
15   A   That's right.
16   Q   And is this the agreement that governs
17 this case?
18   A   Yes.
19   Q   And can you tell me when it was entered
20 into?  It's on page 2 at the top.
21   A   April 24th, 2012.
22   Q   Okay.  And that's the same day that --
23 that MPERS moved for appointment of the lead
24 plaintiff and lead counsel; is that correct?
25   A   That's correct.

---

**100**

1    Q   And looking at page 2 --
2    A   Of Exhibit 9 or 10?
3    Q   Of Exhibit 10.  It seems that the
4  agreement only applies to the Chitwood firm; is that
5  correct?
6    A   Well, that is the firm that is retained,
7  but they have the authority to bring in other
8  counsel if they -- with our approval.  Look on
9  paragraph six, page 4.  We -- it's our policy -- we
10 don't -- we -- I think one time we didn't do this,
11 but -- and that -- we may not have even done it
12 then, but we sign a retention agreement with one law
13 firm and then give authority based on whatever the
14 circumstances may be that -- of other law firms that
15 may be involved in litigation, but the retention
16 agreement is with one, and then they do a joint
17 effort agreement or whatever they may want to call
18 it.
19   Q   So did the Attorney General's office on
20 behalf of MPERS give approval for the Chitwood firm
21 to, pursuant to paragraph six here, associate other
22 attorneys at its own expense?
23   A   That's right.
24   Q   Do you know if that's -- there's an
25 agreement to that effect?

---

GEORGE W. NEVILLE  30(b)(6)                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

101

1    A   We gave them the authority that they would
2    be able to use and could use G&E as long as the
3    court approved it.
4    Q   And is that just a verbal okay or is that
5    reflected in writing anywhere?
6    A   I imagine I just told it to them because
7    it's been our policy all along, is that they -- they
8    have to notify us who they're going to use if they
9    want to bring in a firm.
10       We have cases -- not necessarily
11   securities cases, but we have some more complex
12   anti-trust or consumer-type cases or health care
13   fraud cases, and we may have a retention agreement
14   with a particular firm, but we know from having met
15   with a group if there's a group that might want to
16   work on the litigation who is involved, and then
17   they do some sort of a agreement amongst themselves.
18   Q   And what other firms did the Chitwood firm
19   associate in this case?
20   A   Well, it was -- G&E was going to be
21   co-lead counsel, and then Lieff Cabraser was going
22   to be local counsel.  That's not what the court --
23   what the court approved.
24   Q   How did -- was it the recommendation of
25   the Attorney General that Grant & Eisenhofer be

---

102

1    associated and Lieff Cabraser be associated as lead
2    and local -- co-lead and local counsel,
3    respectively?
4    A   He approved it.  It was my recommendation.
5    Q   Your recommendation to the Chitwood firm?
6    A   It was my recommendation to the Attorney
7    General that we would -- that Chitwood would be the
8    signator on the retention agreement, G&E would work
9    with them and Lieff Cabraser would be local counsel,
10   and he agreed to that.
11   Q   Turn to paragraph three of the agreement
12   that's on page 3, the top.
13       MR. HARNES:  What is the order?
14   BY MS. BRETAN:
15   Q   It says, "The Attorney General and the law
16   firm both recognize that the claims present numerous
17   factual and legal obstacles"; do you see that?
18   A   Uh-huh.
19   Q   What are the factual and legal obstacles
20   in this case?
21   A   This is standard language we use, I think,
22   in every retention agreement.  I think it will -- as
23   we flesh out this litigation in court, we'll best be
24   able to determine what you all perceive to be
25   factual and legal obligations, but I haven't done

---

103

1    any kind of analysis for it.
2    Q   In paragraph four it says, "The Attorney
3    General shall maintain responsibility for the public
4    distribution of information concerning this matter."
5    A   Right.
6    Q   It goes on.  What is that -- what is that
7    provision about?
8    A   It's the same provision that's in all the
9    other retention agreements, securities or
10   non-securities, and if it -- the local press called
11   up the law firm because they saw their name on the
12   pleadings and started asking them about it, the law
13   firm needs to refer to us.
14   Q   And I'm going to -- the retention
15   agreement has two fee agreements attached as
16   exhibits.  The first one appears to relate only to
17   matters settled prior to the initiation of
18   litigation.
19   A   Right.
20   Q   You know, at the time of this agreement
21   obviously litigation had been initiated.
22   A   That's right.
23   Q   So that's not really pertinent here,
24   correct?
25   A   That's correct.

---

104

1    Q   So I'd like to turn to Exhibit B in just a
2    minute, but just staying on this same page, on
3    page 3 it says under section B that "All reasonable
4    and necessary costs of the litigation, in short, are
5    reimbursed from the recovery in the case"; is that
6    right, to the law firm?
7    A   We allow them to file for reimbursement
8    for those expenses from any settlement or judgment.
9    Q   Let's turn to Exhibit B.  And just --
10   sorry.  Just -- you signed this agreement on behalf
11   of the Attorney General?
12   A   No, GM is Geoffrey Morgan.
13   Q   Oh.
14   A   He's the chief of staff.
15   Q   Oh, that's the chief of staff.
16   A   I'm GN.  He's GM.
17   Q   Okay.  My Ms and the Ns were confused.
18   A   That's all right.
19   Q   Let's look at Exhibit B.
20   A   We can abbreviate our names GEO period;
21   we'd both be the same.
22   Q   So Exhibit B appears to set forth a
23   contingent fee schedule for cases that are already
24   in litigation; is that correct?
25   A   That's right.

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

| 105 |
| --- |

1     Q   And is this the fee agreement that applies
2   in this case?
3     A   Yes.
4     Q   Okay.  And so if I'm reading it correctly,
5   if there's a recovery by the State of Mississippi up
6   to 25 million, there's a sort of tiered percentages
7   of -- with respect to fees; is that -- is that
8   right, based on certain criteria?
9     A   Yeah, this really speaks for itself.  I
10  mean, I think it's pretty clear cut.
11    Q   Okay.  And turning to the explanatory note
12  on page 8, I just want to ask, just so I'm
13  understanding it correctly, sort of midway down --
14    A   Of the page or the paragraph?
15    Q   The first paragraph.  It talks about the
16  fee -- the incremental dollar amounts falling within
17  each subcategory and various -- and multiplying the
18  incremental amount.  What's an incremental amount?
19    A   This was developed because we always had
20  understood if you had a recovery of, let's say,
21  $100 million, that you wouldn't say, "Well, it's the
22  third to --" after filing the complaint in the
23  middle -- after filing the complaint after discovery
24  and completing waiting trial, 14 percent -- it
25  wouldn't be 14 percent of the 100 million.  It would

| 106 |
| --- |

1   actually be the percentage for the first 25.  It
2   would be the percentage for the 25 to 75, and then
3   the last $25 million would be in this fee, and you
4   would add those three things together.
5         This is what we understood all along, but
6   one of the people we entered in the agreement with,
7   the non-securities case, felt like they -- it would
8   be helpful to have this explanatory note so there
9   wouldn't be some confusion down the road if I
10  dropped dead or the General dropped dead or
11  something and there was nobody to say, "Oh, yeah,
12  that's what it meant."  And you wouldn't go right to
13  that figure because, in essence -- simplistically
14  you could say that, but that's not what it meant.
15  So we devised this explanatory note with an example
16  just to make sure that folks would understand what
17  the agreement meant.
18    Q   So the incremental amount is the
19  additional amount that falls in the next category --
20  the additional amount of recovery?
21    A   You take that which applies -- falls into
22  each one of those categories and you add them
23  together.
24    Q   Okay.  And just to clarify one more thing
25  about the Exhibit B, it says, "For recovery by the

| 107 |
| --- |

1   State of Mississippi after 25 million," in the first
2   tranche there.  So is that -- does that really mean
3   to say recovery on behalf of the class?
4     A   In this particular -- I'm sorry.  I
5   interrupted you.
6     Q   Do you mean class recovery or recovery to
7   Mississippi PERS?
8     A   In this particular case it's going to be
9   the class.
10    Q   Okay.
11        (Exhibit 11 was marked for
12        identification by the court reporter.)
13  BY MS. BRETAN:
14    Q   So Exhibit 11 is the order appointing
15  class counsel.  Do you recognize this document?
16    A   Yes, uh-huh.
17    Q   And it notes -- in the first paragraph of
18  the order it notes that Mississippi PERS had
19  submitted declarations explaining its due diligence
20  in selecting counsel and why counsel was favored
21  over other -- over other candidates; is that right?
22    A   Yes.
23    Q   And that was the declaration that the
24  earlier order had referred to; is that correct?
25    A   We submitted everything the court asked us

| 108 |
| --- |

1   to.
2     Q   Okay.  And turning the page there, it
3   looks like the court appointed the Chitwood firm and
4   Lieff Cabraser but not Grant & Eisenhofer; is that
5   correct?
6     A   That's right.
7     Q   And I understand the court ordered that
8   the proposals and the selection process is --
9   remains under seal; so I'm not going to ask you
10  specifically about that here, but is -- is -- I know
11  we spoke earlier about Grant & Eisenhofer being
12  associated by the Chitwood firm.  Are they still
13  associated in this case by the Chitwood firm
14  notwithstanding this order?
15    A   I don't know what agreement they -- if
16  they ever reached anything in writing, but if the
17  court were to allow G&E to participate in the case,
18  then they will, but as far as I know right now,
19  they're not allowing them to.
20        The last sentence of this paragraph says,
21  "Three law firms will not be appointed due to the
22  risk of wasteful, duplicative effort," and that was
23  the court's position.  Again, we -- we just -- this
24  was an unusual circumstance for us.  Judge Alsup is
25  -- handles things different than most all the judges

GEORGE W. NEVILLE  30(b)(6)                                       April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**109**

1   in the country, but that's his prerogative.  And he
2   felt like because Lieff Cabraser is a -- does a lot
3   of securities work, they're a very good firm,
4   they're on our monitoring list, that if they're
5   going to be local counsel, they might as well be
6   engaged --
7        MR. HARNES:  Can I interrupt for just a
8   second?  I'm sorry.  I have no issue with this
9   witness discussing anything that was submitted to
10  the court, particularly since obviously it was
11  submitted to the court and the court -- I'm just
12  very sensitive to this witness -- the lead plaintiff
13  is ordered to maintain the confidence of all
14  proposals and not to discuss the selection process.
15       MS. BRETAN:  I understand, and I'm not
16  interested --
17       MR. HARNES:  I'm trying --
18       MS. BRETAN:  -- in --
19       MR. HARNES:  I'm trying not to be
20  obstructive because I really don't care.  If it were
21  not for the court's order, I'd be happy for him to
22  discuss anything that was submitted to the court.
23       MS. BRETAN:  I don't --
24       MR. HARNES:  Obviously, it's all out there
25  already.

---

**110**

1        MS. BRETAN:  I appreciate that,
2   Mr. Harnes, and I --
3        MR. HARNES:  But I'm just sensitive -- I'm
4   sorry.  I just wanted to caution the witness not to
5   be too specific.
6        MS. BRETAN:  I understand that,
7   Mr. Harnes, and I'm not going to ask him about what
8   was submitted to the court in the due diligence
9   process.
10       Q    But looking at the order here, it does say
11  that the court felt that three law firms would not
12  be appointed due to the risk of wasteful,
13  duplicative effort, and what's your understanding of
14  that?
15       A    The attorneys aren't paid on an hourly
16  basis like you are.  So if you brought four lawyers
17  to the -- to this deposition, that would cost
18  Diamond whatever your rate is times four.
19       I can bring 15 lawyers to the table and
20  they aren't going to get a fee any larger than what
21  the court is going to award based on a fee structure
22  or whatever the court thinks is prudent.  So I'm not
23  really sure what the judge's concerns were about
24  this, but, be that as it may, he's got it in his
25  order and so we are bound by it.

---

**111**

1        We have a great local counsel, as -- I
2   don't know how many of these securities cases you've
3   done, but a lot of times local counsel is maybe a
4   one- or a two-man shop that's local to the community
5   that -- but in this case we chose Lieff Cabraser
6   because they were a monitoring firm.  They were a
7   monitoring firm; so it made sense to use them.  So
8   the court's position is he's appointing them class
9   counsel, not just local counsel.  That's what it
10  says right here.
11       Q    I understand that the fee structure
12  doesn't change no matter how many attorneys you have
13  in the room, but -- but having multiple law firms
14  would change -- it could potentially impact the
15  costs that are associated with prosecuting the
16  action, correct?
17       A    It could, but, I mean, we could -- you
18  know, sometimes it's better to have more, but I --
19  you know, we just -- we're following whatever the
20  judge's guidelines are on it.
21       MS. BRETAN:  Okay.
22       (Exhibit 12 was marked for
23       identification by the court reporter.)
24       MS. BRETAN:  Can you hold on to that for a
25  second?

---

**112**

1        Q    Are you familiar with the terms "pay to
2   play"" or "pay to sue"?
3        A    I have heard of those terms, yes.
4        Q    And what's your understanding of what
5   those terms are about?
6        A    It's a National Chamber of Commerce's very
7   false, misleading accusations trying to pass tort
8   reform across the country, to appoint very
9   conservative federal judges and state -- and elect
10  state court judges so that they aren't held
11  accountable for the wrongful actions that they
12  commit.
13       One of the things that they try to say is
14  that the only way that a law firm is going to get a
15  case by -- for any office holder is they contribute
16  to their campaign.  So that's what the "pay" is, as
17  I understand it.  So if you don't contribute, you
18  don't get to, quote, play.
19       It's horrific PR bullshit, and I take
20  great offense to it, but I'm a public servant, and I
21  don't have any -- I don't have Fox News to trumpet
22  my BS, and I don't have the money that the National
23  Chamber of Commerce has to overcome the BS; so we
24  just trudge on and do our job.
25       Q    So the pay in "pay to play" or "pay to

---

GEORGE W. NEVILLE  30(b)(6)                                  April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**113**

1  sue" is about political campaign contributions?
2      A    That's my understanding.
3      Q    Okay.
4      A    And they apply to contractors with the
5  governor or the mayor.  I mean, it's whatever -- it
6  is an attempt to try to disparage office holders, as
7  I appreciate it.  You asked me about it because in
8  the context of these cases it would apply to my
9  boss, but -- because he is the Attorney General.
10  But it's certainly something they'll castigate the
11  mayor of San Francisco or the governor of Ohio about
12  doing.
13      Q    So "pay to play" or "pay to sue" applies
14  to your boss, as an elected official?
15      A    He has to run for office, and so he raises
16  campaign funds, and so the criticism has been that
17  he raises funds from people that often have --
18  involved in litigation on behalf of the State.
19      Q    Are you familiar with House Bill 211?  I
20  think that's called the Sunshine Act.
21      A    That's the most ridiculous name in the
22  world, but I am vaguely familiar with it.  I'm very
23  intimately familiar with it.
24      Q    And what is it?
25      A    It is an attempt to carry the water for

---

**114**

1  the National Chamber of Commerce by the Mississippi
2  legislature, the new speaker, who didn't get hired
3  by our office to do -- get involved in a case that
4  he wanted his law firm to be involved with, which is
5  a conflict of interest.  So part of his punishment
6  in carrying the water for whatever that organization
7  is, the National Legislative Conference something --
8  I don't know -- that the Chamber of Commerce funds,
9  gave it model -- gave model legislation they wanted
10  passed to try to keep people from being able to hold
11  them accountable.
12      Q    So does the Sunshine Act relate to those
13  concepts we were discussing, the "pay to play" and
14  "pay to sue" concepts?
15      A    Not really.  All it is an attempt to
16  try to stop the ability to file the lawsuits and
17  limit the ability to file cases to hold wrongful
18  corporate wrongdoers accountable.
19      Q    Would it be fair to say that the Sunshine
20  Act related to concerns raised about contingency fee
21  contracts being awarded to people donating to
22  political campaigns?
23      A    It doesn't stop it; so it has nothing to
24  do with that.  It's all a political ploy to stop
25  people from being able to file lawsuits to hold the

---

**115**

1  corporate wrongdoers accountable.  We run into it
2  over and over again with so-called tort reform,
3  which is all it is, is an inability to be able to
4  hold corporate wrongdoers accountable.
5      Q    How does the Sunshine Act prevent lawsuits
6  from being filed?
7      A    Well, the idea is that --
8          MR. HARNES:  Can I interrupt for just a
9  second?  I'm going to allow this witness, but I'm
10  just curious as to what topic identified in the
11  30(b)(6) motion --
12          MS. BRETAN:  Six.
13          MR. HARNES:  Six.  And how does the
14  Sunshine law have anything to do with anything in
15  question six?
16          MS. BRETAN:  Adequacy.
17          MR. HARNES:  What --
18          MS. BRETAN:  Adequacy.
19          MR. HARNES:  In what respect?
20          MS. BRETAN:  Well, I don't need to justify
21  any line of questioning to you.  I believe it
22  relates completely to adequacy and the adequacy of
23  this AG to represent Mississippi PERS in a class in
24  this case.
25          MR. HARNES:  Well, can you clue me into

---

**116**

1  the nexus between one or the other?
2          MS. BRETAN:  We'll get there, Mr. Harnes.
3          MR. HARNES:  I'm not saying this witness
4  -- but you're asking him legal opinions, and it's
5  just --
6          MS. BRETAN:  I'm just asking him his
7  understanding of what the Sunshine Act is.
8          THE WITNESS:  It's not sunshine, but,
9  anyway, that's what -- it was, again a propaganda
10  tool.
11  BY MS. BRETAN:
12      Q    It was a propaganda tool?
13      A    The term "Sunshine Act" is a propaganda
14  tool.
15      Q    How does the Sunshine Act or House Bill --
16  let's go with House Bill 211 -- how does that
17  prevent lawsuits from being filed?
18      A    It attempts to -- well, not securities
19  cases, but -- and it was admitted to by a
20  pharmaceutical attorney the other day in court; so
21  it's finally nice to have somebody on the record to
22  admit that the whole attempt -- part of it was to
23  keep attorneys from being able to obtain any kind of
24  a fee from the contingent fee contract off of
25  penalties and punitive damages.

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**117**

1    So if a corporation is peddling goods in
2 Mississippi that are fraudulent or dangerous, or
3 whatever it might be, and under our Consumer
4 Protection Act we file a claim, try to hold them
5 accountable for it, the cost per product or the
6 number of products sold in the state may not be, you
7 know, millions of items or tens of millions of
8 dollars.  So the contract -- I mean, under the --
9 House Bill 211 says you can only collect a
10 contingent fee off of the actual damages the state
11 may have suffered, not any at all on the penalties
12 and fees, and so, as the pharmaceutical lawyer said
13 the other day, it just prohibits -- it keeps the
14 incentive for law firms to want to bring these kinds
15 of cases because they wouldn't be able to afford to
16 bring a case that may have a $200 million penalty
17 component and only -- and I'm just throwing out
18 figures -- a $7 million actual damages component.
19 It becomes economically not practical, just like a
20 business has to do an analysis, "Do I want to go
21 into this market or not?  Do I -- do I want to open
22 hotels in this -- in this locale?"  They have to do
23 a cost-benefit analysis.
24    Well, law firms have to do the same thing
25 when they come to us and say, "We're aware of this

**118**

1 wrongdoing, and we want to try to hold folks
2 accountable for that, and in order to be able to do
3 it, we want to be compensated because, just like
4 you, we want to get paid."  Well, they want to take
5 the incentive out of being paid.  It means it's
6 harder to bring cases.
7    Q   Does that apply in the securities class
8 action context?
9    A   I don't think so, no.
10    Q   Okay.  So let's focus on securities class
11 action.
12    A   Well, you didn't ask me to focus on
13 securities class action.
14    Q   I'm going to now.  So with respect to
15 securities class action that penalties and issue
16 isn't really a limiting factor, correct?
17    A   I'm not sure it's a limiting factor at all
18 because the PL -- PLSRA controls completely over how
19 lawyers are compensated.  So the court is going to
20 make some determination about, you know, what the
21 fee structure is going to be regardless of what the
22 statute says, right?  If Judge Alsup says, "Well,
23 I'm not going to give but 8 percent," even though
24 the fee structure in the statute might say more,
25 that's what it's going to be.

**119**

1    Q   And with respect to contingency fee
2 contracts, it sets the -- House Bill 211 sets new
3 limits on percentages applicable to certain
4 recoveries; is that correct?
5    A   That's right.  It's different than the
6 retention agreement there.
7    Q   Is it different?  How is it different?
8    A   I don't know.  Pick up the papers and look
9 at them.  You're grown.  You can read.  Just --
10 they're different tables.  I don't remember --
11    Q   And --
12    A   -- the specifics.
13    Q   Sorry.  Was -- if you recall, is the --
14 are the percentages in the retention agreement with
15 the Chitwood firm in this case higher than -- than
16 allowed under the House Bill 211?
17    A   I think it's on the lower end of
18 recoveries.  It's -- the new legislation has a
19 higher percentage, but all that's irrelevant because
20 it doesn't apply to this case.  This case was filed
21 before the law went into effect.  So it's
22 irrelevant.  That's why I'm sitting here puzzled why
23 you're making all of this as an issue because it has
24 nothing to do with it.
25    We've been approved as class rep after

**120**

1 certification over and over again, and we get asked
2 the same inane questions that you're asking here.
3 You're wasting my time and you're wasting your time.
4 It's irrelevant.  This case was filed in -- by
5 someone else.  We came in, saw it was a good case,
6 and we've done that.  We've done a good job on cases
7 in the past, and we're going to continue to do good
8 jobs on these cases, and so, you know, rehashing the
9 same old crap that I've listened to before, you
10 know, is just -- it's silly.  It really is silly.
11    Q   So can you get Exhibit 12, please.
12 Exhibit 12 is a copy of the House Bill 211 as sent
13 to the governor of Mississippi.
14    A   Okay.
15    Q   Do you see that?
16    A   I do.
17    Q   Turning to page 5, page 5 is the section
18 758.  My understanding is this is the new -- new
19 provision.
20    A   I don't know, but it doesn't apply.
21    Q   Okay.
22    A   We've already had a case filed and we
23 already had a retention agreement on July 1 of 2012.
24    Q   Okay.  And turning to paragraph two under
25 section 758-2A, it says, "The State, an arm or

---

GEORGE W. NEVILLE  30(b)(6)                              April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**121**

1  agency of the State, or statewide elected official
2  acting in its official capacity may not enter into a
3  contingency fee contract that provides for the
4  outside attorney to receive a contingency fee
5  exclusive of reasonable costs and expenses incurred
6  in connection with the case, which is in excess of
7  the following --"
8      A   Where --
9      Q   -- and --
10     A   Excuse me.  Where are you?
11     Q   I'm at paragraph two, line 52.  And then
12 it sets out certain provisions of recovery similar
13 to percentages set out in the retention agreement,
14 correct?
15     A   There -- it's a schedule.  It reads for
16 itself.  Again, it doesn't apply to this case.  Why
17 are we talking about this?
18         MS. BRETAN:  Can you mark as
19 Exhibit 13 ...
20         (Exhibit 13 was marked for identification
21         by the court reporter.)
22 BY MS. BRETAN:
23     Q   Exhibit 13 is an overview of the history
24 of House Bill 211 --
25     A   Okay.

---

**122**

1      Q   -- do you see that?
2      A   Okay.
3      Q   And if you look at the section under
4  "History of Actions" --
5      A   Okay.
6      Q   -- it looks like at line nine the bill
7  passed the house on February 15th; is that right?
8      A   I don't know.  I'm not familiar with this.
9      Q   Have you seen a legislative history
10 before, Mr. Neville?
11     A   If I have, I don't have any specific
12 memory of it.  It's not my role in the office
13 that -- we have different attorneys that deal with
14 various laws that are being passed that have
15 something to do with our -- we have people who work
16 with legislature.  We have people who interpret laws
17 on behalf of the state.  That's not me.
18     Q   So line nine, on February 15th it looks
19 like it passed the house of the Mississippi
20 legislature, and line 16 -- you see that? -- on the
21 10th of April it looks like the Bill passed as
22 amended the senate of Mississippi; is that right?
23     A   I have no idea.  I don't know what -- I
24 mean, I'm still struggling figuring out what all of
25 this is relevant to.  It didn't go into effect until

---

**123**

1  July 1st of 2012.  So what difference does it make
2  when it passed a committee or when it passed the
3  house or when it was signed by the governor?
4      Q   Who is the governor of Mississippi?
5      A   Phil Brian.
6      Q   And do you know if he was in favor of this
7  bill or expected to sign it?
8      A   My understanding, he was in favor of it.
9      Q   So he was -- by the time lead plaintiff
10 had filed its motion for appointment of lead
11 counsel --
12     A   It's irrelevant.
13     Q   -- it had passed?
14     A   I'm not answering any more of the
15 questions.  The law reads for itself.  You can read
16 it.  I can read it.  You can read it and tell me
17 what it means or I can read it and tell you what it
18 means.  It's irrelevant.  It's not the law in this
19 case.
20         MR. HARNES:  Could we take a short break?
21         MS. BRETAN:  Short one.
22         THE VIDEOGRAPHER:  I'll get us off the
23 record.
24         MS. BRETAN:  Actually, sorry.  Let's
25 finish the questioning on this document.  Sorry.

---

**124**

1      Q   Did the Attorney General's office or its
2  counsel let the court know that this act had passed
3  by the time it submitted -- passed the house and
4  senate of Mississippi by the time it submitted its
5  motion for approval of lead plaintiff -- lead
6  counsel in this action?
7          MR. HARNES:  I'm going to object to the
8  question, advise the witness not to answer the
9  question.  The submissions were done under seal
10 under order of the court, and until -- you know, if
11 you want to get some relief from that order, I'm
12 delighted to answer that question.
13         MS. BRETAN:  I'm not interested in the due
14 diligence in selecting counsel.
15         MR. HARNES:  The papers were filed --
16         MS. BRETAN:  I just --
17         MR. HARNES:  -- under seal.  There was a
18 reason that the court required us to file under
19 seal, and you can -- you can interpret that as
20 broadly, as narrowly as you want.  The court is well
21 aware of what we submitted; so anything we decide
22 here today is not going to inform the court.  So I'm
23 just telling you:  I am not going to let this
24 witness answer questions as to the contents of any
25 filing that pursuant to this court's order were

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**125**

1  filed under seal.
2      MS. BRETAN:  Okay.
3      Q   Do you know if counsel proposed as lead
4  counsel in this case has given money directly or
5  indirectly to the political campaign of the Attorney
6  General, Jim Hood?
7      A   I hope you have.  I don't know who all has
8  given money to them.  I don't know.  Probably.  Have
9  you?  I've contributed.  Thousands of people have
10  contributed.
11     Q   So you don't know if the Chitwood firm has
12  given money to the campaign?
13     A   They probably have.  I hope they have.
14     Q   Did you ever try and find out whether lead
15  counsel proposed in this action had given money to
16  the political campaign of --
17     A   It's --
18     Q   -- Attorney General Hood?
19     A   It's not an issue for me.  I don't -- I
20  don't track political contributions.
21     Q   So you didn't ever try to find out whether
22  lead counsel approved by the Attorney General in
23  this case had donated to his political campaign?
24     A   I don't know how many times I've got to
25  answer it.  It's not relevant for me.  I don't go

---

**126**

1  search his financial reports.  They don't file at
2  the Secretary of State's office.  If you want to go
3  read them, go read them.
4      Q   But you're here as a fiduciary for PERS,
5  correct?
6      A   Yeah, but that has nothing to do with it.
7  So why would I go look at his campaign contribution
8  reports?  It has nothing to do with anything.
9  You're wasting my time.  You're wasting your time.
10  I don't understand why you can't get that through
11  your head.  You have some notion, apparently,
12  that -- it's not worked before, Jennifer.  Why is it
13  you want to waste my time like this?
14     Q   Are you familiar with a political action
15  group or 527 known as the Democratic Attorney
16  General's Association?
17     A   I've heard of DAGA.  That's what I
18  understand it's called.  I don't know if that's what
19  it stands for.  I don't know.
20     Q   And what is it?
21     A   I think it's an Association of Attorney
22  Generals.  They're all Democrats.
23     Q   Are you a member of DAGA?
24     A   No, I'm not a member of DAGA.  I'm not an
25  Attorney General.

---

**127**

1      Q   Do you know who the members of DAGA are?
2      A   Democrats who are elected, if they choose,
3  I suppose.  I don't think it's mandatory.  If you're
4  elected as a Democrat as an Attorney General in a
5  state, you can join.  Democrat Attorney General's
6  Association.
7      Q   Okay.  What are the --
8      A   RAGA is Republican Attorney General's
9  Association.  If you're elected as a Republican, I
10  guess if you want to, you can be a member of RAGA.
11     Q   What does DAGA do?
12     A   I don't know.  I'm not -- I don't go to
13  their meetings.  I'm not a member.  I don't know.
14     MS. BRETAN:  Okay.
15     (Exhibit 14 was marked for
16     identification by the court reporter.)
17  BY MS. BRETAN:
18     Q   Exhibit 14 is a November 8th, 2011, email
19  from Nikole Davenport to you --
20     A   Okay.
21     Q   -- do you see that?
22     A   Uh-huh.
23     Q   This was produced in this action.  Who is
24  Nikole Davenport?
25     A   She's an attorney at Chitwood Harley.

---

**128**

1      Q   And it looks like she's forwarding on to
2  you an election update she received from DAGA; is
3  that correct?
4      A   It appears to be, yes.
5      Q   And that update notes that Attorney
6  General Hood has won reelection?
7      A   Right.
8      Q   And she's offering congratulations to
9  you --
10     A   Yeah.
11     Q   -- is that right?
12     And this had to do with the most recent
13  election in November 2011; isn't that right?
14     A   That's right.
15     Q   Do you know if Ms. Davenport is a member
16  of DAGA?
17     A   As far as I know, she's not an elected
18  Attorney General; so I don't see how she could be a
19  member of DAGA.
20     Q   She's forwarding on an email that looks
21  like it's to DAGA members, right?
22     A   It beats the hell out of me.  I'm not a
23  member.  I don't know what the deal is.  You keep
24  asking.  How many times do I have to tell you?  I
25  don't know how it operates.

---

GEORGE W. NEVILLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.
April 3, 2013

### 129

1    Q    Okay.
2    A    She sent me something saying
3  "Congratulations."  She forwarded on something.
4  Okay.  Great.  Thank you.
5    Q    Why would she congratulate you on the
6  reelection of Mr. Hood?
7    A    Because I work for the Attorney General at
8  will and pleasure like all the other lawyers, and I
9  guess she was letting me know that
10  "Congratulations."  Hopefully it meant I had another
11  job -- a job for another four years.
12    Q    Your job is dependent on Attorney General
13  Hood appointing you?
14    A    That's what "at will" means.  If you're
15  not sure what "at will" means, then you may have to
16  go to the employment lawyer at your law firm and ask
17  him.  "At will," whenever he decides he wants to
18  fire me, he can fire me.
19        MS. BRETAN:  Okay.
20        (Exhibit 15 was marked for
21        identification by the court reporter.)
22  BY MS. BRETAN:
23    Q    Exhibit 15, I'll represent to you, is a
24  printout of top contributors to DAGA from 2004 to
25  2012.

### 130

1    A    Okay.
2    Q    On the first page there can you look at
3  those top contributor -- top 18 contributors and
4  tell me if you recognize any of the names on the
5  list?
6    A    The Langston Law Firm.  There's Joey
7  Langston's Law Firm and there's Shane Langston.
8  They're brothers, but they have different law firms.
9  I'm not sure which one that is.  Beverly
10  Enterprises, I think, is a nursing home chain.
11  AT&T, I think you know who that is.  MCI --
12    Q    I'm not asking you.  I'm sorry.  I don't
13  mean to interrupt you.
14    A    You're asking me if I know who these were,
15  and I'm just going through and telling you.  Did you
16  not want me to do that?
17    Q    Let me rephrase the question.
18    A    Okay.
19    Q    Could you look through the list and let me
20  know if you recognize any of the names on the list
21  as lawyers with whom the State of Mississippi
22  Attorney General's office does contingency fee work?
23    A    Now or ever?
24    Q    Ever.
25    A    Well, we've done work with Shane Langston,

### 131

1  and we've done work with Joey Langston.  David Nutt
2  & Associates we've done work with in the past, and
3  we're doing -- well, actually, I'm not -- I'm not
4  sure that Dave -- Dave Nutt may have been involved
5  in the tobacco litigation, but that was Attorney
6  General Mike Moore, not us.  And I think -- I'm not
7  positive about Shane or Joey, but one of them, I
8  think, or maybe both were involved in the tobacco
9  litigation with General Moore.
10    Q    And they donated 50,000 to DAGA, it looks
11  like?
12    A    Well, that's what it says.  I don't have a
13  clue whether this is accurate or not.  This is just
14  what this document says.  There's GlaxoSmithKline,
15  20,000.  We've sued them.  Got a lawsuit against
16  them now.  Let's see.  KPMG, we've sued them before.
17    Q    I'm not asking who you sued.
18    A    Well, I think it's relevant.  If you want
19  to know who's contributed, I think it's important to
20  know that sometimes just because they're on this
21  list or having contributed to DAGA doesn't mean --
22  we sued Microsoft.  We got over 50 million --
23  $60 million from Microsoft, suing them for the state
24  of Mississippi.  MCI, Inc., we got over 100 --
25  what -- $110 million for MCI for cheating us on

### 132

1  taxes.  Let's see.  See what I'm saying?
2        I mean, you're trying to take this stuff
3  out of context.  You don't want to know about RAGA,
4  but you want to know about DAGA.  You may want to
5  know who contributed to the Democratic Attorney
6  General's office according to OpenSecrets and
7  whether we did any work with them, but you don't
8  want to know whether we've sued any of them or not.
9    Q    I'm just asking about --
10    A    Well --
11    Q    -- if any of these entities have
12  contingency fee contracts.
13    A    Well, right now none of -- well, none of
14  them have -- none of these people have a current
15  contingent contract, I don't believe.
16    Q    With the State of Mississippi.  What about
17  in the past?  I'm asking you to identify --
18        MR. HARNES:  Asked and answered.
19  BY MS. BRETAN:
20    Q    -- the --
21    A    I've already answered that for you.
22    Q    Okay.  The Langston law firm and David
23  Nutt & Associates?
24    A    I'm not sure Dave Nutt -- David Nutt &
25  Associates.  Dave Nutt was affiliated, involved with

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

### 133

1    the tobacco litigation.  I wasn't handling tobacco
2    litigation.  I worked for Mike Moore when he was
3    Attorney General, but I wasn't involved in the
4    tobacco cases.  So I think one or both of the
5    Langston brothers were involved, and I think David
6    Nutt was involved.
7        Q    Okay.  Turning the page -- and I'm going
8    to make this a narrower question for you.  Are any
9    of the contributors for the 2006 cycle to DAGA firms
10   with whom the State of Mississippi has a monitoring
11   agreement for securities litigation?
12       A    In this particular case, Nix Patterson &
13   Roach.
14       Q    And they donated $50,000, it looks like?
15            MR. HARNES:  Object to the form of the
16   question.
17            THE WITNESS:  Again, I don't know who --
18   what OpenSecrets is, but we haven't -- as far as I
19   know, we haven't done a case with Nix Patterson &
20   Roach, just to make sure for the record you
21   understand that just because they're on this list --
22   and I think one of them -- one of these guys in this
23   law firm may have been a state Attorney General at
24   one time.  I don't know.  I don't know those people.
25   I know the name.

### 134

1    BY MS. BRETAN:
2        Q    Anyone else on that list?
3        A    That's all.
4        Q    Okay.  Turning to the next page, 2008
5    cycle.
6        A    Okay.  Barroway Topaz which -- they're not
7    Barroway Topaz anymore.  They're something else.
8        Q    Okay.
9        A    Bernstein Litowitz, yes.  Labaton, yes.
10   Berstein Liebhard are on the list.  They did one
11   case for us, Cigna.  They haven't done a case
12   lately.  Baron & Budd, yes, they did Semtech, but
13   that's over.  Let's see.
14       Q    Next page.  2010 cycle.  Which firms
15   have -- any of these have monitoring agreements for
16   securities litigation with the State of Mississippi?
17       A    Bernstein -- number two, Bernstein
18   Litowitz; number three, Labaton; number nine, Grant
19   & Eisenhofer firm.
20       Q    Grant & Eisenhofer was proposed as co-lead
21   counsel in this action?
22       A    I think we talked about that about a dozen
23   times.  Fifteen, Kaplan Fox.  Let's see.
24       Q    And 2012 cycle?
25       A    Number seven, Bernstein Litowitz; number

### 135

1    eight, Nix Patterson & Roach.
2            (Exhibit 16 was marked for
3            identification by the court reporter.)
4    BY MS. BRETAN:
5        Q    Mr. Neville, I'd like you to look at
6    Exhibit 16.  I'll represent to you that Exhibit 16
7    is a printout of donors -- a full printout of donors
8    to DAGA from 2010 and 2012.  I went ahead and I
9    flagged the pages that I want to talk about for you.
10   So it looks like the first highlighted entry
11   there -- can you tell me what that entry shows?
12       A    The one in kind of a yellow orange?
13       Q    Yeah.
14       A    $25,000, Lieff Cabraser,
15   January 8th, 2010.
16       Q    Okay.  And turning the page --
17       A    Grant & Eisenhofer for
18   $10,000, October 22nd, 2010.  Then Stuart Grant, two
19   entries, 8,500 and $6,500, both on October 27th,
20   2010.  Then G&E again, $25,000 on October 23rd,
21   2009.  25,000, Chitwood Harley, August the 5th,
22   2009.
23       Q    And continuing on to the next tab ...
24       A    $25,000, Grant & Eisenhofer for May 11th,
25   2009, and $25,000 Grant & Eisenhofer for May 17th,

### 136

1    2010.  Just keep rolling?
2        Q    Keep rolling.
3        A    Lieff Cabraser, $10,000, August the 1st,
4    2011.  $30,000, Chitwood Harley, February 25th,
5    2011.  $25,000, Grant & Eisenhofer for
6    December 20th, 2011.  $10,000, Lieff Cabraser, July
7    the 10th, 2012.
8        Q    That should be it.  So those are all
9    donations by counsel proposed as lead counsel in
10   this action to this association, the Democratic
11   Attorney General's Association?
12       A    That's what this purports to be.
13       Q    Were you aware of the contributions?
14            MR. HARNES:  Let me get my objection in.
15   Let him finish his answer.  Object to the lack of
16   foundation to that question.  Go ahead.
17            THE WITNESS:  No, I wasn't aware of it.
18   BY MS. BRETAN:
19       Q    Were you not aware of -- sorry.  What were
20   you aware of?
21       A    I'm aware that a lot of money has to be
22   raised to counter organizations that are bogus like
23   the Law Enforcement Alliance of America, which is a
24   bogus front group for -- I don't know because they
25   hide the money, but it must be the National

---

GEORGE W. NEVILLE  30(b)(6)                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**137**

1   Chamber of Commerce, tobacco industry, whatever.
2   They spend millions of dollars across the country.
3   They claim to be a group of sheriffs, police
4   officers and whatnot, no members whatsoever in
5   Mississippi, and they spent $700,000 opposing my
6   boss's election when he ran the first time in 2003.
7   But there are no members in Mississippi, and as
8   we -- everybody knows, there's no way in the world a
9   bunch of cops have the money to raise.  So where
10  does the money come from?  We don't know because it
11  was secreted in.
12        They did the same thing to a Supreme
13  Court candidate.  They spent over $1 million
14  opposing one of our Supreme Court candidates,
15  defeated him.  There's a TV special about it called
16  "Hot Coffee."  You ought to watch it.  It's very
17  informative.
18        They also just recently spent -- -- I
19  don't know -- something like $300,000 in Mississippi
20  on the Supreme Court race and elected a fine fellow,
21  has virtually no experience, about like yourself,
22  getting elected to the state Supreme Court, early
23  30s.
24     Q   Thank you.
25     A   Just, you know, early 30s, hadn't done

---

**138**

1   much of anything.  Other guy, very experienced.  And
2   guess what?  We -- everybody understands it's the
3   National Chamber of Commerce secreting money in.  So
4   unfortunately because of that -- and I don't agree
5   with the Supreme Court of the United States's
6   ruling.  Any and everything goes around these days,
7   it seems like, and so people have to raise a lot of
8   money to counter secret negative campaigns.
9   Apparently both sides do it.  We happen to not do it
10  in Mississippi on the Democratic side, but they sure
11  do it on the Republican side.
12     Q   Okay.
13     A   So the level of giving that people do, I
14  think it's really sad, but the reality is if Pfizer
15  -- I'm not saying they did it, but if Pfizer can
16  write $1 million check to the Law Enforcemnt
17  Alliance of America or RJ Reynolds, nobody knows it,
18  they can get away with it, and they want to try to
19  defeat people who want to hold them accountable when
20  they commit fraud or do terrible things to people
21  like pedalling cigarettes that are dangerous or kill
22  people, there's not a whole lot we can do about it
23  because the law of the land allows for it.
24        So there are people who believe in trying
25  to stand up for the little guy, like Jim Hood.  So

---

**139**

1   he has to be able to raise money to be able to win.
2   And people in Mississippi seemed to be pretty
3   pleased with him no matter how you want to take
4   shots at him because although all this crap comes
5   down on him, he won reelection with 63 percent of
6   the vote or 62 percent of the vote or whatever it
7   was in the end.
8      Q   Okay.  I'm just going to ask you to focus
9   on my question.
10     A   Well, your questions --
11     Q   I understand you have -- I understand,
12  and, as I said at the outset, if there -- if you
13  have strong feelings about my questions, there will
14  be an opportunity for you to -- your counsel to ask
15  you about those.
16     A   No, I'm going to answer the questions the
17  way I want them.  You're not going to cut me off.
18  You're not going to tell me what I can say and not
19  say, period.  And you ought to know that by now
20  having reviewed other depositions I've given.  This
21  is all bull crap.  You know it.  I know it.  It's a
22  waste of time.  The court analyzed whatever it
23  wanted to analyze to be able to determine who they
24  thought would be the best lead plaintiff and many
25  other cases on the same --

---

**140**

1      MR. HARNES:  I'm going to --
2      THE WITNESS:  I'm just saying in general
3   what happened.  They've approved us.  And so all of
4   this is a waste of time.  I know you love it because
5   you get paid by the hour.  So as many hours as you
6   can do, churn, is kachink, kachink, kachink for you
7   and your law firm.  I understand that.  But it
8   doesn't mean I have to like it, and it doesn't mean
9   that I have to take your pointed questions, poor
10  foundation, insinuations and just not do anything,
11  and so I'm going to tell you how I feel about it.
12  Just like the legislation that was passed, House
13  Bill 211.  Do you know the Attorney General went
14  over to the legislature and asked to speak to the
15  judiciary committee in the house about legislation
16  about his own office?  And do you know how much
17  opportunity they gave him to speak?  Zero.  Nothing.
18  Would not let him in the room to speak, but if it
19  was about the Department of Environmental Quality,
20  if it was about the Department of Health, the
21  Treasurer's office, they would be given that
22  opportunity.  So why do I have some hostility about
23  all of it personally?  Because it was totally
24  disrespectful to him.  It was wrong, but I can't do
25  anything about it.

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

141

1      MS. BRETAN:  Did we mark Exhibit 18?
2      MS. BAFUS:  Exhibit 17.
3      MR. HARNES:  Are we at an appropriate
4  time?  I need to take a restroom break.
5      MS. BRETAN:  Sure.
6      THE VIDEOGRAPHER:  Okay.  Just give me one
7  moment.  Be sure to put your mics on the table.
8  Going off the record, the time is 12:01 p.m.  We're
9  off the record.
10      (Recess.)
11      (Exhibit 17 was marked for
12      identification by the court reporter.)
13      THE VIDEOGRAPHER:  Okay.  We're back on
14  the record, and the time is -- excuse me --
15  12:07 p.m.
16  BY MS. BRETAN:
17      Q    Before the break, Mr. Neville, we were
18  discussing Exhibit 16, which is the list of donors
19  to the DAGA, or the Democratic Attorneys General --
20  Attorneys General Association, and we went through
21  donations by proposed -- the originally proposed
22  counsel in this action to that association, correct?
23      A    That was the question.
24      Q    And were you aware of the level of
25  donations -- the extent of the donations by counsel

---

142

1  -- opposing counsel in this action to DAGA?
2      A    As I've already testified, I was not.
3      Q    During the break did you talk to anybody
4  about the substance of your testimony today?
5      A    No.
6      MS. BRETAN:  I'd like to go ahead and
7  mark -- sorry.
8      Q    Do you know what DAGA does with the money
9  it receives from its owners?
10      A    No.
11      MS. BRETAN:  Can you mark as Exhibit --
12  did we mark as Exhibit 17?  It should be right
13  there.
14      Q    Mr. Neville?
15      A    What?
16      Q    Can you grab Exhibit 17 there?
17      A    Thanks.
18      Q    I'll represent to you that Exhibit 17 is a
19  list of expenditures by the Democratic Attorneys
20  General Association for 2004, 2008 and 2012.  In
21  looking at the first page with respect to 2004, it
22  lists the top five vendors' expenditures; do you see
23  that?
24      A    I do.
25      Q    And can you tell me what the first one is?

---

143

1      A    It says Jim Hood for Attorney General,
2  300,000.
3      Q    So DAGA gave Jim Hood for Attorney General
4  $300,000?
5      A    I --
6      MR. HARNES:  I'm objecting to the form of
7  the question, and I don't know that this -- it may
8  be it may not be, but I'm objecting as to whether
9  this provides a foundation for that.
10      THE WITNESS:  I don't know the answer.
11  BY MS. BRETAN:
12      Q    And turning to the next page for 2008, Jim
13  Hood for Attorney General is listed as the top
14  vendor for $850,000; is that right?
15      A    That's what this says, uh-huh.
16      Q    Okay.  And turning to the next page for
17  2012, still at top five, Campaign to Reelect Jim
18  Hood $125,000?
19      A    That's what it says.
20      Q    Let's turn to -- Mr. Neville, are you
21  familiar with the fact that candidates for office
22  are required to file a report -- reports of campaign
23  contributions?
24      A    Yes, well, they do in Mississippi.  I
25  don't know about other states.

---

144

1      Q    And have you ever gone and looked at the
2  campaign contributions to Attorney General Hood?
3      A    No.  I think I testified earlier that I
4  did not.
5      MS. BRETAN:  Okay.  So I just wanted to
6  confirm that.  So Exhibit 18.
7      (Exhibit 18 was marked for
8      identification by the court reporter.)
9  BY MS. BRETAN:
10      Q    Exhibit 18 is a periodic report of
11  election campaign receipts and disbursements filed
12  by Mr. Hood for the period October 28th, 2007,
13  through December 31st, 2007; do you see that?
14      A    I do.
15      Q    And is that Mr. Hood's signature there?
16      A    It looks like it.
17      Q    Okay.  And turning the page, can you tell
18  me -- it looks like -- well, let me just go ahead.
19  It looks like Lieff Cabraser -- the Lieff Cabraser
20  firm donated approximately $30,000 there.  Is that
21  what it lists, the highlighted entry?
22      A    Yes.
23      Q    Were you aware that Lieff Cabraser had
24  donated $30,000 to Attorney General Hood in 2007?
25      A    No.  I can just give you a general answer:

---

GEORGE W. NEVILLE  30(b)(6)                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**145**

1  I don't know any of the contributions, don't know
2  when, don't know how much or from whom.  That will
3  just answer all of the questions you might have that
4  pertains to this issue.
5      Q   Okay.  Were you aware -- I think you also
6  testified that you are aware that issues had been
7  raised about political campaign contributions and
8  contingency fee contracts; is that right?
9      A   I read the newspaper, yes.  Uh-huh.
10     Q   So you are aware that issues had been
11 raised with respect to Attorney General Hood?
12     A   Certainly there were campaign commercials
13 that were run against him, but it -- he's the only
14 democratic elected state official in Mississippi.
15 He -- his percentage of reelection in 2011 is higher
16 or higher than anybody.  So, yeah, it was out there,
17 but the public understands he does a good job.
18     Q   Were you curious about the level of
19 campaign contributions by the firms that Attorney
20 General Hood was selecting for securities litigation
21 cases?
22     A   That has nothing to do with what Geoffrey
23 Morgan and I do when it comes to recommendation of
24 firms that we do cases with, and so Geoffrey and I
25 don't pay any attention to that piece of it.

---

**146**

1      Q   And the firms that recommend cases to the
2  AG's office on behalf of Mississippi PERS, those are
3  firms that have monitoring agreements typically?
4      MR. HARNES:  I'm going to object to the
5  form of the question as to a lack of foundation.
6      THE WITNESS:  We -- we have a list.  We've
7  gone over that.  They're the ones that typically
8  recommend cases to us on the security side.  The
9  Pond Gadow & Tyler firm is the exception to that.
10     (Exhibit 19 was marked for
11     identification by the court reporter.)
12     MS. BRETAN:  Exhibit 19 is being marked.
13     Q   Exhibit 19, I'll represent to you, is a
14 collection of all of the reports related to --
15 reports related to campaign contributions to
16 Attorney General Jim Hood's campaign in 2011.  I've
17 gone ahead and I've marked the pages I want to ask
18 you about.  The first report covers the period
19 May 1st, 2011, to May 31st, 2011; do you see that?
20     A   Yes.
21     Q   And that's a -- that would be a report
22 submitted by Attorney General Hood; is that your
23 understanding?
24     A   It has nothing to do with the office of
25 the Attorney General.  It has to do with as a

---

**147**

1  candidate -- obviously he's an incumbent running for
2  reelection, but it has nothing to do with the office
3  itself.  So it appears to be what you say it is.  I
4  haven't printed off, examined these things from the
5  Secretary of State's office.  So whether you have
6  fabricated something or not, I haven't a clue, but I
7  presume you haven't, but I don't know.
8      Q   Okay.  And turning to the first tab in
9  there, in the list of receipts, it shows a donation
10 by J. Eisenhofer of Grant & Eisenhofer for $4500; is
11 that correct?
12     A   That's what it said.
13     Q   Okay.  Turning to the next tab, it looks
14 like there's a donation of 5/23/2011 by Stuart Grant
15 of Grant & Eisenhofer for $4500?
16     A   That's what it says right here.
17     Q   And continuing down, William Titleman of
18 Grant & Eisenhofer for $5,000?
19     A   That's what it says.
20     Q   Okay.  Turning to the next tab, that's a
21 report covering the period July 24th through
22 September 30th, 2011 --
23     A   Okay.
24     Q   -- covering the period July 24th, 2011.
25     A   Okay.

---

**148**

1      Q   And turning to the first tab in there, it
2  looks like two donations by the Chitwood firm on
3  May 10th, 2011, for $1,000 and on August 25th, 2011,
4  for $10,000?
5      A   That's what it says.
6      Q   Were you aware of those donations to the
7  Attorney General?
8      A   No.  No.  No.  No.  How many times do I
9  have to say no?
10     MR. HARNES:  Just answer the question,
11 George.
12 BY MS. BRETAN:
13     Q   And continuing down, there's an entry for
14 Craig Harley on August 22nd, 2011, from the Chitwood
15 firm, $5,000 to the campaign.
16     A   Okay.  All right.
17     Q   And the next tabbed page --
18     A   Okay.
19     Q   -- an entry by John Harnes on August 23rd,
20 2011, for $5,000 for the campaign.
21     A   That's what it says.
22     Q   Mr. Harness is your counsel in this case?
23     A   I think he's sitting right next to me.
24 Yeah.
25     Q   And turning to the next tabbed page, do

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**149**

1   you see the entry for Martin Chitwood of -- is
2   Martin Chitwood associated with the Chitwood law
3   firm?
4       A   My understanding is he is the Chitwood of
5   the Chitwood law firm.
6       Q   And he donated $5,000 on August
7   25th, 2011?
8       A   That's what it says.
9       Q   And turning the page, Nikole Davenport on
10  9/30/2011, Chitwood Harley & Harnes, $250.  That's
11  Ms. Davenport we discussed earlier; is that correct?
12      A   She's the one that sent me the email;
13  that's right.
14      Q   Okay.  Were you aware that she had donated
15  to --
16      A   No.
17      Q   Continuing on, there's a report covering
18  the period October 30th, 2011, to December 31st,
19  2011; do you see that?
20      A   I do.
21      Q   And the next tabbed page has a donation by
22  Elizabeth Cabraser on September 27th, 2011, of
23  $2,000.
24      A   Okay.  I see that.
25      Q   And turning to the next tabbed page, I

**150**

1   just want to ask the question:  It shows a donation
2   from Magnolia Democratic Attorney General's
3   Association; do you know what that is?
4       A   No, ma'am.
5       Q   Do you know if that is the same as the
6   DAGA we were discussing earlier?
7       A   I don't have a clue.
8       Q   Okay.  So just to put a fine point on it,
9   you weren't aware of those donations we just looked
10  at by counsel proposed in this action to the
11  Attorney General's --
12      A   No.
13      Q   -- campaign?
14          Does -- what do you think of it?  What do
15  you think of that?
16      A   Nothing.  I'm glad they helped to get him
17  reelected.
18      Q   Are you surprised by the amount of the
19  donations?
20          MR. HARNES:  I think that's been asked and
21  answered.
22          THE WITNESS:  I'm -- I am, as a citizen of
23  the United States, flabbergasted how much money is
24  spent on political campaigns, but I know a lot of
25  money has to be raised.  I know a lot of money has

**151**

1   to be raised against secret organizations that are
2   out there funding things that typically attack my
3   boss or attack people I think stand a good chance of
4   getting elected.  They're qualified.  They do good
5   jobs, but the reality is they don't fit the agenda
6   of whoever is secretly contributing money through
7   false, bogus organizations like the Law Enforcement
8   Alliance of America.  It has nothing to do with
9   what -- when Geoffrey and I are evaluating cases and
10  go make a recommendation to the General of what we
11  recommend or not.  So it's really irrelevant.
12          I'm glad they've helped.  I'm glad a lot
13  of people helped.  There were lots of people on this
14  list.  So he got reelected.  I think that's a good
15  thing.
16  BY MS. BRETAN:
17      Q   We talked earlier about "pay to play" and
18  "pay to sue," the term "pay to play" and "pay to
19  sue."
20      A   I've never heard "pay to sue."  Okay.
21      Q   And you, on behalf of PERS, are acting in
22  a fiduciary capacity, correct?
23      A   Yes.
24      Q   We talked about that.  So do you think it
25  would be incumbent on you in that -- in that role to

**152**

1   know whether there had been significant campaign
2   contributions by counsel in this -- proposed in this
3   action to the Attorney General's campaign?
4       A   No because Geoffrey and I don't get
5   involved in the political side of raising money or
6   microscopically analyzing the political report.  We
7   analyze cases on his behalf and go to him and make
8   recommendations.
9       Q   Does the Attorney General always accept
10  your recommendation?
11      A   Most of the time.
12      Q   But there are occasions where he doesn't?
13      A   I don't remember one.
14      Q   And your recommendations are typically
15  firms that have monitoring agreements with the
16  Attorney General's office?
17      A   Right.
18      Q   And the Attorney General decides who has
19  monitoring agreements?
20      A   With our recommendation.
21      Q   Okay.  Mr. Neville, do you know -- sorry.
22          Do you know if PERS -- do you know if PERS
23  requires any of its contracting -- contracting
24  investment managers to inform PERS about whether
25  there had been campaign contributions to state

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**153**

1  officials?
2      A   I have no idea.  The only person -- the
3  governor has an appointee, and the state treasurer,
4  by the nature of the job itself -- whoever is the
5  sitting treasurer is on the board.  I think all of
6  the rest of them are elected.  There's a retirees'
7  association or -- not association, but retiree --
8  state employees' retiree representative.  There's a
9  city's representative.  There's a county's
10  representative.  There's a current working state
11  employee's representative.  I don't remember all the
12  designations because we have elections periodically,
13  but I think the only two people that have -- that
14  have, you know, elected -- or certainly the
15  treasurer is, and the governor's appointee is not
16  the governor, but works for someone who is elected.
17      Q   If PERS had a requirement that its
18  contracting parties report any political campaign
19  contributions made to state officials or to PACs,
20  why do you think that would be?
21      A   I have no idea.
22          MR. HARNES:  I want to object to that
23  question --
24          THE WITNESS:  Sorry.
25          MR. HARNES:  -- on a number of grounds,

---

**154**

1  but it's been answered.
2          MS. BRETAN:  I'll come back to it.
3      Q   Mr. Neville, do you know what the class
4  period is in this case?
5      A   You've already asked me that.  I told you
6  I wasn't -- wasn't sure.
7      Q   Sitting here today, you're not sure what
8  the class period is in this case?
9      A   I just don't remember the exact dates, no.
10      Q   Do you know if it's different than the
11  period we talked about, December -- sorry.
12          MS. BALFUS:  December 9th, 2010.
13  BY MS. BRETAN:
14      Q   December 9th, 2010, to November 4th, 2011?
15      A   I just don't remember.  I'm sorry.  I
16  mean, I don't remember names very well and I -- I
17  don't remember the specific dates.  I know that my
18  experience has been in our securities cases the
19  class period is rarely the same as the original
20  complaint's class period.
21      Q   Do you know what the claims are in this
22  case?
23      A   The claim is that Diamond Foods
24  manipulated the financials in order -- in our -- my
25  opinion, to bolster the value of the stock.

---

**155**

1          MS. BRETAN:  I'll mark as Exhibit 20 the
2  initial disclosures of lead plaintiff.
3          (Exhibit 20 was marked for
4          identification by the court reporter.)
5  BY MS. BRETAN:
6      Q   Do you recognize this document?
7      A   Yes, it's the initial disclosures we filed
8  in December of '12.
9      Q   Is this a document you would have
10  reviewed?
11      A   Yes.  I didn't help prepare it, but I
12  would have seen it before it was filed.
13      Q   Did anyone come and talk to you about --
14  sorry.
15          Turning to part A under section one --
16      A   What page?
17      Q   That's on page 3.
18      A   All right.
19      Q   Under section A it says that "Lead
20  Plaintiff is believed to have information concerning
21  its transactions in Diamond stock common stock
22  during the class period"; do you see that?
23      A   What line are we talking about?
24      Q   Line 12 and 13.  Lines 12 and 13.
25      A   Okay.

---

**156**

1      Q   But doesn't it just list Mississippi PERS,
2  care of the law firm; is that correct?
3      A   That's what it says, uh-huh.
4      Q   And was that a complete response to the
5  information that should have been provided in
6  section 1A?
7      A   That's a question --
8          MR. HARNES:  You know, I'm going to -- I'm
9  going to object to that.  You know, this is --
10  you're asking this witness as to whether this
11  complies with Rule 26.  You know, I don't see any
12  legitimate purpose for this, and I'm just stating
13  that for the record, and I will let the witness go
14  ahead, but, you know, I -- I'll just say that.
15          THE WITNESS:  We rely on the counsel to
16  prepare these documents, and if you have a problem
17  with it, you need to take it up with the judge.  I
18  mean, I don't know that it complies with what is
19  necessarily -- what is required under the rules.  I
20  just -- I don't.
21  BY MS. BRETAN:
22      Q   But you're the individual in charge of
23  monitoring this action, correct?
24      A   I understand.
25          MS. BRETAN:  Okay.  Let's turn to

---

GEORGE W. NEVILLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.

April 3, 2013

---

157

1  Exhibit 21.
2       (Exhibit 21 was marked for
3       identification by the court reporter.)
4  BY MS. BRETAN:
5       Q   Exhibit 21 are the plaintiff's amended
6  initial disclosures.
7       A   Okay.
8       Q   Are you familiar with this document?
9       A   I don't remember it being discussed, but I
10  would have gotten a copy of it.
11      Q   And if you turn to section 1A now --
12      A   Okay.
13      Q   -- it lists additional people and entities
14  with -- people with respect to information regarding
15  knowledge of the complaint, the substance of the
16  claims in the lawsuit and the transactions in
17  Diamond's publicly traded securities during the
18  class period; is that right?
19      A   It has more information in it -- it has
20  more information in it than what is set out in
21  Exhibit 20 on page 3, line 11 through 18.
22      Q   And it lists you as one of the individuals
23  with information --
24      A   That's correct.
25      Q   -- correct?

---

158

1       A   That's right.
2       Q   And it lists someone named Pat Robertson,
3  who is the executive director -- listed as executive
4  director of MPERS; is that right?
5       A   It does.
6       Q   And Lorrie Tingle, chief investment
7  officer of MPERS?
8       A   That's right.
9       Q   And that's -- do you know what the purpose
10  of initial disclosures are?
11      A   Under the federal rules there is initial
12  disclosures that have to be provided, but the
13  substance of them and the technical rules of it and
14  how it's applied in each circuit and each district
15  court, no.
16      Q   These were -- these amended disclosures
17  were served on February 18th, 2013, it looks like.
18      A   Okay.
19      Q   I think -- I believe you testified earlier
20  that Mississippi PERS gives complete discretion to
21  its investment managers with respect to the
22  investment decisions -- the decisions to buy or sell
23  certain equities; is that right?
24      A   Within parameters, yes.
25      Q   But the investment manager is making the

---

159

1  decision to buy -- within those parameters, the
2  investment manager is making the decision to buy or
3  sell Diamond, for example?
4       A   That's my understanding, yes.
5       Q   Looking at the amended disclosures here,
6  can you tell me if the investment manager who bought
7  or sold Diamond shares is listed as -- with respect
8  to knowledge of the complaint, the substance of the
9  claims or transactions in Diamond's publicly traded
10  securities during the class period?
11      A   The investment advisor is not -- no
12  investment advisor is listed here.
13      Q   Do you know who the investment manager
14  with respect to the trades in Diamond securities
15  was?
16      A   No. I wasn't designated for that, anyway.
17      Q   But you don't know?
18      A   I don't know, and I wasn't the person
19  designated to testify about that.
20      Q   Okay. Should the investment manager which
21  made the transactions in Diamond securities have
22  been listed there?
23          MR. HARNES: I'm going to object to that
24  question.
25          THE WITNESS: I'm not sure if they should,

---

160

1  but it sounds like a gripe you've got -- you need to
2  take up with the judge and not with me. I don't
3  know the answer to that. He certainly is not going
4  to be someone who's involved in the litigation, but
5  whether it fits under what you believe he should
6  have been disclosed or not, go to the court, please.
7          MS. BRETAN: Exhibit --
8          MS. BALFUS: 22.
9          MS. BRETAN: -- 22.
10          (Exhibit 22 was marked for
11          identification by the court reporter.)
12  BY MS. BRETAN:
13      Q   Mr. Neville, do you recognize this
14  document?
15      A   Uh-huh.
16      Q   And what is it?
17      A   It's our responses and objections to your
18  first production of documents request.
19      Q   Did you review the responses to Diamond's
20  first request for documents before they were served?
21      A   Yes. Before they were served? No. I
22  didn't review Diamond's request for production of
23  documents before they were served. No, I did not.
24      Q   I'm asking whether you reviewed this
25  document.

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

161

1    A   That's not what you asked me.  You asked
2    me if I reviewed Diamond's first production of
3    documents before they were served --
4    Q   Okay.  Let me rephrase.
5    A   -- and I don't think I could do that --
6    Q   Okay.
7    A   -- unless I've got some sort of ability to
8    read into your mind --
9    Q   You're not a mind reader?
10   A   -- or spy into your office.
11   Q   So let me rephrase.  Thank you.
12   A   Okay.
13   Q   Did you review Lead Plaintiff Mississippi
14   PERS' responses and objections to Diamond's first
15   request for production of documents before it was
16   served?
17   A   Yes.
18   Q   And did you believe that all the
19   information in here was accurate?
20   A   To the best of my knowledge.  Obviously
21   this was -- the bulk of the work was -- most all of
22   the work is done by the counsel, and that's their
23   responsibility as part of the retention agreement.
24   Q   What did you do to respond to the document
25   requests?

---

162

1    A   I searched and made sure there was
2    anything we may have had there at the AG's
3    offices that would be discoverable.
4    Q   Did you search your email?
5    A   Yes.  I didn't -- I mean, we had our tech
6    people do that.
7    Q   And what about hard-copy files?
8    A   I think Martin did it, Martin Millett.
9    Q   Searched your hard-copy files?
10   A   That's my understanding.
11   Q   And where did you search?
12   A   In the file cabinet.
13   Q   Just at the AG's office?
14   A   We don't have file cabinets other places.
15   Q   And did you find documents that were
16   responsive to these requests?
17   A   Not to my memory.
18   Q   Not to your memory?
19   A   Uh-uh.
20   Q   There were no documents, to your memory,
21   responsive to these requests?
22   A   We don't -- all we have is attorney-client
23   privileged information.
24   Q   So there were privileged documents that
25   were responsive to the request?

---

163

1    A   Or pleadings.  I mean, there's stuff that
2    you have.  We don't -- it's not like we have
3    anything of -- that -- we don't have any -- any
4    documents that would be of any value in a lawsuit.
5    Q   Do you keep records of prior -- of the
6    currently pending lawsuits -- securities lawsuits by
7    the Attorney General on behalf of PERS?
8    A   We have some of the records.  I mean, we
9    don't have -- we don't -- most stuff is emailed in,
10   and I will review it.  I may or may not print it off
11   on cases.
12   Q   Do you retain those records, though?
13   A   Typically, yes.
14   Q   And did you search those records for
15   responsive documents?
16   A   Well, I certainly didn't search the
17   records of cases that had nothing to do with Diamond
18   Foods.  You just asked if I had retained documents
19   in securities cases.  So we didn't go through the
20   entire file cabinet.
21   Q   You didn't?
22   A   No.  If -- there's probably 20 or more
23   securities cases -- cases that are on file.  You
24   know, we may have pieces or parts of files and --
25   that have nothing to do with Diamond.

---

164

1    Q   Turning to page 11, "Request for
2    Production," 13, that sought "All documents and
3    communications regarding, relating to, or referring
4    to any and all social and/or business dealings you
5    have had with any of your attorneys of record in
6    this action"; do you see that?
7    A   Uh-huh.
8    Q   And what did you do to respond to that
9    request?
10   A   I think we had the email searched.  We
11   looked through the Diamond file.
12       MR. HARNES:  Which request was that again?
13   13?
14   BY MS. BRETAN:
15   Q   That's all?
16   A   Uh-huh.  Yes.
17   Q   To your knowledge -- to your knowledge are
18   there social or business dealings with your
19   attorneys by the Attorney General's office with the
20   attorneys of record in this action?
21   A   I was in Atlanta about a year ago and I
22   went and had a drink with Nikole Davenport.  Is that
23   -- I mean, do you want to know about that?  I mean,
24   I don't -- I don't understand what the -- maybe
25   that's why we objected to it.

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**165**

1       Q   Do you think that -- sorry.  Let me just
2   leave it at that.
3           Turning to page 9, "Request for
4   Production," number 11, it asks for "Documents and
5   communications relating to or referring to any
6   lawsuit, civil action, criminal action, arbitration
7   or administrative or regulatory proceeding during
8   the last -- past ten years to which you were a party
9   or a class member and which involved or related to
10  mismanagement, fraud, breach of fiduciary duty," and
11  so on; do you see that?
12      A   I do.
13      Q   And do you know what was done to respond
14  to that request?
15      A   Yeah, we objected to it.  Do you
16  understand what a state Attorney General's office
17  does?  I mean, seriously, do you even have a clue?
18      Q   I do.
19      A   Okay.  Well, I mean, we're not going to go
20  pull files about taking an action representing the
21  Board of Nursing about a nurse who is misusing
22  prescriptions at a nursing home.  That's what you
23  asked.
24      Q   What about --
25      A   That's what you asked for, right there.

---

**166**

1       Q   What about other securities litigations
2   that the AG has brought on behalf of Mississippi
3   PERS?
4       A   They're in Pacer.  I'm not going to do
5   your work for you.
6       Q   So they're publicly available?
7       A   The Pacer documents are.  You think I'm
8   going to go pull all that stuff off Pacer for you?
9       Q   But my understanding is that you just told
10  me that you receive copies of documents filed in
11  those litigations; is that correct?
12      A   Sometimes.  Mostly by email, but they're
13  -- they're the documents that are on file or they're
14  drafts.  I'm not going to provide you my -- a draft
15  of a complaint that we worked up.  You know that.
16  That's not discoverable.
17      Q   What about other files, pleadings?
18      A   You've got to be more specific.  I mean,
19  there are -- do you want me to go look at nursing
20  home cases that our Medicaid fraud offices looked
21  at?  I mean, that's what it asked for.
22      Q   Do you know whether any documents were
23  produced in response to that request?
24      A   I did not look at all the documents that
25  have been produced in response to the request, no.

---

**167**

1           MS. BRETAN:  Okay.  Let's go to
2   Exhibit 23.
3           (Exhibit 23 was marked for
4           identification by the court reporter.).
5   BY MS. BRETAN:
6       Q   Exhibit 23 are the responses and
7   objections by Lead Plaintiff Mississippi PERS to
8   Diamond Foods' first set of interrogatories; is that
9   right?
10      A   That's right.
11      Q   And you recognize this document?
12      A   Yes.
13      Q   You're familiar with its contents?
14      A   Pretty much.  I mean, I don't remember
15  word for word, but -- yeah, because I signed it.
16      Q   And the last page -- turn to the last
17  page.  That's a verification to you; is that right?
18      A   That's right, uh-huh.
19      Q   And why did you verify this document?
20      A   Why?  Because the rules require it.
21      Q   And you verified the documents before
22  signing the verification?
23      A   I did.
24      Q   So to your understanding all the
25  information in the interrogatory responses would be

---

**168**

1   accurate to the best of your knowledge?
2       A   Best of my knowledge, information and
3   belief, just like it says in the verification.
4       Q   Okay.  Turning to page 2, I want to ask
5   you about interrogatory number one.  Interrogatory
6   number one asked Lead Plaintiff to "Describe in
7   detail all representations, information,
8   recommendations or data upon which you relied in
9   making each purchase, acquisition, sale, transfer or
10  other transaction in Diamond securities as set forth
11  in Exhibit B to your court questionnaire to Lead
12  Plaintiff candidate," which was filed on
13  February 9th, 2012, in this matter; do you see that?
14      A   I do.
15      Q   And could you read the response to
16  interrogatory number one?  That's on page 3.
17      A   "Lead Plaintiff objects to this
18  interrogatory on the grounds that it is vague,
19  ambiguous and overbroad.  Lead Plaintiff further
20  objects that this interrogatory constitutes a
21  contention interrogatory that is premature at this
22  stage of the litigation.  Subject to and without
23  waiving the foregoing conclusions -- objections,
24  Lead Plaintiff responds that Diamond securities
25  traded in an efficient market and that Lead

---

GEORGE W. NEVILLE  30(b)(6)                                         April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**169**

1   Plaintiff intends to rely on the fraud-on-the-market
2   presumption of reliance.  Lead Plaintiff
3   additionally refers Diamond to the public statements
4   made by the defendants as identified in the
5   consolidated complaint as well as documents produced
6   in response to Diamond's first request for
7   production of documents to Lead Plaintiff."
8       Q   What did you do to determine that Diamond
9   securities traded in an efficient market?
10      A   I relied on representations from my
11  counsel.
12      Q   What did you do to determine that you
13  would rely on the fraud-on-the-market presumption of
14  reliance?
15      A   I relied on the knowledge base, the
16  experience and research based from our attorneys and
17  any experts they may have consulted.
18      Q   Did you talk to anyone about this response
19  other than your counsel?
20      A   No.
21      Q   Do you know if counsel talked to the
22  investment manager --
23      A   No.
24      Q   -- prior to this response?
25          Did you talk to the investment manager

---

**170**

1   prior to this response?
2       A   No.
3       Q   Do you know if anyone at PERS spoke to the
4   investment manager prior to this response?
5       A   No.
6       Q   Turning to interrogatory number two --
7       A   Okay.
8       Q   -- interrogatory two asked Lead Plaintiff,
9   to "Identify all persons on whom you relied in
10  making any investment decision regarding Diamond
11  securities, including with respect to all of the
12  transaction in Diamond securities as set forth in
13  Exhibit B to the questionnaire that was earlier
14  defined; do you see that?
15      A   Uh-huh.
16      Q   And can you tell me -- is anyone
17  identified in response to interrogatory number two,
18  any persons?
19      A   Not -- it's not repeated, no.
20      Q   And looking at line 21 and a half there,
21  it says, "Subject to and without waiving the
22  foregoing objections, Lead Plaintiff responds that
23  Diamond securities traded in an efficient market,
24  and Lead Plaintiff intends to rely on the
25  fraud-on-the-market presumption of reliance."

---

**171**

1       A   Right.
2       Q   And did you talk to anyone about that
3   response before this was served?
4       A   I would have discussed each and every one
5   of these with counsel.
6       Q   And did you do anything else to determine
7   that there was an efficient market for Diamond
8   securities?
9       A   I haven't personally nor has Attorney
10  General's office nor has PERS done any kind of
11  analysis independent of anyone else that might show
12  an efficient market or fraud-on-the-market
13  presumption of reliance.  We have -- we -- the
14  securities were bought on the New York Stock
15  Exchange, and typically, is my understanding, that
16  it's considered to be an efficient market.
17      Q   Do you know when the consolidated
18  complaint in this action was filed by Lead
19  Plaintiff?
20      A   When it was filed?  I don't remember the
21  day.  I mean, it was in 2012, but I don't remember
22  when.
23      Q   And your verification, this is March 2013,
24  right?
25      A   Uh-huh.

---

**172**

1       Q   And I can represent to you it's July 30th,
2   2012, the consolidated complaint was filed.
3           MS. BALFUS:  July 30th, 2012.
4           MS. BRETAN:  Okay.
5       Q   And is the -- is -- do you know if the
6   complaint alleges that Diamond securities traded in
7   an efficient market and or not?
8       A   It's like a 200 page document.  I don't
9   remember everything that's in there.
10      Q   What about -- did you have the sense that
11  Diamond was -- Lead Plaintiff was going to intend to
12  rely on the fraud-on-the-market presumption of
13  reliance?  Were you aware of that?
14      A   That Diamond was going to rely on it?
15      Q   I'm sorry.  That Lead Plaintiff was
16  intending to rely on the fraud of --
17  fraud-on-the-market presumption of reliance?
18      A   I've had numerous discussions with counsel
19  over the last year and a half about this case.  I
20  don't remember the specific discussions that we may
21  have had about that particular tenet of the claim.
22          MS. BRETAN:  24?
23          (Exhibit 24 was marked for
24           identification by the court reporter.)
25  //

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

173

BY MS. BRETAN:

1    Q    Exhibit 24, Mr. Neville, is "Lead
2    Plaintiffs Mississippi PERS Supplemental Responses
3    and Objections to Defendant Diamond Foods' First Set
4    of Interrogatories"; do you see that?
5    A    Uh-huh.
6    Q    Are you familiar with this document?
7    A    Yes.  It -- my memory of practicing law,
8    there's bunches of different interrogatories and
9    productions.  Of course, they're limited by the
10   rules, and Judge Alsup has some rules about what you
11   can file and what you can't file, but you file
12   answers.  You supplement answers, and it goes on
13   through the process that the court will allow.
14   Q    And this was dated March 29th, 2013,
15   correct?
16   A    That's what it says, uh-huh.
17   Q    Just a few days ago?
18   A    That's right.  That would be last week, I
19   think.
20   Q    Does that -- do you remember looking at
21   this document?
22   A    Yes.  I mean, I would skim through it.
23   Most of this one was shorter than the others.  Yeah.
24   Q    And did you verify this document?

---

174

1    A    I have to rely on the representations of
2    my client -- I mean, my attorney -- excuse me --
3    about the substance, but as far as -- so I did not
4    call -- for instance, if you look at response to
5    interrogatory number two, line 14, it says, "Lead
6    Plaintiff further responds that Artisan Partners
7    Limited Partnership and Acadian Asset Management,
8    Inc. and Wellington Management Company, LLP acted as
9    investment advisor in connection with purchases and
10   sales and executed them."
11       So I -- I didn't call them and ask them if
12   that's -- these three investment advisors, did they
13   really do that, no, because I relied on them having
14   access to the information to be able to provide it
15   to us.
16   Q    All right.  Did you verify these responses
17   before they were served?
18   A    Before they were what?
19   Q    Served on March 29th, 2013?
20   A    I looked at it.  It looked okay to me,
21   but, again, I -- I -- but I didn't call these people
22   and verify this -- that information, if that's what
23   you're asking.
24   Q    So you're not sure if that information is
25   accurate?

---

175

1    A    I'm not sure what your name is.  I haven't
2    seen your birth certificate.  I mean, I -- I just --
3    you know, I take it for your word that your name is
4    really Jennifer Bretan -- Bretan.  I mean, I -- I
5    believe that my counsel is capable of pulling this
6    information together.  I looked at it, reviewed it,
7    and I'm okay with it, but it might need to be
8    supplemented later.  I don't know.  I mean, that
9    happens a lot in lawsuits.
10       MS. BRETAN:  Okay.  I don't believe we've
11   been provided verification for that document.
12       MR. HARNES:  It was just executed.  It was
13   purely an issue of mechanics.  If you want to mark
14   this, as long as we get it back because it's the
15   only copy we have.
16       MS. BANKS:  That is the only copy.  I can
17   have copies made.
18       MS. BRETAN:  Okay.  Why don't we do that.
19   We can come back to it.
20   Q    It looks like you verified these -- sorry
21   -- these supplemental responses on April 3rd, 2013.
22   A    That would be today.
23   Q    13.  Is that today?
24   A    Yes.
25   Q    Is today the first time you had seen these

---

176

1    responses?
2    A    No, I saw them last week when they emailed
3    them to me, but I'm trying to remember which day.  I
4    think the 29th was Friday.  I think it was Friday,
5    and being that it was Good Friday, we weren't around
6    all day.
7    Q    And what did you do when you received
8    these supplemental responses to verify what was in
9    them?
10       MR. HARNES:  I think that's been asked and
11   answered, but you can go ahead and answer again.
12       THE WITNESS:  I got a confirmation from
13   outside counsel that they felt comfortable that this
14   was what needed to be in here.
15   BY MS. BRETAN:
16   Q    And with respect to interrogatory number
17   two, I know you mentioned that Artisan Partners was
18   mentioned with respect to persons on whom you relied
19   in making investment decisions in Diamond securities
20   and the transactions in Diamond securities; is that
21   right?
22   A    Well, what I'm -- what I understand
23   because I don't -- I don't -- I certainly don't make
24   investment decisions on behalf of PERS.  They don't
25   do any investment decisions in-house.  There are

---

GEORGE W. NEVILLE  30(b)(6)                           April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

177

1  public pension funds that do that.  Alabama, for
2  instance, has a large or some significant portion of
3  their portfolio they manage in-house.  So we don't
4  do that, and so it may be unique.  I don't know.  I
5  mean, I don't know -- I never sat down with CalPERS
6  people and know how state plan and the -- but I have
7  talked to those particular people that we deal with
8  or work with on those cases, and most of them have
9  some mix, but we don't.
10       They hire these investment advisors, and
11  they make the decisions to buy and sell, and
12  Ms. Tingle, Ms. Robertson or the board of trustees'
13  members are not going to be able to call and
14  effectuate some investment or getting out of an
15  investment on their own.  The investment advisors
16  follow whatever criteria that are set out by state
17  statute as well as the criteria from PERS in their
18  own best judgment.  You know, the investment
19  advisors have niches, and if their market is
20  emerging country stock on an international scale,
21  presumably they're not supposed to be buying a
22  start-up tech company in Nevada because that's not
23  an emerging market out -- you know, globally,
24  outside the United States.
25       But I don't even know the parameters.

---

178

1  Ms. Tingle could testify to all of that, and they --
2  you know, so they're supposed to stay within those
3  parameters, and they make their best judgment based
4  on the market and what is out there publicly.  They
5  don't -- presumably, I don't think they have any
6  inside tracks.  There's -- but they're supposed to
7  be knowledgeable and aware of things, and if they
8  get duped, we got duped.
9       Q   Artisan Partners wasn't -- wasn't listed
10  in response to interrogatory number two in the first
11  set of responses in Exhibit 23.  Do you know why
12  that would be?
13       A   My understanding was that you all had been
14  provided the trading data and the investment
15  advisors that handled our -- long ago.  I don't know
16  that -- that was my understanding.  My understanding
17  was that you all demanded that it be listed again;
18  so it was.
19       (Exhibit 25 was marked for
20       identification by the court reporter.)
21  BY MS. BRETAN:
22       Q   Exhibit 25 is a press release dated
23  November 1st, 2011, from Diamond Foods.  Do you
24  recognize this document?
25       A   I don't.

---

179

1       Q   Have you read this document before?  Don't
2  -- haven't seen it before?
3       A   I just I don't remember -- I don't have
4  any independent memory of reading this press
5  release.
6       Q   Looking at this announcement, is there
7  anything in this announcement -- can you tell me,
8  looking at the announcement, what it -- what it
9  says?
10       MR. HARNES:  I'm going to object to that
11  question.
12       MS. BRETAN:  And rephrase.
13       MR. HARNES:  I don't know if I need to
14  explain my explanation -- my objection.
15       MS. BRETAN:  You don't.  I'm good with
16  that, John.
17       Q   The press release announces that "The
18  chairman of the audit committee of Diamond's board
19  had received an external communication regarding
20  Diamond's accounting for certain crop payments to
21  walnut growers"; do you see that?
22       A   Which paragraph are we talking about?
23       Q   The second paragraph.
24       A   Oh.  Okay.
25       Q   And that "In response, Diamond's audit

---

180

1  committee had decided to perform an investigation of
2  the matter."
3       A   That's what it says.
4       Q   Does anything about that suggest to you
5  that there's been fraud?
6       A   I don't know that I am qualified to be
7  able to make a determination of a press release.  I
8  mean, that's what a judge and jury is for.
9       (Exhibit 26 was marked for
10       identification by the court reporter.)
11  BY MS. BRETAN:
12       Q   Exhibit 26 is a press release dated
13  February 8th, 2012, produced by PERS in this action,
14  Bates number 1511.  Have you seen this document
15  before?
16       A   I don't remember seeing this press
17  release.
18       Q   Do you recall reading this press release?
19       A   I mean, portions of these press releases
20  are in our complaint, but as far as reading the
21  press release in its entirety, I doubt that I have
22  done that, but I don't have any memory of doing it,
23  if I did.
24       Q   This press release announces that the
25  audit committee had completed its investigation --

---

GEORGE W. NEVILLE  30(b)(6)                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

181

1    substantially completed its investigation and that
2    there would be a restatement of certain financial
3    results; is that right?  Do you see that?
4        A    Down at the next to the last paragraph, it
5    says, "It's working diligently to complete the
6    restatements and will file all required reports."
7    Okay.
8        Q    Is there anything about this announcement
9    that suggests to you that there's been securities
10   fraud?
11       A    I think it's the same answer I've given
12   before.  I mean, to take this document and other
13   documents, it's got to be developed in the lawsuit
14   in the trial, its impact at the time and its impact
15   in a totality of the facts, and to pull out a press
16   release and try to have me make some determination
17   of whether I think personally that -- whether it's
18   fraud or not is -- it's not my call.  In the
19   totality of all the circumstances that have -- took
20   place in this case, I feel comfortable that there
21   was fraud and that we'll prove it in court.
22       Q    Did you read the company's restatement
23   materials?
24       A    No.
25       Q    Can you tell me what -- you just said that

---

182

1    you felt comfortable that there was fraud in this
2    case.  What -- can you just very basically tell me
3    what the case is about?
4        A    Yeah, the company was playing games with
5    the books and basically saying that payments that
6    were going to growers for 2011 were actually for
7    2012.  They call them minimum payments.  It was what
8    I perceived to be a shell game of attempting to try
9    to make the profitability of the company higher to
10   keep the stock price up so that when they acquired
11   the Pringles division of Proctor & Gamble, it would
12   be easier for them financially to make the deal work
13   because they would have more value in the stock of
14   Diamond in order to make the acquisition.  And they
15   did that fraudulently by misrepresenting what the
16   financial situation for the company was on their
17   profit and losses.
18       Q    And who are the defendants in the case?
19       A    Diamond Foods and then Mr. Neil, I think
20   it is, and Mr. Mendes.
21       Q    Who is Mr. Neil?
22       A    I think he was a CFO at one time.  He's
23   not now.
24       Q    And who is Mr. Mendes?
25       A    He was the chair -- the head of the

---

183

1    company, president, CFO, whatever.  I don't think
2    he's there anymore either.  I think the board
3    relieved both of them.
4        THE VIDEOGRAPHER:  I need to change the
5    tape.  Just one moment.  This marks the end of tape
6    number two in the deposition of George Neville.
7    We're going off the record, and the time is
8    1:05 p.m.
9        (Recess.)
10       THE VIDEOGRAPHER:  Back on the record.
11   This marks the beginning of tape number three in the
12   deposition of George Neville.  The time is 1:12 p.m.
13   Go ahead.
14       MS. BRETAN:  We're marking as Exhibit 27
15   the "Notice of Motion and Motion for Class
16   Certification" and the "Memorandum of Points and
17   Authorities" submitted by MPERS in this action.
18       (Exhibit 27 was marked for
19       identification by the court reporter.)
20   BY MS. BRETAN:
21       Q    Mr. Neville, do you recognize this
22   document?
23       A    Yes.
24       Q    And what is it?
25       A    It's a "Notice of Motion and Motion for

---

184

1    Class Cert."
2        Q    Did you review this document prior to its
3    filing?
4        A    Yes.
5        Q    Okay.  And turning to page 13, this is the
6    motion -- sorry.  This is the "Motion by Lead
7    Plaintiff to Certify a Class of All Purchasers in
8    the Class Period."
9        A    I understand.
10       Q    Okay.  And turning to page 13, line 14 and
11   a half there, it notes that "During the class
12   period, Mississippi PERS purchased 57,300 shares of
13   Diamond common stock," and it cites to a
14   certification by you, which is attached as Exhibit B
15   to the declaration of Harnes; do you see that?
16       A    Uh-huh.
17       MS. BRETAN:  Okay.  Let's go ahead and
18   mark as 28 that declaration.
19       (Exhibit 28 was marked for
20       identification by the court reporter.)
21   BY MS. BRETAN:
22       Q    So, Mr. Neville, Exhibit 28, is the
23   declaration of Mr. Harnes in support of Lead
24   Plaintiff's motion along with Exhibit B to that
25   declaration; do you see that?

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

185

1     A    Right.
2     Q    And Exhibit B is a certification by you --
3     A    Okay.
4     Q    -- is that right?
5     A    Uh-huh.
6     Q    And, in fact, it's the certification we
7  looked at.  Is it the same certification we looked
8  at earlier?
9     A    It looks like it.  I can't say that
10 there's a word or two missing, but it seems to be
11 the same.
12    Q    Did you sign a new certification with
13 respect to the class certification motion?
14    A    I don't remember doing that.
15    Q    And this certification is dated
16 January 5th, 2012?
17    A    That's right.
18    Q    And the consolidated complaint in this
19 action was filed July 30th, 2012, correct?
20    A    I don't remember.
21    Q    I can represent to you that it was
22 July 30th, 2012.
23    A    Okay.  All right.
24    Q    So looking at Exhibit 28 --
25    A    Okay.

---

186

1     Q    -- which has -- Exhibit B is your
2  certification from January of 2012, paragraph three
3  says, "Mississippi PERS has reviewed the facts and
4  allegations of a complaint filed in this action and
5  adopts its allegations"; do you see that?
6     A    Right.  I think we went over that when
7  whatever exhibit number it is -- I was looking to
8  see if I could find it, but we went over this
9  already.  Uh-huh.
10    Q    And you signed this in January of 2012,
11 correct?
12    A    That's what it says.
13    Q    So what -- so at the time that you signed
14 this, you weren't looking at the consolidated
15 complaint in this action; is that correct?
16         MR. HARNES:  I think that's been asked and
17 answered.  Objection.
18         THE WITNESS:  The complaint I reviewed was
19 the one on file.  It was the name of the gentleman
20 whose name I couldn't pronounce.  That's what you --
21 under the -- the PLSRA, you look at the complaint
22 that's on record.  That's what I did.
23 BY MS. BRETAN:
24    Q    And at the time this certification was
25 submitted to the court in connection with the class

---

187

1  certification motion, there was a consolidated
2  complaint on record; is that right?
3     A    I don't -- I just don't remember all the
4  iterations.  I know there was a complaint on file
5  that we didn't file.  We -- you are basically
6  required to adopt it, and we did that.  We filed a
7  complaint later.  I don't remember the specific
8  dates.
9     Q    After this certification?
10    A    Yes.
11    Q    Okay.  And so when you, in paragraph
12 three, talk about a complaint filed in this action
13 and adopting its allegations, that's still referring
14 to that original complaint?
15    A    Yes.  We covered this earlier this
16 morning, yes.
17    Q    It's not referring to the consolidated
18 complaint in this action?
19    A    We've already covered that this morning.
20 This is talking about the original complaint filed
21 in the action.
22    Q    Okay.  So -- so there's been the new
23 consolidated -- the consolidated complaint filed in
24 July of 2012.  Why did you not update your
25 certification to reflect that that is the complaint

---

188

1  that you're looking at for purposes of this class
2  certification motion?
3     A    I don't know that I have or haven't.  I
4  just -- I know that when you file for lead plaintiff
5  status or request to be appointed as lead plaintiff,
6  you have to file a certification, and that's what we
7  did.
8     Q    Okay.  So what -- the Exhibit 27 says, the
9  class certification motion, is that during the class
10 period, Mississippi PERS purchased 57,300 shares of
11 Diamond common stock, correct?
12    A    That's what it says, right.
13    Q    And it cites to your certification,
14 correct?
15    A    It does cite to that.
16    Q    And your certification was talking about
17 the class period reflected in the original complaint
18 filed in this action, correct?
19    A    The certification is required of PLSRA to
20 be filed when you attempt to want to be lead
21 plaintiff.  We did that.  We complied with the
22 court.  Sometimes there are errors made; sometimes
23 they're not on the transactional data, but the
24 transactional data is attached as schedule A to this
25 certification.  Over here on Exhibit 27, page 13, it

---

GEORGE W. NEVILLE  30(b)(6)                                     April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

189

1  says, "During the class period, Mississippi PERS
2  purchased 57,300 shares of Diamond common stock,"
3  and then it refers you to the certification which
4  has Exhibit A attached to it.
5      Q   And at the time --
6      A   It --
7      Q   -- of your certification -- sorry.  I
8  don't mean to cut you off.
9      A   You -- I think you used the phraseology
10  that we adopted that certification.  It just refers
11  you to it.  Just the "see" is in Italics -- the
12  s-e-e is in Italics much like if you were to tell
13  somebody to go look at a court case.
14      Q   So turning back to Exhibit 28, paragraph
15  three of Exhibit 28 says -- this is your
16  certification -- "Mississippi PERS has reviewed the
17  facts and allegations of a complaint filed in this
18  action and adopts its allegations."  That's where
19  that language came from.  Do you see that?
20      A   Uh-huh, it's right there in front of me.
21      Q   Okay.  And you testified that you were
22  adopting the allegations based on your review of the
23  original complaint in the case?
24          MR. HARNES:  Objection.  His testimony is
25  what it is.

---

190

1          THE WITNESS:  I've said this numerous
2  times.  I mean, I don't know what -- I mean, how I
3  can make this any more clear.
4  BY MS. BRETAN:
5      Q   Your certification is about Mississippi
6  PERS representing a class of individuals, correct?
7      A   That's what we're doing now as the lead
8  plaintiff.  If the court allows us under the class
9  certification motion to be the class representative,
10  then that's the role that we will play.
11      Q   And the class period has changed
12  subsequent to this certification?
13      A   That's my memory, but I would have to look
14  at the document -- the complaint itself to see, but
15  it's so common that the class periods change or
16  narrow based -- through the process of litigation in
17  these -- in these security cases I've been on.  I
18  just don't independently sit here and remember the
19  exact dates and when they -- if they changed, when
20  they changed and what was added, not added.  I just
21  don't remember all of the details of that.  The
22  complaint speaks for itself.  It's very detailed.
23  It's very plain written.  I think you can read it
24  and understand what it is that we are wanting to
25  accomplish here.

---

191

1          You have asked me if I am comfortable with
2  the latest complaint we're dealing with right now,
3  and I said yes.  So if you -- if you want me to
4  certify it, put it in front of me and I'll put my
5  hands on it, and you want me to certify that I'm
6  comfortable with it and I adopt it, I'll do that,
7  but I just -- I'm really lost at the point you're
8  trying to make here.
9      Q   Well, if the class period has changed, is
10  it your understanding that the transactions
11  reflected on schedule A remain the same; do you
12  know?
13      A   Well, the transactions aren't going to
14  change.  It could be that there are more
15  transactions or less transactions, right.
16      Q   In the class period?
17      A   If the class period changes --
18  unfortunately -- I say "unfortunately" -- we sold --
19  I'm taking your representation of it that we sold --
20  because I didn't do the math on Exhibit -- schedule
21  A of my certification to Exhibit 28 that we sold all
22  of our stock by November 16th of 2011.  If that is
23  true, then I can't create more transactions because
24  there are not any.
25      Q   But you don't know if there were

---

192

1  additional purchases subsequent to that?
2      A   I don't have that electronic access.  I
3  have to rely on my counsel to be able to provide me
4  that his ---I could call Ms. Tingle or
5  Ms. Robertson, and they could provide it to me, but
6  I don't -- I don't have to put them through that
7  effort because that's why our counsel has electronic
8  access, so they can do that manual -- in essence,
9  manual work so the PERS staff is not -- or I don't
10  have to go and try and dig that up.
11      Q   Do you report on the securities
12  litigations to PERS in any way?
13      A   I don't directly.  There is an update that
14  is provided to them, uh-huh.
15      Q   And who provides that update?
16      A   Well, I generally work it up with
17  assistance of the counsel about the status of
18  different cases.
19      Q   And is that information provided to the
20  board of PERS?
21      A   Yes.
22      Q   And you're representing PERS?
23      A   That's right.
24          MS. BRETAN:  Okay.  I'm going to mark as
25  Exhibit 29 a PERS of Mississippi mid-cap growth

---

GEORGE W. NEVILLE  30(b)(6)                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**193**

1   fiduciary review, parts one and two, for Artisan
2   Partners Limited Partnership.
3          (Exhibit 29 was marked for
4          identification by the court reporter.)
5   BY MS. BRETAN:
6      Q   Have you seen this document before,
7   Mr. Neville?
8      A   No.
9      Q   Do you know what it is?
10     A   No.
11     Q   Okay.  Were you aware that Mississippi
12  PERS has its investment managers provide information
13  in this fiduciary -- this type of fiduciary review?
14     A   No.
15     Q   And turning to the second page, this is
16  Bates-labeled 11839 through 11840.  Turning to part
17  three of the review, it says, "Political
18  Contributions"; do you see that?
19     A   Uh-huh.
20     Q   And it asks Artisan Partners to provide a
21  copy of the current policy and procedures related to
22  monitoring and reporting campaign contributions; do
23  you see that?
24     A   Uh-huh.
25     Q   Why would PERS want a policy -- a copy of

---

**194**

1   the current policy and procedures related to
2   monitoring and reporting campaign contributions from
3   Artisan Partners?
4      A   I have no idea.
5      Q   And in response it looks like Artisan
6   Partners provides a "pay to play" policy?
7      A   I have no idea.
8      Q   Do you see that?  That's what it says.
9      A   I see that's what it says, but, I mean, I
10  think I've told you I don't know what this is.  I
11  didn't know.  I don't -- have never seen it, don't
12  know what it means, don't know nothing.
13     Q   Okay.  And part B under part three,
14  provision B, asks for Artisan Partners to "Provide a
15  list of any contributions made by Artisan, your firm
16  or any associate of your firm to any government
17  officials, including political candidates, PACs or
18  state or local parties in Mississippi"; do you see
19  that?
20     A   I -- you read it correctly.
21     Q   Do you have any idea why Mississippi
22  PERS --
23     A   No.
24     Q   -- in its fiduciary review --
25     A   No.

---

**195**

1      Q   -- would want to know about --
2      A   No.
3      Q   Let me finish my question.
4      A   Well, it's "No" for everything.
5      Q   That's fine.  Let me just finish my
6   question.  Any understanding of why Mississippi PERS
7   would, in its fiduciary review of Artisan Partners,
8   want to know about contributions made by Artisan
9   Partners or associates of Artisan Partners to
10  government officials, including political
11  candidates, PACs or state or local --
12     A   No.
13     Q   -- parties in Mississippi?
14     A   Don't have a clue.
15     Q   Why do you think?
16     A   I don't have an opinion.
17     Q   You have no opinion on why they might want
18  to know about political campaign contributions?
19     A   You've asked this about 15 different ways,
20  and the answer is no.  I don't have a clue.  I've
21  never seen this.  I've never talked to them.  I
22  didn't know it existed.  I don't know.  Ms. Tingle
23  is going to be testifying for you.  She works at
24  PERS.  Why don't you ask her?  You're going to
25  depose Mike Morrison.  Ask him.  You're asking

---

**196**

1   somebody who has told you 14 different ways I'm
2   unfamiliar with it, don't know what it is.  You
3   can't keep asking me questions about my
4   understanding of it for anything like that because I
5   don't know.
6      Q   Okay.  Mr. Neville, you're a fiduciary on
7   behalf of PERS, correct, in this --
8      A   Sure.
9      Q   -- litigation?  Correct?
10     A   I'm their counsel.
11     Q   And you're a fiduciary on behalf of the
12  class, correct?
13     A   Right.  That's right.
14     Q   And PERS, who you're representing -- it's
15  important to PERS, apparently, that its investment
16  managers fill out information in a fiduciary review,
17  correct?
18          MR. HARNES:  I'll object to that question.
19          THE WITNESS:  I don't know what this is
20  about.  It could be because the state treasurer is
21  on the board and they're elected.  It could be
22  because the governor is elected and he's got a
23  designee.  I don't know, but you've got some people
24  you can ask this, but I'm not the guy to be asking.
25  //

---

GEORGE W. NEVILLE  30(b)(6)                              April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

### 197

1  BY MS. BRETAN:
2      Q    Do you know whether the contracts with --
3  sorry.
4           Mississippi PERS has contracts with its
5  investment managers; is that correct, to your
6  understanding?
7      A    Yes.  I understand a 30(b)(6) -- you know,
8  I hate to be kind of being a jerk, but this is a
9  30(b)(6) notice.  We divided the responsibilities.
10  These questions are for Ms. Tingle, and you know
11  that.  So I don't understand why you keep asking me
12  questions that we have said she's handling.
13      Q    I just --
14      A    Investment advisors, how PERS operates and
15  how they buy stocks and sell stocks and how all that
16  stuff is delegated out and who gets hired as
17  investment advisor, she can tell you that stuff up
18  and -- she is very smart and very knowledgeable
19  about all of this, the day-to-day type things.  This
20  document I'm unfamiliar with.  I don't know.  Ask
21  her.
22      Q    Okay.  I'm just interested in,
23  Mr. Neville, whether you were aware as a fiduciary
24  on behalf of PERS --
25      A    I'm not aware.

### 198

1      Q    -- that PERS wanted to know about -- wants
2  to know about whether the investment managers with
3  whom it contracts have made political campaign
4  contributions to state officials or PACs.  That's
5  all I'm asking.
6           MR. HARNES:  I object to the form of the
7  question and the lack of foundation.
8           THE WITNESS:  I've told you, no, I don't
9  know.  You need to ask the right people.
10  BY MS. BRETAN:
11      Q    Has the Attorney General's office ever
12  discussed with PERS the Sunshine Act, House Bill
13  211, that we discussed earlier?
14      A    Jane Mapp, who is the counsel that works
15  over there every day, she may have.  I have not.
16      Q    And --
17      A    And --
18      Q    -- and so you're --
19      A    -- it's not Sunshine, House Bill 211,
20  because there's no sunshine.
21           MR. HARNES:  I was hoping we could get
22  past without you throwing that in.  That's all
23  right.
24  BY MS. BRETAN:
25      Q    So you're not aware -- you think Ms. Mapp

### 199

1  may have discussed House Bill 211 with ...
2      A    I don't know whether she did.  It's
3  attorney-client privilege.
4      Q    Is the Attorney General the counsel for
5  PERS with respect to House Bill 211?
6      A    It's counsel to PERS on everything unless
7  we have need of an outside counsel to help on a
8  matter where there's a bankruptcy issue or whether,
9  as I told you, they get sued because somebody wants
10  them to disgorge monies from when a company was
11  acquired.  Otherwise, we provide full counsel for
12  them.
13      Q    Is House Bill 211 the law now?
14      A    It was signed by the governor.
15      Q    And so does the retention agreement in
16  this case with the Chitwood firm -- would it pass
17  muster under that law?
18           MR. HARNES:  I'm going to object to that.
19  I mean, you can --
20           THE WITNESS:  Well, that's irrelevant.
21           MR. HARNES:  You can answer it if you want
22  to.
23           THE WITNESS:  It doesn't matter because
24  it's not -- it wasn't the law at the time it was
25  entered into.

### 200

1  BY MS. BRETAN:
2      Q    And it was effective in July of 2012?
3      A    July 1.
4      Q    Uh-huh.  And that's just shortly after
5  lead counsel was appointed in this case?
6           MR. HARNES:  Object to the form of the
7  question.
8           THE WITNESS:  I've got to go.  You
9  finished?
10           MS. BRETAN:  I'm done, but I think --
11           MR. MARTIN:  Five questions for you.  Do
12  you want to swap mics?
13           THE VIDEOGRAPHER:  Absolutely.  Do you
14  want to go off the record or stay on?
15           MR. MARTIN:  It's whatever --
16           THE VIDEOGRAPHER:  You can stay on if it's
17  just a quick change.
18           EXAMINATION
19  BY MR. MARTIN:
20      Q    Thank you, Mr. Neville.  I'll be quick.
21  My name is Robert Martin.  I represent Michael
22  Mendes.  Do you know who I'm referring to when ...?
23      A    It's my understanding, I think he was
24  president or chairman of the board or chief
25  executive officer.  I can't remember his exact

---

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

201

1    title.
2        Q   Did you, the Attorney General's office or
3    MPERS have any contact with Michael Mendes or any
4    communications with him?
5        A   Certainly not involved in this case, I
6    don't believe.  I mean, if I saw him at a social
7    gathering or something like that, I mean, I can't
8    tell you.
9        Q   But to your knowledge you're --
10       A   No.
11       Q   Are you aware of any documents between
12   you, MPERS or the Attorney General's office and
13   Mr. Mendes?
14       A   I can't imagine that there would be, no.
15       Q   So you're not aware of any?
16       A   I'm not aware of any, but I can't imagine
17   that there would be.
18       Q   Are you aware of any prior litigation
19   against Mr. Mendes by the Mississippi Attorney
20   General's office or MPERS?
21       A   No.
22       Q   Are you aware of any documents referring
23   to Mr. Mendes that were in your possession and the
24   possession of the AG's office or in the possession
25   of MPERS?

---

202

1        A   Not prior to us being approached about
2    doing the case.
3        Q   So would any such documents referring to
4    Mr. Mendes -- would those have been produced in
5    response to the RFP in response to Diamond's request
6    for production?
7        A   Well, they would be privileged because it
8    would be, you know, an analysis.
9        Q   Putting aside non-privileged or just --
10       A   Okay.
11       Q   Putting aside --
12       A   I can't --
13       Q   -- non-privileged documents, are you aware
14   of any documents that referred to Mr. Mendes or
15   related to Mr. Mendes?
16       A   I doubt that there would be anything like
17   that.
18       Q   Okay.  So to your knowledge there aren't
19   any?
20       A   Not to my knowledge.
21       MR. MARTIN:  Okay.  Thank you very much.
22       MS. BRETAN:  I have one more question for
23   you, Mr. Neville.  I apologize.  We'll make it
24   quick.
25       MR. HARNES:  You have to get back to your

---

203

1    hotel?
2        THE WITNESS:  Uh-huh.
3            RE-EXAMINATION
4    BY MS. BRETAN:
5        Q   I want to go back to -- let me mark one
6    more exhibit.
7        (Exhibit 30 was marked for
8        identification by the court reporter.)
9    BY MS. BRETAN:
10       Q   Exhibit 30.  Mr. Neville, Exhibit 30 is a
11   set of reports of receipts by Attorney General Hood
12   during the periods January 1st, 2010, through
13   December 31st, 2010, and I just want to ask you
14   about one item on here.  It's the last tab.
15       MS. BAFUS:  Second to the last.
16   BY MS. BRETAN:
17       Q   Second-to-the-last tab.  Do you see that
18   highlight?
19       A   Uh-huh.
20       Q   Can you tell me -- it looks like there was
21   a contribution refunded to Weight Watchers in
22   greater Mississippi of, I think, $2,000.  Is that --
23   do you see that?
24       MR. HARNES:  What page?  Oh.
25       MS. BRETAN:  It's the second-to- -- it's

---

204

1    the page, my eyesight, 23 of 26.
2        THE WITNESS:  I don't know whether it was
3    a -- it appears to me -- and I didn't prepare these
4    reports.  I haven't seen the reports, but it appears
5    to me that the Weight Watchers in greater
6    Mississippi made two different contributions, $1,000
7    apiece, one of them on April 25th, 2010, and the
8    second one on December 13th, 2010, and the
9    December 13th, 2010, contribution was refunded on
10   1/18.
11   BY MS. BRETAN:
12       Q   What -- any -- do you know why a
13   contribution would be refunded?
14       A   In this particular case I don't know, but
15   I can tell you that the state law on
16   contributions -- there's a statute maybe now not
17   effective because of the U.S. Supreme Court's ruling
18   in -- whatever it was, I can't remember about --
19   anyway, the $1,000 is the most a corporation can
20   give.  An individual is unlimited in Mississippi.
21   So my guess is that when he gave -- it says "Corp"
22   on the far -- the next-to-the-last column says,
23   "Corp, $1,000," and then there was a second
24   contribution.  I don't know what Charleston Place is
25   because that's not -- I don't know whether -- my

---

GEORGE W. NEVILLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.

April 3, 2013

---

**205**

1  guess is that there was two $1,000 contributions
2  made.  You can only have one per calendar year.  So
3  these January 1 through December 31 you can only --
4  a corporation can only cut a check for $1,000.
5      Q   Is there a contract with -- by the
6  Attorney General with Weight Watchers?
7      A   I don't know.  I know that we have a
8  program of -- a weight loss program for the state,
9  AG's employees with Weight Watchers, but I don't
10  know -- I guess there was a contract.  I don't know.
11  I had never -- fortunately, I'm not -- I don't need
12  their services, but if I keep eating like I've been
13  eating, I will.
14      MS. BRETAN:  There you go.  All right.
15  Thank you, Mr. Neville.
16      THE VIDEOGRAPHER:  Anything else from
17  anyone?  Okay.  I'll close out the depo.  Just give
18  me a minute.  This concludes tape number three and
19  the end of the videotaped deposition of 30(b)(6)
20  witness George Neville.  We're going off the record
21  on April 3, 2013, and the time is 1:39 p.m.
22      (TIME NOTED: 1:39 p.m.)
23
24
25

---

**207**

1      DEPOSITION ERRATA SHEET
2
3
4  Our Assignment No.  508275
5  Case Caption:  IN RE: DIAMOND FOODS, INC.
6  SECURITIES
7
8      DECLARATION UNDER PENALTY OF PERJURY
9  I declare under penalty of perjury that I have read the
10  entire transcript of my Deposition taken in the
11  captioned matter or the same has been read to me, and
12  the same is true and accurate, save and except for
13  changes and/or corrections, if any, as indicated by me
14  on the DEPOSITION ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17
18  Signed on the _____ day of _____, 20___.
19  _____
20      GEORGE W. NEVILLE
21
22
23
24
25

---

**206**

1      REPORTER'S CERTIFICATION
2
3      I, Catherine A. Ryan, Certified Shorthand
4  Reporter in and for the State of California, do
5  hereby certify:
6
7      That the foregoing witness was by me duly
8  sworn, that the deposition was then taken before me
9  at the time and place herein set forth; that the
10  testimony and proceedings were reported
11  stenographically by me and later transcribed into
12  typewriting under my direction; that the foregoing
13  is a true record of the testimony and proceedings
14  taken at that time.
15
16      IN WITNESS WHEREOF, I have subscribed my
17  name this _____day of
18  _____,_____.
19
20  Catherine A. Ryan
21
22
23  _____
24  Catherine A. Ryan, RMR, CRR, CSR No. 8239
25

---

**208**

1      DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25      GEORGE W. NEVILLE

---

GEORGE W. NEVILLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

209

1          DEPOSITION ERRATA SHEET
2     Page No._____Line No._____Change to:_____
3     _____
4     Reason for change:_____
5     Page No._____Line No._____Change to:_____
6     _____
7     Reason for change:_____
8     Page No._____Line No._____Change to:_____
9     _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25        GEORGE W. NEVILLE

GEORGE W. NEVILLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

Page 206

1                    REPORTER'S CERTIFICATION

2

3            I, Catherine A. Ryan, Certified Shorthand

4      Reporter in and for the State of California, do

5      hereby certify:

6

7            That the foregoing witness was by me duly

8      sworn, that the deposition was then taken before me

9      at the time and place herein set forth; that the

10     testimony and proceedings were reported

11     stenographically by me and later transcribed into

12     typewriting under my direction; that the foregoing

13     is a true record of the testimony and proceedings

14     taken at that time.

15

16            IN WITNESS WHEREOF, I have subscribed my

17     name this ___5___ day of

18     ___April___, 2013.

19

20

21                              _Catherine A. Ryan_

22

23     _____

24     Catherine A. Ryan, RMR, CRR, CSR No. 8239

25

# Exhibit 2

LORRIE SMITH TINGLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.

April 3, 2013



**1**

```
            UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
              SAN FRANCISCO DIVISION

IN RE DIAMOND FOODS, INC., )
SECURITIES LITIGATION      )
                           )
                           )CASE NO. 11-cv-05386-WHA
_____  )
                           )
This Document Relates to:  )
                           )
     All Actions.          )
_____  )

            30(b)(6) DEPOSITION OF
               LORRIE SMITH TINGLE

               April 3, 2013
                  2:17 p.m.

    Lieff, Cabraser, Heimann & Bernstein, LLP
         275 Battery Street, 29th Floor
         San Francisco, California 94111




    Catherine A. Ryan, RMR, CRR, CSR No. 8239
```

**3**

1  APPEARANCES (Continued)
2
3  For the Defendant Steven Neil:
4     HOGAN LOVELLS US LLP
   BY:  AVI DANIEL ROSENBLIT, ESQ.
5     3 Embarcadero Center, Suite 1500
   San Francisco, California 94111
6     415.374.2314
   415.374.2499 Fax
7     avi.rosenblit@hoganlovells.com
8
9
10
   Also Present:
11
   Videographer:
12
   NANCY KARP, ESQUIRE DEPOSITION SOLUTIONS
13
14
15
16
17
18
19
20
21
22
23
24
25

**2**

1
2
3  APPEARANCES OF COUNSEL
2
3  For the Lead Plaintiff Mississippi PERS:
4     CHITWOOD HARLEY HARNES
   BY:  JOHN F. HARNES, ESQ.
5     1350 Broadway, Suite 908
   New York, New York 10018
6     917.595.4600
   jfharnes@chitwoodlaw.com
7
   BY:  ZE'EVA KUSHNER BANKS, ESQ.
8     2300 Promenade II
   1230 Peachtree Street
9     Atlanta, Georgia 30309
   404.873.3900
10    404.876.4476 Fax
   zbanks@chitwoodlaw.com
11
12
13 For the Defendant Diamond Foods:
14    FENWICK & WEST, LLP
   BY:  JENNIFER C. BRETAN, ESQ.
15     MARIE BAFUS, ESQ.
   555 California Street, 12th Floor
16    San Francisco, California 94104
   415.875.2412 (Ms. Bretan)
17    415.875.2371 (Ms. Bafus)
   415.281.1350 Fax
18    jbretan@fenwick.com
   mbafus@fenwick.com
19
20 For the Defendant Michael Mendes:
21    SIDLEY AUSTIN, LLP
   BY:  ROBERT B. MARTIN, ESQ.
22    555 California Street
   San Francisco, California 94104
23    415.772.7443
   415.772.4000 Fax
24    rbmartin@sidley.com
25    //

**4**

1          INDEX OF EXAMINATION
2
3  WITNESS:  LORRIE SMITH TINGLE
4  EXAMINATION              PAGE
5  By Ms. Bretan            9
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LORRIE SMITH TINGLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.

April 3, 2013

**5**

INDEX TO EXHIBITS
Exhibit        Description                   Page

Exhibit 31 "Introduction"; Bates MSPERS 003328 -   31
MSPERS 003386

Exhibit 32 "BNY Mellon Security History        45
Transactions Consolidated 1/31/2009 -
6/30/2012"; Bates MSPERS 009182

Exhibit 33 "Public Employees' Retirement System   49
of Mississippi Investment Management
Agreement"; Bates MSPERS 003317 -
MSPERS 003327

Exhibit 34 "Artisan Partners Domestic Mid Cap   53
Growth Equity as of December 31,
2010"; Bates MSPERS 012270 - MSPERS
012273

Exhibit 35 Email series, "Subject: FW: Artisan   59
Reporting - ADV" and attachment; Bates
MSPERS 010175 - MSPERS 010316

Exhibit 36 "Public Employees' Retirement System   72
Board of Trustess, Tuesday, June 22,
2010, 1:00 P.M. Agenda"; Bates MSPERS
009384 - MSPERS 009416

Exhibit 37 "Public Employees' Retirement System   76
Board of Trustess, Tuesday, December
21, 2010, 1:00 P.M., Agenda"; Bates
MSPERS 009788 - MSPERS 009833

Exhibit 38 "Public Employees' Retirement System   80
Board of Trustees, Wednesday, April
27, 2001, 1:00 P.M., Agenda"; Bates
MSPERS 009372 - MSPERS 009383

Exhibit 39 Email dated August 15, 2011, "Subject:   83
Artisan Conference Call - August 16,
2011" and attachment; Bates MSPERS
010565 - MSPERS 010598

//

**7**

INDEX (Continued)
EXHIBITS

EXHIBIT            DESCRIPTION            PAGE
Exhibit 47 "Board of Trustees Minutes, Public   114
Employees' Retirement System, June 26,
2012, Page 1"; Bates MSPERS 008993 -
MSPERS 009029

Exhibit 48 "Investment Department Record        122
Retention Policy As of 1/1/2012";
Bates MSPERS 003718

**6**

INDEX (Continued)
EXHIBITS
EXHIBIT            DESCRIPTION            PAGE
Exhibit 40 Email dated October 11, 2011,      88
"Subject: Artisan
Reporting-Mississippi Employees'
Retirement MCG
(Pack_MissPERS_artmc235)" and
attachment; Bates MSPERS 011277 -
MSPERS 011302

Exhibit 41 Email dated October 17, 2011,      91
"Subject: Mississippi PERS Quarterly
Portfolio Manager Letter" and
attachment; Bates MSPERS 011843 -
MSPERS 0011849

Exhibit 42 Email dated December 09, 2011,      95
"Subject: Artisan
Reporting-Mississippi Employees'
Retirement MCG
(Pack_MissPERS_artmc235)"; and
attachment; Bates MSPERS 011303 -
MSPERS 011325

Exhibit 43 "Annual Report Public Employees'      99
Retirement System of Mississippi - MCG
Performance Summary As of December 31,
2011"; Bates MSPERS 011326 - MSPERS
011330

Exhibit 44 Email dated January 17, 2012,      101
"Subject: Mississippi PERS Quarterly
Portfolio Manager Letter" and
attachment; Bates MSPERS 011850 -
MSPERS 011856

Exhibit 45 "Public Employees' Retirement System   105
Board of Trustees, Tuesday, February
28, 2012, 1:00 P.M., Agenda"; Bates
MSPERS 008620 - MSPERS 008723

Exhibit 46 "Public Employees' Retirement System   108
Board of Trustees, Tuesday, April 24,
2012, 1:00 P.M., Agenda"; Bates MSPERS
008764 - MSPERS 008945

**8**

DEPOSITION OF LORRIE SMITH TINGLE

April 3, 2013

THE VIDEOGRAPHER:  Good afternoon.  We are on the record.  This is tape number one in the videotaped deposition of Lorrie Tingle, In Re Diamond Foods, Inc. Securities Litigation.  Excuse me.  Being heard before the United States District Court, Northern District of California, San Francisco Division.  Case number is CV-11-05386-WHA. This deposition is being held at the law offices of Lieff Cabraser, 275 Battery Street in San Francisco, California.  Today's date is April 3, 2013, and the time on the record is 2:17 p.m.  My name is Nancy Karp, and I'm the videographer with Esquire.  The court reporter is Catherine Ryan.

Counsel, will you please introduce yourselves and affiliations and the witness will be sworn.

MS. BRETAN:  Jennifer Bretan on behalf of Defendant Diamond Foods.

MS. BAFUS:  Marie Bafus from Fenwick & West on behalf of Defendant Diamond Foods.

MR. MARTIN:  Robert Martin of Sidley Austin on behalf of Defendant Michael Mendes.

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

9

1        MR. ROSENBLIT:  Ari Rosenblit on behalf of
2    Steven Neil, from Hogan Lovells.
3        MS. BANKS:  Ze'eva Kushner Banks from
4    Chitwood Harley Harnes on behalf of Lead Plaintiff.
5        MR. HARNES:  John Harnes from Chitwood
6    Harley on behalf of Mississippi PERS.
7        THE VIDEOGRAPHER:  Thank you.  Would you
8    swear the witness, please.
9            LORRIE SMITH TINGLE,
10   having been administered an oath, was examined and
11   testified as follows:
12       THE VIDEOGRAPHER:  Please proceed,
13   Counsel.
14           EXAMINATION
15   BY MS. BRETAN:
16   Q    Good afternoon, Ms. Tingle.  Could you
17   state your full name for the record and address?
18   A    Yes, it's Lorrie Smith Tingle, 1919
19   McRaven Road, Clinton, Mississippi.
20   Q    And, Ms. Tingle, I'm with Fenwick & West,
21   and I'm counsel for Diamond Foods, who is a
22   defendant in this action.  My name is Jennifer
23   Bretan.
24       I wanted to ask you whether you had ever
25   been deposed before.  Have you?

---

10

1    A    Yes, I have.
2    Q    And how many times have you been deposed?
3    A    This should make the 12th time.
4    Q    What types of cases have you been deposed
5    in?
6    A    Various securities litigation cases.
7    Q    And are those cases where PERS was a
8    plaintiff?
9    A    Yes.
10   Q    And you mentioned securities litigation.
11   Are those -- are those cases where you've been
12   deposed cases where PERS was lead plaintiff?
13   A    In some cases lead plaintiff predominantly
14   and then other cases co-lead plaintiff.
15   Q    Okay.  I'm going to show you what's been
16   marked as Exhibit 1.
17   A    Are they here?
18   Q    It's right in front of you there.
19   A    Okay.
20   Q    Yeah.  Sorry.  Okay.  Exhibit 1 is a
21   "Notice of Deposition of Lead Plaintiff Mississippi
22   PERS Pursuant to Federal Rules of Civil Procedure
23   26 and 30(b)(6)."  This case is pending in the
24   District Court for the Northern District of
25   California.  Ms. Tingle, do you understand you're

---

11

1    testifying here in connection with a lawsuit filed
2    against Diamond Foods?
3    A    Yes, I do.
4    Q    And do you understand you're testifying as
5    the person most knowledgeable with respect to
6    certain topics?
7    A    Yes.
8    Q    And which topics are those in the notice
9    of deposition, if you could identify them?
10   A    It would be two and possibly three and
11   four and eight.
12   Q    What about topic one, the --
13   A    Oh, I'm sorry, yes.
14   Q    And topic one.  And topic one asks for
15   "The identities and duties of persons and entities
16   with responsibility for determining, making or
17   approving the investments by Lead Plaintiff during
18   the period June 5th, 2010, to June 8, 2012"; is that
19   right?
20   A    Yes.
21   Q    And are you the person most knowledgeable
22   at PERS with respect to those investments?
23   A    Yes.
24   Q    Okay.  At -- I just want to go through
25   some general rules of depositions for the record.

---

12

1    You understand you're under oath today?
2    A    Yes.
3    Q    And that anything you say today, it's as
4    if you were in court and you're testifying in front
5    of a jury; do you understand that?
6    A    Yes, I do.
7    Q    Do you understand that you need to testify
8    truthfully?
9    A    Yes.
10   Q    And the reporter is going to transcribe
11   everything that's said today; do you understand
12   that?
13   A    Yes, I do.
14   Q    If you don't understand one of my
15   questions, please say so, okay?
16   A    I will.
17   Q    All right.  Otherwise, I'm going to assume
18   that you understood my question if you don't tell me
19   otherwise.  Do you understand that?
20   A    Yes.
21   Q    It's also important today for the
22   deposition that you answer audibly.  That means no
23   sort of shaking of the head or nodding, but -- you
24   know, so that the reporter can transcribe your
25   answer.  Do you understand that?

---

LORRIE SMITH TINGLE  30(b)(6)                                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**13**

1    A  Yes, I do.
2    Q  It's also important that we don't talk
3  over each other.  I'll do my best not to do that to
4  you, and, similarly, if you let me finish a question
5  before you answer, that would be best.  Do you
6  understand that?
7    A  Yes.
8    Q  Okay.  Now, I'm -- today I'm entitled to
9  your best recollection.  I'm not asking for you to
10  guess about things, but for your best recollection.
11  If later on in the deposition you remember something
12  or additional information that you think clarifies
13  one of your answers, please just let me know that.
14    A  I will.
15    Q  Okay.  If you think there are documents
16  that would help you in your testimony today, please
17  feel free to let me know that.  We are able to take
18  breaks today, but just not while a question is
19  pending.  So if I've asked you a question, that's
20  not the time to take a break.
21    A  I understand.
22    Q  Are you represented here today?
23    A  Yes.
24    Q  So I understand your counsel from the
25  Chitwood firm is here today.

---

**14**

1    A  Correct.
2    Q  And if you -- do you understand that even
3  if counsel objects, they're doing that to preserve
4  their objection for the record; that doesn't mean
5  you don't answer the question --
6    A  Yes.
7    Q  -- unless instructed not to answer?
8      MR. HARNES:  I'm going to object to that
9  instruction.  I will instruct the witness whether or
10  not to answer the question.
11  BY MS. BRETAN:
12    Q  Okay.  And, most importantly, you need to
13  answer my question.  You may have feelings about
14  some of the things we're going to discuss and
15  certain points you want to make, and if you're
16  called as a witness by your counsel, you'll have the
17  opportunity to make those points, but the purpose of
18  today's deposition is to allow me a chance to ask
19  you some questions, and so it's important that you
20  limit your answers to the questions I asked, okay?
21    A  All right.
22      MR. HARNES:  I'm going to object to that
23  instruction as well to the suggestion that this
24  witness should not answer -- give any facts that she
25  feels necessary to give a complete answer to the

---

**15**

1  question.
2  BY MS. BRETAN:
3    Q  Is there any reason you're not able to
4  testify truthfully today?
5    A  No, there's not.
6    Q  Not on any medications?
7    A  No.
8    Q  Okay.  Did you do anything to prepare for
9  this deposition?
10    A  Met with counsel briefly last week.
11    Q  And how long did you meet with counsel?
12    A  Approximately an hour.
13    Q  And other than your counsel, did you speak
14  with anybody about this deposition?
15    A  No.
16    Q  Did you review any documents in
17  preparation for your deposition?
18    A  Yes.  I looked over transactions that we
19  supplied counsel and a list of the cases that I've
20  given depositions for.
21    Q  Did any of those documents refresh your
22  recollection regarding this matter?
23    A  The transactions helped me recall which
24  managers were involved in this case.
25    Q  Okay.  And so that was a list of

---

**16**

1  transactions in Diamond Foods?
2    A  Yes.
3    Q  And have those -- if you know, do you know
4  if those transactions have been produced -- those
5  documents have been produced in this matter?
6    A  We submitted them to our counsel, and I
7  don't know whether you've gotten a copy of buys and
8  sells.  I assume so.
9    Q  Did you talk about those documents with
10  anyone other than your counsel?
11    A  No.
12    Q  Is there correspondence, emails, texts,
13  messages, phone conversations with anyone about this
14  deposition other than your counsel?
15    A  No.
16    Q  Have you been told to keep all of your
17  documents related to this case?
18    A  Yes.
19    Q  And when were you told that?
20    A  We received a memo on February -- February
21  of 2012.  I don't know the exact date.
22    Q  And have you kept all of your documents
23  related to this case?
24    A  Yes.
25    Q  All correspondence and email; have you

---

LORRIE SMITH TINGLE  30(b)(6)                                      April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**17**

1    kept those?
2    A    Yes.
3    Q    Are there any documents you had that
4    related to this case at one point, but no longer
5    have?
6    A    Not to my knowledge.
7    Q    Okay.  Just briefly, I'd like to go
8    through your educational and professional
9    background.  Did you attend college?
10   A    Yes, I did.
11   Q    And where was that?
12   A    University of Alabama.
13   Q    And did you -- when did you graduate?
14   A    1981.
15   Q    You received your degree?
16   A    Yes, I did.
17   Q    What kind of degree was that?
18   A    It was a bachelor of science.
19   Q    And what was the major or minor?
20   A    Geology.
21   Q    Do you have any graduate degrees?
22   A    I have a MBA from Mississippi College.
23   Q    And when did you get that?
24   A    1994.
25   Q    Any professional degrees?

---

**18**

1    A    I'm a Chartered Financial Analyst.
2    Q    And, Ms. Tingle, who do you -- for whom do
3    you work currently?
4    A    The Public Employees' Retirement System of
5    Mississippi.
6    Q    And how long have you been in that
7    position?
8    A    How long have I worked for PERS?  Since
9    August 1991.
10   Q    And what's your current title?
11   A    Chief investment officer.
12   Q    And how long have you been chief
13   investment officer?
14   A    Since June of 1996.
15   Q    And to whom do you report?
16   A    Pat Robertson, the executive director.
17   Q    And what are her responsibilities?
18   A    The executive director is responsible
19   for -- basically she's the head of the agency; so
20   she's responsible for all the activities of -- of
21   the agency, which includes the benefit payments, the
22   counseling of our participants in the retirement
23   system, the investment program, the legal issues,
24   every -- she's -- she's the head of the agency.  So
25   she's ultimately responsible for all actions of the

---

**19**

1    agency.
2    Q    Do you have any direct reports?
3    A    Yes, I do.
4    Q    And who are they?
5    A    Elaine Kyzer is my administrative
6    assistant, Charles Nielsen, George Dahduh, which is,
7    D-a-h-d-u-h, and Jim Feazell, F-e-a-z-e-l-l.
8    They're all portfolio managers responsible for a
9    recite of different areas of the portfolio.
10   Q    And what are your responsibilities as
11   chief investment officer for PERS?
12   A    I am responsible for oversight of the --
13   and management of the investment portfolio for PERS
14   and the other systems that are included under the
15   PERS umbrella.  So that basically is the -- the
16   function that reports to the board with regards to
17   any investment activities, to hiring and firing of
18   our external managers, the asset allocation
19   decisions, oversight of our -- any ancillary
20   programs related to the investment program.  We also
21   oversee the investments for the deferred
22   compensation plan.
23   Q    You said you started with PERS in June of
24   1996, I believe?
25   A    Right.

---

**20**

1    Q    And how long -- when did you become the
2    chief investment officer?
3    A    That was in June of 1996.  I started in
4    August of 1991.
5    Q    Oh, sorry.
6    A    That's okay.
7    Q    June of '96, okay.  And what was your role
8    before you became chief investment officer?
9    A    I was a senior investment analyst.  So it
10   was a support position.  Basically at that time the
11   staff consisted of three people in the whole
12   investment department.  So my job principally was
13   interacting with our external investment managers
14   and overseeing their activities.
15   Q    And are you involved with the decisions of
16   which investment managers to use?
17   A    Yes.
18   Q    Are you the primary contact with the
19   investment managers?
20   A    I am the principal contact for PERS, yes;
21   however, my -- the staff members that were mentioned
22   earlier each have oversight responsibility for
23   certain parts of the portfolio.  So they do daily or
24   quarterly interaction with the managers that they're
25   responsible for.

---

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**21**

1    Q    What is PERS?
2    A    PERS is a defined benefit plan.  It's a
3    401A plan under the IRS regulations.  So it is -- as
4    a defined benefit plan, it provides retirement
5    benefits for the participants that include state
6    employees, the teachers, municipalities, cities and
7    counties.  So it's all the entities that are a part
8    of our public -- any public employee for the state
9    of Mississippi.
10   Q    Okay.  Is that called a pension fund; is
11   that --
12   A    Yes, it is.
13   Q    All right.  And is there a board that
14   oversees PERS?
15   A    Yes.
16   Q    And is that board elected or appointed?
17   A    It is a combination of both, actually.
18   It's a ten-member board.  Eight of the members are
19   elected by various constituencies within the
20   retirement system, participant groups.  The state
21   treasurer is an ex-officio member by virtue of that
22   position, and then the governor has one appointee.
23   Q    How often does the board of PERS meet?
24   A    Their official board meetings are every
25   other month.

---

**22**

1    Q    And do you attend those meetings?
2    A    Yes.
3    Q    Who else attends from PERS?
4    A    The executive director.
5    Q    Is that Ms. Robertson?
6    A    Yes, it is.  All of the executive staff.
7    So all the other division directors and heads of
8    other departments and then the executive director's
9    administrative assistant takes minutes.  So she's
10   there.  Our attorney, in-house counsel, attends.
11   Q    And who is that?
12   A    Jane Mapp.
13   Q    And so Ms. Mapp is in-house counsel for
14   PERS?
15   A    Correct.
16   Q    And so she works for PERS?
17   A    She is assigned to PERS.  She actually
18   works for the Attorney General's office, but she's
19   assigned to PERS.
20   Q    And she usually attends the board
21   meetings?
22   A    Yes, she does.
23   Q    Okay.  What about Mr. Neville from the
24   AG's office; do you know him?
25   A    I do know him.

---

**23**

1    Q    Does he attend the meetings?
2    A    No.
3    Q    Is the board of PERS responsible for
4    setting the investment strategy?
5    A    Yes.
6    Q    And also responsible for oversight of
7    PERS?
8    A    Yes.
9    Q    What is PERS' strategy for investments,
10   broadly?
11   A    Broadly, yes, our -- our objective is to
12   ensure that adequate assets are available to cover
13   the liabilities, the benefit payments over time.  So
14   the primary objective -- that is the primary
15   objective, is to ensure that assets are available to
16   make -- to make sure that they cover all the benefit
17   payments over time.  So that really boils down to
18   achieving a set rate of return that's projected into
19   the future to meet our liabilities.
20   Q    And what's that rate of return?
21   A    8 percent.
22   Q    So this strategy of PERS for investments
23   is to achieve an 8 percent return on the investment?
24   A    It is to prudently and efficiently -- it
25   is -- the trust fund dollars belong to the

---

**24**

1    participants.  So it's -- clearly as fiduciaries
2    they have a duty to invest prudently, but the
3    long-term goal -- the return objective is 8 percent.
4    Q    How does the board hear about investments
5    by PERS?  Does the board hear about investments by
6    PERS?
7    A    They don't necessarily hear about
8    individual -- individual securities.  They focus
9    much more on -- at a high level on asset classes.
10   So they -- they are really much more interested in
11   hearing about the outcome of the entire portfolio as
12   opposed to really getting granular with the
13   individual investments.
14   Q    Does the board make the specific
15   investment decisions for PERS?
16   A    The board sets the asset allocation and
17   the board hires and fires investment managers who
18   are charged with managing parts of the portfolio
19   that achieve that asset allocation.
20   Q    Does PERS do any of its own research
21   concerning investments?
22   A    PERS does research on asset allocation
23   decisions, not on individual securities, if that's
24   your question.
25   Q    So PERS wasn't going out and researching

---

LORRIE SMITH TINGLE  30(b)(6)                                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

25

1   Diamond, for example?
2       A   That's correct.
3       Q   Who decided to make the investment in
4   Diamond?
5       A   The individual portfolio -- or individual
6   portfolio managers or teams for the various
7   investment management firms that we've retained that
8   actually invested in Diamond.
9       Q   So those are the investment managers?
10      A   Yes.
11      Q   And who was that investment -- if you
12  know, who was the investment manager with respect to
13  the transactions in Diamond stock?
14      A   To the best of my recollection, Wellington
15  Management, Artisan Partners and Acadian, I believe.
16      Q   So Artisan Partners, for example, would
17  have made the decision of whether to buy or sell
18  Diamond stock?
19      A   That is correct.
20      Q   Do you understand that PERS is lead
21  plaintiff in this case?
22      A   Yes.
23      Q   Do you know how it is that PERS became
24  lead plaintiff in this case?
25      A   That decision was made by the state

---

26

1   Attorney General.
2       Q   So the AG brings suit on behalf of PERS?
3       A   That's correct.
4       Q   And is the AG -- so is the AG essentially
5   acting as a fiduciary on behalf of PERS with respect
6   to the suit?
7           MR. HARNES:  I'm going to object to this
8   line of questioning.  I don't think it's encompassed
9   anywhere within the topics for which Ms. Tingle has
10  been proffered, but I'm not going to tell her not to
11  answer the question, but it's your -- it's your
12  time.
13          THE WITNESS:  Can you repeat the question?
14  BY MS. BRETAN:
15      Q   So is the AG acting essentially -- when it
16  brings suit on behalf of PERS, is the AG acting in a
17  fiduciary capacity with respect to PERS?
18      A   The Attorney General is acting as the
19  legal representative for all state agencies in the
20  capacity to make this decision.  Whether or not he's
21  acting as a fiduciary, I can't comment on.
22      Q   Do you know who the counsel are in this
23  action?
24      A   Representing us or --
25      Q   (Nods head.)

---

27

1       A   It's the folks from Chitwood.
2       Q   Anyone else?
3       A   Not to my knowledge.
4       Q   Do you know what a monitoring agreement
5   is?
6       A   I'm sorry?
7       Q   The monitoring agreement?
8       A   You'll have to give me more than that.
9   That's lots of things.
10      Q   Are you aware that the Attorney General's
11  office has monitoring agreements with law firms with
12  respect to the securities held by PERS?
13      A   Yes.
14      Q   Do you know how many agreements the AG's
15  office has, monitoring agreements?
16      A   10 or 11.
17      Q   How do you know about the monitoring
18  agreements?
19      A   We have confidentiality agreements with
20  all of those firms because of the -- because they
21  have access to our trading data.
22      Q   Do you know if the Attorney General's
23  office has a monitoring agreement with the counsel
24  -- the Chitwood firm in this action?
25      A   Yes, they do.

---

28

1       Q   Is the information that is given to the
2   monitoring firms public information or is it
3   confidential?
4       A   The information that's given to them in
5   what respect?
6       Q   Is the trading information -- is the
7   trading information of PERS public information?
8       A   Yes.
9       Q   So it's available to anyone?
10      A   Upon request, yes.
11      Q   What kind of request would that be?
12      A   Our website has a public records request
13  format or form and instructions, and you can request
14  any information you want.  That's a state law.
15      Q   Earlier you mentioned that there's a
16  confidentiality agreement with the monitoring firms;
17  is that correct?
18      A   Yes.
19      Q   So what is -- what's -- what's
20  confidential -- what's being protected that's
21  confidential, what information?
22      A   Any information that we -- that we give
23  them, we would prefer that it only be used with
24  respect to, I suppose, whatever the purpose that
25  they're being retained is, rather than just -- just

---

LORRIE SMITH TINGLE  30(b)(6)                              April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**29**

1  making access to our information.  As I said,
2  there's a formal process for requesting information.
3  The firms have ongoing access to our custodial bank
4  information.  That's not something that we would
5  grant just anybody, that they could tap into our
6  ongoing realtime information.  So -- so it's really
7  to facilitate their confidentiality of -- of any
8  information that we give them on a realtime basis.
9      Q    You mentioned that there's a public
10  records request provision.
11     A    Yes.
12     Q    So -- so if someone came to Mississippi
13  PERS and asked for -- put in a request under that
14  provision for the trading records, how long,
15  approximately, would it take to get that
16  information?
17     A    It depends on -- and the request -- the
18  law is fairly specific.  If it's -- if you came and
19  asked for every trade for Apple stock and we don't
20  have an existing report that only includes that
21  information, then we might have to provide you
22  hundreds of pages of monthly reports or whatever.
23  So the Public Records Act has a 14-day window that
24  we have to meet -- or we have to supply information
25  that's requested through the official channels.  We

---

**30**

1  would do our best to get you that information, but
2  if you -- if you ask for something that there wasn't
3  such a thing in existence that we'd have to
4  create -- we don't actually have to create reports.
5  We only have to give you information that's actually
6  in existence before the report.  So if you said, "I
7  only want to see transactions on this stock," and
8  there isn't such a thing, we don't have to create
9  something, but we would have to send you every
10  manager report with Apple in it for whatever time
11  frame you're asking for.
12     Q    Is there any -- is there any information
13  publicly available about PERS holdings on a given
14  day?  Like, if I wanted to look today to find out
15  what are the holdings of that currently and
16  historically in PERS --
17     A    Yes.
18     Q    -- would I be able to do that?
19     A    No.  You could ask for a month-end report
20  because that's the only time we actually get
21  hard-copy reports, is at month end.  So if you asked
22  as of a month end, then we could supply you with
23  that information.  We don't receive interim reports.
24  We have access to it online from our custodial bank,
25  but we don't actually receive physical copies until

---

**31**

1  month end.
2      Q    And the information available from the --
3  what is the custodial bank?  Sorry.  What is the
4  custodial bank?
5      A    That's okay.  The custodial bank is the
6  bank that settles all of our trades and keeps our
7  accounting books.
8      Q    And what is that bank?
9      A    Bank of New York Mellon.
10     Q    Okay.  And is the information you've
11  talked about having access to at the custodial
12  bank -- is that the same information that the
13  monitoring firms -- the firms with monitoring
14  agreements get?
15     A    Yes.
16     Q    But that's not publicly available
17  information?
18     A    That is correct.
19     Q    Other than -- well, is it ever -- would
20  that information be available to anyone, that access
21  to the custodial bank through the public records
22  request?
23     A    No.
24         (Exhibit 31 was marked for
25         identification by the court reporter.)

---

**32**

1  BY MS. BRETAN:
2      Q    We've marked as Exhibit 31 a document
3  produced in this action Bates-labeled 3328 to, it
4  looks like, 3386.  Do you recognize this document --
5      A    Yes.
6      Q    -- Ms. Tingle?
7      A    Excuse me.  Yes.
8      Q    And what is it?
9      A    It is the standard operating procedures
10  manual for the investment department of PERS.
11     Q    And if you turn to page 2, it says, "This
12  manual was revised August 2010"; is that right?
13     A    That's what it says.
14     Q    So I know produced to us in this -- I'll
15  represent to you that produced to us in this action
16  was another manual dated with a revision date of
17  November 2011.  Do you know if there were interim
18  changes to the manual or is that the next revision?
19     A    No, that would have been the next
20  revision.
21     Q    Okay.  And is this the manual that governs
22  PERS' investments?
23     A    Yes.
24     Q    Okay.  And so this would have been the
25  operative manual with respect to investments up to

---

LORRIE SMITH TINGLE  30(b)(6)
IN RE: DIAMOND FOODS, INC.

April 3, 2013

**33**

1  that next revision in November 2011; is that right?
2      A   That's correct.
3      Q   Okay.  And then turning to page 4, it sets
4  out PERS' investment division, and it says it's
5  composed of a chief investment officer -- is that
6  you?
7      A   Yes.
8      Q   -- and portfolio managers and
9  administrative assistant; is that right?
10     A   Yes.
11     Q   And in the last sentence of that second
12  paragraph there it says, "This position --" the
13  chief -- it talks about chief investment officer
14  duties and goes on to say, "This position oversees
15  and is the primary contact at PERS for all external
16  investment managers"; do you see that?
17     A   Yes.
18     Q   Is that correct?
19     A   Yes, it is.
20     Q   And so, for example, in -- with respect to
21  Diamond, if Artisan Partners is the investment
22  manager, you would have been the primary contact?
23     A   Yes.
24     Q   Okay.  And turning to page 13, page 13
25  sets out equity investment policies.  Is this --

**34**

1  these are the policies that would apply to something
2  like buying shares of Diamond; is that right?
3      A   Yes.
4      Q   Okay.  And the final sentence there, it
5  says, "Equity investments shall be made with a view
6  towards achieving a total rate of return, market
7  appreciation, plus dividend income higher than
8  obtainable in fixed-income investments"; is that
9  correct?
10     A   Yes.
11     Q   And is that -- when we were talking
12  earlier about the 8 percent, is that -- is that what
13  this is, this relates to?
14     A   Yeah, to some degree.  I mean, if you're
15  -- you're taking more risk with equity investments
16  than you are theoretically with fixed-income
17  investments.  So the -- the expectation is that you
18  would -- there would be greater return for the
19  additional risk taken.
20     Q   And when it says the "Total rate of
21  return" here in parentheses, it talks about market
22  appreciation.  What's that?
23     A   That is a stock going up.
24     Q   Okay.  And it says, "Plus Dividend
25  Income."

**35**

1      A   Right.
2      Q   And what's that?
3      A   That is the income that is paid out by
4  companies in the form of dividends.
5      Q   So is the gain on effectively the -- the
6  return on the investment as both the stock --
7      A   If a --
8      Q   -- appreciation and the dividend?
9      A   That is correct.
10     Q   Okay.  Turning to page -- sorry -- 26.
11  This is a proxy voting policy.  So if I'm reading
12  this right -- you can tell me -- so does the board
13  -- PERS give out -- hand over voting on proxies to
14  its investment managers?
15     A   Yes.
16     Q   And -- and so the decisions related to
17  voting those proxies, it's just in the investment
18  manager's discretion?
19     A   That is correct.
20     Q   Okay.  On page 27 this reads, "The
21  review of outside investment managers."  So is this
22  -- and it has a list of what looks like -- well, why
23  don't you tell me.  What are -- what is reflected
24  here on page 27?
25     A   It's an outline of basically the -- the

**36**

1  procedures that are used by my staff as far as
2  monitoring their assigned investment managers, and
3  we -- staff receives copies of trades from most of
4  the managers, not all, but most of the managers on a
5  daily basis at the end of the day after all trading
6  has been completed, and they're looking at those
7  trades to make sure that investment guidelines have
8  not been breached.
9           The guidelines are based on the statutes
10  or the policies that have been set for each
11  individual managers.  So it's a very high-level
12  review of the daily trading activity.  The month-end
13  statements and -- of holdings and transactions are
14  reviewed both by my investment staff and by the
15  investment accountants.  Again, it's for compliance
16  purposes.  It's to really know what's happening in
17  the -- within the portfolios, changes that managers
18  are making, not so much with individual names, but
19  more with sector exposure and the ways that they are
20  positioning the portfolios.  The quarterly reports
21  are produced -- in this case, Mercer Investments,
22  our former consultants, they provide quarterly
23  performance reports for the -- each individual
24  portfolio within the PERS -- the larger PERS
25  portfolio and then at the total portfolio level.

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**37**

1    So staff is responsible for keeping up
2    with the performance of their individual managers.
3    They are -- they have quarterly conference calls
4    with the portfolio teams to get an update on any
5    strategy changes or repositioning of the portfolio
6    that might have taken place or that's anticipated to
7    take place going forward.  We receive monthly
8    compliance reports from our custodial bank.  They've
9    downloaded all the investment guidelines that are
10   included in the investment management agreement.  So
11   any violations are -- the reports are produced and
12   staff is responsible for monitoring that, and let's
13   see --
14       Q    And then there are annual reports by the
15   investment managers?
16       A    Yes, the -- each manager comes in to
17   report to the board -- the investment committee of
18   the board once a year with the exception of the --
19   the index fund managers, and we don't bring those
20   in.
21       Q    Okay.  So when you -- when your staff or
22   you look at -- do you look at the daily transactions
23   as -- typically?
24       A    I don't, but my staff does.
25       Q    But those are executed transactions that

---

**38**

1    they're looking at?
2        A    That's correct, yes.
3        Q    And so the investment manager is charged,
4    effectively, with making those decisions to buy or
5    sell or they have the discretion to do that?
6        A    That is correct.
7        Q    Okay.  Just turning the page, page 28 is a
8    watch list or termination guidelines.  So what
9    factors would -- in my understanding of this -- tell
10   me if -- you can correct me -- that this is sort of
11   a set of factors for putting investment managers who
12   aren't performing on sort of notice or something
13   like that?
14       A    (Witness nods head.)
15       Q    So what are the factors that would place
16   an investment manager on -- on a watch list for
17   PERS?
18       MR. HARNES:  Object to the form of the
19   question except for the last sentence.
20       THE WITNESS:  Well, there are a couple of
21   factors, and -- well, actually, there are several.
22   They're bulleted here.  If there's a violation of
23   the investment guidelines, if a manager is changing
24   their -- their investment strategy, investment
25   style, if a key person in the portfolio -- in the

---

**39**

1    management of the portfolio leaves, occasionally if
2    there is a change of ownership of the firm, that
3    could cause a manager to put it on a watch list, if
4    there's some sort of litigation going on with the
5    firm that might really pull the portfolio team away
6    from their -- their main duties to us of managing
7    the portfolio or if there is some sort of conflict
8    of interest or something that's not disclosed to us,
9    that could result in a firm being put on a watch
10   list or terminated.  Out of that group, the primary
11   one that we -- we see most often is if there's a
12   turnover on the portfolio team, we will put a firm
13   on watch until the situation -- we have enough
14   evidence that it's not going to have an impact on
15   performance going forward.
16       There are some other measures.  Each
17   manager is charged with an index
18   that they're assigned as well as a peer group of
19   other funds that are managing the same type
20   strategy.  If a portfolio underperforms either or
21   both of those for a -- it's a -- it's kind of
22   complicated.  It's four consecutive rolling
23   three-year periods.  Then they're automatically put
24   on a watch list, and this was -- this is the
25   procedure that the board uses to formally notify

---

**40**

1    managers that "There is displeasure with your
2    performance" and that there could be subsequent
3    action taken.
4    BY MS. BRETAN:
5        Q    So -- so with respect to -- I guess what's
6    written here is quantitative factors.  There's an
7    expectation that there should be out-performance of
8    an index; is that --
9        A    That is correct.
10       Q    Okay.  What -- by how much?  Does it vary
11   for each investment manager?
12       A    It does.  It's generally -- and it's in --
13   it's all of this with 99 percent of our managers is
14   captured in their investment management agreement in
15   one of the exhibits, but generally it's anywhere --
16   and it does vary with strategy, fixed-income
17   managers.  It's generally 50 to 75 basis points over
18   an index.  Other equity managers, it could be
19   anywhere from 100 to 300 basis points over an index.
20       Q    And what does that mean, being over by a
21   100?
22       A    Outperforming -- outperforming by 1 to
23   3 percent of a -- of an index fund.  So we're paying
24   them to actively manage the portfolio, and they
25   should outperform by that much.

---

LORRIE SMITH TINGLE  30(b)(6)                                      April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**41**

1    Q    Just jumping up to the back -- the top of
2   the list, you mentioned that the final bullet point
3   under the qualitative factors has to do with failing
4   -- conflicts of interest, right?
5    A   Uh-huh.
6    Q    So what -- what kind of information is it
7   that needs to be disclosed with respect to potential
8   conflicts of interest?
9    A   You know, I don't know that we've ever had
10  anything that would fall into that category.  I
11  suppose if there were some instance where ...  I
12  don't know.  I can't think of an example at the
13  moment.  But if a -- if an investment manager was on
14  a board of a company or their spouse was on the
15  board of a company and they're -- suddenly we're a
16  big investor of that company, that could potentially
17  be a concern for us.  We've never had an instance of
18  this, but that's just the first thought that comes
19  to mind.
20   Q    The -- I think in ...  We'll just go on.
21        Why don't you just, if you don't mind,
22  take a look at Exhibit -- what's been marked as
23  Exhibit 4.  It should be right in front of you
24  there.  Exhibit 4 was a declaration submitted in
25  support of the motion by PERS to be appointed lead

---

**42**

1   plaintiff; do you see that?
2    A   Yes.
3    Q    And attached to -- to the declaration as
4   Exhibit A was a certification from Mr. Neville; do
5   you see that?
6    A   Yes.
7    Q    Are you familiar with this document?
8    A   No.
9    Q    Have you seen it before?
10   A   No.
11   Q    Mr. Neville's certification attaches a
12  schedule A, if you turn a couple pages there; do you
13  see that?
14   A   Yes.
15   Q    Are you familiar with this schedule A?
16   A   No.
17   Q    Do you know where Mr. Neville would have
18  gotten this information?
19   A   We supplied the buy and sell information
20  to Chitwood -- the Chitwood firm; so I don't know
21  where Mr. Neville got it, but I would assume he got
22  it from the Chitwood firm.
23   Q    And I think you said earlier that Chitwood
24  was the monitoring firm; so they would have had
25  access to that buy and sell information through the

---

**43**

1   custodial bank; is that right?
2    A   Yes.
3    Q    And then turning to Exhibit B, there's a
4   -- what looks to be a loss calculation for Diamond
5   Foods; do you see that?
6    A   Yes.
7    Q    Are you familiar with this document?
8    A   No.
9    Q    Did -- you didn't help prepare this
10  document?
11   A   No.
12   Q    Do you happen to know, Ms. Tingle, if
13  there were dividends associated with the investment
14  in Diamond Foods by PERS?
15   A   I don't know.
16   Q    You don't know.  If there were dividends
17  associated with the investment by Diamond Foods,
18  would that be part of a gain on the investment?
19   A   That would be income.  It wouldn't be
20  investment gain or loss.
21   Q    So earlier we were talking about the -- in
22  Exhibit 31 that equity investments are made with a
23  view towards achieving a total rate of return --
24   A   Yes.
25   Q    -- based on market appreciation plus

---

**44**

1   dividend income.
2    A   Yes.
3    Q    So in terms of the return on the
4   investment, that's both the stock appreciation and
5   the dividend?
6    A   Yes.
7    Q    But that's different --
8    A   For total return, yes.
9    Q    Okay.  Is that different than a gain on
10  the investment?
11   A   From an accounting perspective.  That's --
12  that's an accounting perspective, and the
13  performance calculation is not necessarily the same
14  as an accounting categorization.  Income and --
15  investment gains and losses and income together make
16  the performance -- the total return, the return
17  calculation.
18   Q    Okay.  Should -- if you're calculating
19  losses on the investment by -- in Diamond Foods by
20  PERS, would you include the income that had been
21  received in dividends?
22   A   Normally we would not, but I don't -- the
23  calculations that are done for cases like this are
24  beyond my -- my role in this; so I don't have
25  anything to do with how this is calculated.

---

LORRIE SMITH TINGLE  30(b)(6)                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

45

1         MS. BRETAN:  Okay.  Let's go to
2  Exhibit 32.
3         (Exhibit 32 was marked for
4         identification by the court reporter.)
5  BY MS. BRETAN:
6    Q    Exhibit 32 is Bates-labeled 9 -- MSPERS
7  9182 and appears to be security transactions from
8  January 31st, 2009, to June 30th, 2012, related to
9  Artisan Partners; is that right?
10   A    Yes.
11   Q    Are you familiar with this document?
12   A    Actually, it's the first time I've seen
13  it, but I'm familiar with the format.
14   Q    Do you know what the class period is in
15  this case?
16   A    Not right offhand.
17   Q    I'll represent to you that the class
18  period is October 5th, 2010, through February 8th,
19  2012, as set out in the consolidated complaint.  Are
20  all the transactions listed here by PERS in Diamond
21  stock in that period?
22   A    Are you asking me are these all the
23  transactions?
24   Q    No.  I'm saying:  Are all the transactions
25  in Diamond by PERS listed here in that period that

---

46

1  we just discussed?
2    A    Yes, they should be.
3    Q    All right.  And up at the top it says
4  "Artisan Partners"; do you see that?
5    A    Yes.
6    Q    Is that because Artisan Partners would
7  have been the investment manager responsible for all
8  of these transactions?
9    A    Yes.
10   Q    Okay.  How did Artisan become an
11  investment manager for PERS?
12   A    Artisan manages a mid-cap growth
13  portfolio; so they were selected from a group of
14  three candidates that were brought to the board of
15  trustees for consideration for this mandate.
16   Q    And what are the guidelines that were used
17  in selecting Artisan?
18   A    Our typical -- well, we -- are you asking
19  about the process that's used?
20   Q    Well, let me ask you this:  Is historical
21  performance by Artisan Partners part of the -- one
22  of the factors that would lead PERS to contract with
23  Artisan as an investment manager?
24   A    Yes, that is one of the factors.
25   Q    And what about consistent out-performance

---

47

1  of the market; would that be one of the factors?
2    A    Consistent out-performance of the mid-cap
3  growth index, yes.
4    Q    Okay.  And part of what PERS would have
5  looked at in selecting Artisan, would that have been
6  Artisan's strategy for making investments?
7    A    Yes.
8    Q    If you look at the transactions listed
9  here on Exhibit -- sorry -- 32, it looks like on the
10  left-hand side there there are some buys and -- B --
11  codes B and S.  And are those buys and sells, to
12  your knowledge?
13   A    Yes.
14   Q    Okay.  And so looking at the first string
15  of buys, I guess, are June 3rd, 2011, to about --
16  let's go up to August 19th, 2011.  Do you know what
17  Artisan would have been relying on -- what
18  information they would have been relying on in
19  making those trades -- purchases?
20   A    I do not.
21   Q    And continuing on, it looks like there are
22  a couple of purchases in September of 2011,
23  September 27th and 28th of 2011.  Do you know what
24  Artisan would have been relying on in making those
25  purchases, what information?

---

48

1    A    No.
2    Q    Okay.  And it looks like Artisan sold on
3  September 30th; do you see that, 2011?
4    A    Yes.
5    Q    Do you know what they would have been
6  relying on in selling on that date?
7    A    Artisan had -- when they came in for their
8  annual presentation to the board, there was -- there
9  was a statement in their presentation to the board
10  that there had been some -- some issues with the
11  financial statements for Diamond Foods.  So they
12  moved out of the position.
13   Q    And when was that annual presentation?
14   A    I'm sorry.  It was in 2011, but I don't
15  know when.
16   Q    Are they generally the same period every
17  year?
18   A    It's the same -- yeah, but we've switched
19  because as we've added additional managers, we've
20  had to move things around -- move different groups
21  around because we only have six meetings a year.  So
22  I don't know exactly the month.
23   Q    Would that presentation have been after
24  these -- this trade, though?
25   A    Yes, I believe it would be.

---

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

49

1    Q   So you don't know specifically what
2  Artisan would have been -- Artisan Partners would
3  have been relying on in selling on September 30th?
4    A   I do not.
5    Q   Okay.  What about -- there are a series of
6  three buys right after that on October 6th, 2011,
7  18th and 21st of October 2011; do you see that?
8    A   I do.
9    Q   Do you know what Artisan would have been
10 relying on when they made those purchases?
11   A   I do not.
12   Q   Okay.  And then continuing on, it looks
13 like from November 11th through November 16th,
14 2011 -- it looks like Artisan sells all of its
15 holdings in Diamond; is that correct?
16   A   Yes.
17   Q   And do you know what they would have been
18 relying on in making those sales?
19   A   I do not.
20   MS. BRETAN:  Okay.  Let's go to
21 Exhibit 33.
22   (Exhibit 33 was marked for
23   identification by the court reporter.)
24 BY MS. BRETAN:
25   Q   Do you recognize this document?

---

50

1    A   I do.
2    Q   And what is it?
3    A   It's the investment management agreement
4  between PERS of Mississippi and Artisan Partners.
5    Q   And is this the operative agreement that
6  governs the relationship between PERS and Artisan
7  right now?
8    A   Yes.
9    Q   And it looks like it was entered on
10 September 11th, 2002.  You were at PERS at the time
11 of -- of this agreement?
12   A   Yes.
13   Q   And were you involved with entering into
14 this agreement with Artisan?
15   A   Yes.
16   Q   Okay.  Turning to page 6, which is
17 addendum one to the agreement, can you tell me what
18 this addendum is?
19   A   Yes, this outlines the performance
20 expectations that we establish with all of our
21 managers, and in this case it's between -- it's the
22 performance expectations set forth for Artisan.  So
23 it basically captures what we'll be measured --
24 measuring them against, which index, what the
25 expectation is for their performance, which, in this

---

51

1  case, is 200 basis point net of fees over their
2  index and then the level of risk that we measure by
3  standard deviation which is acceptable in order to
4  achieve that return.
5    Q   And provision A there says, "Consistent
6  above median performance."
7    A   Oh, I'm sorry.
8    Q   That's okay.  What does that mean?
9    A   As I mentioned earlier in the discussion,
10 when we talked about the watch list, each manager
11 has a peer group, a group of like managers in our --
12 that our investment consultant maintains a universe
13 of information on, and so they are expected to be
14 above median.
15   Q   So above the middle of the pack --
16   A   Yes.
17   Q   -- of their peers; is that right?
18   A   Yes.
19   Q   And part B is about exceeding the Russell
20 mid-cap growth index by 200 basis points.  So that's
21 2 percent --
22   A   Correct.
23   Q   -- above?
24   Okay.  Are you happy with Artisan's
25 performance on behalf of PERS?

---

52

1    A   Yes.
2    Q   Have they beat the market pretty
3  consistently?
4    A   They have.
5    Q   And how is it that Artisan is able to do
6  that, achieve those results?
7    A   They do a very good job of stock selection
8  and rotating sectors within the mid-cap space, and
9  they are very good at getting in and getting out of
10 stocks at the right time.
11   Q   And turning to the back of Exhibit 33, it
12 looks like a letter to you dated May 29th, 2007; do
13 you see that?
14   A   Yes.
15   Q   Is this part of the agreement with
16 Artisan?
17   A   It's not part of the agreement, but it's
18 in the contract file because it's -- it actually is
19 a document that's a change or request for a change
20 that was made.
21   Q   In the second-to-last paragraph of the
22 letter the first sentence notes that "At Artisan we
23 are keenly focused on providing the most value
24 possible for our clients over the long term"; do you
25 see that?

---

LORRIE SMITH TINGLE  30(b)(6)                             April 3, 2013
IN RE: DIAMOND FOODS, INC.

## 53

1    A   Yes.
2    Q   Is that part of -- that value, is that
3  part of what Artisan provides to PERS, investments
4  that provide value?
5    A   They -- yes.  What -- what they -- my
6  understanding of this sentence or interpretation of
7  this sentence would be that for what they are paid,
8  they will provide us or they strive to provide us
9  with the performance that meets the expectations
10  that we've set for them.
11    Q   Okay.  And then turning back a page, the
12  last paragraph there, it says -- we'll leave it.
13       So I'm going to mark as Exhibit 34 a
14  document Bates-labeled MSPERS 12270 through 12273.
15       (Exhibit 34 was marked for
16       identification by the court reporter.)
17  BY MS. BRETAN:
18    Q   Ms. Tingle, do you recognize this
19  document?
20    A   Yes.
21    Q   What is it?
22    A   This is a document that my staff produces
23  for -- we do -- when managers come in to make their
24  annual presentations before our board, they come in
25  -- we usually try to bring all of the mid-cap and

## 54

1  small-cap managers in at one time.  So staff
2  provides an overview of each firm, basically, to
3  remind our board members who's coming in, what it is
4  they do for us, and so this is really just a summary
5  that was provided in -- my guess would be that this
6  was for our December 10th, 2010, investment
7  committee meeting, and this was the staff
8  introduction section that was provided for Artisan
9  Partners.
10    Q   Are these key comments by your staff or
11  are they comments taken from Artisan's information?
12    A   It's probably a combination.  Staff
13  actually puts this together, but they do -- they do
14  pull information from the quarterly reports or from
15  information that Artisan provides them.
16    Q   In the first key comment it says that "The
17  team, led by Andrew Stephens, seeks to build a
18  portfolio of mid-cap companies with accelerated
19  earnings and reasonable valuations and hopes to
20  identify these companies through bottom-up
21  research"; do you see that?
22    A   Yes.
23    Q   What is bottom-up research?
24    A   Bottom-up research is doing actual
25  company-focused research as opposed to -- there's

## 55

1  bottom up and there's top down, and top down is
2  generally looking at various sectors within the
3  equity market, telecoms, financials, industrials,
4  that sort of thing.  So bottom-up research is more
5  individual stock, individual company research as
6  opposed to high-level -- deciding we're going to
7  have -- we're going to overweigh our telecom
8  exposure.
9    Q   So is that bottom-up research -- that's
10  research that Artisan Partners would be doing?
11    A   That is correct.
12    Q   And that's research that would let them
13  identify investments where there were reasonable
14  valuations?
15    A   Based on their research, yes.
16    Q   What's a reasonable valuation?
17    A   Artisan is -- seeks to not pay more than
18  their research shows that a company is worth.
19    Q   So is one of the things that PERS looks to
20  Artisan to do to ferret out or search out
21  investments that will have value, essentially, that
22  are undervalued in some way?
23    A   To -- to some extent.  Artisan is not a --
24  what's called a value manager.  They are looking for
25  companies that are -- there are two types of

## 56

1  investments.  Value investments are mispriced by the
2  market.  They're inexpensive, and you're hoping that
3  at some point the market recognizes that value and
4  those -- and a price is -- a reasonable price is
5  realized.  Growth companies really are focused more
6  on growing the business.  So your appreciation comes
7  from -- not from the market necessarily recognizing
8  something that's undervalued, but for the company
9  expanding, the company continuing to build on itself
10  and to grow, and the market recognizes that along
11  the way.
12       Artisan is a growth -- a growth manager.
13  They do -- they are sensitive, though, to
14  valuations; so they will -- they prefer not to pay
15  more than they think is a reasonable price for that
16  potential growth.
17    Q   And that's based on the research that they
18  do with respect to the individual companies?
19    A   Yes.
20    Q   In looking at -- at Exhibit 34, do you --
21  can you tell me if you -- how much of MPERS' assets
22  are invested with Artisan?
23    A   How much are invested right now or --
24    Q   At the time of this document?
25    A   -- at this time?

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

57

1    Q   Yeah.
2    A   2010.  The mid-cap portfolios are
3  generally about -- about 7 percent of the total
4  equity.  Equity -- I would say probably maybe a
5  couple of percent of the whole portfolio.  Maybe
6  1 percent or less.
7    Q   In rough numbers how much, ballpark?
8    A   The total portfolio in 2010 was
9  19 billion; so they were managing 730 million at the
10  time.  So --
11   Q   Oh, for MPERS?
12   A   Yes, for MPERS.
13   Q   I see.  Okay.  And then just turning back
14  to the agreement with Artisan, which is Exhibit 33,
15  do you have that?
16   A   Uh-huh.
17   Q   So addendum two to that agreement, which
18  is Bates -- there was a Bates number at the bottom
19  there, 3323.
20   A   Right.
21   Q   Do you see that?
22   A   Right.
23   Q   And it notes there are a number of --
24  47 percent on all assets.  Is that the fee that
25  Artisan receives with respect to that 700 --

58

1    A   Yes.
2    Q   -- okay -- $730 million?
3    A   Yes.
4    Q   And is that an annual fee?
5    A   Yes.
6    Q   So they get 40 -- .47 percent of whatever
7  the annual --
8    A   Yes.
9    Q   Okay.  And so that's a -- is that a -- is
10  that a fee number consistent or are there investment
11  managers that have better fees, lower fees?  How
12  does that work?
13   A   We are pretty fee sensitive.  So this
14  would not be -- we occasionally will hire a manager
15  who has higher fees than the median in this group,
16  but it's a pretty rare occurrence.  So Artisan -- my
17  recollection is Artisan is probably -- that's
18  probably middle of the pack.  Our overall fees are
19  consistently lower than our peer group.  So my guess
20  is this is -- this is an average fee for this sort
21  of mandate.
22   Q   But it's about -- I'm terrible at math,
23  but ballparking --
24   A   That's okay.
25   Q   -- so it's a few million dollars a year in

59

1  fees --
2    A   Yes.
3    Q   -- to Artisan?
4    A   Yes.
5        MS. BRETAN:  Let's go to Exhibit 35.
6        (Exhibit 35 was marked for
7        identification by the court reporter.)
8  BY MS. BRETAN:
9    Q   Do you recognize this document,
10  Ms. Tingle?
11   A   Yes.
12   Q   What is it?
13   A   This is Artisan's 2011 ADV form.
14   Q   What is that, "ADV form"?
15   A   It is a disclosure that's made by
16  registered investment firms to the SEC.
17   Q   Then turning to, oh, what's Bates-labeled
18  10237 on the bottom, it says page 20, but I think
19  there are more than 20 pages ahead of it.
20   A   Yeah.
21   Q   We'll see what -- I'm guessing if you
22  start at 10218, it looks like there's a brochure
23  from Artisan Partners Limited Partnership; do you
24  see that?  10218.
25   A   Yes.

60

1    Q   And that's dated March 18th, 2011?
2    A   Yes.
3    Q   So what is -- what is this part of the
4  ADV?
5    A   It's another part of the -- the filing
6  that is done for the SEC.
7    Q   Okay.  Now, turning to page 20 of that
8  document --
9    A   Okay.
10   Q   -- Bates 10237, down at the bottom there
11  it talks about U.S. mid-cap growth strategy; do you
12  see that?
13   A   Yes.
14   Q   Okay.  And is this an overview of what --
15  what -- what's set out here in this U.S. mid-cap
16  growth strategy section, from your understanding?
17  Is this what -- let me rephrase.
18       Is this basically an overview of what --
19  what Artisan offers?
20   A   Yes.
21   Q   And turning to the next page, 10238, one
22  of the -- one of the things listed under "Security
23  Selection" is "Attractive Valuations"; do you see
24  that?
25   A   Yes.

61

1    Q   It goes on to say that "Through its own
2  fundamental research, Artisan estimates the amount a
3  buyer would pay to buy the entire company, the
4  company's intrinsic value or private market value
5  and considers whether to purchase a stock if it
6  sells at a discount to that estimate"; do you see
7  that?
8    A   Yes.
9    Q   Is the fundamental research referred --
10  referenced here that sort of bottoms-up research
11  that we talked about earlier?
12    A   Yes.
13    Q   And in terms of the private market value,
14  what is that, your understanding?
15    A   My understanding is that is what a company
16  would sell for if it was being sold in its entirety
17  or if it was being purchased in its entirety.
18    Q   And that's an estimate Artisan makes based
19  on its research?
20    A   Yes.
21    Q   Okay.  Is -- and then is -- it looks like
22  what they say here is that they consider whether to
23  make a purchase based on whether the -- the stock is
24  trading at a discount to that sort of estimated
25  value.

62

1    A   That's correct.
2    Q   And that's your understanding of what --
3  one of the things Artisan provides to PERS?
4    A   Yes.
5    Q   Okay.  Turning to -- just, actually, on
6  the same page it says, "The second element of the
7  investment process is capital allocation"; do you
8  see that?
9    A   Yes.
10    Q   And under "Garden" do you know which
11  allocation Diamond would fall into on these?
12    A   I don't.  They generally began investing
13  in companies in a garden position.  So they'll take
14  a very small position, which they literally grow
15  over time.  So as the -- depending on the success of
16  their initial investment and based on their
17  research, they'll add to positions that they feel
18  are going to grow.  So at some point I would assume
19  that Diamond began in the garden position.  Where it
20  ended up, I don't know.
21    Q   Okay.  And under the garden description it
22  talks about companies that Artisan believes have a
23  good franchise, attractive valuation and so on; do
24  you see that?
25    A   Yes.

63

1    Q   And so that attractive valuation, is that
2  -- is that, you know, things that are selling at a
3  discount to that private market value estimate that
4  -- that we talked about earlier?
5    A   That would be my understanding, yes.
6    Q   And turning to page 35, the first full
7  paragraph there -- I think it's Bates-labeled
8  10252 -- it says that "Artisan tries to identify
9  legal actions as a result of which a client may have
10  a claim in connection with portfolio securities held
11  or previously held by the client"; do you see that?
12    A   Yes.
13    Q   And did Artisan do that with respect to
14  Diamond?
15    A   No.
16    Q   We're going to turn to what's been marked
17  as Exhibit 29.  It should be in front of you there.
18    Oh, sorry.
19    Q   There you go.
20    A   Yes.
21    Q   Ms. Tingle, do you recognize this
22  document?
23    A   Yes.
24    Q   And what is it?
25    A   This is a copy of the fiduciary review

64

1  that we request from our managers annually.  This is
2  the 2011 fiduciary review submitted by Artisan
3  Partners.
4    Q   And what's the purpose of the fiduciary
5  review?
6    A   It's really twofold.  We send this out to
7  -- to get an idea about our commission recapture
8  program and how our managers are -- are using that
9  and directing commissions on our behalf or not, and
10  if they aren't, then they are required to give us a
11  reason why, and then the second part is to disclose
12  any relationship that any of our investment managers
13  might have with our investment consulting firm.  We
14  do this for conflict of interest purposes so that we
15  know which of our managers are paying or not paying
16  our -- our investment consulting firm.
17    And then the third part, the political
18  contribution section has to do with government
19  disclosing contributions made to government
20  officials within Mississippi, and this is primarily
21  focused on our state treasurer, who sits on our
22  board and has a part in the investment decisions,
23  but since the board does see this, it has been
24  expanded to include all political candidates.
25    Q   And is this required of all investment

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

65

1    management firms --
2        A   Yes.
3        Q   -- for PERS?
4        A   Yes.
5        Q   And all contractors with PERS?
6        A   No.  This -- this is sent out by the
7    investment department, and it's -- it is strictly
8    for our investment managers.
9        Q   Do you know if there's a similar document
10   that the Attorney General uses with its law firms or
11   contractors?
12       A   I have no knowledge of what the Attorney
13   General's office does.
14       Q   So looking at part three, it asks whether
15   there is a current policy for monitoring and
16   reporting campaign contributions, and so what
17   information is -- is PERS looking for in that
18   regard?
19       A   We're actually just looking for any policy
20   or procedure that firms have to know what their
21   individual employees might be doing so that we don't
22   get a response that says we have no knowledge that
23   anybody is giving any money to anybody.  There's
24   actually -- our concern is that that would -- that
25   might be the comment that we would get, and so we

---

66

1    have asked for policies if there are internal
2    policies, and most firms now do have policies to
3    monitor or to have their employees report any
4    campaign contributions that are made outside of
5    their own local district or whatever, but we have a
6    policy -- the board has a policy that they will not
7    solicit campaign contributions, and since the state
8    treasurer is on our board, there have been some
9    instances in the past where that was a problem.  So
10   this is our way to monitor, "Are you giving money to
11   any of our board members?"
12       Q   And is the concern that having received
13   campaign contributions, the board would then give
14   contracts to -- preferential contracts to certain
15   firms?
16       A   That is generally what "pay to play"
17   implies, yes.
18       Q   And, in fact, here Artisan attaches a "pay
19   to play" policy -- or references a "pay to play"
20   policy effective March 1st, 2011.  That wasn't
21   attached to this document that was produced.  Do you
22   have a copy of that "pay to play" policy?
23       A   I would think that we would in our files,
24   but if it wasn't attached, then it's possible that
25   it hasn't -- that it has not -- that it has become

---

67

1    unattached at some point since 2011.  I don't have
2    any knowledge personally.  They would have attached
3    it at the time.  So ...
4        Q   What is "pay to play"?
5        A   "Pay to play" is giving campaign
6    contributions or other compensation or any kind of
7    benefit in return for the expectation or the actual
8    awarding of -- of something of benefit, whether it's
9    a contract or whatever the case may be.
10       Q   So -- so with respect to the investment
11   managers, I think what you said was you thought
12   Artisan was -- several -- a contract for several
13   million dollars; is that right?
14       A   Yes.
15       Q   So the concern would be if Artisan was
16   making campaign contributions and then awarded a
17   contract for several million dollars, that would be
18   a conflict, an issue?
19       A   It doesn't necessarily mean that there is
20   a conflict, but there's certainly the -- there could
21   certainly be the potential for conflict of that
22   nature, yes.
23       Q   In looking at part B under "Political
24   Contributions," it asks for a list of any
25   contributions by Artisan or its associates to

---

68

1    government officials, including political
2    candidates, PACs or state or local parties in
3    Mississippi; do you see that?
4        A   Yes.
5        Q   And why does PERS want that information?
6        A   Again, this is a document that is put out
7    or sent out by my department.  As I said, our state
8    treasurer is a member of our board.  So they're the
9    only elected -- state-wide elected official.  So
10   it's a very broad policy so that we know -- the
11   state treasurer would be included in this, but
12   wouldn't be singled out.  So it's written in this
13   way so that we cover a broad net of political
14   candidates.  The PACs and the state and local
15   parties are because those are indirect ways to get
16   money to individual candidates.
17       Q   Okay.  And do you know if similar
18   information is sought from outside counsel by the
19   Attorney General when it hires outside counsel on
20   behalf of PERS?
21       A   I have no knowledge of what the Attorney
22   General's office does.
23       Q   Do you think that the Attorney General
24   should ask for that information before it awards
25   contracts?

---

LORRIE SMITH TINGLE  30(b)(6)                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

69

1          MR. HARNES:  I'm going to object to this
2  -- to that line of questioning.  This is an
3  investment officer here testifying as to
4  transactions that Mississippi affected.  I'm not
5  going to advise her not to -- let you go on and on
6  about this.  You know, her opinion as to what the
7  Attorney General's office should do is beyond
8  anything that this witness is here to testify to,
9  but you can go ahead and answer.
10  BY MS. BRETAN:
11      Q    You can answer.
12      A    Can you repeat the question?  Sorry.
13      Q    Do you think the Attorney General -- let's
14  go back.
15          My understanding is that the Attorney
16  General, with respect to litigation, is acting on
17  behalf of PERS; is that correct?
18      A    That's correct, yes.
19      Q    And is doing that with respect to this
20  litigation, correct?
21      A    That is correct.
22      Q    So do you think that the Attorney General,
23  before determining what counsel it will propose for
24  a securities litigation, should seek similar types
25  of information regarding political campaign

---

70

1  contributions or donations to PACs?
2      A    Should they ask for the disclosure of
3  that?  In my opinion, I don't think that's
4  necessary.  I think that information is, to some
5  degree, available on our Secretary of State's
6  website.
7      Q    And that would be true of donations to the
8  treasurer, who is the board member of PERS as well?
9      A    It would be true.  This saves us the --
10  saves us the trouble of having to go through those
11  reports, and it also gives our managers -- it shines
12  a light on where our managers are potentially giving
13  campaign contributions.  So ...
14      Q    Sunshine?
15      A    Sunshine, yeah, sure.
16      Q    And if you were to have found that there
17  were substantial donations by a new investment
18  manager to an elected official that sits on PERS'
19  board, would that affect the decision whether to go
20  ahead with that contract?
21      A    It would -- I guess, first of all, we
22  wouldn't really find out about it before the fact
23  because this is only sent out to existing managers.
24  It would merit the issue to be brought to the
25  chairman of the board of trustees' attention and

---

71

1  then brought to the full board's attention, and the
2  board would take action as they felt appropriate.
3  If the manager is doing what they're supposed to do,
4  that's my primary concern.  It is a board policy
5  that contributions are not solicited by board
6  members.  So the board may or may not take any
7  action, but it definitely would cause me to have a
8  conversation with the investment manager.
9      Q    What kind of conversation?
10      A    It would be a conversation to discourage
11  that from any future -- they get solicitations and
12  they are pressured, can be -- can feel pressured to
13  make contributions, and we send them a copy of the
14  board of trustees' procedures manual that says that
15  the trustees are not supposed to solicit, and they
16  are generally more than happy to throw those
17  contribution requests in the trash.
18      Q    And is the concern that there had -- if
19  there were significant campaign contributions and a
20  contract was awarded to an invest manager, would the
21  concern be, I guess, what's called here "pay to
22  play"?  That there had been a quid pro quo?
23      A    Yes, there is -- there is that.  It
24  certainly could potentially, although the state
25  treasurer is only one of ten board members, but it

---

72

1  certainly could give the impression to the general
2  public that there was something -- there was some
3  impropriety.
4      Q    And is the -- is the -- is the Attorney
5  General an elected position, to your knowledge?
6      A    Yes.
7          MS. BRETAN:  I'm going to mark as Exhibit
8  -- I think it's Exhibit 36.
9          (Exhibit 36 was marked for
10          identification by the court reporter.)
11  BY MS. BRETAN:
12      Q    Ms. Tingle, do you recognize this
13  document?
14      A    Yes.  These are -- the first is the agenda
15  from the board of trustees meeting June 22nd, 2010,
16  and the following pages are the minutes from that
17  meeting.
18      Q    And we talked earlier about board
19  meetings.  Is this one of those board meetings for
20  the trustees of PERS that you would have attended?
21      A    Yes.
22      Q    Turning to page, I guess, 29 of the
23  minutes and Bates number 9413, it looks like there's
24  a litigation report there; is that correct?
25      A    That is correct.

---

LORRIE SMITH TINGLE  30(b)(6)                                       April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

73

1    Q    And is this standard for the minutes of
2  the board of PERS?
3    A    Yes.
4    Q    And it notes that there was a -- that
5  "Special Assistant Attorney General Jane Mapp,
6  currently representing the Attorney General at the
7  Department of Corrections, has been selected by PERS
8  staff to fill the PERS position"; do you see that?
9    A    Yes.
10   Q    And what's the PERS position?
11   A    That's in-house counsel for PERS.  Our
12 previous Attorney General -- they call him Special
13 Assistant Attorney General -- assigned to PERS was
14 retiring, Margo Bowers, and so Jane Mapp was
15 selected from a field of one proposed to us by the
16 Attorney General for a replacement.
17   Q    And I -- I -- just to confirm, Mr. Neville
18 doesn't generally -- from the Attorney General's
19 office doesn't generally attend these meetings?
20   A    No, he does not.
21   Q    The litigation report, first paragraph
22 here, goes on to say that "Ms. Robertson noted that
23 a meeting of the National Association of Public
24 Pension Attorneys is being held in North Carolina
25 and that the Attorney General felt it would be

---

74

1  beneficial for Ms. Mapp and the PERS attorney
2  representatives to attend"; do you see that?
3    A    Yes.
4    Q    Who are the PERS attorney representatives?
5    A    That would have been Margo Bowers and --
6  who retired shortly after that meeting, and we also
7  had a woman named Denise Mounger, who actually was
8  the policy advisor to the executive director at the
9  time.  She had at one time been our -- worked for
10 the Attorney General's office and been assigned to
11 PERS, and that was in the late '80s, early '90s.
12 She then became a PERS employee and was a deputy
13 director there over the benefit side of -- of
14 things, and she worked as the policy advisor for the
15 executive director.  She was an attorney by
16 training.  So she attended this meeting every year.
17   Q    Do you know what the National Association
18 of Public Pension Attorneys is?
19   A    Yes, it's -- it's an organization of
20 counsel representing -- well, in-house counsel
21 representing pension plans such as PERS.
22   Q    Are outside counsel participants in that
23 organization or just in-house?
24   A    I'm not a member of the organization.  I
25 do believe that there are probably law firms and --

---

75

1  law firms outside of the public service realm
2  represented as well as probably other service
3  providers.  I know these national organizations --
4  for example, two of the national retirement
5  organizations consist of trustees and staff from the
6  pension plans as well as investment managers,
7  custodial bank service providers, in general.
8  So ...
9    Q    Okay.  It goes on -- the litigation report
10 goes on to say that "Ms. Robertson," I guess, "in
11 the absence of Ms. Bowers," or is it Mr. Bowers?
12   A    "Ms."
13   Q    "Ms. Bowers gave a summary of cases and
14 actions since the last board meeting," and then it
15 goes on to list information about a number of cases
16 there; do you see that?
17   A    Yes.
18   Q    And then at the bottom of the list it says
19 "Securities Litigations" and just has, I guess,
20 names of securities litigations?
21   A    Yes.
22   Q    Is there more information than this
23 provided to the PERS board about securities
24 litigations?
25   A    No, this is the report.  This is actually

---

76

1  -- to my knowledge, this is -- occasionally there
2  might be a one- or two-sentence update on the cases,
3  but that's basically all that's -- and it's really
4  just kind of where things are as far as the process
5  goes.  It's not details about the case.  It's
6  whether a motion has been filed.  It's that kind of
7  thing, procedural.
8    Q    But this is just a list, not any details
9  on cases?
10   A    That's --
11        MR. HARNES:  Objection.  Asked and
12 answered.
13        THE WITNESS:  Yes.
14        MS. BRETAN:  Exhibit 37.
15        (Exhibit 37 was marked for
16        identification by the court reporter.)
17 BY MS. BRETAN:
18   Q    Do you recognize this document?
19   A    Yes, this is -- the first page is the
20 agenda from the December 21st, 2010, meeting of the
21 board of trustees, and then the subsequent pages are
22 the minutes from that meeting.
23   Q    And if you turn to page, I guess, 14 of
24 the minutes, Bates label 9802, that's another
25 litigation report like the one we saw previously?

---

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**77**

1    A   Yes, it is.
2    Q   And Ms. Mapp would have presented the
3  status of the cases listed here; is that right?
4    A   Yes.  I'm sorry.  Yes, that is true.
5    Q   And at the bottom there's the list
6  of securities litigation; do you see that?
7    A   Yes.
8    Q   Do you know if the board was provided any
9  more information than what's in the list with
10 respect to the individual securities litigations?
11   A   No.  As I said before, if there is any
12 additional information, it's where -- where things
13 are from a procedural nature.  It's not specifics
14 about the case.
15   Q   Okay.
16       MR. HARNES:  I think, rather than asking
17 her what Ms. Mapp would have stated, you should
18 probably show the witness the entire minutes as to
19 what's reflected was stated.  That's, I guess, an
20 objection to form.
21 BY MS. BRETAN:
22   Q   Did Ms. Mapp present -- were you in
23 attendance at this meeting; do you recall?
24   A   Yes, I was.
25       MR. HARNES:  Well, I think you should --

---

**78**

1  my only point is you should direct the witness's
2  attention to the entire summary of what Ms. Mapp
3  said, and there's something said on the next
4  sentence.
5       MS. BRETAN:  Well, I'm going to get there
6  John, please.
7       MR. HARNES:  Fine.  Well, I think it's
8  misleading to ask a question giving half a document
9  and ask the witness to remember what occurred
10 two-and-a-half years ago and not show her all the
11 document.
12 BY MS. BRETAN:
13   Q   At the bottom of the list of securities
14 litigation cases it says that -- why don't you go
15 ahead and read that two sentences there on page 15
16 of the minutes, "In accordance with the request"?
17   A   Oh, okay.  Yes.
18   Q   Do you see that?  Could you read that?
19   A   Could I read it?  Yes.  "In accordance
20 with the request from the board of the October
21 meeting, Ms. Mapp presented a summary of
22 settlements/funds received by PERS from securities
23 litigation cases since 2004."
24   Q   And was that -- if you recall, was that a
25 document or was that a verbal presentation?

---

**79**

1    A   I do not recall.  There is a -- at this
2  particular meeting there is a -- a handout that does
3  have a list of the cases, an update, as I said, on
4  motions filed, motions denied, that sort of thing
5  and what the -- what settlements we received -- what
6  settlements we receive and, once PERS receives their
7  settlements, their ultimate settlements per
8  settlement what was received by PERS.
9    Q   And why would the board want to know what
10 was received by PERS?
11   A   It really is a follow-up to the fact that
12 we're in all these cases, and so they are interested
13 in what the outcome is.
14   Q   If -- if PERS received a good settlement
15 from -- from the case?
16   A   Good, bad or indifferent, it's --
17   Q   Okay.
18   A   -- they want to know what the -- what the
19 entire settlement was and then what PERS actually
20 receives.  It's just a way, as fiduciaries, of
21 monitoring the results of this activity.
22   Q   And in the handout you mentioned are the
23 law firms in the cases listed as well?
24   A   I believe they are.
25   Q   Do you know if that document has been

---

**80**

1  produced in this action?
2    A   Ms. Mapp produced all of the minutes; so I
3  don't know what they actually produced.
4    Q   Okay.  Is PERS -- is PERS interested in
5  getting the most money back for the beneficiaries
6  through the securities litigation -- the most money
7  it's able to back for the beneficiaries through the
8  securities litigation?
9    A   Yes.
10   Q   And so the amount of fees, for example,
11 that come out of the settlements for a securities
12 litigation would reduce the amount of money coming
13 into PERS; is that right?
14   A   PERS as well as any other participant in
15 the -- in the settlement, yes.
16       (Exhibit 38 was marked for
17       identification by the court reporter.)
18 BY MS. BRETAN:
19   Q   You've just been given what's been marked
20 as Exhibit 38.  Do you recognize this document,
21 Ms. Tingle?
22   A   Yes.
23   Q   And what is it?
24   A   This is -- the first page is the agenda
25 from the April 27th, 2011, PERS board meeting, and

---

LORRIE SMITH TINGLE  30(b)(6)                        April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**81**

1  the subsequent pages are the minutes of that
2  meeting.
3      Q    And turning to what is Bates-labeled 9380
4  to 9381, I guess that's pages 8 and 9 in the
5  minutes.
6      A    Yes.
7      Q    Let me first ask you:  Do you recall --
8  were you there at this meeting?
9      A    It does not appear that I was.
10     Q    Any reason to doubt that the minutes don't
11 reflect what occurred at the meeting?
12     A    Oh, no.
13     Q    Okay.  So I'll have you just look at the
14 litigation report.  You can look at the entire
15 thing, and then I'll ask you questions about it.
16     A    Okay.
17     Q    Just let me know when you're ready.
18     A    Okay.
19     Q    It looks like Ms. Mapp, again, provided an
20 overview of cases; is that correct?
21     A    Yes.
22     Q    Okay.  And then turning to the section on
23 securities litigation, it has the list of securities
24 cases there again; do you see that?
25     A    Yes, I do.

---

**82**

1      Q    And then right below that it says that
2  "Ms. Mapp has reported that no securities litigation
3  settlements have been reported since the February
4  board meeting"; do you see that?
5      A    Yes.
6      Q    It goes on to say, "There was a discussion
7  pertaining to the listing of the securities
8  litigation firms and settlements and that
9  Ms. Robertson advised that staff will revise the
10 report and provide a summary of the information"; do
11 you see that?
12     A    Yes.
13     Q    Do you know what that discussion was
14 about?
15     A    I do not.
16     Q    Do you remember being asked by anyone to
17 provide -- to revise a report on settlements to
18 include the securities litigation firms?
19     A    They wouldn't -- they would not -- the
20 board would not have asked me for that.  They would
21 have asked Ms. Mapp; so no, and I wasn't at the
22 meeting.  So I don't -- I don't recall exactly what
23 was about.
24     Q    Do you have any idea why the board would
25 be interested in what firms were representing PERS

---

**83**

1  in the various securities litigations?
2      MR. HARNES:  Object to the form of the
3  question.
4      THE WITNESS:  No.
5      MS. BRETAN:  You know what?  Let's take a
6  break.
7      THE VIDEOGRAPHER:  Okay.  I need to get us
8  off the record to change the DVDs.  Just one moment.
9  This marks the end of tape number one in the
10 deposition of Lorrie Tingle.  We're going off the
11 record, and the time is 4:05 p.m.
12     (Recess.)
13     THE VIDEOGRAPHER:  Back on the record.
14 This marks the beginning of tape number two in the
15 deposition of Lorrie Tingle.  On the record at 4:14.
16     MS. BRETAN:  39.
17     (Exhibit 39 was marked for
18     identification by the court reporter.)
19 BY MS. BRETAN:
20     Q    We've marked as Exhibit 39 a document
21 Bates-labeled MSPERS 10565 to 10598.  Do you
22 recognize this document?
23     A    The first is an email to my staff member
24 Charles Nielsen, who oversees the Artisan portfolio
25 in addition to all the other domestic equity

---

**84**

1  portfolios, and it appears that this was a document
2  sent in preparation for a conference call that was
3  to be held on August 16th, 2011, with Charles
4  Nielsen.
5      Q    And the document attached here, this is an
6  investment review from PERS from Artisan; is that
7  right?
8      A    That is correct.
9      Q    And that's a review as of July 31st, 2011?
10     A    Yes.
11     Q    And would you have seen this document?
12     A    Would I have seen it?  Not necessarily.
13     Q    Not necessarily.  If you turn to page 6 of
14 the investment review, it's Bates-labeled 10573; do
15 you see that?
16     A    Yes.
17     Q    The -- the title there says "Investment
18 Philosophy Overview."  Would that be Artisan
19 Partner's investment philosophy, to your knowledge?
20     A    Yes, it would.
21     Q    And looking down, there are three sort of
22 boxes there.  The first says "Broad Knowledge."
23     MR. HARNES:  Sorry.  I'm sorry.  I didn't
24 mean to interrupt.
25     MS. BRETAN:  Is something funny?

---

LORRIE SMITH TINGLE  30(b)(6)                                     April 3, 2013
IN RE: DIAMOND FOODS, INC.

85

1     MR. HARNES:  I was -- off the record for
2  just a second.  I was just --
3     THE VIDEOGRAPHER:  Okay.  Let me get us
4  off the record.
5     MR. HARNES:  It doesn't matter.
6     THE VIDEOGRAPHER:  Is that okay with
7  everybody?  Do you want to go off the record?
8     MS. BRETAN:  That's fine.
9     MR. HARNES:  I was just suggesting that
10  selling a document that says "Be right more often
11  than wrong," and people could pay to do that.  That
12  was all.  I'm sorry.  I was not making any comment
13  about any question or anything.  I was just
14  observing that I'm in the wrong business.
15     MS. BRETAN:  Okay.
16     Q   The first box there, "One Part of the
17  Investment Philosophy," it says, "Broad Knowledge."
18  It says, "Invest opportunistically across the entire
19  economy"; do you see that?
20     A   Yes, I do.
21     Q   And is Artisan's ability to -- what does
22  "invest opportunistically" mean to you?
23     A   It means to -- to be selective in what --
24  in the investments that you make.
25     Q   For opportunities in the investments?

86

1     A   Yes, yes.
2     Q   And is that -- and that's based on broad
3  knowledge?
4     A   That is correct.
5     Q   Okay.  And is that ability of Artisan to
6  invest opportunistically something that PERS
7  appreciated in its investment manager?
8     A   Yes.
9     Q   And then turning the page to page 7, this
10  is an overview of the investment process and
11  security selection.  It says, "There are three key
12  elements"; do you see that?
13     A   Yes.
14     Q   First is about "Franchise Companies."
15     A   Yes.
16     Q   And the second one is "Attractive
17  Valuations"; do you see that?
18     A   Yes.
19     Q   And listed there it says, "Purchase stocks
20  at a discount to private market value"; do you see
21  that?
22     A   Yes.
23     Q   And is that the estimate we talked about
24  earlier, private market value that Artisan uses to
25  determine whether to invest?

87

1     A   Yes.  It's the same information that was
2  in their ADV submittal.
3     Q   Okay.  And that was, you know, an estimate
4  based on their bottom-up or fundamental research?
5     A   Yes.
6     Q   Okay.  That's not something you can look
7  up, what's the private market value, like on an
8  objective board or something?
9     A   That is correct.
10     Q   Okay.  That's sort of Artisan's own
11  information?
12     A   Yes.
13     Q   Okay.  If you turn to page 9 of the
14  exhibit, the "Presentation" --
15     A   Yes.
16     Q   -- the -- it's Bates-labeled 10576; do you
17  see that?
18     A   Yes.
19     Q   The document is redacted, but I think
20  what's redacted here -- I don't know.  Maybe you
21  know -- is information regarding PERS performance in
22  the quarters -- the quarter and July and year to
23  date, one year, et cetera; is that right?
24     A   Yes.
25     Q   Would -- typically that information would

88

1  be listed here in a --
2     A   Yes.
3     Q   Okay.  And is that information privileged
4  information?
5     A   No.
6     Q   Is there -- it's just how Artisan has done
7  for PERS; is that right?
8     A   No.  The original report would have had
9  that information --
10     Q   Okay.
11     A   -- there or the report that was supplied
12  to us would have had the information.
13     Q   On how PERS' investments with Artisan's
14  had performed relative to the rest of the mid-cap --
15     A   Yes.
16     Q   -- index?  Okay.
17     40.
18     (Exhibit 40 was marked for
19     identification by the court reporter.)
20  BY MS. BRETAN:
21     Q   Just circling back for a minute before we
22  talk about Exhibit 40, so that information about
23  Artisan's performance, periodic performance or
24  yearly, quarterly, whatever, that's -- that's what
25  PERS would use to sort of judge whether Artisan's

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

89

1  investments were doing well relative to the Russell
2  mid-cap as a benchmark; is that right?
3      A    That's correct.
4      Q    Does Artisan generally perform well
5  relative to the Russell mid-cap benchmark?
6      A    Yes.
7      Q    So you're -- PERS is happy with Artisan?
8      A    Yes.
9      Q    Okay.  Okay.  Exhibit 40.  Do you
10 recognize this document, Ms. Tingle?
11     A    Yes, it is one of the month-end reports
12 submitted to us by Artisan, and this is as of
13 September 30th, 2011.
14     Q    And Artisan submits this to PERS monthly;
15 is that right?
16     A    Yes, they do.
17     Q    And if you turn to what's Bates-labeled
18 11294, it's toward the back.  Are you there?
19     A    Yes.
20     Q    Forgive my eyesight, but I think what this
21 says is -- it reflects is a purchase of Diamond
22 Foods shares on September 28th, 2011; is that right?
23     A    Yes.
24     Q    And so that would have been a purchase
25 that Artisan decided to make in Diamond Foods on

---

90

1  that date?
2      A    That's correct.
3      Q    And do you know what information Artisan
4  would have been relying on when it made the purchase
5  on September 28th, 2011?
6      A    No.
7      Q    And then turning to page 11297, page
8  Bates-labeled 11297, this shows a sale of Diamond
9  shares on September 30th, 2011; do you see that?
10     A    Yes.
11     Q    And do you know what information -- and
12 would Artisan have made the decision to sell on that
13 date --
14     A    Yes.
15     Q    -- not PERS?
16     A    Correct.
17     Q    Okay.  And do you know what information
18 Artisan was relying on when it sold on
19 September 30th, 2011?
20     A    No.
21     Q    Is it under- -- is it your understanding
22 that Artisan -- I think we've talked about this, but
23 Artisan conducts its own research about stocks that
24 inform its purchases and sales; is that right?
25     A    That is correct.

---

91

1      MS. BRETAN:  Okay.
2      (Exhibit 41 was marked for
3      identification by the court reporter.)
4  BY MS. BRETAN:
5      Q    You've just been given what's been marked
6  as Exhibit 41, Ms. Tingle.  Do you recognize this
7  document?
8      A    Yes.  It is -- Artisan sends us a
9  quarterly management letter that basically recaps
10 their performance and some of the portfolio activity
11 for the -- the preceding quarter.  So this is their
12 -- part of their quarterly reporting package.
13     Q    And so Artisan provides information on a
14 quarterly basis?  Is that -- is it based on the
15 calendar year or how does --
16     A    Yes.
17     Q    -- that work?
18     A    No, it is on a calendar year.
19     Q    So the fourth quarter would be --
20     A    As of December 31.
21     Q    As of December -- okay.  And this letter
22 is dated October 17th.  So that would relate to the
23 third quarter?
24     A    That's correct.
25     Q    Okay.  And what's the purpose of these

---

92

1  letters?
2      A    The purpose is really just to recap for --
3  for our records and for staff performance
4  measurements done on a quarterly basis.  So this is
5  really just a review -- to provide a review for PERS
6  of what's happened with the portfolio over the
7  preceding quarter.
8      Q    And is the ultimate performance measured
9  on an annual basis, then?
10     A    It is.  Actually, as far as the
11 performance measurement that is most important to
12 PERS, it's on a rolling three-year basis, but it is
13 measured quarterly on a one-, three-, five-, seven-,
14 ten-year, however long.
15     Q    And this page 1184, this is a letter to
16 you, correct?
17     A    Yes.
18     Q    And do the letters always come to you from
19 Artisan?
20     A    The letters are emailed out and they're
21 addressed to me.  They're also -- as you can see
22 from the email, they go to Callan.  They go to
23 Charles Nielsen on my staff and generally Elaine
24 Kyzer, who actually keeps up with all of our filing,
25 is normally copied on this.  So ...

---

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

93

1    Q    And at the bottom there's a label that
2    says "Redacted."  Do you -- can you tell from
3    looking at the document what information was
4    redacted?
5    A    It appears that the performance specific
6    to the PERS Artisan mid-cap portfolio was redacted.
7    Q    But you would have received that
8    information?
9    A    Yes.
10    Q    And listed next to that is the Russell
11    mid-cap growth index?
12    A    Correct.
13    Q    And so by looking at whatever was listed
14    in the first column and comparing it to the second
15    column, that's how you judge Artisan's performance
16    for that quarter --
17    A    That's correct.
18    Q    -- or for July-August calendar year?
19    A    For the quarter, and the year to date is
20    below that.
21    Q    Turning the page, there's a discussion of
22    performance.
23    A    Yes.
24    Q    Again, I think there's information
25    redacted here, but looking through the letter, if

94

1    you wouldn't mind looking through the letter and
2    just letting me know if you see any reference to
3    Diamond in here.
4    A    I do not.
5    Q    Do you know if the unredacted letter
6    referred to Diamond?
7    A    I do not.
8    Q    On the second page of the letter under
9    "Performance Discussion," in the first paragraph
10    there it notes that "Even China, which had been a
11    driving force for the world economy, experienced
12    rising inflation and signs of slowing growth"; do
13    you see that?
14    A    Yes.
15    Q    And that's -- is that with reference to
16    the third-quarter period?
17    A    Yes.
18    Q    And why would -- what was your
19    understanding of why that information was relevant
20    to PERS?
21    A    Because, as you can see from the negative
22    returns for the index, my guess would have been that
23    would be that Artisan's performance was also
24    negative during that period.  This is really just to
25    lay the groundwork for why the markets were down

95

1    during the quarter.  China has been a -- as it says
2    here, "has been a driving force."  A lot of the -- a
3    lot of the securities and the companies within --
4    not just non-U.S. companies, but U.S. companies, has
5    been very dependent on demand from China over the
6    past few years.  So when China slows down, it slows
7    down -- it has a very far-reaching effect on markets
8    worldwide.
9    Q    Because demand from China would be slowing
10    down and have an effect on U.S. companies?
11    A    Potentially, yes.
12    Q    Okay.  So the letter, as far as you know,
13    doesn't mention Diamond?
14    A    As far as I know.
15    Q    Okay.  And that's October 17th, 2011.
16         (Exhibit 42 was marked for
17         identification by the court reporter.)
18    BY MS. BRETAN:
19    Q    I'm going to mark Exhibit 42.  Do you
20    recognize Exhibit 42?
21    A    Yes, this is another of the monthly
22    reporting packages from Artisan, and this is as of
23    November 30th, 2011.
24    Q    So it would be a report of transactions
25    for the month of November or as of November -- the

96

1    end of November 2011?
2    A    As of the end of November.  It's
3    performance.  It also gives a breakdown of some
4    portfolio statistics, and then it is transactions.
5    Q    Okay.  And turning, if you will, to what's
6    Bates-labeled MSPERS 11320 toward the back of the
7    document -- I don't think there are pages on here.
8    A    I'm sorry.  What was the number?
9    Q    11320.
10    A    Okay.
11    Q    Looking at 11320, it appears to show a
12    number of sales of Diamond Foods on November 11th,
13    14th, 15th and 16th.
14    A    Yes.
15    Q    Do you see that?
16    A    Uh-huh.
17    Q    And it would have been Artisan who made
18    the decision to sell those shares?
19    A    That's correct.
20    Q    And then turning to -- do you know why
21    Artisan was selling the shares?
22    A    Based on the comments on the first page of
23    this document, it says, "They sold Diamond Foods
24    amid questions surrounding its accounting for
25    payments to walnut growers which threatened the

97

1    company's ability to close its planned acquisition
2    of Pringles from Proctor & Gamble."
3        Q    And they -- this is an -- this is after
4    the fact, that information?
5        A    After they --
6        Q    After they --
7        A    -- made the transactions.
8        Q    -- when you received this?
9            When did you receive this report?
10       A    Well, we would have received it in
11   December after the November month end, and the
12   transactions took place during November.  So this
13   would have been written as a summary of -- as a
14   summary commentary on their transactions during
15   November.
16       Q    Okay.  That you would have received in
17   December?
18       A    December, correct.
19       Q    And specifically turning back to 11320 --
20       A    Yes.
21       Q    -- do you know what information Artisan
22   specifically would have been relying on on
23   November 11th when it determined to sell shares of
24   Diamond?
25       A    No.

98

1        Q    If you look over on the right-hand side
2    there, on the third-to-last column --
3            MR. HARNES:  Which page are we on again?
4            MS. BRETAN:  11320.
5            THE WITNESS:  Yes.
6            MR. HARNES:  I'll get there.
7    BY MS. BRETAN:
8        Q    Do you see that notation "Electronic"?
9        A    Yes.
10       Q    Do you know what that is?
11       A    They -- Artisan uses their commission
12   dollars to pay for certain services.  That's not
13   unusual in the world of investment management.  So
14   they are receiving some sort of electronic service.
15   It could be Bloomberg, a subscription to Bloomberg,
16   whatever.  They use the commission dollars for
17   various purposes.
18       Q    And is that related to the specific trade?
19       A    No.  It's -- well, it is, but it's -- it
20   is saying why they -- okay.  If you start one column
21   over to the left, it gives the broker code, and
22   there's commission information, and then their
23   system denotes what those commissions -- they traded
24   through ITGI and the part of those commission
25   dollars were used for electronic -- something

99

1    electronic, whatever that might be.
2        Q    Okay.  But is that, generally speaking --
3    it's not necessarily -- it's just that the
4    commission on this trade was applied to something
5    for Artisan?
6        A    Correct.
7        Q    But it doesn't necessarily mean that it's
8    applied to this specific trade?
9        A    It means that the trade dollars -- part of
10   the commission dollars that were paid to this broker
11   subsequently were used.  The broker then supplied
12   Artisan with some sort of electronic service.
13           MS. BRETAN:  Okay.  Thanks.
14           (Exhibit 43 was marked for
15           identification by the court reporter.)
16   BY MS. BRETAN:
17       Q    The court reporter has just marked
18   Exhibit 43.  Do you recognize this document?
19       A    Yes.  This is part of the reporting
20   requirements that are used when our managers come in
21   to present to the board on their annual visit.
22       Q    And in section two -- I guess there's
23   information redacted from this document as well, if
24   you look at 11328.  Again, that would -- would that
25   have been the performance of --

100

1        A    Yes.
2        Q    -- Artisan for PERS?
3        A    Yes.
4        Q    And then turning to 11329, can you tell me
5    what this page reflects?
6        A    Yes.  We ask each manager -- we had these
7    -- all of these standard templates for the managers
8    to use so that we -- at a minimum we get something
9    consistent from all managers, and this is to provide
10   a summary of their investment strategy for the
11   board, and then under number one it's to talk about
12   any changes that -- significant changes that took
13   place in the account over the year, which is the
14   period that they're reporting over, and then they
15   are also supposed to denote whether there any
16   changes to their strategy over the course of the
17   year.
18       Q    And -- sorry.  I didn't mean to cut you
19   off.
20       A    That's okay.  It just provides an overview
21   to the board, a summary of what's happened over the
22   year.
23       Q    And with respect to item two there,
24   "Deviations from Previous Outline Strategy," it says
25   there are none; is that your understanding?

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**101**

1    A   Yes.
2    Q   There were no strategy changes by Artisan
3    in the period reflected here?
4    A   There were no changes in their overall
5    portfolio management strategy, yes.
6        MS. BRETAN:  Okay.
7        (Exhibit 44 was marked for
8        identification by the court reporter.)
9    BY MS. BRETAN:
10   Q   Exhibit 44 is another quarterly letter; is
11   that right?
12   A   That is correct.
13   Q   And what's the date of the letter?
14   A   The letter is dated January 13th, 2012.
15   Q   And on 11851, the first page, it's -- the
16   letter again talks about performance; is that right?
17   A   Yes.
18   Q   And compares -- would have compared PERS
19   Mississippi performance to the Russell mid-cap?
20   A   That's correct.
21   Q   Is it your experience in working with
22   investment managers that -- let me ask it this way:
23   Are -- are most of your investment managers on a
24   calendar year -- quarter -- quarterly reporting
25   structure?

---

**102**

1    A   Yes.
2    Q   And Artisan is one of those?
3    A   That's correct.
4    Q   And is it your experience as the chief
5    investment officer --
6    A   Yes.
7    Q   -- of PERS that there's a higher turnover
8    with respect to stocks in Q4 as compared to the
9    prior quarters?
10   A   Not necessarily.  Some years maybe.  This
11   year, 2012 particularly, because there were some
12   concerns about changes in the tax structure, capital
13   gains and so a lot of people sold stocks to try to
14   realize capital gains before taxes went up in 2013.
15   It is not necessarily the case in any -- any year
16   unless there's something like that going on that
17   there is substantial selling.  We're not taxable.
18   So it's not a -- it's not a tax-related phenomenon
19   for us, but our managers could anticipate that there
20   might be a big sell-off for one reason or another
21   and sell securities potentially, or buy securities.
22   Q   And aside from tax considerations, if a --
23   an investment manager has a stock that's
24   underperforming, is it your -- your experience that
25   for those types of stocks you might see more selling

---

**103**

1    in the fourth quarter than in other quarters?
2    A   No.  Our fiscal year-end is June 30th.
3    That's really the most important date for us, that
4    performance is as good as it can be.  So there's
5    really no motivation for our managers to -- to do
6    anything around any quarter-end, really, but we
7    don't -- I would not say that we see more activity
8    at quarter-end as opposed to any other time.  Index
9    funds maybe because they have clients coming in or
10   going out of funds at quarter-end a lot of times,
11   but as far as active managers, no, there's no real
12   pattern there.
13   Q   Managers are -- the annual performance of
14   the managers ends at the end of December in a given
15   year; is that correct?
16   A   Well, yes, it does, but we -- we look at
17   them every quarter, and so every quarter we are
18   looking at that 12-month period as the one-year --
19   as the one-year period.  So one year as of
20   June 30th is a one-year return for us, which is
21   really critical.  It's our -- our fiscal year-end.
22   September 30th we look at the 12 months prior.  So
23   that's a one-year.  So it's -- any 12-month period
24   is -- there's no 12-month period that's really any
25   more significant than another.  So -- from a

---

**104**

1    performance perspective.
2    Q   If you turn to 11852, it's the second page
3    of the letter.  Down at the bottom it notes that
4    Diamond was a bottom-performing stock; do you see
5    that?
6    A   Yes.
7    Q   And I think this is similar to the
8    language in the other document we were looking at,
9    but it says that "Artisan sold the position amid
10   questions surrounding," I guess, "Diamond's
11   accounting for payment to walnut growers"; do you
12   see that?
13   A   Yes.
14   Q   And "which threatened the company's
15   ability to close its planned acquisition of Pringles
16   from Proctor & Gamble."
17   A   Yes.
18   Q   And my understanding is that Artisan
19   liquidated its -- liquidated its position in Diamond
20   in November 2011.  I think we looked at the list --
21   A   Yes.
22   Q   -- of transactions earlier.  Yeah.
23   Do you know what -- what Artisan would
24   have been relying -- what information Artisan would
25   have been relying on in selling those shares in

---

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**105**

1  November?
2      MR. HARNES:  I think that question has
3  been asked and answered.
4      THE WITNESS:  No.
5  BY MS. BRETAN:
6      Q   Do you -- did -- do you think Artisan
7  thought there was fraud at Diamond in November?
8      A   I --
9      MR. HARNES:  I'm going to object to that
10 question.  If you want to ask her what they said or
11 whatever, but, you know, she can go ahead and
12 answer, but I think that that's not a proper
13 question.
14     THE WITNESS:  I don't know what they were
15 relying on other than there were questions around
16 accounting payments.  So I guess that -- I don't
17 know whether they knew anything for certain, but
18 just the concern around the complication that there
19 might be something was enough to have them sell.  It
20 was in their garden positions, which means it's a
21 small holding, and it probably wasn't worth the
22 headache to them.  But you would have to ask
23 Artisan.
24     (Exhibit 45 was marked for
25     identification by the court reporter.)

---

**106**

1  BY MS. BRETAN:
2      Q   And we've marked as Exhibit 45 what
3  appears to be an agenda in minutes relating to a
4  meeting on February 28th, 2012, of PERS' board; is
5  that right?
6      A   That is correct.
7      Q   Were you at this meeting?
8      A   Yes, I was.
9      Q   And do you recognize this document?
10     A   Yes.
11     Q   If you turn to 8636 through 8638, I
12 believe that's a litigation report to the board?
13     A   Yes, it is.
14     Q   And this is similar to the other
15 litigation reports we've seen to the board today?
16     A   Yes.
17     Q   And again listed there under "Securities
18 Litigation" are a list of the cases.
19     A   Yes.
20     Q   And then continuing down, do you recall if
21 there was more information provided about the
22 specific cases?
23     A   I don't recall.
24     Q   Okay.  And continuing down to -- on page
25 8638, page 18 of the minutes, it says, "Ms. Mapp

---

**107**

1  advised that Diamond Foods is a new securities
2  litigation case dealing with improper accounting
3  procedures.  PERS is seeking lead plaintiff status
4  in this case"; do you see that?
5      A   Yes.
6      Q   Was PERS informed that it would be seeking
7  lead plaintiff status in this case before this time?
8      A   Not to my knowledge.
9      Q   Did anyone --
10     MR. HARNES:  Excuse me.  When you say
11 "PERS" or the PERS board?  Because obviously
12 somebody -- Ms. Mapp was informed.
13 BY MS. BRETAN:
14     Q   Was the PERS board informed that it would
15 be seeking -- that PERS would be seeking lead
16 plaintiff status before this time?
17     A   No.
18     Q   Were you informed that PERS would be
19 seeking lead plaintiff status before this time?
20     A   I do not recall.
21     Q   Do you know if anyone spoke to other
22 people in your office about the decision to seek
23 lead plaintiff status in the Diamond case -- in this
24 case before the decision was made?
25     A   I don't know.

---

**108**

1      Q   If someone wanted to talk to Artisan about
2  the investments, would that come through your
3  office?  Would they -- if -- about the investments
4  in Diamond, would that -- would you be the first
5  point of contact?
6      A   Yes.
7      Q   And do you know if anyone spoke to Artisan
8  about the decision to seek lead plaintiff status
9  before it was made?
10     A   Not to my knowledge.
11     Q   At this meeting was the board informed of
12 who was being considered as lead counsel?
13     A   No, not to my knowledge.
14     (Exhibit 46 was marked for
15     identification by the court reporter.)
16 BY MS. BRETAN:
17     Q   You've just been given what's been marked
18 as Exhibit 46, Ms. Tingle.  Do you recognize this
19 document?
20     A   Yes.
21     Q   And what is it?
22     A   The first page is the agenda from the
23 April 24th, 2012, PERS board meeting and then behind
24 that are the minutes for that same meeting.
25     Q   Were you at this meeting, if you recall?

---

LORRIE SMITH TINGLE  30(b)(6)                          April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

### 109

1    A   It doesn't appear that I was.
2    Q   There's no -- you have no reason to doubt
3  that these were the minutes of the meeting?
4    A   No, these were the official minutes.
5  So ...
6    Q   Okay.  If you turn to page 890 -- 89 --
7  sorry -- 8910, it's addendum L.
8    A   Yes.
9    Q   What is this?  What is addendum L?
10   A   This is the investment policy statement
11 that the board adopted at their April 2012 meeting,
12 and it's -- it's basically a -- a policy document
13 that is in place to -- to give a framework to the
14 management of the investment program.
15   Q   Was there a policy in place prior to
16 April 2012, similar investment policy statement?
17   A   I believe that this -- yes.  This was the
18 -- this was -- we review this statement annually.
19 So this was the -- the 2012 review and any changes
20 that were made were adopted at this meeting.
21   Q   Okay.  And do you remember -- were you
22 involved at all with the changes to the investment
23 policy statement?
24   A   Yes.
25   Q   And do you recall offhand -- are there

---

### 110

1  many changes or just a few that were adopted?
2    A   This has been a document that hasn't been
3  around for really the last three years.  So most
4  of the changes that were made -- we actually added
5  all of these appendices at the back or -- I'm sorry
6  -- the -- the asset allocation appendix was added.
7  We have updated it more than anything.  There aren't
8  really significant changes, but there have been some
9  updates.
10   Q   Okay.  And if you turn to, I guess, page 8
11 of addendum L Bates-labeled MSPERS --
12   A   Yes.
13   Q   -- 8917 --
14   A   Yes.
15   Q   -- what -- what is this?  What is page 8?
16   A   Page 8 identifies or lays out the ethics
17 and conflicts-of-interest policy that the PERS
18 portfolio will be managed under.  So it talks about
19 the responsibility of the board, PERS staff,
20 investment management consultants, custodial banks
21 as far as loyalty to PERS and avoiding any conflicts
22 of interest, including disclosure of "pay to play"
23 relationships, which we discussed previously.
24   Q   Was this a new -- was this a new addition
25 to the investment policy statement?

---

### 111

1    A   I don't -- I don't recall.  I don't think
2  it was.  I think this has been in it since the
3  beginning.
4    Q   Sorry.
5    A   It's okay.
6      THE VIDEOGRAPHER:  Watch your microphone.
7  BY MS. BRETAN:
8    Q   Okay.  Looking at page 8, the ethics and
9  conflict of interest, the first point talks about
10 board members being "fund fiduciaries with a duty of
11 loyalty to PERS and responsibility to observe the
12 exclusive benefit rule"; do you see that?
13   A   Yes.
14   Q   And what's the "exclusive benefit rule"?
15   A   That the investments made and really any
16 -- any action that they take should be for the
17 exclusive benefit of the participants and
18 beneficiaries of PERS as opposed to something that
19 might be beneficial to their -- their own
20 constituents particularly or to the governor or to
21 various politicians, that their duty is loyalty
22 exclusively to the participants in PERS.
23   Q   And it goes on to say that "All members of
24 the board, executive director, investment staff will
25 disclose any conflict of interest related to PERS

---

### 112

1  investments."
2    A   Correct.
3    Q   And with respect to litigation, securities
4  litigation, this litigation, the Attorney General is
5  also acting as a fiduciary with respect to PERS; is
6  that right?
7    A   You know, that's not -- I don't know
8  exactly what his role is, whether it's a fiduciary
9  or whether it's actually solely as the legal
10 representative for state agencies, all state
11 agencies, and PERS happens to be one of them.
12   Q   And would you expect that the Attorney
13 General, if there was a conflict of interest with
14 respect to PERS, would let PERS know with respect to
15 the Attorney General's relationship to PERS in some
16 way -- would let PERS know about that conflict of
17 interest?
18   A   I would assume so, yes.
19     MR. HARNES:  I'm not sure I understand
20 that question, but if the witness did, she can go
21 ahead and answer it.
22     THE WITNESS:  I think if the attorney felt
23 that there was a conflict of interest, then he would
24 disclose that to PERS.
25 //

---

LORRIE SMITH TINGLE  30(b)(6)                                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**113**

BY MS. BRETAN:

Q   And "pay to play" agreements were an example of one of the things that -- that you think would need to be disclosed to PERS or circumstances that could suggest a "pay to play" arrangement?

MR. HARNES:  I'm not sure I understand that question.  Are you saying if the Attorney General has a "pay to play" relationship, that should be disclosed; is that your question?

BY MS. BRETAN:

Q   Earlier we talked about campaign contributions and contracts being awarded by elected officials having -- suggesting a potential "pay to play" conflict issue --

A   Yes.

Q   -- is that right?

A   Yes.

Q   And if there were contributions to the Attorney General's campaign, for example, that could lead to allegations related to awarding contracts as a result of those contributions, you would expect -- you would hope that that information would be disclosed to PERS?

A   We would hope so.

MS. BRETAN:  47.

---

**114**

(Exhibit 47 was marked for identification by the court reporter.)

BY MS. BRETAN:

Q   Ms. Tingle, do you recognize this document?

A   I do.

Q   And what is it?

A   These are the minutes from the June 26, 2012, meeting of the board of trustees of PERS.

Q   And were you present at this meeting?

A   Yes.

Q   If you turn to, I guess, page 11 of the minutes Bates-labeled MSPERS 9003, that's another litigation report similar to the ones we've seen in the board minutes?

A   Yes.

Q   And you can take a minute to look through the report.  If you turn to the next page when you're ready, there's, again, a list of securities litigation cases.

A   Yes.

Q   And do you recall whether there was additional information about those cases provided?

A   I -- I don't recall.

Q   And then at the bottom there it says,

---

**115**

"Ms. Robertson --"  That's Pat -- that's the head of PERS?

A   Correct.

Q   "-- gave an overview of House Bill 211 titled the Sunshine Act"; do you see that?

A   Yes.

Q   Were you there for that presentation?

A   Yes.

Q   And was it a document or was it a verbal presentation, if you recall?

A   My recollection is it was -- the overview was just verbal.

Q   And are you familiar with what the Sunshine Act is?

A   Yes.

Q   And what is it?

A   This was a bill that was passed to basically require that the Attorney General work together with agencies when bringing cases on the agency's behalf and that the -- our interpretation is that the agency will have to --

MR. HARNES:  Could I interrupt for just a second?  I want to make sure that we're not -- could I have -- I want to go off the record because this is obviously a legal issue, and I'd like to discuss

---

**116**

the basis of the witness's opinion before she testifies.

MS. BRETAN:  Sorry.  I'm not asking --

Q   Is Ms. Robertson a lawyer?

A   No.

Q   Okay.  And she provided an overview?

A   Yes.

Q   And --

MR. HARNES:  I'm still going to ask her the basis of what happened, and you can answer her questions -- you can ask her your questions, but I'm going to find out the genesis of -- because we are talking about a legal interpretation.  There was a memo from -- as this exhibit reflects, from the AG's office and I'm going to ask the witness questions related to whether this is privileged or not.

MS. BRETAN:  We can go off the record.

MR. HARNES:  I mean, you can dispute whatever you want.

THE VIDEOGRAPHER:  Just one moment.  Put your microphone on the table, if you would, ma'am.

MR. HARNES:  I've already done -- oh.

THE VIDEOGRAPHER:  Going off the record, the time is 5:06.

(Whereupon, counsel and the witness left

---

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

### 117

1    the deposition room at 5:06 p.m. and
2    returned at 5:09 p.m..)
3        THE VIDEOGRAPHER:  Back on the record.
4    The time is 5:09.
5    BY MS. BRETAN:
6        Q    During the break did you speak with anyone
7    about the substance of your testimony here today?
8        A    My counsel.
9        Q    And what did you discuss?
10       A    The response to your question regarding
11   the Sunshine bill -- Act -- sorry -- Sunshine Act
12   and our interpretation -- our, as in PERS, the
13   agency's, interpretation of that act.
14       Q    What is PERS' interpretation of that act?
15       A    The agency's interpretation is that the
16   Attorney General will work in concert with the
17   agency and the agency -- before bringing legal
18   action on our behalf and that the agency will have
19   to approve or disapprove of that action.
20       MR. HARNES:  I want to make the record
21   clear that the conference was with respect to
22   privileged -- whether privilege existed and whether
23   the opinion of the Attorney General -- the opinion
24   that Mrs. Tingle just testified was relayed to her
25   by counsel or had the providence in any way of

---

### 118

1    advice given to her by counsel.  The obvious answer
2    -- the answer may be self-evident from the fact that
3    I have allowed her to testify.  So I want the record
4    to be clear.  I don't want any suggestion that I was
5    coaching the witness or was asking whether --
6    whether I liked the answer or not.  The discussion
7    was the providence of the opinion and to what extent
8    it revealed attorney-client confidences.  And,
9    Ms. Tingle, if I've said anything inaccurate, feel
10   free to correct the record.
11       THE WITNESS:  No, that's correct.
12       MR. HARNES:  Okay.
13   BY MS. BRETAN:
14       Q    And was the memorandum a privileged
15   memorandum, an attorney-client confidence?
16       MR. HARNES:  I'm going to object to that.
17       THE WITNESS:  The memo issued by the
18   Attorney General's office?
19   BY MS. BRETAN:
20       Q    The opinion.
21       A    No, it -- I'm sorry.
22       MR. HARNES:  It's a memo.  It's been -- I
23   object to the characterization of it as an opinion.
24       THE WITNESS:  It's -- it's a memo that was
25   issued by the Attorney General's office with their

---

### 119

1    synopsis, their summary of the bill.  So, no, it --
2    to my knowledge it is not -- it is public record.
3    BY MS. BRETAN:
4        Q    Do you know if that memo has been produced
5    in this action?
6        A    I -- I don't know.
7        MS. BRETAN:  Counsel, we'd ask that that
8    memo be produced.
9        THE VIDEOGRAPHER:  Counsel, could you
10   please put your mic on?
11       MR. HARNES:  It mischaracterize --
12       THE VIDEOGRAPHER:  I can't hear you.
13   Could you put your mic on?
14       MR. HARNES:  Oh, I'm sorry.
15       THE VIDEOGRAPHER:  Thank you.  Thanks.
16       MR. HARNES:  This witness, who is a
17   nonlawyer -- I've allowed her to answer the question
18   as to whether it's privileged or not.  I don't think
19   it's within her ken to make a determination whether
20   a document is privileged or not, and I also think
21   it's way beyond the scope of about what she's here
22   to testify, but I haven't --
23   BY MS. BRETAN:
24       Q    What's your --
25       MR. HARNES:  -- reserved any objection.

---

### 120

1    If it is publicly available and if we make the
2    determination that it is not privileged, we will
3    produce it.
4    BY MS. BRETAN:
5        Q    What's your understanding of the Sunshine
6    Act?  You talked about PERS.  What's your
7    understanding of --
8        A    My understanding is in line with the
9    agency's understanding, that it is -- it is designed
10   to have agency -- state agencies and the Attorney
11   General's office work together to make decisions
12   about litigation.
13       Q    And are those decisions the decisions like
14   who was counsel in the litigation?
15       A    No, it would be whether or not to pursue
16   litigation, period, not -- not beyond that.  It's
17   the Attorney General's purview.
18       Q    I can't remember if we -- I think we were
19   in the middle of discussing this when we took the
20   break, but the minutes reflect that Ms. Robertson
21   gave an overview of the bill.  I can't recall what
22   your answer was.  Was it that -- was it an oral
23   presentation or a document?
24       A    My recollection was it was just an oral
25   summary of the bill itself.

---

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

### 121

1    Q   Do you know if the Sunshine Act has
2    provisions related to the fees that counsel --
3    outside counsel can charge in contingency contracts?
4    A   I -- I don't know.  I'm not that familiar
5    with it other than just -- and -- in the
6    decision-making process.  So I don't -- I don't
7    recall from the bill itself anything about these.
8    Q   Are you aware that the bill -- it's law
9    now; is that right?
10   A   Correct.
11   Q   And that law applies to contracts with
12   outside counsel for the securities litigation; is
13   that -- is that accurate?
14       MR. HARNES:  Are you asking her what her
15   understanding of the law is?
16   BY MS. BRETAN:
17   Q   Your understanding.
18       MR. HARNES:  Thank you.
19       THE WITNESS:  Yes.
20   BY MS. BRETAN:
21   Q   And are you aware that the bill has a cap
22   on fees for contingency contracts of $50 million?
23   A   Yes, I believe that was -- that is
24   included in this bill, so yes.
25   Q   Do you know why this bill was introduced?

---

### 122

1    Were you aware of issues related to contingency
2    contracts with outside counsel?
3    A   No.  I don't -- I don't pretend to get
4    into the heads of our legislature, but I know that
5    the Attorney General has pursued litigation not just
6    on behalf of PERS, but on behalf of the state in
7    general, and there were some, I guess, concerns
8    about the fees that were paid.  I -- that's just my
9    speculation.
10   Q   And did the concerns involve contingency
11   contracts going to lawyers who had contributed to
12   the election campaigns of the Attorney General?
13   A   I -- I have no knowledge of that.  I don't
14   know if that was -- if that was specifically
15   addressed or identified.  There are -- there was no
16   -- to my recollection, no prohibition within this
17   bill of campaign contributions or anything along
18   those lines.  So I don't know if that was part of
19   this -- part of the reason for this bill.
20       (Exhibit 48 was marked for
21        identification by the court reporter.)
22   BY MS. BRETAN:
23   Q   We've just marked as Exhibit 48 -- well,
24   let me ask you:  Do you recognize this document?
25   A   Yes, this is the records retention policy

---

### 123

1    as of the 1st of January of 2012 for the investment
2    department at PERS.
3    Q   And do you recall when, prior to this -- I
4    guess this is as of 11/20/12 -- when -- was this
5    applicable to the prior year?
6    A   It would have -- we have revised this
7    policy over time and in some cases changed some of
8    the time frames, but this would have been the one
9    from January 1st going forward.  So there were
10   previous ones.
11   Q   Okay.  And what happens -- and this is --
12   this policy reflects what -- how records are
13   retained by your department?
14   A   Correct.
15   Q   Okay.  So what happens when there's a
16   litigation?
17   A   If -- as soon as we become aware of a
18   litigation -- an ongoing litigation, we retain any
19   -- any documents.  The correspondence files are
20   retained permanently and the contracts are retained
21   permanently.  The custodial bank information is
22   online permanently for us.  So the rest of this
23   information we hold.  Basically, if there is a
24   litigation that we're aware of, we hold any emails.
25   We hold any -- anything that has to do with that

---

### 124

1    litigation.  This is more a broad-based policy.
2    Q   And when you say that you're "aware of,"
3    what do you mean -- a litigation that you're "aware
4    of," what do you mean?
5    A   The Attorney General's office notifies us
6    primarily through these board reports.  So we find
7    out every other month cases that we're involved in
8    unless they specifically reach out to either myself
9    or our in-house counsel to make us aware of a case
10   that has started; otherwise, we don't really
11   communicate with the Attorney General's office
12   related to these cases.
13   Q   So, then, that's -- that would be when
14   it's reported to the board that PERS will be seeking
15   lead plaintiff status; is that right?
16   A   Generally we are notified.  The litigation
17   report contains cases in which we either are lead
18   plaintiff or we're co-lead plaintiff or we're class
19   representative, something where we're actually
20   involved in litigation.  As far as the -- we are not
21   always notified when we're seeking lead plaintiff
22   designation because it might or might not happen, I
23   suppose, but we -- the communication is -- is
24   primarily for -- in preparation for these board
25   meetings.

---

LORRIE SMITH TINGLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**125**

1    Q   Okay.  And then looking at Exhibit 48, it
2   says, "Class Action Filings."
3    A   Yes.
4    Q   "Open claims should be retained until
5   settlement is received.  Settle -- claims will be
6   scanned and retained three years."  Is -- are there
7   files with class action filings at PERS?
8    A   Yes.
9    Q   And do you keep those?
10    A   Yes, my department does.
11    Q   And what are those?  Are those everything
12   that's filed in a -- in a class action that PERS is
13   participating in?
14    A   No.  It has nothing to do with, for
15   example, this case and this sort of document.  These
16   are where PERS is a participant in a class -- in any
17   class action and a settlement has been reached and
18   the claims administrator has sent out the claim
19   forms and we have filed our -- this is the filings
20   for our -- our part of the settlement -- of any
21   settlement of any class action that we happen to be
22   in.  So this is where we file claim forms.  We get
23   our money back and we keep all the documentation.
24    Q   I see.  So claims that PERS was making as
25   part of a class member?

---

**126**

1    A   Correct.
2    Q   And that's different than when PERS is a
3   litigant --
4    A   Yes.
5    Q   -- a co-lead plaintiff, for example?
6    A   Correct.
7    Q   Do you have files about the litigation
8   that are kept separately from --
9    A   If it's a case where we do set up files
10   for all the cases, and generally if the Attorney
11   General's office or if our counsel sends us
12   documents like a 30(b)(6) document, usually we
13   get -- or at least I get this and the -- whatever,
14   and that might even be what this is, whatever is
15   asking for a discovery document.  So that's about
16   the extent of any legal documents that I get.
17    Q   And are you aware that there was document
18   requests from Diamond Foods to Lead Plaintiff in
19   this action?
20    A   Yes.
21    Q   And would these files listed on the
22   records retention policy be among the files reviewed
23   for purposes of producing documents --
24    A   Yes.
25    Q   -- that were responsive?

---

**127**

1    A   Yes.
2    Q   And who would have done that search?
3    A   Charles Nielsen on my staff and myself and
4   Elaine Kyzer would all have gone through
5   correspondence, our hard-copy correspondence.
6   Charles actually produced the -- the transactions
7   that were requested, and Elaine keeps copies of all
8   of the management agreements.  So those were all
9   provided there, and then email searches were done,
10   actually, by counsel for us.  So ...
11        MS. BRETAN:  Okay.  So I'd like to go to
12   Exhibit 23, previously marked Exhibit 23.  I'm not
13   sure if it's in there.
14        THE WITNESS:  I don't think I have that
15   one.
16        THE REPORTER:  I have to go get it.
17   BY MS. BRETAN:
18    Q   Exhibit 23 -- are you familiar with
19   Exhibit 23?
20    A   No.
21    Q   Exhibit 23 are "Responses and Objections
22   to Diamond Foods' First Set of Interrogatories to
23   Lead Plaintiff"; do you see that?
24    A   Yes, I see that.
25    Q   And then just turning to the objections

---

**128**

1   and responses to interrogatory number one,
2   interrogatory number one is that the -- is at the
3   bottom of page 2; do you see that?
4    A   Yes.
5    Q   And -- and that interrogatory asked to
6   "Describe in detail all representations,
7   information, recommendations or data upon which
8   you," being lead plaintiff, "relied in making each
9   purchase, acquisition, sale, transfer or other
10   transactions in Diamond securities set forth in
11   Exhibit B to your court questionnaire is lead
12   plaintiff's candidate filed February 9th, 2012, in
13   this matter of the questionnaire"; do you see that?
14    A   Yes.
15    Q   So effectively we were seeking information
16   regarding what PERS was relying on in making the
17   purchases and sales of Diamond Foods; do you see
18   that?
19        MR. HARNES:  I'm going to --
20        THE WITNESS:  Yes.
21        MR. HARNES:  Is that a question?
22   BY MS. BRETAN:
23    Q   Do you agree?  Is that fair?
24    A   Yes.
25    Q   And in response to the interrogatory, line

---

LORRIE SMITH TINGLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

**129**

1  five and a half there, it says, "Subject to and
2  without waiving the foregoing objections, Lead
3  Plaintiff responds that Diamond securities traded in
4  an efficient market and Lead Plaintiff intends to
5  rely on the fraud-on-the-market presumption of
6  reliance"; do you see that?
7      A   Yes.
8      Q   Did anyone consult -- you're the -- your
9  primary responsibility is the investments of MPERS,
10 correct?
11     A   Yes.
12     Q   Did anybody consult you about whether
13 there was an efficient -- Diamond securities traded
14 in an efficient market?
15     A   No.
16     Q   Did anybody consult you about whether
17 MPERS could rely on a fraud-on-the-market in this
18 case?
19     A   No.
20     Q   Did anyone ask -- did you ask Artisan for
21 their rationale behind making the trades in Diamond
22 securities?
23     A   No.
24     Q   Do you know if anyone else asked Artisan
25 the rationale for making the trades in the Diamond

---

**130**

1  securities?
2      A   I'm not aware that anyone did.
3      Q   Do you know if anyone asked Artisan
4  whether Diamond securities traded in an efficient
5  market?
6      A   I'm not aware of it.
7      Q   If you look at interrogatory number two,
8  that's also on page 3; do you see that?
9      A   Yes.
10     Q   Interrogatory number two asks to "Identify
11 all persons on whom you relied in making any
12 investment decision regarding Diamond securities,
13 including with respect to all of the transactions in
14 Diamond securities set forth in Exhibit B to the
15 questionnaire previously defined"; do you see that?
16     A   Yes.
17     Q   And in looking through the response to
18 interrogatory number two, is it fair to say that
19 Artisan Partners is not listed there?
20     A   That is fair to say.
21     Q   And would PERS have relied on Artisan
22 Partners in making investment decisions with respect
23 to Diamond Foods?
24         MR. HARNES:  I'm going to object to the
25 question and assert the same objection that's

---

**131**

1  asserted in the interrogatory, that "reliance" is a
2  term of art under the law that calls for a legal
3  conclusion.  You can ask this witness any facts, but
4  I think it's improper for her to testify as to a
5  legal conclusion, particularly since she's here to
6  testify as to facts.  But in any event, she can
7  answer the question.
8          THE WITNESS:  Okay.  I'm sorry.  Now would
9  you repeat the question?
10 BY MS. BRETAN:
11     Q   My question was whether PERS would have
12 relied on Artisan Partners in making investment
13 decisions -- to make the investment decisions with
14 respect to Diamond Foods.
15     A   Yes.
16     Q   24.
17     A   What number is it?
18     Q   Do you recognize what's been marked as
19 Exhibit 24?
20     A   Yes.  Oh, no.  I'm sorry.  I don't.  Let
21 me -- let me look at it.  I have Exhibit 24.  I do
22 not recognize Exhibit 24.
23     Q   And when you say you "have Exhibit 24" --
24     A   In front of me.
25     Q   Oh, you have it in front of you right now?

---

**132**

1      A   I have it in front of me.
2      Q   You don't recall seeing it before?
3      A   That is correct.
4      Q   And Exhibit 24 is "Lead Plaintiff's
5  Supplemental Responses and Objections to Diamond
6  Foods' First Set of Interrogatories"; is that right?
7      A   Yes.
8      Q   And turning to interrogatory number two --
9      A   Yes.
10     Q   -- the same question which is asked to
11 "Identify all persons on whom you relied on making
12 any investment decision regarding Diamond securities
13 including with respect to all the transactions in
14 Diamond securities set forth in Exhibit B to the
15 questionnaire"; do you see that?
16     A   Yes.
17     Q   And now interrogatory number two, if you
18 look at line 14, could you read the sentence
19 starting with "Lead Plaintiff"?
20     A   "Lead Plaintiff further responds that
21 Artisan Partners Limited Partnership, including but
22 not limited to, James Hammel and Andrew Stephens,
23 Acadian Asset Management, Inc. and Wellington
24 Management Company, LLP, acted as an investment
25 advisor in connection with the purchase --" oh, I'm

---

LORRIE SMITH TINGLE  30(b)(6)                                April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

### 133

1   sorry "-- with such purchases and sales -- executed
2   them."
3       Q   "And executed them."
4       A   Oh, I'm sorry.  "And executed them."
5       Q   And that's consistent with your
6   understanding that Artisan executed the sales in
7   Diamond during the class period?
8       A   That is correct.
9           MS. BRETAN:  Okay.  Thank you.  If we
10  could just take a break.
11          THE VIDEOGRAPHER:  Just one second.  I'll
12  get us off the record.  We're going off the record.
13  The time is 5:33 p.m.
14          (Recess.)
15          THE VIDEOGRAPHER:  We're back on the
16  record.  The time is 5:39 p.m.  Go ahead.
17  BY MS. BRETAN:
18      Q   Ms. Tingle, we've talked about the fact
19  that PERS' shares in Diamond were sold in
20  November 2011; is that --
21      A   Yes.
22      Q   And are you aware that in this litigation
23  that -- and the position was zeroed out, right?
24      A   Yes.
25      Q   There were no more holdings after that

---

### 134

1   final sale in November.  And are you aware that this
2   -- the class period in this case extends beyond
3   November of 2011?
4       A   Yes.
5       Q   And so would purport to cover people who
6   were buying shares while PERS shares were being
7   sold, buying Diamond shares while PERS was selling
8   its shares?
9       A   Yes.
10      Q   And people who were buying shares in
11  December after PERS had exited its position --
12      A   Yes.
13      Q   -- in Diamond?
14          And into January --
15      A   Yes.
16      Q   -- 2012, after -- well after PERS had
17  exited its position?
18          Is it your understanding that -- is PERS
19  in any different position than people who were --
20  having exited in November than people who were
21  buying in December or in January?  Is PERS typical
22  of people who would be buying in January and
23  December?
24          MR. HARNES:  I'm going to object to that.
25  I mean, this witness is here as a fact witness to

---

### 135

1   testify to specific limited areas, and you're asking
2   her -- she's an investment analyst.  You're asking
3   her legal questions.  Typical -- typicality is a
4   legal term of art, and I'm sorry I'm sounding cranky
5   because it's late in New York time, but, you know,
6   I've just -- I've sat here and allowed you to ask
7   every question, but I'm really -- it's just really
8   improper.  And if she has an opinion, she can go
9   ahead, but it's -- it's just -- it's just really
10  improper.
11          THE WITNESS:  I can't speculate on what
12  other people were doing or whether they are -- or
13  were in any different circumstance in PERS during
14  that time.
15  BY MS. BRETAN:
16      Q   Okay.  In your role as chief investment
17  officer at PERS, do you deal at all with whether
18  PERS has been damaged by a particular investment --
19  the damages PERS suffers with respect to its
20  investments?
21      A   It's --
22          MR. HARNES:  I'm going to object to that
23  question because, again, "damages" is a term of --
24  legal term of art.
25          THE WITNESS:  Can you -- can you explain

---

### 136

1   what you're asking exactly or say it again?  I'm not
2   exactly sure I know what your question means.
3   BY MS. BRETAN:
4       Q   Well, so PERS has submitted a loss
5   calculation we looked at earlier with respect to its
6   Diamond Foods transactions; do you recall that?
7       A   Yes.
8       Q   Is that loss calculation the same as
9   damages to PERS?
10          MR. HARNES:  I'm going to have the same
11  objection.  This witness is not here -- it's a legal
12  conclusion.  She can answer if she -- if she can,
13  but I'm sorry if I'm seeming that I'm losing
14  patience.
15          THE WITNESS:  Damages and losses as
16  calculated for these cases, that's the purview of
17  the Attorney General's office; that's not anything
18  PERS gets involved with.
19  BY MS. BRETAN:
20      Q   Okay.  At the beginning of today's
21  deposition we talked a little bit about your prior
22  deposition experience, and I think you said you
23  testified in depositions before; is that right?
24      A   Yes.
25      Q   And some of those were securities class

---

LORRIE SMITH TINGLE  30(b)(6)                                      April 3, 2013
IN RE: DIAMOND FOODS, INC.

---

## 137

1  action cases?
2      A   Correct.
3      Q   And you worked with outside counsel in the
4  context of those cases?
5      A   Yes.
6      Q   And do you recall the names of any of the
7  counsel that you worked with in those cases, the
8  firm names?
9      A   The firms.  We have worked with the
10  Chitwood firm before.  We have worked with Bernstein
11  Litowitz, and I think that may be it.
12      Q   In your experience?
13      A   Yes, in my experience.
14      Q   And the Chitwood firm and Bernstein
15  Litowitz, are those both firms that have monitoring
16  agreements --
17      A   Yes.
18      Q   -- to your knowledge?
19      And do you know whether the Chitwood firm
20  or Bernstein Litowitz has donated to the political
21  campaigns of Attorney General Jim Hood?
22      A   I do not know personally.
23      Q   Do you know whether the Chitwood firm or
24  Bernstein Litowitz has donated to PACs that
25  contribute to the campaign of Attorney General Jim

---

## 138

1  Hood?
2      A   I don't know.  I don't have access to that
3  information.
4      MS. BRETAN:  Thank you.  That's all for
5  me.
6      THE VIDEOGRAPHER:  Anything from anyone
7  else?  Okay.  I'll make a closing statement, and
8  then we'll get your orders for video and
9  transcripts.
10      MR. HARNES:  Oh, we get to do closing
11  statements?
12      THE VIDEOGRAPHER:  Pardon me?
13      MR. HARNES:  Nothing.  I was just making a
14  joke.
15      THE VIDEOGRAPHER:  I didn't hear you.
16      MR. HARNES:  I said:  We get to make
17  closing statements?  No one told me.
18      THE VIDEOGRAPHER:  I do.  Just a moment.
19  This concludes tape number two and the end of the
20  videotaped deposition of Lorrie Tingle.  We're going
21  off the record on April 3rd, 2013, and the time is
22  5:46 p.m.
23      (TIME NOTED: 5:46 p.m.)
24
25

---

## 139

1      REPORTER'S CERTIFICATION
2
3      I, Catherine A. Ryan, Certified Shorthand
4  Reporter in and for the State of California, do
5  hereby certify:
6
7      That the foregoing witness was by me duly
8  sworn, that the deposition was then taken before me
9  at the time and place herein set forth; that the
10  testimony and proceedings were reported
11  stenographically by me and later transcribed into
12  typewriting under my direction; that the foregoing
13  is a true record of the testimony and proceedings
14  taken at that time.
15
16      IN WITNESS WHEREOF, I have subscribed my
17  name this _____ day of _____, _____.
18
19
20                         Catherine A. Ryan
21
22
23      Catherine A. Ryan, RMR, CRR, CSR No. 8239
24
25

---

## 140

1      DEPOSITION ERRATA SHEET
2
3
4      Our Assignment No. 508375
5      Case Caption:  IN RE DIAMOND FOODS, INC.
6      SECURITIES
7
8      DECLARATION UNDER PENALTY OF PERJURY
9  I declare under penalty of perjury that I have read the
10  entire transcript of my Deposition taken in the
11  captioned matter or the same has been read to me, and
12  the same is true and accurate, save and except for
13  changes and/or corrections, if any, as indicated by me
14  on the DEPOSITION ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17
18  Signed on the _____ day of _____, 20____.
19      _____
20      LORRIE SMITH TINGLE
21
22
23
24
25

---

LORRIE SMITH TINGLE  30(b)(6)                                        April 3, 2013
IN RE: DIAMOND FOODS, INC.

141

1        DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25             LORRIE SMITH TINGLE

142

1        DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25             LORRIE SMITH TINGLE

LORRIE SMITH TINGLE  30(b)(6)                                    April 3, 2013
IN RE: DIAMOND FOODS, INC.

Page 139

1                    REPORTER'S CERTIFICATION

2

3          I, Catherine A. Ryan, Certified Shorthand

4    Reporter in and for the State of California, do

5    hereby certify:

6

7          That the foregoing witness was by me duly

8    sworn, that the deposition was then taken before me

9    at the time and place herein set forth; that the

10   testimony and proceedings were reported

11   stenographically by me and later transcribed into

12   typewriting under my direction; that the foregoing

13   is a true record of the testimony and proceedings

14   taken at that time.

15

16         IN WITNESS WHEREOF, I have subscribed my

17   name this   5    day of   April   , 2013 .

18

19

20            Catherine A. Ryan

21

22   _____

23         Catherine A. Ryan, RMR, CRR, CSR No. 8239

24

25

# Exhibit 3 – Redacted Pages Filed Under Seal Pursuant to Court Order

ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013

1—4

---

Page 1

1        UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3         SAN FRANCISCO DIVISION

------------------------------------------------------

IN RE DIAMOND FOODS, INC.
SECURITIES LITIGATION    Case No. CV-11-05386-WHA

------------------------------------------------------

Video examination of ANDREW STEPHENS,

taken at the instance of Diamond Foods, Inc., under and

pursuant to Rules 30(b)(6) and 45 of the Federal Rules of

Civil Procedure, before JESSICA R. WAACK, Certified

Realtime Reporter, Registered Diplomate Reporter,

Certified Shorthand Reporter and Notary Public in and for

the State of Wisconsin, at Brown & Jones Reporting, Inc.,

735 North Water Street, Suite M185, Milwaukee, Wisconsin,

on Thursday, April 4, 2013, commencing at 8:59 a.m. and

concluding at 5:16 p.m.

---

Page 2

1       A P P E A R A N C E S

2  FENWICK & WEST LLP, by
    MR. ALEXIS I. CALOZA;
3  MS. EMILY GISCHE,
    555 California Street, 12th Floor,
4  San Francisco, California 94104,
    appeared on behalf of Diamond Foods, Inc.
5
    K&L GATES LLP, by
6  MR. JOSEPH C. WYLIE,
    70 West Madison Street, Suite 3100,
7  Chicago, Illinois 60602-4207,
    appeared on behalf of Artisan Partners Limited
8  Partnership.

9  ARTISAN PARTNERS L MITED PARTNERSHIP, by
    MS. SARAH A. JOHNSON,
10  875 East Wisconsin Avenue, Suite 800,
    Milwaukee, Wisconsin, 53202,
11  appeared on behalf of Artisan Partners Limited
    Partnership and Mr. Andrew Stephens.
12
    CHITWOOD HARLEY HARNES LLP, by
13  MS. KRISSI T. GORE,
    2300 Promenade II,
14  1230 Peachtree Street,
    Atlanta, Georgia 30309,
15  appeared on behalf of Lead Plaintiff Mississippi Public
    Employees' Retirement System.
16
    SIDLEY AUSTIN LLP, by
17  MS. NAOMI A. IGRA,
    555 California Street, Suite 2000,
18  San Francisco, California 94104,
    appeared telephonically on behalf of Michael J. Mendes.
19
    HOGAN LOVELLS US LLP, by
20  MR. AVI ROSENBLIT,
    3 Embarcadero Center, Suite 1500,
21  San Francisco, California 94111,
    appeared telephonically on behalf of Steven M. Neil.
22
    A L S O  P R E S E N T
23
    Mr. Dean Van Hoogen, Videographer.
24
        * * * * *
25

---

Page 3

1        I N D E X

2  Examination:        Page

3  By Mr. Caloza.................................  6
4  By Ms. Igra................................ 225

5  Exhibit Identified:      Page

6  No. 49 - Subpoena For Mr. Stephens................. 11
7  No. 50 - March 26, 2013 Letter, From Joseph C.
    Wylie, II, to Alexis I. Caloza............ 18
8  No. 51 - An In-Depth View of Artisan Growth Team
    Investment Philosophy and Process......... 29
9  No. 52 - Artisan U.S. Mid-Cap Grow h Strategy
    December 31, 2012, Fact Sheet............ 70
10  No. 53 - Document Bates Stamped Nos. MSPERS 010175
    Through MSPERS 010316................. 73
11  No. 54 - Research Pitch Packet Bates Nos.
    AP0001440 Through AP0001448............. 83
12  No. 55 - Printout of the Internal Research and
    Trading Note System Bate Stamped
13    AP0001396 Through AP0001414......... 99
    No. 56 - Handwritten Notes Bates Nos. AP0001213
14    Through AP0001223..................... 105
    No. 57 - Single Page Bates Stamped AP0001034 of
15    Handwritten Notes..................... 107
    No. 58 - PG Deal For Pringles Document Bates
16    Stamped AP0000694 Through AP0000696....... 128
    No. 59 - Document Bates Stamped No. AP0001773...... 132
17  No. 60 - Online Article From the Wall Street
    Journal Bates Stamped MSPERS 001573 to
18    MSPERS 001575....................... 154
19  No. 61 - Document Bates Stamped AP0000333 to
    AP0000334........................... 158
20  No. 62 - Excel Sheet Bates Stamped AP0001774...... 178
    No. 63 - Document Bates Stamped AP331 to AP332..... 182
21  No. 64 - Document Bates Stamped AP0001817 to
    AP0001818........................... 183
22  No. 65 - Document Bearing Bates Stamps AP352
    Through AP366....................... 191
23  No. 66 - Document Bearing Bates Numbers AP336
    Through AP347....................... 194
24  No. 67 - Document Bates Stamped AP1 Through AP16... 195
25

---

Page 4

1      I N D E X  C O N T' D

2  Exhibit Identified:      Page

3  No. 68 - Document Bearing Bates Numbers AP2188
    Through AP2238....................... 199
4  No. 69 - Printout of a Spreadsheet Produced By
    Artisan to Diamond in Native Excel Format. 202
5  No. 70 - Document Bates Stamped AP229 Through
    AP312.............................. 212
6  No. 71 - Document Bates Stamped AP116 Through
    AP228.............................. 214
7  No. 72 - Document Bearing Bates Stamps AP91
    Through AP115....................... 214
8  No. 73 - Document Bearing Bates Stamps AP66
    Through AP90........................ 215
9  No. 74 - Document Bearing Bates Stamps AP43
    Through AP65........................ 215
10  No. 75 - Document Bearing Bates Stamp AP21 Through
    AP42............................... 216
11  No. 76 - Document Bearing Bates Numbers AP325
    Through AP330....................... 219
12  No. 77 - Document Bearing Bates Stamps AP319
    Through AP324....................... 221
13  No. 78 - Document Bearing Bates Numbers AP313
    Through AP318....................... 221
14

15  Disposition Of Original Exhibit/s:

16  All original exhibits were included in the original
    transcript. Copies of exhibits were supplied to
17  counsel upon request.

18

19

20

21

22

23

24

25



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013

5–8

Page 5

1          TRANSCRIPT OF PROCEEDINGS
2
3          THE VIDEOGRAPHER:  This is Disc No. 1 to
4     the video deposition of Andrew Stephens in the
5     matter of Diamond Foods, Incorporated, Securities
6     Litigation being heard before the U.S. District
7     Court, Northern District of California, Case No.
8     CV-11-5386.
9          This deposition is being held at Brown &
10    Jones Reporting on April 4th, 2013, at 8:59 a.m.
11    My name is Dean Van Hoogen, and I am the
12    videographer.  The court reporter is Jessica
13    Waack.
14         Counsel, will you please introduce
15    yourselves and affiliations, and the witness will
16    be sworn.
17         MR. CALOZA:  Alexis Caloza, Fenwick &
18    West, counsel for Diamond Foods, Incorporated.
19         MS. GORE:  Krissi Gore, Chitwood,
20    Harley, Harnes, counsel for the plaintiffs.
21         MR. WYLIE:  Joseph Wylie, K&L Gates,
22    counsel for the deponent.
23         MS. JOHNSON:  Sarah Johnson, counsel for
24    Artisan Partners.
25         MS. GISCHE:  Emily Gische, counsel for

Page 6

1     Diamond Foods.
2                    * * * * *
3          ANDREW STEPHENS, called as a witness
4     herein, having been first duly sworn on oath, was
5     examined and testified as follows:
6                  EXAMINATION
7     BY MR. CALOZA:
8   Q   Can you please state your full name for the
9     record?
10  A   Andrew Craig Stephens.
11  Q   And could you state your current business address?
12  A   It's 875 East Wisconsin, Suite 800, Milwaukee,
13    Wisconsin 53202.
14  Q   Have you ever been deposed before?
15  A   I have not.
16  Q   Okay.  I'm just going to go through a few ground
17    rules right now just at the outset.
18         MR. CALOZA:  I'm sorry, do we have any
19    counsel on the phone?
20         MS. IGRA:  Yes, this is Naomi Igra from
21    Sidley Austin representing Michael Mendes.
22         MR. CALOZA:  Anyone else?
23         MR. ROSENBLIT:  Yeah, Avi Rosenblit of
24    Hogan Lovells representing --
25         (Naomi Igra from Sidley Austin for

Page 7

1     Michael Mendes left.)
2          MR. ROSENBLIT:  I'm sorry, Avi Rosenblit
3     from Hogan Lovells representing Steven Neil.
4          MR. CALOZA:  Okay.  Anyone else?
5     BY MR. CALOZA:
6   Q   Mr. Stephens, do you understand that your
7     testimony today is under oath just as if you were
8     testifying in court?
9   A   Yes.
10  Q   And that -- do you understand that you have an
11    obligation to testify truthfully?
12  A   Yes.
13  Q   The reporter will transcribe everything that is
14    being said, so it's very important that you answer
15    audibly.  No shakes of the head or nods.
16         (Naomi Igra for Michael Mendes from
17    Sidley Austin joined.)
18  BY MR. CALOZA:
19  Q   Do you understand -- let me just repeat that.
20         MS. IGRA:  Apologies for the technical
21    trouble here.
22  BY MR. CALOZA:
23  Q   Okay.  It's important because the court reporter
24    is transcribing everything that you answer my
25    questions with an audible answer and not just a

Page 8

1     shake of the head or a nod.  Do you understand?
2   A   Yes.  Can't shake and nod at the same -- to
3     speak --
4   Q   That's fine as long as there's an audible answer.
5   A   Also, to make it easier for the court reporter,
6     please don't speak over me or, you know, answer
7     questions until I'm done asking my question.  Do
8     you understand that?
9   A   Yes.
10  Q   Let me know if you don't understand a question,
11    and, you know, I'll do my best to clarify, but if
12    you answer, I'll assume that you understood the
13    question.  Do you understand?
14  A   Yes.
15  Q   Thank you.  If you need a break, let me know.  I
16    can't promise that I will take a break
17    immediately, but I will try to do so as soon as I
18    get to a good stopping point.  Do you understand?
19  A   Yes.
20  Q   I'm not going to ask you to guess or speculate as
21    to any answers, but I am entitled to your best
22    recollection.  Do you understand?
23  A   Yes.
24  Q   Is there any reason why you cannot give your best
25    testimony today?



Page 9

1  A   No.
2  Q   Okay.  Thank you.  I'd like to start with your
3      educational background.  Do you have any post
4      secondary education?
5  A   No -- yes, sorry.  Yes, I have a bachelor of
6      science degree from the University of Wisconsin in
7      economics.
8  Q   And when did you receive that degree?
9  A   1986.
10 Q   And did you do any graduate school education after
11     that?
12 A   No.
13 Q   Do you have any other degrees?
14 A   No.
15 Q   What was your first -- what was your first job
16     after college?
17 A   I was employed by Strong/Corneliuson Capital
18     Management in Milwaukee.
19 Q   And when was that, what dates?
20 A   That was -- I started in January of 1987, and I
21     was there until March of 1997.
22 Q   And what was your job title?
23 A   Through that period or --
24 Q   Through that period?
25 A   I had a number of different jobs.  I started in an

Page 10

1      entry-level statistics and marketing position, and
2      I left as a portfolio manager.
3  Q   Okay.  And as a portfolio manager, what were your
4      responsibilities?
5  A   I was responsible for managing the equities in a
6      balanced mutual fund, making the purchase and sale
7      decisions.
8  Q   Okay.  Where did you go after you left that job?
9  A   To Artisan Partners.
10 Q   And what was your title when you started at
11     Artisan?
12 A   Portfolio manager.
13 Q   Okay.  And what were your job responsibilities as
14     a portfolio manager?
15 A   The same, the -- making the research -- conducting
16     the research and making the purchase and sale
17     decisions for an equity portfolio.
18 Q   Is your current title still portfolio manager?
19 A   It is.
20 Q   Have your job responsibilities changed at all
21     since you started in -- at Artisan?
22 A   No.
23 Q   Okay.  And can you remind me when you said you
24     started at Artisan?
25 A   March 1997.

Page 11

1          MR. CALOZA:  Okay.  So as a -- let me
2      start with something else.
3          (Exhibit No. 49 is marked.)
4  BY MR. CALOZA:
5  Q   Mr. Stephens, have you seen this document before?
6  A   No, I have not.
7  Q   Do you understand that you are testifying today as
8      a witness -- a representative witness for Artisan
9      Partners?
10 A   Yes.
11 Q   Could you take a look at Page 3 of the Exhibit A,
12     so that would be the second-to-last page of
13     Exhibit 49?  Do you -- and it says "Deposition
14     Topics."  Do you see that?
15 A   Yes.
16 Q   Could you, please, just read those deposition
17     topics?
18 A   "Any agreement or arrangement between you and
19     MPERS."  That's No. 1; No. 2, "All
20     communication" --
21 Q   Let me -- let me do it this way.  Could you read
22     Deposition Topic No. 1 just -- do you see that it
23     says, "Any agreement or arrangement between you
24     and MPERS?
25 A   Yes.

Page 12

1  Q   Are you prepared to testify on that topic today?
2          MR. WYLIE:  I am going to object to the
3      extent that you are asking him to testify on
4      topics beyond what Artisan has agreed to
5      designate the witness to testify on.
6          MR. CALOZA:  I understand your
7      objection --
8          MR. CALOZA:  Can we go off the record
9      for a second?
10         THE VIDEOGRAPHER:  We are off the record
11     at 9:08 a.m.
12         (Discussion held off the record.)
13         THE VIDEOGRAPHER:  We are back on the
14     record at 9:10 a.m.
15         MR. CALOZA:  I believe counsel for
16     Artisan wanted to state an objection for the
17     record.
18         MR. WYLIE:  Yeah, pursuant to an
19     agreement between myself and counsel for the
20     defendant, Artisan and the deponent object to any
21     questions that imply that there is an obligation
22     for the deponent to testify as to matters outside
23     the scope of what Artisan has agreed to designate
24     a witness to testify as to as set forth in the
25     correspondence between myself and counsel for the



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013

13–16

Page 13

1   defendant.
2          MR. CALOZA:  And I would just like to
3   clarify that Diamond's position is that there was
4   no agreement, but we will proceed and deal with
5   that later, if necessary.
6   BY MR. CALOZA:
7   Q   Mr. Stephens, going back to Exhibit 49, could you
8       please read Deposition Topic No. 1?
9   A   No. 1 "Any agreement or arrangement between you
10      and MPERS."
11  Q   And do you understand that MPERS refers to
12      Mississippi Public Employees' Retirement System?
13  A   Yes.
14  Q   And I may refer to MPERS as MS PERS or PERS or
15      MSPERS, and by that I mean to refer to Mississippi
16      Public Employees' Retirement System.  Do you
17      understand that?
18  A   Yes.
19  Q   Are you prepared to testify on Topic No. 1 today?
20  A   Yes.
21  Q   Could you please read Topic No. 2?  Do you see
22      that it says, "All communications between you and
23      MPERS, or any person on MPERS' behalf, regarding,
24      relating to or referring to MPERS' investments,
25      including but not limited to investments or

Page 14

1   proposed investments in Diamond or P&G Securities,
2   during the period June 5, 2010 to June 8, 2012."
3   Do you see that?
4   A   Yes.  To clarify, did you mean me, or you mean
5       Artisan Partners?
6   Q   "You" means Artisan Partners.  Do you understand
7       that?
8   A   I understand the question.
9   Q   Are you prepared to testify as to Deposition Topic
10      No. 2?
11  A   No.
12  Q   Could you please read Deposition Topic No. 3.  Do
13      you see that it says, "All purchases,
14      acquisitions, sales, transfers or other
15      transactions involving Diamond or P&G Securities,
16      by MPERS or on MPERS' behalf during the period of
17      June 5, 2010 to June 8, 2012, including the
18      reasons for such transactions"?
19  A   Yes.
20  Q   Are you prepared to testify as to Deposition Topic
21      No. 3 today?
22  A   Yes, to the best of my ability.
23  Q   Could you please read Deposition Topic No. 4?  Do
24      you see that it says, "Any research, investment
25      advice, proxy voting or other service involving

Page 15

1   Diamond or P&G Securities, performed or provided
2   by you to MPERS or any person on MPERS' behalf" --
3          MR. WYLIE:  Just to remind the witness,
4   "you" here means Artisan Partners, not you
5   personally.
6   BY MR. CALOZA:
7   Q   -- "during the period June 5, 2010 to June 8,
8       2012."  Do you see that?
9   A   Yes.
10  Q   Mr. Stevens, are you prepared to testify on
11      Deposition Topic No. 4 today?
12  A   Yes, to the best of my ability.
13  Q   Could you please read Deposition Topic No. 5?  Do
14      you see that it says, "Any analysis, research,
15      investigation, review, commentary or other service
16      conducted by you regarding any of Diamond's or
17      P&G's public disclosures during the period June 5,
18      2010 to June 8, 2012."  Do you see that?
19  A   Yes.
20  Q   And are you prepared to testify as to Deposition
21      Topic No. 5 today?
22  A   Not as it relates to P&G's public disclosures, no.
23  Q   If you turn the page to Page 4, Deposition Topic
24      No. 6 says, "Any research or investigation of
25      Diamond or P&G conducted by you, or by others

Page 16

1   acting on your behalf, during the period June 5,
2   2010 to June 8, 2012."  Do you see that?
3   A   Yes.
4   Q   And are you prepared to testify as to Deposition
5       Topic No. 6?
6   A   You know, I have -- can I ask a clarifying
7       question?
8   Q   Yes.
9   A   "You" as it relates to Artisan Partners is in
10      reference to the strategy that I'm responsible
11      for, not the overall Artisan Partners, the firm,
12      correct?
13  Q   Well, "you" refers to Artisan Partners, but if you
14      are only prepared to testify as to the strategy
15      that you are responsible for, you can say that in
16      your response.
17  A   Yes, only as it relates to the strategy that I
18      am -- I am responsible for, and only as it relates
19      to Diamond.
20  Q   And could you read Deposition Topic No. 7?
21  A   Yes.
22  Q   Do you see that it says, "Your organization
23      structure," and, again, "your" refers to Artisan
24      Partners?
25  A   Yes.



Page 17

1  Q   Are you prepared to testify as to Deposition Topic
2      No. 7?
3  A   Yes, to the best of my ability.
4  Q   Do you see Deposition Topic No. 8:  "Documents
5      regarding, relating to or referring to Diamond"?
6      Do you see that?
7  A   Yes.
8  Q   And are you prepared to testify as to Deposition
9      Topic No. 8?
10 A   Yes, as it relates to my strategy.
11 Q   Could you please read deposition -- or Topic
12     No. 9?  Do you see that it says, "MPERS'
13     investment policies, goals, plans, objectives and
14     restrictions"?
15 A   Yes, to my understanding, yes.
16 Q   And are you prepared to testify as to Deposition
17     Topic No. 9?
18 A   Yeah, and to my understanding, yes.
19 Q   And the last deposition topic is "MPERS' profits
20     or losses from purchases, acquisitions, sales,
21     transfers or other transactions involving Diamond
22     or P&G Securities from January 1, 2009 to the
23     present."  Do you see that?
24 A   Yes.
25 Q   And are you prepared to testify as to Deposition

Page 18

1      Topic 10?
2  A   I can only speak to No. 10 as it relates to the
3      strategy that I manage for MPERS and only as it
4      relates to Diamond Securities.  Can I have a point
5      of clarification?  In the earlier references to
6      "you," I would like to add in Nos. 1, 2 -- and I
7      guess it was No. 4, that "you" relates just to my
8      strategy.
9  Q   And I should have said this earlier, but if you
10     need to clarify any previous answer, just let me
11     know --
12 A   Okay.
13 Q   -- and then we can go back.
14 A   Okay.
15        MR. CALOZA:  Can you mark this as
16     Deposition Exhibit No. 50?
17        (Exhibit No. 50 is marked.)
18 BY MR. CALOZA:
19 Q   Mr. Stevens, the court reporter has handed you
20     what has been marked as Deposition Exhibit No. 50,
21     and it is a March 26, 2013 letter, from Joseph C.
22     Wylie, II, to Alexis I. Caloza.  Have you seen
23     this document before?
24 A   I have not.
25 Q   Could you please turn to Page 5?  Do you see where

Page 19

1      it says, "Subject to and without waiving its
2      objections, Artisan Partners will produce a
3      representative prepared to testify as to the
4      following subjects"?
5  A   I'm sorry, where is that?
6  Q   It is at the bottom of the page right before
7      Letter "A."  Do you see it?
8  A   "Subject to and without waiving its objections,
9      Artisan Partners will produce a representative
10     prepared to testify as to the following subjects."
11     Yes.
12 Q   And the first subject underneath that is "The
13     manner in which Artisan Partners made decisions to
14     purchase or sell securities in the MPERS account
15     in which MPERS purchased or sold securities of
16     Diamond, the MPERS mid-cap account."  Do you see
17     that?
18 A   Yes.
19 Q   And are you prepared to testify as to that topic
20     today?
21 A   Yes.
22 Q   And below it, the second topic is, "The process by
23     which the Artisan partners personnel responsible
24     for the management of the MPERS mid-cap account
25     gathered information related to Diamond and the

Page 20

1      process by which Artisans Partners made the
2      decisions to purchase and sell securities of
3      Diamond in the MPERS mid-cap account."  Do you see
4      that?
5  A   Yes.
6  Q   Are you prepared to testify as to that topic
7      today?
8  A   Yes.
9  Q   The next topic is "The manner in which Artisan
10     Partners typically causes securities to be
11     purchased or sold in accounts managed by the
12     Artisan Partners personnel responsible for
13     management of the MPERS mid-cap account."  Do you
14     see that?
15 A   Yes.
16 Q   And are you prepared to testify as to that today?
17 A   Yes.
18 Q   The next topic is "The manner in which Artisan
19     Partners' personnel responsible for the management
20     of the MPERS mid-cap account typically communicate
21     with clients regarding purchases, holdings or
22     sales of securities and such clients' investment
23     accounts."  Do you see that?
24 A   Yes.
25 Q   And are you prepared to testify as to that topic



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
21–24

Page 21

1   today?
2 A   Yes.
3 Q   And the final topic is "The identities and
4     responsibilities of persons involved in decisions
5     to purchase or sell securities in the MPERS
6     mid-cap account."  Do you see that?
7 A   Yes.
8 Q   And are you prepared to testify as to that topic
9     today?
10 A   Yes.
11 Q   Okay.  Thank you very much.  Do you understand
12     that you are testifying in a representative
13     capacity today, not in an individual capacity?
14 A   Yes.
15 Q   Did you do anything to prepare for the deposition
16     today?  And I'm not asking you to reveal any
17     attorney-client privileged communications.
18         MR. WYLIE:  Just for the record, I'll
19     object to the extent the question purports to call
20     for the disclosure of attorney-client
21     communications.
22 BY MR. CALOZA:
23 Q   You may answer.
24 A   Could you repeat the question, please?
25 Q   Did you do anything to prepare for the deposition

Page 22

1   today?
2 A   Yes.
3         MR. WYLIE:  Same objection.
4 BY MR. CALOZA:
5 Q   What did you do?
6         MR. WYLIE:  Same objection.
7         THE WITNESS:  I read through some
8     background information.
9 BY MR. CALOZA:
10 Q   And what background information did you read?
11 A   The history of our internal notes.
12 Q   Anything else?
13 A   Our original research report.
14 Q   Anything else?
15 A   A brief review of the client guidelines.
16 Q   What do you mean by "client guidelines"?
17 A   The cont -- the original investment management
18     contract.
19 Q   Did you review anything else?
20 A   No.
21 Q   Did you meet with anyone?  And, again, I'm not
22     asking you to reveal any attorney-client
23     privileged communications.
24 A   No.
25 Q   Have you had any discussions with anyone at MPERS

Page 23

1     about coming to the deposition today?
2 A   No.
3 Q   And have you had any discussions with anyone at
4     Artisan about coming to the deposition today?
5         MR. WYLIE:  Object to the extent it
6     calls for the disclosure of attorney-client
7     communications.
8 BY MR. CALOZA:
9 Q   You may answer.
10 A   Yes.
11 Q   And who did you meet with, or who did you have a
12     discussion with?
13         MR. WYLIE:  Object to the extent that it
14     calls for the disclosure of attorney-client
15     communications.
16         THE WITNESS:  My assistant.
17 BY MR. CALOZA:
18 Q   And what did you discuss with your assistant?
19 A   The timing of my being out of the office, the
20     scheduling of this appointment.
21 Q   Did you discuss the deposition with anyone else?
22 A   No.
23 Q   Mr. Stevens, a few moments ago you --
24 A   Can I -- can I clarify that?
25 Q   Yes.

Page 24

1 A   To the point of your objection, the
2     attorney-client, does that include my attorneys?
3 Q   Yes.  I'm not going to ask about the content of
4     that.  But if you met with your attorneys, you
5     should say so.
6 A   Oh, yes, yes, sorry.
7 Q   And who was present at those discussions?
8 A   Sarah and Joe.
9 Q   And by "Sarah" --
10 A   Sarah Johnson and Joe Wylie.
11 Q   And who is Sarah Johnson -- Sarah Jones?
12 A   Sarah Johnson, our counsel.
13 Q   Okay.  And she is the general counsel of Artisan,
14     is that right?
15 A   Yes.
16 Q   Was anyone else present other than Sarah Johnson
17     and Mr. Wylie?
18 A   No.
19 Q   Thank you.  How would you characterize your
20     investment strategy at Artisan?
21         MR. WYLIE:  Objection to the form.  Are
22     you asking about -- Artisan overall or his team?
23 BY MR. CALOZA:
24 Q   I'm asking about your specific team.
25 A   And the question was, how would I characterize it?



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
25–28

Page 25

1  Q   Right, how would you describe your investment
2       strategy?
3  A   It's a -- as it relates to the MPERS account, it
4       is a long-only, public securities-based
5       equity-only growth-focused investment strategy in
6       a broadly diversified portfolio.
7  Q   What do you mean by "growth focused"?
8  A   We look -- we look for companies who are either
9       currently or likely to embark on what we call a
10      positive profit cycle, so we expect their profits
11      should accelerate, and, therefore, we define it as
12      growth, growing businesses -- growing --
13      businesses with growing profit streams.
14 Q   Other than this growth-focused investment strategy
15      that your team is responsible for, does Artisan
16      have any other general investment strategies?
17          MR. WYLIE: Objection. Form. Vague.
18      If you can answer.
19 BY MR. CALOZA:
20 Q   Do you understand the question?
21 A   I believe so. Yes, Artisan does have other
22      investment strategies.
23 Q   And what other investment strategies does Artisan
24      have?
25 A   I can't speak to them in specific detail because I

Page 26

1       don't manage those portfolios, but we do have four
2       other teams at Artisan that manage equity
3       portfolios.
4  Q   And just to the best of your ability, could you
5       briefly describe what those investment teams -- do
6       those investment teams have the same type of
7       investment strategy that your team has?
8  A   To the best of my understanding, it is similar in
9       some ways and different in many ways.
10 Q   Okay. How independent are those teams from one
11      another and from yours?
12          MR. WYLIE: Objection. Form. Vague.
13      If you can answer.
14          THE WITNESS: They're --
15 BY MR. CALOZA:
16 Q   Do you understand the question --
17 A   They're independent in their research and
18      decision-making, although we have a centralized
19      research repository where some data can be viewed
20      by all the teams.
21 Q   And when you say "some data can be reviewed by all
22      the teams," is that -- is that all the research
23      that each investment team conducts, or what --
24      strike the question.
25          When you refer to this centralized data

Page 27

1       repository --
2  A   Uh-huh.
3  Q   -- what information is shared among the teams?
4  A   Only the information that's contributed by the
5       teams. It's a voluntary system.
6  Q   And could you give examples of what information
7       might be shared in that central data repository?
8  A   If someone had a -- if one of the teams had a
9       meeting with a company, they may write up notes
10      and contribute them to the system, similar to the
11      notes that you have in your -- in your exhibits,
12      or they may not.
13 Q   If one team believes that a particular stock is a
14      good investment, does it typically share that
15      information with other investment teams?
16 A   No.
17 Q   Conversely, if another investment team believes
18      that a particular stock is a good investment,
19      would you expect that information to be shared
20      with your investment team?
21 A   No.
22 Q   Okay. Are Artisan's investment teams designed to
23      work autonomously from one another?
24 A   Yes.
25 Q   Why is that?

Page 28

1  A   Because we think that independence and autonomy in
2       investment decision-making produces the best
3       results.
4  Q   Could -- why do you think it produces the best
5       results?
6  A   Because it allows you to be highly focused in your
7       process and methodology and not be deluded by
8       others' approaches.
9  Q   Does your investment strategy team manage
10      investments on behalf of MPERS?
11 A   Yes.
12 Q   To your knowledge, are there any other teams at
13      Artisan that manage investments on behalf of
14      MPERS?
15 A   Yes.
16 Q   Which teams are those?
17 A   Our emerging markets team.
18 Q   I'm sorry, did you say "emerging markets"?
19 A   Emerging markets, yes. That's to the best of my
20      knowledge.
21 Q   And are you aware of any coordination between the
22      emerging markets team and your investment team in
23      managing investments on behalf of MPERS?
24 A   There's no official, coordinated cooperation.
25          MR. CALOZA: I'd like to mark this as



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013

29—32

Page 29

1       Exhibit 51.
2          (Exhibit No. 51 is marked.)
3    BY MR. CALOZA:
4    Q    Mr. Stevens, you've been handed a document marked
5         as Exhibit 51, and it says, "An In-Depth View of
6         Artisan Growth Team Investment Philosophy and
7         Process."  Are you familiar with this document?
8    A    Yes, yes.
9    Q    What is it?
10   A    It's an overview of our investment philosophy and
11        process and our key decision-makers.
12   Q    Can you please turn to Page 2, and do you see at
13        the top of that page, it has a list of people
14        associated -- it has a list of people under
15        "Leadership" and lists analysts as well?
16   A    Yes.
17   Q    And are those all members of your investment
18        strategy team?
19   A    Yes, they are.
20   Q    And are there any individuals who are part of your
21        investment strategy team during the period between
22        June 5, 2010, and June 8, 2012, who are not listed
23        at the top of Page 2 of Exhibit 51?
24   A    I'm trying to -- I'm sorry, can you restate the
25        question?

Page 30

1    Q    Are there any individuals who were part of the
2         growth investment strategy team, your investment
3         strategy team, during the period between June 5th,
4         2010, and June 8, 2012, who are not listed on the
5         top of Page 2 of Exhibit 51?
6    A    Yes, I believe there are.
7    Q    What are their names?
8    A    Well, it's missing our trading group, Jay Peters,
9         Brenda Loeffel, Nick Costello and -- it's missing
10        our administrative assistants, Kathy Eurich and
11        Robin Johnson.
12   Q    And did any of those --
13   A    And I'm trying to think. It may be missing an
14        analyst that -- that we've -- I can't -- I can't
15        recall the time period when we hired some of our
16        newer analysts, so they may be -- they may be
17        missing. Jess Gelhar is not on here either,
18        Jessica Gelhar, who is an associate analyst. I
19        don't know her start date.
20   Q    Did any of the individuals you just named have a
21        role in determining which investments were
22        purchased and sold by Artisan on behalf of MPERS?
23   A    No.
24   Q    Do you see that under "analysts," it lists
25        Roderick M. Brower?

Page 31

1    A    Uh-huh.
2    Q    What role does he have in determining which
3         investments are purchased and sold on behalf of
4         MPERS?
5    A    Rod is a senior analyst. He has great input into
6         the securities that we research, and he has -- he
7         has great influence in the securities we decide to
8         purchase and sell.
9    Q    Okay. What is his role? When you say "great
10        input" and "great influence," what do you mean?
11   A    I should say significant.
12   Q    Okay.
13   A    Strike "great" and replace it with "significant."
14   Q    Okay. When you say significant input and
15        influence, what do you mean by that?
16   A    Rod is responsible for covering the consumer
17        sector for our research team, so all securities --
18        all investment ideas that are in the consumer area
19        of the economy, Rod will bring to our attention.
20        He will do the fundamental research and present it
21        to the team of other analysts and portfolio
22        managers. He will give us a recommendation for
23        purchase and sale.
24   Q    When you say "consumer" -- well, let me back up a
25        second.

Page 32

1          Are you familiar with Diamond Foods,
2    Inc.?
3    A    Yes.
4    Q    Do you know what type of products Diamond has?
5    A    Yes.
6    Q    What kind of products does Diamond sell?
7    A    Food products: nuts, snack foods.
8    Q    Would those fall into the consumer --
9    A    Yes, that's considered a consumer staple.
10   Q    So would Mr. Brower -- would Diamond fall into, I
11        guess, Mr. Brower's purview in terms of
12        researching potential investments?
13   A    Yes. As well as Martin Jochmann's and Jessica
14        Gelhar's, but primarily Rod's.
15   Q    You mentioned Mr. Jochmann --
16   A    Uh-huh.
17   Q    -- is that correct? What role does he have in
18        determining which investments are purchased and
19        sold on behalf of MPERS?
20   A    A similar -- a similar role to Mr. Brower,
21        although his area of coverage is slightly
22        different.
23   Q    How is it different?
24   A    He's primarily involved in the healthcare sector
25        and consumer services as opposed to consumer



Page 33

1       products, although there is some overlap.
2   Q   Okay.  And you also mentioned Jessica Gelhar?
3   A   Yeah.
4   Q   She is not listed on the top of Page 2.  What
5       role -- or Page 2 of Exhibit 51.  What role does
6       she have in determining which investments are
7       purchased and sold on behalf of MPERS?
8   A   At the time of the period in question or today?
9   Q   Let's start with the period in question, so
10      June 5th, 2010, through June 8, 2012?
11  A   For the majority of that period, she had a -- she
12      was in a support role to Rod Brower, Roderick
13      Brower, as an associate analyst.  So primarily
14      fact gathering and reporting of information.
15  Q   Did she also support Mr. Jochmann?
16  A   She -- she might when -- on an as-needed basis.
17  Q   I'd like to turn to your investment team's
18      strategy.
19  A   Uh-huh.
20  Q   If you look at the bottom of Page 2 under
21      "Securities Selection," it says, "The first
22      element of our process is securities selection."
23  A   Uh-huh.
24  Q   Do you see that?
25  A   Yes.

Page 34

1   Q   Could you describe what -- what you mean by
2       "securities" -- or what -- could you just talk
3       about the reference to "securities selection"?
4       What does that mean?
5   A   It means determining which securities are
6       appropriate for inclusion in the portfolio out of
7       all securities available to be purchased.
8   Q   And what are the elements of that selection
9       process, where does it begin?
10  A   It's --
11          MR. WYLIE:  I'll object.  Compound.
12  BY MR. CALOZA:
13  Q   Do you understand the question?
14  A   Um --
15  Q   Where does the investment process begin?
16  A   It begins with security selection.
17  Q   And what is the first step in selecting a security
18      for investment?
19  A   Well, first of all, it's judgment -- it's judgment
20      based, so it's to the best of our ability.  It --
21      it starts with trying to find businesses that we
22      think are in some way franchise companies.
23          And by "franchise," I mean those that
24      have established markets or are established in
25      their markets such that we have confidence or a

Page 35

1       level of confidence that they should be protected
2       from economic uncertainty and from competitive
3       uncertainty.
4   Q   Other than this, I guess, franchise
5       characteristic, what other characteristics do you
6       look for in selecting stocks for investment?
7   A   Well, that would be the first.  The second would
8       be that we believe they have a reasonably
9       attractive valuation, and by that I mean, we can
10      understand the assumptions that are used to get to
11      what we determine to be the private market value
12      of the business; in other words, what we would pay
13      to take the business private.
14          And, thirdly, the presence of conditions
15      that would suggest the profits are either
16      accelerating or will likely accelerate.  Those are
17      our three primary conditions.
18  Q   And who is -- who is responsible for identifying
19      -- strike that.
20          Who's responsible for researching
21      whether a company has these franchise
22      characteristics, a reasonable attractive -- a
23      reasonably attractive valuation and, you know,
24      whether there are conditions suggesting
25      accelerating profits?

Page 36

1   A   Well, we all have that responsibility.  Typically,
2       one member of the team will bring it to the
3       attention of the other members of the team.  And
4       from there, we will try to collectively build the
5       case for those -- for those conditions being
6       present.
7           So in the case of a consumer stock like
8       Diamond, typically, Rod Brower will bring it to
9       our attention, but it may come from someone else.
10  Q   Do you have team meetings to discuss the stock?
11  A   Yes.
12  Q   How often do you typically meet to discuss a stock
13      before determining to invest or not?
14  A   It varies.  We meet -- we try to meet daily as a
15      group.  A particular stock may or may not be on
16      the agenda at that daily meeting.  It depends on
17      our prior experience with the stock.
18          If it's something that we're just
19      learning for the first time, it will be a number
20      of discussions before we make an investment,
21      typically.
22  Q   Okay.  Does the term "research qualified" have any
23      significance to your investment team?
24  A   Yes.
25  Q   What does "research qualified" mean?



ANDREW STEPHENS  30(b)(6)                                          April 04, 2013
IN RE DIAMOND FOODS, INC.                                              37–40

Page 37

1  A   It means that we have gone through the process of
2      identifying the company.  We've -- we've worked up
3      a -- typically, we've worked up a -- what we call
4      a research report, research packet, that's been
5      reviewed by the team.
6          There's been questions that have been
7      raised and answered, and, ultimately, the security
8      is voted on in an informal way by the portfolio
9      managers, and you need the support of at least two
10     portfolio managers for the idea before it becomes
11     research qualified.
12 Q   Must a stock be research qualified before Artisan
13     invests in that stock?
14 A   I can't speak to Artisan overall.
15 Q   What about with respect to your specific
16     investment team?
17 A   In general, that is true, yes.
18 Q   Can you think of any examples where your team has
19     invested in a stock without first having it
20     research qualified by the team?
21 A   The research qualification is an internal and
22     subjective judgment, but it's most often followed.
23     I can't think of a specific example off the top of
24     my head where it hasn't been.  There -- there
25     probably is, though, but I can't think of it off

Page 38

1      the top of my head.
2  Q   Okay.  And if a stock is research qualified, does
3      that mean that it has the three qualities you
4      mentioned earlier; that is, franchise
5      characteristics, evaluation that you understand in
6      terms of private market value and the prospect for
7      accelerating profits?
8  A   To the best of our knowledge; however, we do say
9      even in this document that security selection is
10     all about trying to be right more often than we're
11     wrong.  So, yes, we will be wrong.
12 Q   Okay.  But to the best of your understanding, you
13     know, at the time you -- your team determines a
14     stock to be research qualified, do you typically
15     believe that the stock contains those three
16     qualities?
17 A   Yes.
18 Q   I'd like to focus on those qualities for a second.
19     You previously mentioned franchise
20     characteristics.  Why are franchise
21     characteristics important?
22 A   Well, we believe that, you know, all -- all a
23     company is a stream of cash flow, and,
24     ultimately, as public market investors, we're
25     trying to capitalize those cash flows -- or assign

Page 39

1      the appropriate capitalization rate.  That is
2      probably the better way to say it.  And, you know,
3      the most important thing when you're doing that is
4      that that business will be around in the future in
5      a similar form as it is today.  Competition is
6      probably the most powerful force that we deal
7      with.  And, therefore, we consider those four
8      characteristics to be barriers to competition to
9      help protect the value of the investment.  So
10     that's why we consider it important.
11 Q   And does your investment team -- can you think of
12     any examples where your investment team invested
13     in companies that you believed did not have those
14     franchise characteristics at the time of
15     investment?
16 A   I can think of -- I cannot think of any examples
17     where we knowingly invested without those --
18     without at least a few of those characteristics.
19     I should point out that we never have all of those
20     characteristics present.  We're trying to get at
21     least a few of them.
22 Q   How does -- how does your investment team estimate
23     private market value?
24 A   You want the formula for it or...
25 Q   I'll take the formula.  But -- well, first, in

Page 40

1      general, you know, what -- what is the -- what is
2      the process for determining private market value?
3  A   Yeah, consistent with my earlier statement, you
4      know, we believe that a company is a stream of
5      cash flows, and so our job is to, as much as we
6      can, accurately forecast the future potential of
7      those cash flows and then assign the correct
8      multiple to them.
9          In order to do that, we need to
10     understand what we believe the organic growth rate
11     of the business is over the acceleration period.
12     As I mentioned before, we're after accelerating
13     profits, so we want to understand the organic
14     growth rate of the business.  We want to
15     understand the normalized free cash flow margins
16     of the business.  We want to understand the
17     persistency and stability of the cash flow stream
18     through time, and we want to understand the
19     overall level of interest rate that's the
20     structure of the yield curve and the level of what
21     we call the risk-free rate.  And from there, we
22     essentially use a modified dividend discount model
23     to capitalize those cash flows.
24 Q   And just to clarify, is your team's estimate of
25     private market value the same thing as your



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
41–44

Page 41

1     estimate of intrinsic value?
2  A   We don't use the term "intrinsic value," so I
3     wouldn't -- I wouldn't be one to opine on that.
4  Q   Okay.  Is PMV -- does your team use PMV as an
5     abbreviation for "private market value"?
6  A   Yes, it does.
7  Q   Now, you mentioned organic growth as one of the
8     factors in determining private market value.  What
9     do you mean by "organic growth"?
10  A   In an idealized state, organic growth would simply
11     be the unit growth times the price plus the
12     incremental margins in the business.  It's -- it
13     is hard to strip that away in a real living
14     organization, so -- but that would be in an
15     idealized state.
16  Q   Okay.  Where do you obtain the information
17     necessary to determine private market value?
18  A   It comes from a number of places.  It comes from
19     forecasts that are created by other financial
20     organizations.  It comes from the internal
21     forecast generated by the company itself.  It
22     comes from our understanding of the business and
23     business conditions, and, ultimately, it comes
24     from our analysts' synthesis of all of that
25     information into their own projections for the

Page 42

1     business.
2  Q   And you mentioned forecasts created by other
3     financial organizations.  Could you give examples
4     of that?
5  A   Yeah.  It could be models that have been built by
6     analysts on the -- on the south side -- you know,
7     firms like -- as an example, Goldman Sachs or
8     Merrill Lynch or places like that.
9  Q   I'd like you to take a look at Page 3 of
10     Exhibit 51, and the first paragraph at the top of
11     that page.  Halfway through that paragraph it
12     says, "We will consider for investment those
13     companies that are selling at a discount to our
14     estimate of private market value."
15  A   Uh-huh.
16  Q   Do you see that?
17  A   Yeah, yep.
18  Q   And do you agree with that statement?
19  A   I do with the added next sentence which says,
20     "However, we are less interested in the absolute
21     discount we pay than the potential for the private
22     market value to rise over time."
23  Q   What is the importance of a discount to your
24     team's estimate of private market value?
25  A   Well, the private market value is -- embodies a

Page 43

1     control premium that would be paid by someone who
2     wants to take the business private.  As public
3     market investors, we wouldn't be expected to pay
4     the control premium, so we would expect to be able
5     to buy it at a discount to that price.
6  Q   Okay.  What is the -- in your view, is the
7     difference between the private market value that's
8     calculated by your team and the market price, is
9     that, generally, entirely attributable to this
10     control premium?
11  A   I'm sorry.  Re...
12  Q   You just testified that the private market value
13     embodies a control premium that would be paid by
14     someone who wants to take the business private.
15     Does the discount between your estimate of private
16     market value and the market price of the stock, is
17     that entirely attributable to this control
18     premium?
19  A   No, no.  Private market values change far less
20     than public security prices change.  Many factors
21     can influence the depth of the discount between
22     the private market value and the -- and the -- and
23     the public security price.  My point was simply
24     the reason that we look for a discount to private
25     market value is intellectually we don't think we

Page 44

1     should pay the control premium.
2  Q   Okay.  I understand.  What other factors might
3     account for the difference between the private
4     market value as calculated by your team and the
5     market price?  Do you understand that question?
6  A   Yes.
7         MR. WYLIE:  I will object to the extent
8     it calls for speculation.
9  BY MR. CALOZA:
10  Q   You may answer.
11  A   Well, of the factors that I discuss that determine
12     a private -- or the way we calculate a private
13     market value, the market from time to time as
14     embodied by all other investors may have wildly
15     different assumptions than we do.  It may think
16     the growth rate is much higher or lower than we
17     do.  It may think that the normalized free cash
18     flow margins are much higher or lower than we do.
19     It may think the persistence or stability of the
20     cash flow stream is different.  All we can go on
21     is what we think -- what we have determined
22     through our analysis those inputs are; and
23     therefore, that determines our private market
24     value.
25         And the reason we use the term private



ANDREW STEPHENS  30(b)(6)                                  April 04, 2013
IN RE DIAMOND FOODS, INC.                                        45–48

Page 45

1     market value is because it is what we would be
2     willing to pay if we were in the business of
3     taking companies private, which we are not.  It's
4     a reference -- it's simply a reference point.
5  Q   So based on your testimony, is it fair to say that
6     the private market value calculated by your team
7     reflects your view of the value of the business
8     plus this control premium that you referenced
9     earlier?
10         MR. WYLIE:  Object to the extent it
11     misstates his prior testimony.
12         THE WITNESS:  Yes.  No, the private
13     market value is what we think the business is --
14     is worth to a private buyer.
15  BY MR. CALOZA:
16  Q   Assuming that a stock is already research
17     qualified, does your team typically invest in the
18     stock if the market price is greater than your
19     estimate of the private market value?
20         MR. WYLIE:  Objection.  Calls for
21     speculation.  Incomplete hypothetical.
22         THE WITNESS:  Typically, we would not.
23  BY MR. CALOZA:
24  Q   And why not?
25         MR. WYLIE:  Same objection.

Page 46

1         THE WITNESS:  It wouldn't -- it wouldn't
2     be consistent with our stated investment approach.
3  BY MR. CALOZA:
4  Q   So can you think of any instances where your team
5     did, in fact, invest in a stock even though the
6     market price was greater than your team's estimate
7     of private market value?
8  A   The only time I could see it potentially happening
9     is when there's information that's in a state of
10     flux and the analyst has not had the time to
11     rebuild their model in our -- and publish it in
12     our system, but they're -- in their judgment, it
13     is going up.  And in the discussions we've had,
14     they've been able to tell us it's going to be --
15     when they republish that number, it will be much
16     higher; so, therefore, it is.  It's just not as
17     it's currently shown in our reports.  It may be
18     out of date.  That's the only time I can think of
19     it.
20  Q   How much of a discount is typically necessary
21     before your team will consider investing in a
22     stock; and by "discount," I mean, the discount
23     between the market price and your estimate of
24     market -- sorry, your estimate of private market
25     value?

Page 47

1  A   Our private market value is an annualized
2     calculation, so we're always trying to look out
3     365 days.  We're far less interested in the
4     absolute discount than we are the fact that that
5     private market value looks like it's going to grow
6     through -- we believe that the private market
7     value will increase through time.
8         So subjectively, we will determine
9     sometimes that less discount is required, because
10     the private market value should inflect higher
11     beyond that 365-day period.  Other times, we don't
12     think it's ready to inflect, and we will
13     demand more of a discount.  So it's a
14     judgment-based decision-making.
15  Q   In the latter scenario where you don't believe it
16     is ready to increase, is there a typical amount
17     that's required for the discount before you will
18     consider investment?
19         MR. WYLIE:  Objection to the extent it
20     misstates his prior testimony.
21         THE WITNESS:  A normalized range?
22  BY MR. CALOZA:
23  Q   Correct.
24  A   Would be in the 20- to 30 percent discount to
25     private market value.

Page 48

1  Q   And then, again, in the former scenario where you
2     believe that, you know, private market value looks
3     like it's going to increase over time, is there a
4     typical, you know, discount -- a normalized
5     discount range?
6         MR. WYLIE:  Objection to the extent it
7     misstates his prior testimony.
8         THE WITNESS:  Yeah, I can't -- I can't
9     normalize those situations.
10  BY MR. CALOZA:
11  Q   What would be an example of a stock where you
12     believed the private market value was going to
13     increase over time?
14  A   Well, we think that there's generally two places
15     that accelerating profit cycles come from:  The
16     first is internal changes within a business, so
17     situations where you either have a new management
18     team coming on board, you have a new product cycle
19     starting up, you have an acquisition or a
20     divestiture that will drive -- that we believe
21     will drive accelerating profits; the second would
22     be external secular events that drive profit
23     cycles, like technological breakthroughs,
24     regulatory change, demographic waves.
25  Q   Why are accelerating profits important to your



ANDREW STEPHENS  30(b)(6)                                    April 04, 2013
IN RE DIAMOND FOODS, INC.                                        49–52

Page 49

1      investment strategy?
2  A   In our work, the highest correlated factor with
3      the stock market success over the medium- to
4      long-term is stocks follow profits, and the
5      derivative to that is stocks follow accelerating
6      profits, so we think it's a key to stock market --
7      to success in investing in public equities.
8  Q   Now, you mentioned several examples of internal
9      changes that might drive accelerating profits.
10     One of them was new management coming on board.
11 A   Uh-huh.
12 Q   Does your estimate of private market value
13     incorporate your views on the likelihood of new
14     management coming in?
15 A   No. We would wait -- we would wait to see the
16     occurrence of the new management team being
17     brought in by a board.
18 Q   Okay. You also had mentioned as a potential
19     catalyst, proposed acquisition or divestiture that
20     would drive accelerating profits.
21 A   Uh-huh.
22 Q   In that case, does your estimate of private market
23     value incorporate your view on the likelihood of
24     that merger or divestiture occurring?
25 A   It can.

Page 50

1  Q   Are you familiar with the term "crop" -- strike
2      that.
3          Does the term "crop" have any special
4      significance to your investment strategy?
5  A   Yes.
6  Q   And what -- what does "crop" mean?
7  A   There's three broad areas or broad allocation
8      groupings within our portfolio: the garden, the
9      crop and the harvest. The crop is where we take
10     much larger positions in the portfolio, because we
11     have high confidence that the profit cycle in the
12     business has taken hold. The garden is where we
13     take a relatively limited size positions, because
14     we think it is still somewhat uncertain that the
15     profit cycle will take hold -- has or will take
16     hold.
17 Q   And did you -- you also mentioned harvest. What
18     does "harvest" mean?
19 A   Harvest is where we're reducing our positions
20     either because they've exceeded our private market
21     value on a sustainable basis or the profit cycle
22     we anticipated and bought the security for doesn't
23     look like it's accelerating any longer and will
24     likely decelerate.
25 Q   Now, you just said with respect to harvest stocks

Page 51

1      that you're reducing your position -- or one
2      reason you might -- might reduce your position is
3      because it has exceeded your private -- your
4      estimate of private market value on a sustainable
5      basis. Could you explain why that would be a
6      reason to reduce your position in that stock?
7  A   Once it's exceeded and stayed above our private
8      market value and we've had the time to consider
9      any new information into our private market value,
10     if the stock is still above that, we no longer --
11     no longer intellectually understand why we should
12     own the stock. It's beyond our valuation in our
13     best -- our best work on what the valuation should
14     be; and, therefore, we shouldn't own it. We
15     should be reducing that position.
16 Q   So is that because the market -- the market price
17     reflects a higher valuation for that stock than
18     your team believes is reasonable given the
19     information available to your team?
20         MR. WYLIE: I object to the form of the
21     question. Vague as to the term "reasonable."
22 BY MR. CALOZA:
23 Q   Do you understand the question?
24 A   Yes. I would say that's largely correct, yes.
25         MR. WYLIE: Alexis, we've been going a

Page 52

1      little over an hour. If you get to a point to a
2      transition, maybe it would be a good time for a
3      break.
4          MR. CALOZA: We can go ahead and take a
5      break now. I have more questions on this, but now
6      is a -- as convenient stopping place as any.
7          MR. WYLIE: Okay.
8          MR. CALOZA: Can we go off the record?
9          THE VIDEOGRAPHER: We are off the record
10     at 10:10 a.m.
11         (A brief recess is taken.)
12         THE VIDEOGRAPHER: We are back on the
13     record at 10:21 a.m.
14 BY MR. CALOZA:
15 Q   Mr. Stevens, I'd like to return to the discount
16     between the market price of a security and the
17     private market value as calculated by your
18     investment team.
19 A   Uh-huh.
20 Q   Now, you previously testified that part of that
21     discount reflects a control premium; is that
22     right?
23 A   I don't believe that's what I said. I believe
24     what I said was that the private market value is a
25     reflection of what someone would pay to own and



ANDREW STEPHENS  30(b)(6)                                    April 04, 2013
IN RE DIAMOND FOODS, INC.                                          53–56

Page 53

1    control a business, and the reason that we would
2    not pay that price is, to us, that would imply we
3    had -- we were paying the control premium.  But
4    the discount may be the result of many factors.
5  Q   Okay.  Let's talk about some of those -- those
6    factors in the discount.  You previously testified
7    that part of the discount may result from
8    different assumptions by different investors; is
9    that right?
10 A   To the best of my knowledge.  I don't -- I don't
11    know why other people assign the prices they do to
12    securities.  I know why we assign the prices that
13    we do.
14 Q   Okay.  Well, one factor that you testified about
15    previously is that other investors may assume
16    different growth rates; is that correct?
17 A   I did mention that that may be one reason that a
18    discount is wider than what we project, yeah.
19 Q   How does Artisan estimate and apply a growth rate
20    to a particular stock?
21 A   In an idealized world, we would try to strip the
22    business down and understand how fast we believe
23    the units can grow, how much pricing power we
24    think there are within the product categories and
25    what the resulting incremental margins would be in

Page 54

1    the business.
2        That gives us a sense to the best of our
3    ability of what the -- what we call the organic
4    growth rate should be.  There are many factors
5    that ultimately end up influencing a company's
6    growth rate that we can't predict such as
7    cyclical -- the cyclical influences of the
8    economy, the deleveraging effect within a
9    business, the resulting either incremental or
10    decremental margins from acquisitions or
11    divestitures.  There's just many things that we
12    can't predict, so we try to calculate an ideal
13    organic growth rate.  It's subjective and
14    judgment-based.
15 Q   And the inputs in that -- you know, that
16    subjective- and judgment-based calculation of
17    organic growth rate, is that based on publicly
18    available information?
19 A   Yes, always.
20 Q   And is it fair to say that another investor taking
21    the same publicly available information may
22    believe that the growth rate is different than
23    what your team calculates?
24        MR. WYLIE:  Objection to the extent it
25    calls for speculation.

Page 55

1        THE WITNESS:  I can't predict what they
2    do.  I'm sure that people come up with wildly
3    different assumptions.
4  BY MR. CALOZA:
5  Q   Do you -- in determining private market value, do
6    you ever attempt to quantify the control premium
7    that a -- you know, a private buyer would pay to
8    take the business private?
9  A   Rephrase your -- restate your question, please.
10 Q   Well, you've testified that private market value
11    refers to what you think a business is worth to a
12    private buyer --
13 A   Right.
14 Q   -- is that right?  And is part of that value to a
15    private buyer the value associated with
16    controlling the business?  Is that...
17        MR. WYLIE:  Objection to the form of the
18    question.  I'm not even sure that was a question.
19 BY MR. CALOZA:
20 Q   Is part of the value of -- is part of private
21    market value the value that -- well, let me ask it
22    this way:  In taking a public business private,
23    would a private buyer need to pay a control
24    premium over the -- in addition to the value of
25    the business as a public business?

Page 56

1        MR. WYLIE:  Objection.  Form.  Vague.
2    Calls for speculation and incomplete hypothetical.
3  BY MR. CALOZA:
4  Q   Do you understand the question?
5  A   Yeah, I can't speak in general terms about
6    every -- you know, every company and every
7    transaction to take somebody private and what's
8    embedded in the assumptions.  I can say that our
9    view of the private market value -- when we
10    calculate the private market value, it's from the
11    perspective of if we were going to take this
12    company private, what do we think the cash flows
13    are worth to us.  We -- we try to disregard what
14    anyone else thinks in that calculation.  It's from
15    our perspective.
16 Q   And why do you disregard, you know, what
17    investor -- what other investors think in that
18    calculation?
19 A   Because it's unknowable; we don't know what they
20    think.
21 Q   What about the market price of the stock, the
22    current market price of the stock?  Does that
23    factor into your analysis of what Artisan would
24    pay to take the business private?
25 A   Not directly, no.



Page 57

1  Q    Does it factor into that calculus indirectly?
2  A    It can lead us to ask ourselves what we might be
3         missing in our calculation, but it doesn't
4         influence the calculation itself.
5  Q    When you say it can lead you to ask "what might be
6         missing in our calculation," can you give examples
7         of what you mean by that?
8  A    Well, an abstract example would be if an analyst
9         came to me and said, "I have calculated the
10       private market value on this, let's say, bank, and
11       it's $100," and I go through his analysis and then
12       I say, "Where is the stock trading?"  And he says,
13       "At $40." I'll say, "That's an exceptionally wide
14       discount.  Do you think there's something missing
15       in your analysis?  Let's see -- let's go back
16       through this and see if there's something
17       missing."
18             But it may or may not influence what we
19       do with that -- you know, how we eventually come
20       up with that private market value, but it will
21       lead us to ask the question.
22  Q    I believe that you previously testified that --
23       assuming that you do not believe that the private
24       market value will increase over time, the typical
25       discount-to-market price is 25 -- well, do you

Page 58

1         remember testifying about the typical discount
2         that would be required between private market
3         value and market price before your team would
4         consider an investment?
5             MR. WYLIE:  I'll object to the extent it
6         misstates prior testimony.
7             THE WITNESS:  Yeah, I believe what I
8         said was we are more interested in private market
9         value being able to increase through time than we
10       are the absolute discount of the -- of the stock
11       price to the private market value, and that in a
12       normalized scenario, we look for a 20- to 30
13       percent discount, but that's in a normalized --
14       that's a normalized range.  So I don't believe
15       that there is a -- well, yeah.
16  BY MR. CALOZA:
17  Q    Okay.  If a -- if the market price for a stock
18       were 20- to 30 percent lower than your team's
19       estimate of private market value, would that set
20       off similar questions about what you might be
21       missing as what you just, you know, testified to?
22             MR. WYLIE:  Well, object.  Form.  Calls
23       for speculation.  Incomplete hypothetical.
24  BY MR. CALOZA:
25  Q    Do you understand the question?

Page 59

1  A    I do, but I think it mischaracterizes what I --
2         the question you asked me, as I understood it,
3         was:  Is there ever a time when public price would
4         influence the calculation of our private market
5         value, and I gave you a hypothetical situation.
6  Q    Okay.  If the discount between private market
7         value and the market price were the 20- to 30
8         percent, do you -- would you typically go back and
9         ask an analyst what you may be missing in
10       understanding and calculating the private market
11       value?
12             MR. WYLIE:  Objection.  Form.  Compound.
13       Calls for speculation.  Incomplete hypothetical.
14             THE WITNESS:  I'm not sure what all that
15       is, but our research process is dependent on us
16       collectively and individually always reviewing the
17       private market value as we -- as we lead up to our
18       research qualification.  So there may be many,
19       many factors that we're questioning and going
20       through as we come up with our private market
21       value, one of which may be the discount.
22  BY MR. CALOZA:
23  Q    Could you turn to Page 4 of Exhibit 51?
24  A    Is that the last page?
25  Q    Yes.  Do you see where it says, "sell discipline."

Page 60

1  A    Yes.
2  Q    Could you read that paragraph under "sell
3         discipline."
4             (Pause in testimony.)
5  BY MR. CALOZA:
6  Q    Do you see where it says, "We may sell a stock if
7         it is approaching our estimate of full valuation"?
8  A    We may, yes.
9  Q    What does that mean; what does that sentence or
10       part of that sentence mean?
11  A    That means that dependent on our judgment of the
12       private market value and its ability to increase
13       through time, we may conclude that it no longer
14       has the ability to increase, and, therefore, as it
15       approaches the private market value, we will begin
16       to sell the stock.
17  Q    So does "full valuation" mean that the private
18       market value no longer has the ability to increase
19       through time, or does it mean that the stock is
20       approaching your estimate of private market value?
21  A    Restate --
22             MR. WYLIE:  Objection.
23             THE WITNESS: --  your question.
24             MR. WYLIE:  Form.  Compound.
25  BY MR. CALOZA:

Page 61

1   Q    When I asked about the meaning of that sentence,
2        you testified that you may conclude that it no
3        longer has the ability to increase, and,
4        therefore, it approaches the private market value.
5             I'm trying to understand that response.
6        Are you saying that full valuation -- this
7        reference to selling a stock if it is approaching
8        your estimate of full valuation, does full
9        valuation mean that the stock price is approaching
10       your current estimate of private market value
11       or -- well, let me just ask that question.
12            MR. WYLIE:  Objection.  Form.  Misstates
13       prior testimony.  If you understand the
14       question...
15            THE WITNESS:  Yeah, I think I do.  As I
16       testified earlier, our private market value that
17       we capture in our system that's included in the
18       exhibits, is based on a 365-day annualized
19       calculation.  The private market value calculation
20       is built off scenarios that based on what we
21       believe the organic growth rate can be over time,
22       what we think the normalized free cash flow margin
23       can be over time.
24            We -- we, in our judgment, try to
25       understand how much room that private market value

Page 62

1        has over time.  So the stock may, on a current
2        basis, look like it's at full valuation versus our
3        stated private market value on the next 365 days,
4        whereas we believe it still has plenty of room to
5        go up.  We would be less likely to sell in that
6        situation.
7    BY MR. CALOZA:
8    Q    If you look at page -- or the same sentence of
9        Exhibit 51, it says, "We may sell stock if it is
10       approaching our estimate of full valuation if
11       there is a clear deceleration occurring in the
12       company's cycle -- profit cycle, if changing
13       circumstances affect the original reasons we
14       purchase the stock or if we come across a more
15       attractive opportunity."  Do you see that?
16   A    Yes.
17   Q    What would be an example of a "clear deceleration
18       in company's profit cycle"?
19   A    Well, no two stocks are the same -- no two
20       companies are the same, and no two data points are
21       exactly crystal clear.  But, as an example, if we
22       bought a company -- if we bought -- if we made an
23       investment in a company because we thought that a
24       new product, as an example, would achieve some
25       level of market share penetration, and we saw --

Page 63

1        we saw in evidence, either through the reported
2        company data or through our anecdotal checks
3        within the industry, that that -- that that
4        acceleration was slowing prior to achieving our
5        market share target, we would conclude that it
6        wasn't likely to do what we thought it was going
7        to do, and we would reduce the position.
8             There could be many, many forms of that
9        dependent on the drivers that I gave you earlier
10       for profit cycles, of which there are many.
11   Q    Now, part of -- one of the factors that Exhibit 51
12       lists as a factor in selling a stock is if Artisan
13       comes across a more attractive opportunity.  Do
14       you see that?
15   A    Yes, yep.
16   Q    What might your team consider a "more attractive
17       opportunity"?
18            MR. WYLIE:  Objection.  Speculation.
19       Incomplete hypothetical.
20   BY MR. CALOZA:
21   Q    Do you understand the question?
22   A    I do understand the question.  If we came across
23       something -- another investment opportunity, if we
24       were -- if we were out of cash in the portfolio,
25       we were fully invested and had no room, and we

Page 64

1        came across another opportunity where we had
2        higher conviction than a number of other
3        securities in the portfolio -- and by
4        "conviction," I mean that it was a more durable
5        and protected franchise, that the private market
6        value could grow through time, we had more
7        confidence that it could grow through time and
8        that we saw stronger indications of an
9        accelerating profit cycle -- we may conclude that
10       we were better off selling one security and buying
11       that candidate.
12   Q    So would you agree that your team might decide to
13       close out an investment solely to free up capital
14       for a different investment?
15   A    We may.
16   Q    And under those circumstances, would you agree
17       that the decision to close out the original
18       investment would be for reasons unrelated to a
19       change in information regarding that investment?
20   A    Repeat that, please.
21   Q    If Artisan exits an investment in order to free up
22       capital for a different investment, would you
23       agree that the decision to close out the original
24       investment could be for reasons unrelated to
25       change in information regarding that first



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
65–68

Page 65

1      company?
2  A   Just to be clear again, I only speak for my
3      strategy and not other strategies at Artisan.
4  Q   Understood.
5  A   Yeah.  That is possible.
6  Q   Do you believe that your investment strategy
7      produces superior results over time as compared to
8      the stock market, in general?
9  A   I think the --
10          MR. WYLIE: I'll object.  Form.  Vague.
11 BY MR. CALOZA:
12 Q   Do you understand the question?
13 A   Yes.  I think the quantifiable facts would suggest
14     that it -- relative to our appropriate benchmarks,
15     it does produce superior investment results over
16     time.
17 Q   And does the amount of the fee charged by Artisan
18     reflect those superior results?
19          MR. WYLIE:  Objection to form.
20     Foundation.  Beyond the scope of the topics on
21     which the deponent was designated to testify.
22 BY MR. CALOZA:
23 Q   Do you understand the question?
24 A   Yes.
25 Q   Does Artisan receive a fee from MPERS for managing

Page 66

1      MPERS' investments?
2  A   We do receive a fee, yes.



ANDREW STEPHENS  30(b)(6)

April 04, 2013

IN RE DIAMOND FOODS, INC.

69–72

Page 71



1 Q What are they?
2 A A global opportunities strategy and a U.S. small
3    cap growth strategy.
4 Q And what are the differences between those two
5    strategies and the -- specifically, the U.S.
6    mid-cap growth strategy?
7 A The primary difference is in portfolio
8    construction and the securities that are available
9    by guideline for those portfolios. So the U.S.
10    small cap growth portfolio has a smaller
11    capitalization range as defined by its prospectus,
12    and the global opportunities portfolio has a
13    broader capitalization range and a broader
14    geographic range as defined by its prospectus.
15 Q And when you say "broader capitalization range,"
16    what do you mean by that?
17 A In the case of the global opportunities portfolio,
18    it is considered to be an all-cap portfolio, so it
19    has no restrictions -- no practical restrictions
20    on the capitalization range that we can invest in;
21    whereas, the mid-cap portfolio has a practical
22    limitation.
23 Q Other than distinctions in the capitalization
24    range and the geographic range, are there any
25    other significant differences between the general

Page 72

1    growth investment strategy that you described
2    earlier and, specifically, the U.S. mid-cap growth
3    strategy that is applied to Artisan's account?
4       MR. WYLIE: Object to the form. What do
5    you mean by "Artisan's account"?
6 BY MR. CALOZA:
7 Q The -- other than distinctions in the
8    capitalization range and the geographic range, are
9    there any significant differences between the
10    general investment strategy that you described
11    earlier and, specifically, the U.S. mid-cap growth
12    strategy that you applied to the investments you
13    manage on behalf of Artisan?
14 A The process --
15       MR. WYLIE: Same -- same objection.
16 BY MR. CALOZA:
17 Q Do you understand the question?
18 A I believe so, yes. The process that we discussed
19    before as it relates to private market value and
20    profit cycles and other things does apply to the
21    Mississippi PERS mid-cap growth portfolio that we
22    manage, yes.
23       MR. CALOZA: Can you mark this as
24    Exhibit 53?
25       (Exhibit No. 53 is marked.)

4       MR. CALOZA: Can you mark this as
5    Exhibit 52? 
6       (Exhibit No. 52 is marked.)
7 BY MR. CALOZA:
8 Q Mr. Stevens, you've been handed a document marked
9    Exhibit 52, and it says, "Artisan U.S. Mid-Cap
10    Growth Strategy December 31, 2012, Fact Sheet"?
11 A Uh-huh.
12 Q Do you recognize this document?
13 A Yes.
14 Q What is it?
15 A It's an Artisan U.S. mid-cap growth strategy fact
16    sheet dated December 31st, 2012.
17 Q And is this the strategy that Artisan uses -- that
18    your team uses in managing MPERS' investment
19    account?
20 A It's a composite, yes.
21 Q Are there any differences between -- well, let me
22    back up. Other than the U.S. mid-cap growth
23    strategy, does your investment team manage any
24    other strategies?
25 A Yes.



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013

73–76

Page 73

1   BY MR. CALOZA:
2   Q   Mr. Stephens, you've been given a document marked
3       Exhibit 53 bearing the Bates Nos. MSPERS 010175
4       through MSPERS 010316?
5   A   Can I make just one comment?  My last name is
6       spelled with a P-H, just in case that screws up
7       your records.
8   Q   If you look on Page MSPERS 010177.
9   A   010177.
10  Q   It says "Form ADV" at the top of the page; do you
11      see that?
12  A   Yes.
13  Q   Do you recognize this document?
14  A   Not in its entirety, no.
15  Q   Do you know what a Form ADV is?
16  A   Yes.
17  Q   What is a Form ADV?
18          MR. WYLIE:  Objection to the extent it
19      calls for a legal conclusion.
20          THE WITNESS:  My not being an attorney,
21      my general understanding is it describes the
22      investment process and the investment advisor.
23  BY MR. CALOZA:
24  Q   Do you know how often -- and is this the Form ADV
25      of Artisan Partners?

Page 74

1           MR. WYLIE:  Objection.  Form and
2       foundation.
3   BY MR. CALOZA:
4   Q   You may answer the question.
5   A   I can't speak to it in its entirety, but based on
6       what it says on the first page, I believe it to
7       be, yes.
8   Q   Do you have any understanding of how often Artisan
9       Partners updates its Form ADV?
10  A   Not specifically, no.
11  Q   Do you have any general understanding of whether
12      Artisan updates its Form ADV?
13  A   It's not my area of responsibility, but I do
14      believe we update it periodically.
15  Q   And do you have any understanding whether Artisan
16      distributes updated forms -- Form ADVs to its
17      clients?
18  A   I don't specifically know the schedule, but I do
19      generally believe that we distribute them when
20      they're updated.
21  Q   Could you turn to Page MSPERS 010237?  Do you see
22      where it says, "U.S. mid-cap growth strategy"?
23  A   Uh-huh, yes.
24  Q   And underneath that, do you see where it says,
25      "Artisan's U.S. mid-cap growth strategy employs a

Page 75

1       fundamental investment process to construct a
2       diversified portfolio of U.S. mid-cap growth
3       companies"?
4   A   Yes.
5   Q   Do you have any understanding of what "fundamental
6       investment process" refers to?
7   A   I believe so.
8   Q   And what is that understanding?
9   A   The process that we discussed earlier or portions
10      of it.
11  Q   When you say "portions of it," what portions --
12      what do you mean by "portions of it"?
13  A   That we only discussed portions of it earlier.
14  Q   Are there parts of the fundamental -- what
15      additional portions of the fundamental investment
16      process -- or what -- strike that.
17          What are the additional portions of the
18      fundamental investment process that we did not
19      discuss?
20  A   It's a very general question.  I could take you
21      through hours of specifics.
22  Q   Are you referring to something other than
23      securities selection?
24  A   Yes.
25  Q   What are you referring to other than securities

Page 76

1       selection?
2   A   The composition, roles, responsibilities, daily
3       interactions of our team members, the research
4       process itself for collecting and analyzing
5       information, the security selection process, the
6       capital allocation process, the portfolio
7       construction process and the client communication
8       and -- yeah, client communications, in general.  I
9       may have missed something there, but, in general,
10      I would describe it as that.
11  Q   Could you describe the research process for
12      collecting and analyzing information?
13  A   To what level of detail would you like it?
14  Q   You can start with a general level, and if there
15      are specifics, I'll ask.
16  A   We -- we have a team of portfolio managers,
17      analysts, associate analysts, traders.  The team
18      is assigned responsibilities for areas of the
19      general economy.  They are responsible for
20      understanding the companies in those areas of the
21      economy and identifying the companies that fit our
22      investment criteria, collecting information on
23      those companies' businesses, understanding their
24      financial models, their market opportunities,
25      building up a research report, presenting it to



Page 77

1   the team.
2          The team is responsible for
3   understanding and vetting that research report.
4   Portfolio managers are responsible for assigning
5   the research qualification.  That's the general
6   extent of the research collection.
7          THE VIDEOGRAPHER:  This is the end of
8   Disc No. 1.  We are off the record at 11:04 a.m.
9          (A brief recess is taken.)
10         THE VIDEOGRAPHER:  We are back on the
11   record at 11:07 a.m.
12   BY MR. CALOZA:
13   Q    Mr. Stephens, prior to the break, we were
14        discussing the research process, and you mentioned
15        that it begins with identifying companies fitting
16        investment -- Artisan's investment criteria; do
17        you remember that?
18   A    Yes.
19   Q    And by "investment criteria," what do you mean?
20   A    Consistent with our -- the characteristics that we
21        discussed earlier for security selection:
22        franchise companies, reasonable assumptions for
23        the private market value and the occurrence of an
24        accelerating profit cycle with the belief that a
25        profit cycle will occur.

Page 78

1   Q    Do you have any understanding of how the research
2        analysts identify companies matching those
3        criterias?
4   A    Yes.
5   Q    And how does that happen?
6   A    It can happen in many forms.  They can hear about
7        them anecdotally from their connections within an
8        industry.  They can read about them in
9        periodicals, whether they be mass periodicals or
10        specialized industry periodicals.  They can find
11        them through quantitative research screens.  They
12        can hear about them from other investment
13        professionals, or they can be brought to their
14        attention by people within our team.  Those are --
15        those are general sets.  There may be other ways.
16   Q    And then you said that the research analysts
17        collect information on the businesses they
18        identify; is that right?
19   A    The industry, the subsector of the industry, the
20        business itself, yes.
21   Q    And what kind of information are they collecting
22        at this stage?
23   A    They're trying to build the case for investments,
24        so it would be information relating to the
25        franchise characteristics of the business,

Page 79

1   information relating to the -- to building out a
2   private market value estimate and information
3   relating to the presence of a potential profit
4   cycle.
5   Q    And where would they go to get information related
6        to franchise characteristics and, you know, the
7        profit cycle?
8   A    They would look at all available public sources of
9        information, so it may be reported information
10        from the company.  It may be vendors who provide
11        research reports.  It may be contacts that they
12        have in the industry.
13   Q    Do research analysts ever reach out to a company's
14        direct suppliers?
15   A    Yes, on occasion.
16   Q    What about reaching out to a company's customers?
17   A    Yes, on occasion.
18   Q    And what is the purpose for reaching out to a
19        company's customer?
20   A    There can be many reasons, but it's most likely
21        trying to further build the investment case around
22        the three areas that I described earlier.
23   Q    And is it the same rationale for reaching out to a
24        company's vendors?
25   A    Yes.

Page 80

1   Q    Do you keep a research file for each potential
2        investment?
3   A    Do I personally, or does Artisan Partners --
4   Q    Does Artisan?
5   A    Our team keeps a file for the research we do on
6        companies, yes.
7   Q    And is that file client-specific?
8   A    No.
9   Q    So a single research file could be used for all of
10        your team's clients?
11   A    All of our team's clients, yes, yes.
12   Q    And does Artisan have -- does your team have a
13        research file on Diamond Foods?
14   A    Yes.
15   Q    And given your prior testimony, is it fair to say
16        that that research file is used on behalf of all
17        of your team's clients?
18   A    Yes.
19          MR. WYLIE:  Objection to the extent it
20        misstates his testimony.
21   BY MR. CALOZA:
22   Q    Well, are you aware of any research regarding
23        Diamond that was conducted by Artisan; and by
24        "Artisan," I'm referring to Artisan Partners, not
25        just your investment team.  Are you aware of any



Page 81

1    research regarding Diamond that was conducted by
2    Artisan that was not available for use by your
3    investment strategy team?
4  A   No, I'm only aware of the information that was
5    collected by our research team, to the best of my
6    recollection.
7  Q   And all of the research available to your
8    investment team, was that available for use in
9    managing investments specifically on behalf of
10    MPERS?
11  A   Restate that, please.
12  Q   Are you aware of any research regarding Diamond
13    that was conducted by Artisan, either your
14    investment team or one of the other investment
15    teams, that was not available for use in
16    considering which investments to make on behalf of
17    MPERS?
18  A   That's a somewhat nesting question, but I'm only
19    aware of the information in our -- that we
20    collected.
21  Q   Okay.
22  A   And that was the only information used, to my
23    knowledge, to make investment decisions for MPERS.
24  Q   And the -- was the general investment process that
25    you testified to earlier consistent with the

Page 82

1    process used to determine whether to invest in
2    Diamond Foods?
3         MR. WYLIE:  I'll object to the form.
4         THE WITNESS:  For MPERS or for all
5    accounts?  For all of the accounts with similar
6    strategy?
7  BY MR. CALOZA:
8  Q   For all the accounts.
9  A   Yes.
10  Q   And does your answer -- is your answer different
11    specifically with respect to MPERS?
12  A   No.
13         MR. CALOZA:  Can you mark this as the
14    next exhibit?
15         (Exhibit No. 54 is marked.)
16         THE WITNESS:  Can I clarify something?
17  BY MR. CALOZA:
18  Q   Sure.
19  A   When you say "all of our accounts," are you
20    including our different strategies within our same
21    group or just our mid-cap growth strategy?
22  Q   I meant your mid-cap growth strategy.
23  A   Because we applied -- basically the same strategy
24    to our small cap growth portfolio as well, just to
25    clarify.

Page 83

1  Q   You've been handed a document marked Exhibit 54,
2    Bates Nos. AP0001440 through AP0001448.  Do you
3    recognize this document?
4  A   Yes, in general.
5  Q   What is it?
6  A   It's our -- one of our research pitch packets.
7  Q   And what do you mean by a "pitch packet"?
8  A   That's when the analyst presents the idea in
9    its -- in a form for the team to consider for
10    research qualification.
11  Q   So at this point in the investment process, fair
12    to say that the analyst has already conducted a
13    significant amount of research into a potential
14    investment?
15         MR. WYLIE:  Objection.  Form.  Vague.
16         THE WITNESS:  They've conducted a level
17    of research to complete -- to be able to present
18    this document.  It may or may not be significant.
19  BY MR. CALOZA:
20  Q   Do you recall when this pitch packet was presented
21    to the team?
22  A   Not specifically.
23  Q   Do you have a general recollection?
24  A   Roughly, yes.
25  Q   And when was that?

Page 84

1  A   I am going off the date on the cover, and I would
2    assume it was somewhere around March 30th of 2010.
3  Q   Do you know if -- well, do you know who put
4    together this pitch packet?
5  A   I would assume that Rod Brower did the majority of
6    the work since his initials are on the front page.
7  Q   And where is that?
8  A   Where it says under analyst, R.M.B.
9  Q   Do you know how long Mr. Brower had been
10    researching Diamond prior to presenting this pitch
11    packet?
12  A   No.
13  Q   I'd like to point your attention to where it says
14    "expected value" --
15  A   Yes.
16  Q   -- on the first page; do you see that?
17  A   Yep, yep.
18  Q   What is this chart?
19  A   This is the manifestation of the discussion that
20    we had earlier about how we build up the private
21    market value since our belief is that -- well,
22    that's what it is.
23  Q   And what are the inputs that go into this chart?
24  A   Well, there's, first of all, three different
25    cases.  There's a bear case, a base case and what



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
85–88

1  we call a bull case.  There is a rough outline of
2  the financial model under each of those cases.
3  There is estimates of what we believe the growth
4  rate for the business is and what the earnings
5  profile or free cash flow of the business is and a
6  measure of what we think the risk is to the cash
7  flow stream.  And then there is a result, which is
8  the private market value calculation that we
9  discussed earlier, under each of those cases and
10  for the current year and the forward year.  It's
11  then annualized and probability weighted.  There's
12  other things in here, but that's the general.
13  Q  Now, you referred to a bear case, a base case and
14  a bull case?
15  A  Uh-huh.
16  Q  What did you mean by that?
17  A  That there's a bear case, a base case and a bull
18  case.
19  Q  Well, what do you mean by "bear case"?
20  A  That means if -- that's if we're -- if the -- in
21  the unlikely event that things go horribly wrong,
22  that could be the resulting business model.
23  Q  And what do you mean by "the base case"?
24  A  That's the most probable scenario.
25  Q  And what do you mean by "the bull case"?

1  A  If things go horribly right, that could be the
2  business model.
3  Q  Where does the -- where do you get the information
4  to populate these three models?
5      MR. WYLIE:  I'll object to form.  Are
6  you asking specifically about this particular
7  model, or are you asking generally about documents
8  of this type?
9      MR. CALOZA:  I'm asking generally about
10  documents of this type right now.
11     THE WITNESS:  Consistent with my earlier
12  testimony, there's multiple sources that can be
13  used to populate this, including other published
14  financial models, company projections, our
15  interpretation of those and our assumptions as it
16  relates to each of those significant variables.
17  BY MR. CALOZA:
18  Q  So is it fair to say that the numbers populating
19  these financial models, these three scenarios,
20  reflects your team's judgment about the
21  appropriate numbers to use for the bear case, the
22  bull case and the base case?
23  A  No.
24  Q  Well, let me ask specifically about this document.
25  Do you see under "Fiscal '10" -- I think that's

1  "Fiscal '10 estimate revenue" under the bear case,
2  it says "599"?
3  A  Uh-huh.
4  Q  Where -- what would that 599 reflect?
5      MR. WYLIE:  Object to form.  And
6  objection.  Calls for speculation.
7  BY MR. CALOZA:
8  Q  Do you know what that figure represents?
9  A  I don't specifically in this instance.
10  Q  Well, does it reflect -- does it reflect the --
11  does it reflect Mr. Brower's estimate of Fiscal
12  '10 revenue, if, under the bear case, things go
13  horribly wrong?
14  A  This report is dated March 30, 2010.  If he
15  created it on or around that time, the fiscal year
16  is July.  So there's four months left in the year,
17  so he's probably -- yeah, he's probably, for the
18  remainder of the year, making an assessment of
19  what the revenue downside could be, in his
20  judgment.  But we have -- no one else has affirmed
21  that number at this point.
22  Q  Okay.  And do you have any understanding of the
23  basis for that judgment, where he derived that 599
24  figure?
25  A  Not beyond a guess, no.

1  Q  Do you see that the bear and bull case estimates
2  for Fiscal '10 revenue match what is listed under
3  consensus for that year?
4      MR. WYLIE:  I'll object.
5      THE WITNESS:  I'm sorry.  My eyes are --
6  BY MR. WYLIE:
7  Q  Do you see where --
8      MR. WYLIE:  It's mischaracterizing the
9  document.
10  BY MR. WYLIE:
11  Q  Do you see where it says "consensus" to the right
12  of the chart?
13  A  Yes.
14  Q  And below that it says "low," "mean" and "high."
15  And below low it says "599," and below high it
16  says "609"?
17  A  Yes, I do see that.
18  Q  Now, do you see under bear for Fiscal '10 estimate
19  of revenue, it says "599"?
20  A  Yes.
21  Q  And for bull, it says "609"?
22  A  Yes.
23  Q  Do you see that those two figures match what is
24  listed under consensus for Fiscal '10 estimated
25  revenue?



Page 89

1  A   I do, but I don't know what the meaning of
2      "consensus" is.
3  Q   Okay.  So you have no understanding of what
4      "consensus" refers to?
5  A   Not in this context.
6  Q   Do you see where it says growth at the left of the
7      column -- or at the left of the chart?
8  A   As an example in bear, where it would say 10
9      percent?
10 Q   Yes.  What does "growth" refer to?
11 A   Our assessment of the organic growth rate of the
12     business in that scenario.
13 Q   So -- and below it, it says "risk"?
14 A   Yes.
15 Q   What does risk refer to?
16 A   As I testified earlier, it's one of the four
17     components in our private market calculation.  In
18     this case, it refers to the persistency and
19     durability of the business model, the cash flow
20     stream in this business model through time.  And
21     in this case, we consider it to be medium.
22 Q   So M refers to medium?
23 A   M refers to medium.
24 Q   Okay.  And then below "risk," it says "PMVF 10."
25     What does that refer to?

Page 90

1  A   That's the private -- in that -- depending on the
2      scenario, that would be the private market value
3      based on the inputs above for that fiscal year.
4  Q   And below it, it says "PMVF 11," what does that
5      refer to?
6  A   The same thing, except for Fiscal Year '11.
7  Q   Okay.  The next row says, "Annualized PMV"?
8  A   Yes.
9  Q   What is the annualized PMV?
10 A   As I testified earlier, that's the blending of the
11     current year and the forward year and annualizing
12     it for 365 days.
13 Q   Okay.  The next row says "probability."  What does
14     that refer to?
15 A   That's the -- in this case, Rod's preliminary
16     assessment of the probability waiting for the
17     different scenarios actually occurring.
18 Q   So in this -- in this document, it says, "100
19     percent under base -- under the base scenario."
20     Do you see that?
21 A   Yes.
22 Q   What does that mean?
23 A   That means as a preliminary input for a
24     discussion, for a preliminary discussion with our
25     team, Rod chose to put a hundred percent weight on

Page 91

1      the base case occurring.
2  Q   Okay.  The next row says "WTD PMV."  Is that the
3      weighted PMV?
4  A   That is the -- yeah, that is the probability
5      weighted PMV.
6  Q   Okay.  And underneath bear it says "add."  Do you
7      see that?
8  A   Yes.
9  Q   What does that mean?
10 A   It's not related to the bear or bull case.  It's
11     simply taking the weighted PMV times a preset 60
12     percent.  And under -- then there's another one
13     for trim, which would be taking the base -- or I'm
14     sorry, not the base, the weighted PMV times .8.
15     It's just unfortunate that they line up under the
16     bear and bull case.
17 Q   Okay.  Well, what does -- what does 60 percent of
18     weighted PMV refer to?
19 A   It's just a -- it's a guideline for alerting us to
20     the fact that there's a significant discount to
21     the weighted private market value.
22 Q   And when you say "significant discount," are you
23     referring to the discount between weighted private
24     market value at the -- the current market price of
25     the stock?

Page 92

1  A   I'm sorry.  Repeat that.
2  Q   When you say "significant discount," what are you
3      referring to when you refer to "discount"?
4  A   I'm referring to the fact that $37 would be a
5      discount to the base -- I'm sorry, to the weighted
6      PMV.
7  Q   Okay.  And what is the significance of a 60
8      percent discount to the weighted PMV?
9  A   That it's a 40 percent discount to the weighted
10     PMV.
11 Q   What is the purpose of identifying that 40 percent
12     discount?
13 A   There is none.
14 Q   Do you see where it says "target range"?
15 A   Yes.
16 Q   And to the right of it, it says "37" under bear --
17     the bear scenario?
18 A   Yep.
19 Q   What does "target range" refer to?
20 A   It refers to $37 and $49.
21 Q   Okay.  And what -- what is the significance of
22     that target range?
23 A   There is none from a practical perspective.
24 Q   Why is it included on this chart of expected
25     value?



Page 93

1  A   Because it's one -- it's one set of numbers that
2     we review along with all the others that we
3     review.
4  Q   Does the target range have any significance in
5     determining whether to invest in a stock?
6  A   Not by itself.
7  Q   Does it have any significance in combination with
8     other factors?
9  A   It's a consideration.
10 Q   Okay.  And what is the -- the target range -- does
11    the target range have any significance in
12    determining an appropriate price to acquire the
13    stock?
14 A   No.  Repeat that, I'm sorry, just so I get the
15    specifics of it.
16 Q   Is there -- does the target range have any
17    significance in determining whether to acquire the
18    stock at a specific price?
19 A   Any significance?
20 Q   Yes.
21 A   At a specific price?
22 Q   Yes.
23 A   It is not in and of itself a determinant.  It
24    gives us a guidepost for understanding the math
25    behind the discount rather than having to compute

Page 94

1     it in our heads as we're looking at this.
2  Q   Well, if a -- so what is the purpose of the word
3     "add" in this chart; does it have any
4     significance?
5  A   No, it's just a column heading.  It doesn't have a
6     bearing on actual actions taken in the portfolio.
7  Q   What about the word "trim"?
8  A   It's the same.
9  Q   Why is it important to understand -- well, you
10    said that the target range is a guidepost, is that
11    right?
12 A   Uh-huh.
13 Q   Why is it important to understand that guidepost?
14          MR. WYLIE:  Objection.  Form.  Assumes
15    facts not in evidence.
16 BY MR. WYLIE:
17 Q   Is it important to understand that guidepost?
18 A   It's important to understand without having to
19    compute the math as you're looking at this.  So
20    this refers to the normalized range that I talked
21    about before.  So this bounds that normalized
22    range.
23 Q   And when you say it "bounds that normalized
24    range," what do you mean?
25 A   Under normal circumstances, if the discount that

Page 95

1     we think is appropriate is 20- to 30 percent, we
2     can quickly look at this and see whether the
3     current price falls within that range as we're
4     getting ready to have a discussion about the
5     stock.
6  Q   Do you see towards the right of the chart the word
7     "guidance" appearing three times?
8  A   Yes.
9  Q   Do you know what that refers to?
10 A   Not -- I don't know specifically in this
11    situation, but in general.
12 Q   And what is your general understanding?
13 A   That would be, in this case for Fiscal Year '10,
14    the company guidance is -- would be my guess -- is
15    $1.79 to $1.83, and the Fiscal '11 would be 2.25
16    to $2.35.
17 Q   And above that, do you see where it says
18    "Guidance," and below that it says "585 to 605M"?
19 A   I'm sorry, where are you?
20 Q   At the top of the chart on the right --
21 A   Yes, yeah.
22 Q   -- there's the word "Guidance," and below it, it
23    says, "585 to 605M."  Do you see that?
24 A   Yeah, yep.
25 Q   What does that refer to?

Page 96

1  A   I would assume that it's similar, that it's the
2     company guidance for the Fiscal '10 year, and
3     they're bounding the range at 585 to 605.  What I
4     don't know is when they issued that related to
5     when this report was written, if that's what it
6     is.
7  Q   Do you see that under revenue -- so is that
8     guidance for a revenue figure?
9  A   I can only assume, yeah.
10 Q   Okay.  At the bottom of the chart, it says "rate,"
11    and to the right of it, it says "4.5 percent"?
12 A   Yeah.
13 Q   What does that refer to?
14 A   That's our -- that's consistent with my earlier
15    testimony.  There's four -- four primary inputs
16    into our private market value calculation, one of
17    which is our determination of the risk-free
18    rate -- what we call the risk-free rate, and it's
19    set at 4 1/2 percent.
20 Q   And what do you mean by "risk-free rate"?
21 A   That would be the equivalent rate that one
22    would -- it's basically the rate that you use to
23    discount back the projected future cash flows.
24 Q   Okay.  You mentioned that the risk-free rate is
25    one of the four factors in determining private



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013

97–100

1    market value.
2  A   Uh-huh.
3  Q   Is that right?
4  A   Yep.
5  Q   And what are the other three factors?
6        MR. WYLIE:  Objection.  Asked and
7     answered.
8  BY MR. WYLIE:
9  Q   You may answer.
10  A   The organic growth rate of the business, the
11     normalized free cash flow margins of the business,
12     the -- what we call business risk or the
13     persistency and durability of the cash flow stream
14     over time and the -- our assessment of the
15     risk-free rate.
16  Q   Does the normalized free cash flow margins appear
17     on this chart?
18  A   In this case, I don't see a specific free cash
19     flow margin.  I'm assuming that Rod is using the
20     reported earnings as a surrogate for free cash
21     flow.
22  Q   And does this chart reflect any assessment of the
23     durability of the cash flow stream?
24  A   That's the business model risk that we discussed
25     earlier.

1        MR. WYLIE:  Alexis, if you're shifting,
2     let's take another break.  We've been going
3     another hour and a half here.
4        MR. CALOZA:  Let me -- I'm almost done
5     with this document, then we can take a break.
6  BY MR. WYLIE:
7  Q   Could you look at the bottom of Page AP0001440?
8  A   Uh-huh.
9  Q   Do you see where it says "conclusion"?
10  A   Yes.
11  Q   Do you see the reference to -- do you see where it
12     says, "We should intent to R qualify"?
13  A   Yeah.
14  Q   What does "R qualify" mean?
15  A   I think I testified to that earlier.
16  Q   Is that a reference to research qualifying?
17  A   Yes.
18  Q   And later on in that sentence it says, "Chasing
19     here doesn't seem prudent."  Do you see that?
20  A   Yes.
21  Q   Do you have any understanding of what "chasing
22     here" means?
23        MR. WYLIE:  Objection.  Foundation.
24        THE WITNESS:  I don't, based on my
25     recollection of the events that led up to us

1     talking about this.
2  BY MR. CALOZA:
3  Q   Do you have any understanding based on -- strike
4     that.
5        MR. CALOZA:  Can we go off the record?
6        THE VIDEOGRAPHER:  We are off the record
7     at 11:44 a.m.
8        (A brief recess is taken.)
9        THE VIDEOGRAPHER:  We are back on the
10     record at 12:30 p.m.
11        MR. CALOZA:  Could you mark this as
12     Exhibit 55?
13        (Exhibit No. 55 is marked.)
14  BY MR. WYLIE:
15  Q   Mr. Stephens, you have been handed a document
16     marked Exhibit 55, Bates stamped AP0001396 through
17     AP0001414.  Do you recognize this document?
18  A   Yes.
19  Q   What is it?
20  A   It's the -- it's a printout of our internal
21     note -- research and trading note system.
22  Q   And when you say it's a printout of your internal
23     research and trading system, does that mean that
24     it includes the research -- well, strike that.
25        What do you mean by internal research

1     and trading system?
2  A   It captures the data that was submitted to it
3     relative to our research and trading, and it looks
4     like it's printed out on Diamond Foods.
5  Q   Are you aware of any research regarding Diamond
6     that would not be included or summarized in this
7     document?
8  A   Yes.
9  Q   And what research would that be?
10  A   I would believe that there's handwritten --
11     there's probably research notes that were written
12     in hand that were included in the research file.
13  Q   What typically gets summarized in your internal
14     research and trading system?
15  A   Summaries of meetings that we may have -- that we
16     may have had, or our internal thinking based on
17     some information that's come out in the public --
18     in a public forum someplace.
19  Q   Would you --
20  A   And then -- and then trades that were entered to
21     our trading department.
22  Q   Would you expect all significant -- would you
23     expect the internal research and trading system to
24     reflect all significant information regarding the
25     company?



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
101–104

Page 101

1   A    No.
2   Q    What are -- do you see the column headers at the
3        top of Exhibit 55?
4   A    Yes.
5   Q    What does "ARTMX" mean?
6   A    That is the mutual fund for our mid-cap growth
7        strategy, and it's used as a proxy for the
8        composite of all accounts that employ that
9        approach.
10  Q    And what does "ARTSX" refer to?
11  A    It's the -- small cap, it's the ticker symbol --
12       sorry, ARTMX is the ticker symbol.  ARTSX is the
13       ticker symbol, and we use it as a reference
14       account, again, for all of the clients that are in
15       our small cap growth strategy.
16  Q    And "OPPTY"?
17  A    Is our global opportunities portfolio.  That's not
18       the ticker.  I don't know why they have it in here
19       as OPPTY, but it's a reference to our global
20       opportunities portfolio, and it's a reference for
21       all of the accounts that are in that composite.
22  Q    What about "ARTLSE"?
23  A    That's our long/short fund.
24  Q    And are all of these funds managed by your
25       investment team?

Page 102

1   A    Yes.
2   Q    Do you see where it says "close price"?
3   A    Yes.
4   Q    What does that refer to?
5   A    That's generally the -- I believe it to be the
6        closing price of the security that's referenced.
7        I just don't know if it's as of the date or the
8        night before that's listed on here.
9   Q    I'd like you to turn to AP0001413, which is the
10       second-to-last page of the document.
11  A    Yep.
12  Q    You see at the bottom of the page where it says
13       "N. Martin Jochmann" --
14  A    Yes.
15  Q    -- "4/7/2010"?
16  A    Yes, yep.
17  Q    What does the N signify?
18  A    It means the note that was written was by Martin
19       Jochmann, was authored and submitted by Martin
20       Jochmann.
21  Q    And then it says, "Summary, met with V.P. of
22       corporate strategy and V.P. of treasury/IR."
23  A    Yep.
24  Q    Do you know, does that refer to the V.P. of
25       corporate strategy and V.P. of treasury/IR of

Page 103

1        Diamond?
2   A    Yes, I believe so, based on the note that follows.
3   Q    Okay.  And do you know the names of those
4        individuals?
5   A    I don't.
6   Q    Do you know whether Mr. Jochmann met with any
7        other members of management -- of Diamond
8        management at that time?
9   A    I don't.
10  Q    Other than what appears in the content of this
11       entry dated 4/7/2010, are you aware of any other
12       documents that discuss the content of
13       Mr. Jochmann's meeting with Diamond management?
14  A    I am not, no.
15  Q    If you look at the last page of the document,
16       AP0001414.
17  A    Yeah.
18  Q    Do you see where it says No. 4, and it starts,
19       "Kettle uses a very similar sales approach"?
20  A    Yes, yep.
21  Q    And the line below that, it refers to "DSD"?
22  A    Yes.
23  Q    Do you know what "DSD" stands for?
24  A    I believe in Martin's parlance it's direct store
25       distribution.

Page 104

1   Q    And what does "direct store distribution" mean?
2   A    That would mean that someone who has trucks that
3        go to -- that make deliveries to the store versus
4        contracting for delivery through a third party.
5   Q    Now, how often -- well, how typical is it for an
6        analyst to meet with company management?
7   A    Very.
8   Q    And this entry's dated April 7, 2010.  Do you
9        know -- excuse me.  Do you know if Diamond was
10       research qualified at that time?
11  A    Offhand, no, I don't know.
12  Q    Under No. 1 in this entry, which appears on
13       AP0001414, it describes the background of the CEO
14       and CFO; do you see that?
15  A    Yes, yep.
16  Q    Is it important to Artisan to understand company
17       management's background?
18  A    Yes.
19  Q    Why is that?
20  A    Well, by "Artisan," I'm speaking about our
21       investment strategy and not Artisan overall.  But
22       as it relates to our investment strategy, it's
23       important because it has a bearing on their
24       ability to maintain the franchise that we're
25       investing in.



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
105–108

Page 105

1   Q   Do you --
2               MR. CALOZA:  Can you mark this as
3       Exhibit 56?
4               (Exhibit No. 56 is marked.)
5   BY MR. WYLIE:
6   Q   Mr. Stephens, you've been handed a document marked
7       Exhibit 56 bearing Bates Nos. AP0001213 through
8       AP0001223.  And at the top of the first page, it
9       says, "4/7/09, Meet With Diamond management."
10  A   Yep.
11  Q   Do you recognize this document?
12  A   Yes.
13  Q   What is it?
14  A   It's someone's handwritten notes.
15  Q   Do you recognize the handwriting?
16  A   I don't.
17  Q   If you look at Page AP1413 of Exhibit 55, the
18      entry by Mr. Jochmann is dated April 7, 2010, and
19      Exhibit 56 is dated April 7, 2009.  Do you know
20      whether Exhibit 56 corresponds with Mr. Jochmann's
21      notes of the meeting referenced in the April 7,
22      2010 entry of Exhibit 55?
23  A   I don't.
24  Q   Do you know whether Mr. -- do you know whether
25      research analysts at Artisan were following

Page 106

1       Diamond as early as April 7, 2009?
2   A   Yes -- oh, no, no, no.  Sorry, sorry, sorry.
3       Strike that.  2009.  This is April 7, 2010, and
4       this is 2009.
5   Q   Do you have any understanding whether the notes in
6       Exhibit 56, which is dated 2009, corresponds with
7       the entry in Exhibit 55, dated April 7, 2010?
8   A   I have no idea.
9   Q   Okay.  If you -- look at the top of Exhibit 56.
10      It says, "CEO," and I think that says, "Michael
11      Mendes."  Do you see where -- do you see that?
12  A   I see where you're looking, yeah, but I can't make
13      it out.
14  Q   Do you know whether this refers to a conversation
15      with the CEO?
16  A   I tried to read through this in my review, and I
17      couldn't make out the handwriting, so I can't
18      really say.
19  Q   Do you -- do you have any reason to believe this
20      reflects a conversation with the CEO of Diamond?
21  A   I do.
22  Q   Based on what?
23  A   Well, apparently, it was in our research folder
24      for Diamond.  It's not unusual for things to be
25      legible only to the analysts that wrote them.  So

Page 107

1       by association, I assume that it's from
2       conversation.
3   Q   Could it be possible that this is a conversation
4       about the CEO?
5   A   It's possible.  It says, "Meet with Diamond
6       management," but the date's wrong, so it's hard
7       for me to say.
8   Q   Are you aware of any -- do you have any
9       understanding of the context in which Exhibit 56
10      was written?
11  A   I honestly don't.  It's illegible to me.
12              MR. CALOZA:  Can you mark this as
13      Exhibit 57?
14              (Exhibit No. 57 is marked.)
15  BY MR. WYLIE:
16  Q   Mr. Stephens, you've been handed a document marked
17      Exhibit 57, a single page Bates stamped AP0001034.
18  A   Yep.
19  Q   Do you recognize this document?
20  A   I've seen it, yes.
21  Q   What is that?
22  A   It's a -- it's someone's handwritten notes.
23  Q   Do you recognize this handwriting?
24  A   I don't.
25  Q   Do you see that the document is dated 4/15/10?

Page 108

1   A   Yes.
2   Q   And at the top, it says "DMND F/up."  Do you have
3       any understanding of what "DMND F/up" means?
4   A   I understand what DMND means.  The F/up can have
5       many meanings.
6   Q   Fair enough.  Below that is an asterisk and MGMT.
7       Do you have any understanding what that means?
8   A   I would assume that that means management.
9   Q   Do you have any understanding of whether this
10      document refers to a follow-up conversation with
11      Diamond management?
12  A   I don't know.  It could be a prep for a call.  I
13      don't know what it is.
14  Q   So do you have -- are you aware of any of the
15      context in which this document was created?
16  A   No.  I'd be guessing, but -- I'd be guessing.
17  Q   If you turn back to Exhibit 55 and look at
18      Page AP0001413, there's an entry for March 9,
19      2011; do you see that?
20  A   March 9, 2011, yep.
21  Q   And to the left of it, it says "N. Rod Brower," do
22      you see that?
23  A   Yup.
24  Q   Does that indicate that Rod Brower wrote this
25      note?



ANDREW STEPHENS  30(b)(6)                           April 04, 2013
IN RE DIAMOND FOODS, INC.                               109–112

Page 109

1   A   It indicates that he submitted it, so I would
2       assume he wrote it, yeah.
3   Q   Okay.  At the end of the first paragraph under
4       that note, it says, "We'll see MGMT tomorrow at
5       BAL conference."  Do you see that?
6   A   Yep.
7   Q   Do you understand what that sentence means?
8   A   Yes.  That means that Rod will be at the B -- B of
9       A/Merrill Lynch conference, and the management
10      team will be there as well.  It's a -- yeah.
11  Q   And do you know if Mr. Brower actually attended
12      the Bank of America/Merrill Lynch conference?
13  A   I don't know.  I don't recall whether he did or
14      didn't, but I -- yeah.
15  Q   Do you have any reason to doubt that he attended
16      the Bank of America/Merrill Lynch conference?
17  A   No.
18  Q   Do you have any reason to doubt that he met with
19      management at that conference?
20  A   No.
21  Q   And just to confirm, do you know -- well, strike
22      that question.
23          Can you turn to Page AP1411 of
24      Exhibit 55?
25  A   Yep.

Page 110

1   Q   Do you see the entry on March 14, 2011?
2   A   Yes.
3   Q   And was that entry written or submitted by Rod
4       Brower?
5   A   It was.
6   Q   Under summary it says, "Rough notes from MGMT
7       meeting last week pasted in detail section."  Do
8       you see that?
9   A   Yep.
10  Q   Does that refresh your recollection on whether or
11      not Mr. Brower met with management at the BA -- B
12      of A/Merrill Lynch conference?
13  A   It doesn't refresh my memory that specifically,
14      but I would believe, based on this, that he did
15      meet with them, yeah.
16  Q   And do you know any details about that meeting
17      with management?
18  A   Only the ones that are written here.
19  Q   And do you know who Mr. Brower met with from
20      Diamond's management?
21  A   I don't.
22  Q   At the end of that paragraph on Page 1411, it
23      says, "We'll discuss DMND on Friday."  Do you see
24      that?
25  A   Yes.

Page 111

1   Q   Do you know what that's a reference to?
2   A   I don't specifically, but I believe it means that
3       in our lunch meeting, in our daily research
4       meeting, we will discuss Diamond Foods on Friday,
5       whatever Friday of that week was.
6   Q   So does that refer to an internal team meeting of
7       your investment team?
8   A   Yeah.
9   Q   Do you remember discussing Diamond in your team's
10      daily research meetings?
11  A   Not specifically.
12  Q   Do you know whether Diamond was research qualified
13      by March 14, 2011?
14  A   I don't.
15  Q   If you look right above the March 14 entry, there
16      is an entry for March 18, 2011.
17  A   Yes.
18  Q   Do you see that?
19  A   Yep.
20  Q   And to the left it says, "Craigh" -- I'm not sure
21      how to pronounce that same, but it's Cepukenas --
22  A   Cepukenas.
23  Q   Is Mr. Cepukenas a member of your investment team?
24  A   He is.
25  Q   Okay.  And then underneath "Summary" it says,

Page 112

1       "Buy, DMND 20 DPS, 20 TGT, no LMTSC13."  Do you
2       see that?
3   A   Yep.
4   Q   What does that mean?
5   A   That means that a buy order was entered for 40
6       basis points in Diamond common equity with a 40
7       basis-point target with no price limit for the
8       small cap accounts of which SC13 is the composite
9       account -- or model account for the composite.
10  Q   And you said the order was for 40 basis points?
11  A   Yes.
12  Q   Do you see that the entry says 20 basis points?
13  A   There's two entries.  There's an entry by Craigh
14      Cepukenas for 20 basis points and Rob Brower for
15      20 basis points, totaling 40.
16  Q   Oh, okay.  You see that there are multiple entries
17      for March 18 --
18  A   Yes.
19  Q   -- 2011?
20  A   Yep.
21  Q   And one is by Matt Kamm, one is by Rod Brower and
22      one is by Craigh Cepukenas; is that right?
23  A   That's correct, yes.
24  Q   In the entry by Rod Brower, it says, "See related
25      DDM note."  Do you see that?



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
113–116

Page 113

1  A   In the entry by Rod Brower it says -- yes, "See
2       related DDM note," yep.
3  Q   What does "DDM note" mean?
4  A   It's in reference to the system that I mentioned
5       before that -- the research and trading system.
6       Its moniker is due diligence manager, DDM.
7  Q   Now, do you have any understanding whether Diamond
8       was research qualified by March 18, 2011?
9  A   Based on this, I would say, yes, it was research
10      qualified.
11 Q   And to confirm, "research qualified" means that it
12      has been fully vetted by your investment team?
13          MR. WYLIE:  Objection.  Vague.
14 BY MR. WYLIE:
15 Q   Do you understand the question?
16 A   I do.  "Fully" is inaccurate.
17 Q   Does research qualified mean that it has been
18      vetted by your research team?
19 A   To a basic level of decision-making, yes.
20 Q   Now, when -- strike that.
21          Why are there three purchase entries for
22      the same day by three different team members?
23 A   There's one entry, which is to buy Diamond to --
24      50 basis points.  There are three separate
25      individuals who are allocating the capital to what

Page 114

1       we call their sub portfolios so we can keep track
2       of their performance instead of internal
3       accounting and tracking system so we can monitor
4       our people's performance.
5  Q   But only one order for 50 basis points would have
6       been submitted for execution --
7  A   Correct.
8  Q   -- is that right?
9  A   Yeah.
10 Q   Okay.  Do you see where it says "51.40" in these
11      three entries for March 18, 2011?
12 A   Yeah, yep.
13 Q   And what is that a reference to?
14 A   It should be, if you look at the front page, the
15      column heading under "closing price."
16 Q   And is there a -- is there anywhere in the DDM
17      file at this point that indicates what the -- what
18      your view of private market value was at the time
19      of this purchase?
20 A   Not in this -- not in this view of the DDM, no.
21 Q   Is it fair to say that at this point in time on
22      March 18, 2011, your team's estimate of private
23      market value was greater than $51.40?
24 A   Yes.
25 Q   And is that because your team only invests when

Page 115

1       there is a discount to the market price of the
2       stock estimate compared to your estimate of
3       private market value?
4  A   Repeat that.
5  Q   Well, you testified that at this point in time,
6       March 18, 2011, your team's estimate of private
7       market value was greater than $51.40, which is the
8       price of Diamond stock on that day; is that right?
9          MR. WYLIE:  Objection.  Assumes facts
10      not in evidence.
11 BY MR. WYLIE:
12 Q   You can answer.
13 A   I'm sorry.  Repeat it one more time.
14 Q   Did you testify that on -- that your team's
15      estimate of private market value on March 18,
16      2011, the date of this 50 basis points purchase,
17      your team's estimate was greater than $51.40,
18      which represents the closing price of Diamond on
19      that day?
20          MR. WYLIE:  Same objection.
21 BY MR. CALOZA:
22 Q   Is that an accurate summary of your testimony?
23 A   I did say that.  I should have said I believe it
24      would have been higher than that in a normal case,
25      yes.

Page 116

1  Q   And why do you believe that it would have been
2       higher than the closing price of Diamond on that
3       day?
4  A   Because I think it would be an exception for us to
5       initiate a position above our estimate of private
6       market value, but not impossible.
7  Q   And do you have any reason to believe that this
8       instance on March 18, 2011, was an exception to
9       the general rule?
10 A   No.
11 Q   If you look at the bottom of AP1410, there's an
12      entry for March 18 submitted by Rod Brower.  Do
13      you see that?
14 A   At the bottom?
15 Q   Of 1410.
16 A   Yep.
17 Q   And then it continues onto the next page and says,
18      "briefly visited Diamond on -- DMND on Friday.
19      It's been R qualified for SX."
20 A   Right.
21 Q   What does it mean when it says, "It's been R
22      qualified for SX"?
23 A   That it's been -- it's a bit of a misnomer in the
24      way he described it, but it's been R qualified,
25      and we've determined that it's appropriate for the



Page 117

1     small cap portfolio.
2  Q   Are there different processes for research
3     qualifying stocks for the small cap for the --
4     portfolio versus the mid-cap portfolio?
5  A   No.
6  Q   So when it says it's been "R qualified for SX," is
7     the reference to SX a function of just market
8     capitalization, or is it -- strike that.
9         Do you see under No. 3 of that entry, it
10    says, "MGMT, I've had the opportunity to get in
11    front of them on two separate occasions."  Do you
12    know what those -- do you know what that refers
13    to?
14  A   It sounds like he's in some way had an opportunity
15    to meet the management on two separate occasions.
16  Q   Do you know what those occasions were?
17  A   Not from this, no.  Not specifically.
18  Q   And then it goes on to say, "Recent meeting with
19    CFO was productive in building my comfort level."
20    Do you know any details about Mr. Brower's meeting
21    with the CFO?
22  A   Only the details that he published on 3/14 that
23    are included here.
24  Q   Do you know if he met with any other members of
25    management at that time?

Page 118

1  A   I don't.
2  Q   Is 50 basis points a typical amount for an initial
3     investment in a stock?
4  A   Yes.
5  Q   And when your team invests in a stock, does it
6     invest for all of its clients at once, or does it
7     determine specific -- or does it invest in a stock
8     on a client-by-client basis?
9         MR. WYLIE:  Objection.  Form.  Compound.
10    If you can answer.
11  BY MR. CALOZA:
12  Q   Do you understand the question?
13  A   I do.  We manage three strategies for clients.
14    All clients fit into one of those three.  When we
15    make an investment, we do it by strategy type, and
16    all clients within that strategy purchase or sell
17    at the same time, and it's allocated to them pro
18    rata.
19  Q   So, in other words, is it fair to say that your
20    team decides to purchase a security and purchase
21    it -- purchases it as a block for the clients for
22    that particular strategy?
23        MR. WYLIE:  Objection.  Form.  Vague as
24    to the term "block."
25  BY MR. CALOZA:

Page 119

1  Q   Do you understand the question?
2  A   I do understand the question.  In general, yes.
3     There are some exceptions that have to do with
4     specific client guidelines.
5  Q   Do you know if there were any exceptions with
6     respect to purchases of Diamond Foods?
7  A   No, not that I know of.
8  Q   Can you turn to Page AP1409?
9  A   14...
10  Q   09.
11  A   09.  Yep.
12  Q   Do you see an entry for March 22, 2011?
13  A   Yes.
14  Q   Now, to the right of that line, it says "0.22."
15    What does that refer to?
16  A   The column heading, I believe, is in reference to
17    the small cap composite.  So the small cap
18    accounts at that point would have approximately 22
19    basis points each in Diamond Foods.
20  Q   And underneath "Summary," it says, "Spoke with
21    Linda Segre as a follow-up to our small group
22    meeting with Diamond at BAML consumer conference
23    last week."  Do you see that?
24  A   Yep.
25  Q   Do you know who Linda Segre is?

Page 120

1  A   No, I don't.
2  Q   Do you know who participated in this small group
3     meeting with DM -- with Diamond?
4  A   I don't, no.
5  Q   Do you know if anyone other than Mr. Brower would
6     have participated on Artisan's end?
7  A   On Artisan's behalf?
8  Q   Yes.
9  A   No, I don't know.
10  Q   On the next page, AP1410, do you see where it says
11    "Q for commentary"?
12  A   I'm sorry, it says what?
13  Q   "Q for commentary."
14  A   Yes.
15  Q   And do you see where underneath that it says,
16    "Missed the top line by 9 million driven entirely
17    by the non-retail biz, i.e., walnuts)"?
18  A   Yep.
19  Q   Do you know whether -- do you know whether this
20    refers to a commentary in Mr. Brower's meeting
21    with Ms. Segre?
22  A   I believe it does, yes.
23  Q   Do you know whether this was public information at
24    this point in time?
25  A   I don't know, because I don't know who Linda Segre



Page 121

1    is.  But, yes, I have to believe it's -- if we
2    have it, it's public information.
3  Q    Now, are you aware whether part of Diamond's
4    products include walnut products?
5  A    Am I aware of whether Diamond's products include
6    walnut products?
7  Q    Yes.
8  A    Yes, I am aware of that.
9  Q    Is this comment about missing the top line by 9
10    million significant?
11  A    I don't know.
12  Q    Underneath that it says, "Guidance increased by
13    EPS by 2C in combination with 7C increase in add
14    spend, management clearly had room to maneuver."
15    Do you see that?
16  A    Yes.
17  Q    Is that a -- do you think that is a significant
18    statement?
19        MR. WYLIE:  Objection to form.  I don't
20    know what you mean by "significant."
21  BY MR. CALOZA:
22  Q    Do you understand the question?
23  A    Not really.  Can you repeat it?
24  Q    Is that -- would that information be important in
25    considering whether to invest in Diamond Foods?

Page 122

1  A    Not particularly, no.
2  Q    And why is that?
3  A    My sense from what I looked at earlier, that two
4    cents is not a significant amount for this company
5    on $1.87 of earnings.
6  Q    Do you have any understanding of what it means
7    when it says, "Management clearly had room to
8    maneuver"?
9  A    Not in this instance, no.
10  Q    Then if you go down two lines, it says, "Walnuts
11    only.  Any ingredients international bulk been in
12    non-investment mode, fixed margin biz, set price
13    paid to farmers in August."  Do you see that?
14  A    Yeah.
15  Q    Do you have any understanding of what that means?
16  A    Not the level of understanding that I once had,
17    but I can sort of figure it out.
18  Q    Do you, sitting here today, do you have any
19    understanding of what that means?
20  A    In general terms, yes.
21  Q    And what is your general understanding?
22  A    That the company's been de-emphasizing walnuts,
23    that it's a fixed margin business.  They pay
24    prices -- they pay a price to the farmers in
25    August, and that it -- the net of that came in

Page 123

1    below -- 9 million below on the top line.
2  Q    And is it important in your investment calculus
3    that they were de-emphasizing walnuts?
4  A    I think it was important that they weren't
5    emphasizing walnuts.
6  Q    Why is that?
7  A    Because we didn't view that as the growth part of
8    the business.
9  Q    So does the fact that they were not emphasizing
10    walnuts, did that make it more likely that you
11    would invest in Diamond?
12  A    No.
13  Q    Did it have any effect on the likelihood of you
14    investing in Diamond?
15  A    No.
16  Q    Now, the reference to "fixed margin biz," do you
17    understand what that means?
18  A    Yes, I believe so.
19  Q    What does that mean?
20  A    It means that -- I believe it means that they sold
21    the walnuts through at a fixed -- at a fixed
22    margin over the price they paid to the farmers for
23    the walnuts.  But without talking to Rod about it
24    right now for sure, I can't say.
25  Q    And then the line below it, below that it says,

Page 124

1    "Set price at fixed margin, penny profit margin,
2    not percentage."  Do you see that?
3  A    Yeah.
4  Q    Do you have any understanding of what that means?
5  A    It sounds like it was a direct dollar markup -- or
6    direct price markup, not a percentage markup.
7  Q    Do you have any understanding of -- well, do you
8    see where it says "Set price paid to farmers in
9    August"?
10  A    Yep.
11  Q    Do you have any understanding of how that price
12    paid to farmers was determined?
13  A    I may have at one time, but I don't have a
14    recollection now.
15  Q    Do you know what product lines Diamond has other
16    than walnuts -- or had at this point in time?
17  A    In general terms, yes.  I knew specifically at one
18    time.  My recollection is probably not great right
19    now.
20  Q    Do you have a general recollection of what they
21    sold at this point in time?
22  A    Yes.
23  Q    And what is that?
24  A    They had Pop Secret, they had Kettle Chips.  They
25    had the Diamond snack food business just beyond



Page 125

1   the walnuts, mixed nuts.  That's all I can recall
2   right off the top of my head.
3  Q   Now, how significant were those other businesses,
4   by which I mean the businesses other than, you
5   know, walnut products; how significant were those
6   businesses in your analysis of whether to invest
7   in Diamond?
8  A   My recollection is it was the growth, the
9   prospects for growth, in those businesses that was
10   important.
11  Q   And was the prospect of growth in those businesses
12   more important than -- in your opinion, than the
13   walnut business?
14  A   I think I should restate something.  You know,
15   "important" to the increase in private market
16   value or the potential decrease in private market
17   value.  We weren't expecting a decrease in private
18   market value driven by the walnut business.
19        So if you're asking me the importance to
20   the upside of our private market case, the snack
21   food business was more important than the walnut
22   business, but they were both important to the
23   investment.
24  Q   Okay.  Can you turn to Page 1405?  Do you see an
25   April 5, 2011 entry by Mr. Brower?

Page 126

1  A   Yes.
2  Q   And the first line of that entry says, "I'm
3   inclined to be skeptical, but the more I've
4   thought about -- the more I've thought through it,
5   the more I like the Pringles deal."  Do you see
6   that?
7  A   Yes.
8  Q   Do you know what the "Pringles deal" refers to?
9  A   Yes.
10  Q   And what is that?
11  A   The purchase from Procter & Gamble of their
12   Pringles brand potato chip business.
13  Q   Was that -- was that announced acquisition
14   significant to your team's determination of
15   whether to invest in Diamond?
16  A   Not initially, no.
17  Q   On Page AP1406, do you see the paragraph starting,
18   "We don't have all the answers today"?
19  A   Yes, yep.
20  Q   And three lines into that paragraph, there's a
21   sentence that starts, "The difference today being
22   that we have a year of cumulative history behind
23   us and a few management interactions under our
24   belt."  Do you see that?
25  A   Yes.

Page 127

1  Q   Do you have any knowledge of what those management
2   interactions were?
3  A   None other than what we discussed earlier.
4  Q   And that would be the other meetings with
5   management contained in this Exhibit 55; is that
6   right?
7  A   I believe so, yes.
8  Q   Now, further on in that paragraph, Mr. Brower
9   writes, "I think we should hold this doc in SX for
10   now.  Actively gather more prospective on the
11   combination and make a critical assessment as to
12   how the go-forward story compares to that which we
13   bought into for SX a few weeks back."  Do you see
14   that?
15  A   Yeah, yep.
16  Q   Do you know what the -- what he's referring to by
17   the "go-forward story"?
18  A   I would assume he's talking about the Diamond --
19   the prospect for Diamond after they acquire the
20   Pringles business from Procter & Gamble.
21  Q   And he refers to "that which we bought into for SX
22   a few weeks back."  Do you know what that refers
23   to?
24  A   I would assume that means Diamond without any
25   knowledge of the Procter & -- the Pringles

Page 128

1   acquisition.
2  Q   Now, would a -- would the Pringles acquisition be
3   expected to accelerate Diamond's profits?
4  A   Yeah, I would -- I would expect that our forward
5   private market value would incorporate enhanced
6   growth from that.
7  Q   Does that mean that the private market value would
8   increase as compared to prior to this
9   announcement?
10  A   That would be my assumption, yeah.
11        MR. CALOZA:  Mark this as 58.
12        (Exhibit No. 58 is marked.)
13  BY MR. CALOZA:
14  Q   Mr. Stephens, you've been handed a document marked
15   Exhibit 58, Bates stamped AP0000694 through
16   AP0000696.  Do you recognize this document?
17  A   Yes, I saw it when I was reviewing the file.
18  Q   Do you recognize whose handwriting this is?
19  A   I don't.
20  Q   On Page AP694, it refers to "PG deal for Pringles"
21   at the top of the page.  Do you see that?
22  A   PG deal --
23  Q   In the third bullet --
24  A   -- 694.
25  Q   -- point.



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
129–132

Page 129

1  A   I'm sorry, I'm not seeing it.  Oh, yeah, "PG
2       deal," yeah, yeah, yeah.
3  Q   Does that indicate anything to you about the
4       timing of these notes?
5  A   Yes.
6  Q   What; what does that indicate?
7  A   That information about a deal with Procter &
8       Gamble for Pringles was public information.
9  Q   And then below on the same page it says,
10      "Franchise profit cycle and valuation."  Do you
11      see that?
12  A   Yep.
13  Q   And those are factors in determining whether to
14      select a stock for investment; is that right?
15  A   Yes.  Let me see.  Franchise, profit cycle and
16      valuation, yeah, yep.
17  Q   And then to the right of that it says, "Blended
18      PMV E method."  Do you see that?
19  A   Yeah, yep.
20  Q   What does the "E method" mean?
21  A   The E method means that we can rely on free cash
22      flow to be close to earnings in the two periods
23      that we're looking at; in other words, the current
24      fiscal year and the forward fiscal year.
25          The normalized method means that there

Page 130

1      will be a -- there will be a discrepancy between
2      reported earnings in cash flow and what the
3      potential cash flow will be in the out period, and
4      so you need to go out to the out period and
5      discount that back and ignore the two current
6      periods.  So you're normalizing the earnings power
7      of the business.
8  Q   I'm sorry, did you say you disregard the
9      current -- the two current periods?
10  A   You -- you may.  Yeah, what you would do is you
11      would go out to the terminal -- whatever that
12      terminal period is, use that free cash flow number
13      and discount it back to approximate what you think
14      the earnings should be versus what the reported
15      earnings or cash flow will be.
16  Q   And why would there be a discrepancy between what
17      you think the earnings should be versus what the
18      reported earnings would be?
19  A   There can be a number of reasons, but examples
20      would be a large acquisition that would take on a
21      great deal of goodwill or other
22      amortization-related expenses.
23  Q   Is there a distinction between blended PMV and
24      probability-weighted PMV?
25  A   No.

Page 131

1  Q   If you turn to the last page of the Exhibit 58.
2  A   Yeah.
3  Q   It says, "Arb pressure heading into," and then
4       "short interest pop."  Do you know what that
5       means?
6  A   I know what each of those terms means.  I'm not
7       sure what he's talking about specifically in this
8       situation.
9  Q   What does "arb pressure" mean?
10  A   My guess is he's saying that the arb --
11      arbitrage-related strategies are either buying or
12      selling the stock in relation to a preset deal
13      price.
14  Q   And would that affect the -- would that arbitrage
15      affect the market price of the stock?
16  A   It may, or it may not.  It just depends.
17  Q   And what do you understand "short interest pop" to
18      mean?
19  A   I understand it to mean that the level of short
20      interest has risen.  I don't know if it's for
21      Diamond or for P&G or for some other company.
22  Q   And if the level of short interest rises, how
23      would that affect the market price of the stock?
24  A   If the level of short interest rises?
25  Q   Correct.

Page 132

1  A   I can't generalize.
2          MR. CALOZA:  Could you mark this as
3      Exhibit 59?
4          (Exhibit No. 59 is marked.)
5  BY MR. CALOZA:
6  Q   Mr. Stephens, you've been handed a document marked
7      Exhibit 59.
8  A   Uh-huh.
9  Q   And the first page bears Bates No. AP0001773, and
10      I will represent to you that this is a -- this is
11      printed from a spreadsheet provided to Diamond in
12      native Excel format, and that I have printed the
13      pitch PMV consolidated P&L and segment P&L tabs
14      from that natively produced spreadsheet.
15  A   And it was provided to Diamond?
16  Q   Correct.
17          MR. WYLIE:  In this litigation.
18          THE WITNESS:  Oh, okay.
19          MR. CALOZA:  Thank you for that
20      clarification.
21  BY MR. CALOZA:
22  Q   If you'll look at the second page of this exhibit,
23      it's dated March 30, 2010.  Do you see that?
24  A   Yeah.
25  Q   And it is -- appears to be similar to the pitch



Page 133

1    packet that was Exhibit 54.  Do you see that?
2  A   Exhibit 54.  Yes.
3  Q   And if you turn to the third page, there is
4    another expected value chart.  Do you see that?
5  A   Third page, including the cover page --
6  Q   Correct.
7  A   -- yeah, yeah.
8  Q   And the date of that chart is April 13, 2011.  Do
9    you see that?
10 A   Yes, yep.
11 Q   Now, in this expected value chart, do you know
12   the -- do you see that there are estimates for
13   Fiscal '11, Fiscal '12 and Fiscal '13?
14 A   Yes.
15 Q   Do you know what the basis of those numbers are --
16   well, strike that.  Let me ask a different
17   question:  Do you know whether Diamond was issuing
18   estimates for Fiscal '11, Fiscal '12 and Fiscal
19   '13 at this time?
20 A   I have no idea.
21 Q   In your experience, is it usual or typical for a
22   company to issue estimates three fiscal years out?
23 A   It's hard to say.  They may, in combination with a
24   large transaction, do something like that, but
25   it's hard to say.

Page 134

1  Q   Do you have any understanding as to whether
2    Diamond did so prior to April 13, 2011?
3  A   Not off the top of my head, no.
4  Q   If those numbers are not based on guidance issued
5    by Diamond, what else might they be based on?
6        MR. WYLIE:  Objection.  Calls for
7    speculation.
8  BY MR. CALOZA:
9  Q   You can answer.
10 A   Well, given that it's in our model, Rod would have
11   most likely put it together from his usual sources
12   of external research, internal research.
13 Q   And would these numbers represent Mr. Brower's
14   best estimate of revenue for Fiscal '11, '12 and
15   '13, in his judgment?
16       MR. WYLIE:  Objection.  Foundation.
17       THE WITNESS:  I take objection to the
18   term "best."  I think they're probably estimates
19   that he used.
20 BY MR. CALOZA:
21 Q   Okay.  And, well, do you know how he arrived at
22   those estimates?
23 A   I don't.
24 Q   And do you know if they were based on Diamond's
25   public statements?

Page 135

1  A   I don't.
2  Q   Do you see where it says, "guidance" to the right
3    in blue, and underneath it says, "925 to 950 M"?
4  A   Yes.
5  Q   Do you know what that refers to?
6  A   I don't specifically.
7  Q   Do you have a general understanding?
8  A   I do.
9  Q   And what is that?
10 A   It's lined up against the Fiscal '11 estimate row,
11   and I would guess that it's guidance from the
12   company for the Fiscal '11 year that ends in July,
13   although it's in blue, so I don't know if it's
14   a -- his estimate or the company estimate.
15 Q   And do you see where it says "consensus"?
16 A   I do.
17 Q   Do you know what that refers to?
18 A   I know what "consensus" means, but I don't know
19   what it means in this situation.
20 Q   Do you see where it says "annualized PMV"?
21 A   Annualized PMV?  Yes, I do.
22 Q   You previously testified that annualized PMV is a
23   365-day measure of private market value; is that
24   right?
25 A   It should be, yes, yeah.

Page 136

1  Q   Now, do you see that there are three fiscal years
2    listed right above it:  Fiscal '11, Fiscal '12 and
3    Fiscal '13?
4  A   Yes.
5  Q   How do you calculate an annualized PMV when there
6    are more than one -- when there are values for
7    more than one fiscal year?
8  A   We use a math function within the spreadsheet that
9    references -- you see the fiscal year over here on
10   the right side, 7/31/2011?
11 Q   Uh-huh, yes.
12 A   It looks at the date, today's date, whatever that
13   date was on this spreadsheet, and it figures out
14   how many days are left in this fiscal year and
15   applies that much to the current year.  And then
16   it takes the remaining number of days, that minus
17   365, and applies it to the forward year and comes
18   up with that.
19       What I don't know is when you opened
20   this up in your Excel spreadsheet and printed it
21   out, whether it was using the date that you opened
22   it or whether it used the date that was referenced
23   on this document.  I'd have to do the math to
24   crosscheck that.
25 Q   But it would be a combination of Fiscal '11 and



ANDREW STEPHENS  30(b)(6)                                    April 04, 2013
IN RE DIAMOND FOODS, INC.                                          137–140

Page 137

1      Fiscal '12?
2  A   If the date of April 13th, 2011, is correct, yes.
3  Q   Do you see next to target range, it says, "Add 48"
4      and then "trim 64"?
5  A   Yes.
6  Q   If the market price were $48 -- well, let me back
7      up.  What is the weighted private market value
8      calculated in this chart?
9  A   According to this with the 10 percent probability
10     in the bear case, a 55 percent probability of the
11     base case and a 35 percent probability of the bull
12     case, the weighted private market value is $80.
13 Q   And do you know the basis for determining the bear
14     case as a 10 percent probability?
15 A   I do not.  I'm sure I did it at the time.  I don't
16     recall right now.
17 Q   And is it based on Mr. Brower's judgment of the
18     likelihood of the bear case?
19 A   Based on my understanding of the state of this
20     document, yes.
21 Q   Okay.  And similarly, his estimate of the
22     probability of the bull case, 35 percent, would be
23     based on his judgment?
24 A   Yes.
25 Q   Now, if the weighted private market value is $80,

Page 139

1  Q   How would you characterize it?
2  A   It would be a 40 percent discount to our computed
3      weighted private market value.
4  Q   Are you testifying that the target range indicated
5      on this document has no bearing on whether to
6      invest in Diamond securities?
7  A   I did not testify that it has no bearing.
8  Q   What is --
9  A   I testified that it is not the only bearing.
10 Q   How significant is the target range indicated on
11     this document?
12 A   How significant is it?
13 Q   Yes.
14 A   It's a -- it's a range.  It's a static range.  It
15     goes from 60 percent of the weighted private
16     market value to 80 percent of the private market
17     value.  It's the same -- it's the same range.
18 Q   What is the purpose of identifying that 60- to 80
19     percent range?
20 A   So that we know -- so that we don't have to do the
21     math in our head to understand the discount to
22     private market value.  So that we understand the
23     range.
24 Q   And the level of discount to private market value
25     is a factor in determining whether to purchase

Page 138

1      would $48 be -- would $48 be an attractive
2      discount to that weighted private market value?
3          MR. WYLIE:  Objection.  Form.  Vague.
4  BY MR. CALOZA:
5  Q   Do you understand the question?
6  A   It may not be a realistic discount.
7  Q   But would it be an attractive discount in terms of
8      what -- determining whether or not to purchase
9      Diamond securities?
10         MR. WYLIE:  Objection.  Form.  Vague.
11         THE WITNESS:  It's -- it would only be
12     one contributing factor in that analysis.
13 BY MR. CALOZA:
14 Q   But would it -- would it -- I understand that
15     there may be multiple factors, but if Artisan's
16     estimate of private market value is $80 and the
17     stock is trading at $48, is that a -- would that
18     be an attractive discount level in determining
19     whether to purchase Diamond securities?
20         MR. WYLIE:  I'll object.  Form.  Vague.
21     I'll also object asked and answered.
22 BY MR. CALOZA:
23 Q   You may answer.
24 A   I would not characterize it -- I would not use the
25     term "attractive."

Page 140

1      Diamond securities?
2  A   It is one factor of many.
3          MR. CALOZA:  Do you want to go off the
4      record?
5          MR. WYLIE:  Yeah, we've been going for a
6      little over an hour anyway.  We may as well take a
7      five-minute break.
8          THE VIDEOGRAPHER:  This is the end of
9      Disc No. 2.  We are off the record at 1:46 p.m.
10         (A brief recess is taken.)
11         THE VIDEOGRAPHER:  We are back on the
12     record at 1:56 p.m.
13 BY MR. CALOZA:
14 Q   Mr. Stephens, could you turn to Page AP1401 of
15     Exhibit 55?
16 A   Exhibit 55.
17 Q   I'm sorry.  It's --
18         MR. WYLIE:  No, no, that's right.
19         THE WITNESS:  55.  55.  What number?
20     Sorry.
21 BY MR. CALOZA:
22 Q   Sorry.  I meant Page 1405.
23 A   Yep.
24 Q   Do you see that there is an April 27, 2011 entry,
25     by Rod Brower?



ANDREW STEPHENS  30(b)(6)                                      April 04, 2013
IN RE DIAMOND FOODS, INC.                                          141–144

Page 141

1  A   Yes.  Which?  The -- the notes or the -- I'm
2      sorry, go ahead.
3  Q   And there's a summary, and underneath the summary
4      it says, "Updating the PMV based on our Pringles
5      transaction discussion from a couple weeks ago and
6      the updated financials that accompanied that
7      review."
8  A   Yep.
9  Q   Do you know who was -- what that discussion refers
10     to?
11 A   Not specifically, no.
12 Q   Do you know whether that is an internal Artisan
13     discussion?
14 A   That would be my assumption.
15 Q   And it says, "The net impact is $12 increase in
16     the PMV, $68 goes to $80."  Do you see that?
17 A   Yep.
18 Q   Do you know whether that $12 increase was --
19     strike that.
20         Do you know whether the prior PMV value
21     of $68 was calculated before or after the Pringles
22     transaction was announced?
23 A   I don't know.  Not without reading through all of
24     this.  I don't know.
25 Q   And later on in that paragraph it says, "A 10

Page 142

1      percent LTG for Diamond prior to PMV update, that
2      was probably too conservative."  Do you see that?
3  A   Yes.  Yep.
4  Q   What was too conservative?
5  A   I don't recall.  And it doesn't -- it doesn't
6      spell it out for me here.
7  Q   And then below that, it says -- in the next
8      paragraph it says, "I am still considering Diamond
9      for MX and hoping for a pullback to do so."  Do
10     you see that?
11 A   Yep.
12 Q   What does that mean?
13 A   It means that he's still considering recommending
14     Diamond for inclusion in the mid-cap growth
15     composite portfolios and that he's hoping for a
16     pullback in the price to do that.
17 Q   And would a pullback in the price affect Artisan's
18     estimate of private market value?
19 A   It would not affect our estimate of private market
20     value.
21 Q   Would it affect the discount between Artisan's
22     estimate of private market value and the market
23     price?
24 A   If there was a pullback, the discount would be
25     wider, yes.

Page 143

1  Q   And so would it -- relative to Artisan's estimate
2      of private market value, a pullback would -- in
3      the price would allow Artisan to purchase the
4      stock for a better value; is that right?
5  A   According to this, it would allow us to consider
6      Diamond for MX.
7  Q   But a cheaper stock relative to Artisan's estimate
8      of private market value would represent a greater
9      value; is that right?
10        MR. WYLIE:  Object to form.
11 BY MR. CALOZA:
12 Q   Do you understand the question?
13 A   Restate the question.
14 Q   If Artisan is able to purchase Diamond stock for a
15     greater discount as a result of a pullback, does
16     that mean that Artisan can purchase the stock for
17     a greater value as compared to without a pullback?
18        MR. WYLIE:  I'll object to form.  Vague.
19     Compound.
20 BY MR. CALOZA:
21 Q   Do you understand the question?
22 A   I don't think you've defined "value" for me.  It
23     has many meanings.
24 Q   Could Artisan purchase the stock for cheaper
25     than -- well, let me ask it this way:  A pullback

Page 144

1      does not affect Artisan's estimate of private
2      market value; is that right?
3  A   Depends.
4  Q   Well, how would a pullback in the price affect
5      Artisan's estimate of private market value?
6  A   It depends on what drove the pullback in the
7      price.  If there was new information, if something
8      else -- something else happened that made us
9      reconsider our investment case, we may, in fact,
10     change our private market value.
11 Q   If a pullback occurs in the absence of additional
12     information, would that affect Artisan's estimate
13     of private market value?
14 A   No.
15 Q   And so absent additional information, the change
16     in market price is -- is that even relevant to
17     Artisan's estimate of private market value?
18 A   The pullback in price absent any --
19 Q   Additional information.
20 A   -- additional information at all would have no
21     bearing on our private market value.
22 Q   Could you turn to Page AP1401?
23        MR. WYLIE:  1401?
24        MR. CALOZA:  1401.
25 BY MR. CALOZA:



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
145–148

Page 145

1   Q   Do you see an entry for June 2nd, 2011, by Rod
2       Brower?
3   A   Yes.
4   Q   And in the second paragraph -- well, let me back
5       up.  Do you understand the context for this entry
6       on June 2, 2011?
7   A   I would have to read the whole thing to answer
8       that question.  Would you like me to do that?
9   Q   Could you read the summary portion of this note?
10  A   I believe, based on the summary, that they
11      reported their financial results for probably the
12      third quarter -- third fiscal quarter.
13  Q   Okay.  And if you look at the second paragraph, on
14      the second line it says, "Management pulled
15      forward its LT guidance by one year saying it
16      expects to reach $4 in EPS by Fiscal '14 versus
17      Fiscal '15 prior.  Quite frankly, my guess is the
18      street was already there to a large extent
19      explaining the stock's recent run."  Do you see
20      that?
21  A   Yeah, yep.
22  Q   When it refers to "the street already being there
23      to a large extent," do you know what that refers
24      to?
25  A   Not in this specific instance.

Page 146

1   Q   Later on in that paragraph it says, "Management
2       has a tendency to guide conservatively, so I would
3       guess the new target is beatable."  Do you see
4       that?
5   A   Do you mean, after the in addition they needed to
6       put up a -- I said, "following, in addition, they
7       needed to put up a strong print ahead of the
8       Pringles deal.  That said, management has a
9       tendency to guide conservatively, so I would guess
10      the new target is beatable"?
11  Q   Yes.  Do you have any understanding about whether
12      management did -- whether management was
13      conservative in its guidance?
14  A   I have no idea.
15  Q   Do you have any understanding historically whether
16      management tended to guide conservatively?
17  A   No idea.
18  Q   And that paragraph goes on to say, "For what it's
19      worth, our base case Fiscal '14 estimate, when we
20      did our dive on valuation post Pringles
21      announcement, was $4.04.  Bull case is $5.35."  Do
22      you see that?
23  A   Yep.
24  Q   And is that -- does that exceed the guidance
25      issued by management noted earlier in that

Page 147

1       paragraph?
2   A   Let me see here.  "Management afforded its
3       long-term vent by one-year goal saying expects to
4       reach $4 in Fiscal '14, versus prior.  For what
5       it's worth, our base case estimate when we did --
6       by four cents, it appear.
7   Q   So Artisan believed that -- or Mr. Brower
8       estimated that Fiscal '14 would exceed the
9       guidance issued by management; is that right?
10  A   By four cents.
11  Q   And Mr. Brower's -- the estimate referenced by
12      Mr. Brower there, was that before management's
13      updated guidance?
14  A   Based on this, I would assume, yes.
15  Q   So does that mean Artisan -- does that mean that
16      Mr. Brower was more optimistic about Diamond's
17      future prospects than management's guidance?
18  A   I think it's immaterial.  It's one percent.  I
19      can't -- I can't conclude.
20  Q   If you look at the last sentence on the page, it
21      says, "From a timing perspective, I've learned
22      from watching Diamond over the past year too that
23      there's a good chance that some point of
24      controversy will arise along the way that gives us
25      an opportunity to add to our SX position or

Page 148

1       initiate one in MX on a pullback."  Do you see
2       that?
3   A   Yes.
4   Q   Do you know what the reference to "controversy"
5       is?
6   A   I don't specifically, no.
7   Q   Do you have any general understanding of what that
8       reference to "prior controversies" is?
9           MR. WYLIE:  I will object to the extent
10      that it misstates the contents of the document.
11  BY MR. CALOZA:
12  Q   Do you understand the question?
13  A   Repeat it, please.
14  Q   Well, this document refers to "a good chance that
15      some point of controversy will arise along the
16      way."  Do you see that?
17  A   Yes.
18  Q   Do you understand the basis for that statement?
19  A   I think he means that there's a lot of news flow
20      in this company, which tends to create volatility
21      in the public share price.
22  Q   Why would a lot of news flow tend to create
23      volatility?
24  A   Well, as I testified earlier, it's my belief that
25      other investors come to their own conclusions over



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013

149–152

Page 149

1     different points of information.  So the more
2     information there is coming into the market, the
3     more volatile a stock is, typically.
4   Q   And Artisan is one such investor coming to its own
5     conclusion regarding news; is that right?
6   A   I believe so, yes.
7   Q   If you continue to Page AP1403, underneath the Q&A
8     section?
9   A   Uh-huh.
10   Q   It says, "Walnut accrual adjustment was 70 basis
11     points which was opposite direction than fiscal --
12     than FQ 2."  Do you understand what that means?
13   A   I have a recollection of what it means.  I may be
14     off on the details.
15   Q   And what is your recollection?
16   A   That they -- since they make a -- I believe it's a
17     few, if not only one payment, to their growers.
18     And the price changes throughout the period that
19     they accrue what they believe the payment will be,
20     the final total of what the payment will be.  And
21     there was a 70-basis-point adjustment to that
22     accrual.  It doesn't tell me whether it's -- I'm
23     assuming it's a positive 70 basis points, but it's
24     hard for me to tell from this.
25   Q   Do you understand why the price would change

Page 150

1     throughout the period?
2   A   I did at one time.  I don't recall today.
3   Q   Do you know whether the payments made to growers
4     are based on an estimate of the ultimate price?
5   A   I don't know that right now.  I probably did at
6     one time.
7   Q   Could you please turn to Page AP1400?  Do you see
8     a June 22 entry by Mr. Brower?
9   A   Yes.
10   Q   You see that he has pasted an email from him to
11     you with a CC to Mr. Cepukenas?
12   A   Yes.
13   Q   And below that is an email from you to Mr. Brower
14     and Mr. Cepukenas?
15   A   Yes.
16   Q   In your email, it says, "Sounds to me -- sounds to
17     me like PG cleaned Pringles up before they made
18     the sale.  The two companies probably have to plan
19     in 2010.  Diamond needed a better currency, and
20     P&G needed better financials.  Makes me worry
21     about how much low-hanging fruit is really left
22     here."  Do you have any understanding of what that
23     means?
24   A   Yes.
25   Q   What is your understanding?

Page 151

1   A   First of all, it was conjecture on my part based
2     on reading something that Rod gave to me whether
3     it was included in the DDM or someplace else.
4         Second of all, it was my quick summary
5     of high-level observation of what I thought was
6     going on with this transaction.
7   Q   What do you mean by Diamond needed a better
8     currency?
9   A   That they couldn't afford the Pringles transaction
10     at the time they hatched the plan, in my
11     estimation; again, conjecture, and that they
12     needed to improve their stock price.
13   Q   And why would they need to improve their stock
14     price?
15   A   This is just -- again, just my recollection, but
16     because Pringles was a very expensive transaction
17     for a small company like Diamond.
18   Q   Did you think that -- did you think that the
19     expense affected the likelihood of the transaction
20     closing?
21   A   I would not conclude that from what I wrote here.
22   Q   Do you see on Page AP1400 a September 9, 2011
23     entry, by Jessica Gelhar?
24   A   I'm sorry, 1400.  On which day?  September 15th?
25   Q   September 9.

Page 152

1   A   September 9, yeah, yep.
2   Q   And it refers to the Barclays BTS conference.  Do
3     you know what "BTS" stands for?
4   A   I think it's "back to school."
5   Q   And underneath that it says, "General presentation
6     plus small group meeting with CEO, CFO, CSO."  Do
7     you know whether Ms. Gelhar met with Diamond
8     management at this conference?
9   A   That would be my assumption based on what she
10     wrote here.
11   Q   And CEO stands for chief executive officer; is
12     that right?
13   A   Yes.
14   Q   CFO stands for chief financial officer?
15   A   Yes.
16   Q   What does CSO stand for?
17   A   I don't know.
18   Q   Do you know if Ms. Gelhar met with any other
19     members of Diamond's management?
20   A   I don't.
21   Q   Other than what appears on Page AP1400, do you
22     know the contents of that discussion?
23   A   I don't have any recollection, no.
24   Q   Could you turn to Page AP1399?  Do you see an
25     October 6, 2011 entry, by Mr. Brower?



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
153–156

Page 153

1  A   October 6.  Yep, got it.
2  Q   And towards the bottom of that entry it says, "I
3      feel like we should be adding to this one on
4      recent pullback."  And towards the end of that
5      paragraph it says, "That said, to the extent that
6      this pullback is related to the Walnut-Gate
7      controversy, I'll take the other side."  Do you
8      know what "Walnut-Gate controversy" refers to?
9  A   I don't recall all the specifics.
10  Q   Do you have a general recollection?
11  A   I do.
12  Q   And what is it?
13  A   My summary of it would be that the company
14      underpaid their walnut growers so they could
15      inflate their profitability to keep their stock
16      price high to conclude the Pringles transaction.
17      That may be jumbling together facts from the time
18      of this note and things that have happened since
19      then, but that's my understanding of it.
20  Q   Do you know when Mr. Brower became aware of the
21      Walnut-Gate controversy?
22  A   I'm sure it's in here somewhere.  It's when --
23      it's probably when other participants in the
24      market became aware of it.
25  Q   And do you have any recollection of when that is?

Page 154

1  A   My recollection is there was an article in the
2      national press somewhere that highlighted the
3      issue.  That was the first -- I think that was the
4      first instance of it.
5          MR. CALOZA:  Could you mark this as
6      Exhibit 60?
7          (Exhibit No. 60 is marked.)
8  BY MR. CALOZA:
9  Q   Mr. Stephens, you've been handed a document marked
10      Exhibit 60.  It's Bates stamped MSPERS 001573 to
11      MSPERS 001575.  Do you recognize this document?
12  A   Not this specific document, but I recognize it as
13      an online article from the Wall Street Journal, or
14      a reprint of it.
15  Q   Now, you referred to an article in the national
16      press.  Could this be the article you were
17      thinking about?
18  A   It probably was.
19  Q   And this article is dated September 27, 2011; is
20      that right?
21  A   Yes.
22  Q   Now, if you look on Page AP1399 of Exhibit 55 --
23  A   Yep.
24  Q   -- there is a September 27, 2011 entry, by both
25      Mr. Cepukenas and yourself; do you see that?

Page 155

1  A   Yes, yep.
2  Q   And is that an order to buy five -- well, could
3      you -- could you tell me what that -- what
4      Mr. Cepukenas' entry means?
5  A   Let me see.  It looks like a trade order in our
6      internal system to buy five basis points to a
7      target of 119 basis points with no limit in the
8      small cap portfolio.  What I don't know is what
9      time of day this was entered.
10  Q   Do you know whether Mr. Cepukenas or yourself saw
11      this Wall Street journal article, Exhibit 60,
12      before making those trades?
13  A   I don't have any specific recollection.
14  Q   Do you --
15  A   It doesn't have any commentary, so I don't know.
16  Q   Returning to the October 6 entry by Mr. Brower, he
17      says that he'll take the other side in the walnut
18      gate controversy.  Do you see that?
19  A   Yeah, yep.
20  Q   Do you know whether Mr. Brower believed there was
21      an issue with the -- with Diamond's accounting for
22      walnuts at the time he wrote this note?
23  A   The question was what?  I'm sorry.
24  Q   Mr. Brower says, "I'll take the other side."
25  A   Right.

Page 156

1  Q   My question is whether you know if he believed
2      that there was any problem with Diamond's
3      accounting for walnuts at the time that he wrote
4      this note?
5  A   I don't know what he believed.
6  Q   Well --
7  A   I know that in his -- according to this, as he
8      weighed the probabilities, he seemed to believe
9      that it -- at that point in time, it was not a
10      significant issue.
11  Q   And when you say "he weighed the probabilities,"
12      what do you mean by that?
13  A   I think that he did not believe that it was much
14      more than the normal course of business, and --
15      yeah.
16  Q   I'm not sure I understood your response.  When
17      you're referring to it -- when you say that he did
18      not think that it was much more than the normal
19      course of business, are you saying that he did not
20      believe it was -- that he did not believe that the
21      controversy was a significant issue?
22          MR. WYLIE:  Object to the form.
23          THE WITNESS:  Yeah, I'm saying that I
24      don't know what he believed.  I think he -- my
25      guess is he thought if there was a controversy,



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
157–160

Page 157

1     there was an issue, it was immaterial, and,
2     therefore, not -- not something to change his
3     private market value over.
4   BY MR. CALOZA:
5   Q    So if it's not something to change his
6     private market value over, would it affect his decision on
7     whether or not to invest in Diamond?
8         MR. WYLIE:  Object.  Form.  Assumes
9     facts not in evidence.
10  BY MR. CALOZA:
11  Q    You may answer the question.
12  A    Restate the question, please.
13  Q    You testified that -- strike that.
14        Now, if you continue reading
15    Mr. Brower's entry, it says, "It's less than 10
16    percent of profits and getting smaller post
17    Pringles transaction."  Do you know what that
18    refers to?
19  A    I believe it refers to the walnut business and his
20    understanding of it, contribution to the
21    profitability of Diamond.
22  Q    And is that consistent -- strike that.
23        Mr. Stephens, if you look again at the
24    October 6 entry on Page AP1339, there is an order
25    to buy five basis points of Diamond stock.

Page 158

1   A    Uh-huh.
2   Q    Is that right?
3   A    Yes.
4   Q    Do you know what the rationale was for that
5     purchase?
6   A    I believe it was captured in Rod's summary that we
7     just went over.
8   Q    And so -- well, strike that.
9         MR. CALOZA:  Could you mark this as
10    Exhibit 61?
11        (Exhibit No. 61 is marked.)
12  BY MR. CALOZA:
13  Q    Mr. Stephens, you've been handed an Exhibit marked
14    61.  It's Bates stamped AP0000333 to AP0000334.
15    Do you recognize this document?
16  A    Unfortunately, no.
17  Q    Do you know whether the second page, AP334,
18    relates to Diamond?
19  A    I can't say for certain.
20  Q    Do you recognize --
21  A    I think it does, but I can't say for certain.
22  Q    Do you recognize the handwriting on Page AP334?
23  A    I don't.
24  Q    Do you have any understanding of the context in
25    which this document was created?

Page 159

1   A    I'd be guessing.
2         MR. CALOZA:  Can we go off the record?
3         THE VIDEOGRAPHER:  We are off the record
4     at 2:37 p.m.
5         (A brief recess is taken.)
6         THE VIDEOGRAPHER:  We are back on the
7     record at 2:49 p.m.
8   BY MR. CALOZA:
9   Q    Mr. Stephens, prior to the break, I was asking you
10    about Exhibit 61.
11  A    Yes.
12  Q    And the handwritten notes on Page 334, AP334.
13  A    Yes.
14  Q    And you testified that you don't recognize this
15    handwriting; is that correct?
16  A    That's correct.
17  Q    This was produced to us by Artisan.  Do you have
18    any reason to believe that these notes are not in
19    Diamond's research -- or Artisan's research file
20    regarding Diamond?
21  A    No.
22  Q    Do you know anybody at Artisan who is
23    knowledgeable about these notes?
24  A    I know the people who should be knowledgeable.
25  Q    And who is that?

Page 160

1   A    The same people that we've talked about today:
2     either Rod Brower, Martin Jochmann, Jess Gelhar,
3     Craigh Cepukenas, Matt Kamm or myself.
4   Q    Did you ask any of those individuals about the
5     contents of these notes?
6   A    No.  I testified earlier that I did not speak to
7     anybody about this deposition.
8   Q    Now, this Page AP334 in the lower right refers to
9     a continuity payment.  Do you see that?
10  A    I see -- I can't tell if it's contingency or
11    continuity, but, yeah, I see something.
12  Q    Do you recall anyone discussing a continuity
13    payment with you?
14  A    I have no specific recollection.
15  Q    Do you have a general recollection?
16  A    The term is familiar.
17  Q    And below that, I think it says, "Momentum
18    payment."  Do you have any recollection of any
19    discussion regarding a momentum payment?
20  A    I have no specific recollection.
21  Q    Do you have a general recollection?
22  A    I recognize the term.
23  Q    And what does the term mean?
24  A    Momentum payment.
25  Q    Do you have any understanding of what momentum



Page 161

1    payment means?
2  A   Not at this time.
3  Q   And do you have any understanding of what
4      continuity payment means?
5  A   Not at this time.
6  Q   So do you have any information about the context
7      of this document?
8  A   I don't.  There's not a date on it.  There's not a
9      name on it, and it's on the back of a Coach
10     earnings report document, so it's confusing to me.
11         MR. CALOZA:  Counsel, Mr. Stephens has
12     not been able to testify as to any of the
13     handwritten notes in Artisan's production.  One of
14     the deposition topics that we noticed was
15     documents regarding, relating to or referring to
16     Diamond, which I think under any reasonable
17     interpretation includes the handwritten notes
18     regarding Diamond produced by Artisan.  Is there
19     any -- do you have any witness prepared to testify
20     on Artisan's behalf regarding these notes?
21         MR. WYLIE:  No.  We objected to that
22     topic.  We did not agree to produce somebody on
23     behalf of Artisan prepared to testify as to that
24     topic, and you knew that fact before today's
25     deposition began.

Page 162

1          MR. CALOZA:  Counsel, you agreed to
2     produce a witness who could testify as to both --
3     as to the process by which Artisan Partners made
4     the decisions to purchase and sell securities of
5     Diamond in this account.  Is it your position that
6     these handwritten notes are irrelevant to that
7     process?
8          MR. WYLIE:  No, I believe that
9     Mr. Stephens has testified ably and competently as
10    to that process.
11  BY MR. CALOZA:
12  Q   Mr. Stephens, please turn to Exhibit 61, Page
13     AP334.
14  A   Uh-huh.
15  Q   Do you see where it says, "Walnut sold into
16     shelled walnut markets?
17  A   Yeah, I can't make out what it says after that.
18  Q   Do you have any understanding of what that means?
19  A   Not specifically, no.
20  Q   Do you see the reference to a blog post seeking
21     alpha?
22  A   Yes.
23  Q   Do you have any references -- do you have any
24     understanding as to what that reference means?
25  A   Not specifically.

Page 163

1  Q   Do you know whether these notes reflect a
2      conversation?
3  A   I have no idea.
4  Q   And do these notes reflect any information
5      released by Diamond?
6  A   Again, I have no information.
7  Q   Are you aware whether Diamond announced an
8      internal investigation into payments to walnut
9      growers?
10  A   My recollection is that there was a reference to
11      it somewhere in these documents.
12  Q   And do you recall any specifics about the internal
13      investigation?
14  A   I'm sorry.  Repeat that.
15  Q   Do you know what the internal investigation was
16      about?
17  A   I believe it was about payments to walnut growers.
18  Q   Do you know any specifics?
19  A   No, my recollection is vague.  I think there's a
20      reference to it somewhere in here.
21  Q   Could you please turn to Page AP1397 in
22      Exhibit 55?  Do you see a November 2, 2011 entry,
23      by Mr. Brower?
24  A   Yes.
25  Q   Do you see in the first paragraph it says, "GLW

Page 164

1      and I spoke with the company late yesterday, and
2      I've debriefed with CAC."
3  A   JLW?
4  Q   Yes.
5  A   Yes.
6  Q   Who is JLW?
7  A   Jason L. White.
8  Q   And what does CAC refer to?
9  A   Craigh A. Cepukenas.
10  Q   Did Mr. Brower or Mr. White speak with you about
11      the discussion with Diamond?
12  A   I don't see it referenced in here.  I don't have a
13      specific recollection.
14  Q   Do you have a general recollection of whether they
15      discussed the contents of that conversation with
16      you?
17  A   A general -- I'm sorry, did you ask me if I have a
18      general --
19  Q   Do you have a general recollection whether they
20      discussed the contents of their conversation with
21      Diamond with you?
22  A   I can't -- it's hard for me to say now that I've
23      read all of this.  I don't have a recollection as
24      I sit here of having that conversation.
25  Q   Now, if you read the entry, it says, "Diamond



Page 165

1    issued a release yesterday after the close
2    indicating the Pringles transaction with PG would
3    be delayed to the first half of 2012 to allow time
4    to investigate an external communication the BOD
5    received regarding potential fraudulent crop
6    payment treatment by Diamond."  Do you see that?
7  A    Yeah.
8  Q    Do you know whether anyone on -- anyone in your
9    team had an opinion whether Diamond had actually
10    -- strike that.
11        Do you know whether anyone on your team
12    had any opinion as to whether Diamond engaged in
13    any fraud regarding its crop payments?
14        MS. GORE:  Objection.  Asks for
15    speculation.
16        MR. WYLIE:  I'll object.  Vague as to
17    timeframe.
18  BY MR. CALOZA:
19  Q    You can answer.
20  A    Can you repeat it?
21  Q    Do you have any understanding as to whether anyone
22    on your team believed that Diamond engaged in
23    any fraudulent crop payment treatment?
24  A    In terms of general recollection, I can't say
25    whether anyone believed it.  There was probably

Page 166

1    people who were suspicious.
2  Q    Were you suspicious?
3  A    My recollection is I may have been.
4  Q    And is this in the November 2011 timeframe?
5  A    I would guess that it was.
6  Q    Now, the note says that, "This issue appears to be
7    very similar to the short report put out by Off
8    Wall Street several weeks ago," and then it goes
9    on to say that "45 percent of Diamond's float is
10    sold short."  Do you see that?
11  A    Yes, yep.
12  Q    Do you know why Mr. Brower would have noted -- do
13    you know why he noted that information?
14        MS. GORE:  Objection.  Calls for
15    speculation.
16  BY MR. CALOZA:
17  Q    You may answer.
18  A    I think he thought it was material.
19  Q    And why would that be material?
20  A    Because it's lending credence to the fact pattern
21    of potential fraud at Diamond.
22  Q    And how does that lend credence to the potential
23    fact pattern of fraud?
24  A    Because there is no certainty, and all you can do
25    is collect data points.  The more data points you

Page 167

1    have, the higher the probability.
2  Q    What is the significance of 45 percent float being
3    sold short?
4  A    It's a high -- it's a -- in the overall
5    distribution of short interest in public
6    securities, 45 percent would be considered an
7    outlier, in our opinion.
8  Q    And if someone is selling Diamond short, does that
9    mean that they expect the price to fall?
10        MR. WYLIE:  Objection.  Foundation.
11    Calls for speculation.
12  BY MR. CALOZA:
13  Q    Let me ask it a different way:  What does it mean
14    to sell a share -- to sell a share short?
15  A    At a minimum, you don't think it's going higher.
16  Q    Does it mean you expect the price to fall?
17  A    Not always.
18  Q    Do you have any reason to dispute that 45 percent
19    of Diamond's float was sold short at this point in
20    time?
21  A    I would -- I generally rely on the information of
22    our analysts, so I believe it to be true.
23  Q    At the bottom of this entry, it says, "I have a
24    hard" -- "I have a hard time believing the
25    premeditated fraud accusation is true, but can't

Page 168

1    rule it out.  That said, I'll do a little more
2    background gathering and would suggest we discuss
3    the situation at lunch including the context of
4    the Diamond-grower relationship, last year's
5    walnut crop and the timing process of crop
6    payments."  Do you see that?
7  A    Yes.
8  Q    Do you know whether Mr. Brower did additional
9    background gathering?
10  A    I can't recall for certain, but I assume if he
11    said he was going to, he did.
12  Q    But you don't know any specifics; is that true?
13  A    As I sit here today, I cannot recall any
14    specifics.
15  Q    The reference to discussing the situation at
16    lunch, is that a reference to your team's internal
17    team meetings?
18  A    Yes.
19  Q    Do you recall discussing Diamond at those team
20    meetings in this timeframe?
21  A    I don't have a specific recollection.
22  Q    Do you have a general recollection?
23  A    I know it was discussed.  I don't know if it was
24    at those lunch meetings around that timeframe.
25  Q    Now, it refers to the context of the



Page 169

1    Diamond-grower relationship.  Do you know whether
2    Mr. Brower did any investigation of the
3    Diamond-grower relationship?
4  A  Yes.
5  Q  And what did he -- what information did he gather?
6  A  I think he -- I believe, my recollection is, he
7    did more research, firsthand research, to try to
8    understand how the walnut industry works.
9  Q  Do you know what specific research he conducted?
10 A  I have a recollection of being on a call with him
11    with an industry participant.
12 Q  What do you mean by "an industry participant"?
13 A  Someone who participates in the walnut industry.
14 Q  Do you know -- in what way did this individual
15    participate in the walnut industry?
16 A  I believe it was -- they were a grower.
17 Q  Do you know whether it was a grower contracted to
18    deliver walnuts to Diamond?
19 A  I can't recall specifically.
20 Q  Do you know when that conversation took place?
21 A  I can't recall specifically.
22 Q  Was there anyone else on -- who participated in
23    this call other than Mr. Brower, yourself and this
24    grower?
25 A  I don't recall specifically.

Page 170

1  Q  Do you know the name of the grower?
2  A  I don't recall.  And, I believe, it was a grower.
3    I'm not 100 percent sure.  It was a participant in
4    the walnut industry.
5  Q  Is there anything else that you recall about this
6    conversation between Mr. Brower, yourself and this
7    grower?
8  A  Only in general terms.
9  Q  And what are those general terms?
10 A  He didn't like the management team at Diamond.
11 Q  Anything else?
12 A  No.
13 Q  Why didn't he like the management team?
14 A  I don't recall specifically.
15 Q  If you turn to the first page of Exhibit 55, there
16    is an entry for November 2nd, 2011, written by
17    Mr. Brower.  Do you see that?
18 A  Yes.
19 Q  And it says -- he says that he has updated the PMV
20    based on margin, tweaks and models after that note
21    and a change in the risk from H to M.  Do you see
22    that?
23 A  Change in the risk from -- to H from M, yes.
24 Q  What does H refer to?
25 A  He increased our assessment of the business model

Page 171

1    risk; in other words, the persistency in duration
2    from the cash flows of the business from medium to
3    high.
4  Q  Now, he says that he has recast the model to
5    incorporate fine-tuning on the earnings model, a
6    shift of scenario probability weightings and a
7    shift to high risk from medium risk prior.  Do you
8    see that?
9  A  Yes, yep.
10 Q  Does -- well, in the first -- do you see where it
11    says, "one intentional accounting fraud"?
12 A  Yes.
13 Q  And it says, "I'd put a low probability on this
14    outcome, but the outcome would be a disaster."
15 A  Yes.
16 Q  Do you know why Mr. Brower put a low probability
17    on intentional accounting fraud?
18 A  Because every analyst that I've ever worked with
19    is hopeful.
20 Q  Do you have any understanding whether he believed
21    there was accounting fraud at this time?
22       MS. GORE:  Objection.  Calls for
23    speculation.
24 BY MR. CALOZA:
25 Q  You can answer.

Page 172

1  A  I think "believed" is too strong of a word.  I
2    think suspicious, maybe.
3  Q  Well, if he were suspicious, is putting a low
4    probability on that outcome consistent with a
5    suspicion of accounting fraud?
6  A  Perhaps "suspicious" is too strong of a word.
7    There's some word that defines not -- didn't
8    believe, but didn't disbelieve either.
9  Q  If you continue to look in that paragraph, it
10    says, "No Pringles transaction and a management
11    house cleaning, stock get completely flogged with
12    my best guess being down another 50 percent from
13    here on trough EV/EBITDA multiple."
14 A  Uh-huh.
15 Q  Do you understand what he means by "my best guess
16    being down another 50 percent from here"?
17 A  Yes.  In conjunction with stock getting -- "get
18    completely flogged," I believe he thinks that this
19    stock will be down -- the public stock price will
20    be down another 50 percent from wherever it was
21    trading at that point.
22 Q  And then the next scenario under No. 2 is, "No
23    fraud, but aggressive accounting and biz
24    practices.  Pringles transaction closes but
25    delayed by a quarter."  Do you see that?



Page 173
1  A   Yes.
2  Q   And then he says, "This outcome is very possible
3      and maybe even probable, but it is difficult to
4      know with high confidence."  Do you see that?
5  A   Yes.
6  Q   And then on the next page, AP1397, he says, "In
7      this case, we're back to prior PMV less the costs
8      incurred from this event."  Do you see that?
9  A   Yep.
10  Q   Do you understand what that last sentence means?
11  A   The one that reads, "Maybe there's some penalty
12      box time on sentiment, but new PMV would be 70 --
13      approximately 72 versus the 83 new baseline PMV?"
14  Q   No, I meant, "We're back to prior PMV less the
15      cost from this event."  Do you understand what
16      that means?
17  A   Roughly.
18  Q   And what's your understanding?
19  A   Maybe there's some penalty box time on sentiment,
20      but new PMV would be 72 versus 83 new baseline
21      PMV.
22  Q   So even in the event that there were no accounting
23      fraud, his estimate of private market value would
24      decrease; is that accurate?
25  A   I think he's saying if there was no fraud, but the

Page 174
1      result of whatever investigation was aggressive
2      accounting and business practices, yes, that would
3      result in a lower private market value.  And the
4      transaction was pushed one quarter further out
5      than what he had in his current private market
6      value.
7  Q   And then in scenario No. 3, it says, "Same as
8      No. 2, but PG walks.  No Pringles deal."  Do you
9      see that?
10  A   Yep.
11  Q   So in this scenario, there's no fraud, but
12      aggressive accounting and business practices, and
13      the Pringles deal does not go through; is that
14      accurate?
15  A   Yes.
16  Q   And under this scenario, Mr. Brower's calculation
17      of private market value is $76; is that accurate?
18  A   Let me see.  It looks like he has a few more puts
19      and takes than what you stated, but yet since the
20      net of it is the new PMV would be 76.
21  Q   And the fourth scenario, "The investigation's
22      quickly resolved and Pringles closes in January
23      of 2012."  Do you see that?
24  A   Yes.
25  Q   And under that scenario, private market value

Page 175
1      would be $83; is that accurate?
2  A   Yes, yep.
3  Q   Do you know whether anyone calculated an estimated
4      private market value taking into account the
5      probabilities of these four scenarios?
6  A   I don't have any specific recollection.  I believe
7      if they did, it would be in here.
8  Q   At the top of Page 1396, there are one, two,
9      three -- four entries related to selling Diamond
10      stock.  Do you see that?
11  A   Yep.
12  Q   And is that selling 21 basis points -- well, could
13      you tell me what the first line under -- where it
14      says "ACS sell," what that line means?
15  A   The very first line?
16  Q   Correct.
17  A   It says, "ACS sell Diamond 21 basis points, zero
18      target."  That means that I'm selling all of the
19      stock out of the mid-cap portfolios.
20  Q   Now, my --
21  A   All of my stock -- all the stock that's in my sub
22      portfolio.
23  Q   Now, if you look again at Mr. Brower's
24      November 2nd entry, he says, "My recommendation is
25      to stick with it given it's contracted to a base

Page 176
1      garden level."  Do you see that in the second
2      paragraph?
3  A   Yes, yep.
4  Q   Do you know whether Mr. Brower's --
5  A   But where it says "but the risk is obviously
6      high"?
7  Q   Correct.  Do you know whether Mr. Brower's
8      recommendation changed between November 2nd and
9      November 11?
10  A   It probably did based on discussion, because he
11      said, "As new info becomes available, or upon
12      further discussion and reflection, we can
13      certainly decide to pull the rip cord and move
14      on."
15  Q   And do you have any recollection of further
16      discussion and reflection between November 2nd and
17      November 11?
18  A   I don't have any recollection of reflection.  I
19      have recollection of deciding to sell the stock.
20  Q   When did you decide to sell the stock?
21  A   According to this, on November 11th.
22  Q   Was there --
23  A   At 11:17 a.m., it looks like, or 11:23, I guess.
24  Q   Was that a team discussion and decision?
25  A   I have no specific recollection.  It looks like it



ANDREW STEPHENS  30(b)(6)                          April 04, 2013
IN RE DIAMOND FOODS, INC.                          177–180

Page 177

1    may have been since everybody sold.
2  Q   At the time you sold the stock on November 11, did
3    you believe that Diamond's -- that Diamond had
4    committed any intentional accounting fraud?
5      MR. WYLIE:  Object to the extent it
6    calls for a legal conclusion.
7  BY MR. CALOZA:
8  Q   You can answer.
9  A   I cannot say specifically that I believed they
10    committed fraud.  I thought -- my recollection is
11    I thought there was a substantial probability they
12    may have.
13 Q   Do you know whether or not anyone on your team
14    disagreed with that conclusion?
15 A   I don't recall.
16 Q   Do you know whether the conversation with
17    Mr. Brower, yourself and the grower occurred
18    between November 2nd and November 11?
19 A   I don't have a specific -- I have a vague
20    recollection that it happened before November 2nd,
21    but I don't know for sure.
22 Q   So is your vague recollection -- do you know --
23    strike that.
24      Do you have any recollection of whether
25    that conversation took place before Mr. Brower

Page 178

1    submitted this entry on November 2nd?
2  A   I don't.
3      MR. CALOZA:  Can you mark this as
4    Exhibit 62?
5      (Exhibit No. 62 is marked.)
6  BY MR. CALOZA:
7  Q   Mr. Stephens, you've been handed a document marked
8    Exhibit 62 Bates stamped -- and the first page is
9    Bates stamped AP0001774.  And I will represent to
10    you that this is an Excel sheet that -- or
11    printout of tabs from an Excel sheet that was
12    produced by Artisan to Diamond in native form, and
13    it includes the pitch tab, the PMV tab, the PMV
14    adjusted tab, consolidated P&L tab and segment P&L
15    tab.  If you look at the third page of this
16    document, there is an expected value chart.  Do
17    you see that?
18 A   Yeah.
19 Q   And this is, again, a calculation of Artisan's
20    estimated private market value.  Do you see that?
21 A   Yep.
22 Q   Now, what is the expected private market value as
23    of November -- or do you see that this -- strike
24    that.
25      Do you see that this chart is dated

Page 179

1    November 3rd, 2011?
2  A   Yes.
3  Q   And if you look on the first page of Exhibit 62,
4    the file name is Diamond workbook 2011, 11 of 3.
5    Do you see that?
6  A   2011 -- yep.
7  Q   Do you have any reason to believe that this
8    analysis was not conducted on November 3, 2011?
9  A   No, I don't have any reason not to.
10 Q   And what is the expected value as of November 3rd,
11    2011?
12 A   I think it's the same as we just discussed, $84.
13 Q   Now, this analysis was conducted after Artisan
14    became aware of the allegations of improper
15    accounting; is that correct?
16 A   If that's the sequence, yes.
17 Q   Well, do you know when -- well, this analysis is
18    dated October 3, and Mr. Brower's notes are --
19    regarding the investigation are dated
20    November 1st -- sorry, November 2nd.  Do you see
21    that in Exhibit No. 55?
22 A   Yes, yep.
23 Q   Do you have any reason to believe that the
24    analysis in Exhibit 62 did not take place after
25    Mr. Brower became aware of the allegations of

Page 180

1    accounting fraud?
2  A   I have no reason to believe it didn't, but I can't
3    confirm it did.
4  Q   And when Mr. Brower analyzes private market value
5    on November 3rd, his weighted private market value
6    is $84; is that correct?
7  A   Yes.
8  Q   Do you know, does this analysis take into account
9    the probability of accounting fraud?
10 A   I don't know specifically.  I believe it's
11    consistent with what we already talked about when
12    we discussed recasting his model and coming up
13    with an $83 private market value.  I think it's
14    just a rounding error.  So I think it's the same
15    as what we just talked about.
16 Q   Now, in -- if you look on Exhibit 55 under
17    "intentional accounting fraud" where Mr. Brower
18    refers to a 50 percent loss from here, is that a
19    reference to a 50 percent loss on the market
20    price, or -- of Diamond, or is it a 50 percent
21    loss on Artisan's calculated estimated private
22    market value?
23 A   I believe he's saying it's both, because he
24    references a trough enterprise EBITDA multiple on
25    the old Diamond EBITDA.



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
181—184

Page 181

1  Q   So the -- so are you saying that he thinks the
2      market price would fall by half and the expected
3      private market value would fall by half from 84 to
4      42?
5  A   I can't say specifically, but that's my
6      interpretation.
7  Q   So even in the scenario of intentional accounting
8      fraud, the calculation would be that private
9      market value would be $42; is that accurate?
10 A   On that single case which he considers to be a low
11     probability, I would generally agree with your
12     conclusion.
13 Q   That is the worst outcome out of the four
14     scenarios; is that right?
15 A   The way I read it, yes.
16 Q   So taking into account all four scenarios, would
17     you agree that weighted private market value would
18     be in excess of $42?
19           MR. WYLIE:  Objection.  Calls for
20     speculation.
21 BY MR. CALOZA:
22 Q   You can answer.
23 A   If I did the math on a probability weighted basis,
24     my guess is I would come up with higher than 42,
25     if 42 is really what the private market value

Page 182

1      would be, yeah.
2  Q   Do you know if there were any other analyses of
3      private market value after November 3rd, 2011?
4  A   I don't know.
5           MR. CALOZA:  Could you mark that as
6      Exhibit 63?
7           (Exhibit No. 63 is marked.)
8  BY MR. CALOZA:
9  Q   Mr. Stephens, you've been handed a document marked
10     Exhibit 63, Bates stamped AP331 to AP332.  Do you
11     recognize this document?
12 A   I saw it in the file.
13 Q   Do you know whose handwriting this is?
14 A   I don't.
15 Q   And do you have any understanding of the context
16     in which Exhibit 63 was created?
17 A   Not specifically, no.
18 Q   Do you have any understanding of whether this
19     reflects any conversation regarding Diamond?
20 A   I don't know if it's a conversation or just a
21     worksheet.
22 Q   Do you see the reference to pre-harvest?
23 A   Yes.
24 Q   Do you have any understanding of what that refers
25     to?

Page 183

1  A   Not beyond an assumption.
2  Q   Do you see on the bottom left it says "grower,
3      quote, tight versus loose"?
4  A   Where is that?  I'm sorry.
5  Q   It is on the left margin at the bottom of Page
6      AP331?
7  A   I see "tight versus loose."  I can't make out...
8  Q   Do you have any understanding what that refers to?
9  A   None.
10 Q   Do you know anyone at Artisan who would be able to
11     testify about this document?
12 A   Not specifically.  It's the same group that I
13     referenced earlier.
14 Q   And, again, you did not discuss this deposition
15     with any of those individuals that you referenced
16     earlier; is that right?
17 A   I did not, no.
18           MR. CALOZA:  Can you mark this as
19     Exhibit 64?
20           (Exhibit No. 64 is marked.)
21 BY MR. CALOZA:
22 Q   Mr. Stephens, you've been handed a document
23     Exhibit 64, Bates stamped AP0001817 to AP0001818.
24 A   Uh-huh.
25 Q   Do you recognize this document?

Page 184

1  A   Yes.
2  Q   What is it?
3  A   I believe it's in reference to the phone call that
4      I recalled earlier with a participant in the
5      walnut industry.
6  Q   Does this document refresh your recollection of
7      when that phone call took place?
8  A   I don't see anything on it that references a date.
9  Q   Do you know --
10 A   Just a -- I'm looking through it.
11 Q   Let me know when you've had a chance to review the
12     document.
13 A   I don't see anything that gives me a specific
14     idea.  It looks like it was after 2010 sometime.
15 Q   Do you know if these are your notes?
16 A   They are not my notes.
17 Q   Do you know if they're Mr. Brower's notes?
18 A   I don't know if they're Mr. Brower's notes.
19 Q   Do you know whose notes these might be if they're
20     not yours or Mr. Brower's?
21 A   One of the group that I mentioned earlier.
22 Q   Did anyone else from that group participate in
23     this phone call with the grower?
24 A   I have no specific recollection.
25 Q   You have no reason to believe that another team



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
185–188

Page 185

1    member participated in the call other than
2    yourself and Mr. Brower; is that accurate?
3  A  No.  I have many reasons to believe that others
4    did participate.  I just can't recall if they did
5    or not.
6  Q  Do you know how Artisan identified a grower to
7    speak with?
8  A  I don't.
9  Q  Do you have any recollection about the context in
10   which this call took place?
11 A  Generally, yes.
12 Q  And what's your general recollection?
13 A  We wanted to understand better the walnut payment
14   issue and asked Rod to talk to people to try to
15   find someone within the industry that could
16   explain it to us on a firsthand basis.
17 Q  Do you remember how long this conversation lasted?
18 A  Not specifically.
19 Q  Do you have a general recollection?
20 A  Generally, less than 45 minutes.
21 Q  Do you know whether the information conveyed to
22   you by this grower was publicly available at that
23   time?
24        MR. WYLIE:  Object to foundation.
25        THE WITNESS:  I'm having a hard time

Page 186

1    with the definition of "publicly."  I think it was
2    well-known within the walnut industry.  How many
3    other people in the general public would care, I
4    don't know.
5  BY MR. CALOZA:
6  Q  Did you speak to any other growers?
7  A  Not that I recall.
8  Q  If you turn to AP1818, it says halfway down,
9    "Contractually able to do this."  Do you know what
10   that refers to?
11 A  Not specifically, no.
12 Q  Do you have a general recollection?
13 A  It comes after "smartest guy in the room," so I'm
14   not sure what they were referring to.
15 Q  It says, "Competitive market price based on market
16   conditions."  Do you know what that refers to?
17 A  Not specifically.  I believe it has to do with
18   walnut prices.
19 Q  Do you have any understanding of the relationship
20   between the market price and market conditions?
21 A  For walnuts?
22 Q  Correct.
23 A  I did at one time.  I don't know.
24 Q  Do you see -- do you see where it says, "Forecast
25   was 485K, will not be made.  Maybe 430 to 460K

Page 187

1    tons"?
2  A  "485 will not be made.  Maybe 430 to 460."  Yep.
3  Q  Do you have any understanding of what that means?
4  A  Not specifically.
5  Q  Do you have a general recollection?
6  A  Not -- no.  I don't know what type of walnut or...
7  Q  Do you know if that refers to the walnut crop?
8  A  I don't.  I don't know if it's his crop.  I don't
9    know if it's the total crop.  I don't know if it's
10   Diamond's crop.  I don't know.  I don't recall.  I
11   did at the time, I'm sure.
12 Q  If you look to the next paragraph, it says "China
13   had a big crop, so not buying as much."  Do you
14   see that?
15 A  Yep.
16 Q  How would the fact that China is not buying as
17   much affect the market price of walnuts, if there
18   is one?
19 A  I don't know.
20        MR. WYLIE:  Objection.  Foundation.
21   Speculation.
22 BY MR. CALOZA:
23 Q  Well, in -- would you expect if -- strike that.
24        At the bottom of the page, it says,
25   "Three responses, Kool-Aid drinkers, probably 30-

Page 188

1    to 40 percent of growers, up yours, and then
2    splitting their deliveries, 40- to 50 percent of
3    growers."  Do you see that?
4  A  Yep.
5  Q  Do you have any understanding of what this means?
6  A  I believe so.
7  Q  And what is that understanding?
8  A  My recollection is that Kool-Aid drinkers are
9    those that will go along with whatever Diamond is
10   offering them, which is probably 30 to 40 percent
11   of the growers.  "Up yours" are people who were
12   tired of dealing with Diamond, and the third,
13   "splitting their deliveries," 30 to 40 percent of
14   growers are doing both.
15 Q  Do you have any understanding of whether Diamond
16   had discretion to set walnut prices?
17 A  I have no specific recollection.  Prices to -- for
18   the overall market, or prices to the customers
19   they bought from?  Or the suppliers they bought
20   from?
21 Q  The suppliers they bought from.
22 A  I have no specific recollection.
23 Q  Do you have a general recollection?
24 A  I don't.
25 Q  On page AP 1817, towards the bottom it says,



Page 189

1    "Contract:  Definitely growers out there that are
2    died in the wool Diamond-growers that want to
3    security."  Do you see that?
4  A   I'm sorry, where was it?
5  Q   Towards the bottom of the page, four lines up.
6  A   "Contract:  Definitely growers out there that are
7    died in the wool Diamond-growers that want to
8    security."
9  Q   Do you have any idea what that means?
10  A   I have a general understanding.
11  Q   And what's your understanding?
12  A   That there's contracted -- Diamond has growers
13    under contract that like the security -- they're
14    loyal to Diamond, and they like the security of
15    those contracts.
16  Q   And what security does a contract with Diamond
17    provide?
18  A   I don't know specifically.
19  Q   At the top of AP 1818, it says, "Retail biz is at
20    an advantage in down years, disadvantage in up
21    years."  Do you see that?
22  A   Yes.
23  Q   Do you have any understanding what that means?
24  A   I have a general understanding.
25  Q   And what is that general understanding?

Page 190

1  A   That in years of weak walnut prices, they earn the
2    spread by being able to sell nuts at retail.  And
3    in years where walnut prices are strong, I would
4    guess that there's a squeeze.
5  Q   Do you know whether there was a squeeze in 2011?
6  A   I don't recall.
7        MR. CALOZA:  Can you mark this as
8    Exhibit 65.
9        (Exhibit No. 65 is marked.)
10  BY MR. CALOZA:
11  Q   Actually, before I ask about Exhibit 65, I have
12    one more question about Exhibit 64.  Are you aware
13    of any other investors who discussed the walnut
14    accounting allegations with growers?
15  A   With growers?
16        MR. WYLIE:  I'll --
17  BY MR. CALOZA:
18  Q   With any grower.
19        MR. WYLIE:  -- object.  Misstates his
20    prior testimony and misstates the contents of the
21    document.
22  BY MR. CALOZA:
23  Q   I'll rephrase.  Are you aware of any other
24    investors who discussed Diamond's payments to
25    growers -- with a Diamond grower after the

Page 191

1    disclosure of the company's investigation into
2    walnut payments?
3        MR. WYLIE:  I will, again, object.  It
4    misstates his testimony and it misstates the
5    content of the document.
6  BY MR. CALOZA:
7  Q   You can answer.
8  A   No, not that I recall.
9  Q   Do you know, prior to this conversation with a
10    grower noted in Exhibit 64, had Artisan ever
11    reached out to any of Diamond's walnut growers?
12  A   I think you'd asked me that earlier, and I
13    testified no, that I didn't believe that we had.
14  Q   Okay.  You were handed Exhibit 65, which is a
15    document Bates marked AP 352 through AP 366.  Do
16    you recognize this document?
17  A   To the best of my recollection, I've never seen
18    this before.  This wasn't in our file, not in
19    This was a document produced to Diamond by
20    Artisan.  And if you look at page AP 354 --
21  A   I'm sorry, which page?
22  Q   AP 354.
23  A   Yep.
24  Q   It lists -- or it has details about a 2006 crop,
25    additional delivery payment by Diamond Foods, Inc.

Page 192

1    Do you see that?
2  A   354, I'm sorry.  What was it?
3  Q   This page lists details regarding a 2006 crop,
4    additional delivery payment by Diamond Foods,
5    Inc. --
6  A   Yep.
7  Q   -- do you see that?
8  A   Yeah, yep.
9  Q   Do you have any reason to -- do you have any
10    reason to believe that this document was not part
11    of your investment team's research file on
12    Diamond?
13  A   Actually, I do.
14  Q   And why is that?
15  A   Because I didn't see it in the review material.
16  Q   And in pulling together material to review, did
17    you -- you testified that you didn't discuss this
18    deposition with anyone on your team, is that
19    right?
20  A   Except my assistant.
21  Q   And where did you -- how did you pull together
22    material to review?
23        MR. WYLIE:  I object to the extent it
24    calls for the disclosure of attorney-client
25    communications.



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
193–196

Page 193

1  BY MR. CALOZA:
2  Q   Did you -- is there a hard copy research file
3      containing notes on Diamond?
4  A   I have not seen the original file.  I've only seen
5      a replication of the file, but, yes, I believe
6      there is one.
7  Q   Did you review any documents not provided to you
8      by counsel, by your counsel?
9  A   No.
10 Q   And is the only basis -- well, you previously
11     testified that you have a reason to doubt that
12     this is part of your team's research file, because
13     it was not a document that you had seen in
14     preparation for this deposition, is that correct?
15 A   I'm not sure if those are the exact words I used.
16     I just said I hadn't -- I had reason to doubt that
17     it was -- that it was in our file, because I
18     didn't see it.  It doesn't mean that it's not.  It
19     just means I didn't see it.
20 Q   And is that the only basis for your doubt, that
21     you did not previously see it?
22 A   Yes.
23        MR. CALOZA:  Can you mark this as
24     Exhibit 66.
25        (Exhibit No. 66 is marked.)

Page 194

1        MR. WYLIE:  We've been going almost an
2  hour and a half again, and if you're switching to
3  another document, it might be a good time to take
4  a break.
5        MR. CALOZA:  No, I'm -- I'm almost to
6  another topic, so let me just keep going.  Oh,
7  actually, if we're running out of tape, why don't
8  we take a break now.
9        THE VIDEOGRAPHER:  This is the end of
10 Disc No. 3.  We are off the record at 3:57 p.m.
11        (A brief recess is taken.)
12        THE VIDEOGRAPHER:  We are back on the
13 record at 4:07 p.m.
14 BY MR. CALOZA:
15 Q   Mr. Stephens, prior to the break you were handed a
16     document marked Exhibit 66 --
17 A   Yep.
18 Q   -- Bates numbered AP 336 through AP 347.  Do you
19     recognize this document?
20 A   Unfortunately, I do not.
21 Q   Do you have -- this is a document that was
22     produced to you -- Diamond by Artisan.  Do you
23     have any understanding of how Artisan obtained
24     this document?
25 A   To supply to you or to -- in its original form, to

Page 195

1      supply to you?
2  Q   In its original form?
3  A   I don't, no.
4  Q   Do you have any understanding of when Artisan
5      obtained this document?
6  A   I don't.
7  Q   Do you have any understanding of whether other
8      investors have access to this document?
9  A   I don't.
10        MR. CALOZA:  Could you mark this as
11     Exhibit 67.
12        (Exhibit No. 67 is marked.)
13 BY MR. CALOZA:
14 Q   Mr. Stephens, you've been handed a document marked
15     Exhibit 67 Bates stamped AP 1 through AP 16.  Do
16     you recognize this document?
17 A   It looks like a document that I reviewed -- that I
18     have reviewed, yes.
19 Q   Is this the operative investment management
20     agreement between Artisan and MPERS?
21        MR. WYLIE:  I'll object to the extent it
22     calls for a legal conclusion.
23 BY MR. CALOZA:
24 Q   You can answer.
25 A   Yes, I believe it is.

Page 196

1  Q   Are you aware if there are any amendments to this
2      agreement that are not contained in this
3      Exhibit 67?
4  A   I'm not aware of any amendments.
5  Q   Does this document specify Artisan's investment
6      strategy for the MPERS account?
7  A   Does it specify our investment strategy?
8  Q   Yes.
9  A   I don't --
10 Q   And let me point you to Addendum III on AP 8.
11 A   Addendum III on AP 8.  I believe it states our
12     investment objectives and guidelines, but does not
13     spell out our strategy.
14 Q   Does Artisan Partners have more than one Mid-Cap
15     Growth strategy?
16 A   No.  This is the one Mid-Cap Growth strategy.
17 Q   And does this Exhibit 67 specify any restrictions
18     on investing by Artisan on behalf of MPERS?
19 A   I believe it does.
20 Q   Other than the restrictions specified -- well,
21     what restrictions are there on investments on
22     MPERS' behalf?
23 A   They're listed here.  Did you want me to read
24     them?
25 Q   Are they listed under paragraph 2.3?



ANDREW STEPHENS  30(b)(6)                                    April 04, 2013
IN RE DIAMOND FOODS, INC.                                      197–200

Page 197

1   A   I believe they're listed throughout.
2   Q   Other than the restrictions in Exhibit 67, are
3       there any other restrictions on which investments
4       Artisan may make on behalf of MPERS?
5   A   I'm not -- I'm not a lawyer, so I can't say.  But
6       we do agree to comply with our investment
7       philosophy and processes as described to MPERS and
8       their consultant.
9   Q   If you turn to Addendum I on AP 6.  The investment
10      agreement specifies certain minimum performance
11      standards.  Is that accurate?
12  A   I think it states an expectation, yes.
13  Q   And one of those minimum performance standards is
14      consistent above-median performance in the Mid-Cap
15      Growth manager universe, is that accurate?
16  A   I believe that that's -- one of their
17      expectations, yes.
18  Q   And what do you understand that expectation to
19      require?
20  A   Well, I understand the "above-median performance."
21      I don't understand their definition of
22      "consistent."
23  Q   What does "above-median performance" mean in
24      the -- well, let me take that back.  Can you
25      explain what your understanding of that sentence

Page 198

1       means?
2   A   I believe it to mean in more measurable periods
3       than not, we should be greater than the 50th
4       percentile of performance versus the Mid-Cap
5       Growth manager universe as provided by the MPERS
6       consultant and investment consultant.
7   Q   And does that mean that more often than not,
8       Artisan is expected to outperform the general
9       market?
10  A   No.
11  Q   Well, look at the next sentence, "Performance
12      which consistently exceeds the Russell Midcap
13      Growth Index by 200 basis points net of fees."  Do
14      you have any understanding of what that
15      requirement or what that expectation means?
16  A   Performance which consistently exceeds -- which
17      "consistently" to me means in more measurable
18      periods than not, exceeds the rest of the Mid-Cap
19      Growth basis by 200 basis points net of fees.
20  Q   Now, does that expectation require Artisan to more
21      often than not outperform the market?
22  A   It doesn't require us to do anything.  It's an
23      expectation.
24  Q   Is that an expectation that Artisan will more
25      often than not outperform the market?

Page 199

1   A   I think in relation to these other expectations.
2       It's not a mutually exclusive statement is my
3       understanding of it.
4   Q   Well, it is requiring Artisan -- it is an
5       expectation that Artisan will more often than not
6       exceed the Russell Midcap Growth Index, is that
7       correct?
8   A   At this point --
9           MR. WYLIE:  Objection.  Asked and
10      answered.
11          THE WITNESS:  Yeah.
12  BY MR. CALOZA:
13  Q   You can go ahead and answer.
14  A   I believe it to be one consideration of three that
15      Mississippi PERS reviews.
16          MR. CALOZA:  Can you mark this as
17      Exhibit 68.
18          (Exhibit No. 68 is marked.)
19  BY MR. CALOZA:
20  Q   Mr. Stephens, you've been handed an exhibit marked
21      68 bearing Bates numbers AP 2188 through AP 2238.
22      Do you recognize this exhibit?
23  A   It looks like a document that I reviewed.
24  Q   What is it?
25  A   To the best of my understanding, it's the

Page 200

1       Mississippi PERS Internal Investment Manager
2       Standard Operating Procedures manual.
3   Q   And does your investment team consider the
4       information in this operating manual in
5       determining which investments to make on behalf of
6       MPERS?
7   A   I can't speak to the whole document in detail.  I
8       can say that where there is a specific guideline
9       that's been communicated to us by PERS, we do
10      follow that, yes.
11  Q   Can you please turn to page 26 of document, which
12      is -- which bears Bates stamp AP 2214.  I'll give
13      you a moment just to review that page.
14          (Pause in testimony.)
15          THE WITNESS:  Okay.
16  BY MR. CALOZA:
17  Q   Now, this page lists factors that may be grounds
18      for investment managers to be placed on a watch
19      list or terminated, does it not?
20  A   Without studying the detail, I think, generally,
21      yes, that's what it says.
22  Q   And they include both qualitative and quantitative
23      factors, is that right?
24  A   That's correct, yes.
25  Q   And the quantitative factors pertain primarily to



Page 201

1      performance, is that correct?
2  A   There's both an absolute performance and a
3      relative performance criteria, according to this.
4  Q   And if -- if an investment manager -- is it your
5      understanding that an investment manager that
6      fails to meet these performance requirements is
7      subject to termination?
8  A   No.
9          MR. WYLIE:  Objection.  Foundation.
10     Calls for speculation.
11         THE WITNESS:  That is not my
12     understanding.
13 BY MR. CALOZA:
14 Q   What is your understanding of the purpose of these
15     quantitative factors?
16 A   My understanding is that the board, at its
17     discretion, can place a manager on the watch list
18     or terminate a manager at any time with 30-days
19     notice.
20 Q   What is your understanding of the reasons why an
21     investment manager might be placed on the watch
22     list or terminated?
23 A   According to this, there's both qualitative
24     factors and quantitative factors.
25         MR. CALOZA:  Mark this as Exhibit 69.

Page 202

1          (Exhibit No. 69 is marked.)
2  BY MR. CALOZA:
3  Q   Mr. Stephens, you've been handed a document marked
4      Exhibit 69, which the first page of that document
5      bears the Bates stamp AP 17.  And I will represent
6      to you that this is a printout of a spreadsheet
7      produced by Artisan to Diamond in native Excel
8      format.  Do you recognize this document?
9  A   Yes.
10 Q   What is it?
11 A   It looks like a trade blotter for the Diamond --
12     I'm sorry, for the Mississippi PERS portfolio.
13 Q   And when you say "trade blotter," what does that
14     mean?
15 A   It -- I believe it to be a report of the buys and
16     sells and dividends, stock splits and other
17     transactions in the Mississippi PERS account.
18 Q   If you look on the first page of the printout
19     after the cover page, the right columns -- the
20     right column says, "Com purpose."  What does that
21     refer to?
22 A   Commission purpose.
23 Q   And if you look in the eighth row, it says
24     "Third-party research."  What does that mean?
25 A   I don't -- I did not create the title, so I'm not

Page 203

1      sure what the bucket includes specifically.  But
2      my general knowledge of it is it's for third-party
3      research providers.
4  Q   And if you look further down, there's a reference
5      to proprietary research.  Do you have any
6      understanding of what that means?
7  A   Actually, I don't.
8  Q   Could that be to Artisan's research?
9  A   I would assume that it is, yes.
10 Q   Are you familiar with -- well, strike that.
11         Other than the explanations set forth in
12     Exhibit 55, which was the printout of Artisan's
13     DDM system, do you have any understanding for the
14     bases of any of the trades in this document?
15 A   I didn't understand that question.
16 Q   Other than what appears in Exhibit 55 --
17 A   Yes.
18 Q   -- which is the printout of Artisan's interim
19     research and trading system, do you have any
20     understanding of the rationale for the trades
21     listed in Exhibit 69?
22 A   Yes, in general.
23 Q   And what is that understanding?
24 A   Exhibit 55 is simply the communication from the
25     investment management team to our trading and

Page 204

1      compliance area.  The transactions that are listed
2      on the trade blotter are the actual -- my
3      understanding, are the actual daily fills within
4      the portfolio as well as other transactions such
5      as dividends and stock splits.
6  Q   Do you have any understanding of -- well, let's
7      start with the first trade on June 3, 2011.  Do
8      you have any understanding of the basis for that
9      trade?
10         MR. WYLIE:  Objection.  Vague as to the
11     term "basis."
12 BY MR. CALOZA:
13 Q   Mr. Stephens, do you recall the information you
14     considered on -- do you recall the information you
15     considered when determining to buy Diamond on
16     June 3, 2011?
17 A   Not a specific recollection, but in general, I
18     think it's referenced in Exhibit 55.
19 Q   What about the purchase on June 6, 2011?
20 A   June 6 is likely a continuation of the fills for
21     the original ticket that was entered on June 3.
22 Q   Other than what appears in Exhibit 55, do you have
23     any specific recollection regarding the
24     information considered by your investment team in
25     purchasing any of the securities listed in



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
205–208

Page 205

1    Exhibit 69?
2  A   Other than what's contained in 55, do I have any
3    specific knowledge for each and every trade on
4    this document?
5  Q   Correct.
6  A   I don't think I can answer that.
7  Q   Well, we can go through transaction by
8    transaction.  Do you have any specific knowledge
9    of the information you considered in purchasing
10   stock on June 7, 2011?
11        MR. WYLIE:  Objection.  Assumes facts
12   not in evidence.  Misstates prior testimony.
13  BY MR. CALOZA:
14  Q   You can answer.
15  A   I believe that that information is contained in
16   Exhibit 55.
17  Q   What about June 8, 2011?
18        MR. WYLIE:  Same objection.
19        THE WITNESS:  I would guess that it's
20   contained in Exhibit 55.
21  BY MR. CALOZA:
22  Q   June 14, 2011?
23  A   In order to accurately answer the question, I
24   would need more information than what you've
25   provided to me.

Page 206

1  Q   So sitting here, can you explain the information
2    you considered in purchasing securities -- Diamond
3    securities on June 14, 2011?
4  A   It's my assumption that it's the same instruction
5    that I gave to our trading desk with the original
6    order on June 3.
7  Q   What about June 17, 2011?
8  A   Again, that is my assumption.
9  Q   June 22, 2011?
10  A   You've not provided me with the appropriate
11   information to give you the answer to that.
12  Q   But sitting here today, can you testify as to the
13   information your team considered in purchasing
14   Diamond securities on June 22, 2011?
15  A   I believe that I can.
16  Q   And what is that information?
17  A   It's contained in Exhibit 55.
18  Q   What about June 28, 2011?
19  A   I believe, to the best of my ability, I can.
20  Q   And what is that?
21  A   It's contained in Exhibit 55.
22  Q   Other than what is in Exhibit 55, can you say the
23   basis -- the information that your team relied on
24   in purchasing Diamond securities on July 27, 2011?
25  A   I think I can reasonably assume that it's

Page 207

1    contained in Exhibit 55.
2  Q   What about the August 2, 2011 purchase?
3  A   August 2, 2011.  Yes, I believe I can reasonably
4    assume that it was contained in Exhibit 55.
5  Q   What about August 9, 2011?
6  A   Yes, it's directly referenced.
7  Q   In Exhibit 55?
8  A   Yes.
9  Q   What about the August 11, 2011 purchase?
10  A   I can reasonably assume that it's contained in
11   Exhibit 55.
12        THE VIDEOGRAPHER:  Excuse me.  We need
13   to go off the record.  We are off the record at
14   4:33 p.m.
15        (Discussion held off the record.)
16        THE VIDEOGRAPHER:  We are back on the
17   record at 4:36 p.m.
18  BY MR. CALOZA:
19  Q   Could you state the information your team relied
20   on in purchasing Diamond securities on August 12,
21   2011?
22  A   On August 12.  And the question again?
23  Q   What information did your team rely on in
24   purchasing Diamond on August 12, 2011?
25  A   I can reasonably assume it was in Exhibit 55.

Page 208

1  Q   And August 15, 2011?
2  A   I can reasonably assume it is contained in
3    Exhibit 55.
4  Q   August 19, 2011?
5  A   I can reasonably assume it's contained in
6    Exhibit 55.
7  Q   September 27, 2011?
8  A   It's directly referenced in Exhibit 55.
9  Q   September 28, 2011?
10  A   September 28.  I can reasonably assume it's
11   contained in Exhibit 55.
12  Q   What information did your team rely on in selling
13   Diamond securities on September 30, 2011?
14  A   I cannot say specifically, but, in general, I
15   believe it was a client withdrawal.
16  Q   And October 6, 2011, what information did your
17   team rely on in purchasing securities on that
18   date -- purchasing Diamond securities on that
19   date?
20  A   I'm sorry.  October 6?
21  Q   Correct, October 6, 2011.
22  A   I should have brought my reading glasses.  That's
23   directly referenced in Exhibit 55.
24  Q   What about October 18, 2011?
25  A   I can reasonably assume it's contained in



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
209–212

Page 209

1    Exhibit 55.
2  Q    October 21, 2011?
3  A    I'm sorry.  October 21?
4  Q    Correct.  2011.
5  A    Yeah, it's directly referenced in Exhibit 55.
6  Q    What information did your team rely on in selling
7     Diamond securities on November 11, 2011?
8  A    On November 11?
9  Q    Correct.
10  A    It's directly referenced in Exhibit 55.
11  Q    What about November 14, 2011?
12  A    I can reasonably assume it's contained in
13     Exhibit 55.
14  Q    What about November 15, 2011?
15  A    I can reasonably assume that it's in reference to
16     the trade instruction contained in Exhibit 55.
17  Q    And November 16, 2011?
18  A    I can reasonably assume it's related to the trade
19     instruction contained in Exhibit 55.
20        MS. GORE:  I would like to state that
21     the same objections stated by Mr. Wylie with
22     reference to the June 3, 6 and 7, 2011 trades,
23     apply to each of the dates in Exhibit 69.
24  BY MR. CALOZA:
25  Q    Now, other than the information contained in

Page 210

1     Exhibit 55, are you aware of any specific
2     information relied upon by your team in executing
3     any of the trades contained in Exhibit 69?
4  A    In addition to the information included in
5     Exhibit --
6  Q    55.
7  A    -- 55?
8  Q    Yes.
9  A    Am I aware of any additional information?
10  Q    Correct.
11  A    Not specifically.  But, in general, the nature of
12     the conversation and the history of the
13     conversation may have contributed.
14  Q    What conversation are you referring to?
15  A    Our conversations -- research conversations as it
16     relates to Diamond Foods.
17  Q    But sitting here, you cannot point to any specific
18     conversations?
19  A    I can point to a body of conversations stretching
20     over multiple years.  A cumulative knowledge.
21  Q    Can you recall any specific content from those
22     conversations?
23  A    Not specific --
24        MR. WYLIE:  Objection to form.  Are you
25     asking whether he can recall anything that was

Page 211

1     ever discussed in any meeting of his team?
2        MR. CALOZA:  Mr. Stephens just referred
3     to a body of conversations stretching over
4     multiple years.  I'm simply asking if he recalls
5     any specific content from those conversations.
6        MR. WYLIE:  I'll object to form.  Vague.
7  BY MR. CALOZA:
8  Q    Do you understand the question?
9        MR. WYLIE:  And I also object that it
10     goes beyond the scope of the subject matter on
11     which the deponent was designated to testify.
12  BY MR. CALOZA:
13  Q    Do you understand the question?
14  A    No.  Can you give me an example of specific
15     knowledge?
16  Q    Well, you referred to conversations stretching
17     over multiple years as a possible source of
18     information regarding the basis on which Artisan
19     traded in Diamond.
20        What I'm asking you about is whether you
21     recall any specific conversations regarding
22     information not already contained in Exhibit 55
23     that was used in determining whether to trade in
24     Diamond.
25  A    I recall that there were specific conversations.

Page 212

1     I don't recall the specifics of those
2     conversations.  The cumulative effect of which led
3     to the judgment to sell Diamond, which we are
4     provided in our investment contract.
5        MR. WYLIE:  Excuse me.  Off the record.
6        THE VIDEOGRAPHER:  We are on the record.
7        MR. WYLIE:  On the record.  How long
8     have we been on the record?
9        THE VIDEOGRAPHER:  A little over six
10     hours.
11        MR. CALOZA:  Can you mark this as 70?
12        (Exhibit No. 70 is marked.)
13  BY MR. CALOZA:
14  Q    Mr. Stephens, you've been handed a document marked
15     Exhibit 70, Bates stamped AP229 through AP312.  Do
16     you recognize this document?
17  A    In general terms, yes.
18  Q    What is it?
19  A    It appears to be a portfolio update summary for
20     the period ending -- for the month-end June 30,
21     2011, and potentially the portfolio appraisal for
22     MPERS and a transaction history for MPERS.
23  Q    Do you know whether this document was provided to
24     MPERS?
25  A    I don't know specifically, but I would assume that



Page 213

1     it was.

2 Q  Under commentary on page AP229 in the second line

3     it says, "We outperform the Russell Mid Cap Growth

4     Index due to strong individual stock selection."

5     Do you see that statement?

6 A  I do see that statement, yep.

7 Q  Do you have any basis to disagree with that

8     statement?

9 A  "We outperform Russell Mid Cap Growth Index."

10    Well, I don't like it.

11 Q  But do you have a reason to disagree with that --

12    the statement that Artisan "outperformed the

13    Russell Mid Cap Growth Index due to strong

14    individual stock selection"?  Is that an

15    inaccurate statement?

16 A  Well, the out-performance appears to be factually

17    correct as listed at the top of the page.  Whether

18    it was from stock selection, I can't tell you from

19    my recollection.  But I would believe it to be

20    true if we stated it.

21        MR. CALOZA:  Can you mark this as

22    Exhibit 71.

23        (Exhibit No. 71 is marked.)

24 BY MR. CALOZA:

25 Q  Mr. Stephens, you've been handed a document marked

Page 214

1    Exhibit 71 Bates stamped AP116 through AP228.  Do

2    you recognize this document?

3 A  Not specifically, but, in general, yes.

4 Q  What is it?

5 A  It appears to be a month-end summary of the

6    Artisan Mid-Cap Growth strategy provided to the

7    Public Employees' Retirement System of Mississippi

8    and includes their portfolio holdings and

9    transaction history.

10        MR. CALOZA:  Can you mark this as

11    Exhibit 72.

12        (Exhibit No. 72 is marked.)

13 BY MR. CALOZA:

14 Q  And do you know whether Exhibit 71 was provided to

15    MPERS?

16 A  I don't know specifically, but I assume that it

17    was.

18 Q  You've been handed a document marked Exhibit 72

19    bearing Bates stamps AP91 through AP115.  Do you

20    recognize this document?

21 A  Not specifically, but, in general, I believe so.

22 Q  And what is it?

23 A  It appears to be a month-end summary for the

24    Mid-Cap Growth strategy provided to the Public

25    Employees' Retirement System of Mississippi, as

Page 215

1    well as their -- I believe their portfolio

2    holdings and transaction history.

3        MR. CALOZA:  Could you mark this as

4    Exhibit 73.

5        (Exhibit No. 73 is marked.)

6 BY MR. CALOZA:

7 Q  Mr. Stephens, you've been handed a document marked

8    Exhibit 73 bearing Bates stamps AP 66 through

9    AP 90.  Do you recognize this document?

10 A  Not specifically, but, in general, I believe so.

11 Q  And what is it?

12 A  I assume that it's a month-end summary of the U.S.

13    Mid-Cap Growth portfolio provided to the Public

14    Employees Retirement System of Mississippi as well

15    as their portfolio holdings and a transaction

16    summary.

17        MR. CALOZA:  Can you mark this as

18    Exhibit 74.

19        (Exhibit No. 74 is marked.)

20 BY MR. CALOZA:

21 Q  You've been handed a document marked Exhibit 74

22    bearing Bates stamps AP 43 through AP 65.  Do you

23    recognize this document?

24 A  Not specifically, but, in general, yes.

25 Q  What is this document?

Page 216

1 A  I assume it's a month-end summary for the U.S.

2    Mid-Cap Growth portfolio provided to the Public

3    Employees Retirement System of Mississippi for the

4    month ended October 31, 2011, and includes their

5    portfolio holdings, a summary of the transactions.

6        MR. CALOZA:  Can you mark this as

7    Exhibit 75.

8        (Exhibit No. 75 is marked.)

9 BY MR. CALOZA:

10 Q  Mr. Stephens, you've been provided a document

11    marked Exhibit 75 bearing Bates stamp AP 21

12    through AP 42.  Do you recognize this document?

13 A  Not specifically, but, in general, yes.

14 Q  What is it?

15 A  I believe it's a portfolio summary for the U.S.

16    Mid-Cap Growth portfolio provided to the Public

17    Employees' Retirement System of Mississippi dated

18    November 30, 2011.  And it contains their

19    portfolio holdings and transaction summary.

20 Q  If you look at the last sentence of the second

21    paragraph under "commentary" on page AP 21.  It

22    says, "Positive stock selection results helped our

23    portfolio outperform the Mid-Cap Growth Index."

24    Do you see that?

25 A  Where is it?  Sorry.



Page 217

1  Q    The last sentence of the second paragraph under
2       "commentary" on page AP 21.
3  A    "Positive stock selection results helped our
4       portfolio outperform the Mid-Cap Growth Index."
5       Yes.
6  Q    Is that an accurate statement?
7  A    I don't know.
8  Q    Do you have any reason to believe that it is
9       inaccurate?
10 A    No.
11 Q    And if you look on the second paragraph from the
12      bottom starting, "Broadcom and Garden holdings
13      Diamond Foods were among our weaker performances"
14      -- if you look at the second paragraph on the
15      bottom of AP21, the paragraph starting, "Broadcom
16      and Garden holdings, Diamond foods, were among our
17      weaker performances."
18          The last sentence of that
19      paragraph says, "We sold Diamond Foods, a branded
20      food company specializing in nuts and snack
21      products amid questions surrounding its accounting
22      for payments to walnut growers, which threatened
23      the company's ability to close its planned
24      acquisition of the Pringles brand from Procter &
25      Gamble."  Do you see that?

Page 218

1  A    Yep.
2  Q    How significant was the effect of -- strike that.
3          What do you understand that sentence to
4       mean?
5  A    "We sold Diamond Foods, a branded food company
6       specializing in nuts and snack products amid
7       questions surrounding its accounting for payments
8       to walnut growers, which threatened the company's
9       ability to close its planned acquisition of the
10      Pringles brand from Procter & Gamble."
11 Q    At the time you sold Diamond Foods, did you
12      believe that Diamond had incorrectly accounted for
13      payments to walnut growers?
14 A    Repeat the question.
15 Q    At the time you sold Diamond Foods, did you
16      believe that Diamond had incorrectly accounted for
17      payments to walnut growers?
18 A    No, I did not believe that.  I thought it was
19      possible.
20 Q    But you were not certain?
21 A    There is no certainty.
22          MR. CALOZA:  Can you mark this as
23      Exhibit 76.
24          (Exhibit No. 76 is marked.)
25 BY MR. CALOZA:

Page 219

1  Q    You've been handed a document marked Exhibit 76
2       bearing Bates numbers AP325 through AP330.  Do you
3       recognize this document?
4  A    In general, yes, but not specifically.
5  Q    What is it?
6  A    I believe it to be a letter to Lorrie Tingle, the
7       chief investment officer of Public Employees'
8       Retirement System of Mississippi, reviewing the
9       performance of the Artisan U.S. Mid-Cap growth
10      strategy for the second quarter of 2011 and
11      providing a current perspective and positioning of
12      the portfolio and the market.
13 Q    If you look on page 329, AP329, which is page 5 of
14      the document, you'll see your name.  Is that your
15      signature?
16 A    Yes.
17 Q    Did you help author this document?
18 A    I believe that I had input into the document, yes.
19 Q    Do you see on page 325, the first page, the last
20      sentence under "investing environment and
21      performance review," it says, "Strong relative
22      stock selection helped our portfolio best both the
23      Russell Midcap and Russell Midcap growth indexes."
24      Do you see that?
25 A    Yes.

Page 220

1  Q    Is that an accurate statement?
2  A    I believe that it is.
3  Q    And does stock -- does "stock selection" there
4       refer to selecting stocks with the characteristics
5       you described earlier, namely:  Franchise
6       characteristics, valuation you understand and
7       accelerating profits?
8  A    I'm not sure that's the definition of it here.  I
9       think it's -- says, "Relative to all other stocks
10      we could have selected, ours were stronger for
11      that period."
12 Q    But you select stocks on the basis of franchise
13      characteristics, valuation that you understand and
14      accelerating profits, is that correct?
15          MR. WYLIE:  Objection.  Misstates prior
16      testimony and asked and answered.
17 BY MR. CALOZA:
18 Q    You can answer.
19 A    We attempt, to the best of our ability, to do that
20      with an imperfect record.
21          MR. CALOZA:  Can you mark this as
22      Exhibit 77.
23          (Exhibit No. 77 is marked.)
24 BY MR. CALOZA:
25 Q    Mr. Stephens, you've been handed a document



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
221—224

Page 221

1    marked Exhibit 77 bearing Bates stamps AP319
2    through AP 324.  Do you recognize this document?
3  A   Not specifically, but, in general, yes.
4  Q   What is the document?
5  A   I believe it to be a letter sent to Lorrie Tingle,
6    the chief investment officer of the Public
7    Employees' Retirement System of Mississippi.
8        MR. CALOZA:  Can you mark this as
9    Exhibit 78.
10       (Exhibit No. 78 is marked.)
11  BY MR. CALOZA:
12  Q   Mr. Stephens, you've been handed a document marked
13    Exhibit 78 bearing Bates numbers AP313 through
14    AP 318.  Do you recognize this document?
15  A   Not specifically, but, in general, yes.
16  Q   And what is it?
17  A   I believe it to be a letter to Lorrie Tingle, the
18    chief investment officer of the Public Employees'
19    Retirement System of Mississippi.
20  Q   And if you'll turn to the second page, which is
21    AP 314, the last paragraph discusses Diamond
22    Foods.  Do you see it?
23  A   Yes.
24  Q   And it discloses that Artisan sold its position
25    among questions concerning its -- Diamond's

Page 222

1    accounting for payments to walnut growers, which
2    threatened the company's ability to close its
3    planned acquisition of the Pringles brand from
4    Procter & Gamble.
5        Did you -- other than in this letter,
6    have you ever discussed the sale of Diamond stock
7    with Mississippi PERS?
8  A   I have no recollection.  Actually, I think,
9    according to this, we did.  It seems to me on
10    November 30, we gave this to them.
11  Q   Are you referring to Exhibit --
12  A   75.
13  Q   Okay.  Other than in Exhibit 75 and Exhibit 78,
14    have you ever discussed with Mississippi PERS the
15    reasons for selling Diamond stock?
16  Q   Me individually or our firm collectively?
17  Q   Your firm collectively.
18  A   I can't say specifically.  I would assume that our
19    client service people had discussed it, but I
20    don't know that for certain.
21  Q   So you have no specific knowledge of that
22    occurring?
23  A   I have no specific knowledge of that.
24  Q   Do you have any specific knowledge of any
25    conversation between Artisan and Mississippi PERS

Page 223

1    regarding the reasons for purchasing Diamond?
2  A   I have no specific knowledge.
3  Q   At any time following -- rather, do you have any
4    general knowledge whether Artisan discussed its
5    reasons for purchasing Diamond with Mississippi
6    PERS?
7  A   The only general knowledge I would have is we
8    normally describe our new positions in these
9    letters to clients, but I don't have the
10    appropriate time frame in front of me to be able
11    to tell you for certain.
12  Q   Has Mississippi PERS ever asked you for the
13    basis -- rather, has Mississippi PERS ever asked
14    you for your rationale for purchasing Diamond
15    stock?
16  A   "You" being --
17  Q   "You" being Artisan.
18       MR. WYLIE:  I'll object as being beyond
19    the scope of the topics in which the deponent was
20    designated to testify.
21  BY MR. CALOZA:
22  Q   You can answer.
23  A   I can't say.
24  Q   What about with respect to your specific
25    investment team?

Page 224

1  A   I can't say.
2  Q   Do you know --
3  A   It's not that I can't say.  I'm sorry, I answered
4    that incorrectly.  I don't know.  I can assume
5    they may have asked.
6  Q   But you -- do you have any specific knowledge that
7    they did ask?
8        MR. WYLIE:  Objection.  Beyond the scope
9    of the subject matter on which the deponent was
10    designated to testify.
11  BY MR. CALOZA:
12  Q   You can answer.
13  A   I have no specific knowledge that they asked.
14  Q   Has Mississippi PERS ever directed your investment
15    team to buy or sell specific securities?
16  A   To buy or sell specific securities?
17  Q   Correct.
18  A   It depends on the definition.  If they give us
19    additional contributions to their portfolio, it's
20    their expectation that we will buy the securities
21    in the portfolio for them to match the account
22    they already have.
23       And, conversely, if they redeem money
24    from their portfolio, there's an expectation that
25    we will sell securities pro rata for them.  So, in



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
225—228

Page 225

1     that way, yes, they have given us specific
2     instructions.
3  Q   Other than in the context of additional
4     contributions or redemptions, has Mississippi PERS
5     ever directed your investment team to buy or sell
6     securities?
7  A   Not that I can recall, no.
8  Q   And that includes Diamond securities?
9  A   To the best of my knowledge, that's correct.
10         MR. CALOZA:  I don't have any additional
11     questions at this time.
12         MS. GORE:  I have no questions.
13         THE WITNESS:  Are you sure you just
14     don't want to ask them?  Swing one?
15         MR. CALOZA:  Does counsel on the phone
16     have any follow-up questions?  Is anyone --
17         MS. IGRA:  Naomi Igra for Michael
18     Mendes.  I have a couple of questions.  Are you
19     hearing me all right?
20         MR. CALOZA:  We are now.
21         THE WITNESS:  Yep, yep.
22            EXAMINATION
23  BY MS. IGRA:
24  Q   Are you aware of any contacts or communications
25     with Michael Mendes, in particular?

Page 226

1  A   By --
2         MR. WYLIE:  Object to form.  Do you mean
3     contacts between Artisan and Michael Mendes?
4         MS. IGRA:  Yes.
5         THE WITNESS:  And, specifically,
6     Artisan, the team that I represent?
7  BY MS. IGRA:
8  Q   Yes.
9  A   In my -- and your question is; am I aware of any
10     contacts specifically?
11  Q   Yeah, or communications with Michael Mendes, in
12     particular.
13  A   Only as referenced in document -- or Exhibit 55
14     where they mentioned he was present in meetings.
15  Q   There are no other contacts or communications of
16     which you are specifically aware?
17  A   None that I am specifically aware.
18  Q   To the best of your knowledge, are documents
19     referring to Michael Mendes, were they produced in
20     response to Diamond's RFP?
21  A   Diamond's RFP?  I'm not familiar with the term.
22  Q   Their request for production.
23         MR. WYLIE:  You mean the subpoena?  I
24     don't know if you heard me.  I asked for
25     clarification.  Did you mean --

Page 227

1         MS. IGRA:  I'm sorry.  I am having some
2     trouble with the phone connection.  I did not hear
3     you.
4         MR. WYLIE:  By "RFP," do you mean the
5     subpoena directed to Artisan Partners?
6         MS. IGRA:  Yes.
7         THE WITNESS:  And the question was, the
8     documents we produced were in response to that?
9     I --
10  BY MS. IGRA:
11  Q   Are you -- as far as you know, any documents in
12     your possession that refer to Michael Mendes,
13     would they have been produced in response to the
14     subpoena?
15         MR. WYLIE:  I'll object as being beyond
16     the scope of the subject matter on which the
17     deponent was designated to testify.
18  BY MS. IGRA:
19  Q   Okay.  Thank you.  That's all.
20  A   Okay.
21         MR. ROSENBLIT:  This is Avi Rosenblit.
22     I have no questions.
23         THE VIDEOGRAPHER:  This is the
24     conclusion of the deposition --
25         MR. WYLIE:  If I can just go on the

Page 228

1  record briefly.  I don't have any questions.
2  Artisan Partners would like to designate the
3  transcript as confidential subject to the
4  opportunity to review and de-designate as provided
5  in the protective order previously entered in this
6  case.
7         THE VIDEOGRAPHER:  This is the
8  conclusion of the deposition.  We are off the
9  record at 5:16 p.m.
10         (Proceedings concluded at 5:16 p.m.)



ANDREW STEPHENS  30(b)(6)
IN RE DIAMOND FOODS, INC.

April 04, 2013
229–231

Page 229

1  STATE OF WISCONSIN  )
                     ) SS:
2  COUNTY OF MILWAUKEE )

3

4

5        I, JESSICA R. WAACK, a Certified

6  Realtime Reporter, Registered Diplomate Reporter,

7  Cer ified Shorthand Reporter and Notary Public in and

8  for the State of Wisconsin, do hereby certify that the

9  above video examination of ANDREW STEPHENS was recorded

10 by me on April 4, 2013, and reduced to writing under my

11 personal direction.

12        I further certify that I am not a

13 relative or employee or attorney or counsel of any of

14 the parties, or a relative or employee of such attorney

15 or counsel, or financially interested directly or

16 indirectly in this action.

17        In witness whereof I have hereunder set

18 my hand and affixed my seal of office at Milwaukee,

19 Wisconsin, on April 5, 2013.

20

21        _____
                Notary Public
22        In and for the State of Wisconsin

23

24
   My Commission Expires:  September 1, 2013.
25

Page 230

1  STATE OF           )
                      ) SS:
2  COUNTY OF          )

3

4        I, ANDREW STEPHENS, do hereby certify

5  that I have read the foregoing transcript of

6  proceedings, taken April 4, 2013, at Brown & Jones

7  Reporting, Inc., 735 North Water Street, Suite M185,

8  Milwaukee, Wisconsin, and the same is true and correct

9  except for the list of corrections noted on the annexed

10 page.

11        Dated at

12 this      day of           , 2013.

13

14

15

16              ANDREW STEPHENS

17

18 Subscribed and sworn to before me

19 this      day of        , 2013.

20

21

22
   Notary Public
23 My Commission Expires:
24

25

Page 231

1                    CORRECTIONS
2  PAGE NO.      LINE NO.     DESCRIPTION
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

