United States District Court
For the Northern District of California

1
2
3
4
5
6        IN THE UNITED STATES DISTRICT COURT
7
8        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   IN RE:
                                              No. C 11-05386 WHA
11   DIAMOND FOODS, INC.,
     SECURITIES LITIGATION.
12   _____/
                                              **ORDER GRANTING MOTION TO**
13   This Document Relates to:               **CERTIFY CLASS PURSUANT**
                                              **TO RULE 23(b)(3)**
14       All Actions.
     _____/
15

16                          **INTRODUCTION**

17          Plaintiff has filed a putative class action against defendants claiming violations of the

18   Securities Exchange Act and alleging false and misleading statements relating to payments made

19   to walnut growers.  To the extent stated below, this order finds class certification is appropriate

20   under Rule 23(b)(3).

21                           **STATEMENT**

22          The background of this action has been set forth in prior orders and need not be discussed

23   in detail herein (*see* Dkt. No. 182).  In brief, a number of putative class actions were filed on

24   behalf of investors who purchased securities of Diamond Foods, Inc.  The actions were

25   consolidated and the Mississippi Public Employees' Retirement System ("MSPERS") was

26   appointed as lead plaintiff (Dkt. No. 99).  Defendants include Diamond, Deloitte & Touche LLP

27   (Diamond's outside auditor), and individual defendants Michael J. Mendes (former Chairman of

28   the Board and President and Chief Executive Officer of Diamond) and Steven M. Neil (former

     Chief Financial Officer of Diamond).

United States District Court

For the Northern District of California

1    Prior to incorporation in 2005, Diamond was a member-owned agricultural cooperative

2    association that specialized in processing, marketing, and distributing nuts.  In 2005, Diamond

3    converted to a Delaware corporation and completed a public offering of shares (Consol. Compl.

4    ¶ 26).  Diamond subsequently acquired several snack food brands, including Pop Secret, a brand

5    of microwave popcorn products, and Kettle Foods, a premium potato chip company.  Diamond

6    also processed, marketed, and distributed other nut and snack products.

7    The consolidated complaint alleges that defendants deliberately understated commodity

8    costs — specifically, the costs of walnuts — and improperly accounted for payments made to

9    walnut growers to increase apparent profits and maintain high share prices.  Plaintiff alleges that

10   defendants were motivated to inflate share prices during a period in which Diamond was seeking

11   to use its stock to acquire Pringles, a snack chip brand owned by Proctor & Gamble Co.

12   ("P&G").  When the truth became known, Diamond's stock price declined dramatically,

13   resulting in financial losses to those who purchased the stock at the inflated price.  The relevant

14   facts are discussed below.

15   In the spring of 2009, Diamond began discussions with P&G regarding an acquisition

16   from P&G of the Pringles brand of snack chips, which was held by a wholly-owned subsidiary of

17   P&G.  Following several rejected offers, on April 5, 2011, an agreement for Diamond's

18   acquisition of Pringles was announced, pursuant to which Diamond agreed to exchange shares of

19   Diamond stock and pay $850 million in cash.  The agreement had a "cash collar," such that if the

20   price of Diamond stock rose or fell, the amount of cash Diamond would pay for the acquisition

21   would increase or decrease accordingly.

22   As Diamond stock was the principal consideration of Diamond's offers to acquire

23   Pringles from P&G, defendants sought to inflate the price of Diamond shares to effectuate the

24   Pringles acquisition (*id*. at ¶ 42).  According to the consolidated complaint, defendants

25   manipulated Diamond's financial statements by falsely accounting for payments for walnuts.  In

26   violation of generally accepted accounting principles, instead of matching its cost of walnuts

27   with the revenue earned from selling them, Diamond recognized the revenue part right away but

28   found a gimmick to postpone accounting for the cost part (*id*. at ¶¶ 232–38).  The Pringles deal

**United States District Court**

For the Northern District of California

1   was eventually scuttled following the discovery and disclosure of the alleged fraud.  The

2   termination of the deal was announced on February 15, 2012.

3          Pursuant to GAAP, the costs associated with purchasing the fall 2009 walnut crop

4   should have been recorded in fiscal year 2010, which ran from August 1, 2009, to July 31, 2010

5   — the same fiscal year as when the revenue therefrom was recognized.  Similarly, costs

6   associated with purchasing the fall 2010 crop should have been booked in fiscal year 2011.  The

7   consolidated complaint alleges that defendants deliberately understated the payments due to

8   walnut growers at the end of fiscal years 2010 and 2011.  Diamond then provided make-up

9   payments to walnut growers that it attempted to disguise as payments for later, future crops,

10  calling the make-up payments "continuity payments" and "momentum payments," though it had

11  never used such terms before and GAAP did not recognize such terms.  Diamond disguised these

12  make-up payments in order to postpone the cost part of the accounting equation, while the

13  revenue part was either immediately recognized or had already been recognized, all in an effort

14  to report higher profits and inflate its stock value.  As a result of this manipulation, Diamond

15  reported much higher earnings for fiscal years 2010 and 2011, as well as for the quarterly

16  periods reported in Diamond's Form 10-Q statements for those fiscal years.

17         In late September 2011, analysts and the financial media began to raise concerns

18  regarding the "continuity" and "momentum" payments.  For example, a report from Off Wall

19  Street Consulting Group published on September 25, 2011, questioned Diamond's accounting

20  practices regarding walnut purchases.  Following this disclosure, Diamond's shares declined

21  $5.11 per share, or approximately 5.7% (*id*. at ¶ 425).  A *Reuters Breakingviews* article

22  published on September 26 discussed the prices Diamond paid to walnut growers and opined that

23  the "follow-up payment by Diamond to walnut growers just two days after its Aug[ust] 31

24  outlay" was strange (*id*. at ¶ 165).  The article reported that "Diamond's IR chief says the period

25  to which the September payment applies is '*somewhat of a blur*' because the company sees it in

26  the context of its three, five and 10-year contracts with growers" (*ibid.*) (emphasis added).  The

27  article also opined that "how the company packages its 'momentum payment' in financial reports

28  surely matters to P&G shareholders as they consider switching into Diamond stock" (*ibid.*).  A

United States District Court

For the Northern District of California

1    *Wall Street Journal* article published on September 27 reported that Diamond stated in an email

2    that: "[i]n an effort to optimize cash flow for growers, particularly in light of the delayed harvest,

3    we issued a momentum payment to growers that provides additional cash flow in the fall

4    consistent with the current market environment as we enter the 2011 harvest" (*id*. at ¶ 166). At

5    the close of trading on September 27, the share price declined $3.20, or 3.7%, as compared to the

6    previous day's price (*id*. at ¶ 428).

7         On October 3, Diamond issued a press release stating that it had made a "pre-harvest

8    momentum payment to walnut growers in early September, prior to the delivery of the fall

9    walnut crop to reflect the fiscal 2012 projected market environment." Diamond also stated that

10    the payment was accounted for in the fiscal year 2012 cost of goods sold (*id*. at ¶ 168).

11        On November 1, Diamond disclosed that the previously announced Pringle's acquisition

12    from P&G was delayed and that an internal investigation would be conducted. Diamond stated

13    that the investigation was in response to "an external communication regarding Diamond's

14    accounting for certain crop payments to walnut growers" (*id*. at ¶ 171). Following the

15    disclosure, Diamond's shares declined $11.33 per share, or 17.7% (*id*. at ¶ 430).

16        On December 12, Diamond disclosed that it would miss its filing deadline with the SEC

17    due to the investigation. Following this disclosure, Diamond's shares declined $31.30 per share,

18    or 22.8% (*id*. at ¶ 434). Two days later, Diamond announced that it had received a formal order

19    of investigation from the SEC. Diamond stated that "[t]he SEC has informed Diamond that its

20    investigation should not be construed as an indication by the SEC that any violations of law have

21    occurred" (*id.* at ¶ 194). The stock price fell again, this time by 5.6%.

22        On February 8, 2012, Diamond announced that its internal audit committee had

23    substantially completed its investigation and concluded that the "continuity" and "momentum"

24    payments to walnut growers in August 2010 and September 2011 had not been accounted for in

25    the correct periods (*id.* at ¶ 212). Diamond further disclosed that it would have to restate its

26    prior financial statements for fiscal years 2010 and 2011, including certain interim quarterly

27    reports. Diamond simultaneously announced that CEO Mendes and CFO Neil had been placed

28    on administrative leave. Following these disclosures, the stock price decreased by $13.53 per

1   share, or 36.9% (*id.* at ¶ 438).  On February 15, Diamond announced the termination of the

2   Pringles acquisition.

3       The consolidated complaint asserts claims under Section 10(b) of the Securities

4   Exchange Act of 1934 and Rule 10b-5 against all defendants and asserts claims under Section

5   20(a) of the Exchange Act against the two individual defendants, CEO Mendes and CFO Neil.

6   Upon motion by lead plaintiff MSPERS, attorneys from the law firms of Chitwood Harley

7   Harnes LLP and Lieff Cabraser Heimann & Bernstein LLP were appointed as class counsel (Dkt.

8   No. 121).  Defendants moved to dismiss the consolidated complaint, which was granted as to

9   Deloitte and denied as to the remaining defendants.  Plaintiff now moves for class certification.

10  Defendant Diamond filed an opposition to the motion, to which the remaining defendants filed

11  motions for joinder.

12                              **ANALYSIS**

13      The party seeking class certification bears the burden of showing that the four

14  prerequisites of Rule 23(a) are met:  (1) numerosity of the class; (2) that there are questions of

15  law or fact common to the class; (3) that the named plaintiff's claims and defenses are typical;

16  and (4) that the named plaintiff can adequately protect the interests of the class.  As plaintiff

17  seeks to certify a class under Rule 23(b)(3), the Court must further find "that the questions of law

18  or fact common to class members predominate over any questions affecting only individual

19  members," and "that a class action is superior to other available methods for fairly and

20  efficiently adjudicating the controversy."  Rule 23(b)(3).  In determining whether class

21  certification is appropriate, "the question is not whether the plaintiff or plaintiffs have stated a

22  cause of action or will prevail on the merits, but rather, whether the requirements of Rule 23 are

23  met."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974).  The Supreme Court has

24  "cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some

25  overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores, Inc. v. Dukes*, 564

26  U.S. —, 131 S. Ct. 2541, 2551 (2011); however, "[m]erits questions may be considered to the

27  extent — but only to the extent — that they are relevant to determining whether the Rule 23

28

**United States District Court**
For the Northern District of California

5

1    prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust*

2    *Funds*, — U.S. —, 133 S. Ct. 1184, 1194–95 (2013).

3           Plaintiff brings a claim for violation of Section 10(b) of the Securities and Exchange Act

4    of 1934 and Rule 10b–5, promulgated thereunder.  Plaintiff also alleges a violation of Section

5    20(a), which extends liability for violations of other provisions of the Act, including Section

6    10(b), to certain "controlling persons."  *Desai v. Deutsche Bank Sec. Ltd*., 573 F.3d 931, 937–38

7    (9th Cir. 2009).  Therefore, in this case, liability under Section 20(a) is based on a violation of

8    Section 10(b).  To recover damages in a private securities fraud action under Section 10(b) of the

9    Exchange Act and Rule 10b-5, plaintiff must prove the following elements:  "(1) a material

10   misrepresentation or omission by the defendant; (2) scienter; (3) a connection with the purchase

11   or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and

12   (6) loss causation."  *Matrixx Initiatives*, *Inc. v. Siracusano*, 563 U.S. —, 131 S. Ct. 1309, 1317

13   (2011) (internal quotation marks omitted).

14          Plaintiff seeks certification of the following class:

15          All persons and entities who purchased publicly traded securities of
             Diamond Foods, Inc. ("Diamond" or the "Company") during the
16          period from October 5, 2010 through and including February 8, 2012,
             and who suffered damages as a result.  Excluded from the Class are (1)
17          Diamond, Michael J. Mendes ("Mendes"), Steven M. Neil ("Neil")
             (collectively, the "Defendants"); (2) any person who was an officer or
18          director of the Company during the Class Period; (3) members of the
             immediate families of any Defendants; (4) any firm, trust, corporation,
19          officer or other entity in which any defendant has a controlling
             interest; and (5) the legal representatives, heirs, successors or assigns
20          and any such excluded party.

21   (Dkt. No. 189-1).

22          Defendant opposes certification on three grounds: (1) plaintiff is unable to establish that

23   Diamond's stock traded in an efficient market during the relevant period, (2) plaintiff has not

24   demonstrated that damages are susceptible to proof on a classwide basis, and (3) lead plaintiff

25   MSPERS is neither typical of the class nor an adequate representative thereof.  Each of the

26   requirements of Rule 23(a) and Rule 23(b)(3) is considered below.

27

28

United States District Court

For the Northern District of California

6

**United States District Court**
For the Northern District of California

### 1.   RULE 23(a)(1): NUMEROSITY.

Defendant does not challenge certification based on the numerosity element, which is satisfied when joinder of individual plaintiffs would be impracticable.  While plaintiffs need not allege the exact number or identity of class members, mere speculation as to the number of class members involved does not satisfy the requirement of Rule 23(a)(1).  *See Davis v. Astrue*, 250 F.R.D. 476, 485 (N.D. Cal. 2008) (Judge Marilyn Patel).  Plaintiff has satisfied the burden required by Rule 23(a)(1).

### 2.   RULE 23(a)(2) AND RULE 23(b)(3): COMMONALITY AND PREDOMINANCE.

A class has sufficient commonality under Rule 23(a)(2) if "there are questions of law or fact which are common to the class."  Rule 23(a)(2) does not require that each member in a class have identical factual and legal issues surrounding his or her claim.  "The existence of shared legal issues with divergent factual predicates is sufficient" to meet the requirements of Rule 23(a)(2).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Although the same principles guide the predominance requirement of Rule 23(b)(3), "if anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."  *Comcast Corp. v. Behrend*, — U.S. —, 133 S. Ct. 1426, 1432 (2013).  The analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law [has] been established pursuant to Rule 23(a)(2)."  *Hanlon*, 150 F.3d at 1022.  In contrast to Rule 23(a)(2), "Rule 23(b)(3) focuses on the relationship between the common and individual issues."  *Ibid.*  Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication.  *Ibid.*

As stated above, among other elements, a plaintiff asserting a claim for securities fraud under Section 10(b) must prove reliance.  *Matrixx*, 131 S. Ct. at 1317.  Defendant contends that individual questions concerning the element of reliance and the "fraud-on-the-market" presumption predominate over common questions.

### A.   Fraud-on-the-Market Theory and Reliance.

As stated by our court of appeals,

> Reliance establishes the causal connection between the alleged fraud and the securities transaction. To say that a plaintiff relied on a defendant's bad act is to say that the defendant's actions played a substantial part in the plaintiff's investment decision. It is thus often referred to in cases involving the public securities markets as transaction causation, presumably because reliance requires an investor-plaintiff to show that he would not have engaged in the transaction in question had he known about the fraud.

*Desai*, 573 F.3d at 939 (internal quotation marks and citations omitted). Plaintiff here seeks to rely on the fraud-on-the-market theory approved by a plurality of the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 241–49 (1988). *Basic* "created a rebuttable presumption of investor reliance based on the theory that investors presumably rely on the market price, which typically reflects the misrepresentation or omission." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 n.12 (9th Cir. 2003).

The rebuttable presumption of reliance based on the fraud-on-the-market theory is particularly significant in securities class actions, where class certification would be virtually impossible without it, as individual questions regarding reliance would overwhelm common questions. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011). As the Supreme Court stated in *Basic*, the fraud-on-the-market theory posits that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246. That is, "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . ." *Id*. at 241. Because such a market "transmits information to the investor in the processed form of a market price," it can be presumed that an investor relies on public misstatements whenever he or she buys or sells stock at the price set by the market. *Id*. at 244, 247; *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005). The presumption of reliance is rebuttable, and "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [its] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248.

In order to invoke *Basic*'s presumption of reliance, plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) the stock traded in an efficient market, and

(3) the relevant transaction took place "between the time the misrepresentations were made and the time the truth was revealed." *Halliburton*, 131 S. Ct. at 2185 (citing *Basic*, 485 U.S. at 248, n.27). The majority of courts in this circuit agree that, for purposes of the fraud-on-the-market theory, market "efficiency" means that prices will "reflect all relevant information," a definition of efficiency known as informational efficiency. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114–15 (9th Cir. 1989); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 610 (C.D. Cal. 2009) (Judge Mariana Pfaelzer). As stated by our court of appeals, "in a modern and efficient securities market, the market price of a stock incorporates all available public information." *Am. W. Holding Corp.*, 320 F.3d at 947. The requirement that an efficient market digest "all relevant information" is not equivalent, however, to a requirement that such information is insinuated in the stock price in an objectively accurate way, such that the price reflects the "fundamental value" of the stock. "The fraud-on-the-market theory is concerned with whether a market processes information in such a way as to justify investor reliance, not whether the stock price paid or received by investors was 'correct' in the fundamental value sense." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

Market efficiency is a fact-specific inquiry. *Am. W. Holding Corp.*, 320 F.3d at 935. In *Basic*, the Supreme Court refused to "conclusively adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. While our court of appeals has not articulated a specific test for market efficiency, it has employed the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989) (Judge Alfred Lechner). "*Cammer* sets out five well-recognized factors designed to help make the central determination of efficiency in a particular market," and provides a useful, if nonexhaustive, guide to analyze whether a market is efficient within the meaning of the fraud-on-the-market theory. *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010) (internal quotation marks omitted). Defendant contends that plaintiff has failed to prove the market for Diamond stock was efficient during the period in question. In particular, defendant focuses on plaintiff's expert's event study and the trading strategy of plaintiff's investment advisor, Artisan Partners, LP. "An event study is a statistical regression analysis that examines the effect of an

United States District Court

For the Northern District of California

1   event on a dependent variable, such as a corporation's stock price." *In re Imperial Credit Indus.,*

2   *Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) (Judge Stephen Wilson).

3          Plaintiff's expert, Dr. Jay Hartzell, submitted a declaration opining that the market for

4   Diamond securities was "semi-strong form efficient" during the period in question.  Dr. Hartzell

5   defines such efficiency as meaning "a market in which stock prices reflect all publicly-available

6   information, and stock prices react quickly to new material information (news) regarding stock

7   value" (Hartzell Decl. ¶ 8).  This definition of market efficiency is similar to that discussed

8   above, as gleaned from the numerous judicial decisions on this topic.  *See, e.g., PolyMedica*, 432

9   F.3d at 10 n.16.  In support of his opinion, Dr. Hartzell evaluates the market efficiency factors

10  set forth in *Cammer* and discusses the results of his event study.  Defendant and its expert do not

11  dispute Dr. Hartzell's analysis of the *Cammer* efficiency factors, with the sole exception of Dr.

12  Hartzell's event study, as now discussed.

13               ***i.        Trading Volume and Shares Held by Non-Affiliates.***

14         Diamond common stock was (and still is) traded on the NASDAQ stock exchange.  The

15  average daily turnover rate for Diamond stock over the class period was 3.6%, which implies a

16  weekly turnover rate of 18.2% (*id.* at ¶ 11).  An actively traded security, as evidenced by a large

17  weekly volume of stock trades, indicates "significant investor interest in the company," and

18  therefore, a "likelihood that many investors are executing trades on the basis of newly available

19  or disseminated corporate information."  *Cammer*, 711 F. Supp. at 1286.  Here, the weekly

20  turnover rate of Diamond stock was much higher than the two percent of a company's

21  outstanding shares that *Cammer* suggested would justify a strong presumption that the market

22  for the security is an efficient one.

23         Additionally, Diamond met the requirements for filing an S-3 Registration Statement

24  throughout the class period.  That a company's public offerings met the threshold requirements

25  for filing a Form S-3 tends to support a finding of efficiency, as only companies that have $75

26  million of stock held by non-affiliates are required to file such reports.  Additional requirements

27  for filing a Form S-3 registration statement are, *inter alia*, that the company is organized and

28  operating under the laws of the United States or its territories, has filed reports under the

1   Exchange Act for twelve months, and has suffered no default of its obligations. *See* SEC 1379,

2   "Form S-3, Registration Statement under the Securities Act of 1933" (Revised Jan. 2012). In

3   November 2010, Diamond had an "aggregate diluted market value of common equity held by

4   non-affiliates of $976 million," well above the minimum stock value requirement for Form S-3

5   filing (Hartzell Decl. ¶ 16).

6                               *ii.      Analyst Interest.*

7           The existence of securities analysts following Diamond stock during the class period

8   would imply that the market would rapidly and fully incorporate information into the stock price

9   because analyst reports would likely be "closely reviewed by investment professionals, who

10   would in turn make buy/sell recommendations to client investors." *Cammer*, 711 F. Supp. at

11   1286. Dr. Hartzell's declaration notes that analysts from thirteen companies, including Barclays,

12   BB&T, MBO Capital Markets, and others (including the mainstream press) followed and

13   reported on Diamond's activities.

14                               *iii.      Market Makers and Arbitrageurs.*

15           The existence of market makers and arbitrageurs would further provide a mechanism

16   through which the market could be expected to receive information and fully incorporate it into

17   the stock price of a security, as these individuals "would react swiftly to company news and

18   reported financial results by buying or selling stock and driving it to a changed price level." *Id.*

19   at 1286–87. Dr. Hartzell states that during the class period there were nineteen brokers who

20   reported trading over one million shares of Diamond common stock and a minimum of 5.3

21   million common shares sold short on the NASDAQ. According to Dr. Hartzell, the trading

22   activity of Diamond stock indicates "the presence of arbitrage activity, with investors taking

23   positions on both sides of the stock" (Hartzell Decl. ¶ 14).

24                               *iv.      Empirical Evidence Suggesting Causal Connection.*

25           As stated, defendant does not challenge the above-listed *Cammer* efficiency factors.

26   Defendant does, however, contend that plaintiff has failed to set forth "empirical facts showing a

27   cause and effect relationship between unexpected corporate events or financial releases and an

28   immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. In support, defendant

United States District Court

For the Northern District of California

1  relies on its expert, Dr. Allan Kleidon, who submitted a declaration critical of Dr. Hartzell's

2  event study.

3      The most common empirical test for a causal connection is an event study, which

4  attempts to calculate the effect of an event on the value of the stock of a company (Hartzell Decl.

5  ¶ 17).  Dr. Hartzell first established a statistical "market model" to predict the normal or

6  expected return on the stock given market returns.  The events to be studied were then selected

7  based on Diamond's Form 8-K disclosures during the class period.  Those disclosures likely to

8  result in a significant price change based on the existence of analyst reports were separated from

9  those unlikely to cause a price change, such as routine announcements regarding shareholder

10  elections and investor presentations.  Disclosure events identified for further analysis were then

11  categorized as positive or negative based on the likely market response.  Based on this

12  classification and Dr. Hartzell's market model, the study calculated abnormal returns for each

13  event date and compared those figures against their expected results.  Defendant's expert agrees

14  that an event study is "an appropriate test for market efficiency for a particular stock," but

15  contends that plaintiff's event study uses a flawed methodology and does not test whether the

16  market price fully impounded the alleged material information within one trading day.

17      *First*, Dr. Kleidon (the defense expert) argues that the events studied were not objectively

18  selected.  Specifically, he contends that the study used analyst reports related to Diamond's Form

19  8-K disclosures to determine both the events to be included in the analysis *and* the expected

20  price impact of the disclosure.  As to one such disclosure event, Dr. Kleidon argues that the

21  study considered five analyst reports that were issued after market close, and thus could have

22  been influenced by the actual stock price reaction.  Dr. Hartzell (the plaintiff's expert) counters

23  that the analyst reports were used to "help decide which 8-Ks were likely to represent material

24  changes in the market's beliefs about the valuation of Diamond Foods' stock" (Hartzell Reply

25  Decl. ¶ 13).  As to the content of those reports, Dr. Hartzell claims that such information was

26  used to "help classify each earnings announcement as a positive or negative surprise," or as one

27  that was unlikely to cause a price reaction.  He did not, however, rely on the analyst reports of

28  the actual post-announcement stock-price reactions to establish the predicted direction for the

United States District Court

For the Northern District of California

1    stock price change. Defendant's expert has failed to establish that the event study uses a flawed

2    methodology on this ground, based on this single example.

3           *Second*, Dr. Kleidon contends that Dr. Hartzell's quantitative measurements of the

4    information contained in Diamond's earnings disclosure on October 5, 2010, were incorrect.

5    The experts dispute whether the expected price reaction and earnings per share adjustment in

6    response to Diamond's financial results announcement in October 2010 should be categorized as

7    a positive or negative earnings per share surprise. Dr. Kleidon contends that the earnings

8    announcement beat the consensus estimate by six cents, which should have resulted in a positive

9    earnings per share surprise. Instead, Dr. Hartzell's analysis indicates that there should be a

10   negative significant abnormal return. Dr. Hartzell accounts for this supposed discrepancy by

11   positing that the higher earnings surprise was based on earnings from lower investment in

12   advertising, which is qualitatively different than higher earnings due to increased sales. Dr.

13   Hartzell contends the study therefore correctly adjusted for the expected impact of the October

14   2010 earnings disclosure, citing as support a number of analyst reports discussing expectations

15   of and reactions to the news.

16          In analyzing event studies at the class certification stage, courts have acknowledged that

17   "many decision points in designing an event study require some subjectivity." *See, e.g., In re*

18   *Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. at 618. Factors to consider in determining the

19   probative value of event studies include whether the study is based on a sufficiently large

20   number of observations and the steps taken to minimize the subjectivity of the study. Here, Dr.

21   Hartzell's study examined each of Diamond's official disclosures (through its Form 8-Ks)

22   throughout the class period and analyzed in depth both earnings statements and news regarding

23   the anticipated Pringles acquisition. This order finds that the set of information selected for

24   analysis is reasonably objective. Dr. Kleidon's argument that the study's methodology is

25   fundamentally flawed is supported only by two isolated examples. Notably, defendant did not

26   submit any expert study or analysis demonstrating evidence of inefficiency in the market for

27   Diamond stock. Dr. Kleidon's specific attacks on the event study's methodology are, on this

28

1    limited record, insufficient to refute the conclusion of Dr. Hartzell's event study that the market

2    for Diamond stock was efficient during the relevant period.

3         *Third*, defendant argues that Dr. Hartzell did not test whether Diamond's market price

4    immediately reacted to information, "as opposed to taking more than one trading day." Dr.

5    Kleidon asserts that "a proper test of market efficiency also requires assessing whether there are

6    delayed price responses to the events of interest" (Kleidon Decl. ¶ 77). As plaintiff points out,

7    Dr. Kleidon does not himself provide such a study that would indicate that, in this case, such

8    analysis is appropriate and probative. No authority has been submitted that would require that an

9    event study assess delayed price responses, in the absence of evidence indicating there were in

10    fact delayed market reactions to material news.

11         To summarize, defendant does not provide a study or other evidence concluding that the

12    market for Diamond stock was not efficient during the class period. Defendant's expert, while

13    purportedly identifying fundamental flaws in plaintiff's event study, has not provided sufficient

14    rebuttal of the study's conclusion regarding efficiency. Nor has defendant identified any

15    authority, binding or otherwise, that has held that common shares traded on the NASDAQ are

16    not traded in an efficient market. For purposes of this order, plaintiff has sufficiently

17    demonstrated market efficiency and is therefore entitled to the *Basic* presumption of reliance.

18         While a showing of market efficiency is clearly required at the class certification stage in

19    an action relying on the fraud-on-the-market theory, the Supreme Court has not addressed

20    whether market efficiency is an issue for the jury to determine at trial (or, where appropriate,

21    summary judgment), or is a matter reserved for the judge. Nor has our court of appeals

22    specifically addressed this question. In *Basic*, the Supreme Court stated that "*any showing* that

23    severs the link between the alleged misrepresentation and either the price received (or paid) by

24    the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the

25    presumption of reliance." *Basic*, 485 U.S. at 248 (emphasis added). *Basic* then listed a number

26    of examples of ways the presumption could be rebutted, such as through proof that the truth

27    credibly entered the market and dissipated the effects of the alleged misstatements. *Basic* stated

28    that such an attempt to offer proof of a "truth on the market" defense to rebut the presumption of

1    reliance is "a matter for trial." *Id.* at 249 n.29.  A review of decisions on the issue of market

2    efficiency at the merits stage indicates that the majority of courts treat efficiency as an issue for

3    the finder of fact at trial.  *See, e.g., In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir.

4    2005); *Cammer*, 711 F. Supp. at 1290; *In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. 112,

5    121-22 (E.D. Va. 2012) (Judge T.S. Ellis); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.

6    2d 512, 586–87 (S.D.N.Y. 2011) (Judge Richard Holwell); *Vinh Nguyen v. Radient Pharm.*

7    *Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012) (Judge David Carter); *In re Countrywide Fin. Corp.*

8    *Sec. Litig.*, 273 F.R.D. at 616; *In re Homestore.com, Inc. Sec. Litig.*, No. 01-11115, 2011 WL

9    1564025 (C.D. Cal. Apr. 22, 2011) (Judge Ronald Lew).  Defendant, therefore, will have the

10   opportunity at trial and/or summary judgment to rebut the presumption that the market for

11   Diamond shares was efficient during the relevant period.  For now, plaintiff has met its burden in

12   this regard.

13                          ***v.***      ***MSPERS' Investment Strategy Does Not***

14                                ***Refute Market Efficiency.***

15            MSPERS' investment decisions regarding its purchase and sale of Diamond stock were

16   based on the advice of its investment advisor firm, Artisan Partners.  Artisan, said to be a highly

17   sophisticated investment manager, relied on its own research and review of publicly available

18   information to calculate the private market value of a given security.  This private market value

19   attempted to place a value on what Artisan would pay to take the business private (Stephens

20   Dep. at 35).  The market price of the security was "factored into [plaintiff's] investment decision

21   only as a comparator" to Artisan's private market valuation (Opp. at 12).  Artisan's trading

22   strategy was to "take advantage of market inefficiencies," essentially looking for bargains where

23   there was a large difference between Artisan's private market value and the market price of the

24   stock.  For example, a brochure on Artisan's investment philosophy and process states that "we

25   evaluate opportunities based on a 3–5 year investment time horizon.  By extending our time

26   horizon, we aim to take advantage of bargains that result when negative news and nervous

27   investors drive stock prices down . . . [P]atience is important in exploiting this inefficiency"

28   (Kristy Decl. Exh. 13 at 3).  Defendant contends that Artisan's investment strategy "refutes the

15

United States District Court
For the Northern District of California

premise of the fraud-on-the-market doctrine" because Artisan seeks to exploit "market inefficiencies."  Perhaps a jury will buy this argument, but it is not enough to defeat class certification.

As discussed above, the concept of market efficiency — as relevant to the fraud-on-the-market theory — does not require that all relevant information be evaluated in exactly the same way by all investors.  As a matter of common sense and logic, many investors "purchase stock based on the belief that the market is, in some way and for some reason, undervaluing the stock and that the stock will thereafter appreciate . . . ."  *In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. at 123.  Such differences of opinion do not establish that the market is inefficient. Investors will tend to have different visions of the future and different takes on sector trends, so they will take publicly available information and factor it into their own predictive models.  But the fact remains — and this is the key fact — that they are all efficiently factoring the publicly available information into their models and in turn they are each making buy-sell-hold decisions based on the known information.  Artisan's subjective belief that its model was smarter than other investment models does not refute plaintiff's evidence regarding market efficiency.

### B.   Proof of Damages on a Classwide Basis.

Defendant's next major argument is that plaintiff has not met its burden of demonstrating that common issues predominate because plaintiff has failed to proffer evidence establishing that damages can be proven on a classwide basis.  Citing the Supreme Court's recent decision in *Comcast Corporation v. Behrend*, — U.S. —, 133 S. Ct. 1426, 1433 (2013), defendant argues that plaintiff has not met its burden of setting forth the requisite evidentiary proof.

In *Comcast*, the Supreme Court addressed whether class certification in an antitrust action had been properly granted where plaintiffs' proffered damages model did not measure damages resulting specifically from the theory of liability that the district court had determined was appropriate for class treatment.  *Comcast* found that the plaintiffs' damages model "falls far short of establishing that damages are capable of measurement on a classwide basis," and indeed was based on a methodology that identified damages unconnected to plaintiff's legal theory. *Ibid.*  This order need not decide whether, as defendant claims, *Comcast* requires that class

**United States District Court**
For the Northern District of California

1   certification be denied absent affirmative evidence that "damages are susceptible of

2   measurement across the entire class." *Ibid*.  Indeed, in a recent decision affirming class

3   certification in a securities fraud action alleging violations of Section 10(b) and Rule 10b-5 of

4   the Exchange Act, the Supreme Court emphasized that Rule 23(b)(3) "does *not* require a plaintiff

5   seeking class certification to prove that each element of her claim is susceptible to classwide

6   proof.  What the rule does require is that common questions *predominate* over any questions

7   affecting only individual class members." *Amgen*, 133 S. Ct. at 1196 (internal quotation marks

8   and citations omitted) (emphasis in original).  Here, both defendant's and plaintiff's experts

9   agree that recoverable damages in a securities fraud case such as this one should be assessed

10  based on determining the price the security would have been, absent the fraud.  Plaintiff's expert

11  has provided an event study that analyzes the impact of Diamond's disclosures on the share

12  price.  He further states that damages "will be calculated using an event study analysis similar to

13  the event study analysis" regarding market efficiency (Hartzell Reply Decl. ¶ 24).  He claims

14  that the event study already provided demonstrates that damages are calculable on a classwide

15  basis using this standard methodology.

16         "The event study method is an accepted method for the evaluation of materiality damages

17  to a class of stockholders in a defendant corporation." *In re Credit Indus., Inc. Sec. Litig.*, 252 F.

18  Supp. 2d 1005, 1014 (C.D. Cal. 2003) (Judge Stephen Wilson) (internal quotation marks and

19  citations omitted).  Plaintiff cites numerous decisions wherein an event study was used to

20  identify the economic loss caused by alleged fraud in securities class actions.  *See, e.g., ibid.*; *In

21  re Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844 (D. Ariz. 2007) (Judge James Teilborg);

22  *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (Judge Vaughan Walker).

23  While defendant contends that plaintiff has failed to meet its burden of demonstrating a

24  classwide method of proof, defendant does not identify any specific complications that would

25  make such a calculation impossible or ill-advised in this case.  As stated by our court of appeals

26  in a class action alleging violations of Section 10(b) and Rule 10b-5 of the Exchange Act,

27         The amount of damages is invariably an individual question and
       does not defeat class action treatment. [ ] Moreover, in this
28         situation we are confident that should the class prevail the amount
       of price inflation during the period can be charted and the process

of computing individual damages will be virtually a mechanical task.

*Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).  Whether plaintiff will ultimately prevail in proving damages is not necessary to determine at this stage.  Instead, the question for class certification is whether plaintiff has met its burden of establishing that damages can be proven on a classwide basis.  On this record, plaintiff has sufficiently shown that damages are capable of measurement on a classwide basis such that individual damage calculations do not threaten to overwhelm questions common to the class.

> 3.      RULE 23(a)(3) AND (a)(4):  TYPICALITY AND ADEQUACY RE TRADING HISTORY.

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class . . . [C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Hanon*, 976 F.2d at 508 (internal quotation marks and citations omitted).

While often overlapping with typicality, the adequacy inquiry is directed at whether the representative parties will "fairly and adequately protect the interests of the class."  Rule 23(a)(4).  The two key inquiries are (1) whether there are conflicts within the class; and (2) whether plaintiffs and counsel will vigorously fulfill their duties to the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  The adequacy inquiry also "factors in competency and conflicts of class counsel."  *Amchem*, 521 U.S. at 626 n.20.  Defendant contends that MSPERS is not typical of the proposed class because it relied on an investment advisor.  Defendant also argues that, because MSPERS sold all of its stock holdings prior to the end of the proposed class period, MSPERS cannot demonstrate typicality and adequacy.  Each of these arguments is addressed below.

> A.      MSPERS' Trading Strategy.

The role of Artisan surfaces again, this time on the issue of typicality, although it is based on the same circumstance described above.  As stated, MSPERS relied on its investment advisor Artisan in its transactions involving Diamond stock.  Artisan in turn based its investment decisions on its own research and review of publicly available information.  Defendant contends that this trading strategy subjects MSPERS to unique defenses atypical of the class.  Specifically,

defendant argues that Artisan did not rely on the integrity of the market price in purchasing Diamond stock.

Courts have routinely rejected the argument defendant now advances, finding that "[n]one of the different strategies that these institutional plaintiffs . . . used to make investment decisions on behalf of their beneficiaries suggests that these plaintiffs will be vulnerable at trial to a unique defense that will defeat the presumption that they relied on the public statements about [defendant] that are at issue here . . . ." *In re WorldCom Inc. Sec. Litig.*, 219 F.R.D. 267, 281–82 (S.D.N.Y. 2003) (Judge Denise Cote); *see also In re Connetics Corp. Sec. Litig.,* 257 F.R.D. 572, 578 (N.D. Cal. 2009) (Judge Susan Illston). Plaintiff's allegations, viewed against the backdrop of Diamond's share price over the class period, indicate that, had the truth been known, Diamond shares would have traded in the $30 range rather than the range of $50 to $80. Based on the current record, plaintiff may well be able to establish that this differential was, in whole or in large part, attributable to price inflation due to the alleged misleading statements. That an investment advisor thinks it is smarter than the rest of the market in evaluating truthful public data in the market should not be a license for manipulators to pump false information into the public domain to grossly inflate a stock price. Most investors think they are a little smarter than average and see opportunities others have missed. Still, they all rely on publicly available data (with the exception, of course, of investors trading on insider information).

Defendant's reliance on *GAMCO Investors, Inc. v. Vivendi, S.A.*, No. 03-5911, 2013 WL 765122 (S.D.N.Y. Feb. 28, 2013) (Judge Shira Scheindlin), is misplaced. In that decision, following class certification and trial, the district court found that an individual investor who relied on the private market valuation of its investment manager to purchase shares of the defendant company was not entitled to rely on the fraud-on-the-market theory. The investor in *GAMCO* continued purchasing stock after the fraud had been fully disclosed to the market, and in fact doubled or tripled its holdings. The district court stated that, on these facts, defendant had proven that "but for the alleged misrepresentations and omissions, Plaintiffs would have been *more likely* to invest in Vivendi." *Id.* at *8 (emphasis added). *GAMCO* is inapplicable here, where defendant has adduced no evidence that, "but for the material misstatements, that investor

19

United States District Court

For the Northern District of California

1    would not have transacted in the securities at issue." *Id.* at *9.  In fact, the evidence defendant

2    does provide appears to support the opposite inference, as Artisan's stated reasons for

3    recommending the sale of Diamond stock were its concerns about Diamond's accounting and its

4    ability to effectuate the Pringles acquisition (Kristy Decl. Exh. 21).  Defendant has not set forth

5    any evidence rebutting the presumption that "[a]n investor who buys or sells stock at the price

6    set by the market does so in reliance on the integrity of that price." *Basic*, 485 U.S. at 247.  Nor

7    has it established that a defense unique to MSPERS will threaten to become the focus of the

8    litigation.

9                    **B.      MSPERS' Sale of Shares Within the Class Period.**

10            MSPERS purchased Diamond securities between June 3, 2011, and October 21, 2011

11    (Dkt. No. 37-2).  This included MSPERS' purchase of 3,700 shares of Diamond stock between

12    September 27 and 28, soon after news articles regarding possible issues with Diamond's

13    payments to walnut growers were published.[*]  On November 1, 2011, Diamond announced that

14    the Pringles acquisition would be delayed and an internal investigation begun regarding

15    Diamond's accounting for certain crop payments to walnut growers.  Following this

16    announcement, MSPERS sold all of its holding of Diamond stock between November 11 through

17    November 16, 2011 (*ibid.*).  Defendant contends that MSPERS will be unable to demonstrate

18    loss causation and that its sale of shares prior to the end of the class period renders its interests

19    adverse to those of class members who held on to shares through the end of the period.

20                    ***i.      MSPERS is Not Subject to a Unique Loss Causation Defense.***

21            The parties dispute whether MSPERS has adequately alleged that the truth leaked out to

22    the market through a series of partial disclosures.  Defendant argues that a disclosure that reveals

23    only the mere "risk" or "potential" of fraud is not sufficient to demonstrate loss causation, citing

24    *Metzler Investment GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 (9th Cir. 2008).  It

25    is, of course, clear that a plaintiff need not prove loss causation in order to certify a class in a

26    securities fraud case.  *See Halliburton*, 131 S. Ct. at 2187.  As emphasized by the Supreme Court

27

28            [*] On September 30, 2011, MSPERS sold 2,500 of its 48,600 shares of Diamond
        stock (Dkt. No. 37-2).

                                                    20

United States District Court

For the Northern District of California

1   in *Amgen*, however, whether a plaintiff's relevant transactions took place "between the time the

2   misrepresentation was made and the time the truth was revealed" is relevant to whether the

3   plaintiff's claims are typical of the claims of investors who did trade "during the window

4   between misrepresentation and truth revelation." 133 S. Ct. at 1198–99.

5       Loss causation establishes "a causal connection between the material misrepresentation

6   and the loss." *Dura*, 544 U.S. at 342; 15 U.S.C. 78u–4(b)(4). "[T]he logical link between the

7   inflated purchase price and any later economic loss is not invariably strong, since other factors

8   may affect the price. . . . However, to touch upon a loss is not to cause a loss, as 15 U.S.C.

9   78u–4(b)(4) requires." *Id.*, at 336–37. "A plaintiff is not required to show that a

10  misrepresentation was the *sole* reason for the investment's decline in value in order to establish

11  loss causation.  As long as the misrepresentation is one substantial cause of the investment's

12  decline in value, other contributing forces will not bar recovery under the loss causation

13  requirement but will play a role in determining recoverable damages." *In re Daou*, 411 F.3d at

14  1025 (internal quotation marks and citations omitted) (emphasis in original).  Defendant argues

15  that, under our court of appeals' decision in *Metzler*, disclosures of mere "risk" or "potential" for

16  widespread fraudulent conduct are not sufficient to allege loss causation.  The requisite causal

17  connection between disclosures of fraudulent conduct and a drop in stock price must be more

18  than just "euphemism" and speculation.  Our court of appeals recognized in *Metzler*, however,

19  that neither *Daou* nor *Dura* require an admission or finding of fraud to plead loss causation.

20  *Metzler*, 540 F.3d at 1063–64.

21      Defendant misreads the prior order herein on the motions to dismiss, which held that

22  plaintiff had adequately alleged loss causation for purposes of the pleading requirements under

23  the Private Securities Litigation Reform Act.  That order stated that a jury could reasonably find

24  that "[i]t was not until February 8, 2012, that the truth was sufficiently disclosed to the market"

25  (Dkt. No. 182 at 24).  Defendant contends that, as a matter of law, the February 8 disclosure is

26  the sole corrective disclosure sufficient to establish loss causation.  Therefore, MSPERS will be

27  unable to recover as a result of any economic loss, it says, because it sold its shares prior to the

28  time the truth was revealed.  Plaintiff claims that, in support of the complaint's allegations of

21

loss causation, it can demonstrate a "statistically significant price decline as a direct result of negative news" regarding Diamond's fraudulent accounting and/or the impact of such fraud on the proposed Pringles acquisition on at least three dates within the class period:  September 26, 2011, November 1, 2011, and February 8, 2012 (Reply at 6).  Plaintiff's allegations that the truth was revealed to the market through several partial corrective disclosures over time are adequately alleged.  Whether plaintiff will ultimately prevail in demonstrating a significant market impact that was in fact caused by the alleged fraudulent misrepresentations is a matter for proof at trial, or summary judgment

### ii.   *MSPERS' Sale of Shares Prior to the End of the Class Period Does Not Create a Conflict of Interest.*

Defendant's contentions regarding MSPERS' sale of shares prior to the end of the class period also relate to possible conflicts concerning the calculation of damages.  That is, MSPERS will be focused on establishing loss causation and damages for the period prior to its own sale of shares.  Moreover, MSPERS will maximize its own recovery by arguing that the price was inflated prior to or at the time of its purchases, but was removed as a result of corrective disclosures before it sold its shares in November 2011.  In contrast, individuals who purchased stock after MSPERS sold its stock will maximize their recovery by arguing that the price was still inflated at that time and that there were no corrective disclosures until the time they themselves sold their shares.  This argument regarding potential interclass conflict has been rejected by the majority of judges, including the undersigned.  *See In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. at 261–62; *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529–30 (N.D. Cal. 2009) (citing *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, No. 03-2522, 2006 WL 1180267, *7 (N.D. Cal. May 3, 2006) (Judge Marilyn Patel)); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. at 578.  "Courts have . . . repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification."  *In re Connetics*, 257 F.R.D. at 578 (quoting *In re Alstom SA Sec. Litig.*,

United States District Court
For the Northern District of California

253 F.R.D. 266, 277 (S.D.N.Y. 2008) (Judge Victor Marrero)).  This order agrees with the weight of authority and finds that class members are unified by an interest in proving the same common course of conduct regarding Diamond's allegedly fraudulent misrepresentations. "Common issues concerning that fundamental course of conduct predominate over any individual incentives particular class members may have to maximize their damages."  *In re LDK*, 255 F.R.D. at 530.

Given that plaintiff has identified three allegedly partial corrective disclosures, however, it will be necessary to track liability and damages for at least three groups within the class:  those who sold shares between September 26, 2011 and October 31, 2011, and were damaged thereby; those who sold shares between November 1 and February 8, 2012, and were damaged thereby; and those who sold shares after February 8, 2012, and were damaged thereby.  This order finds, however, that there is no immediate need to divide the proposed class into subclasses based on trading history, as issues common to the class predominate.

**4.     RULE 23(a)(4): PAY-TO-PLAY AND ADEQUACY OF LEAD PLAINTIFF.**

Defendant argues that plaintiff has not demonstrated that it will adequately represent the interests of the class.  Defendant first challenges plaintiff's selection of counsel, contending that counsel were selected pursuant to a "pay-to-play" arrangement whereby the Mississippi Attorney General's Office selected counsel for MSPERS from a short list of law firms who made political campaign contributions to Attorney General Jim Hood.  Specifically, the Attorney General's Office retained thirteen law firms to monitor MSPERS' investment portfolio and investigate potential claims of violations of securities laws related to those investments (Kristy Decl. Exh. 28; Neville Dep. at 20).  Law firms selected to provide free "monitoring" services were given access to MSPERS' trading information (Kristy Decl. Exh. 28).  According to Special Assistant Attorney General George Neville, the law firm who first notified MSPERS of a potential action was generally selected as counsel.  Recommendations for counsel were made by unelected career staff, although the final decision was made by Attorney General Hood (Neville Dep. at 28).

Shortly after Chitwood and Leiff Cabraser were appointed by the Court as class counsel in June 2012, a new law passed by the Mississippi legislature went into effect.  Among other

United States District Court

For the Northern District of California

1    things, the new law requires the attorney general to make a written determination when hiring

2    outside counsel on a contingency fee basis that the representation "is both cost-effective and in

3    the public interest" and caps contingency fees at $50 million.  H.B. 211, 2012 Leg., Reg. Sess.

4    (Miss. 2012).  The law does not appear to address the practice of retaining firms to provide free

5    monitoring services or prohibit the attorney general from appointing law firms who have made

6    or will make contributions to the attorney general's political campaign.

7        At least one court has criticized such arrangements between law firms and institutional

8    investors, whereby the law firm provides free monitoring services to identify potential securities

9    fraud lawsuits and presumably is remunerated only if it is ultimately appointed as counsel in

10   such a lawsuit.  *See Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing &*

11   *Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009) (Judge Jed Rakoff).  Such an

12   arrangement creates incentives for firms to recommend filing suit even if the case is weak,

13   leading to an increase in frivolous securities fraud claims.  The instant action, however, has

14   survived a motion to dismiss and cannot be deemed frivolous.

15       This order must focus on the issue of whether MSPERS' choice of counsel in this case

16   has betrayed the class in some way.  In support of its contention that counsel's political

17   contributions led to their appointment by the Mississippi Attorney General's Office, defendant

18   has submitted a chart of contributions made by Chitwood and Lieff Cabraser to Mississippi

19   Attorney General Jim Hood.  It does not appear that the law firms or their individual attorneys

20   made contributions to Attorney General Hood *after* counsel were approved by the Court in June

21   2012.  Defendant has also provided information regarding donations made by counsel to the

22   Democratic Attorneys General Association ("DAGA").

23       As this Court stated in the order appointing MSPERS as lead plaintiff, "[n]o decision by

24   the lead plaintiff is more important than the selection of class counsel" (Dkt. No. 98 at 12).  The

25   lead plaintiff has a fiduciary duty to the class to select appropriate counsel who will diligently

26   represent the interests of the class, not those of counsel, or of MSPERS alone.  Pursuant to this

27   duty, lead plaintiff must carefully select counsel based on counsel's strengths, weaknesses, and

28   experience.  Additionally, the financial burden on the class of counsel's projected fees and costs

must be considered.  *Wenderhold v. Cylink Corp.*, 191 F.R.D. 600, 602–03 (N.D. Cal. 2000) (Judge Vaughan Walker).  In this case, it is true, the Court has been concerned that MSPERS is a figurehead and that Attorney General Hood has really controlled it and has used this case as a reward for campaign contributions.  Due to that concern, the Court made special inquiries at two stages:  the first was at the time of selection of the lead plaintiff and its counsel and the second was on the instant motion.

In the first stage, and as set forth in the order appointing lead plaintiff, MSPERS was required to explain the due diligence undertaken with respect to the selection of counsel, including the reasons for selecting counsel over other candidates.  Lead plaintiff's proposal for class counsel was carefully vetted by the Court, which was apprised of the experience and past performance of the law firms and individual attorneys, the reasons for selecting counsel, and the proposed fee structure.  Moreover, and as suggested by the Third Circuit in *In re Cendant Corporation Litigation*, 264 F.3d 201, 269 (3d Cir. 2001), plaintiff and the proposed law firms were required to disclose to the Court any campaign contributions made directly or indirectly to any fundraiser or political campaign in Mississippi.  Those submissions were carefully reviewed and considered by the judge prior to the June 2012 order appointing two of plaintiff's proposed three law firms as class counsel (Dkt. No. 121).

During this vetting process, however, plaintiff and the law firms did not disclose to the Court all contributions made to DAGA by the law firms or its individual members (nor were they required to so disclose).  As stated on its website, DAGA "is a national political organization formed to support the election of Democrats to the office of attorney general in all of the states and territories of the United States."  DAGA — ABOUT US, http://www.democraticags.org/about_us.html (last visited Apr. 22, 2013).  As defendant now points out, publicly available records indicate that, in 2012, Lieff Cabraser made two contributions to DAGA totaling $15,000.  According to plaintiff, contributions made to DAGA cannot be earmarked for specific candidates.  Nevertheless, there is a sufficient possibility that at least a portion of these contributions, though made to a national, separate organization, might eventually be provided to Attorney General Hood's political campaigns that they should have

been disclosed to the Court. Indeed, DAGA provided $850,000 to Hood's 2007 campaign and $550,000 to his 2011 campaign. Accordingly, an order issued requiring plaintiff's counsel to submit a statement itemizing all contributions made to DAGA by the law firms or its members from January 2012 to the present and to provide any communications between either law firm and the Mississippi Attorney General's Office concerning any such contribution. Having reviewed the law firms' submissions, it does not appear that there was any communication between the law firms and Attorney General Hood, or his office, regarding any expectation that the law firms contribute to DAGA or that such contributions would eventually make their way to Attorney General Hood.

The PSLRA was not intended as a vehicle for keeping elected officials in office by allowing them to extract campaign contributions from lawyers selected to serve as class counsel. To repeat, the PSLRA and Rule 23 insist that class counsel always be selected based on the best interest of the class rather than on counsel's political connections due to political or campaign contributions (or any other extraneous reason). We must never lose sight of the fact that in class actions, all of the absent class members' individual claims will be extinguished and replaced by whatever verdict or settlement class counsel obtain. Absent class members deserve and are entitled to the most adequate counsel available. Just as a lawyer or judge should not participate where there would be an appearance of impropriety, no one should take on the fiduciary responsibility of class counsel when it might reasonably appear that their selection was based on political campaign contributions rather than merit. If the case is lost, as sometimes happens (*see, e.g., Pipefitters Local 522 & 633 Pension Trust Fund v. JDS Uniphase Corp.*, No. 02-cv-01486-CW (N.D. Cal. 2002)), then class members will have their claims totally extinguished. They should then at least take comfort in the belief that class counsel were adequate to the challenge and should not have to worry that class counsel got the job as a reward for political campaign contributions.

On the present record, however, the Court is satisfied that class counsel will adequately and vigorously represent absent class members. From many other lawsuits, the Court knows the excellent work of counsel at Lieff Cabraser and is confident those counsel will bring to bear the

**United States District Court**
For the Northern District of California

1   same excellence in this case.  While the Court is not equally familiar with the Chitwood law

2   firm, at least the Court can say that their conduct herein has been adequate to date.  Moreover,

3   the Chitwood firm has made no contributions to DAGA at all since January 1, 2012.  Defendant

4   has not advanced a record adequate to torpedo this action based on a pay-to-play theory.

5          Defendant next contends that MSPERS has not been actively involved in managing and

6   supervising the litigation.  Defendant raises a number of issues in this regard, including:  (1) that

7   MSPERS' representative, Special Assistant Attorney General Neville, responded rudely to

8   questions regarding Mississippi's recent passage of House Bill 211, which imposed certain

9   requirements on the Attorney General's Office in relation to the selection of counsel for other

10  agencies; (2) MSPERS delegated responsibility for its initial disclosures to counsel; and (3)

11  MSPERS' representatives were not aware of basic facts in the case and of legal positions taken

12  by counsel.

13         Defendant's complaints do not give rise to an inference that MSPERS is not actively

14  involved in supervising the litigation on behalf of the class.  After a review of the record, this

15  order finds that MSPERS has adequately participated in the litigation thus far, including through

16  its participation in discovery and court filings.  The issues raised are not sufficient to disqualify

17  MSPERS on this basis.  For example, defendant's contention that MSPERS' representatives

18  were not aware of the general allegations and underlying legal principles in this case is not

19  supported by the record.  Much of defendant's complaints relate to questions asked of MSPERS'

20  designated deposition witnesses regarding legal theories and issues for further proof, such as

21  damages.  That the witnesses could not explain MSPERS' legal arguments regarding loss

22  causation or its alleged recoverable damages (as opposed to financial loss) is not equivalent to

23  establishing that the representatives were unaware of the basic facts for which they were

24  designated to be deposed (*see* Tingle Dep. at 133–36).  As another example, the parties spill

25  much ink contesting the significance of Attorney Neville's comportment at his deposition.

26  Defendant argues that Attorney Neville, a witness produced by MSPERS in response to

27  defendant's Rule 30(b)(6) deposition notice, was obstructionist and rude at his deposition when

28  asked about House Bill 211 and pay-to-play issues regarding Attorney General Hood.  Plaintiff

United States District Court

For the Northern District of California

1   counters that such questions were irrelevant or were beyond the scope of the Rule 30(b)(6)

2   deposition notice.  Upon review of the identified portions of the deposition transcript, while not

3   approving obstructionism, this order finds that defendant's challenge to MSPERS' adequacy on

4   this basis is insufficient.  The Court is satisfied that the class representative, and its counsel, will

5   fairly and adequately protect the interests of the entire class.

6           **5.      CLASS DEFINITION.**

7           Defendant contends that the proposed class definition is overbroad.  Specifically,

8   defendant claims that the proposed class improperly includes short sellers as well as those who

9   were not damaged by the alleged misrepresentations.  Short sellers, as the term is used here, are

10  investors who sell stock that they borrow from brokers but do not own, incurring the obligation

11  to "cover" their sales in the future.  Such traders purchase shares with the expectation that the

12  share price will decline.  Plaintiff's expert states that there were a high number of short sellers of

13  Diamond shares during the class period (Hartzell Decl. ¶ 14).

14          The parties do not dispute the requirement that class members must demonstrate damages

15  in order to state a claim and that short sellers should be excluded from the class.  Plaintiff argues

16  that its proposed class definition explicitly requires that a class member be an investor who

17  purchased Diamond shares during the class period and was harmed thereby.  Therefore, short

18  sellers are definitionally excluded from the class.  This order agrees with the parties that short

19  sellers should be excluded from the class definition, which should be modified as follows

20  (changes in bold):

21              All persons and entities who purchased publicly traded securities of
                Diamond Foods, Inc. ("Diamond" or the "Company") during the period
22              from October 5, 2010 through and including February 8, 2012, and who
                suffered damages as a result.  Excluded from the Class are (1) Diamond,
23              Michael J. Mendes ("Mendes"), Steven M. Neil ("Neil") (collectively, the
                "Defendants"); (2) any person who was an officer or director of the
24              Company during the Class Period; (3) members of the immediate families
                of any Defendants; (4) any firm, trust, corporation, officer or other entity
25              in which any defendant has a controlling interest; and (5) the legal
                representatives, heirs, successors or assigns and any such excluded party.
26              **The Class also excludes short sales of Diamond securities and
                subsequent purchases of Diamond securities to cover short sales.**

27

28

**CONCLUSION**

For the reasons stated above, plaintiff's motion for class certification is **GRANTED**.  The above-quoted class is hereby certified.  Within **TWENTY-ONE CALENDAR DAYS** of the date of entry of this order, the parties shall submit jointly an agreed-upon form of notice, a joint proposal for dissemination of the notice, and the timeline for opting out of the action.  Plaintiff must bear the costs of the notice, which shall include mailing by first-class mail.


**IT IS SO ORDERED.**


Dated:  May 6, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

29